The Honorable Robert J. Bryan

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHAO CHEN, individually and on behalf of
all those similarly situated,

                             Plaintiff,

      v.

THE GEO GROUP, INC., a Florida
corporation,

                          Defendant.

No.  17-cv-05769-RJB

PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS

SCHROETER  GOLDMARK  &  BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................. 1

II. STATEMENT OF FACTS ................................................................... 1

III. ARGUMENT ....................................................................................... 3

   A. STANDARD OF REVIEW ............................................................ 3

   B. FEDERAL LAW DOES NOT PREEMPT THE
      WASHINGTON MINIMUM WAGE ACT. ................................... 3

      1. IRCA does not expressly preempt Washington's
         Minimum Wage Act. ........................................................... 5

      2. The Washington Minimum Wage Act is not field
         preempted. ............................................................................ 8

      3. The Minimum Wage Act is not conflict preempted. ......... 11

   C. PLAINTIFF HAS STATED A PLAUSIBLE CLAIM FOR
      RELIEF AGAINST DEFENDANT UNDER THE
      WASHINGTON MINIMUM WAGE ACT. ................................. 15

      1. The express terms of the MWA confer coverage to the
         putative class. ..................................................................... 16

      2. Plaintiff does not seek relief under FLSA, but under
         Ninth Circuit precedent interpreting the Act, he is not
         precluded from doing so. .................................................... 18

      3. Defendant relies upon inapposite case law from outside
         jurisdictions that is easily distinguished from the case at
         bar. ....................................................................................... 22

   V. CONCLUSION ............................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Abel Verdon Const. v. Rivera*, 348 S.W.3d 749 (Ky. 2011) ...................................................... 7

*Affordable Housing Foun., Inc. v. Silva*, 469 F.3d 219 (2d Cir. 2006)...................................... 6

*Air Conditioning & Refrigeration Inst. v. Energy Res.Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005)........................................................................ 5

*Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) ................................................................ 4

*Alvarado Guevara v. I.N.S.*, 902 F.2d 394 (5th Cir. 1990)...................................................... 22

*Anfinson v. FedEx Ground Package Sys.*, 281 P.3d 289 (Wash. 2012)........................... 16, 17

*Arizona v. United States*, 567 U.S. 387 (2012) ............................................................. 4, 9, 11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 3

*Asylum Co. v. D.C. Dep't of Emp't Servs.*, 10 A.3d 619 (D.C. 2010) ........................................................................................... 7

*Atay v. County of Maui*, 842 F.3d 688 (9th Cir. 2016) ............................................................ 9

*Baker v. McNeil Island Corr. Ctr.*, 859 F.2d 124 (9th Cir. 1988) ........................................ 19

*Balbuena v. IDR Realty, LLC*, 845 N.E.2d 1246 (N.Y. Ct. App. 2006) .................................. 5

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) ............................................................ 5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................... 3

*Bonnette v. Cal. Health & Welfare Agency,* 704 F.2d 1465 (9th Cir. 1983) ......................... 19

*Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) ................................................... 14

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945) ............................................................ 22

*Bruesewitz v. Wyeth*, 562 U.S. 223 (2011) .............................................................................. 4

*Carter v. Dutchess Cmty. College*, 735 F.2d 8 (2d Cir. 1984)........................................ 18, 21

*Castle v. Eurofresh, Inc.*, 731 F.3d 901 (9th Cir. 2013) ....................................................... 19

*Chamber of Commerce v. Whiting*, 563 U.S. 582 (2011) ........................................................ 5

*Coma Corp. v. Kansas Dep't. of Labor*, 154 P.3d 1080 (Kan. 2007) ........................................................................................ 7, 12

*Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324 (Minn. 2003)........................................... 7

*Coupar v. U.S. Dep't of Labor,* 105 F.3d 1263 (9th Cir. 1997)............................................. 20

SCHROETER  GOLDMARK & BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

1

*Table of Authorities, continued*

2

**Page**

3

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806 (1997) ........................... 4

*Dowling v. Slotnik*, 712 A.2d 396 (Conn. 1998).................................................................7

4

*Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582 (Wash. 2000) ............................... 15, 15

5

*Elec. Const. & Maint. Co., Inc. v. Maeda Pac. Corp.*,
6
    764 F.2d 619 (9th Cir. 1985) ........................................................................... 3

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ......................................................... 8

7

*Fong Yue Ting v. United States*, 149 U.S. 698 (U.S. 1893)................................................. 20

8

*Gamble v. Minn. State-Operated Servs.*, CV 16-2720 (JRT/KMM),
9
    2017 WL 4325702 (D. Minn. Sept. 28, 2017) ....................................................... 23

*Goldstein v. California*, 412 U.S. 546 (1973) ................................................................. 11, 12

10

*Gonzales v. Mayberg*, CV-07-6248 CBM MLG, 2009 WL 2382686 (C.D. Cal.
11
    July 31, 2009)........................................................................................... 20

12

*Grocers Supply, Inc. v. Cabello*, 390 S.W.3d 707, 715 (Tex. App. 2012) ............................. 6

13

*Gruver v. Lesman Fisheries, Inc.*, 409 F. Supp. 2d 1263 (W.D. Wash. 2005)....................... 3

*Hale v. State of Ariz.*, 967 F.2d 1356 (9th Cir. 1992) ...................................................... 19, 20

14

*Hale v. State of Ariz.*, 993 F.2d 1387 (9th Cir. 1993) ...................................................... 18, 19

15

*Hannan v. City of Tacoma*, 05-CV-5396-RJB, 2006 WL 2128683
16
    (W.D. Wash. July 27, 2006) ......................................................................... 16

*Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994) .................................................... 4

17

*Hillsborough Cty, Fla. v. Automated Med. Lab., Inc.*,
18
    471 U.S. 707 (1985)................................................................................... 8, 15

19

*Hoffman Plastic Compounds v. NLRB*, 353 U.S. 137 (2002) ............................................. 12

*Hydrick v. Hunter*, 500 F.3d 978 (9th Cir.2007) ............................................................ 20

20

*Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005 (9th Cir. 2007) ............................................ 12

21

*Lake v. Woodcreek Homeowners Ass'n*, 243 P.3d 1283 (Wash. 2010) .............................. 16

22

*Lynch v. State*, 145 P.2d 265 (Wash. 1944) ................................................................. 17

23

*Madeira v. Affordable Housing Found., Inc.*, 469 F.3d 219 (2d Cir. 2006)............................ 6

24

*Mendoza v. Zirkle Fruit Co.*, No. CS-00-3024-FVS, 2000 WL 33225470, *11
    (E.D. Wash. Sept. 27, 2000) 301 F.3d 1163 (9th Cir. 2002) ..................................... 6

25

*Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125 (D. Colo. 2015) ..................................... 22

26

SCHROETER  GOLDMARK  &  BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

*Table of Authorities, continued*

**Page**

*Menocal v. The GEO Group, Inc.*, 113 F. Supp. 3d 1125(D. Colo. 2015) ............................. 14

*Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070 (9th Cir. 2010)..................................... 3

*Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409 (9th Cir.1990),
   *cert. denied*, 504 U.S. 979 (1992) ......................................................................... 4

*Petition of Brooks*, 5 F.2d 238 (D. Mass. 1925) ................................................................ 21

*Pineda v. Kel-Tech Const., Inc*., 832 N.Y.S.2d 386 (N.Y. Sup. Ct. 2007) .............................. 7

*Reyes v. Van Elk, Ltd.*, 148 Cal.App.4th 604 (2007) .......................................................... 7

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)...................................................... 4, 8

*Rosa v. Partners in Progress, Inc.*, 868 A.2d 994 (N.H. 2005)............................................. 7

*Salas v. Sierra Chem. Co.*, 327 P.3d 797 (Cal. 2014)...................................................... 7, 12

*State v. Gonzalez,* 226 P.3d 131 (Wash. 2010)................................................................. 16

*Stengel v. Medtronic*, 704 F.3d 1224 (9th Cir. 2013) .......................................................... 4

*Total TV v. Palmer Commc'ns., Inc.*, 69 F.3d 298 (9th Cir. 1995)...................................... 12

*Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992) .............................................................. 18

*Wash. Natural Gas Co. v. Public Util. Dist. No. 1,* 459 P.2d 633 (Wash. 1969) ............... 17

*Watson v. Graves,* 909 F.2d 1549 (5th Cir. 1990) ....................................................... 18, 21

*Whyte v. Suffolk Cty. Sheriff's Dep't*,
   91 Mass. App. Ct. 1124 (2017 WL 2274618) (2017)......................................... 23

*WSB Electric, Inc. v. Curry*, 88 F.3d 788 (9th Cir. 1996).................................................... 4

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) .......................................................... 4, 8, 10

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658 (9th Cir. 1998) ................... 3

**Other Authorities**

**Statutes & Rules**

8 C.F.R. § 274a.12, et al., ......................................................................... *passim*

8 U.S.C. § 1103(a)(11)(A) ...................................................................... 14

8 U.S.C. § 1103(a)(11)(B) ...................................................................... 14

8 U.S.C. § 1324a(a)(1)(A) ........................................................................ 5

8 U.S.C. § 1324a(h)(2)........................................................................... 5, 7

8 U.S.C. § 1555(d) ................................................................................ 10

29 U.S.C. § 202(a)(3) ............................................................................ 21

25 R.C.L. 957 ...................................................................................... 17

PLTF.'S OPP. TO DEF.'S MOT. TO DISMISS
(17-cv-05769-RJB ) - iv

**SCHROETER  GOLDMARK & BENDER**
810 Third Avenue ● Suite 500 ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

*Table of Authorities, continued*

**Page**

**Revised Code of Washington**
RCW Ch. 49.46 ........................................................................................ 6
RCW 49.46.090 ...................................................................................... 6
RCW 49.46.010(3), et al .................................................................. 16, 17

**Miscellaneous**

Laws of 1913, ch. 174, § 2, amended by Laws of 1973, 2d Ex.Sess.
   ch. 16, § 3 (codified at RCW 49.12.020) ....................................... 15

Executive Order 12612, Federalism, 52 Fed. Reg. 41685 (Oct. 26, 1987)....................... 9, 10

Executive Order 13132, Federalism, 64 Fed. Reg. 43255 (Aug. 4, 1999) ..................... 9

H.R. Rep. No. 99-682(I) 58 (1986)....................................................... 6

BLACK'S LAW DICTIONARY 1368 (8th ed.) ........................................... 5

BLACK'S LAW DICTIONARY 1170 (8th ed.) ........................................... 20

SCHROETER  GOLDMARK & BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

## I.   INTRODUCTION

The Minimum Wage Act ("MWA") protects workers in Washington unless and until the Washington Legislature or Congress say otherwise. The law contains no exception for detainees put to work in private for-profit facilities, where they provide such basic functions as cooking and cleaning. Nor does it exempt coverage for undocumented workers. As for Congress, it has done nothing to expressly preempt Washington's wage laws and any award in Plaintiff Chao Chen's favor does not "sanction" Defendant The GEO Group, Inc. ("GEO") for employing persons of undetermined immigration status, it provides a remedy in the form of backpay for GEO's minimum wage violations. Likewise, Congress' regulation in the field of immigration detention does nothing to preempt local wage laws any more than it would somehow exempt GEO from complying with local fire codes. GEO's strained analogue to preempted federal wage laws considered by courts in other jurisdictions construing statutory exemptions that do not exist here does nothing to assist the Court in determining the MWA claims before it. Of course, the mere fact that compliance will hurt GEO's bottom line does not carry the day and indeed, GEO's contract requires it. At the very least, Plaintiff Chao Chen states a claim for relief under the MWA and he respectfully requests that the Court deny GEO's motion.

## II.   STATEMENT OF FACTS

Despite acknowledging that its Rule 12(b)(6) motion "tests the legal sufficiency of [Chen's] claim," ECF No. 8 ("Mot.") at 4, GEO seizes the opportunity to impugn Mr. Chen's character and pad the record with other extraneous "facts." While none of GEO's material is

germane to the issues before the Court, to the extent the Court considers it, it should also consider the following:[1]

First, contrary to GEO's assertions, Mr. Chen and members of the putative class are not all "unauthorized aliens" ineligible for work. Mot. at 10. Their status is, at best, undetermined.  For example, Mr. Chen is a lawful permanent resident, ECF No. 1 ("Compl.") at ¶3.1, and as such, is eligible to work in the United States unless and until a final order of removal is issued by the Board of Immigration Appeals. *See* 8 C.F.R. § 274a.12(a)(1), 8 C.F.R. § 1001.1(p). Other detainees in the putative class are likewise eligible to seek work authorization, including any asylum seekers, Deferred Action for Childhood Arrivals ("DACA" or "Dreamers"), and those on Temporary Protected Status ("TPS"), or with pending Cancellation of Removal or Adjustment of Status applications. *See* 8 C.F.R. §§ 274a.12(c)(8), (c)(9), (c)(10), (c)(19). While the immigration status of workers does not matter for purposes of minimum wage protection under Washington law, such inaccurate statements of fact cannot go unnoticed.

Second, GEO alleges that it meets or has met the basic needs of the putative class, which it contends defeats an employment relationship. If such inquiry were relevant to determining employment status under Washington law (it is not), such assertion cannot stand on GEO's word alone. To the extent the parties conduct discovery on the matter, Plaintiff would show that many detainees rely upon the $1 a day program to buy food, personal hygiene items, and medical supplies, among other things. Moreover, many detainees rely upon their meager earnings from the program to support their families and pay legal fees— sometimes for years on end while they await release.

---

[1] Plaintiff will establish these facts as the litigation progresses, and offers these factual allegations now by way of background only. To the extent the Court wishes to consider these facts as part of the formal record on Defendant's 12(b)(6) motion, Plaintiff will amend his complaint to include these allegations.

# III.    ARGUMENT

## A.    STANDARD OF REVIEW.

On review of a defendant's 12(b)(6) motion, the Court's task "is necessarily a limited one," concerned with "only whether the complaint states a claim upon which relief can be granted," and not whether the plaintiff will ultimately prevail on the merits. *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1100 (9th Cir. 2010) (internal quotations omitted). In making this determination, the Court must accept all well-pleaded allegations of material fact as true, and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). A plaintiff need not plead a specific legal theory in his complaint, so long as the defendant "receives notice as to what is at issue in the lawsuit." *Elec. Const. & Maint. Co., Inc. v. Maeda Pac. Corp.*, 764 F.2d 619, 622 (9th Cir. 1985). "[C]ourt[s] should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." *Id.* at 623. Thus, the Court must deny a motion to dismiss where, as here, the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## B.    FEDERAL LAW DOES NOT PREEMPT THE WASHINGTON MINIMUM WAGE ACT.

Nothing in federal law preempts GEO's compliance with the MWA. To the contrary, the language of the Immigration and Customs Enforcement ("ICE") contract requires it. "Federal law preempts state law if: (1) Congress expressly so states, (2) Congress enacts comprehensive laws that leave no room for additional state regulation, or (3) state law actually conflicts with federal law." *Gruver v. Lesman Fisheries, Inc.*, 409 F. Supp. 2d 1263,

1265 (W.D. Wash. 2005) (citing *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1415 (9th Cir.1990), *cert. denied*, 504 U.S. 979 (1992)). Preemption is an affirmative defense for which the party raising it bears the burden of proof. *Bruesewitz v. Wyeth*, 562 U.S. 223, 251 n.2 (2011). "Parties seeking to invalidate a state law based on preemption 'bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law.'" *Stengel v. Medtronic*, 704 F.3d 1224, 1227-28 (9th Cir. 2013) (*en banc*) (quoting *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997)). "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Under this design, the historic police powers of the States are not superseded by federal law unless that was the clear and manifest purpose of Congress. *Id.* at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

The presumption against preemption is especially strong in areas of traditional state regulation. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Wages are a traditional subject of state police powers. *WSB Electric, Inc. v. Curry*, 88 F.3d 788, 791 (9th Cir. 1996). Congress has never enacted a comprehensive legislative scheme governing labor law. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985). Consequently, "[p]reemption of employment standards within the traditional power of the State should not be lightly inferred." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) (internal quotation omitted).

GEO cannot overcome the strong presumption against preemption in this case. Indeed, GEO fails to even acknowledge that a presumption exists. Instead, the Corporation attempts to turn the analysis on its head by consistently suggesting that the *absence* of a Congressional detainee minimum wage serves as the basis for preemption. *See* Mot. at 9, 12. Accepting GEO's preemption theories requires ignoring both the presumption against

1    preemption of traditional state police powers and the requirement of a clear intent on the part

2    of Congress to preempt. GEO's motion should therefore be denied.

3        **1.    IRCA does not expressly preempt Washington's Minimum Wage Act.**

4        To evaluate GEO's contention that the Immigration Reform and Control Act of 1986

5    ("IRCA") expressly preempts the MWA, the Court must first "identify the domain expressly

6    preempted by that language." *Air Conditioning & Refrigeration Inst. v. Energy Res.*

7    *Conservation & Dev. Comm'n*, 410 F.3d 492, 495 (9th Cir. 2005). In analyzing whether

8    IRCA's preemption clause displaces the MWA, the "focus [is] on the plain wording of the

9    clause, which necessarily contains the best evidence of Congress' preemptive intent."

10   *Chamber of Commerce v. Whiting*, 563 U.S. 582, 589 (2011). "[W]hen the text of a

11   preemption clause is susceptible of more than one plausible reading, courts ordinarily 'accept

12   the reading that disfavors pre-emption.'" *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449

13   (2005).

14       A plain language reading of IRCA's preemption clause reveals that Congress did not

15   intend to preempt the MWA. 8 U.S.C. § 1324a(h)(2). The statutory text preempts state or

16   local "civil or criminal *sanctions*" against employers for engaging in conduct prohibited by

17   IRCA—namely, hiring, recruiting, or referring for employment unauthorized workers. *Id.*

18   (emphasis added). IRCA left "sanctions" undefined. But the term's plain meaning signifies a

19   "penalty or coercive measure" leveled by a government to intervene or punish a specific

20   regulatory or statutory violation. *See Balbuena v. IDR Realty, LLC*, 845 N.E.2d 1246, 1255-

21   56 (N.Y. Ct. App. 2006) (citing Black's Law Dictionary 1368 (8th ed.)).

22       Because employing, recruiting, or referring undocumented immigrants for

23   employment is the act being punished, *i.e.*, "sanctioned" by IRCA, 8 U.S.C.

24   § 1324a(a)(1)(A), only state laws that seek to impose civil or criminal sanctions for the same

SCHROETER  GOLDMARK & BENDER
810 Third Avenue • Suite 500 • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

conduct fall within IRCA's express preemption clause. IRCA "is silent, however, as to its preemptive effect on any other state or local laws." *Affordable Housing Found., Inc. v. Silva*, 469 F.3d 219, 249 (2d Cir. 2006) (holding IRCA does not preempt recovery by undocumented workers under New York scaffolding law).

The MWA carries neither civil nor criminal sanctions relating to the employment of undocumented immigrants. RCW Ch. 49.46. In fact, it provides a remedy for employees, *without regard to immigration status*, to recover monetary damages from employers who fail to pay the State's minimum wage. RCW 49.46.090. *See also Mendoza v. Zirkle Fruit Co.*, No. CS-00-3024-FVS, 2000 WL 33225470, *11 (E.D. Wash. Sept. 27, 2000) (finding IRCA's 'civil or criminal sanctions' provision does not apply to claims for civil money damages), *rev'd on other grounds*, 301 F.3d 1163 (9th Cir. 2002). Because the MWA is not a "sanction," the plain language of IRCA's express preemption clause does apply. *See Madeira v. Affordable Housing Foundation, Inc.*, 469 F.3d 219, 240 (2d Cir. 2006) ("Compensatory damages for personal injury do not reasonably equate to sanctions."); *Grocers Supply, Inc. v. Cabello*, 390 S.W.3d 707, 715 (Tex. App. 2012) (lost wages are not sanctions).  In other words, if Mr. Chen is successful in this case, the finder of fact will not "sanction" GEO, it will award back pay to class members.

IRCA's language, context, and purpose present no evidence that Congress intended the preemption clause to supersede state wage and hour statutes like the MWA. *See* H.R. Rep. No. 99-682(I), at 58 (1986) ("penalties contained in this legislation are intended to specifically preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment, or referral of undocumented [noncitizens]")[2]; *id.* at 99-682(II) at 8-9

---

[2] *See Flores v. United States Citizenship & Immigration Servs.*, 718 F.3d 548, 551 n.1 (6th Cir. 2013).

**SCHROETER GOLDMARK & BENDER**
810 Third Avenue  •  Suite 500  •  Seattle, WA  98104
Phone (206) 622-8000  •  Fax (206) 682-2305

(nothing in IRCA is intended to "limit the powers of State or Federal labor standards agencies ... to remedy unfair practices committed against undocumented employees"). Indeed, interpreting IRCA to preempt state minimum wage laws would undermine IRCA's goals, because employers would have an incentive to employ undocumented workers at subminimum wages knowing that they would not be held liable to pay the difference in wages if they were caught.

GEO fails to cite, and Plaintiff has yet to locate, a single decision in which a court held IRCA expressly preempts state wage laws. *Cf. Coma Corp. v. Kansas Dep't. of Labor*, 154 P.3d 1080, 1083-86 (Kan. 2007) (holding IRCA does not preempt the Kansas Wage Payment Act); *Reyes v. Van Elk, Ltd.*, 148 Cal.App.4th 604, 616 (2007) (same as to California's prevailing wage law); *Pineda v. Kel-Tech Const., Inc.*, 832 N.Y.S.2d 386, 393 (N.Y. Sup. Ct. 2007) (same as to New York prevailing wage law). Indeed, with respect to both state wage laws and labor laws more generally, courts have consistently and overwhelmingly reached the opposite conclusion. *E.g.*, *Salas v. Sierra Chem. Co.*, 327 P.3d 797, 805-06 (Cal. 2014) (holding IRCA does preempt—expressly or impliedly—California law applying labor protections to all persons regardless of immigration status); *Abel Verdon Const. v. Rivera*, 348 S.W.3d 749 (Ky. 2011) (same as to worker's compensation law); *Asylum Co. v. D.C. Dep't of Emp. Servs.*, 10 A.3d 619, 630-34 (D.C. 2010) (same); *Rosa v. Partners in Progress, Inc.*, 868 A.2d 994, 1000, 1002 (N.H. 2005) (same); *Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324, 329 (Minn. 2003) (same); *Dowling v. Slotnik*, 712 A.2d 396, 403 (Conn. 1998) (same). In light of the plain language and intent of Section 1324a(h)(2), and the absence of any authority to the contrary, GEO's express preemption defense fails.

2. **The Washington Minimum Wage Act is not field preempted.**

GEO's field preemption claim also falls short because there is no comprehensive federal scheme governing immigrant detainee labor that displaces the MWA. To the contrary, the federal agency action upon with GEO relies lacks any of the prerequisites for regulatory preemption. Moreover, the language of GEO's contract with ICE specifically contemplates state and local law will govern its performance, ruling out an exclusive federal scheme.

State law is field preempted when it regulates conduct in a field Congress intended the federal government to occupy exclusively. *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Such intent can be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice,* 331 U.S. at 230. However, "merely because the federal provisions [a]re sufficiently comprehensive to meet the need identified by Congress d[oes] not mean that States and localities [a]re barred from identifying additional needs or imposing further requirements in the field." *Hillsborough Cty., Fla. v. Automated Med. Lab., Inc.*, 471 U.S. 707, 717 (1985). "To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive." *Id.* "Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence." *Id.*

In the absence of an express preemption statute, "an agency regulation with the force of law can preempt conflicting state requirements." *Wyeth*, 555 U.S. at 576. An agency's

SCHROETER  GOLDMARK & BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

informal claim to preemption will be analyzed according to "its thoroughness, consistency, and persuasiveness." *Id*. at 577.[3]

Federal agencies must satisfy a host of specific requirements to formulate policy with federalism implications. *See* Executive Order 13132, Federalism, 64 Fed. Reg. 43255 (Aug. 4, 1999).[4] Agencies must consult with State and local officials anytime they seek to preempt state law by regulation. *Id*. at 43257, § 4(d). They must certify compliance with federalism consultation requirements prior to submitting any proposed regulation for review. *Id*. at 43258. And they must discern "clear evidence that Congress intended preemption of State law." *Id*. at 43257.

In *Arizona v. United States*, the Court described the elements of a federal scheme so pervasive as to yield the conclusion Congress occupied the field of noncitizen registration. 567 U.S. at 401. There, federal statutory directives "provided a full set of standards governing alien registration, including the punishment for non-compliance." *Id*. These standards were "designed as a harmonious whole." *Id*. A "single sovereign" is responsible under federal law for carrying out the functions of the field of noncitizen registration. *Id*. at 402. This level of cohesion at the federal statutory level "reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id*.

Unlike the "harmonious whole" governing noncitizen registration, GEO proffers a patchwork of tangentially related statutes, agency interpretations, policy guidelines, and contract clauses to claim Congress intended to occupy "the field of immigration detention,

---

[3] Though *Wyeth* is an obstacle preemption case, "the categories of preemption are not rigidly distinct, and what might be understood as an obstacle preemption argument might instead be understood as a field preemption argument." *Atay v. County of Maui*, 842 F.3d 688, 704 n.10 (9th Cir. 2016) (quotation omitted).

[4] E.O. 13132 expanded upon a prior Executive Order issued by President Reagan—the first of its kind—requiring agencies to strictly limit federal intrusion upon the traditional powers of the states and conduct Federalism Assessments prior to finalizing federal policymaking. Executive Order 12612, Federalism, 52 Fed. Reg. 41685 (Oct. 26, 1987).

including payment of detainees." Mot. at 11. The hodgepodge of federal authority GEO throws against the wall bears none of the hallmarks of field preemption set forth in *Arizona*.[5]

Though it relies upon purportedly "delegated authority" and "broad discretion" of federal agencies to support its field preemption claim, GEO offers no evidence that the Department of Homeland Security ("DHS") ever fulfilled any of the preemption assessment requirements of E.O. 13132. The Court therefore has no affirmative statement by the agency against which it could judge the "thoroughness, consistency, and persuasiveness" of a field preemption claim. *Cf. Wyeth*, 555 U.S. at 557. GEO provides no evidence that DHS views 8 U.S.C. § 1555(d), Congressional appropriations, the Performance Based National Detention Standards, or the Northwest Detention Center ("NWDC") contract as preemptive of State law. Given the commands of E.O. 13132 and E.O. 12612, that evidence should already exist if the agency truly believed Congress intended federal law to occupy the field of detainee labor.

All available evidence of the agency's actions to date points in the opposite direction. ICE requires Voluntary Work Program participants to be paid at "*at least* $1 per day." Voluntary Work Program 5.8.V.K, ICE Performance-Based National Detention Standards at 407 (Dec. 2016).[6] This rate constitutes a floor, not a ceiling. *Id.* The PBNDS allows contractors to pay detainees more, and GEO does so at other ICE detention facilities.[7]

---

[5] Among the other items cited by GEO are the pre-1980 Congressional appropriations bills authorizing allowances for detainees. However, Congress last passed such an appropriation almost 40 years ago, before any privately-run, for-profit federal detention facilities even existed. *See* GEO Group History Timeline, https://www.geogroup.com/history_timeline (last visited Oct. 30, 2017); The CCA Story: Our Company History, http://www.cca.com/our-history (last visited Oct. 30, 2017).

[6] *Available at* https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (last visited Oct. 29, 2017).

[7] *See, e.g.*, Molly Hennessy-Fiske, "Paid $1 to $3 a day, unauthorized immigrants keep family detention centers running," Los Angeles Times (Aug. 3, 2015) *available at* http://www.latimes.com/nation/immigration/la-na-detention-immigration-workers-20150803-story.html (last visited Oct. 29, 2017).

Similarly, GEO's contract with ICE is inconsistent with the existence of a federal regulatory scheme that is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice*, 330 U.S. at 230. The contract provides:

> **Ambiguities**
> All services must comply with the Performance Work Statement (PWS) and all applicable **federal**, **state**, and **local laws** and standards. Should a conflict exist between any of these standards, the most stringent shall apply.

NWDC Contract, HSCEDM-15-D-00015 at 52 (emphasis added). Among the "constraints" the contract says "comprise the statutory, regulatory, policy, and operation considerations that will impact the contractor" are "applicable federal, state and local labor laws and codes." *Id.* at 43, 44. "These constraints may change over time; the contractor is expected to be knowledgeable of any changes to the constraints and perform in accordance with the most current version of the constraints." *Id.* Taken together, the PBNDS and NWDC contract provide no evidence of a "congressional decision to foreclose any state regulation in the area." *Arizona*, 567 U.S. at 402.[8]

### 3.    The Minimum Wage Act is not conflict preempted.

Because Plaintiff's recovery from GEO does not stand as an actual obstacle to the full execution of any purpose or objective of Congress, the MWA is not conflict preempted. Obstacle preemption occurs only in "those situations where conflicts *necessarily* arise." *Goldstein v. California*, 412 U.S. 546, 554 (1973). Tension between federal and state law is not enough to establish conflict preemption." *Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005,

---

[8] Indeed, if GEO's field preemption argument were accepted, it would free the GEO from compliance with any state or local laws, including those governing such subjects as zoning, sanitation, or health and safety. This result would be contrary to the express language of the contract and unsupported by any evidence of the requisite Congressional intent.

1010 (9th Cir. 2007). Nor can a "hypothetical conflict" serve as a sufficient basis for preemption. *Total TV v. Palmer Commc'ns., Inc.*, 69 F.3d 298, 304 (9th Cir. 1995).

IRCA does not conflict-preempt the MWA. An employer's failure to comply with IRCA's employment verification requirements does not trigger preemption of a worker's recovery under state wage and hour laws—especially where the remedy sought is purely retrospective. *See, e.g.*, *Incalza*, 479 F.3d at 1010; *Affordable Housing Found., Inc.*, 469 F.3d at 249; *Salas*, 327 P.3d at 805-06; *Coma Corp.*, 154 P.3d at 1083-0; *cf. Hoffman Plastic Compounds v. NLRB*, 353 U.S. 137 (2002) (denying reinstatement remedy under National Labor Relations Act). Moreover, GEO can comply with IRCA and the MWA while still administering the Voluntary Work Program. That is because a significant portion of detainees at the NWDC are lawful permanent residents, like Mr. Chen, or otherwise hold employment authorization.[9] The VWP sets no minimum number of participants. PBNDS § 5.8. Thus, GEO could comply with IRCA, administer the VWP, and abide by the MWA. Its claim that application of the MWA would be "contrary to federal law" is a "hypothetical conflict," *Total TV*, 69 F.3d 304, that will not "necessarily arise." *Goldstein*, 412 U.S. 554.

Nor would paying Mr. Chen and detainees in the putative class minimum wage frustrate any other federal purpose. The goal of the VWP is to ensure detainees are paid "at least $1 per day." The goal of IRCA is to ensure employers do not depress wages and exploit vulnerable workers by skirting the employment verification requirements. The language of the federal contract requires GEO to perform under the "most stringent" legal regime, to the extent the federal, state, and local laws conflict. All of these purposes are served, rather than

---

[9] As discussed above, many detainees hold or are eligible to seek employment authorization either because they are lawful permanent residents, like Mr. Chen, or are asylum seekers, Dreamers, and the like. Their eligibility for work authorization continues during "any period when an administrative appeal or judicial review of an application or petition is pending." 8 C.F.R. § 274a.12(c).

frustrated, by fully compensating detainees in accordance with "all applicable federal, state, and local laws," as required by GEO's contract.

The remainder of GEO's obstacle preemption defense would, if accepted, yield profoundly troubling implications for those currently in GEO's care, its government partners, and the taxpayers who foot the bill. The Corporation claims that complying with the MWA will result in the company having to charge the government more for the services it performs. Mot. at 16. The key assumption nestled within this claim is an unavoidable inelasticity of demand by GEO for "volunteer" detainee labor. GEO allows neither the possibility of reducing the ranks of its captive workforce nor reducing the number of hours each detainee works.

Contrary to GEO's claims, the "structure of federal government contracting for detention facility services" should not have any effect on GEO's demand for detainee volunteer labor. That is because the Performance Work Statement for the NWDC provides: "Detainees shall not be used to perform the responsibilities or duties of an employee of the Contractor." Contract at 82. Among these employee responsibilities are to keep the facility "clean and vermin/pest free," "launder and change linens," and "provide detainees with nutritious, adequately varied meals, prepared in a sanitary manner while identifying, developing, and managing resources to meet the operation needs of the food service program." *Id.* at 57, 58, 83. The Contract requires that in implementing the VWP, GEO "must comply with all applicable laws and regulations." *Id.* Finally, GEO agreed to "hold harmless and indemnify the Government against any and all liability claims, and cost of whatsoever kind . . . ." *Id.* at 101-02.

What GEO has told the Court, in essence, is that it *must* pay the captive workforce to keep NWDC running. And if NWDC will not run without detainee labor, that fact raises

SCHROETER GOLDMARK & BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

serious questions as to whether detainee labor has displaced the work to be performed by employees and whether all captive labor in the facility is performed voluntarily.

In essence, GEO claims that the MWA is conflict preempted because the cost of complying with the law would be too high. Mot. at 16 (citing *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988)).[10] Though the Corporation identifies the sole federal interest as arranging for appropriate places of detention, Mot. at 15 n.69, other, more directly relevant provisions of federal law focus directly on detainees' well-being. The key federal purpose at stake in immigration detention contracts is to ensure "acceptable conditions of confinement and detention services." 8 U.S.C. § 1103(a)(11)(B). The payments the federal government makes to detention contractors are, by statute, "for necessary clothing, medical care, necessary guard hire, and the housing, care, and security of persons detained by the Service pursuant to Federal law under an agreement with a State or political subdivision of a State." 8 U.S.C. § 1103(a)(11)(A). Ensuring the profit margin of a multinational private prison corporation is not a Congressional objective of immigration detention.

Compliance costs associated with paying Mr. Chen and the putative class of immigration detainees minimum wage may reduce GEO's profit margin on the NWDC contract. Indeed, it may require the Corporation to seek modification of its contract with ICE with higher price terms, as it has done successfully no fewer than eight (8) times since taking over the NWDC contract in the mid-2000s. And perhaps the federal government, newly able to introduce open competition into the contracting process, will engage a different entity that

---

[10] The company's reliance on *Boyle* is misplaced. *Boyle* is a government contractor defense case—not a preemption case—and GEO has not raised a government contractor defense. *Compare Menocal v. The GEO Group, Inc.*, 113 F. Supp. 3d 1125, 1134 (D. Colo. 2015) (rejecting GEO's government contractor defense). The contractor in *Boyle* was ultimately still subject to suit under the Federal Tort Claims Act, and the state's underlying tort law still applied. The Court did not hold that any government interest in reducing taxpayer costs or ensuring the availability of defense contractors preempted state tort law.

can both comply with federal, state, and local law, as the contract requires, while making a return. None of these hypothetical outcomes, however, would necessarily conflict with the government's interest in safely housing immigrant detainees.

The NWDC contract explicitly contemplates legal and regulatory "constraints" and the possibility that they may change over time. Requiring GEO to absorb these costs and perform under its contract in no way "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough Cnty.*, 471 U.S. at 713. Consequently, the MWA is not conflict-preempted.

## C. PLAINTIFF HAS STATED A PLAUSIBLE CLAIM FOR RELIEF AGAINST DEFENDANT UNDER THE WASHINGTON MINIMUM WAGE ACT.

Washington has a "long and proud history of being a pioneer in the protection of employee rights." *Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 586 (Wash. 2000). For example, in 1913—25 years before Congress passed the Fair Labor Standards Act establishing the federal minimum wage—the people of Washington enacted a law prohibiting the employ of workers "at wages which are not adequate for their maintenance." *Id.* at 586-87 (quoting Laws of 1913, ch. 174, § 2, amended by Laws of 1973, 2d Ex. Sess., ch. 16, § 3 (codified at RCW 49.12.020)). The Washington legislature later enacted the Minimum Wage Act ("MWA"),[11] whose general purpose was to "establish[ ] a minimum standard for wages, hours, and working conditions of *all employees in this state, unless exempted herefrom*…." Wash. Sess. Laws, Ch. 294, § 12 (1959) (emphasis added). Mr. Chen now seeks relief for himself and the putative class he wishes to represent for the subminimum wages paid by GEO in violation of the MWA.

---

[11] When the MWA was enacted in 1959, the state minimum wage was $1 an hour. Alan Stein, *Washington Minimum Wage and Hour Act goes into effect on June 11, 1959,* Historylink.org (Nov. 26, 2013), http://www.historylink.org/File/10657 (last visited Oct. 30, 2017). This means that the average worker from roughly 60 years ago earned more than present-day civil detainees at NWDC.

1

### 1.    The express terms of the MWA confer coverage to the putative class.

2      The MWA states in pertinent part that an "employee" is "any individual employed by

3  an employer..." RCW 49.46.010(3). "An '[e]mployer' is any individual or entity 'acting

4  directly or indirectly in the interest of an employer in relation to an employee.'" *Anfinson v.*

5  *FedEx Ground Package Sys.*, 281 P.3d 289, 297 (Wash. 2012) (quoting RCW 49.46.010(4)).

6  And "'[e]mploy' includes to permit work." *Id.* (quoting RCW 49.46.010(2)). The

7  Washington Supreme Court has held that "[t]aken together, these statutes establish that,

8  under the MWA, an employee includes any individual permitted to work by an employer.

9  *This is a broad definition.*" *Id.* (emphasis added).

10

11      Thus, under the MWA's express terms, Mr. Chen was an "employee" in the "employ"

12  of GEO as his "employer" when it "permitted" him to work at the NWDC.

13      This is the proper reading of the MWA under the controlling Washington rules of

14  statutory construction. *Hannan v. City of Tacoma,* 05-CV-5396-RJB, 2006 WL 2128683, at

15  *5 (W.D. Wash. July 27, 2006) ("Federal courts apply state rules of statutory construction

16  when interpreting a state statutory provision."). To start, the Court must analyze the plain

17  language of the statute. *Id.* If the statute is unambiguous, the Court's inquiry about its

18  meaning must end. *Lake v. Woodcreek Homeowners Ass'n*, 243 P.3d 1283, 1288 (Wash.

19  2010). A statute is not rendered ambiguous "merely because different interpretations are

20  conceivable." *State v. Gonzalez,* 226 P.3d 131, 134 (Wash. 2010). Here, the MWA's

21  definition of "employee" is clear and unmistakable, with GEO conceding as much by failing

22  to allege or argue otherwise.[12] Under these circumstances, ignoring the plain language of the

23

24  _____

25  [12] To determine whether in fact a person is actually an "employee" under the MWA, Washington uses the "economic-dependence test." *Anfinson*, 281 P.3d at 299-300. This is a multi-factorial test, each of which involve questions of fact that cannot be resolved on Defendant's 12(b)(6) motion. *Id.* (listing factors). Even at

26  this early stage in the litigation, however, it is clear that many aspects of the economic dependence test are met—for instance, GEO exercises a high degree of control over the detainees' labor; GEO determines the rate

statute would circumvent its meaning and the will of the legislature. *See Lynch v. State*, 145 P.2d 265, 271 (Wash. 1944) (Grady, J., dissenting) ("When the meaning of a law is evident, to go elsewhere in search of conjecture in order to restrict or extend the act would be an attempt to elude it, a method which, if once admitted, would be exceedingly dangerous, for there would be no law, however definite and precise in its language, which might not by interpretation be rendered useless.") (quoting 25 R.C.L. 957).

Second, Washington affords the MWA "liberal construction" because it is "remedial legislation." *Anfinson*, 281 P.3d at 299. "A liberal construction … is one that favors classification as an employee." *Id.* In this case, liberal construction of the MWA augurs in favor of coverage for Plaintiff as an "employee."

Finally, in the context of the MWA, "exemptions from coverage are narrowly construed and applied only to situations which are plainly and unmistakably consistent with the terms and spirit of the legislation." *Id* (internal quotations omitted). Under the MWA, the definition of "employee" includes an exhaustive list of exemptions, but none apply to civil immigration detainees held by private, for-profit corporations like GEO.[13] As such, the Court must not read an exemption into the MWA for the Corporation where the legislature has not provided a specific exclusion. *See Wash. Natural Gas Co.,* 459 P.2d at 636.

---

of pay detainees cannot exercise entrepreneurial skill or initiative; and GEO relies upon the detainees as an integral part its business in that they provide the basic labor necessary to operate and maintain the NWDC.

[13] Defendant briefly discusses RCW 49.46.010(3)(k), which excludes from MWA coverage "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution," but wisely does not argue for its application here because NWDC, as a federally contracted, privately owned facility, clearly does not fall within the ambit of the exemption. *See Wash. Natural Gas Co. v. Public Util. Dist. No. 1,* 459 P.2d 633, 636 (Wash. 1969) ("Where a statute specifically designates the things or classes of things upon which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature under the maxim *expressio unius est exclusio alterius*–specific inclusions exclude implication.").

SCHROETER GOLDMARK & BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

The Court's inquiry may end here, as Plaintiff has alleged facts sufficient to state a plausible claim for relief under the express terms of the MWA.

### 2. Plaintiff does not seek relief under FLSA, but under Ninth Circuit precedent interpreting the Act, he is not precluded from doing so.

GEO urges the Court to disregard the plain language of the MWA and Washington's rules of construction favoring coverage for workers in favor of dubious federal authority interpreting the Fair Labor Standards Act ("FLSA") to hold otherwise. While the MWA and FLSA may be read *in pari materia,* they are "*not* identical" and Washington courts are "*not* bound by [federal authority interpreting the FLSA]." *Drinkwitz,* 140 Wash.2d at 298 (emphasis added). "FLSA is intended to be a 'floor' below which employers may not drop," but "[i]t is not a 'ceiling' on benefits or terms and conditions of employment." *Id.* Thus, federal authority is not necessarily probative of coverage under state law. This is especially true here as GEO seeks to sway the Court with non-binding FLSA-based authority from outside jurisdictions, while ignoring Ninth Circuit law that unquestionably recognizes a cause of action for detainees seeking wage damages under FLSA.[14]

The Ninth Circuit has previously held that FLSA contains no categorical exclusion for inmate labor. *Hale v. State of Ariz.*, 993 F.2d 1387, 1393 (9th Cir. 1993) ("[W]e we cannot agree that the FLSA categorically excludes all labor of any inmate."); *see Watson v. Graves,* 909 F.2d 1549 (5th Cir. 1990) (finding FLSA coverage for prisoners performing work for third-party); *Carter v. Dutchess Cmty. College*, 735 F.2d 8, 12 (2d Cir. 1984) (same); *see also Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) ("We do not question the conclusions of *Carter*, *Watson* and *Hale* that prisoners are not categorically excluded

---

[14] Plaintiff asserts a claim for damages under the MWA and neither relies upon nor alleges coverage under the FLSA. Plaintiff analyzes FLSA here, not as persuasive authority for interpreting the MWA, but to demonstrate that GEO's interpretation of FLSA itself is erroneous.

SCHROETER GOLDMARK & BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

from the FLSA's coverage simply because they are prisoners."). This is in recognition of the "'striking breadth' of the FLSA's definition of 'employee,'" and the Supreme Court's pronouncement "that that term reaches some parties who may not traditionally be thought of as employees at all."[15] *Hale v. State of Ariz.*, 967 F.2d 1356, 1362–63 (9th Cir. 1992), *on reh*'g, 993 F.2d 1387 (9th Cir. 1993).

In *Hale,* the leading Ninth Circuit case on FLSA and inmate labor, the court held that certain Arizona state prisoners were not "employees" under FLSA, but left open the possibility of coverage under different factual circumstances. 993 F.2d at 1389-90. The prisoners in *Hale* were held in a state-run facility and required by law to perform "hard labor" as part of their prison term. *Id.* The court held that the usual standard for determining "employee" status—the economic reality test described in *Bonnette v. Cal. Health & Welfare Agency,* 704 F.2d 1465 (9th Cir. 1983)—was inapplicable "in the case of prisoners who work for a prison-structured [labor] program because they have to." *Hale,* 993 F.2d at 1394. Under those circumstance, the court held, "the economic reality of the relationship between the worker and the entity for which work was performed lies in the relationship between prison and prisoner. It is penological, not pecuniary." *Id.* at 1395. In other words, "the economic reality is that [prisoner] labor belong[s] to the institution." *Id.*

The Ninth Circuit later held that "an inmate's legal obligation to work" is the "*one factor* that triggers application of the *Hale* rule," diverging from the standard "economic reality" test. *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 908 (9th Cir. 2013) (emphasis in

---

[15] For example, the Ninth Circuit has held that a prisoner working in a prison library can be an employee of the prison under Title VII. *Baker v. McNeil Island Corr. Ctr.*, 859 F.2d 124, 128 (9th Cir. 1988) (reversing dismissal, finding prisoner had stated plausible claim under Title VII); *see Hale*, 967 F.2d at 1363 ("Although the FLSA and Title VII are different statutes, cases construing the definitional provisions of Title VII are persuasive authorities when interpreting the FLSA or the ADEA because the definition of 'employee' in the three Acts is virtually identical.") (omitting internal quotations).

SCHROETER GOLDMARK & BENDER
810 Third Avenue • Suite 500 • Seattle, WA 98104
Phone (206) 622-8000 • Fax (206) 682-2305

original); *see Coupar v. U.S. Dep't of Labor,* 105 F.3d 1263, 1265 (9th Cir. 1997) (holding that an inmate's obligation to work pursuant to a prison work program "*brings* him within the rule of *Hale.*"). Thus, absent a "legal obligation to work" in a purely "penological" setting the economic reality test still applies even in a prisoner/detainee context.[16]

These principles came together in favor of FLSA coverage in *Gonzales v. Mayberg*, CV-07-6248 CBM MLG, 2009 WL 2382686, at *4 (C.D. Cal. July 31, 2009), *aff'd sub nom*. *Gonzalez v. Mayberg*, 398 Fed. Appx. 318 (9th Cir. 2010). In *Gonzales*, the plaintiff had been committed to a state run facility as a Sexually Violent Predator where he performed work in the facility's dining room for subminimum wages. *Id.* at *1. Analyzing *Hale,* the court found that the plaintiff had stated a plausible claim under FLSA for wages owed because his confinement was civil in nature and because the work he performed was not required. *Id.* at *3-4. The court ultimately dismissed the plaintiff's FLSA claim, however, because it found no express sovereign immunity waiver permitting his claims to proceed against state actors. *Id.* at *5.

Here, Plaintiff has stated a plausible claim under FLSA as an "employee." First, the putative class consists of civil immigration detainees only, so there is no "penological" aspect to their detention.[17] *Hydrick v. Hunter,* 500 F.3d 978, 989 (9th Cir.2007) ("[C]ivilly detained persons must be afforded more considerate treatment and conditions of confinement than criminals whose confinement are designed to punish."); *see Fong Yue Ting v. United States*, 149 U.S. 698, 730 (U.S. 1893) ("The order of deportation is not a punishment for crime.");

---

[16] "Penological" means to relating to "penal institutions, crime prevention, and the punishment and rehabilitation of criminals, include[ing] the art of fitting the right treatment to an offender." Black's Law Dictionary 1170 (8th ed. 2004).

[17] In discovery or by way of admission, Plaintiff would show that NWDC serves civil, non-penal and non-punitive functions.  *See* James Black, *Tacoma Immigration Detention Center is Misunderstood* (Apt. 15, 2017, 1:30 p.m.), http://www.thenewstribune.com/opinion/article144642549.html (last visited Oct. 30, 2017) (Op-ed authored by GEO Group regional vice president).

*Petition of Brooks*, 5 F.2d 238, 239 (D. Mass. 1925) (same). Second, GEO itself contends that the detainees have no legal obligation to work, and the work they perform is voluntary in nature. Mot. at 8 ("[D]etainees shall be provided the opportunity to participate in a voluntary work program."). Finally, because the detainees are not required to work, the labor they perform and the money they earn belongs to them. *See Watson,* 909 F.2d at 1556 (finding inmates to be "employees" under FLSA because they were not required to work as part of their sentences and because the labor they performed for a third party did not "belong" to the jail); *see also Dutchess Cmty. College,* 735 F.2d at 13–14 (prisoner working as a teaching assistant at community college which paid him wages directly could be FLSA "employee"). Detainees use the money they earn to pay legal fees, support their families outside of NWDC, and buy items to improve their standard of living and general well-being within the detention facility.

Contrary to GEO's claims, construing the MWA and FLSA to include detainee labor is consistent with the purpose of both laws. Providing a minimum standard of living is certainly one purpose of the laws, but another equally important purpose is to eliminate unfair competition between employers and workers seeking employment. *See* 29 U.S.C. § 202(a)(3). The legislators understood that allowing any single employer to pay its workers below the minimum wage has the tendency to depress the wages or threaten the standard of living of other workers in the relevant labor market. Here, rather than hire workers from the local labor market into strong—likely union—jobs, GEO has relied on detainee labor to operate and maintain NWDC for a fraction of the cost. Certainly the lawmakers did not intend for for-profit detention centers to escape the true costs of operation by relying on detainee labor, profiting handsomely along the way. Moreover, because the detainees have less bargaining power than workers outside NWDC by virtue of their detention, laws like the

MWA and FLSA must be enforced to prevent the harms caused by substandard wages to the individual detainees and workers beyond the NWDC. *See Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706–07 (1945) ("[D]ue to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce.")

In sum, under binding and instructive Ninth Circuit precedent, Mr. Chen states a plausible claim as an "employee" under FLSA, and by analogy, the MWA.

### 3. Defendant relies upon inapposite case law from outside jurisdictions that is easily distinguished from the case at bar.

The flaws in GEO's argument become apparent through the prism of Ninth Circuit case law. GEO first directs the Court to the Fifth Circuit's opinion in *Alvarado Guevara v. I.N.S.*, 902 F.2d 394, 396 (5th Cir. 1990), and while analyzing FLSA-specific questions about detainee labor engaged in commerce, *Alvarado* turned on policy concerns rooted in the distinct characteristics of government employment, which status the detainees there sought. *Id.* at 396, n.2. Here, Mr. Chen alleges employment not by the government but by a private for-profit corporation. Moreover, *Alvarado* relied upon FLSA definitions and congressional intent, *id.* at 396, both of which are immaterial to the instant case brought under the MWA. *Alvarado* also presented a cribbed view of FLSA's purpose in that it did not analyze the Act's other aim in eliminating unfair competition.

Likewise, GEO cites the *Menocal* case and others for the proposition that civil immigration detainees do not require a minimum wage because NWDC already provides for their basic necessities. Mot. at 20 (citing *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125 (D. Colo. 2015)). But whether GEO met Mr. Chen's and other detainees' basic needs is a (disputed) question of fact not suitable for disposition on a Rule 12(b)(6) motion. For

1
2
3
4
5
6
7
8
9
10
11
12

example, in *Gamble v. Minn. State-Operated Servs.,* CV 16-2720 (JRT/KMM), 2017 WL 4325702, at *3 (D. Minn. Sept. 28, 2017), the court found the plaintiffs—civil detainees in a state-run facility for sex offenders—had stated a plausible FLSA claim for failure to pay the statutory minimum wage when they participated in a voluntary work program and claimed that the state did not meet all of their basic needs. In *Gamble,* the plaintiffs were required to provide their own work clothing, shoes, medical care, medical supplies and devices, among other things, and to repay the state for the cost of their care. *Id.* Similarly, the detainees at the NWDC must pay for various items such as more and better food, personal hygiene items, and medical supplies and devices. While no Washington court has ever conditioned application of the MWA on a showing of "need," to the extent the Court considers it, the record requires factual development.

13
14
15
16
17
18
19
20
21
22

GEO also urges the court to consider *Whyte v. Suffolk Cnty. Sheriff's Dep't*, 91 Mass. App. Ct. 1124 (2017 WL 2274618) (2017)—an unpublished opinion from an intermediate court in Massachusetts holding that a civil immigration detainee was not an employee under the Massachusetts Minimum Fair Wage Law. Mot. at 22. With little analysis, the court found that civil immigration detainees are akin to criminal inmates by analogizing to *Alvarado*. *Id.* at *1. The plaintiff *did not* claim that inmates were employees, *id.* at *2 n.4, and the court dismissed his action without further analysis. Here, Mr. Chen was not a criminal inmate, and under controlling Ninth Circuit law—not to mention the MWA—the balance of interest tilts in favor of coverage as an employee.

23
24
25
26

Finally, GEO suggests that the MWA cannot apply to civil detainees because the Washington legislature could hardly have imaged that detainees would seek the statutory minimum wage.  But it is just as unlikely that the legislature imagined the rise of for-profit detention centers relying upon detainees being paid near-slave wages to perform vital

SCHROETER GOLDMARK & BENDER
810 Third Avenue • Suite 500 • Seattle, WA  98104
Phone (206) 622-8000 • Fax (206) 682-2305

functions, to the exclusion of the local labor market. Any adjustment to the law in response to these developments is the province of the legislature, not the courts.

## V.   CONCLUSION

Plaintiff's complaint presents sufficient allegations to demonstrate GEO's practice of paying detainees $1 per day to perform vital functions violates the MWA. GEO offers no persuasive reason for excluding itself and Mr. Chen from the MWA's protections. Accordingly, GEO's Motion to Dismiss Plaintiff's lawsuit must be denied.

DATED this 30th day of October, 2017.

SCHROETER GOLDMARK & BENDER

s/ *Jamal N. Whitehead*

_____

Adam J. Berger, WSBA #20714
Lindsay L. Halm, WSBA #37141
Jamal N. Whitehead, WSBA #39818
810 Third Avenue, Suite 500
Seattle, WA 98104
Tel: (206) 622-8000
berger@sgb-law.com
halm@sgb-law.com
whitehead@sgb-law.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

THE LAW OFFICE OF R. ANDREW FREE
*/s Andrew Free*
Andrew Free (*Pro Hac Vice application to be filed*)
PO Box 90568
Nashville, TN 37209
Tel: (844) 321-3221
Fax: (615) 829-8959
andrew@immigrantcivilrights.com


SUNBIRD LAW, PLLC
*/s Devin T. Theriot-Orr*
Devin T. Theriot-Orr, WSBA # 33995
1001 Fourth Avenue, Suite 3200
Seattle, WA  98154-1003
Tel: (206) 962-5052
Fax: (206) 681-9663
devin@sunbird.law

*Attorneys for Plaintiff*

SCHROETER GOLDMARK & BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

1

## CERTIFICATE OF SERVICE

2

3
I hereby certify that on October 30, 2017, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to

4
the following:

5

6
SUNBIRD LAW, PLLC
Devin T. Theriot-Orr, WSBA # 33995
1001 Fourth Avenue, Suite 3200

7
Seattle, WA  98154-1003
Tel: (206) 962-5052

8
devin@sunbird.law

9
Co-Counsel for Plaintiff

10

THE LAW OFFICE OF R. ANDREW FREE
Andrew Free
Admitted *Pro  Hac Vice*
PO Box 90568
Nashville, TN 37209
Tel: (844) 321-3221
andrew@immigrantcivilrights.com

Co-counsel for Plaintiff

11

12
Joan K. Mell
III Branches Law, PLLC
1019 Regents Boulevard, Suite 204

13
Fircrest, WA 98466
Tel: (253) 566-2510

14
joan@3ebrancheslaw.com

15
Attorney for Defendant

16

17

Charles A. Deacon
Mark Emery
Norton Rose Fulbright US LLP
799 – 9th Street, Suite 1000
Washington, D.C.  98801
Tel: (202) 662-0210
Charles.deacon@nortonrosefulbright.com
Mark.emery@nortonrosefulbright.com

Co-Counsel for Defendant

18
DATED at Seattle, Washington this 30th day of October, 2017.

19

20
/s Jamal N. Whitehead

21
_____
Jamal N. Whitehead, WSBA #39818

22

23

24

25

26

PLTF.'S OPP. TO DEF.'S MOT. TO DISMISS
(17-cv-05769-RJB ) – 26

SCHROETER  GOLDMARK & BENDER
810 Third Avenue ● Suite 500 ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305