# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DETENTION WATCH NETWORK and
CENTER FOR CONSTITUTIONAL RIGHTS

Plaintiffs,

v.

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT and UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY,

Defendants.

14 Civ. 583 (LGS)

SUPPLEMENTAL DECLARATION
OF DAVID J. VENTURELLA

I, David Venturella, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the Senior Vice President, Business Development of The GEO Group, Inc. ("GEO"). This declaration is based on my personal knowledge in my capacity as the person responsible for proposals at GEO and as described herein. I submit this Supplemental Declaration to set forth additional information regarding this matter.

2. U.S. Immigration and Customs Enforcement ("ICE") currently has seven (7) Contract Detention Facilities ("CDF") under contract with two private operators, The GEO Group, Inc. ("GEO") and Corrections Corporation of America ("CCA"). The market for CDFs, therefore, constitutes seven (7) facilities. Each of these facilities is operated under a contract that contains an established end or termination date. Assuming it still has the need, ICE will re-compete the facility when each contract ends.

3. Last year, ICE changed its procurement approach for re-competing these facilities when the incumbent's contract ends. In order to increase competition, ICE has moved forward the procurement process for the replacement contract well in advance of the termination of the

Page 1

incumbent's contract to allow offerors, other than the incumbent, to compete for new or re-competed CDF contracts, including proposing a new facility. An offeror wishing to compete against the incumbent can propose new construction or an existing facility as the CDF facility and will have sufficient time to make appropriate arrangements and be prepared to perform under a new or re-competed contract if successful.

4. For example, the first application of this new approach occurred in the recent competition involving the Houston CDF under ICE Solicitation Number: HSCEDM-15-R-00004 (the "Houston RFP"). ICE requested that companies interested in being awarded the contract for the Houston CDF present their proposals by December 4, 2015, well in advance of the scheduled termination date of the incumbent's contract for the existing Houston CDF, which does not expire until March of 2017. In addition to GEO and incumbent CCA, based on information and belief, Emerald Correctional Management ("Emerald"), another competitor in the CDF detention service market, has also submitted a proposal in response to the Houston RFP. A copy of an October 29, 2015 article published in the Houston Chronicle, which supports my belief, is attached hereto as Exhibit A.

5. This change in ICE's procurement approach to competition for CDF detention service contracts thus appears to have already stimulated greater competition for the Houston RFP. ICE's contract award practice and the number of solicitations apparently received in response to the Houston CDF RFP shows that there is a competitive market for CDF detention contracts. Based on ICE's change in procurement strategy and the apparently successful increase in market competitors for the Houston RFP, there will likely be more robust competition in the CDF contract market going forward. GEO reasonably expects to compete with at least two additional competitors whenever it makes an offer for a new or re-competed CDF contract. ICE

has re-competed the Broward contract in the Miami area and the Tacoma contract in the Seattle area in the past. In addition, as stated in paragraph 22 of my December 22, 2015 Declaration, Bureau of Prisons ("BOP") and several states have re-competed contracts for existing facilities rather than renew the contracts with the incumbent.

6. If ICE publicly disclosed GEO's (and CCA's) proprietary bed-day rates and staffing plans as Plaintiffs request, Emerald (and other CDF operators such as Management and Training Company, Community Education Centers, LaSalle Corrections, and MVM Inc.) would have access to this proprietary information and be able to use it against GEO (or CCA) in future CDF competitions. GEO (or CCA) would not have access to similar confidential information from Emerald or the other CDF operators, thereby placing it at a competitive disadvantage that would likely result in substantial competitive financial harm. Such harm would result from a competitor using GEO's proprietary bed-day rates and staffing plans to reverse-engineer the build-up of GEO's pricing and arrive at a lower per diem bed-day rate than GEO's expected per diem rate.

7. Using the "CCA staffing plan" for a state-contracted correctional facility, which I understand was attached to one of the filings in this case (as it was released in response to a state freedom of information request), it is possible to specifically show how a competitor could use this information to reverse-engineer a contractor's proprietary per diem rates and cause competitive harm when competing for a CDF procurement contract. The same analysis could be done using a GEO staffing plan such as one of those attached to its contracts with ICE.

8. A contractor's proprietary bed-day or per diem rate is an amount composed of several elements – (1) labor charges for non-exempt, hourly staff used to operate the facility, (2) labor charges for exempt, salaried staff in management and supervisory positions, (3)

medical services and supplies, food service, inmate expenses, security expenses, utilities (based on local research on rates), program expenses, repairs and maintenance, leases, insurance, professional fees, personnel expenses, travel expenses, administration expenses and appropriate taxes, and (4) profit. In order to reverse-engineer a contractor's proprietary per diem rates, a competitor could first use the contractor's staffing plan to break down the contractor's proprietary per diem rates into these component parts.

9. For example, assuming the CCA staffing plan was for a CDF facility, a CDF market competitor would be able to reverse engineer CCA's proprietary per diem rate merely by using the staffing plan and applying the wage determination hourly rates, including the appropriate state and federal tax rates, medical, dental, life and disability benefit rates to establish the incumbent's non-exempt labor costs, which typically constitute approximately 65% or more of the facility's total operating costs. With access to the incumbent's staffing plan, a CDF market competitor could estimate the incumbent's labor costs based on the applicable wage determination and known benefits.

10. The RFP will identify the number of beds for the facility. The CCA staffing plan is for a 2,016-bed facility. In arriving at the daily per diem rate, some contracts contain a minimum guarantee; so the bidders have one per diem for the guaranteed number of beds and a separate incremental per diem for the beds between the guarantee and the capacity of the facility. Other contracts have no guarantee and the customers expect the bidders to calculate only one per diem for every bed up to design capacity.

11. The final per diem or blended per diem in a contract with a guarantee is then multiplied by the bed design capacity, resulting in the expected annual revenues under the contract for the facility. These annual revenues are evaluated by the clients and typically the

Page 4

customers choose the lowest per diem/annual revenue proposals. This is why knowing and having access to the staffing plan of a competitor could be a huge asset in attempting to lower staffing costs and ultimately a bidder's financial proposal seeking to underbid a rival competitor.

12. The first step is to evaluate the labor portion of the incumbent's per diem bed-day rate for non-exempt, hourly staff. Using the Senior Correctional Officer (Job Code 9012) from the CCA staffing plan as an example, a market competitor could determine the total number of hours performed by this position during a year based on the number of staff and days worked. The CCA staffing plan includes positions for 1 Intake/Property, 1 Visitation, 1 Armory/Key Control, 5 Transportation and 6.6 Housing Zones for a total of 14.6 full time equivalents ("FTE"). They are paid for 40 hours; 52 weeks, or 2,080 hours annually. To build up the proper pay structure we would use the following assumptions: $15.00 base hourly rate or $31,200 annually, $4.27 hourly health & welfare rate (assuming a federal contract) or $8,881.60 annually, 10 paid holidays or $1,200 annually (10 x $15.00 x 8 hours), and 5 paid training days or $600 annually (5 x $15.00 x 8 hours), for a subtotal of $41,881.60 per FTE. We would then add 4% for worker compensation $1,675.26, 3% for general liability $1,256.45, 7.65% for FICA $3,203.94, SUTA at 2.2% on $9,000 ($198 annually), FUTA at 1.1% on $7,000 ($77 annually), all for a total of $48,292.25 per senior correctional officer (or $705,066.85 annually for the 14.6 senior officers).

13. The same exercise will be performed for each non-exempt position in the staffing plan. Once completed, we would add all of the labor together to arrive at the facility's total annual non-exempt labor cost.

14. Next, the competitor would develop its own staffing plan and expected labor costs for the incumbent's facility based on the wage determination. The CDF market competitor could

identify staff from the incumbent's (or other competitor's) staffing plan that it would propose to eliminate in order to reduce its own labor costs when compared to the incumbent's expected labor costs. The CCA staffing plan contains eight staff categories: Management/Support, Security Operations (8 hour shifts); Security Operations (12 hour shifts); Unit Management (8 hour shifts); Maintenance; Services; Programs and Health Services. A CDF market competitor could compare each line of the incumbent's staffing plan to (1) its own proposed staffing plan for the CDF facility at issue and (2) similar staffing plans it has for its own facilities (for the same client) to determine where there are areas to reduce staff within each of these categories.

15. For example, based on my review of the CCA staffing plan, GEO would propose eliminating approximately 38.8 full-time equivalent positions, including, among others, the assistant chief of security under "Security Operations (8 hour shifts)." These reductions reflect GEO's confidential and proprietary approach to managing such facilities.

16. Assuming the $15.00 base hourly rate is an average rate for all 38.8 staff, GEO would reduce annual labor costs of $1,873,739.30 from the competitor's expected staffing plan. This annual impact could then be converted into a daily savings and be reflected in a reduced per diem bed-day rate, which would allow GEO to reduce its bid and underbid the incumbent's expected per diem bed-day rate. For example, using the CCA staffing plan information, $1,873,739.30 divided by 2,016 beds and divided by 365 days per year equates to a per diem rate reduction of $2.44. With this staffing information, therefore, it would be possible for GEO to underbid the incumbent's expected per diem rate by at least $2.44, causing the incumbent substantial financial harm.

17. The next step involves estimating the annual salaries for the salaried, exempt staff in management and supervisory positions. Although not affected by the wage determination,

these positions can be estimated based on GEO's experience operating similar facilities and the number of non-exempt staff. If GEO's analysis results in fewer non-exempt staff, then its estimate of exempt, salaried staff should also be lower than the incumbent's costs for exempt, salaried staff. This number could then similarly be reflected in a reduced per diem bed-day rate, which would allow GEO to further underbid an incumbent's expected per diem bed-day rate.

18. Without the information contained in the staffing plan, a CDF market competitor would not know the comparison between its proposed staffing plan and resulting labor costs (developed on internal information only) compared to the other contractor's expected labor costs. Government contract procurements are usually conducted with bidders acting independently of each other.

19. The next step involves estimating non-labor expenses including medical services and supplies, food service, inmate expenses, security expenses, utilities (based on local research on rates), program expenses, repairs and maintenance, leases, insurance, professional fees, personnel expenses, travel expenses, administration expenses and appropriate taxes (based on local research). These costs can be estimated based on the type of the facility and the agency operating it: different types of government customers have different requirements that would affect the composition of a proprietary per diem bed-day rate, such as different requirements for inmate/detainee programs and healthcare. These costs are generally the same for all CDF market competitors and are based on market rates. GEO would estimate these costs using its own estimating criteria to develop the non-labor expenses component of the proprietary bed-day or per diem rate.

20. A CDF market competitor can roughly identify the profit included in a per diem rate from another contractor by adding together the (1) labor charges for non-exempt, hourly

Case 1:14-cv-05183-RJS Document 136 Filed 02/26/16 Page 9 of 10

staff used to operate the facility based on the staffing plan and wage determination, (2) estimated labor charges for exempt, salaried staff in management and supervisory positions, and (3) estimated non-labor charges including medical services and supplies, food service, inmate expenses, security expenses, utilities (based on local research on rates), program expenses, repairs and maintenance, leases, insurance, professional fees, personnel expenses, travel expenses, administration expenses and appropriate taxes. Subtracting this sum from another contractor's per diem rate would provide an estimate of the total profit included in the per diem rate. This provides information that can be used to underbid a competing contractor's proposal by using a lower profit rate than that expected for the other competitor.

21. If only GEO's per diem rates were disclosed on one of its existing contracts (and not also its staffing plan), a substantial likelihood that GEO would suffer competitive harm still exists. A competitor could generally extrapolate GEO's future per diem rate by using changes in wage determination hourly rates and benefits as well as general cost of living increases over the period of time to adjust previously disclosed proprietary per diem rates. This would allow GEO's competitors to determine GEO's estimated per diem rate for the new competition. GEO's competitor could then submit a rate lower than GEO's expected rate. This type of analysis, and ensuing substantial financial harm, would occur if GEO's confidential and proprietary pricing information contained in older contracts is disclosed.

22. Substantial competitive harm would also result even if all the competitors for a CDF contract obtained each other's proprietary bed-day rates and staffing plans. This would be the case if Emerald wins a CDF contract and joins GEO and CCA as an incumbent. If all CDF competitors' proprietary staffing plan and per diem rates for past contracts were disclosed, competitors in the procurement process for CDF contracts would effectively compete in an

Page 8

informal reverse auction. In a formal reverse auction, each bidder is told what the other competitors are bidding, thereby encouraging each bidder to propose a lower figure time-and-again until the auction closes. In a formal reverse auction procurement, the bidders understand the nature of the competition, choose to compete in such a competition, and recognize that the bidder must arbitrarily reduce its bid in a "race to the bottom" in which the winner submits a price lower than it otherwise would have offered, but for the reverse auction. While reverse auctions may be appropriate as an acquisition tool when it comes to simple products or services, such competitions are not appropriate for complex services such as detention facilities. If proprietary bed-day rates and staffing plans for all CDF competitors are disclosed as a result of Plaintiffs' requests, the CDF incumbents and other competitors would be forced to compete in an unofficial reverse auction process that would likely result in prices offered for bed-day rates that would be lower than prices generated in a traditional competition in which competitors' bidding information is not disclosed. Such a scenario would cause GEO competitive harm because GEO (and its competitors) would be forced to compete in a non-traditional procurement reverse auction procurement in which GEO's proprietary and confidential information is used against it, resulting in GEO offering lower prices, reduced profits and the likely elimination of contingencies.

Dated: February 26, 2016
      Boca Raton, Florida

_____
David J. Venturella