```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
 2                        IN TACOMA

 3   ------------------------------------------------------------

 4   CHAO CHEN,                    )
                                   )
 5            Plaintiff,           )  No. CV17-5769RJB
                                   )
 6      v.                         )
                                   )
 7   THE GEO GROUP,                )
                                   )
 8            Defendant.           )
                                   )
 9   and                          )
                                   )
10   STATE OF WASHINGTON,          )
                                   )
11            Plaintiff,           )
                                   )
12      v.                         )
                                   )
13   THE GEO GROUP, INC.,          )
                                   )
14            Defendants.          )

15

16   ------------------------------------------------------------

17                      MOTION HEARING

18   ------------------------------------------------------------

19
                        August 2, 2018
20

21        BEFORE THE HONORABLE ROBERT J. BRYAN
             UNITED STATES DISTRICT COURT JUDGE
22

23

24

25
```

```
1    APPEARANCES:

2
     For the Plaintiff:        Andrew Free
3                              LAW OFFICE OF R. ANDREW FREE
                               Adam J Berger
4                              Jamal Whitehead
                               SCHROETER GOLDMARK & BENDER
5

6    For the Defendants:       Mark Emery
                               NORTON ROSE FULBRIGHT
7                              Joan Mell
                               III BRANCHES LAW
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

09:28:53AM 1          MS. MELL:  Good morning, your Honor.

09:28:56AM 2          THE COURT:  This is further in Nwauzor versus

09:29:04AM 3    GEO, No. 17-5769, and comes on for oral argument on three

09:29:09AM 4    pending motions.

09:29:14AM 5       Ms. Mell and Mr. Emery are here for the defendants.

09:29:18AM 6    Let's see, Mr. Free, Mr. Whitehead, and Mr. Berger are

09:29:26AM 7    here for plaintiffs.

09:29:28AM 8       A couple of housekeeping matters first.  Mr. Chen was

09:29:40AM 9    dismissed as a plaintiff in the case.  He is still on the

09:29:45AM 10   record as a defendant in the counterclaim.  Is that

09:29:54AM 11   intentional or should he be dismissed from the case?

09:29:59AM 12         MS. MELL:  Your Honor, GEO's position --

09:30:02AM 13         THE COURT:  Wait a minute.  You need to speak

09:30:04AM 14   right into the mic.

09:30:06AM 15         MS. MELL:  GEO's position is that Mr. Chen should

09:30:10AM 16   remain as a counterdefendant.

09:30:13AM 17         THE COURT:  Okay.  That's not the subject of

09:30:20AM 18   today's issues, I just wanted to raise the issue because

09:30:25AM 19   it wasn't clear to staff.

09:30:27AM 20      There have been a couple of late matters filed,

09:30:41AM 21   including a letter from ICE, and then the other one a

09:30:49AM 22   declaration from a Tae Johnson, the last being filed just

09:31:00AM 23   this morning.  Have those things been served on counsel?

09:31:07AM 24   Do you have those?

09:31:11AM 25         MR. FREE:  We do, your Honor.

09:31:14AM 1          THE COURT:  I have read --  I had the week off

09:31:20AM 2     last week, almost.  I spent part of that week sitting on a

09:31:26AM 3     deck out on Hood Canal reading stuff, including everything

09:31:34AM 4     filed on these three motions.  And then I have reviewed

09:31:43AM 5     since then a good deal of what is in the files.  That's a

09:31:50AM 6     lot of reading.  This case is way too paper heavy at this

09:32:03AM 7     point.

09:32:05AM 8          Be that as it may, I have read a lot.  We have

09:32:10AM 9     discussed it and worked on it in chambers, as well.  I set

09:32:16AM 10    this oral argument to give you the opportunity to tell me

09:32:21AM 11    whatever you think is appropriate to say or to argue on

09:32:29AM 12    the issues raised by these three motions.  I would ask

09:32:35AM 13    that you limit your comments to 20 minutes a side.

09:32:47AM 14         In the order of filing, the plaintiffs' motions are

09:32:55AM 15    older than the defendants' motion for class certification,

09:33:01AM 16    so I assume you go first.

09:33:23AM 17              MR. WHITEHEAD:  Yes, your Honor.  I am sorry.

09:33:26AM 18    I'm unclear as to the order.

09:33:29AM 19              THE COURT:  You need to speak into the mic.  You

09:33:32AM 20    will break your back if you lean over.  Just remain seated

09:33:36AM 21    and tell me what's on your mind.

09:33:38AM 22              MR. WHITEHEAD:  I just want to make sure that I

09:33:39AM 23    am clear as to the order.  Are you asking for plaintiffs

09:33:42AM 24    to argue their class certification motion?

09:33:44AM 25              THE COURT:  They made the motion first.  They can

09:33:49AM 1    argue --  They're all three motions.  Anybody can argue

09:33:56AM 2    within the time limits whatever you want to argue about

09:33:58AM 3    those three motions.  I am mindful that plaintiffs' motion

09:34:05AM 4    and the defendants' motion regarding class certification

09:34:09AM 5    are on the same subject.

09:34:11AM 6            MR. WHITEHEAD:  Then, your Honor, we will go

09:34:13AM 7    first.

09:34:14AM 8            MS. MELL:  No.  He said --

09:34:15AM 9            THE COURT:  You won't go first, because they

09:34:18AM 10   filed first, the motion to deny class certification.

09:34:23AM 11           MR. WHITEHEAD:  All right.  Thank you, your

09:34:25AM 12   Honor.

09:34:26AM 13           MR. EMERY:  Good morning, your Honor.  My name is

09:34:29AM 14   Mark Emery of the GEO Group.  I would ask if the court

09:34:37AM 15   would reserve five minutes for rebuttal.

09:34:39AM 16           THE COURT:  The time is yours.  Keep track of it

09:34:41AM 17   yourself.

09:34:42AM 18           MR. EMERY:  Your Honor, this is the first

09:34:44AM 19   opportunity I have had to speak with you on these cases.

09:34:47AM 20   I am counsel for the GEO Group in all of the detainee work

09:34:53AM 21   cases that are currently pending right now, in Colorado,

09:34:56AM 22   both the cases before your Honor, and in California, as

09:34:58AM 23   well.  So I am very aware of the importance of the issues

09:35:01AM 24   that are sitting before the court today, and the fact that

09:35:04AM 25   we put a lot of paper in front of you.

09:35:07AM 1      The issues I would like to cover are, first of all,

09:35:13AM 2  the immunity issue, Yearsley immunity.  I will probably

09:35:18AM 3  spend most of my time on that.

09:35:20AM 4      I would like to say a few things further about the

09:35:23AM 5  issue of employment, the nature of the employment in

09:35:24AM 6  question.  I will say I have reviewed the past hearing

09:35:29AM 7  transcripts and read very carefully your Honor's questions

09:35:32AM 8  that you put forward.

09:35:33AM 9      And I also recognize the importance of the class

09:35:35AM 10 certification issue, because you are the first court to

09:35:38AM 11 consider whether a minimum wage claim would be certified

09:35:41AM 12 for a class.  The Menocal case is older, but that, in

09:35:47AM 13 fact, was dismissed in that case.

09:35:47AM 14     To begin with the Yearsley immunity:  The federal

09:35:54AM 15 government delegates authority to contractors to carry out

09:35:57AM 16 a number of its different missions, including federal

09:36:01AM 17 immigration detention.  The Yearsley doctrine provides

09:36:07AM 18 that when the government authorizes a contractor to take

09:36:11AM 19 certain actions, it directs the contractor, and that

09:36:14AM 20 authorization is valid, the contractor is entitled to

09:36:20AM 21 immunity.

09:36:21AM 22     What we are talking about here is the Voluntary Work

09:36:24AM 23 Program.  What is distinctive about this case is that the

09:36:29AM 24 only claim is a minimum wage claim.  The plaintiffs are

09:36:34AM 25 essentially alleging that we are liable under the

09:36:39AM 1    Washington Minimum Wage Act for doing exactly what the

09:36:43AM 2    government has told us to do.

09:36:45AM 3         Now, I want to get into the details of that

09:36:48AM 4    authorization and try to make it as clear to you as I can

09:36:53AM 5    why we think we have that authorization and are cloaked in

09:36:58AM 6    immunity.

09:36:58AM 7         One sort of very preliminary remark:  When you read

09:37:01AM 8    the nature of the pleadings in this case and the

09:37:03AM 9    arguments, the plaintiffs have gone forward as if they are

09:37:07AM 10   sort of exposing some deep secret that GEO has at the

09:37:13AM 11   Northwest Detention Center, in the way it runs its

09:37:17AM 12   program, the truth could not be further apart.

09:37:20AM 13        What we do is straight up according to the policies

09:37:26AM 14   that ICE put forward in the terms of our contract.  We

09:37:29AM 15   operate the Voluntary Work Program in broad daylight.  I

09:37:36AM 16   would like to begin with a brief discussion of those

09:37:38AM 17   standards.

09:37:39AM 18        If you don't mind, I will put a couple of things up.

09:37:42AM 19   These are all materials that are in the record.  So we

09:37:50AM 20   begin with Section 5.8 of the Voluntary Work Program.

09:37:54AM 21   This is from ICE's national standards.

09:37:56AM 22        The first thing I would point to here is No. 1, where

09:37:59AM 23   it outlines three different kinds of facilities.  ICE

09:38:02AM 24   operates three different kinds of facilities:  An SPC,

09:38:06AM 25   which ICE runs directly, and two different kinds of

09:38:09AM 1   contract facilities, CDFs and IGSA.  The one that is at

09:38:13AM 2   issue is a CDF.  The same policies apply at all of these

09:38:19AM 3   different facilities.

09:38:20AM 4      Second, if you look down at 5.8(1)(b) here, you see

09:38:24AM 5   that this is listed as an expected outcome.  Number one,

09:38:30AM 6   "Detainees may have opportunities to work," and so on, as

09:38:37AM 7   described here, within the constraints of what we are

09:38:39AM 8   doing at a detention facility.

09:38:42AM 9      Flipping over to Section 5(a), again, this is

09:38:47AM 10   mandatory language, "Detainees shall be provided the

09:38:51AM 11   opportunity to participate in a Voluntary Work Program."

09:38:57AM 12      Now we move to the relevant portions of the contract.

09:39:07AM 13   This is from Page 82 of the contract.  We see that one of

09:39:12AM 14   the directives that ICE gives to GEO is to manage --

09:39:16AM 15        THE COURT:  Can you erase those arrows that are

09:39:19AM 16   not --

09:39:22AM 17        MR. EMERY:  How do I do that?  That is

09:39:26AM 18   distracting.  Thank you.

09:39:27AM 19      And I thought it might be worthwhile, very quickly,

09:39:32AM 20   just looking at the particular language of this case.  So

09:39:34AM 21   the first sentence, "Detainee labor shall be used in

09:39:38AM 22   accordance with the detainee work plan developed by the

09:39:42AM 23   contractor, and will adhere" --

09:39:43AM 24        THE COURT:  Just a minute.  You are getting ahead

09:39:45AM 25   of me here.  I don't know where you are looking at,

09:39:49AM 1    Page 82.  I have a copy of the contract here.  All right.

09:39:58AM 2         MR. EMERY:  This is Page 82 of the contract.

09:40:03AM 3    "Detainee labor shall be used in accordance with the

09:40:06AM 4    detainee work plan developed by the contractor, and in

09:40:09AM 5    accordance with the ICE PBNDS on the Voluntary Work

09:40:14AM 6    Program," which we just looked at.

09:40:16AM 7         So we are not hiding anything here.  ICE tells us

09:40:19AM 8    that detainee labor shall be used.  It shall be used in

09:40:23AM 9    accordance with its standards.

09:40:25AM 10        Continuing on, "The detainee work plan must be

09:40:28AM 11   voluntary, and may include work or program arrangements

09:40:32AM 12   for industrial, maintenance, custodial, service, or other

09:40:36AM 13   jobs."

09:40:38AM 14        What I would emphasize there is, we are not just

09:40:41AM 15   talking about detainees cleaning their cells, we are

09:40:46AM 16   talking about a wide range of things that ICE has directed

09:40:49AM 17   us to have detainees do.

09:40:52AM 18        Further, "The detainee work program shall not

09:40:55AM 19   conflict with other requirements of the contract, and must

09:40:57AM 20   comply with all applicable laws and regulations."

09:41:02AM 21        We understand that one of the allegations that the

09:41:06AM 22   plaintiffs make in this case is that this phrase somehow

09:41:09AM 23   encompasses the minimum wage law -- Minimum Wage Act.

09:41:18AM 24   This phrase needs to be read in the context of the

09:41:20AM 25   contract itself.  One really need look no further than the

09:41:24AM 1    very next sentence to understand why detainees aren't

09:41:29AM 2    GEO's employees.

09:41:30AM 3         The next paragraph begins, "Detainees will not be

09:41:34AM 4    used to perform the responsibilities or duties of an

09:41:37AM 5    employer" -- "of the contractor."  So the contract

09:41:39AM 6    especially distinguishes between what detainees do, which

09:41:45AM 7    can be a number of different jobs at the facility, and

09:41:47AM 8    what employees do.

09:41:48AM 9         So moving on to the pay term, which I know is a key

09:41:52AM 10   issue that is in dispute here.  Going back to the PBNDS,

09:41:58AM 11   I'm sure you are familiar with the language by now,

09:42:01AM 12   Subsection K of 5.8 states, "Compensation is at least $1

09:42:07AM 13   U.S. per day.  The facility shall have an established

09:42:10AM 14   system that ensures the detainees receive the pay owed

09:42:14AM 15   them before being transferred or released."

09:42:17AM 16        The authorization that ICE gives us is to pay at

09:42:19AM 17   least $1 a day.  We pay $1 a day.  This is the exact same

09:42:25AM 18   rate ICE pays at its own facility.  This is the same rate

09:42:28AM 19   that's paid in all of the facilities, unless there is some

09:42:32AM 20   other arrangement made.

09:42:33AM 21        You will notice, too, the second sentence here, "The

09:42:36AM 22   facility shall have an established system that ensures

09:42:39AM 23   detainees receive the pay owed them before being

09:42:41AM 24   transferred or released."  An important point that I hope

09:42:45AM 25   has come out in the briefing, and should come out in the

09:42:47AM 1    declarations filed today, and other declarations we filed,

09:42:53AM 2    Mr. Kimble's in particular, is that GEO doesn't pay -- GEO

09:42:59AM 3    doesn't decide what to pay detainees.

09:43:01AM 4            THE COURT:  They decided $1 a day in their

09:43:06AM 5    worker's handbook.

09:43:07AM 6            MR. EMERY:  Your Honor, ICE decides that it's $1

09:43:10AM 7    a day, and we administer that.

09:43:13AM 8            THE COURT:  Where does ICE say $1 a day rather

09:43:19AM 9    than not less than $1 a day?

09:43:23AM 10           MR. EMERY:  We can look to another portion of the

09:43:25AM 11   contract here.  Looking at the highlighted portion, this

09:43:35AM 12   is included in the same contract, "Detainee wages for the

09:43:39AM 13   detainee work program, reimbursement for this line item

09:43:42AM 14   via the actual cost of $1 per day per detainee.

09:43:46AM 15   Contractor shall not exceed the amount shown without prior

09:43:49AM 16   approval by the contracting officer."

09:43:53AM 17       You can see that there are amounts put there.  The

09:43:55AM 18   rate --

09:43:56AM 19           THE COURT:  That's what you get reimbursed for.

09:44:00AM 20   How does that limit the pay?

09:44:03AM 21           MR. EMERY:  That's the amount that ICE pays to

09:44:05AM 22   detainees.  GEO's role in the payment --

09:44:10AM 23           THE COURT:  You pay more than that in some

09:44:14AM 24   facilities, I understand.

09:44:17AM 25           MR. EMERY:  I will address that in a moment.  I

09:44:20AM 1   want to be clear what this provision says, which is that

09:44:24AM 2   ICE pays $1 to detainees.

09:44:27AM 3        The term "reimbursement rate" may be a little bit

09:44:30AM 4   confusing.  It is not a matter of ICE deciding to

09:44:35AM 5   reimburse and GEO being able to pay whatever it wants.

09:44:39AM 6   There is a rate that is set.  There is an amount that can

09:44:43AM 7   be paid per year.  That is the total amount, $114,975.

09:44:48AM 8   This is what ICE has said, "GEO, you will pay this in a

09:44:52AM 9   year."  So essentially a dollar a day, 114,000 of them.

09:44:58AM 10  This is providing 114,900 some daily opportunities --

09:45:03AM 11            THE COURT:  What is to prevent you from deciding

09:45:06AM 12  the rate is going to be $2 per day?

09:45:08AM 13            MR. EMERY:  Per this exact provision, we have to

09:45:10AM 14  seek ICE's approval on that.

09:45:13AM 15            THE COURT:  Why?

09:45:14AM 16            MR. EMERY:  Because it says we shall not exceed

09:45:17AM 17  the amount without the approval of the contracting

09:45:19AM 18  officer.  And there are clear --

09:45:24AM 19            THE COURT:  Isn't that relative to reimbursement

09:45:31AM 20  rather than what you pay detainees?

09:45:40AM 21            MR. EMERY:  I really encourage you to not get

09:45:43AM 22  hung up on the idea of reimbursement.  This is ICE paying.

09:45:46AM 23  GEO does not pay the detainees.  ICE pays the detainees.

09:45:51AM 24  We facilitate the payment.

09:45:52AM 25            THE COURT:  I am curious about that.  GEO set the

09:46:03AM 1  $1 a day in the employee handbook.  I guess I fail to see

09:46:19AM 2  why GEO can't pay more if they choose to out of the

09:46:24AM 3  goodness of their heart.

09:46:27AM 4         MR. EMERY:  This is why, your Honor:  GEO's

09:46:30AM 5  handbook notes a dollar a day, but GEO doesn't set that

09:46:34AM 6  rate.  ICE sets that rate.  For example, when detainees

09:46:37AM 7  enter the facility they are given a detainee handbook.

09:46:40AM 8  That detainee handbook, the one in 2014, when this class

09:46:44AM 9  action began, said, "Pay will be $1 per day."  That is ICE

09:46:49AM 10 telling every detainee in every facility, whether run by

09:46:53AM 11 ICE or run by us, that pay will be $1 per day.  This is

09:46:56AM 12 the rate that ICE sets.

09:46:58AM 13        As for why GEO wouldn't pay -- couldn't pay more, the

09:47:02AM 14 contract says we shall not exceed that amount without

09:47:05AM 15 ICE's approval.

09:47:07AM 16        There are clear reasons why ICE would want that to

09:47:09AM 17 happen.  Your Honor, we are in a long-term contracting

09:47:14AM 18 relationship with ICE.  Every dollar that comes from ICE

09:47:17AM 19 appropriations to detainees comes from U.S. taxpayers.

09:47:21AM 20 The government has an interest in knowing what's expended

09:47:25AM 21 on this.  It sets limits on it.  It is not going to allow

09:47:28AM 22 GEO to go pay higher rates.

09:47:31AM 23        Now, you will find in the declaration that was filed

09:47:34AM 24 this morning --

09:47:35AM 25        THE COURT:  Wait a minute.  Why would the

09:47:40AM 1    government not allow you to pay a higher rate?  They won't

09:47:44AM 2    reimburse you for a higher rate, but why would they say

09:47:47AM 3    you can't pay a higher rate?

09:47:50AM 4          MR. EMERY:  Look through this contract, the

09:47:54AM 5    government controls every aspect of what we do at the

09:47:56AM 6    facility.  I mean, look at the line item --  You see the

09:48:02AM 7    line item here on the top:  "Estimating travel costs,

09:48:07AM 8    including lodging and meals."  You will see it has the

09:48:10AM 9    exact same language in there.  You might use the same

09:48:13AM 10   logic, "Oh, why would the government care how much we

09:48:16AM 11   spend on lodging and meals?"  But that exact same language

09:48:19AM 12   is in there.  The amount that is allocated for it under

09:48:22AM 13   the contract shall not be exceeded without ICE's approval.

09:48:28AM 14   ICE wants to control these costs.  ICE has an interest in

09:48:32AM 15   controlling these costs.

09:48:35AM 16        You will see in the declaration that was filed this

09:48:40AM 17   morning, which comes directly from ICE, in Paragraph 24,

09:48:46AM 18   explains those provisions, "The NWC contract sets the

09:48:51AM 19   quantity of $1 reimbursements at 114,975 per option year.

09:48:54AM 20   GEO shall not exceed that quantity without prior approval

09:48:58AM 21   by the contracting officer.  This approval can be sought

09:49:01AM 22   by GEO and would be memorialized through a bilateral

09:49:05AM 23   contract modification."

09:49:06AM 24        So the rate could be raised.  If ICE decides that

09:49:12AM 25   U.S. taxpayers want to pay $11 to detainees an hour, it

09:49:16AM  1    will pass through that amount to detainees, we'll make

09:49:19AM  2    sure they get paid that amount, and we go on.  But it is

09:49:23AM  3    ICE that funds everything that happens at the detention

09:49:26AM  4    facility.  We are a contractor.

09:49:30AM  5          That brings us back to the immunity point.  We do all

09:49:34AM  6    of this within the scope of our authorization.  If we

09:49:37AM  7    started paying a different amount, it actually would be

09:49:40AM  8    going in a different direction from our authorization.  It

09:49:43AM  9    is in our interest to do what ICE directs us to do, which

09:49:46AM 10    ultimately is in conformity with what Congress has

09:49:51AM 11    directed.

09:49:51AM 12          That's the second part of the Yearsley test, whether

09:49:54AM 13    this authorization to run the VWP at the dollar per day

09:49:59AM 14    rate is validly authorized.

09:50:01AM 15          We have given you the text of this.  The statute

09:50:04AM 16    bears close care, 1855(d).  It is an old statute, but it

09:50:09AM 17    contains all of the language that is necessary to continue

09:50:11AM 18    to direct -- or to infallibly confer authority on ICE to

09:50:17AM 19    have us run the VWP at a dollar per day.  It allocates

09:50:23AM 20    money from here and for after.

09:50:24AM 21          It says Congress may from time to time set a rate,

09:50:27AM 22    which it has done in different years.  It seems to be an

09:50:31AM 23    item that was sort of stuck in the budget for a long time.

09:50:34AM 24    It no longer does.

09:50:35AM 25          Again, the declaration from ICE that we filed today,

09:50:38AM  1    particularly Paragraph 13, explains that Congress set this

09:50:42AM  2    rate, and that's what their rate continues to be.  "Per

09:50:46AM  3    the terms of the contract, as well as authority provided

09:50:48AM  4    above, reimbursement for the Voluntary Work Program is $1

09:50:53AM  5    per day per detainee."

09:50:54AM  6         The last point I want to make on the Yearsley

09:51:02AM  7    immunity is, by asking whether GEO can pay more on its

09:51:10AM  8    own -- this is really missing the point of what's

09:51:13AM  9    happening here, that this is the administration of a

09:51:17AM 10    government program.  The government sets what terms the

09:51:21AM 11    U.S. taxpayers will pay for this.

09:51:23AM 12         Paragraph 19 of the declaration filed today says it

09:51:26AM 13    as clearly as can be said:  "NWAC has implemented and

09:51:31AM 14    conforms to the current PBNDS.  PBNDS requires that

09:51:36AM 15    detainees receive at least $1 per day for work performed

09:51:40AM 16    in the VWP."  That is exactly what we do.  So we act

09:51:43AM 17    within the government's authorization, and therefore we

09:51:46AM 18    are entitled to immunity.

09:51:50AM 19         If your Honor has no other questions on immunity, I

09:51:53AM 20    will move to other issues.

09:51:54AM 21              THE COURT:  Okay.  Thank you.

09:51:58AM 22              MR. EMERY:  A second point --

09:51:59AM 23              THE COURT:  If you wanted to save some time --

09:52:05AM 24    Use your time as you choose, I guess.

09:52:13AM 25              MR. EMERY:  As I said, your Honor, I did want to

09:52:21AM 1    touch on some of the broader issues of employment class

09:52:24AM 2    certification, but I imagine these are things I can

09:52:28AM 3    address later.

09:52:59AM 4           MR. FREE:  Good morning, your Honor.  My name is

09:53:09AM 5    Andrew Free, and I am appearing on behalf of the

09:53:12AM 6    plaintiffs in this case, along with my co-counsel Jamal

09:53:15AM 7    Whitehead.  And Adam Berger is here with us, as well.  I

09:53:19AM 8    am going to address Yearsley immunity, and Mr. Whitehead

09:53:23AM 9    will address the class certification questions in this

09:53:25AM 10   case that are before the court.

09:53:26AM 11        I will pick up with the court's question, which I

09:53:30AM 12   think is the critical one, and that is the difference

09:53:34AM 13   between a reimbursement rate that is set by the federal

09:53:37AM 14   government about how much ICE will pay GEO back for the

09:53:41AM 15   work that is performed by detained immigrants, and a pay

09:53:44AM 16   rate, which is what GEO is saying ICE has authorized it to

09:53:48AM 17   set.  So it is the difference between the floor to the

09:53:51AM 18   ceiling.

09:53:51AM 19        We have Docket No. 101-1, 101-2, and 101-3, a

09:53:59AM 20   judicial admission that GEO can and does pay more than a

09:54:02AM 21   dollar at other facilities that it operates with contracts

09:54:05AM 22   with ICE.  We've got examples of the invoices that GEO

09:54:09AM 23   sends to ICE documenting the reimbursement rate that ICE

09:54:14AM 24   will pay for, and the GEO billable rate that GEO pays when

09:54:18AM 25   it needs to have a higher rate in order to get detainees

09:54:21AM 1    to do the jobs so that it can function.  And we've got an

09:54:24AM 2    example of a page from a GEO detainee manual at another

09:54:28AM 3    one of its facilities.

09:54:29AM 4        The reason we filed those things is because the

09:54:31AM 5    statements that have been made in briefing about a uniform

09:54:34AM 6    national policy of only paying detainees $1 a day are not

09:54:38AM 7    factually accurate.  Those statements are not true.  There

09:54:40AM 8    are dozens of facilities in this country, including at

09:54:43AM 9    least three that I know of that are run by GEO, in which

09:54:46AM 10   the contractor pays more, and the government approves it.

09:54:49AM 11       And that's as it should be.  Because according to the

09:54:52AM 12   declaration submitted by ICE today, this morning, that was

09:54:55AM 13   received by GEO last night at 4:45 -- 4:42, GEO is

09:55:00AM 14   responsible for designing and implementing the

09:55:04AM 15   performance-based requirements, including the

09:55:08AM 16   work program.  That is in the contract language, at

09:55:11AM 17   Page 82, that my friend pointed out to the court.

09:55:15AM 18       Throughout this declaration Mr. Johnson makes clear

09:55:19AM 19   that the contractor is required for coming up with the

09:55:25AM 20   work plan and determining how it is going to be run.

09:55:29AM 21       I can point the court to the paragraphs.  I have only

09:55:32AM 22   had a little bit of time to review it.  It says

09:55:35AM 23   explicitly, "Performance-based contracts do not designate

09:55:38AM 24   how a contractor is to perform the work, but rather

09:55:42AM 25   establishes the expected outcomes and results that the

09:55:45AM 1  government expects."  That's Paragraph 8.

09:55:48AM 2      Throughout this declaration, at Paragraph 9, at

09:55:52AM 3  Paragraph 12, and Paragraph 13, the language is that of

09:55:59AM 4  reimbursement.  The answer to the question, "Why does it

09:56:09AM 5  say a dollar as the reimbursement rate," is because it is

09:56:13AM 6  the reimbursement rate.

09:56:17AM 7      The defendant does not address the key other

09:56:19AM 8  provisions in the contract which require GEO to ascertain

09:56:23AM 9  on a rolling basis what its legal requirements are, its

09:56:29AM 10 state/local legal requirements, and comply with the most

09:56:33AM 11 stringent standard.

09:56:34AM 12     In that respect, GEO is much more like the contractor

09:56:38AM 13 in Campbell-Ewald versus Gomez, where the federal

09:56:42AM 14 government said you have to make sure that you comply with

09:56:46AM 15 the notification requirements before you attack somebody.

09:56:48AM 16 It's like the contractor in Cunningham.

09:56:50AM 17     I think Salim is instructive here.  In Salim the

09:56:55AM 18 Eastern District of Washington reviewed claims of

09:56:57AM 19 derivative sovereign immunity by contractors.  It was key

09:57:01AM 20 that those contractors had a discretionary role in

09:57:04AM 21 formulating the way that the program worked.  That

09:57:07AM 22 destroyed Yearsley prong 1, which was the authorization.

09:57:10AM 23 That discretion, that contractual delegation of authority

09:57:13AM 24 to determine how it works, which we see in this

09:57:17AM 25 declaration from ICE, the first time we have seen it, the

09:57:20AM 1  first time the court has seen it, that's the way GEO

09:57:24AM 2  operates at the Northwest Detention Center.

09:57:26AM 3       And it begs the question, if GEO can pay two or three

09:57:30AM 4  bucks at the south Texas facility, and the LaSalle

09:57:33AM 5  detention facility, why can't it pay 11 here?

09:57:37AM 6       There is no legal impediment from Congress.  That is

09:57:41AM 7  black letter appropriations law.  We cited it at Page 13

09:57:45AM 8  of our response.  And appropriators will tell you that the

09:57:49AM 9  law is, an appropriations bill is valid for the period of

09:57:54AM 10 the appropriation.

09:57:55AM 11      Now, there is an authorization for payment of

09:57:57AM 12 detainees out of the lump sum allocation of money to DHS

09:58:03AM 13 every year.  That is an authorization, okay -- it's the

09:58:05AM 14 authority that Congress has given ICE to pay.

09:58:08AM 15      But the appropriation is two parts.  The

09:58:12AM 16 appropriation does not specify a wage rate, and it has not

09:58:17AM 17 since 1978.  I think the court grasped that in its prior

09:58:21AM 18 rulings.

09:58:21AM 19      In 1939 the Supreme Court said that the government

09:58:24AM 20 does not become a conduit of its immunity in suits against

09:58:29AM 21 its agents and instrumentalities merely because they do

09:58:32AM 22 its work.  That is the proposition that is before this

09:58:37AM 23 court on GEO's motion to dismiss on Yearsley immunity.

09:58:41AM 24 GEO is saying, "Because we have a contract with the

09:58:43AM 25 government, ipso facto, they blessed everything we are

09:58:46AM 1    doing, they have authorized everything we are doing, and

09:58:48AM 2    that's enough.  We are immune."  That is simply not the

09:58:51AM 3    law.

09:58:52AM 4         OIG Document 18-67 was released June 26th, 2017.

09:58:58AM 5    That is the Department of Homeland Security's Office of

09:59:02AM 6    Inspector General.  It is titled, "ICE's inspections and

09:59:06AM 7    monitoring of detention facilities do not lead to

09:59:09AM 8    sustained compliance or systemic improvements."  The fact

09:59:13AM 9    that the contract -- the fact that GEO continues to

09:59:16AM 10   operate the facility does not equal ICE's authorization of

09:59:20AM 11   everything it does there.

09:59:22AM 12        So we think that GEO's motion fails at prong 1.  And

09:59:27AM 13   we have discussed why at prong 2, ICE does not have the

09:59:31AM 14   authority to set a rate.  And you will look in vain for

09:59:34AM 15   something in this declaration or the prior one that was

09:59:37AM 16   filed by Ms. Valerio --  We found out last night she's

09:59:42AM 17   actually serving as a paid consultant for GEO, and

09:59:45AM 18   submitted the declaration in violation, apparently, of the

09:59:48AM 19   agency's Touhy regulations, and I fear in violation of 41

09:59:52AM 20   U.S.C. 2104(a)(3).  You will look in vain for something

09:59:56AM 21   that says, "Here is the delegation from Congress that says

09:59:59AM 22   $1 a day this year."  The last time that happened was in

10:00:02AM 23   1978.

10:00:03AM 24        This is an improper forum.  This motion to dismiss is

10:00:07AM 25   an improper forum to resolve these issues.  These are fact

10:00:11AM 1   questions.  I would love to depose Mr. Johnson.  I would

10:00:14AM 2   love to depose Ms. Valerio.  We have not had an

10:00:18AM 3   opportunity to do that yet.  Ms. Valerio was subpoenaed,

10:00:21AM 4   and her testimony was replaced by some other ICE

10:00:26AM 5   officials.  It was scheduled for Washington, D.C.  We

10:00:28AM 6   later found out that the government was going to move to

10:00:30AM 7   quash those subpoenas.  GEO issued them, and ICE was going

10:00:33AM 8   to move to quash them.  We have not had an opportunity to

10:00:36AM 9   test these propositions through documented fact discovery.

10:00:40AM 10  And we should.

10:00:40AM 11       If you look at the cases on which GEO relies, they

10:00:44AM 12  are resolved on summary judgment, not a motion to dismiss

10:00:48AM 13  pre-depositions, pre-paper discovery.

10:00:50AM 14       An instructive case that we discovered after reading

10:00:53AM 15  GEO's reply is Anchorage versus Integrated Concepts and

10:00:58AM 16  Research, Inc.  That is Judge Gleason in the District of

10:01:02AM 17  Alaska.

10:01:02AM 18            THE COURT:  I'm sorry, Judge who?

10:01:07AM 19            MR. FREE:  Judge Gleason.  1 F. Supp. 3d 1001.

10:01:12AM 20  And we point the court to Page 1012, particularly to Note

10:01:17AM 21  77.

10:01:18AM 22       Because this case is about derivative sovereign

10:01:22AM 23  immunity, we think that the court should at least consider

10:01:26AM 24  what courts have said about the nature of this defense, is

10:01:30AM 25  it a jurisdictional defense, like actual sovereign

10:01:33AM 1   immunity, the immunity of the sovereign, or is it a merits

10:01:37AM 2   defense?  Is it a defense to liability?  At Note 77 of

10:01:42AM 3   this decision Judge Gleason analyzes that, and concludes

10:01:44AM 4   it is the latter, it is a defense to liability, regardless

10:01:47AM 5   of the nomenclature courts have used.

10:01:50AM 6       Judge Walton in the District of Columbia, In Re Fort

10:01:54AM 7   Totten, 895 F.Supp. 2d 48 at Page 78, also discusses how

10:02:00AM 8   this is not actually a jurisdictional defense; it is

10:02:04AM 9   actually a liability defense.

10:02:05AM 10      And if you read Justice Ginsburg's opinion in

10:02:08AM 11  Campbell-Ewald, the manner in which she disposes of the

10:02:12AM 12  question, which is to take all inferences in a light most

10:02:16AM 13  favored to the plaintiff, and avoid summary disposition,

10:02:19AM 14  that is a summary judgment standard.  She cites

10:02:26AM 15  Matsushiba, I believe.

10:02:27AM 16      Again, that would not be the case if it were

10:02:29AM 17  jurisdictional.  The plaintiff would have the burden of

10:02:32AM 18  proving jurisdiction, as it does in a 12(b)(1) factual

10:02:35AM 19  attack.  So we do not believe this is the proper forum to

10:02:38AM 20  resolve these questions.

10:02:39AM 21      And with that, your Honor, unless you have any

10:02:42AM 22  specific questions about Yearsley, I am going to hand it

10:02:44AM 23  over to Mr. Whitehead to discuss the class certification.

10:02:47AM 24          THE COURT:  I might ask you, and the defense may

10:02:56AM 25  wish to respond to this -- if I can find my note.  I

10:03:19AM 1    wondered about this in regard to the elements to prove

10:03:24AM 2    Yearsley immunity.  The first thing is that the government

10:03:30AM 3    authorized the contractor's actions.  Does that mean in

10:03:38AM 4    this setting that the government has to, for Yearsley to

10:03:44AM 5    apply, authorize a dollar a day, or does it mean the

10:03:51AM 6    government has to authorize the contractor to ignore the

10:04:00AM 7    state law?

10:04:01AM 8            MR. FREE:  I think it is the latter, your Honor.

10:04:03AM 9    We would point the court to Meyers versus the United

10:04:06AM 10   States.  That is a Ninth Circuit case from 1963.  The cite

10:04:09AM 11   there is 323 F.2d 580, and it is at Page 583.  The Ninth

10:04:18AM 12   Circuit looked at this authority prong and interpreted it

10:04:21AM 13   as, "in conformity with the terms of said contract."

10:04:26AM 14      So, in other words, it said the contractor is immune

10:04:29AM 15   so long as it is in conformity with the terms of the

10:04:32AM 16   contract.  And once you fall out of conformity, you have

10:04:37AM 17   exceeded the authorization of the government to pay.

10:04:41AM 18      What we would contend in this case is that GEO is out

10:04:44AM 19   of conformity with the term of the contract that requires

10:04:46AM 20   it to continuously ascertain all applicable state and

10:04:50AM 21   local laws; and that by not applying the most stringent

10:04:54AM 22   law in the event of a conflict, specifically by not paying

10:04:58AM 23   minimum wage, it is acting outside the federal

10:05:00AM 24   government's authorization.

10:05:01AM 25          The court will look in vain for any paragraph in the

10:05:06AM 1    Johnson declaration filed this morning saying that ICE has

10:05:11AM 2    authorized GEO to violate Washington's Minimum Wage Act.

10:05:17AM 3    It is not there.

10:05:18AM 4        If the court has no further questions, we will

10:05:21AM 5    address the class cert.

10:05:35AM 6            MR. WHITEHEAD:  Good morning, your Honor.  GEO

10:05:47AM 7    relies upon civil immigration detainees participating in

10:05:53AM 8    the Voluntary Work Program to operate the Northwest

10:05:58AM 9    Detention Center on the Tideflats.

10:06:00AM 10       As the court knows, these VWP workers are only

10:06:04AM 11   compensated at the rate of $1 a day.  Looking at the

10:06:07AM 12   economic realities of the situation, we argue that an

10:06:10AM 13   employment relationship exists between GEO and the

10:06:13AM 14   detainee workers at the Northwest Detention Center, and,

10:06:18AM 15   further, that GEO violates the Washington Minimum Wage Act

10:06:22AM 16   by paying these workers sub-minimum wages.

10:06:26AM 17       GEO obviously disagrees with our position.  But when

10:06:30AM 18   you look at the overarching questions in this case, they

10:06:35AM 19   are common and predominate over any individualized

10:06:38AM 20   questions.  That being the case, the class vehicle is the

10:06:42AM 21   best way, the superior means, by which to resolve the

10:06:46AM 22   rights of hundreds of people, if not more, in one fell

10:06:51AM 23   swoop.  So for that reason, we look to certify a class.

10:06:54AM 24       Rather than hustling through every element of

10:06:57AM 25   Rule 23(a) or 23(b)(3), I would like to quickly, in the

10:07:04AM 1    limited time that I have, address the remaining points,

10:07:07AM 2    the first of which is that GEO practically admits that

10:07:10AM 3    common questions abound and predominate.

10:07:13AM 4         We have heard in its first motion to dismiss, in the

10:07:16AM 5    context of the class certification motions, that there is

10:07:20AM 6    a threshold question, the question of whether or not work

10:07:24AM 7    authorization somehow precludes class certification if

10:07:29AM 8    there is a preemption issue.  This is a rehash of GEO's

10:07:35AM 9    first motion to dismiss.  In other words, they are arguing

10:07:37AM 10   the threshold question is, could an employment

10:07:40AM 11   relationship exist between the parties?

10:07:42AM 12        The court has already answered this question in the

10:07:44AM 13   context of the motion to dismiss, denying that motion.

10:07:47AM 14   And since then, the Central District of California has

10:07:51AM 15   revisited the issue and analyzed and found there is no

10:07:54AM 16   IRCA preemption.

10:07:55AM 17        Setting aside the fact that GEO is wrong on the law,

10:07:58AM 18   in the context of class certification, it simply does not

10:08:02AM 19   matter in the sense that there is an overarching question

10:08:05AM 20   that is common to the class that is capable of a common

10:08:08AM 21   answer.  In that way the threshold question they have

10:08:11AM 22   identified supports and undergirds our contention that

10:08:14AM 23   there is a common overarching question that is capable of

10:08:18AM 24   a common answer in this case.

10:08:19AM 25        Not only that, once you get past what they have

10:08:22AM 1   identified as the threshold question of, could an

10:08:25AM 2   employment relationship exist, you then delve into whether

10:08:28AM 3   or not an employment relationship did in fact exist.

10:08:31AM 4        The Washington State Supreme Court has devised an

10:08:35AM 5   economic reality test, which is a multifactorial test that

10:08:39AM 6   looks at the nature of the relationship between the

10:08:41AM 7   parties.  So when you are looking at the nature of the

10:08:43AM 8   relationship, you are asking yourself questions, for

10:08:45AM 9   example, who, when, where, what, and why of GEO's

10:08:50AM 10  authority.  Who could participate in the volunteer work

10:08:52AM 11  program?  Could they direct where and when they worked?

10:08:55AM 12  Did they control the means of the production?  In this

10:08:58AM 13  instance, did they give them training?  Did they give them

10:09:01AM 14  equipment?  Did they set the pay rate of a dollar a day?

10:09:04AM 15  Does GEO rely upon the labor of the detainee workers to

10:09:09AM 16  support its operations?  These are overarching questions

10:09:11AM 17  that are capable of a common answer.

10:09:13AM 18       Now, GEO will point to the granular aspects of the

10:09:17AM 19  daily tasks.  They will say, "Well, the work that was

10:09:20AM 20  performed by the person that cleaned the kitchen is

10:09:22AM 21  different than the work that was performed by the person

10:09:24AM 22  that cleaned the bathroom."

10:09:25AM 23       They will point to security assessments:  "Well, this

10:09:28AM 24  person is high risk, and therefore they are confined to

10:09:30AM 25  their pod," versus, "This person is deemed as a lower

10:09:34AM 1   security risk and has more free-ranging ability throughout

10:09:37AM 2   the facility."

10:09:38AM 3        At the end of the day, those are questions that do

10:09:40AM 4   not impact the scope of GEO's authority or the scope of

10:09:46AM 5   the economic relationship between the parties.

10:09:48AM 6        I mean, the relationship, however broad, however

10:09:51AM 7   narrow, would be the same, irrespective of the tasks that

10:09:55AM 8   are being performed on a daily basis.

10:09:58AM 9        The second point that I want to look at is the fact

10:10:01AM 10  that individual questions about damages do not predominate

10:10:07AM 11  over the common questions regarding liability.  The cases

10:10:12AM 12  are legion.  We cite them in our brief.  Courts find in a

10:10:17AM 13  wage-and-hour context when there is a common scheme, and

10:10:21AM 14  the fact that there is a common question capable of a

10:10:24AM 15  common answer, the fact that there are individualized

10:10:27AM 16  damage inquiries does not somehow defeat class

10:10:30AM 17  certification.  That is almost always going to be the case

10:10:32AM 18  in a wage-and-hour case, in that there are going to be

10:10:35AM 19  different damages apportioned to different class members.

10:10:37AM 20       The thing about a wage-and-hour case, of course, as

10:10:39AM 21  the court well knows, those damages lend themselves to

10:10:43AM 22  formulaic calculations.  I mean, it is simply a matter of

10:10:46AM 23  math in terms of figuring out what those damages are.  So

10:10:49AM 24  it does not necessarily defeat the overarching common

10:10:52AM 25  question with respect to liability.

10:10:55AM  1      Not only that, as we point out in our briefing,

10:10:59AM  2  representative data may be used, sampling may be used to

10:11:03AM  3  help in the quest to calculate the actual damages.

10:11:06AM  4      The Supreme Court has endorsed this approach.  In

10:11:09AM  5  looking at Tyson Food v. Bouaphakeo, there is the notion

10:11:13AM  6  that we can look to aggregate damages, meaning GEO's total

10:11:18AM  7  liability, as a matter of math in figuring out what the

10:11:21AM  8  total liability would be and then figuring out the

10:11:23AM  9  proportionate share of damages for individual class

10:11:26AM 10  members.

10:11:26AM 11      The last point that I would like to address is the

10:11:28AM 12  adequacy of the plaintiff, Fernando Aguirre-Urbina.  There

10:11:36AM 13  has been a late -- I think it was titled as a supplemental

10:11:39AM 14  authority, that was submitted to the court, regarding his

10:11:42AM 15  medical records, and arguing from those records that he is

10:11:45AM 16  somehow an inadequate class representative.

10:11:48AM 17      I think, first and foremost, GEO has waived these

10:11:51AM 18  sort of arguments in that way, in that they did not

10:11:53AM 19  address it in their motion to deny class certification,

10:11:57AM 20  and did not address it squarely in their opposition to our

10:11:59AM 21  motion to certify.  So I think waiver has occurred in that

10:12:02AM 22  way.

10:12:02AM 23      Even if the court were to consider their arguments,

10:12:04AM 24  what was true in the past of Mr. Aguirre-Urbina is

10:12:07AM 25  certainly not true today.  We submitted in somewhat of,

10:12:10AM 1  perhaps, an unusual step of giving the court the entire

10:12:13AM 2  transcript, as well as the video, so that you could see

10:12:15AM 3  for yourself that he withstood seven hours of very pointed

10:12:19AM 4  questions, at times very disdainful questioning, and

10:12:23AM 5  performed admirably.  The question of adequacy is one as

10:12:26AM 6  to whether or not there is a conflict between the proposed

10:12:29AM 7  class rep and the class, and whether or not that person

10:12:31AM 8  will help in the prosecution of the case.

10:12:35AM 9  Mr. Aguirre-Urbina has done that ably in this matter.

10:12:38AM 10     Even to the extent -- assuming the court were to find

10:12:43AM 11  somehow that he was inadequate as a class representative,

10:12:46AM 12  well, he is one of two proposed class representatives.  So

10:12:49AM 13  that issue alone would not preclude class certification in

10:12:52AM 14  this case.

10:12:53AM 15     In conclusion, what we are dealing with here, and you

10:12:57AM 16  see this in the performance-based national detention

10:13:01AM 17  standards, the contracts, and, frankly, from the argument

10:13:04AM 18  this morning, that we are dealing with a common scheme.

10:13:07AM 19  We are dealing with a common program as it relates to the

10:13:11AM 20  VWP workers which GEO administrates.

10:13:15AM 21     In that way, the class vehicle is well suited to

10:13:20AM 22  resolve the rights of these folks.  So in that way, we

10:13:23AM 23  urge the court to certify a class.  It would not be the

10:13:27AM 24  first court to do so, in the sense that in the District of

10:13:30AM 25  Colorado there was a class certified of detainee workers

10:13:33AM  1  which was recently upheld by the Tenth Circuit.

10:13:37AM  2       Unless there are any further questions from the

10:13:38AM  3  court, I would conclude my remarks.

10:13:41AM  4            THE COURT:  I may have some.  Let's go ahead.

10:13:48AM  5  Defense counsel reserved some time.  Excuse me.  Did you

10:14:04AM  6  get the citations that counsel referred to as we went

10:14:09AM  7  along?  Nathan Nanfelt is one of my law clerks.  He is the

10:14:16AM  8  brains of the operation here.  I sometimes wonder if

10:14:20AM  9  lawyers realize how much they are arguing to law clerks as

10:14:25AM 10  well as the judge.  Anyway, go ahead.

10:14:29AM 11            MR. EMERY:  Your Honor, there is a daunting

10:14:32AM 12  number of things to respond to here, but I think the first

10:14:34AM 13  thing -- just one thing to revisit on Yearsley immunity

10:14:39AM 14  is, again, to emphasize ICE pays the same amount at every

10:14:45AM 15  facility.  There is no reason to treat us different as a

10:14:48AM 16  contractor.  ICE funds the Voluntary Work Program because

10:14:54AM 17  it is its program.  It is a national program.  If you read

10:14:57AM 18  the declaration filed today, there is an emphasis

10:15:00AM 19  throughout that they want uniformity.

10:15:03AM 20       All of the paper that is put in this case --  They

10:15:06AM 21  come in and produce some, you know, blips here and there,

10:15:12AM 22  something from other cases.  Let's talk about this case.

10:15:14AM 23  They have alleged we pay $1 a day.  That's what ICE tells

10:15:18AM 24  us to do.  That's what we are authorized to do.

10:15:20AM 25            The second thing is to turn to the issue of

10:15:24AM 1    employment.   This is an important moment, because if the

10:15:28AM 2    court allows these claims to go forward, and even

10:15:32AM 3    considers them for class certification, it is turning its

10:15:37AM 4    back on a considerable amount of agency experience and

10:15:42AM 5    history.   ICE has been operating detention facilities

10:15:46AM 6    through contractors for decades.   No state agency --

10:15:50AM 7    nobody has ever come forward to GEO and suggested that it

10:15:53AM 8    should be paying state-level minimum wages when Congress

10:15:57AM 9    has expressly said what the rate is for payment, and ICE

10:16:01AM 10   controls the money that goes to detainees.

10:16:05AM 11        I would point you in particular to the FLSA opinions,

10:16:09AM 12   that have gone back for decades, that draw a very simple

10:16:13AM 13   distinction:   Are detainees entitled to minimum wage under

10:16:19AM 14   the FLSA?  No.   Why?  Because they are not employees.

10:16:22AM 15   They work for purposes of institutional maintenance.   They

10:16:25AM 16   are not out seeking a wage to help support themselves.

10:16:27AM 17        When the detainees are in a facility they are

10:16:30AM 18   supported, they have clothing, they have healthcare, they

10:16:33AM 19   have food.   They are not the particular wage earner, and

10:16:36AM 20   they are not the recipient of the largess of state minimum

10:16:39AM 21   wage laws.

10:16:40AM 22        There is nothing in our contract that suggests that

10:16:43AM 23   ICE ever intended us to subject -- to have our detention

10:16:48AM 24   facilities and the VWPs run by the various different state

10:16:53AM 25   laws where ICE has facilities.

```
10:16:55AM  1        This is the same rationale that the --

10:16:57AM  2             THE COURT:  If that's the case, why is that

10:16:59AM  3   provision in the contract regarding state and local laws?

10:17:07AM  4             MR. EMERY:  Because there are a number of state

10:17:09AM  5   laws that we are required to --  For example, there are

10:17:13AM  6   different federal laws.  The VWP complies with OSHA, with

10:17:18AM  7   state labor laws.  That has been expressed.  There is

10:17:21AM  8   definitely room for that.  It doesn't mean that no state

10:17:24AM  9   laws are relevant.

10:17:26AM 10        But on an issue on which Congress has expressly

10:17:29AM 11   spoken, expressly set a rate, now and hereafter there is

10:17:34AM 12   no -- there is simply no plausible understanding that ICE

10:17:37AM 13   intended for state minimum wage laws everywhere it has

10:17:41AM 14   facilities to set what that rate is.

10:17:44AM 15        I mean, if ICE had intended state minimum wages,

10:17:49AM 16   which are at least 11, $12 an hour, how does that make

10:17:53AM 17   sense with the at least $1 per day provision?  Why would

10:17:57AM 18   ICE have that provision, use that language, if it intended

10:18:00AM 19   the state minimum wage laws would work at any given state?

10:18:07AM 20        There has been talk in the briefing and today about

10:18:12AM 21   the economic reality test.  Your Honor, there is only one

10:18:15AM 22   economic reality that matters here.  If Mr. Nwauzor,

10:18:19AM 23   Mr. Aguirre, Mr. Chen, and likely just about anybody in

10:18:24AM 24   their class, had come to GEO while they were detained and

10:18:28AM 25   asked to become a GEO employee, they would have said, "No
```

10:18:30AM 1    chance to do so."  Why?  Because they were forbidden by

10:18:35AM 2    federal law from doing so by their detention status.  They

10:18:37AM 3    either had criminal convictions, which would have

10:18:40AM 4    prohibited --

10:18:40AM 5            THE COURT:  What if GEO is in fact, under an

10:18:43AM 6    economic reality test, employing these people?  The law is

10:18:50AM 7    against the employer from employing people that are not

10:18:53AM 8    employable.  It doesn't prevent any illegal immigrant from

10:19:00AM 9    working.

10:19:01AM 10           MR. EMERY:  I understand your Honor's position on

10:19:03AM 11   that.  What really is the reality --

10:19:05AM 12           THE COURT:  It is not my position.  It is a

10:19:07AM 13   question.

10:19:07AM 14           MR. EMERY:  Okay.  I understand the question.

10:19:09AM 15   What is the reality of saying that we treated them like

10:19:12AM 16   employees?  We absolutely did not treat them as employees.

10:19:16AM 17       Do you know what our employees need to do to pass a

10:19:19AM 18   background check?  Do you know the expectations of them to

10:19:22AM 19   be able to --  Our employees, we can tell them what to do,

10:19:25AM 20   when to show up for work, what to do.

10:19:28AM 21       Think of the typical detainee.  ICE tells them when

10:19:31AM 22   to come to the facility, ICE says when they leave, ICE

10:19:35AM 23   says what classification level they can work at, which

10:19:37AM 24   drastically restricts the jobs they work.  ICE even

10:19:41AM 25   decides on a shift-by-shift basis who can actually work in

10:19:44AM  1    the program.

10:19:45AM  2          This is going back to Page 82 of the contract, where

10:19:49AM  3    we were before.  I would direct you to the very bottom

10:19:53AM  4    paragraph on this page.  It says, "It will be the sole

10:19:58AM  5    responsibility of ICE to determine whether a detainee will

10:20:03AM  6    be allowed to perform on voluntary work details and at

10:20:06AM  7    what classification level."  "The sole responsibility of

10:20:11AM  8    ICE."

10:20:15AM  9          Mr. Kimble's declaration explains how this process

10:20:18AM 10    works.  There are kites that are put out, GEO puts

10:20:21AM 11    together a list which is approved by ICE.  ICE can take

10:20:24AM 12    any single person off this list they want.  How on earth

10:20:28AM 13    is it the economic reality that GEO is the employer of any

10:20:31AM 14    of these detainees?  They are in federal immigration

10:20:37AM 15    detention.  They are in the federal government's custody.

10:20:39AM 16    The federal government says what is done to them.

10:20:42AM 17          The very last thing, quickly, is class certification.

10:20:45AM 18    Your Honor, the main thing I want to say here is we know

10:20:47AM 19    so little about these claims.  We know so little about

10:20:50AM 20    them.  You saw them rattle off, "Oh, we are going to do a

10:20:53AM 21    model of this, we are going to do a model of that."  The

10:20:56AM 22    first gauntlet that any class member would have to do is

10:20:59AM 23    to show that they are authorized to work for us when they

10:21:02AM 24    are at --

10:21:02AM 25                THE COURT:  Wait a minute.  Wait a minute.  Why

10:21:05AM 1   do they have to show that they are authorized to work when

10:21:08AM 2   in fact they are working?

10:21:12AM 3           MR. EMERY:  They are not.  They are voluntarily

10:21:15AM 4   participating in the Voluntary Work Program.  GEO knows

10:21:19AM 5   who works for them, because they pass all of our

10:21:21AM 6   employment verification tests.  None of these detainees

10:21:25AM 7   did.  They performed work as the government said that they

10:21:27AM 8   could volunteer to do for a pay rate the government said

10:21:31AM 9   they could do.

10:21:32AM 10      If there is going to be a class, it is going to have

10:21:35AM 11  to be a class of people who actually were authorized to be

10:21:38AM 12  our employees.  None of these folks were.  None of the

10:21:40AM 13  named plaintiffs so far have met that.  And they haven't

10:21:45AM 14  pointed to a single class member --

10:21:57AM 15          THE COURT:  There are examples all over the

10:21:59AM 16  country of illegal immigrants who get work.  And because

10:22:10AM 17  they are illegal, their employers pay them less than

10:22:15AM 18  minimum wage, because they think they can't complain.

10:22:22AM 19  There are instances where -- we see cases where people in

10:22:31AM 20  fact come into the country and are effectively enslaved

10:22:37AM 21  and required to work without pay.  The Minimum Wage Act is

10:22:44AM 22  designed to protect the workers from being abused by

10:22:52AM 23  employers.  Employers are the ones that are restricted

10:22:59AM 24  from hiring people that aren't qualified to work in the

10:23:03AM 25  country.  But the workers are not so limited.

10:23:13AM 1          I guess what I'm leading up to is this:  Isn't this
10:23:17AM 2     all a jury question?  You guys asked for a jury, to my
10:23:21AM 3     great relief.  Isn't it a jury question as to what the
10:23:27AM 4     employment relationship, if any, was, and how these
10:23:36AM 5     various contract provisions and legal provisions should be
10:23:41AM 6     applied?
10:23:44AM 7          MR. EMERY:  It absolutely is not.  Your Honor, I
10:23:46AM 8     appreciate the concern.  I recognize that that is the
10:23:49AM 9     objective of a lot of state minimum wage laws.  The folks
10:23:54AM 10    in the unfortunate position you are talking about are not
10:23:57AM 11    supported with food, and clothing, and healthcare, and
10:24:00AM 12    medical care at U.S. taxpayer expense.
10:24:04AM 13         THE COURT:  Some of them get various benefits
10:24:06AM 14    from their employers.
10:24:08AM 15         MR. EMERY:  They may.  The Salas case is actually
10:24:12AM 16    quite a good case on this point, your Honor.  Salas says
10:24:15AM 17    you may have to pay back -- an employer might have to pay
10:24:20AM 18    backpay if they sort of willfully ignore the detention
10:24:23AM 19    status of the detainee and employ them.  Once it is
10:24:27AM 20    determined that they are unlawfully working, there is no
10:24:30AM 21    more obligation to pay backpay.
10:24:33AM 22         We know from the day they step into our facility they
10:24:36AM 23    are not employees.  There is no work authorization, and
10:24:39AM 24    therefore no state minimum wage laws are going to apply.
10:24:44AM 25         We are in a different universe here.  The detainees

```
10:24:49AM  1   aren't here because they are being exploited.  The
10:24:51AM  2   detainees are here because they are in the federal
10:24:54AM  3   government's custody.  If that's what the root issue is,
10:24:57AM  4   there is a complaint about their custody itself, and the
10:25:00AM  5   fact that they are in a federal detention facility, this
10:25:03AM  6   is entirely the wrong case.  That's an action that should
10:25:06AM  7   be brought directly against the U.S. government, and not
10:25:08AM  8   its federal contractor.  It is another reason why Yearsley
10:25:16AM  9   applies to us.
10:25:17AM 10           THE COURT:  Thank you.  Let me see if I have any
10:25:19AM 11   other questions I want to put to you.  I had a list of
10:25:24AM 12   things.
10:25:32AM 13           MR. EMERY:  Should I sit down or stay up?
10:25:35AM 14           THE COURT:  Suit yourself, as long as you speak
10:25:39AM 15   into the mic when you talk to me.  I guess the only
10:26:38AM 16   question I have is the process for authoring policies
10:26:53AM 17   listed in the detainee handbook.  Can somebody fill me in
10:27:05AM 18   on that, what the process is?
10:27:08AM 19           MS. MELL:  Your Honor, the position of GEO is
10:27:11AM 20   that the oversight on the PBNDS standards by Congress
10:27:18AM 21   requiring routine updates as to its implementation of
10:27:24AM 22   PBNDS standards have set a Congressional level of
10:27:28AM 23   authority to enforce those regulations.
10:27:31AM 24           THE COURT:  I think you misunderstand my
10:27:34AM 25   question.  I am talking about the process for preparing
```

10:27:40AM 1   the detainee handbook and the policies that are in the

10:27:46AM 2   handbook.

10:27:46AM 3          MS. MELL:  From GEO's perspective?

10:27:49AM 4          THE COURT:  No.  No.  Not from somebody's

10:27:52AM 5   perspective.  What is the process?

10:27:54AM 6          MS. MELL:  I am asking whether you are inquiring

10:27:56AM 7   of the PBNDS standards or GEO's standards?

10:28:01AM 8          THE COURT:  You see, let me explain what I am

10:28:05AM 9   talking about.  We have all this reference to not less

10:28:10AM 10  than a dollar a day, and then in the handbook it says $1 a

10:28:16AM 11  day.  It is not not less than.  It says $1 a day is what

10:28:19AM 12  they will be paid.  My question is, what is the process to

10:28:25AM 13  get from the standards and the contract over to the policy

10:28:34AM 14  as stated in the handbook?

10:28:36AM 15         MS. MELL:  Your Honor, there are two separate

10:28:38AM 16  handbooks.  I just want to be clear.  When the detainee

10:28:41AM 17  comes into the facility, they get the ICE national

10:28:45AM 18  detention standard detainee handbook.  That says for those

10:28:49AM 19  detainees who have been participating within the requisite

10:28:54AM 20  period that we are talking about here shall receive $1 a

10:28:57AM 21  day.

10:28:58AM 22      GEO, the detention facility, promulgates a second

10:29:02AM 23  detainee handbook that mirrors what is in the ICE

10:29:09AM 24  handbook.  They just duplicate it.  And then those are

10:29:13AM 25  both available in dual languages and disseminated to the

10:29:17AM 1    detainees at the facility.

10:29:19AM 2        So in terms of how it happens, GEO relies on the

10:29:23AM 3    detainee handbook that is provided by ICE.

10:29:29AM 4        MR. FREE:  Paragraph 8 of the ICE declaration

10:29:31AM 5    filed this morning essentially says, on Page 3 of the

10:29:43AM 6    declaration, that the performance-based contracts, like

10:29:48AM 7    the one at Tideflats, don't designate how a contractor

10:29:52AM 8    performs the work, i.e., from the facility, but rather

10:29:55AM 9    establishes the expected outcomes and the results.

10:29:58AM 10       The national detainee handbook has never gone through

10:30:01AM 11   any sort of Congressional oversight.  It is not

10:30:06AM 12   incorporated into the contract.  The PBNDS is incorporated

10:30:11AM 13   into the contract, that says at least $1 a day.  The

10:30:14AM 14   national detainee handbook, to the extent it says "shall,"

10:30:17AM 15   is in conflict.  But ICE says it's GEO.  If you look at

10:30:21AM 16   the contract, the contractor -- the very first line of the

10:30:24AM 17   Voluntary Work Program section, the contractor is to

10:30:31AM 18   develop the work plan.

10:30:33AM 19       MS. MELL:  Your Honor, I just want to point out

10:30:35AM 20   on this specific issue that ICE actually approves the

10:30:38AM 21   Northwest Detention Center's version of its detainee

10:30:41AM 22   handbook.  It is reflected on the exhibit itself.

10:30:44AM 23       THE COURT:  Okay.  Thank you.  As I indicated, we

10:30:49AM 24   have already done a lot of work on this.  With all these

10:30:59AM 25   issues raised, as I indicated, it is partly a question of

10:31:04AM  1    what is the law that I should apply now and what are jury

10:31:15AM  2    questions that come later.   That's part of the analysis we

10:31:21AM  3    have to deal with, I think, in coming to conclusions on

10:31:24AM  4    these motions.

10:31:27AM  5         I also wanted to say I am aware on the motion to

10:31:34AM  6    deny -- on the motion to dismiss the amended complaint

10:31:43AM  7    there are some issues that are revisited from the original

10:31:46AM  8    motion to dismiss.   We have revisited those, even though

10:31:53AM  9    there is a question raised about whether they are properly

10:31:57AM 10    before the court.   I felt I ought to look at them anew

10:32:02AM 11    anyway, which we have done.   So that will be reflected in

10:32:08AM 12    the order we will issue.

10:32:10AM 13         Thank you very much.   A lot of the same old, same old

10:32:20AM 14    stuff going on here.   We will try and do an appropriate

10:32:26AM 15    analysis.

10:32:26AM 16         Do you have something further, Ms. Mell?

10:32:28AM 17             MS. MELL:   Your Honor, I just was concerned that

10:32:31AM 18    there was at least some oral presentation by the

10:32:33AM 19    opposition as to the Tracey Valerio declaration.   And it

10:32:37AM 20    is GEO's position that ICE has not instructed us to

10:32:39AM 21    withdraw the declaration, that the Touhy issue in play is

10:32:44AM 22    the application of 5 CFR 2635.805, which says that experts

10:32:51AM 23    like Tracey Valerio can testify as long as they are not

10:32:57AM 24    testifying in a case where it is a party.   To the extent

10:33:01AM 25    we need to brief it --

```
10:33:01AM   1            THE COURT:  Ms. Mell, I read her declaration, and
10:33:08AM   2   saw who she is and where she came from, and the contents
10:33:12AM   3   of her declaration.  I didn't think it made a whole lot of
10:33:16AM   4   difference in anything.  The same thing is true of the
10:33:23AM   5   later ICE declaration, it just didn't add a lot to the
10:33:30AM   6   issues I have to decide.
10:33:34AM   7            MS. MELL:  Thank you, your Honor.
10:33:35AM   8            THE COURT:  What you do about it, whose fault
10:33:38AM   9   that was, who turned ICE on about that is not my concern.
10:33:47AM  10            MS. MELL:  Thank you, your Honor.
10:33:49AM  11            THE COURT:  Okay.  Thank you.
            12                 (Proceedings adjourned.)
            13
            14
            15
            16
            17
            18
            19
            20
            21
            22
            23
            24
            25
```

43

1              **C E R T I F I C A T E**

2

3

4       I, Barry Fanning, Official Court Reporter for the

5   United States District Court, Western District of

6   Washington, certify that the foregoing is a true and

7   correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11

12   _____
     **/s/ Barry Fanning**
13   **Barry Fanning, Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25