# EXHIBIT A

      

2208 North 30th Street, Suite 202, Tacoma, WA 98403 • 253.627.6401 • Toll Free:  800.649.2034 • byersanderson.com

# ONE-WEEK TRANSCRIPT TURNAROUND

Digital Transcripts • Internet Realtime • HD Legal Video • Picture-in-Picture Depositions
Remote Witnesses • Designation Editing • Nationwide Scheduling • HD Videoconferencing

In the Matter of:

NWAUZOR et. al

vs

GEO GROUP

_____

## JEFFREY MUNSON

*December 12, 2019*

_____

Thank you for choosing Byers & Anderson for your court reporting, legal video, and videoconferencing needs.  For over 35 years it has been our goal to provide you with unmatched service.  Our one-week transcript turnaround is an industry leader.  If there is anything we can do to assist you, please don't hesitate to let us know.

*Sarah Fitzgibbon, CCR*
Deposition Services Lead Consultant



The Premier Advantage™
PDF transcript bundle contains:

• Full-size and condensed transcripts
• Printable word index
• Hyperlinked selectable word index
• Embedded printable exhibit scans
• Hyperlinked selectable exhibit viewing
• Common file formats: txt, lef, mdb
  accessed via *paperclip* icon

STRATEGY   •   TECHNOLOGY   •   DESIGN   •   DEPOSITIONS

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON


NWAUZOR et. al,                          )
                                         )
                    Plaintiff,           )
                                         )
              vs.                        ) No.
                                         ) 3:17-cv-05769-RJB
THE GEO GROUP,                           )
                                         )
                    Defendant.           )


DEPOSITION OF JEFFREY MUNSON, PH.D.

December 12, 2019

Seattle, Washington

```
 1                      APPEARANCES

 2    For the Defendant:

 3               Adrienne Scheffey
                 Akerman, LLP
 4               1900 16th Street
                 Suite 1700
 5               Denver, Colorado 80202
                 303.640.2512
 6               adrienne.scheffey@akerman.com

 7

      For the Plaintiff:
 8
                 Adam Berger
 9               Schroeter Goldmark Bender
                 810 Third Avenue
10               Suite 500
                 Seattle, Washington 98104
11               206.622.8000
                 berger@sgb-law.com
12

13    For the State of Washington:

14               Andrea Brenneke
                 Office of the Attorney General
15               800 Fifth Avenue
                 Suite 2000
16               Seattle, Washington 98104
                 206.233.3384
17               andreab3@atg.wa.gov

18

19

20

21

22

23

24

25
```

```
 1                        EXAMINATION INDEX

 2      EXAMINATION BY:                              PAGE NO.

 3       Ms. Scheffey                                    4

 4

 5                          EXHIBIT INDEX

 6        EXHIBIT NO.        DESCRIPTION              PAGE NO.

 7      Exhibit No. 366    Plaintiffs' Expert Witness     7
                           Disclosure
 8
        Exhibit No. 367    Spreadsheet                    42
 9
        Exhibit No. 368    Transcript of Ryan Kimble's    45
10                         30(b)(6) deposition

11      Exhibit No. 369    GEO-Nwauzor 072107 through     56
                           07229
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        BE IT REMEMBERED that on Thursday,

 2      December 12, 2019, at 810 Third Avenue, Suite 500,

 3      Seattle, Washington, at 10:20 a.m., before APRIL COOK,

 4      CCR, appeared JEFFREY MUNSON, PH.D., the witness herein;

 5                        WHEREUPON, the following proceedings

 6      were had, to wit:

 7

 8                        <<<<<< >>>>>>

 9

10      JEFFREY MUNSON, PH.D.,      having been first duly sworn

11                                  by the Certified Court

12                                  Reporter, testified as

13                                  follows:

14

15                        EXAMINATION

16      BY MS. SCHEFFEY:

17   Q  So my name is Adrienne Scheffey, and I'm here on behalf

18      of the GEO Group today.  I wanted to start with a few

19      housekeeping items.

20          Have you ever been deposed before?

21   A  Yes.

22   Q  Okay.  So you probably already know this, but I always

23      repeat it because I think it's the most important rule.

24      She's taking down everything we say.  If we both speak at

25      the same time, she can't write down what we're saying.
```

1   A   -- and majored in psychology.

2   Q   Okay.  Did you have -- did you obtain any other degrees

3       after that?

4   A   Yes.  I got a Ph.D. at the University of Washington,

5       studying child clinical psychology.

6   Q   Okay.  And what is child clinical psychology entail?

7   A   The program at the University of Washington is

8       a research-oriented program.  But given its clinical

9       psychology, focus on children, the course of study was

10      on general childhood psychopathology, treatment and

11      assessment of family's and children's mental health

12      issues, alongside of research training in order to

13      conduct research in those fields.

14  Q   Okay.  And when you say "research training," what does

15      that mean?

16  A   That means statistics, research sort of experimental

17      design and methodology and...

18  Q   Okay.  And is part of that interviewing people and

19      collecting the data or is it more assessing the data

20      afterwards?

21  A   It would include both --

22  Q   Okay.

23  A   -- of those things.

24  Q   And so where do you currently work?

25  A   I work at the University of Washington.

1  Q    Okay.  How long have you worked there?

2  A    I started working there after I graduated in 1998 and

3       was a research scientist.  That was my role for a number

4       of years and then moved to be a research professor.  A

5       similar role:  Doing research.  Studying autism primarily

6       the project's I've been working on.

7  Q    What do you do as a research professor?

8  A    I am involved in, you know, the full array, from

9       designing research studies, writing grants for those,

10      the collection of data.  My primary role, though, the --

11      the portion of that that I spend most of my time on is

12      managing the data infrastructure for lots of studies

13      where I manage, you know, information that comes from,

14      you know, clinical assessments, people interviewing

15      families or children, interacting -- interacting with

16      them, doing, you know, cognitive testing, those kinds of

17      things, plus data generated through machines like eye

18      trackers or EEG and other kinds of sensor-based data.

19      And I manage that and analyze it to address the research

20      questions we have.

21 Q    And when you say you "manage" it, does that mean you

22      organize it in a system or does that mean something else?

23 A    No, that -- it means organizing it in a system.  You

24      know, building a database that, you know, can handle the

25      different sources of data; allows people to integrate

1    that; produce, you know, datasets that can be used, then,

2    for analysis.

3  Q    Okay.  And in that role do you manipulate data?

4  A    Yeah, it's implicit in much of what I've just said it --

5  Q    Okay.

6  A    -- involves.  And by "manipulate," what I mean is, you

7    know, new values are calculated based on other values.

8    Manipulate also means just changing the -- the shape of

9    data --

10  Q    Uh-huh.

11  A    -- to fit the best analytic tools that someone's using.

12  Q    And do you also teach in that role?

13  A    No.  As a research faculty, I do no teaching, other than

14    just with students who are working on some of our

15    projects.

16  Q    And what projects are you working on right now?

17  A    I have a number of studies that I'm a part of.

18    I've recently started bringing to bear the -- sort of

19    this data infrastructure that I've built to other

20    individuals who don't study autism.  My colleague studies

21    serious mental illness and hallucinations, so we've got

22    a project there.  And then another person who studies

23    pregnancy in primates and different pathogens and how it

24    impacts the -- the pregnancy process.

25  Q    Okay.  And in those projects that you're currently

1       working on, are you collecting data or are you just

2       managing data?

3   A   When you say "you," does that mean me as an individual?

4   Q   Yes.

5   A   I --

6   Q   You as an individual.

7   A   -- yes, I -- I am not collecting it myself.  It gets

8       entered in a variety of ways.  People give me files that

9       have been generated from a machine, let's say.  I will

10      build code to import that, process that.

11          Other data is entered directly by participants,

12      maybe on the -- on the web or on a piece of paper.  Some

13      of our staff would then enter that data into the system.

14      I don't do that, though.

15  Q   And when you receive data in your role, do you ever

16      scrutinize it for outliers or do any other assessment to

17      determine its validity or accuracy?

18  A   Yeah.  That's, again, an -- an implicit part of this

19      process, too, is to examine the data as it -- as

20      I receive it.  Then there's a whole host of -- of things,

21      depending on the nature of the data, that I would want to

22      do to ensure its, you know, validity and accuracy.

23  Q   What are those things you would wanna do?  Let's use, for

24      example, user-generated data or self-reported data that

25      you would get for autism.

1   A   You know, depending on the specific question -- let's say

2       a question has a super common instrument -- they're quite

3       simple, usually, with a number of options, so the

4       multiple choice or cross off a number of items; simple

5       things like ensuring each item was in the proper range of

6       responses if they're numbered one through five, for

7       example; looking for patterns of missing information in

8       the midst of it.  So in that context, those are two of

9       the most common -- most common things I would need to do.

10                           (Ms. Roe enters the room.)

11  Q   (By Ms. Scheffey)  And how would you identify if

12      information is missing?

13  A   It would result in a blank in the -- the resulting record

14      in the database.

15  Q   And how would you analyze if someone chose -- I think you

16      said there were multiple-choice options -- if someone

17      chose B and they meant to choose C?

18  A   Well, I couldn't know the intent.  If something was

19      entered as a 2, I would have to treat that as a 2.

20  Q   Okay.

21  A   Because I am -- what I'm only seeing is a 2 entered into

22      a -- a given field in the database in a given record in

23      a given table type of thing.

24  Q   So you do not conduct interviews to validate data.

25                           MR. BERGER:  Objection.  Overbroad.

1        But go ahead and answer.

2                    THE WITNESS:  In the -- in the course

3    of our work, clinicians or staff who conduct interviews,

4    part of that process is an assessment of validity in an

5    ongoing way.  If -- if someone would have a question

6    about a given response, they'd seek clarification just to

7    make sure that someone's writing down an answer properly.

8        In the case of a -- a self-report questionnaire,

9    typically those are just treated as provided by the

10   participant.

11       So, you know, you refer to two different things.

12   You've mentioned interview.  I was referring to

13   a questionnaire.  Those would be different contexts where

14   the questionnaire would be less likely to have

15   a back-and-forth interchange --

16   Q  And --

17   A  -- especially if someone mailed it or filled it online or

18      something.

19   Q  -- and just so I understand:  It would be staff, not you

20      yourself, who would be --

21   A  Yes.

22   Q  -- collecting that?

23   A  I -- I -- I haven't been involved in the direct data

24      collection for many years, although I did do that early

25      on.

1    Q    So then your main job is dealing with data you've been

2         provided.  Or assessing data you've been --

3    A    **Yeah.**

4    Q    -- provided.

5    A    **That's my main role in the -- the research I'm involved**

6         **in currently.**

7    Q    Okay.  So in terms of data analysis, do you have any

8         specific qualifications?  Certificates?

9    A    **No certificates other than graduate-level courses in**

10        **a variety of statistical techniques.  The -- the core**

11        **sort of statistical coursework in my degree program, but**

12        **I've taken additional courses as well, and we have**

13        **different multivariant statistical techniques.**

14   Q    You mentioned numerous "statistical techniques."

15        What are those techniques?

16   A    **They could be the -- the names of different statistical**

17        **techniques can be clumped at different levels of**

18        **generality.**

19        **So aiming for the level at which I think of, one**

20        **is sort of linear mixed models, which is one statistical**

21        **technique that allows you to analyze data that's**

22        **collected across multiple levels.  Repeated observations**

23        **with an individual and then those observations across**

24        **multiple individuals would create two different levels**

25        **of data.  So intermixed models, simple things of looking**

1     for associations between things with correlations and

2     multiple regression.  We can get differences between

3     samples with analysis of variance, and that gets more

4     and more complicated as the questions get more refined,

5     whether there's covariants included and things like

6     that.

7        That covers the bulk of the -- the other class

8     would be structural equation models, which primarily --

9     primarily look at the degree of relationships among

10    different variables.

11 Q  And which one of those two techniques did you use for

12     this case?

13 A  None.

14 Q  None?

15 A  I have no -- I have made no statistical inferences in

16     my work on this case.

17        And, to be clear, by "statistical inference,"

18     I mean by that having a sample of data that's deemed

19     representative of a broader population and then doing

20     statistics, like I mentioned, in order to address

21     specific questions about that data to make sort of

22     generalizations to the broader population.

23        In this case I've just been working with the

24     information I've received and the entirety of it.

25 Q  When you say "the entirety of it," what do you mean?

1  A  If I'm interested -- as -- as an analogy, if we were

2     interested in children with autism, we might get a sample

3     of 50 children and their families and do some things,

4     draw some -- and draw some inferences.  We would

5     generalize that to the broader population of all children

6     with autism, let's say, in the United States.

7         With this work that I've done on the GEO case,

8     I received some information about detainees and, you

9     know, their record of work and I've made calculations

10    based on all of it, not just a subset of it.  So there's

11    no inference from a sample to a population.

12 Q  So in this case you did not receive a sample that you

13    then transferred to the population.

14 A  I -- I received what I understand was all the records

15    related to the detainees at a given facility for a given

16    time period.  And I'm unaware of whether there's more

17    information or not.

18 Q  Okay.  Can you tell me about the last time you took

19    a course or other sort of certificate program about data

20    analysis?

21 A  Oh, it would've been since grad school.  So 1997,

22    probably.

23 Q  How did you become proficient in the data analysis

24    responsibilities that are listed on your résumé?  You may

25    turn and look at that.

```
 1  A   How did I become proficient?

 2  Q   (Ms. Scheffey nods head affirmatively.)

 3  A   I, even as an undergrad, did some work with statistical

 4      software.  Continued that in grad school.  My research

 5      assistant, RA, positions were doing similar things, just

 6      managing data, doing data analysis.  Over time as needs

 7      in our projects grew, I learned about databases.  And,

 8      you know, largely self-taught and, you know, querying

 9      Google many times to try to figure out different things,

10      but have built that -- the data infrastructure largely by

11      myself using Microsoft SQL server and a variety of tools.

12      But -- so it's a combination of self-taught and classroom

13      work as a grad student.

14  Q   Have data analysis standards or practices changed since

15      1998?

16  A   The tools certainly have changed.  Statistical

17      methodology is always changing as well.  My work as an

18      expert in legal arena has always been more on data --

19      data management and, again, making calculations across

20      large amounts of data, but not applying statistical

21      methods to draw inferences from that data.  It's more

22      the mechanical portion of manipulating and managing large

23      amounts of data, implementing assumptions about different

24      damages claims that the case involves, and carrying those

25      out.
```

1      are wages.  If it's work that's been purported to have

2      been done but not paid, I guess that would count as

3      unpaid wages.  I don't -- I'm not using that in the

4      technical, legal sense, but I have done calculations on

5      a number of cases across claims -- various claims like

6      that.

7  Q   Do you have a standard methodology for approaching claims

8      for back wages or missed meal breaks?

9  A   No.  I implement assumptions provided by the attorneys

10     I'm working with relevant to the case at hand.

11 Q   When you say you implement assumptions provided by the

12     attorneys, what do you mean by that?

13 A   That means that the application of the assumptions to

14     the data by means of using -- you know, the -- the last

15     several years I've used R, just -- just the capital

16     letter R -- statistical environment to apply the

17     assumption to the data.  Because the assumption by itself

18     doesn't yield -- it's -- it's unknown how many, let's

19     say, missed rest breaks there would've been.  But taking

20     that assumption, applying it to the data I've received,

21     I can come up with an -- an answer to how many rest

22     breaks were missed.  So that's what I mean when I say

23     apply the assumptions.

24 Q   So if I'm understanding you correctly, an assumption is

25     an unknown and the only thing that is known when you're

1     doing these -- this application is the data; is that

2     correct?

3  A  I would -- well, the -- the assumption is known.  What

4     isn't known is whether the -- the Court or the trier of

5     fact will agree with that assumption or not.  But it's

6     a -- it's a given.  It's an assumption.  And it's the --

7     the technical implementation of the assumption on the

8     data yields the result.  So I -- I guess -- I don't know

9     if that answers your question, but...

10  Q  So for a question about, like we have in this case,

11     individuals who claim that they were not paid minimum

12     wage for a certain number of hours, what is the

13     assumption?

14  A  The assumptions that are present in my work to date was

15     that the average shift length for a given -- for a given

16     worker, working a given day, was 1.72 hours, which came

17     from, you know, what I refer to as Exhibit 20.  I believe

18     that was from Ryan Kimble.  And that was -- that was one

19     assumption.

20        The other assumption was that in the data

21     I looked at, each indication of -- well, now, I just

22     used the -- these totals, the invoices that GEO

23     submitted, I believe -- I -- I don't really their name,

24     but the invoices that were month by month.  And the --

25     there was an assumption that each dollar represented in

1  A   In the materials considered for this report, I had no

2      information about what location an individual did work

3      in, so no.

4  Q   Did you look at any data showing how long a detainee

5      worker's shift was?

6  A   Only -- only Exhibit 20.

7  Q   Okay.  So I'm gonna go through, if you will turn these --

8      and I apologize, these pages aren't numbered.  But I

9      wanted to go to your Exhibit B, which shows the cases

10     you've previously worked on.

11 A   (Witness indicates.)

12 Q   Appendix B, it looks like this.

13 A   (Witness complies.)

14 Q   Yeah.  Or that one.  It looks like they're both the same.

15 A   Okay.  Okay.

16 Q   We can go to the other list.  That's fine.  It's here.

17 A   Oh, no, this is --

18 Q   This is fine.

19 A   Okay.

20                    MR. BERGER:  Okay.

21                    MS. SCHEFFEY:  You knew where it was.

22                    MR. BERGER:  I just --

23                    MS. SCHEFFEY:  I realized today that

24     they didn't have page numbers, so I apologize.

25                    MR. BERGER:  That's okay.

1                        MR. BERGER:  I'm just laughing because
2       there was about 11 hours of cross-examination.
3                        **THE WITNESS:  I do remember that.**
4                        MS. BRENNEKE:  11?
5                        MR. BERGER:  Yeah.
6  Q   (By Ms. Scheffey)  Did you apply a similar methodology to
7       that case as this case?
8  A   **That case I had detailed information about each driver**
9       **and -- and stuff, so the level of the detail -- the**
10      **information for that is very different than what I've**
11      **done thus far for -- in this GEO case.**
12 Q   So would it be fair to say your methodology there was
13      different than here?
14 A   **They're certainly -- the -- the data was different,**
15      **the -- the -- the claims were different, the -- but the**
16      **overarching sort of role of taking the assumptions about**
17      **violations, applying them to the data, that's the --**
18      **that's the same in terms of my -- the nature of my**
19      **opinions and conclusions.**
20 Q   Okay.  What about Hill?  What was that case about insofar
21      as it involved your expert testimony?
22 A   **Very similar in that there were claims about breaks --**
23      **you know, missed rest and meal breaks.  Again, I'm not**
24      **recalling the details of off-the-clock work or -- and/or**
25      **unpaid overtime, but I would say very similar to Brinks.**

1      And essentially all the work that I've done is fulfilling

2      that role of taking the -- the raw data to characterize

3      the work and then applying assumptions about the

4      violations to calculate damages.

5  Q   Do you recall what your findings were in that case?

6  A   Some amount of damages that should the Court find the

7      defendant violating, then those are the damages.  I can

8      say that many of the assumptions -- or it -- it's not

9      uncommon that the assumptions I'm provided, should those

10     be changed as a result of the, you know, litigation

11     process and the Court find a different value, let's say

12     of the percentage of missed meal breaks, that revised

13     assumption could then be -- I could take that and then

14     recalculate the things that I've done typically very

15     easily.

16         So -- so the opinions I -- I offer kinda come with

17     that -- that built-in flexibility because I have no

18     opinion about the veracity of the assumption itself.

19  Q   And was your testimony challenged in Hill?

20  A   I don't recall.

21  Q   Okay.  What about Bruner?  What was that case about?

22  A   Similar issues.  Again, it's an employment law,

23     wage-an-hour things, missed breaks.  Again, a subset of

24     missed breaks, off-the-clock work, unpaid or mispaid

25     overtime.  I don't recall the details of which claims are

1     calculations based on that single number.  So the volume

2     is, like, minuscule compared to, you know --

3  Q  Okay.

4  A  -- what's typical by getting, you know, the full set of

5     employees' let's say daily work record or whatever.

6  Q  Okay.  And are there others in your field who would

7     analyze the data you analyzed in this case in the same

8     way?

9  A  I --

10             MR. BERGER:  Object to form.

11     Go ahead and answer.

12             THE WITNESS:  -- yeah, in my field

13     I -- I would think the -- implementing the assumptions

14     I'm provided could be -- could be carried out with

15     different types of software, but it tends to be simply,

16     at the end of the day, just arithmetic --

17  Q  (By Ms. Scheffey)  When you say --

18  A  -- and multiplication.

19  Q  -- "arithmetic," what do you mean?

20  A  I mean it's multiplication across -- of, let's say, the

21     number of presumed unpaid hours for a week, that number

22     of unpaid hours would've been calculated by adding the

23     amount of missed rest time, let's say on Monday and then

24     on Tuesday for that week.  To get damages you'd take that

25     sum, which arithmetic, multiply it by the relevant rate

1   for that week for that employee -- and, again, what's the

2   relevant rate would be provided as an assumption -- get

3   a value there.  Total damages would be summing across all

4   of those weeks for all of those employees.

5       So it -- so I say arithmetic just because the

6   mathematical operation is -- is straightforward and

7   simple.  Anyone implementing these assumptions would use

8   those mathematical operations.

9       Again, the software, how to do that efficiently,

10  given the existing data, would probably be -- be done in

11  a variety of ways, but should come with the essentially

12  the outcome.

13  Q  Do you need any specialized knowledge to do that

14     arithmetic?

15  A  Not the arithmetic.  I believe you need specialized

16     knowledge to apply it across a giant volume of data.

17     That's --

18  Q  And when --

19  A  -- where --

20  Q  -- you say --

21  A  -- my expertise comes in.

22  Q  -- when you say "apply it," is that what you're -- are

23     you referring to use the software or manipulate the

24     software to --

25  A  Yes.

1   A   I didn't use them to -- to, like, determine whether or

2       not the information in Exhibit 20 was appropriate or not.

3       Or I didn't look at them to -- to try to gain any other

4       understanding of Documents 6 through 19.  They were, you

5       know, given to me as a function of the case.  But to

6       carry out the -- the task that I was asked to do to

7       calculate damages based on the monthly invoices, assuming

8       a 1.72 hour average shift length, I did not need these

9       other documents to do that.

10  Q   So I'm just gonna try and understand.

11      For example, if there was an inconsistency between

12      No. 3, which is the Kimble deposition, and No. 4, which

13      is Exhibit 20, you didn't consider that inconsistency?

14                    MR. BERGER:  Object to form.

15      You can answer.

16                    THE WITNESS:  I was -- I needed --

17      since I have no knowledge of, you know, employee or

18      detainee shift work, I relied on only Exhibit 20 as --

19      as that.  Well -- and I should say that's the assumption

20      I was provided to implement.  And to me that seemed

21      reasonable, given it was a document produced by the

22      company.

23      And it's common in my work with attorneys that the

24      assumptions provided me can vary.  Or sometimes I'm asked

25      to implement a -- a variety of different assumptions

```
 1        to -- you know, to see the impact of should the Court
 2        find that, you know, Assumption A versus Assumption B
 3        is -- reflects the truth.
 4            So here I know that the assumption I was asked to
 5        use, 1.72, comes from Exhibit 20, from the Ryan Kimble
 6        deposition.
 7   Q    (By Ms. Scheffey)  Okay.  Did you review any other
 8        documents that are not listed here?
 9   A    No.
10   Q    Were you provided the entire transcript of the Kimble
11        deposition?
12   A    I -- I don't know --
13   Q    Okay.
14   A    -- if I was or not.
15   Q    Were you provided all of the exhibits to the Kimble
16        deposition?
17   A    I don't believe so if, I assume from this, that there
18        were at least 22.
19   Q    Okay.  How did you conclude that each shift was
20        1.72 hours?
21   A    That is based on Exhibit 20, the -- the result of that
22        work spreadsheet or table, I guess.  I did not review
23        that table to see if the calculations were -- were
24        accurately conducted in each row to get 1.72 as the
25        overall average.  I just took the 1.72 as-is.
```

```
 1       average?

 2   A   It represents an average of one -- yeah, the average

 3       length of a worker's shift.  It doesn't calculate the

 4       variability around that average that there is, but...

 5   Q   And why do you believe it's an average?

 6   A   Well, the bottom row says "Average Hours."

 7   Q   Why do you believe it's the average length of a worker's

 8       shift in particular?

 9   A   Given, you know, what I stated in terms of my

10       understanding of this and what I've been told these

11       columns reflect, that total workers is the numerator with

12       total hours the denominator and then dividing those

13       yields an average of hours per shift.  Well, I -- flip

14       that.  Hours in the numerator.  So 810 divided by 470

15       I presume is 1.72.

16   Q   Did you review Mr. Kimble's testimony to find out what he

17       believes this document is?

18   A   No.

19   Q   Do you know who created this document?

20   A   No.

21   Q   Do you know if the methods used to produce it were

22       reliable?

23   A   No.

24   Q   Did you ask to speak with anyone about how -- who created

25       the document?
```

1   **A**   **No.**

2   Q   Did you ask to speak with anyone about the methods for

3       collecting this document?

4   **A**   **No.**

5   Q   Do you have any understanding of the assumptions

6       underlying this document?

7                   MR. BERGER:  Object to form.

8                   **THE WITNESS:  Not in detail.  I would**

9       **have to make just a commonsense guess about the**

10      **assumptions --**

11  Q   (By Ms. Scheffey)  Did you --

12  **A**   **-- involved.**

13  Q   -- look at any other documents to try to corroborate

14      those estimates?

15  **A**   **No.**

16                MR. BERGER:  When it's a convenient

17      time to take a break, can we take a short --

18                MS. SCHEFFEY:  We can take it now if

19      you want.

20                MR. BERGER:  Great.

21                MS. SCHEFFEY:  Let's go off the

22      record.

23                   (Short recess taken.)

24                MS. SCHEFFEY:  All right.

25  Q   (By Ms. Scheffey)  So before the break I believe we were

1      talking about whether you looked at Mr. Kimble's
2      testimony in his deposition to analyze Exhibit 20.
3  A   **Correct.  You asked and my -- my answer was, no, I just**
4      **I -- I relied on Exhibit 20 as an estimate from the**
5      **company that -- that reflect at least one estimate of**
6      **the --**
7  Q   Okay.
8  A   **-- average shift length.**
9  Q   Okay.  So I am going to mark this as 368.  This is
10     Mr. Kimble's deposition testimony.
11                         (Exhibit No. 368 marked for
12                          identification.)
13                 MS. BRENNEKE:  And so the record is
14     clear, I think I'd like it to just reflect that this the
15     30(b)(6) of GEO Group in the person of Ryan Kimble.
16     Because --
17                 MS. SCHEFFEY:  That's fine.
18                 MS. BRENNEKE:  -- there's a separate
19     deposition of him as a --
20                 MS. SCHEFFEY:  Okay.
21                 MS. BRENNEKE:  -- person.
22                 MS. SCHEFFEY:  And I will represent on
23     the record that it is the Ryan Kimble deposition from
24     which the Exhibit 20 came.
25                 MS. BRENNEKE:  The 30(b)(6) --

1      know, I hadn't reviewed this page, so I was not provided

2      other information other than this is an estimate.

3  Q   (By Ms. Scheffey)  And did you know or do you know,

4      sitting here today, when the document was created?

5                          MR. BERGER:  Which document?

6                          MS. SCHEFFEY:  Exhibit 20.

7                          THE WITNESS:  No.

8  Q   (By Ms. Scheffey)  Do you know if Exhibit 20 represents

9      the maximum staffing in 2014?

10                          MR. BERGER:  Object to form.

11         You can answer.

12                          THE WITNESS:  No, I don't know that.

13  Q   (By Ms. Scheffey)  Do you know if Exhibit 20 represents

14      detainee work assignments in 2015?

15  A   No.  I'm not familiar to what time period Exhibit 20

16      refers.

17  Q   Okay.  Do you know who created Exhibit 20?

18  A   No.

19                          MR. BERGER:  Objection.  Asked and

20      answered.

21                          THE WITNESS:  No.

22  Q   (By Ms. Scheffey)  Okay.  Did you review Mr. Kimble's

23      testimony to determine who created the Exhibit 20?

24  A   No.

25  Q   Okay.

```
 1  Q    Okay.  Is it your understanding that those definitions --
 2       I'm looking at A1, A2, A3 -- only represent different
 3       pods or that they represent different jobs?
 4  A    I don't know.
 5  Q    You don't know?
 6  A    (Witness shakes head negatively.)
 7  Q    Okay.  Did you make any effort to figure out what those
 8       notations meant?
 9  A    No.
10  Q    Okay.
11  A    I, at this point, simply used the overall average --
12  Q    Okay.
13  A    -- for my work to date in the -- the report at 366 --
14       Exhibit 366.
15  Q    Did you review any documents that would indicate there
16       were different shifts in the voluntary work program?
17  A    I'm not sure what you mean by "different shifts."
18  Q    Did you review any documents that would indicate that
19       there were different positions a detainee could hold
20       within the voluntary work program?
21  A    No.  But my understanding is that any one of these
22       somebody could work and that, like, the kitchen, fix
23       breakfast, lunch, dinner.  So there's different times
24       during the day is my assumption there and -- but I did
25       not review other documentation that tells me how someone
```

1    is assigned to a different -- a given shift or -- or

2    what.

3  Q  Okay.  Did you look at any other documents which would

4    inform you about how many barbers, for example, there are

5    in the facility?

6  A  No.

7  Q  Okay.  Did you review Mr. Kimble's testimony about how

8    many barbers there were in the facility?

9  A  No.

10 Q  Okay.  How many barbers did you assume were in the

11   facility?

12 A  I made no assumptions with regard to the number of

13   barbers, per se, only to the degree that this overall

14   estimate of 1.72 relies on, you know, 15 barbers working

15   four hours.  That's -- that's a portion of the

16   information that goes into this average hours.

17 Q  If there were only two barbers working four hours, would

18   that change the 1.72 number?

19 A  Yes.  Any -- any of these -- changing any one of these

20   numbers would change the overall average, yes.

21 Q  And would changing the overall average change your

22   analysis?

23 A  Yes.

24 Q  Okay.

25 A  That would be me being provided a different assumption

1    regarding the average shift length.

2 Q  Okay.  I'll have you turn to Page 85 of Ryan Kimble's

3    deposition.

4 A  (Witness complies.)

5 Q  At Lines 19 through 21, Mr. Kimble indicates that there

6    are a limited number of barber chairs.

7       How many does he state there are?

8 A  Line 20 says:

9       "And it has, I think, four or five barber chairs."

10 Q  Okay.  Did you consider that assumption in contrast with

11    the ten barber chairs on Exhibit 20?

12                    MR. BERGER:  Object to form.

13                    THE WITNESS:  No.  Exhibit 20 says 15

14    under the "Worker" column, but I have no knowledge with

15    regard to the number of people working relative to the

16    number of chairs.  I just don't know --

17 Q  (By Ms. Scheffey)  Okay.

18 A  -- anything about that.

19 Q  On Page 86 did you review Mr. Kimble's testimony from

20    Lines 12 to 16?

21 A  No.

22 Q  In that testimony how many detainee barbers did he

23    testify there would be at any given time?

24 A  It looks like in Line 14 he says:

25       "It could be anywhere from six to eight."

 1  Q   How would six to eight change the 1.72 number in

 2      Exhibit 20?

 3                      MR. BERGER:  Object to form.

 4      Incomplete hypothetical.

 5                      **THE WITNESS:  If the other assumptions**

 6      **held true, six to eight could be -- one would have to**

 7      **choose a single value, replace the 15, and the overall**

 8      **average would drop accordingly.**

 9  Q   (By Ms. Scheffey)  So if there were fewer barbers

10      accounted for in Exhibit 20, you believe that

11      mathematically the average would drop?

12  **A   Yes, given they had four-hour shifts according to this**

13      **document.**

14  Q   Did you review Miss Henderson's deposition?

15  **A   No.**

16  Q   Did you review Alicia Singleton's deposition?

17  **A   No.**

18  Q   Did you review any other depositions to look for

19      inconsistencies in Exhibit 20?

20  **A   No.**

21  Q   How did you account for the unknown variables of

22      Exhibit 20?

23                      MR. BERGER:  Object to form.

24                      **THE WITNESS:  That question -- for**

25      **my purposes, Exhibit 20 provided a single piece of**

1    at that has the reference with each individual's name is

2    more accurate than the one you used, would that change

3    the amount that would be your damages calculation for the

4    month of July 2017?

5  A  Certainly if I used this document as the -- the source

6    data, indicating how many, you know, total shifts, then,

7    yes, the 12,314 would be used rather than the 12,500.

8  Q  And how would that approximately $200 reduction affect

9    your analysis for July 2017?

10 A  Damages would be reduced by that number times minimum

11   wage minus that number.

12 Q  In your methodology is there a standard rate of deviation

13   or error assumed?

14 A  No.  Nor does there need to be, given the methods I used.

15   I simply took the -- the total invoice amount under the

16   "Worker Pay Adjusted" and carried out the calculations.

17   So there was no variance estimate -- I forgot the word

18   you used.

19 Q  Standard deviation.

20 A  Ah.

21 Q  Or if there's another way for calculating it in your

22   methodology.

23 A  No.  It was straightforward, using the -- the total.

24   My -- this workup did make an assumption for months that

25   I did not have an invoice for.  I believe I took the

1    average across the other months and simply applied that

2    to -- to the additional months for which there wasn't

3    data.

4  Q  Okay.  And so what months have an assumption in them?

5  A  The months that have an additional assumption that is

6    based on the average that began in March 1st, 2018.  You

7    can see on Table 1 of my report that that figure's just

8    continued on through the rest of the table with the

9    change in minimum wage happening at January 2019.  But,

10   otherwise, it utilized that average -- that overall

11   average.

12 Q  Okay.  So here I think we agreed that there's an

13   approximately $200 difference between the worker pay in

14   your report and the dollar amounts on the worker pay

15   reimbursement.

16 A  Yes, that those two values differ.

17 Q  In your opinion is that difference significant?

18                     MR. BERGER:  Object to form.

19                     THE WITNESS:  "Significant," that

20   word actually has a variety of meanings statistically.

21   Here I don't know how to -- I don't interpret that

22   difference.  I would simply say I don't know why it's

23   different.

24       Should I be asked to calculate the damages utilizing

25   this information and this subtotal reflects the -- the

1       information, you know, contained -- contained in the

2       subsequent page, then that would be -- that would be

3       the -- the value I'd use.

4   Q   (By Ms. Scheffey)  When you say there's several meanings

5       of significant, can you tell me what those are?

6   A   Well, statistical significance is a concept that, given

7       the probability of an observed test statistic applied to

8       certain data, when someone sets an established threshold

9       of let's say 1 in 100 or 1 in 1,000, should the findings

10      find to be very unlikely to have occurred the way they

11      did, that would be deemed statistically significant.  And

12      I -- I wanted to make sure I wasn't commenting about

13      anything statistical when you used the word

14      "significant."  So --

15  Q   So this analysis is not a statistical analysis?

16  A   That's correct.

17  Q   What would you describe your analysis as?

18  A   It's -- it's the result -- it's the result of a -- of

19      a -- the process of -- it's a -- it's a data analytic

20      process, but implementing these -- these assumptions that

21      have sort of arithmetic sort of operations to carry them

22      out.  Like, it's -- it's what I referred to earlier in

23      the deposition, that I'm not making inferences about

24      a subset of data to a bigger --

25  Q   And then --

1  A    -- to a bigger population.

2  Q    -- how does the data analytic methodology differ from

3       a statistical methodology?

4  A    Statistics employ a bunch of assumptions and calculate

5       an estimate of, like, the degree of -- it depends on --

6       it depends on the analysis undertaken, but the degree of

7       difference between two samples of data.  It's a -- a --

8       a simple one.  And here I'm simply adding, you know, the

9       results of the calculation carried out on each row here

10      in Table 1.

11 Q    Is R a statistical-analysis tool?

12 A    Yes.

13 Q    Was this created using R?

14 A    Yes.

15 Q    But it's your testimony today that it's not a statistical

16      analysis.

17 A    Well, by saying R is a statistical-analysis tool, that

18      doesn't mean that is only what it does.  Part of the

19      inherent nature of analyzing data is processing data,

20      manipulating data.  So I use R to -- to carry out these

21      calculations.  But, again, it's not I think the keyword

22      is inference, that I'm not making statistical inferences.

23 Q    Can -- did you use R to extrapolate the data on

24      Exhibit 20 to a larger population?

25 A    Just to the -- I -- I used R to calculate the average for

1    the months I did have, and then it seemed a reasonable

2    approach to take that average and just apply that to the

3    subsequent months.

4        If I was provided different assumptions such as,

5    well, just take the last three months and use the average

6    of the last three months and apply that to the subsequent

7    months, that could seem a reasonable approach as well.

8    The one I utilized here is just that overall average.

9  Q  Did you use R to analyze Exhibit 20 in any way?

10 A  No.  I just used the 1.72 average shift length, used that

11   piece of information from it.

12 Q  Did you double-check the math of Exhibit 20?

13 A  No.

14 Q  Did you do anything to analyze Exhibit 20 beyond its face

15   value?

16 A  No.  Other than knowing it was produced by the company,

17   I used that just like you said, as -- on its face as an

18   estimate of the average shift length.

19 Q  How did you account for the change in participation in

20   the voluntary work program over time in your report?

21 A  It's implicitly included by assuming that the -- the

22   worker pay value reflects how many individuals were

23   working.  So it's done month by month based on that value

24   from the invoice.

25 Q  Did you account for increases in, for example, a shorter

```
 1                      MR. BERGER:  Object to form.
 2                      THE WITNESS:  Yeah, the -- the
 3        proportion's derived from the number.  I was just saying
 4        if there were more people working in longer shift areas,
 5        the average would go up.  If there's fewer people in the
 6        longer shifts or more people in the shorter shifts, the
 7        average would go down.
 8   Q    (By Ms. Scheffey)  Okay.  How would you account for that
 9        in your analysis?
10   A    There was no attempt to account for that in my report
11        because I had no information that would show that
12        variability.
13             The information in Exhibit 369 appears to contain
14        the specifics with regard to which person in which shift.
15        And in that regard, there would be no estimate required.
16        You could just presumably know how many people were in
17        each area or --
18   Q    Which --
19   A    -- location.
20   Q    -- data would be more reliable for your method?  The
21        Exhibit 20 or the Exhibit 369?
22   A    I think they're -- they're both reliable.  They're
23        different.  I think using the Exhibit 369 information
24        I presume would be more accurate with regard to what
25        happened for specific people on specific days.  That's
```

1     across which one is, you know, applying it to, that would

2     make it a -- a good -- a good estimate.

3          In this case I've, well, for my first report used

4     the average to apply it those subsequent months for

5     which I didn't have invoices.  When you talked about

6     Exhibit 369 you didn't talk about using any average, just

7     the assumption of the shift length by code.

8   Q  (By Ms. Scheffey)  Did you make any assessment of whether

9     the sample provided in Exhibit 20 was similar to the

10    population that it was supposed to reflect?

11                     MR. BERGER:  Object to form.

12                     THE WITNESS:  From the information in

13    369?

14  Q  (By Ms. Scheffey)  No.  In --

15  A  Was that --

16  Q  -- Exhibit --

17  A  -- your --

18  Q  -- 20.

19  A  -- question?  Oh, Exhibit --

20  Q  Did you --

21  A  -- 20?  No, I just -- I used it as an estimate provided

22    by the company, like I said before, as a face valid

23    average.

24  Q  Did you take any other effort -- efforts to establish

25    whether Exhibit 20 was reliable?

```
 1                         MR. BERGER:  Objection.  Asked and

 2       answered.

 3                         THE WITNESS:  No.

 4   Q   (By Ms. Scheffey)  Okay.  I don't think I have any more

 5       questions.  Is there anything you need to correct or you

 6       want to go back and revisit today?

 7   A   I don't believe so.  No.

 8                         MS. SCHEFFEY:  I am done.

 9                         MR. BERGER:  Okay.

10                         MS. BRENNEKE:  Thank you.

11                         MR. BERGER:  Thank you very much.

12                               (Signature reserved.)

13                               (Deposition concluded at

14                                12:49 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

1   STATE OF WASHINGTON )    I, April Cook, CCR #3245,
                        ) ss a certified court reporter
2   County of Pierce    )    in the State of Washington, do
                             hereby certify:

3

4

         That the foregoing deposition of JEFFREY MUNSON, PH.D.
5    was taken before me and completed on December 12, 2019, and
     thereafter was transcribed under my direction; that the
6    deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
7    objections, motions and exceptions;

8        That the witness, before examination, was by me duly
     sworn to testify the truth, the whole truth, and nothing but
9    the truth, and that the witness reserved the right of
     signature;

10

         That I am not a relative, employee, attorney or counsel
11   of any party to this action or relative or employee of any
     such attorney or counsel and that I am not financially
12   interested in the said action or the outcome thereof;

13       That I am herewith securely sealing the said deposition
     and promptly delivering the same to Adrienne Scheffey.

14

         IN WITNESS WHEREOF, I have hereunto set my signature on
15   the 15th day of December, 2019.

16

17

18

19   _____

     April Cook, CCR
20   Certified Court Reporter No. 3245
     (Certification expires 10/11/20.)

21

22

23

24

25