# WHITEHEAD DECLARATION

# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

----------------------------------------------------------

UGOCHUKWU GOODLUCK NWAUZOR,            )

FERNANDO AGUIRRE-URBINA,               )

individually and on behalf of all      )

those similarly situated,              )

          Plaintiffs,                )

     vs.                              ) No. 17-cv-05769-RJB

THE GEO GROUP, INC., a Florida         )

corporation,                           )

          Defendant.                 )

----------------------------------------------------------

Videotaped

Deposition Upon Oral Examination of

MARC A. JOHNSON

----------------------------------------------------------

2:05 p.m.

Tuesday, December 3, 2019

1019 Regents Blvd., Suite 204

Fircrest, Washington

REPORTED BY:  Keri A. Aspelund, RPR, CCR No. 2661

Marc Johnson                                        December 3, 2019

Page 15

1                MS. MELL:  Object to the form.

2        A.    Yes.

3        Q.    Now, some of the personnel may be different, but

4    in terms of the structure, is that more or less the way

5    that things are today?

6        A.    Yes.

7        Q.    All right, who's housed at the Northwest

8    Detention Center?

9                MS. MELL:  Object to the form.

10       A.    Detainees that have been taken into Immigration

11   and Customs Enforcement custody.

12       Q.    Are the folks there in any sort of criminal

13   detention?

14               MS. MELL:  Object to the form of the question.

15       A.    Not to my knowledge.

16       Q.    To your knowledge, are they there as punishment?

17               MS. MELL:  Object to the form of the question.

18       A.    No.

19       Q.    Have you or any of your coworkers talked about

20   this lawsuit?

21       A.    Yes.

22       Q.    Tell me about some of those conversations.

23       A.    We talked about that, you know, there is a

24   lawsuit.  I've seen some updates in the news and stuff.

25   It's been very brief, nothing -- nothing major.

Page 20

1        Q.    In what way?

2              MS. MELL:  Object to the form of the question.

3        A.    If -- it would -- it would get done regardless

4    if the detainees did it or not.  It's not a mandatory

5    thing.

6        Q.    But certainly the work they do helps out?

7              MS. MELL:  Object to the form of the question.

8        A.    Yes.

9        Q.    Now, as a detention officer, do you believe that

10   part of your job is directing the work and providing

11   training and supervision of the detainee workers in the

12   Voluntary Work Program?

13             MS. MELL:  Object to the form.

14       A.    Yes, it's a collateral job.

15       Q.    When you say collateral, what do you mean?

16       A.    As a detention officer, we're doing multiple

17   things at once, you know.  The main focus is safety and

18   security, but a part of that is, you know, making sure that

19   order is maintained and cleanliness is maintained in the

20   units and other areas wherever you're assigned, so yes.

21       Q.    All right.  Well, let's take a look at

22   Exhibit-313.  Now, at the top there, this appears to be an

23   excerpt from GEO's Policy and Procedure Manual.  This is

24   the Chapter: Detainee Services and Program, Title:

25   Voluntary Work Program.

Marc Johnson                                    December 3, 2019

Page 27

1    giving them guidance.

2         Q.   Now, do the detainee workers in the recreation

3    yard have discretion to deviate from the rules,

4    regulations, or guidance, however you want to characterize

5    it, that you're -- you're giving to them?

6         A.   I mean, they can -- they can deviate if they

7    want.

8         Q.   But there are potentially consequences though if

9    they deviate; is that right?

10        A.   Yes.

11        Q.   Anything else as it relates to your direction

12   and supervision of detainee workers in the recreation yard?

13        A.   No.

14        Q.   And now living area and evening workers, I don't

15   know if we should tackle those separately or together, but

16   can you tell me what you've done to direct or supervise

17   detainee workers with respect to living area and evening

18   workers?

19        A.   So as a lieutenant for the living area, it's

20   been mostly indirect, just making sure that the units are

21   clean and sanitary.  Since laundry is listed under living

22   area, we do indirectly assist the laundry, similar to the

23   kitchen, you know, with movements or investigations for

24   theft or -- and other types of misconduct.

25             And then with regards to the evening workers,

Marc Johnson                                    December 3, 2019

Page 28

1    the facility janitorial, it's just kind of overseeing, you

2    know, if they're -- the general cleanliness of whatever

3    they're working on, and also like if there's waxing details

4    or stripping the floors.

5            As an officer, I've been directly involved with

6    the living areas, or supervising the cleaning of the

7    workers in the living areas, you know, cleaning up after

8    meals, the servers, going to pick up the meals, and

9    distributing the meals, cleaning up after meals, cleaning

10   up in general.

11           Again, there's a worker job description sheet

12   that explains kind of, you know, different stuff happens at

13   different times during the day, day cleaners, evening

14   cleaners, graveyard cleaners, or night cleaners.  For

15   example, they clean the showers at the end of the day when

16   the showers are all done being used.

17           And then as a -- as an officer supervising the

18   evening workers, just being, you know, posted to observe,

19   make sure they're okay, there's no security violations, and

20   also assist them with any supplies they may need or tools.

21       Q.   So this sounds like more hands-on supervision

22   and direction on your part?

23       A.   As an officer, yes.

24       Q.   And is that one of the main distinctions between

25   being a shift supervisor and an officer?

Marc Johnson                                    December 3, 2019

                                                          Page 29

1           A.   With regards to cleaning, I mean, it just
2    depends on if I'm assigned that task.
3                As a shift supervisor, you're in charge -- or a
4    lieutenant, you're in charge of the whole building.  So,
5    you know, periodically I'll check in, but I can't focus my
6    whole time on that one thing.  And then having -- as an
7    officer, you know, I've been assigned to a detail, hey,
8    we're doing this detail, so that was my -- my -- one of my
9    main focuses.
10               As the pod officer, same thing, you know, I'm --
11   I'm in charge of the security and the safety of everyone,
12   but it's that collateral duty to make sure we get the
13   meals, everyone gets a meal, we clean up after the meals.
14          Q.   Tell me about the details that you've been
15   assigned with respect to the Voluntary Work Program.
16          A.   Like it's mainly just there's a trash pickup at
17   night -- I've primarily worked graveyard shift for my ten
18   years.  I did work swing shift, but for the most part, I've
19   been on graveyard.
20               On graveyard they do a trash pickup at night.
21   The units place the trash in trash bags outside the unit,
22   and then detainees go around and pick it up and collect it
23   by the loading dock.  So we've supervised the movement.
24   Sometimes they have to take an elevator, which you have to
25   ride escorted.

Marc Johnson                                     December 3, 2019

Page 30

1          And then we -- we do -- they wax the floors,
2     they'll sweep and mop the floor, and then they'll also wax
3     or strip, you know, remove the previous floor shine and
4     apply new floor shine or wax, whatever you call it.
5          Q.    The floor waxing, buffing, shining, stripping, I
6     mean, does that primarily occur at night?
7          A.    Yeah.
8          Q.    And the workers, the detainee workers that do
9     that work, do they have previous experience with the
10    buffing, stripping, waxing the floors?
11         A.    Some have told me that they to.
12         Q.    Is that something then that GEO trains those
13    workers on if they don't have prior experience?
14         A.    Yes.
15         Q.    And of course GEO's providing the equipment to
16    do that work?
17         A.    Yes.
18         Q.    And the cleaning materials and solutions that
19    they'll need to also carry out that work?
20         A.    Mm-hm.  Yes.
21         Q.    And are you directing them in terms of where in
22    the facility to do the buffing, stripping, waxing, shining?
23         A.    Yes.
24              MS. MELL:  Counsel, could I interrupt for a
25    minute?  I'm getting a notification about arrangements for

Marc Johnson                                    December 3, 2019

Page 32

1          Q.   Well, have you directed or supervised detainee

2    workers as they paint in the facility?

3          A.   Yes.

4          Q.   Tell me more about that.

5          A.   Similar to the other job duties, just making

6    sure they have the equipment, and they're -- they're okay

7    and safe, and following the rules, and painting in the

8    appropriate areas and stuff.

9          Q.   Now, this painting, is it touch-up paint, or is

10   it, you know, painting walls in corridors?

11         A.   It could be both.  Sometimes it's just touch up,

12   and sometimes it's repainting a whole area.

13         Q.   Along the gray mile?

14         A.   Correct, or other areas.

15         Q.   In the pods?

16         A.   Yes.

17         Q.   Anywhere else?

18         A.   Intake, the booking area.

19         Q.   So in terms of how long that painting takes, I

20   suppose it can vary depending on how large the job is?

21         A.   Yes.

22         Q.   Are you able to give me a range for how long the

23   painting might take?

24         A.   I've seen it take two hours to sometimes four

25   hours.

Marc Johnson                                    December 3, 2019

Page 33

1       Q.   Now, with respect to the painting, is GEO
2   training the detainee workers on proper painting technique?
3       A.   Yeah, similar to the other jobs.
4       Q.   What about the -- the buffing, waxing, and
5   stripping of the floors, how long does that typically take?
6       A.   It can take -- again, it varies.  It can take
7   two hours to, you know, four or five hours.
8       Q.   And it just depends on how much, you know,
9   buffing, waxing, and stripping, you know, how much ground
10  essentially they've got to cover?
11           MS. MELL:  Object to the form.
12      A.   Yes.
13      Q.   And they, of course, being the detainee workers?
14      A.   Yes.
15           I've also seen it where the detainees, you know,
16  they -- they're motivated to -- to do more, you know, or go
17  longer than one would reasonably expect to complete it.
18      Q.   And what do you take from that?
19      A.   That they enjoy the work there, they're
20  motivated, and you know, it's kind of self-driven.
21      Q.   Do these workers that are self-driven and do a
22  good job, do they make more money?
23      A.   No.
24      Q.   Is there an opportunity for them to make more
25  money as, you know, stellar performers?

Marc Johnson                                              December 3, 2019

Page 34

1          A.    No.

2          Q.    And the murals, there are murals along the gray

3    mile?

4          A.    Yes.

5          Q.    Were those painted by detainee workers?

6          A.    Yes.

7          Q.    Was that at GEO's direction?

8          A.    No.

9          Q.    Do you know how those murals came to be?

10         A.    GEO submitted a request to the detainees to see

11   if anyone wanted to paint the murals, and several detainees

12   submitted their interest, and I believe they had to submit

13   artwork submissions showing their skill set.

14         Q.    So an interview of sorts?

15               MS. MELL:  Object to the form of the question,

16   mischaracterizes the testimony.

17         A.    No.

18         Q.    All right, so we talked about your role in

19   directing or supervising work with respect to the kitchen,

20   recreation/barber, living area, evening workers, and

21   laundry.

22               Did I get that right?

23         A.    Yes.

24         Q.    Now, what role, if any, does ICE play in the

25   direction and supervision of workers in those same job

Marc Johnson                                    December 3, 2019

Page 37

1    cleared medically or approved medically.  I can't speak to

2    how it happens.

3         Q.    Well, on either front, whether it be the number

4    of kitchen workers or medical clearance, can you point me

5    to a specific policy related to ICE's involvement in the

6    direction and supervision of workers?

7         A.    I don't have it offhand.  I believe it's in

8    their PBNDS.

9         Q.    Now, this is the Performance-Based National

10   Detention Standards?

11        A.    Yes.

12        Q.    And it's your understanding, of course, that GEO

13   has to comply with the PBNDS; correct?

14        A.    Yes.

15        Q.    And part of that compliance is making sure that

16   GEO and its personnel are supervising and directing

17   immigration detainees consistent with the PBNDS?

18             MS. MELL:  Object to the form of the question.

19        A.    Yes.

20        Q.    All right, so other than your belief that ICE

21   mandates the number of kitchen workers and has a role in

22   medical clearance, are you aware of any other way in which

23   ICE directs and supervises kitchen workers?

24        A.    No.

25        Q.    Do you know whether or not there is an ICE

Marc Johnson                                    December 3, 2019

Page 38

1      officer or personnel stationed in the kitchen?
2              A.    I don't understand the question.
3              Q.    Well, I understand from my deposition of Mr.
4      Delacruz that there are a number of GEO personnel in the
5      kitchen.  My question to you is, do you know whether or not
6      there is ICE personnel stationed inside the kitchen?
7              A.    Yeah, it's the station part.  I mean, I know ICE
8      visits the kitchen, but I -- I don't believe they're
9      stationed there.
10             Q.    And when you say visits, what do you mean?
11             A.    There's a Detention Standards Manager Howard.
12     He visits the kitchen to ensure compliance with the
13     Performance-Based National Detention Standards.
14             Q.    Do you know how often Howard makes his rounds in
15     the kitchen?
16             A.    I do not, no.
17             Q.    And do you know whether or not Howard, in his
18     role, is it limited to just the kitchen, or is it
19     facilitywide?
20             A.    It's the whole facility.
21             Q.    And I'm sorry, Howard's title again was?
22             A.    Is the DSM, it's an acronym for detention
23     standards manager, I believe.
24             Q.    And it's your belief that he is an ICE employee?
25             A.    Yes.

Marc Johnson                                      December 3, 2019

Page 39

1          Q.   Okay.   How many detention standards managers
2    work or are stationed at the Northwest Detention Center?
3          A.   One.
4          Q.   Big picture, how many ICE personnel are
5    stationed at the Northwest Detention Center?
6               MS. MELL:   Object to the form.
7          A.   I don't know.
8          Q.   If you had to guess?
9               MS. MELL:   No, don't guess.
10         Q.   I'm looking for a ballpark.
11              Is it more than five?
12         A.   I would imagine so, but I don't know for sure.
13         Q.   Well, in your ten years of experience there,
14   both as a detention officer and as a lieutenant, can you
15   tell me the names of other ICE personnel that have been
16   stationed at the Northwest Detention Center?
17         A.   Yes.
18         Q.   Who?
19         A.   Arroyo -- oh, man, on the spot here, let's
20   see -- Renner, Rukhstruhl, Muirhead.   I mean, there's more,
21   I'm just -- I can't recall offhand.
22         Q.   And where within the facility -- let me back up.
23              The people that you just named, do they have
24   offices within the facility?
25         A.   Yes.

Marc Johnson                                    December 3, 2019

Page 40

 1        Q.   Are they clustered together, or are they
 2   sprinkled throughout?
 3        A.   They're all together.
 4        Q.   Where?
 5        A.   It's on the second floor of the administration
 6   building.
 7        Q.   Is that the only location?
 8        A.   At the Northwest Detention Center, yes.
 9        Q.   And the five people total that you mentioned,
10   and I understand that you said there may be more, are they
11   all currently employed, or are you just thinking about the
12   span of your ten-year career with GEO?
13        A.   I believe they're currently employed.
14        Q.   And of the names that you mentioned, I'm sorry,
15   was it Howard, is that the first name or last name for the
16   detention standards manager?
17        A.   That's the last name.
18        Q.   All right, so the detention standards manager
19   you mentioned is someone that you believe is responsible
20   for ensuring that GEO's in compliance with the PBNDS.  Do
21   you have any insights or understandings about the roles of
22   the other people that you named?
23        A.   I believe some of them are like deportation
24   officers or supervisory deportation officers.
25        Q.   Do you have any other insights into what their

Marc Johnson                                    December 3, 2019

Page 41

1    roles are?

2         A.    No.

3         Q.    And so it sounds like Detention Standards

4    Manager Howard is different than the other four that you

5    mentioned by name, is that fair to say, in terms of his

6    role at the facility?

7         A.    Yes.

8         Q.    Okay.  And then on Detention Standards Manager

9    Howard's visits to the kitchen, you believe that he may

10   offer direction and supervision to the detention -- or to

11   the detainees?

12        A.    No.

13        Q.    Is there anything else that you can think of in

14   terms of ICE's involvement with the supervision and

15   direction of detainee workers in the kitchen?

16        A.    No.

17        Q.    Now, we can do the same thing for the other

18   categories, recreation/barber, living area, evening

19   workers, laundry, in terms of ICE's involvement, but before

20   we do that, my question to you is, would your answer be any

21   different than what you've just described to me about ICE's

22   involvement in the kitchen?

23        A.    No, it -- it would be the same.  DSM Howard's in

24   charge of, you know, the whole building, so

25   responsibilities for all the areas, including these, and

Marc Johnson                                    December 3, 2019

                                                        Page 42

 1     you know, it's overseen by ICE.

 2          Q.   So how often would -- or are ICE personnel in

 3     the pods, for example?

 4          A.   I believe they come around once a week to do

 5     visits with the detainees, and then I'm not sure if the --

 6     they do what's called a kite pickup.  I think they have to

 7     do that every day, Monday through Friday.

 8          Q.   In that way, would you call ICE's involvement

 9     more administrative, if they're picking up kites, and

10     detention visits are related to immigration status; is that

11     a fair characterization?

12               MS. MELL:  Object to the form of the question,

13     fairness is not relevant, nor is his opinion.

14          A.   What was the question?

15          Q.   Yeah, and I got a little lost in the objection

16     too.  I do want to hear your opinion.  I mean, you've

17     worked there for ten years, so you're going to know better

18     than myself and even Counsel about what takes place at the

19     facility.

20               My question is whether or not you view ICE's

21     role and involvement there as more administrative in

22     nature?

23               MS. MELL:  Object to the form of the question.

24          A.   No.

25          Q.   What would you call it?

Marc Johnson                                    December 3, 2019

Page 43

1          MS. MELL:  Again, object to the form.

2          A.    I mean, they're, you know -- it's -- it's -- ICE

3    is -- ICE is the client.  They -- they say what goes.  So,

4    you know, I've seen detainees appeal to ICE to have stuff

5    changed, and they've done that, or ICE has mandated

6    changes, you know.

7          Q.    Do you believe though that GEO handles more of

8    the day-to-day hands-on work of the facility?

9          MS. MELL:  Object to the form of the question.

10         A.    I mean, yeah.

11         Q.    And that includes the direction and supervision

12   of the detainees and the detainee workers --

13         MS. MELL:  Object --

14         Q.    -- correct?

15         MS. MELL:  Object to the form of the question.

16         A.    According to the PBNDS.

17         Q.    That's GEO's role, to do the hands-on work of

18   managing the detainees, including the detainee work?

19         MS. MELL:  Object to the form of the question.

20         A.    Yes.

21         Q.    Now, how is it that detainees are assigned to

22   work in the VWP?

23         A.    I don't under -- the BWP?

24         Q.    The VWP?

25         A.    Oh, sorry, the Voluntary Work Program?

Marc Johnson                                    December 3, 2019

Page 46

1        Q.   That's GEO personnel; correct?

2        A.   Correct.

3        Q.   Is there a line on this form for ICE to sign off

4   on?

5        A.   No.

6        Q.   Let's look at the fourth item there at the top.

7   It reads, "Unexcused absence, unsatisfactory work

8   performance, or participation in a serious infraction, e.g.

9   fighting, is cause for removal from a work assignment."

10            Did I read that correctly?

11       A.   Yes.

12       Q.   Is that statement true?

13       A.   Yes.

14       Q.   Now, who initiates the process for removal from

15   a work assignment, is that ICE or GEO?

16       A.   It could be either.

17       Q.   Tell me about a time that ICE initiated the

18   removal process.

19       A.   I can't think of any offhand.

20       Q.   In your ten years of experience at the Northwest

21   Detention Center, you can't think of a single instance in

22   which ICE initiated the removal of a detainee worker from a

23   work assignment?

24            MS. MELL:  Object to the form.

25       A.   Like I said, I can't recall.

Marc Johnson                                      December 3, 2019

Page 47

1          Q.   Let's look at the sixth item there on

2    Exhibit-314, the Volunteer Work Program Agreement.   It

3    reads, "Detainees must adhere to all safety regulations and

4    to all medical and grooming standards associated with a

5    work assignment."

6               Did I read that correctly?

7          A.   Yes.

8          Q.   Does GEO work to ensure that detainee workers

9    are complying with safety regulations and medical and

10   grooming requirements?

11         A.   Yes.

12         Q.   That's part of the job of a detention officer;

13   correct?

14              MS. MELL:   Object to the form.

15         A.   Yes.

16         Q.   And that eighth item there says "Primary factors

17   that impact hiring are classification level, attitude,

18   behavior, and physical ability to perform the job."

19              Did I read that correctly?

20         A.   Yes.

21         Q.   From that sentence, is it safe to assume that

22   GEO has some discretion in who to hire?

23              MS. MELL:   Object to the form.

24         A.   No.

25         Q.   How do you interpret that sentence?

Marc Johnson                                    December 3, 2019

Page 48

1            MS. MELL:   Object to the form.

2       A.   Well, it lists the -- the certain things, but it

3  says they impact not that they will affect, they just

4  impact it.

5       Q.   And do you see a distinction between impact

6  versus affect?

7       A.   Yes.

8       Q.   Tell me, what is that distinction?

9       A.   If it had an effect, I would interpret that to

10  be we could pick and choose who we wanted, whereas this

11  just says it will have an impact.

12           From what I understand, the worker -- once you

13  submit a request to be a worker, you go on a waiting list,

14  and GEO can't jump around on the list; it's first in, first

15  out, so to speak.

16       Q.   Now, there's a black bar towards the end, and I

17  redacted out someone's name there, but if you look above

18  that black bar, the last sentence of that paragraph, right

19  above it, it reads, "We thank you for your important

20  contribution to maintaining this facility."

21           Did I read that correctly?

22       A.   Yes.

23       Q.   Do you believe that the detainee workers make an

24  important contribution to maintaining the Northwest

25  Detention Center?

Page 49

```
 1                MS. MELL:  Object to the form of the question.
 2          A.    Yes.
 3                MR. WHITEHEAD:  All right, let's take a break.
 4                THE VIDEOGRAPHER:  This is the end of media one.
 5   This deposition will continue on media two.  The time is
 6   3:13.  Going off the record.
 7                     (Recess at 3:13 p.m.)
 8                     (Reconvened at 3:23 p.m.)
 9                THE VIDEOGRAPHER:  Back on the record.  This is
10   the beginning of media two to the deposition of Marc
11   Johnson.  The time is approximately 3:23.
12          Q.    Do the various work assignments for the detainee
13   workers have job descriptions?
14          A.    Yes.
15          Q.    Let's take a look at Exhibit-315.
16                And you've just been handed Exhibit-315, and
17   these are various detainee job descriptions.  The
18   descriptions are undated, but do these look familiar to
19   you?
20          A.    Yes.
21          Q.    I'd like to go through each of these and talk
22   about GEO's level of control over the detainee workers in
23   each of the job descriptions here.
24                So let's start with the first page; have you
25   supervised barbers in the barbershop ever?
```

Marc Johnson                                        December 3, 2019

Page 50

1       A.    No.

2       Q.    Based on what you know about directing and
3   supervising detainee work at the Northwest Detention
4   Center, would it be your expectation that detainee workers
5   in the barbershop follow the specific work duties outlined
6   on the job description?

7             MS. MELL:  Object to the form of the question.

8       A.    Yes.

9       Q.    Now, do detainee workers have the discretion to
10  deviate from their specific work duties?

11            MS. MELL:  Object to the form.

12      A.    No.

13      Q.    For example, looking at this job description
14  here on the first page of Exhibit-315, it instructs
15  barbers, it says "Towels will not be used."  Looks to be
16  the fifth bullet down.

17            Do you see that?

18      A.    Yes.

19      Q.    For example, could a detainee use towels even
20  though the job description says not to?

21      A.    I believe they could try, but the staff would
22  intervene and not allow it.

23      Q.    In that way, staff is supervising the detainee
24  workers to ensure that they're complying with their job
25  duties?

Marc Johnson                                    December 3, 2019

Page 51

1              MS. MELL:   Object to the form of the question.

2       A.    Yes.

3       Q.    And GEO provides the barbers, in this case, with

4  the equipment they need to do their jobs?

5       A.    Yes.

6       Q.    And there's no expectation that the detainee

7  workers, you know, bring their own equipment to the

8  barbershop; correct?

9       A.    No.

10      Q.    In fact, they'd be prohibited from doing so?

11             MS. MELL:   Object to the form.

12      A.    Correct.

13      Q.    Now, if a barber has preexisting skill as a

14  barber, is there an opportunity for them to make more?

15      A.    No.

16      Q.    Can they earn more money if they do a complex

17  haircut or hairstyle?

18      A.    No.

19      Q.    Are there GEO barbers at the Northwest Detention

20  Center?

21      A.    I don't understand the question.

22      Q.    Are there -- is there GEO personnel that's

23  responsible for or that also cuts hair at the Northwest

24  Detention Center?

25      A.    No.

Marc Johnson                                         December 3, 2019

Page 52

1        Q.   If the detainees did not work as barbers, who
2    would cut hair?
3             MS. MELL:   Object to the form.
4        A.   I don't know.
5        Q.   GEO would have to hire someone; is that a safe
6    assumption?
7             MS. MELL:   Object to the form of the question.
8        A.   I'm not sure.
9        Q.   Now, let's look at the next page, page 2 of
10   Exhibit-315.   This is a job description for barbershop
11   cleaner.   Now, the first bullet there under the specific
12   work duties instructs detainee workers to spray liberally
13   the clippers with H42 cleaner.
14             Do you see that?
15       A.   Yes.
16       Q.   Could a detainee worker use a different type of
17   cleaner if they wanted to?
18       A.   No.
19       Q.   And GEO provides the barbershop cleaners with
20   the cleaning materials that they need to do their job;
21   correct?
22       A.   Yes.
23       Q.   Provides them with the training on the safety
24   regulations that they need to do the job as well?
25       A.   Yes.

Marc Johnson                                    December 3, 2019

Page 53

 1              MS. MELL:  Counsel, I just realized that I don't

 2    see continuing Bate -- Bates numbers on these pages, and I

 3    thought you represented this was from the discovery.

 4              MR. WHITEHEAD:  It is.  This is from GEO's

 5    production.  I'm not quite sure why the Bates numbers did

 6    not print.  I believe it's just one of the radio buttons

 7    didn't get checked off when printing this from our document

 8    management system.

 9              MS. MELL:  But it's not -- this isn't the Bates

10    number down here?

11              MR. WHITEHEAD:  No, it's not.

12              Yeah, I don't know why, if it was just a matter

13    of it getting cut off, but I will represent for the record

14    that Exhibit-315 came from GEO's production.  And if you'd

15    like, after the fact I could find the specific Bate

16    numbers -- Bates numbers that are represented here in the

17    document.

18              MS. MELL:  Okay, thank you.

19              MR. WHITEHEAD:  Of course.

20         Q.   All right, with the barbershop cleaners, could

21    they decide on their own that they would like to clean the

22    clippers, for example, in the yard or a different part of

23    the facility outside of the barbershop?

24         A.   No.

25         Q.   Could the barbershop cleaners make more money if

Marc Johnson                                    December 3, 2019

Page 54

1    they were efficient or good at their job in cleaning the

2    barbershop?

3         A.   No.

4         Q.   Have you ever had a detainee worker ask for a

5    raise?

6         A.   No.

7         Q.   Have you ever sought authorization to pay a

8    detainee worker more than a dollar a day for their work?

9         A.   No.

10        Q.   With the barbers, could they make more money if

11   they cut more heads in the barbershop?

12             MS. MELL:   I hope they aren't cutting heads;

13   more hair of heads -- on heads?

14        A.   No.

15        Q.   They couldn't charge per haircut, for example?

16        A.   No, it's a flat rate.

17        Q.   Of a dollar a day?

18        A.   Correct.

19        Q.   Let's look at page 3 of Exhibit-315.  This one

20   is a job description, job title Medical Cleaning.  Here

21   again, this job description lists specific duties.

22             Do you see that?

23        A.   Yes.

24        Q.   And do detainee workers have discretion to mop

25   other than the designated areas for medical?

Marc Johnson                                December 3, 2019

Page 55

1          A.    No.

2          Q.    Part of their job is to remove trash and replace

3    with new liners.  That's item 6 there.  GEO provides those

4    liners; is that correct?

5          A.    Yes.

6          Q.    And GEO provides the equipment they need to do

7    the cleaning?

8          A.    Yes.

9          Q.    As well as the cleaning solution?

10         A.    Yes.

11         Q.    GEO provides the medical cleaners on proper

12   sanitation and safety as it relates to their job; correct?

13              MS. MELL:   Object to the form of the question.

14         A.    Yes.

15         Q.    Now, there's a bottom section there entitled

16   Termination.

17              Do you see that?

18         A.    Yes.

19         Q.    Do you agree that failure to follow staff

20   instructions could lead to termination of a detainee

21   worker?

22         A.    Yes.

23         Q.    Do you agree that failure to follow safety

24   procedures could lead to termination of a detainee worker?

25         A.    Yes.

Marc Johnson                                    December 3, 2019

Page 56

1        Q.   Excessive absenteeism?

2        A.   Yes.

3        Q.   Misconduct and horseplay?

4        A.   Yes.

5        Q.   Theft?

6        A.   Yes.

7        Q.   Unsatisfactory work performance?

8        A.   Yes.

9        Q.   Now, in each of those instances, would it be GEO

10   that initiates the termination or disciplinary proceedings

11   against the detainee worker?

12       A.   It depends.

13       Q.   What does it depend on?

14       A.   I mean, the reason.

15       Q.   Well, my question drives more at who the actor

16   is that would initiate the proceedings; is it GEO or

17   someone else?

18       A.   A majority of the time it would be GEO.

19       Q.   And if not GEO, who?

20       A.   It could be ICE.

21       Q.   And if I remember from earlier, you said that

22   you cannot think of a time in which ICE initiated

23   termination or discipline against a Voluntary Work Program

24   participant; did I get that right?

25       A.   Not specifically, no.

Marc Johnson                                    December 3, 2019

Page 57

1          Q.    Not specifically.

2                You can't recall specifically you're saying?

3          A.    Correct.

4          Q.    Again, working with Exhibit-315, let's look at

5     page 4.  This is a job description for job title General

6     Worker.  Now, the specific work duties there, are those

7     consistent with your understanding of what this job

8     entails?

9          A.    Yes.

10         Q.    And again, as it relates to those work duties,

11    the detainees -- the -- strike that.

12               As it relates to those specific job duties, it's

13    the case that the detainee workers may not deviate from

14    their specific duties and responsibilities; correct?

15         A.    Correct.

16         Q.    And here again, GEO provides the equipment they

17    need to do their job?

18         A.    Yes.

19         Q.    GEO provides the training they need to do their

20    job?

21         A.    Yes.

22         Q.    GEO supervises them to ensure that they're

23    complying with GEO's policies and regulations; correct?

24         A.    Correct.

25         Q.    Now, with the general workers, is there an

Marc Johnson                                    December 3, 2019

Page 58

 1   opportunity for them to earn more money if they're good

 2   workers?

 3        A.   No.

 4        Q.   They get paid regardless of whether or not they

 5   have -- the same -- excuse me.

 6             They get paid the same regardless of whether

 7   they have prior experience in the janitorial industry;

 8   correct?

 9        A.   Yes.

10        Q.   Let's look at the bottom here of page 4.  Again

11   we see the Termination heading.

12             Do you agree that failure to follow staff

13   instructions could lead to the termination of general

14   workers --

15        A.   Yes.

16             MS. MELL:  I just object to the omission of CSC

17   in that phrase.  We're still dealing with CSC policy it

18   looks like.

19        Q.   No, my question was different, you know, my

20   question is exactly what I asked.

21             Failure to follow GEO staff instructions, could

22   that lead to a detainee worker's termination from their job

23   assignment?

24        A.   Yes.

25        Q.   And that's true of -- of any detainee worker

Marc Johnson                                    December 3, 2019

Page 59

1    job; correct?

2         A.   Yes.

3         Q.   Excessive absenteeism, that could lead to

4    termination; correct?

5         A.   Yes.

6         Q.   Misconduct and horseplay?

7         A.   Yes.

8         Q.   Theft?

9         A.   Yes.

10        Q.   And unsatisfactory work performance?

11        A.   Yes.

12        Q.   Let's look at the next page, page 5.  This one

13   is for Laundry Worker is the title of the job description.

14             Now, the specific work duties here listed, are

15   those consistent with your understanding of what the

16   laundry worker job entails?

17        A.   Yes.

18        Q.   Do the detainee workers, the laundry workers,

19   have discretion to deviate from these specific work duties?

20        A.   No.

21        Q.   And GEO supervises them to ensure that they're

22   complying with their work duties?

23        A.   Yes.

24        Q.   GEO provides them with the training they need to

25   do their job?

Marc Johnson                                    December 3, 2019

Page 60

1        A.   Yes.

2        Q.   And the equipment they need to do their job?

3        A.   Yes.

4        Q.   And the detainee laundry workers have no

5    opportunity to earn more money if they're good at their job

6    or do more work; correct?

7        A.   Correct.

8        Q.   To your knowledge, can the detainee workers seek

9    employment outside the Northwest Detention Center?

10       A.   Not while they're being detained by immigration.

11       Q.   Can detainee workers earn overtime?

12            MS. MELL:  Object to the form.

13       A.   No.

14       Q.   Do detainee workers that aren't very good at

15   their job make less money?

16       A.   No.

17       Q.   How many janitors are employed by GEO right now?

18       A.   Right now, I believe two.

19       Q.   And over your decade with GEO, has it been more

20   or less two janitors that work at the facility?

21       A.   I believe it's normally three.  They have had I

22   think sometimes four.

23       Q.   The janitors, where do they clean?

24       A.   Primarily the unsecured areas.

25       Q.   In other words, they clean the areas that the

Marc Johnson                                    December 3, 2019

Page 61

1    detainees don't have access to?

2         A.    Yes.

3         Q.    Do the janitors clean any of the secured areas?

4         A.    I believe the medical administration offices is

5    the only place on the secured side.

6         Q.    And is that because the medical administration

7    office is a secured area?

8         A.    Right, it's like restricted.  Medical would be

9    considered a secured area as well, but --

10        Q.    There's heightened restrictions for the admin

11   office?

12        A.    Right.

13        Q.    How big is the Northwest Detention Center, if

14   you know, in terms of square footage?

15        A.    I don't know.

16        Q.    It's pretty big though?

17        A.    It's a large -- large building, couple

18   buildings.

19        Q.    What is a pod porter?

20        A.    A pod porter is like a detainee worker that

21   works in their housing unit, their assigned housing unit.

22        Q.    Let's take a look at Exhibit-316, please.

23              You're looking at Exhibit-316.  It's titled

24   Northwest Detention Center Pod Porter Job Descriptions.

25              Have you seen this document before?

Marc Johnson                                    December 3, 2019

Page 64

1           MS. MELL:  Object to the form.

2       A.   -- I should have said no.

3       Q.   Now, looking at the Pod Porter Job Descriptions,

4    on the back of the form here I see a line for the

5    detainee's name as well as the detainee's signature; is

6    that right?

7       A.   Yes.

8       Q.   And then it references offices -- officer's

9    signature.

10           Who is the officer referenced there?

11      A.   The GEO officer.

12      Q.   Is there a spot anywhere on this form where ICE

13   is expected to sign off?

14      A.   No.

15      Q.   Does ICE play any role in where detainees are

16   assigned to work?

17      A.   Not that I know of.

18      Q.   Let's take a look at Exhibit-309.

19           What are we looking at here at Exhibit-309?

20      A.   This is a daily pod worker list.

21      Q.   As you flip through, it's not just the pods,

22   there's references to laundry and kitchen as well.

23      A.   Oh, okay.  So yeah, it looks like it's the -- a

24   facility worker list.

25      Q.   Now, is this a document or something like this

Marc Johnson                                    December 3, 2019

Page 69

1        A.    I'm sorry, repeat the question.

2        Q.    Well, let me try and put it into context.

3              So looking at Exhibit-308, if you look at the

4    top there --

5        A.    Mm-hm.

6        Q.    -- that last bullet, it says "By detainee

7    signature staff is affirming that the following have been

8    evaluated and met acceptable standards: the job was

9    completed, detainee maintained a good attitude, and the

10   detainee began work on time."

11             So my question is, is it the detention officer

12   that decides whether or not a detainee worker may actually

13   sign this form?

14       A.    No.

15       Q.    Let me try one -- one more time.

16             If a detainee hasn't performed their work to a

17   satisfactory fashion, could a detention officer say, No,

18   you don't get to sign the worker pay sheet today?

19       A.    Yes.

20       Q.    Does that happen?

21       A.    Yes.

22       Q.    Give me an example of a time when that would

23   happen or has happened?

24       A.    If they aren't cleaning the showers good, I --

25   you know, not scrubbing correctly, cleaning them, you know,

Marc Johnson                                    December 3, 2019

Page 70

1    or they try and do it too quickly, like two minutes, and

2    then sign, I want to be done.

3         Q.   Can you tell me about another time?

4         A.   If they just, you know, refuse to get up for

5    their shift or clean.

6         Q.   They don't get paid?

7         A.   They don't get paid, and they could potentially

8    lose their job.

9         Q.   What are IDP sanctions?

10        A.   That's a disciplinary hearing.

11        Q.   And IDP, what does that stand for?

12        A.   I believe it stands for Institutional

13   Disciplinary Panel.

14        Q.   Who is on that panel?

15             And you can give me titles if you don't know

16   names.

17        A.   I believe it's the restricted housing unit

18   lieutenant and an ICE officer or supervisor, ICE

19   supervisor.

20        Q.   Anybody else?

21        A.   Just those two people.

22        Q.   What is a UDC hearing?

23        A.   I believe it stands for a Unit Disciplinary

24   Committee.

25        Q.   Who is on the Unit Disciplinary Committee?

Marc Johnson                                    December 3, 2019

Page 71

 1      A.   Just a -- a sup -- I believe it's any

 2  supervisor, sergeant or lieutenant, or it may just be a

 3  lieutenant.

 4      Q.   So what's the difference between IDP and UDC?

 5      A.   The UDC is like a lower level infraction, an IDP

 6  is for a more serious infraction.

 7      Q.   Can you give me an example of a more serious

 8  infraction that would go to IDP?

 9      A.   So for fighting, two people fighting would go to

10  an IDP, whereas like a simple theft would just be a UDC.

11      Q.   What about poor performance in the Voluntary

12  Work Program, would that be UDC or IDP?

13      A.   You don't get written up for a poor performance.

14      Q.   Now, the UDC determinations, to your knowledge,

15  do those go to ICE at any point?

16      A.   I don't believe they do.  They go in your

17  detainee file.

18      Q.   And the IDP proceedings, ICE is a part of it?

19      A.   Correct.

20      Q.   As a detention officer, do you take attendance

21  for the detainee workers that are under your -- your

22  charge?

23      A.   Yeah, I would verify when they're supposed to

24  work and did they complete the work satisfactorily.

25      Q.   And that's -- is that back to the worker pay

Marc Johnson                                    December 3, 2019

Page 88

1                    C-E-R-T-I-F-I-C-A-T-E

2

3     STATE OF WASHINGTON )

4                        )  ss.

5     COUNTY OF THURSTON  )

6

7            I, the undersigned Registered Professional
      Reporter and Certified Court Reporter, hereby
8     certify that the foregoing deposition upon oral
      examination was taken stenographically before me and
      transcribed under my direction;

9

10           That the witness was duly sworn by me,
      pursuant to RCW 5.28.010, to testify truthfully; that the
11    transcript of the deposition is a full, true, and correct
      transcript to the best of my ability; that I am neither
12    attorney for, nor a relative or employee of, any of the
      parties to the action or any attorney or counsel employed
13    by the parties hereto, nor financially interested in its
      outcome.

14

15           I further certify that in accordance with CR
      30(e), the witness was given the opportunity to examine,
16    read, and sign the deposition, within 30 days, upon its
      completion and submission, unless waiver of signature was
17    indicated in the record.

18

19           IN WITNESS WHEREOF, I have hereunto set
      my hand this 10th day of December, 2019.

20

21

22

23    _____
      NCRA Registered Professional Reporter
24    Washington Certified Court Reporter No. 2661

25