# WHITEHEAD DECLARATION
# EXHIBIT I

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

UGOCHUKWU GOODLUCK NWAUZOR,            )

FERNANDO AGUIRRE-URBINA,               )

individually and on behalf of all     )

those similarly situated,             )

        Plaintiffs,            )

    vs.                               ) No. 17-cv-05769-RJB

THE GEO GROUP, INC., a Florida        )

corporation,                          )

        Defendant.             )

---

Videotaped

Deposition Upon Oral Examination of

DAVID M. TRACY

---

10:13 a.m.

Tuesday, December 3, 2019

1019 Regents Blvd., Suite 204

Fircrest, Washington

REPORTED BY:  Keri A. Aspelund, RPR, CCR No. 2661

David Tracy                                    December 3, 2019

Page 19

1       A.    When I was -- 27.80 -- 27.84, I believe.

2       Q.    And then when you went back to detention

3  officer, what was your hourly rate?

4       A.    27.84.

5       Q.    Okay.  And what is your current hourly rate?

6       A.    29.69.

7       Q.    I want to talk about your time as a sergeant.

8             Was that a position that you applied for on your

9  own, or were you recommended into the position?

10      A.    I applied on my own.

11                  (Exhibit-311 marked.)

12            THE COURT REPORTER:  This is Exhibit-311.

13            THE WITNESS:  Thank you.

14      Q.    You've just been handed Exhibit-311.

15            What are we looking at here?

16      A.    A job description.

17      Q.    Have you seen this document before?

18      A.    I'm not sure.  Probably at some point in my life

19  I've seen this.  I don't know if it was this exact job

20  description.

21      Q.    Well, do you think this is a fair and accurate

22  representation of the job description for sergeant, the

23  position of sergeant, at the Northwest Detention Center?

24      A.    Yeah.  Yes.

25      Q.    All right.  So looked like you just read the --

David Tracy                                        December 3, 2019

Page 20

1      the document front and back there.

2                Do you see the Primary Duties and

3      Responsibilities there on the first page?

4           A.   Yes.

5           Q.   And do you agree that those were your primary

6      duties and responsibilities as sergeant?

7           A.   I would say the overall primary duty is to

8      ensure the safety and security of all individuals inside

9      the building.

10          Q.   Certainly overarching, but as to the specific

11     duties and responsibilities, would you agree there that

12     that was an accurate statement of your duties and

13     responsibilities as sergeant?

14               MS. MELL:   Object to the form of the question --

15          A.   Yes.

16               MS. MELL:   -- asked and answered.

17          Q.   I'm sorry, your answer was yes?

18          A.   Yes.

19          Q.   Is there anything that you would add to this

20     list?

21               MS. MELL:   Object to the form.

22          A.   There's other things that could be added but not

23     necessary.   These are the primary duties.

24          Q.   I'd like for you to look at the tenth bullet

25     down for me.  It's the one that reads, "Directs work,

David Tracy                                    December 3, 2019

Page 21

1    provides training, and performs inspections of work

2    performed by inmate/detainee workers."

3              Do you see that?

4        A.    Yes.

5        Q.    Can you tell me all the ways in which you

6    directed detainee work as a sergeant at the Northwest

7    Detention Center.

8        A.    We would get a list of volunteers that want to

9    do some type of outside duty, they're not required to do

10   it, but something that they want to do.  Some people may,

11   you know -- if they're a really good painter, and they want

12   to paint, or they used to buff and wax floors outside

13   before they were there, and they want to do it, it gets

14   them outside of where they, you know, have to be.  So they

15   would come to -- usually they would go to one of the pod

16   officers, Hey, I want to do this, you know, is there a way

17   I can do it?

18              And then we would talk to them, get them the

19   equipment they need, make sure they have the understanding

20   of what needs to be done and how to make sure it gets done

21   safely.  If they need to wear goggle -- you know, safety

22   equipment, make sure they have their safety equipment, make

23   sure that they have all the equipment they need to do the

24   job they're going to do or they want to do.

25       Q.    Anything else as to how you directed the work of

David Tracy                                        December 3, 2019

Page 22

1    detainee workers while you were a sergeant?

2          A.    Besides assigning an officer to oversee the --

3    the actual work that was being done, I don't think so.

4          Q.    And is it the case, did you directly oversee the

5    work that was being done by detainee workers?

6          A.    Not -- you know, not standing over them, you

7    know, a hundred percent of the time, but occasionally, you

8    know, walking down the -- the hallway, you would check out

9    what they were doing, and talk to them, make sure

10   everything's going good.  And if they needed anything, they

11   could, you know, always ask.

12         Q.    So is it the case then that you would direct

13   them in terms of the tasks to carry out, but that your

14   supervision wasn't always direct?

15              MS. MELL:  Object to the form of the question.

16         A.    There would -- you know, with something like

17   buffing and waxing, there would be an officer present, but

18   paintingwise, you know, they could go and paint a hallway

19   without having to be directly supervised by an officer.

20         Q.    Would you agree that as a detention officer,

21   which is your current role, that part of your job is to

22   direct the work, provide training, and perform inspections

23   of work performed by inmate/detainee workers?

24              MS. MELL:  Object to the form of the question.

25         A.    Can you say it one more time?

David Tracy                                    December 3, 2019

Page 23

1          Q.    Sure.

2                Your current role is that of detention officer;

3    correct?

4          A.    Yes.

5          Q.    Okay.  As part of your job as a detention

6    officer, does it involve directing the work, providing

7    training, and performing inspections of work performed by

8    the detainee workers?

9                MS. MELL:   Object to the form.

10         A.    Yes.

11         Q.    And as a detention officer, is your direction

12   and supervision of the detainee workers more hands on or

13   more direct than it was when you were a sergeant?

14               MS. MELL:   Object to the form of the question.

15         A.    Yes.

16         Q.    In what way?

17         A.    As the officer, you're there the whole time.

18   You know, if you're -- for example, if you're in a unit,

19   and they're -- a detainee's mopping the floor, you're

20   physically there in the area to see what's going on, versus

21   a supervisor, you would see it when you would come and do

22   round or if you needed to go to the unit for whatever

23   reason.  You weren't physically in that -- that location or

24   that area the whole time.

25         Q.    Any other distinction?

David Tracy                                    December 3, 2019

Page 24

```
 1              MS. MELL:  Object to the form.

 2         A.   Not that I can think of.

 3         Q.   Who do you currently report to?

 4         A.   Chain of command.  So my sergeant, lieutenant,

 5    captain, major.

 6         Q.   Who is your current sergeant that you report to?

 7         A.   On shift, it would be Sergeant Steffens or

 8    Sergeant Hillin.

 9         Q.   And the lieutenant?

10         A.   Wilson -- I'm sorry, Lieutenant Wilson or

11    Lieutenant Jackson.

12              THE WITNESS:  Can I get some water, please?

13              MS. MELL:  Yeah.

14              THE WITNESS:  Thank you.

15              MS. MELL:  Actually, let's -- I just need one

16    quick break while I fill that.

17              THE WITNESS:  Thank you.

18                 (Ms. Mell left the proceedings.)

19              MR. WHITEHEAD:  Well, looks like we're off the

20    record.

21              THE VIDEOGRAPHER:  Going off the record.  The

22    time is 10:37.

23                 (Recess at 10:37 a.m.)

24                 (Reconvened at 10:38 a.m.)

25              THE VIDEOGRAPHER:  Back on the record.  The time
```

David Tracy                                    December 3, 2019

Page 27

1   habit, but for the most part, it's FA.

2         Q.   All right, so there's the warden turning into

3   the facility administrator; any other name changes?

4         A.   The assistant warden.

5         Q.   Is now assistant facility administrator?

6         A.   Yeah, AFA.

7         Q.   Okay.  Any others?

8         A.   Not that -- not that I can think of.

9         Q.   Who does the Northwest Detention Center house?

10        A.   The detainees?

11        Q.   Yes.

12        A.   Detainees either waiting or fighting their case

13   within the immigration system.

14        Q.   To your knowledge, is any component of their

15   stay criminal punishment?

16             MS. MELL:  Object to the form of the question.

17        A.   No, it's all -- it's administrative.

18        Q.   Have you ever been disciplined at Northwest

19   Detention Center?

20        A.   Not -- not to my knowledge.

21        Q.   Do you receive performance reviews?

22        A.   Yes.

23        Q.   Have there been any issues or any aspects of it

24   that have been critical of your performance?

25        A.   In -- I don't know what year it was, the only

David Tracy                                    December 3, 2019

Page 31

```
 1          Q.   What about recreation/barber, can you tell me
 2    about all aspects of your direction or supervision that you
 3    provided to the detainee workers?
 4          A.   The barbershop is open during the days, day
 5    shift, which early morning.  I didn't work that shift.
 6          Q.   So you've had no involvement then with
 7    supervising or directing the work in the barbershop?
 8          A.   No.
 9          Q.   That would be just other detention officers
10    then?
11          A.   Other supervisors, other officers.
12          Q.   What about in the living areas, can you tell me
13    about all aspects of the direction and supervision that you
14    provided to detainee workers in the living areas?
15          A.   You allow them access to the janitor closet,
16    allow them to get what they need to do -- to do their job
17    they've requested, and then amongst just daily work inside
18    the unit, you're always cognitive of I know I've got a
19    group over here mopping and sweeping, so make sure they
20    have -- you know, make sure there's a wet floor sign down,
21    that type -- that type of stuff, overseeing what they're
22    doing.
23          Q.   Do you ever tell them where to clean?
24          A.   Yeah.
25          Q.   Do you tell them when to clean?
```

David Tracy                                    December 3, 2019

Page 32

1          A.    There's -- with inside the units, they kind of
2     have their own.    The other detainees, once they get a new
3     job, they kind of explain to them how it works.    So, for
4     example, the food porter, he works when the food comes.
5     That's what his job -- you know, that's what his job is.
6     He can't do his job when there's no food there.    So when
7     it's time for food, you know, you might have to go wake him
8     up or let him know, if he's outside playing basketball, or
9     whatever, meals -- meals are up.
10         Q.    So in that way then, you're directing whoever
11    that food porter is to show up to work?
12               MS. MELL:    Object to the form of the question,
13    totally mischaracterizes his testimony.
14         A.    Can you repeat your question one more time?
15         Q.    Sure.
16               You told me that with the food porter, for
17    example, that they can only work when the food arrives, and
18    that if they're asleep or in recreation, that you go to get
19    help; did I get that right?
20         A.    Yeah, let them know that, you know, the meals
21    are ready, ask them to go to the kitchen.    Not making them
22    go to the kitchen, because they don't have to do it, they
23    can always put a request in to not work anymore.
24         Q.    All right, you mentioned janitor, closet access;
25    do you remember that?

David Tracy                                    December 3, 2019

Page 33

1          A.    Yes.

2          Q.    Okay.  And that's so that they can access the

3    cleaning supplies?

4          A.    Correct.

5          Q.    And these are supplies that GEO provides;

6    correct?

7          A.    Correct.

8          Q.    Do the detainee workers supply their own

9    cleaning materials?

10         A.    No.

11         Q.    Does GEO provide the cleaning solution?

12         A.    Yes.

13         Q.    Does GEO provide the sponges and mops necessary

14   to do the cleaning?

15         A.    Yes.

16         Q.    The rags?

17         A.    Yes.

18         Q.    As it relates to the cleaning, do you train or

19   have you trained detainee workers on proper cleaning

20   technique?

21         A.    Yes, you explain, you know, how it's -- how it

22   needs to be done, or you know, what -- what to look for.

23   In the showers, you know, you might want to use this tool

24   instead of using a mop to wipe down the shower walls, you

25   might want to use a scrub brush, to use the scrub brush to

David Tracy                                    December 3, 2019

Page 34

1    actually scrub -- scrub inside the showers.

2         Q.   What if a detainee worker has no prior cleaning

3    experience; is it the case then that GEO would train that

4    person on how to do the job?

5         A.   I would explain to them how to do it.

6         Q.   And that explanation is essentially on-the-job

7    training; is that fair to say?

8         A.   Yeah.

9         Q.   Can the detainee workers -- again, we're talking

10   specifically about living areas --

11        A.   Okay.

12        Q.   -- could they clean a different pod for more

13   money?

14        A.   No.

15        Q.   If they worked quickly or more efficiently,

16   could they earn more money?

17        A.   No.

18        Q.   Could they earn overtime for working more?

19        A.   No.

20        Q.   Has a detainee worker ever tried to negotiate

21   with you about the rate of pay for cleaning their living

22   area?

23        A.   Not that I can recall.

24        Q.   Could a detainee worker -- strike that.

25             Do detainee workers have discretion to clean

David Tracy                                                 December 3, 2019

Page 35

1    outside the facility?

2            A.    When you say outside the facility --

3            Q.    Yeah, that wasn't -- that wasn't a good one.

4                  And I should say that also.  I'll probably ask

5    some bad questions today.  I'm going to try my best to ask

6    good ones, and certainly let know if you don't understand,

7    just like you did there.

8                  I guess what I'm driving at is if a detainee

9    worker says, I don't want to clean my assigned area, I want

10   to clean somewhere else, do they have the discretion to

11   make that call in the moment?

12           A.    They can basically quit their job they

13   volunteered for and put another request in to go clean

14   where they want to clean, and then they might join the

15   waiting list and have to wait for one of those spots to

16   open up.

17           Q.    That request is seeking authorization though he

18   to clean somewhere else; is that right?

19                 MS. MELL:  Object to the form of the question.

20           A.    So if they're -- just for example, if they're a

21   worker in the living area, and they want to -- they don't

22   want to work in the living area anymore, they can say they

23   want -- they don't want to work anymore.  If they're in the

24   living area and want to work in the kitchen, they can --

25   they can still work in the living area and wait.  You know,

David Tracy                                December 3, 2019

Page 36

1    the kitchen usually has a waiting list.  They can --
2    sorry -- they can still work in the unit until that job in
3    the kitchen comes available, and then once that job is
4    available, then they can make the decision hey, I want to
5    keep doing this, or no, I do not want to do this anymore,
6    I'm going to take that position in the kitchen.
7         Q.   The scenario you've just described though is --
8    involves the detainee worker though requesting to work
9    somewhere else; is that right?
10             MS. Mell:  Object --
11        A.   Yes.
12             MS. MELL:  Object to the form.
13        Q.   And they can only work somewhere else if GEO
14   authorizes them to do so?
15             MS. MELL:  Object to the form of the question.
16        Q.   Is that right?
17             MS. MELL:  Object to the form of the question.
18        A.   Yes, they need permission to work in certain
19   areas due to classification or whatever.
20        Q.   So that's my question.  I mean, if a detainee
21   worker was assigned to work in pod A, they couldn't just
22   wake up that day say, you know what, I'm going to clean in
23   the laundry today?  They don't have the discretion to do
24   that; is that correct?
25        A.   No.

David Tracy                                    December 3, 2019

Page 37

```
 1                MS. MELL:   Object to the form.
 2           A.   No.
 3           Q.   And when you say no, you're agreeing with me,
 4   they lack the discretion to make that call in the moment
 5   about where to work?
 6           A.   I'm answering your question that they cannot
 7   decide where they want to go work.   They're allowed to work
 8   in the area that they're assigned to.
 9           Q.   You talked about part of your supervision of
10   detainee workers in the living area about did you say
11   making sure that there was signage out?
12           A.   Correct.
13           Q.   So wet floor signs, for example?
14           A.   Yes.
15           Q.   So is this an example of you making sure that
16   they're conducting their work in a safe manner?
17           A.   Safe for everybody; safe for them, safe for
18   other -- other detainees, safe for officers.
19           Q.   Are there safety regulations that you're aware
20   of for the detainee workers working in the living area, or
21   frankly, anywhere in the facility?
22           A.   Can you go a little -- explain a little bit
23   further?
24           Q.   Sure.
25                All right, well let's ground it then.   We're
```

David Tracy                                    December 3, 2019

Page 38

1    talking about the living area, so let's stick there.

2              Do you train detainee workers about safety when

3    it comes to cleaning in the living areas?

4         A.   There's safety data sheets that are available to

5    them that show this chemical, this is what it's for, this

6    is how it's supposed to be used, this is the dilution rate,

7    this is what you need to do if you interact with the

8    chemical, you know, if the chemical gets -- were to get

9    into your eyes, diluted and nondiluted, all that

10   information is available.

11        Q.   And as a detention officer, or as sergeant, did

12   you provide that information directly to the detainee

13   workers?

14        A.   It's in a book on the desk.  Anybody can look at

15   it at any time.

16        Q.   My specific question though is, did you provide

17   that to them?  Did you -- was there ever a moment at which

18   you affirmatively said, Hey, guys, gals, here are the

19   safety regulations for the work that you're about to do?

20        A.   I -- I can't recall.  I -- you know, working in

21   a unit, put many people into the work program.  I can't

22   force you to read something.

23        Q.   When you say you don't recall, is it the case

24   that it may have happened, and you just don't recall, or

25   that doesn't sound like something you would have done?

David Tracy                                    December 3, 2019

Page 39

 1        A.   It -- I'm -- it probably has happened, but I
 2   can't recall a specific date, a specific individual.  It's
 3   just day-to-day work.
 4        Q.   All right.  Is there anything else that you
 5   could think of about the direction and supervision that you
 6   provided to detainee workers working in the living areas,
 7   beyond what you've already described to me?
 8        A.   If they need something, you know, whatever they
 9   needed to do the job that they needed to do, they can
10   always ask, and we get them the supplies or whatever item
11   they need to do the work to get what they need to do done,
12   if that makes sense.
13        Q.   It does.
14        A.   Okay.
15        Q.   GEO gives them what they need to do the job?
16        A.   Correct.
17        Q.   Let's talk about -- well, Exhibit-313 talks
18   about evening workers, and says in parentheses, they are
19   facility janitorial.
20             Do you know what that means?
21        A.   I don't specifically know what it means.
22   Looking at the classification to the right of that, where
23   it says "Low - Medium High," I'm going to take that as the
24   detainees that work outside after lights out.  So the
25   detainees that go and, you know, mop -- dust mop and mop

David Tracy                                    December 3, 2019

                                                    Page 40

1     the main hallways that -- throughout the facility.

2              Q.   Did you ever direct or supervise detainee

3     workers performing those evening cleaning tasks?

4              A.   Yes, just on the basis that you're out on the

5     actual floor while they're working.   You're not so hovering

6     over them, Hey, you missed a spot here, or like that, but

7     you're physically out there with them.   You can see what

8     they're doing.

9              Q.   And that's as a detention officer, where the

10    direction and supervision is more hands on?

11             A.   Same as a supervisor.   Supervisor would leave

12    the office.   He's not stuck in the desk all day.

13             Q.   And when you say supervisor, are you referring

14    to sergeant?

15             A.   Sergeant, I'm sorry.   Sergeant.

16             Q.   And laundry, did you provide any direction or

17    supervision to detainee workers working in laundry?

18             A.   Yes.

19             Q.   Tell me about that.

20             A.   They are trained on how to use the washing

21    machine, the dryer, how to clean the equipment.

22             Q.   Anything else in terms of the direction and

23    supervision that you provided the detainee workers in the

24    laundry?

25             A.   When I personally worked in laundry, I worked

David Tracy                                    December 3, 2019

Page 41

1    with them.  So it was very hands on, you know, right next

2    to them.

3              Q.    Meaning you were doing the laundry right

4    alongside them?

5              A.    Yes.

6              Q.    How long did you work in laundry?

7              A.    A rough estimate, possibly a year.

8              Q.    You said that the detainee workers were trained

9    on how to use the washer and dryer; did I get that right?

10             A.    Correct.

11             Q.    And this is training that GEO provides to the

12   detainee workers?

13             A.    The officer in charge of laundry would be the

14   one doing it.

15             Q.    This is GEO's officer; correct?

16             A.    Correct.

17             Q.    Okay.  And that GEO would provide the detainee

18   workers training on how to clean the equipment; correct?

19             A.    Correct.

20                   When I say clean, I'm not talking about like

21   taking apart the machine, but I'm talking about like the

22   dryers, the lint trap.  Not like actually taking apart of

23   machine and cleaning out the machine.

24             Q.    Okay.  Fair enough.

25                   And GEO provided all of the laundry detergent to

David Tracy                                    December 3, 2019

Page 42

 1    do the laundry; correct?

 2           A.    Yes.

 3           Q.    If a detainee worker had some secret home remedy

 4    for how to get out stains, could they use it, or would they

 5    have to stick with their training and do the work in the

 6    way that GEO's instructed?

 7           A.    If they did it, I'm not aware of it.  You know,

 8    if they had, you know, personal soap or something like

 9    that, I wasn't aware.  My expectation was use what we

10    provide to you.

11           Q.    And when you say you weren't aware, you never

12    observed anyone using anything other than what GEO

13    provided; is that fair to say?

14           A.    Yeah.

15           Q.    All right, we'll look at some job descriptions

16    later on, but I want to keep working through your post.

17                 So you said laundry -- maybe I should ask in a

18    more open-ended fashion.

19                 Did you ever direct and supervise detainee

20    workers -- strike that.

21                 Tell me where else you've directed and

22    supervised detainee workers.  We talked about the living

23    areas, we talked about laundry; where else, if anywhere?

24           A.    I think I've worked everywhere in the building,

25    so visitation, intake, every unit besides the female unit.

David Tracy                                    December 3, 2019

Page 45

1    laundry shift that you would supervise, for example?

2         A.    Roughly one to four.

3         Q.    And the cleaning, how long would it take to --

4    for a detainee worker to finish their assignment in the

5    visitation room?

6         A.    Approximately 20 to 30 minutes.

7         Q.    What about intake?

8         A.    I would say roughly the same time, 20 to 30

9    minutes.

10        Q.    What about the rec yard?

11        A.    I would say just in general, the normal

12   cleaning, just the sweeping, mopping, that type of thing,

13   roughly 20 to 30 minutes in -- in every area.

14        Q.    Now, the time estimates that you've just given

15   me, do you base them on your firsthand observation as a

16   detention officer or sergeant?

17        A.    Yes.

18        Q.    Now, we've talked a lot about the direction and

19   supervision that you provide.  What role, if any, does ICE

20   play in directing and supervising the detainee work?

21        A.    I believe -- well, they're not -- there's no

22   supervision from an ICE officer, but the only thing I

23   believe is that they set the dollar a day that works into

24   the voluntary worker program.

25        Q.    Sure, and we'll certainly talk about the dollar

David Tracy                                    December 3, 2019

Page 46

1    a day, but to my specific question though about the

2    detainee work, to your knowledge, does ICE play any role in

3    directing and supervising the detainee work?

4              MS. MELL:   Object to the form of the question.

5         A.   No, they may observe if they happen to be in the

6    same area, but specifically, not to my knowledge.

7         Q.   You said you've been there for about ten years

8    at the facility?  Longer than that.

9         A.   October 2009.

10        Q.   2009, okay, yeah, so ten years.

11             In your ten years at the Northwest Detention

12   Center, have you ever observed any ICE personnel directing

13   a detainee worker in their work in the Voluntary Work

14   Program?

15        A.   Not to my knowledge.

16        Q.   To your knowledge, does ICE play any role in

17   inspecting the areas that detainee workers have cleaned?

18        A.   No, not to my knowledge.

19        Q.   All right.  I deposed Mr. Delacruz yesterday and

20   asked him a lot of questions about the kitchen, and he

21   described for me various detainee shifts.  If I remember

22   correctly, he said there was a morning, a lunch, a dinner,

23   and an evening shift.

24             Can you make any broad statements about detainee

25   worker shifts for other areas within the facility?

David Tracy                                    December 3, 2019

Page 49

1       privileges relating to the detainee work status."

2                   Do you see that?

3           A.      Number 7?

4           Q.      Yes.

5           A.      Correct.

6           Q.      Do detainee workers have the discretion to

7       disregard the rules and regulations as explained by GEO?

8           A.      No, but for example, lights out within the

9       building is 11:30.   Technically you're supposed to be in

10      your bunk, you know, ready to go to sleep when lights go

11      out.   There's people outside working -- not outside, but

12      outside the dormitory working at that time.   So that --

13      does that answer your question?

14          Q.      Well, it does in a way.

15                  So let me -- let me try and rephrase it.

16                  I mean, setting aside that narrow example of a

17      detainee worker trying to complete the work, I mean, it's

18      your expectation, as a detention officer and sergeant, that

19      the detainee workers comply with GEO's rules and

20      regulations for the Voluntary Work Program; correct?

21          A.      Yes.

22          Q.      And in fact, part of the supervision that you

23      provide is to make sure that the detainee workers are

24      complying with GEO's rules and regulations; correct?

25          A.      Correct.

David Tracy                                    December 3, 2019

                                                        Page 51

 1                THE COURT REPORTER:  This is Exhibit-314.

 2        Q.   You've just been handed Exhibit-314.

 3             What are we looking at here?

 4        A.   Volunteer work agreement.

 5        Q.   Who is this agreement between?

 6        A.   The detainee and I -- GEO.

 7        Q.   And have you asked detainee workers to sign a

 8   form like this?

 9        A.   Yes.

10        Q.   In fact, this is a regular part of what you do?

11        A.   Yes.

12        Q.   Let's look at the fourth item there at the top.

13   It says "Unexcused absence, unsatisfactory work

14   performance, or participation in a serious infraction, e.g.

15   fighting, is cause for removal from a work assignment.

16   Workers are expected to be ready for work at the required

17   time."

18             Did I read that correctly?

19        A.   Yes.  Yes.

20        Q.   And do you agree that GEO has the right to

21   remove detainee workers from their work assignment?

22             MS. MELL:  Object to the form.

23        A.   Yes.

24        Q.   Let's look at item 6.  It reads, "Detainees must

25   adhere to all safety regulations and to all medical and

Page 52

1    grooming standards associated with a work assignment."

2             Did I read that correctly?

3    A.   Yes.

4        Q.   And would you agree with me that the implication

5    is that if they don't adhere to safety regulations and

6    medical and grooming standards, that they can't work?

7             MS. MELL:  Object to the form of the question.

8        A.   In -- I believe that's specific to a certain

9    area, like the kitchen.

10        Q.   Let's look at number 8.   "Primary factors that

11   impact hiring are classification level, attitude, behavior,

12   and physical ability to perform the job."

13            Do you see that?

14   A.   Yes.

15        Q.   Would you agree that GEO has some discretion in

16   who to hire within the Voluntary Work Program?

17            MS. MELL:   Object to the form of the question.

18   A.   Yes.

19        Q.   Is there any sort of skills assessment that you

20   all do before a detainee worker begins working whatever

21   their job assignment may be?

22        A.   So I know for the kitchen, they have to be

23   cleared by medical.

24        Q.   Do you look for any prior experience?

25            MS. MELL:  Object to the form of the question.

David Tracy                                    December 3, 2019

Page 53

1        A.   No.

2             This document, if they want to work, they fill

3   this out, and write a request, and that's how it's

4   completed.

5        Q.   Do people with prior experience get paid more

6   than people with no prior experience?

7        A.   No.

8        Q.   And by people, I mean the detainee workers?

9        A.   No.

10       Q.   So if a detainee worker has a vast amount of

11  experience buffing or waxing floors, they don't make any

12  more than someone that has no experience buffing and waxing

13  floors; correct?

14       A.   It's number 7, "Compensation shall be $1.00 per

15  day."

16       Q.   So you're agreeing with me, that detainee

17  workers --

18       A.   My -- my answer is they -- whether you have 50

19  years experience or one day experience, the compensation is

20  one dollar per day.

21            MR. WHITEHEAD:  Let's take a quick break.  I

22  think what I want to do next is a longer patch, so let's

23  break here.

24            THE VIDEOGRAPHER:  This is the end of media one.

25  This deposition will continue on media two.  The time's

David Tracy                                          December 3, 2019

Page 54

1      11:25.  Going off the record.

2                        (Recess at 11:25 a.m.)

3                        (Reconvened at 11:49 a.m.)

4               THE VIDEOGRAPHER:  Back on the record.  This is

5      the beginning of media two to the deposition of David

6      Tracy.  The time is approximately 11:49.

7           Q.    Mr. Tracy, do the various work assignments

8      within the Voluntary Work Program have job descriptions?

9           A.    Yes.

10          Q.    And are the job descriptions made available to

11     the detainee workers?

12          A.    Yes.

13          Q.    And they're made available before they request a

14     particular job assignment; is that the case?

15          A.    Yes.

16          Q.    And that's so they can know what they're getting

17     into in terms of duties and responsibilities?

18               MS. MELL:  Object to the form.

19          A.    Correct.

20          Q.    Is there also an accountability piece to the job

21     descriptions, meaning that if a worker isn't carrying out

22     their specific work duties, everyone will know that that

23     worker's falling short?

24               MS. MELL:  Object to the form.

25          A.    Not to my knowledge.

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110   FAX: 206.622.6236

David Tracy                                    December 3, 2019

Page 56

1    section called Specific Work Duties.  That section Specific

2    Work Duties, is that what GEO expects of the detainee

3    workers in terms of their duties and responsibilities?

4            MS. MELL:  Object to the form of the question.

5        A.   I don't know what GEO expects.  If I was the

6    officer in the barbershop, this is what I would expect for

7    myself and the detainee workers.

8        Q.   And that's true of each of the job descriptions

9    where we look at the specific work duties, that those will

10   be the work duties that the detainee worker would be

11   responsible for?

12       A.   Correct.

13       Q.   Now, taking that first page, in your experience

14   as a detention officer and a sergeant at the Northwest

15   Detention Center, do detainee workers working in the

16   barbershop have discretion to deviate from the specific

17   work duties that are shown there on the first page of

18   Exhibit-315?

19            MS. MELL:  Object to the form of the question.

20       A.   I have never worked in a barbershop.

21       Q.   Setting that aside, of what you know of the

22   facility and your work as a detention officer, and a

23   sergeant, and having looked at other job descriptions,

24   would detainee workers be allowed to deviate from their

25   specific work duties?

David Tracy                                    December 3, 2019

Page 57

1              MS. MELL:  Object to the form of the question.

2         A.   If these are the specific work duties, this is

3    what is expected.

4         Q.   So let's look at the second bullet there, "Apply

5    clipper oil after each cleaning."

6              Do you see that?

7         A.   Yes.

8         Q.   Would a detainee worker have the discretion to

9    disregard that instruction?

10             MS. MELL:  Object to the form of the question.

11        A.   No, if it says they're supposed to apply clipper

12   oil after each cleaning, the expectation is to apply

13   clipper oil after each cleaning.

14        Q.   Let's look a couple bullets down.  It says

15   "Towels will not be used."

16             Do you see that?

17        A.   Yes.

18        Q.   Could a detainee worker decide hey, I'm going to

19   use towels?

20             MS. MELL:  Object -- object to the form of the

21   question.

22        A.   They can make any decision they want to make.

23   The ramification is that they probably aren't going to work

24   in the barbershop anymore.

25        Q.   And that's the case, GEO's there, the detention

David Tracy                                    December 3, 2019

Page 59

1          Q.   Detainee workers working in the barbershop don't
2    have discretion to cut hair in the yard, do they?
3               MS. MELL:   Object to the form of the question.
4          A.   No.
5          Q.   GEO directs them to cut hair in the barbershop;
6    correct?
7          A.   Correct.
8          Q.   And provides the space for them to do so;
9    correct?
10         A.   Correct.
11         Q.   And provides the scissors for them to cut hair?
12         A.   I don't know if they have scissors, clippers.
13         Q.   Provides the equipment for them to cut hair?
14         A.   Correct.
15         Q.   Detainee workers aren't allowed to use their own
16   equipment in the barbershop; is that right?
17         A.   Correct.
18         Q.   Detainee workers working as barbers don't get
19   paid more if they have preexisting skill as a barber; is
20   that right?
21         A.   Every person that works gets a dollar per day is
22   the compensation.
23         Q.   So you're agreeing with me then that regardless
24   of preexisting skill as a barber, they don't get paid more?
25              MS. MELL:   Object to the form.

David Tracy                                    December 3, 2019

Page 60

1        A.   I'm telling you that just like I said earlier,

2   50 years experience or one day experience, the compensation

3   rate is a dollar per day.

4        Q.   There's no opportunity for the barbers to make

5   more if they are doing a more complex haircut or hair

6   styling; correct?

7        A.   No.

8        Q.   And when you say no, you're agreeing with me,

9   they can't make more?

10       A.   The compensation is one dollar per day, no more.

11       Q.   Are there any GEO barbers at the Northwest

12   Detention Center?

13       A.   Officers?

14       Q.   Correct.

15       A.   No.

16            I don't know if they cut hair outside on their

17   own time.  I'm sure somebody does, but --

18       Q.   Have you --

19       A.   -- they don't cut detainee hair.

20       Q.   I'm sorry, I cut you off there.

21            Have you ever observed GEO personnel cutting

22   hair at the Northwest Detention Center?

23       A.   No.

24       Q.   Are you aware of GEO personnel cutting hair at

25   the Northwest Detention Center?

David Tracy                                December 3, 2019

Page 61

1          A.    No.
2          Q.    If detainee workers didn't cut hair at the
3    Northwest Detention Center, who would?
4              MS. MELL:   Object to the form of the question.
5          A.    I -- I don't know.
6          Q.    GEO would have to find someone; correct?
7              MS. MELL:   Object to the form of the question.
8          A.    I don't know.
9          Q.    All right, let's look at the next page of
10   Exhibit-315.   This is a detainee job description for
11   barbershop cleaner.
12              Are you with me?
13         A.    Yes.
14         Q.    Looking at that first bullet, it states "Clean
15   Clippers by turning clippers off, brush hair from blades,
16   turn clippers back on and spray liberally with H42 cleaner
17   until blades are clear of all foreign matter."
18              Do you see that?
19         A.    Yes.
20         Q.    Would you agree that GEO is directing barbershop
21   cleaners to use H42 cleaner?
22         A.    That's how I read it.
23         Q.    Do detainee barbershop cleaners have discretion
24   to use a different type of cleaner in cleaning the
25   clippers?

David Tracy                                    December 3, 2019

                                                        Page 62

1           A.   Based on this sentence you just read me, no.

2    I've never worked in the barbershop, so the first time I am

3    seeing in this.   I can only answer with what I read.   It

4    says that they're supposed to use H42, that's what they're

5    supposed to use.

6           Q.   And is it fair to assume that GEO would provide

7    the H42 cleaner to the detainee barbershop cleaners?

8           A.   Yes.

9           Q.   Are you aware of any GEO personnel working as

10   barbershop cleaners?

11          A.   Not -- no.

12          Q.   Let's look at the next page.   This is the third

13   page of Exhibit-315.   It's a detainee job description for

14   medical cleaning.

15               Are you there?

16          A.   Yes.

17          Q.   Now, towards the top here, this one says "Pay

18   Scale Grade:  Unskilled."

19               Do you see that?

20          A.   Yes.

21          Q.   What does that unskilled mean?

22          A.   I don't know.   I didn't create the form.   I

23   don't know what the intentions of it is or why it's there.

24          Q.   Have you ever seed that -- seen that notation

25   before on job descriptions, unskilled?

David Tracy                                    December 3, 2019

Page 63

1         A.    If you continue to flip through the pages, it's

2    on every single one except for the barbershop.

3         Q.    Let's look at the specific work duties for the

4    medical cleaning job description.   The first item there

5    says "Dust Medical Offices."

6               Do you see that?

7         A.    Yes.

8         Q.    Could the medical cleaners clean in an area

9    other than the medical offices?

10        A.    I don't believe they clean in the medical

11   offices.

12        Q.    Could the medical cleaners dust anywhere other

13   than the medical offices?

14        A.    In the hallways, in the cells, behind the

15   counter, in the corners of the door, down the hallway, the

16   window sills in medical.

17        Q.    Well, my question then is, could they clean

18   outside of medical if they weren't assigned?

19        A.    If their job title is medical cleaning, no.   I

20   mean, they -- they can clean inside the unit if they want

21   to.

22        Q.    I guess I'm not phrasing this very well.

23              I mean, the job description is for medical

24   cleaning.   The expectation is that they clean the medical

25   unit; correct?

David Tracy                                    December 3, 2019

Page 64

 1              A.    Yes.    Correct.

 2              Q.    And then it goes on to list about vacuuming,

 3    mopping, cleaning.   GEO provides all of the materials

 4    necessary to carry out those tasks; correct?

 5              A.    Correct.

 6              Q.    And in looking at these specific work duties,

 7    GEO is directing the medical cleaners to dust, to vacuum,

 8    to mop, to clean the toilets, to remove the trash; correct?

 9              A.    Those are the work duties, yes.

10              Q.    Now, looking at this medical cleaning job

11    description, there's a section called Termination.

12              Do you see that?

13              A.    Yes.

14              Q.    The first item says "Failure to follow CSC staff

15    instructions."

16              What is CSC staff?

17              A.    I don't know.   I've never seen this form before.

18              Q.    But to my question, CSC, have you ever seen that

19    acronym before?

20              A.    Probably sometime in my life, but I don't know

21    what it refers to here.

22              Q.    Looking at the next item down, it says "Failure

23    to follow safety procedures."

24              Would you agree that failure to follow safety

25    procedures could lead to termination?

David Tracy                                    December 3, 2019

Page 65

1           A.   Yes.

2           Q.   Item 3 says "Excessive absenteeism."

3                Would you agree that excessive absenteeism could

4    lead to termination of the medical cleaners?

5           A.   Yes.

6           Q.   Would you agree that misconduct and horseplay

7    could lead to termination of the medical cleaners?

8           A.   Yes.

9           Q.   Would you agree that theft could lead to

10   termination of the medical cleaner?

11          A.   Yes.

12          Q.   Would you agree that unsatisfactory work

13   performance could lead to termination of the medical

14   cleaner?

15          A.   Yes.

16          Q.   And it's GEO that decides if any of these

17   fireable offenses have occurred --

18               MS. MELL:   Object --

19          Q.   -- is that the case?

20               MS. MELL:   Object to the form.

21          A.   It could be anybody.   If two people are

22   fighting, and a nurse walks by, they're not going to ignore

23   the fighting, they're going to tell somebody.

24          Q.   That nurse would be GEO staff though; correct?

25          A.   No.

David Tracy                                    December 3, 2019

Page 66

```
 1              MS. MELL:   Object to the form.
 2         Q.   No?
 3              All right, well let's take item 6 there,
 4    "Unsatisfactory work performance," who would make that
 5    determination?
 6         A.   An officer.
 7         Q.   That's a GEO officer; correct?
 8         A.   Correct.
 9         Q.   And what about failure to follow safety
10    procedures leading to termination, who would make that
11    call?
12         A.   GEO.
13         Q.   Now, the medical cleaners, could they make more
14    money if they were excellent cleaners?
15         A.   Compensation for any job in the facility is one
16    dollar per day, whether they are an excellent cleaner, not
17    such a good cleaner, they have been cleaning for 50 years,
18    if this is the first day they picked up a mop, compensation
19    is one dollar per day, not more, not less.
20         Q.   Have you ever requested a pay raise, so to
21    speak, for any of the detainee workers that you've
22    supervised?
23         A.   No.
24         Q.   Have you ever inquired with -- within your chain
25    of command, to the lieutenant or the captain, about whether
```

David Tracy                                          December 3, 2019

Page 67

1      or not GEO could pay detainee workers more than a dollar a

2      day?

3              A.    No.

4              Q.    Now, if the detainee workers didn't carry out

5      the medical cleaning described on page 3 of Exhibit-315,

6      who would?

7              A.    I don't know.

8              Q.    Are you aware of any GEO personnel that is

9      responsible for cleaning the medical unit?

10             A.    GEO has janitors.

11             Q.    How many janitors does GEO have?

12             A.    I'm not sure.  There were three at one point.

13             Q.    And would that be three working all at once, or

14     three spread out across various shifts?

15             A.    I don't know their schedule.

16             Q.    How many janitors does GEO have right now?

17             A.    I'm not sure.

18             Q.    Can you name any of them for me?

19             A.    Last name.

20             Q.    Sure, who?

21             A.    Edgecomb.

22             Q.    Spell that for me.

23             A.    Edgecomb, E-D-G-E-C-O-M-B, I believe.  That's

24     just a guess.

25             Q.    So Edgecomb.

David Tracy                                      December 3, 2019

Page 68

1          A.    Nguyen.

2          Q.    Spell that one for me.

3          A.    N-G-U-Y-E-N, guessing.

4          Q.    Anyone else?

5          A.    Not that I can think of.

6          Q.    Now, the -- you said that Mr. Edgecomb and Mr.

7    Nguyen are current janitors?

8          A.    Correct.

9          Q.    Can you distinguish for me the work that these

10   two do as opposed to the janitorial services that the

11   detainee workers do?

12              MS. MELL:   Object to the form.

13         A.    They have access to parts of the facility where

14   detainees wouldn't be able to go.

15         Q.    Are you aware of any other distinction?

16         A.    Not to my knowledge.   I'm not a janitor.   I'm

17   not sure what the difference is.

18         Q.    And as you sit here today, the first thing that

19   you can think of though is that the janitors have access to

20   areas that the detainee workers can't go; correct?

21              MS. MELL:   Object to form.

22         A.    Correct.

23              They also have keys.

24         Q.    Can you tell me the areas that the janitors can

25   go that the detainee workers can't?

David Tracy                                    December 3, 2019

Page 69

1           A.   Would you like a list or --

2           Q.   Sure.

3           A.   Break room, male locker room, female locker

4    room, courts, immigration, warehouse, maintenance, loading

5    dock, front lobby, employee restrooms, visitation

6    restrooms, outside in the dog run, perimeter, upstairs in

7    immigration, through emergency doors, parking lot, on the

8    property.

9                I'm sure there's more, I just --

10          Q.   But the common theme though among all the items

11   that you just listed for me is that detainees can't go

12   there?

13          A.   Correct.

14          Q.   Now, are you aware of the janitors cleaning in

15   areas that detainees have access to?

16          A.   Medical, but parts that they wouldn't have

17   access to.

18          Q.   All right, so again, are you aware of the

19   janitors cleaning areas that the detainee workers have

20   access to?

21          A.   I mean, if they see something on the ground,

22   they might pick it up, if you consider that cleaning, but I

23   would think all the officers would do the same thing.  So

24   technically, we all clean.

25          Q.   I get that, and that certainly makes sense.  I

David Tracy                                    December 3, 2019

Page 70

 1    mean, if there was a piece of trash in Ms. Mell's hallway,

 2    I would pick it up and throw it away for her.

 3              But my specific question is whether or not you

 4    observed the janitors cleaning in let's say a pod, for

 5    example?

 6         A.    No.

 7         Q.    Have you observed the janitors cleaning in the

 8    laundry room?

 9         A.    No.

10         Q.    Have you observed the janitors cleaning in the

11    kitchen?

12         A.    No.

13         Q.    And these are all areas that the detainees have

14    access to?

15         A.    Correct.

16         Q.    So is it fair to say that the detainee workers

17    clean the areas that they have access to, and that the

18    janitors clean the areas that the detainee workers do not

19    have access to?

20         A.    Correct.

21              MS. MELL:   Object.

22         Q.   And in your ten years at the facility, has the

23    number of janitors been constant?  You mentioned that there

24    were three, but you named two for me --

25         A.   There was three, and I believe one retired.

David Tracy                                    December 3, 2019

Page 73

1    might not be an everyday thing, but it's a possibility they

2    could be asked to do that.  It's a -- it's a work duty they

3    may be asked to do.

4          Q.   And looking as page 4 there of Exhibit-315, we

5    see the section there at the bottom Termination.

6               Do you see that?

7          A.   Yes.

8          Q.   Is it the case then that general workers could

9    be fired for excessive absenteeism?

10         A.   Yes.

11         Q.   Could they be fired for misconduct and

12   horseplay?

13         A.   Yes.

14         Q.   Could they be fired for theft?

15         A.   Yes.

16         Q.   Could they be fired for unsatisfactory work

17   performance?

18         A.   Yes.

19         Q.   Could they earn more if they were really good at

20   their job?

21         A.   Compensation for any job is one dollar per day.

22         Q.   So that's no, they can't earn more?

23         A.   No.  Compensation's one dollar per day.

24         Q.   And it's the case that GEO provides all of the

25   equipment and cleaning materials necessary for the general

David Tracy                                    December 3, 2019

Page 74

1    workers to do their job?

2         A.    Correct.

3         Q.    Can the general workers work outside the

4    Northwest Detention Center?

5         A.    What do you mean by outside?

6         Q.    Well, let me put it this way:  In your ten years

7    at the facility, are you aware of any detainee worker

8    working for another company outside the detention center?

9         A.    While they're being detained?

10        Q.    Yes.

11        A.    No.

12        Q.    So there's no opportunity then for a detainee

13   worker to say, I don't want to work for GEO, I want to work

14   down the street?

15             MS. MELL:  Object to the form of the question.

16        A.    No.  It's a secured facility.  They can't leave

17   and come as they want to.

18        Q.    They have to stay?

19        A.    Correct.

20        Q.    And you mentioned sometimes with the general

21   workers that -- no, strike that.

22             Let's look at the next page of Exhibit-315.

23   This is page 5.  This is for laundry worker.

24             Are you there?

25        A.    Yes.

David Tracy                                          December 3, 2019

Page 75

1          Q.    Would you agree that those are the specific work

2    duties of detainee workers in the laundry department?

3          A.    Yes.

4          Q.    And when you were working as the detention

5    officer in laundry, that's what you expected of the

6    workers; correct?

7          A.    Correct.

8          Q.    And they didn't have the discretion to deviate

9    from their specific work duties; is that the case?

10         A.    That's the job duties, that's what was expected.

11         Q.    GEO provided all of the equipment and materials

12   needed for them to do their jobs as laundry workers?

13         A.    Correct.

14         Q.    And they couldn't do their laundry work outside

15   of the laundry unit?

16               MS. MELL:   Object to the form of the question.

17         A.    No.

18         Q.    They couldn't, for example, take a load of

19   laundry and fold it in the yard?

20         A.    No.

21         Q.    Is there a third-party service that does laundry

22   at the Northwest Detention Center?

23               MS. MELL:   Object to the form.

24         A.    Not to my knowledge.

25         Q.    If the detainee workers didn't do laundry, who

David Tracy                                    December 3, 2019

Page 76

1    would?

2              A.    I -- I don't know.

3              Q.    And then we also see here on the laundry worker

4    job description a list of fireable offenses.

5                    Do you see that?

6          A.    Correct.

7              Q.    Do you agree that failure to follow safety

8    procedures could lead to termination of laundry workers?

9          A.    Yes.

10         Q.    Excessive absenteeism?

11         A.    Yes.

12         Q.    Misconduct and horseplay?

13         A.    Yes.

14         Q.    Theft?

15         A.    Yes.

16         Q.    And unsatisfactory work performance?

17         A.    Yes.

18         Q.    And with any of the job descriptions that we've

19   seen, can detainee workers change the job duties?

20         A.    They cannot change the job duties.

21         Q.    Can they negotiate for more pay?

22         A.    No, compensation is a dollar per day.

23         Q.    What is a pod porter?

24         A.    Be a detainee who -- pod porter?

25         Q.    Yes.

David Tracy                                    December 3, 2019

Page 79

1    eventually end up with this?

2         A.   Correct.

3         Q.   These questions are going to be similar, but I'm

4    going to ask again.

5              Do the pod porters have discretion to deviate

6    from the job duties that are listed here?

7         A.   No.  These are the expectations.  This is what's

8    expected.

9         Q.   And the pod porters use the materials provided

10   by GEO; correct?

11        A.   Correct.

12        Q.   And they clean in the areas that GEO tells them

13   to clean in; correct?

14        A.   For a pod porter.  It's the common areas of the

15   living area.

16        Q.   Looks like there are -- well, let me back up.

17             Is it the case then that a pod porter is

18   expected to clean in each of these areas, or do they have a

19   specific area?

20        A.   So it's a specific area.

21        Q.   So let's take the first one for example, shower

22   cleaners.  So a particular pod porter could be assigned to

23   clean the showers only; is that the case?

24        A.   Correct.

25        Q.   And then a different pod porter or detainee

David Tracy                                    December 3, 2019

Page 80

1    worker could be assigned to clean the bathrooms and

2    bathroom cell?

3         A.    Correct.

4         Q.    So let's say a pod porter assigned to clean the

5    shower --

6         A.    Mm-hm.

7         Q.    -- do they have discretion to clean the bathroom

8    instead?

9         A.    That's not their job.  They can clean whatever

10   they want inside the unit, their job is shower cleaner.  So

11   they can help wherever they want to clean, they can clean

12   on their own time because they want, they like it, they

13   enjoy it, it gives them something to do, but that's their

14   main -- that's their job, shower cleaner.

15        Q.    And if they clean more, right, they don't make

16   more money?

17        A.    No.

18        Q.    Is it the case then that the detainee worker

19   signs this form that is Exhibit-316 and then to the

20   detention officer signs as well?

21        A.    Correct.

22        Q.    And GEO fires pod porters if they fail to do

23   their job; is that correct?

24        A.    Correct.

25        Q.    Now, if the detainee workers didn't clean the

David Tracy                                    December 3, 2019

Page 81

```
 1    pods, who would?
 2              A.   I -- I don't know.
 3              Q.   Do you think the detainee workforce is an
 4    important part of carrying out the operations at the
 5    Northwest Detention Center?
 6              MS. MELL:   Object to the form of the question.
 7              A.   I think it's a benefit to the population.  They
 8    gain some -- a sense of pride from it, they gain the sense
 9    of I'm not stuck here.  It gives them -- you know, just
10    like everybody else, you know, everybody else works.  You
11    know, they have their normal job, that type of thing.  This
12    gives them a sense of I'm not just stuck in here, I have
13    this, this objective or goal that I have to do.  And it
14    helps them out financially.  I think it's a benefit to --
15    sorry -- the population overall.
16         Q.   Do you think GEO gets something out of it too
17    though?
18              MS. MELL:   Object to the form of the question.
19         A.   I'm sure they do.
20         Q.   I guess that's what I'm driving at.  I mean, do
21    you think that the work that GEO gets from the detainee
22    workers is important?
23              MS. MELL:   Object to the form of the question.
24         A.   Yes.
25         Q.   It's important to the operation of the facility?
```

David Tracy                                    December 3, 2019

Page 82

```
 1              MS. MELL:  Object to the form of the question.

 2         A.   Correct.

 3         Q.   What is a detainee worker pay sheet?

 4         A.   It's a -- I don't -- do you -- do you have one?

 5         Q.   I do.

 6         A.   Okay, cool.  Because it's easier to explain

 7    it --

 8         Q.   Let's do it that way.

 9         A.   -- instead of trying to explain it --

10         Q.   Yeah, no it's not --

11         A.   -- you hand it to me.

12         Q.   It's not a gotcha question.

13              Hold on, let me --

14         A.   Basically it's a sheet, once they've completed

15    their task or their job for the day, they sign the sheet

16    saying I've done, you know, whatever my job is, I've

17    completed it for the day.  And it gets turned in every

18    night.

19         Q.   Oh, I guess we used it yesterday.  Give me a

20    second.

21              Exhibit-308, please.

22              Okay.  All right, you've just been handed

23    Exhibit-308.

24         A.   Thank you.

25         Q.   Is this an example of a detainee worker pay
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

David Tracy                                    December 3, 2019

Page 83

1    sheet?

2              A.    Yes.

3              Q.    Let's look at the top there of Exhibit-308.

4    That last bullet, it says "By detainee signature staff" --

5    excuse me, let try that again.   Strike that.

6                    Let's look at the last bullet there at the top

7    of Exhibit-308.   It says, "By detainee signature staff is

8    affirming that the following have been evaluated and met

9    acceptable standards: the job was completed, detainee

10   maintained a good attitude, and the detainee began work on

11   time."

12                   Did I read that correctly?

13             A.    I believe so.

14             Q.    Was that your understanding when a detainee

15   signed off, it was the staff affirming that the detainee

16   had done their job?

17             A.    We hold this paper, it's in the desk, or

18   wherever it may be, so us giving it to them and having them

19   sign it.

20             Q.    Well, let me ask a different way.

21                   When and why do detainees sign off on this form?

22                   MS. MELL:   Object to the form of the question.

23             A.    It's verifying that the work was done.

24             Q.    In that way then is this a sort of roll sheet so

25   that you have a record of whether or not the work was

David Tracy                                    December 3, 2019

Page 84

1    actually done?

2         A.    Correct.

3               And it's -- you know, it's a paper trail so, you

4    know, if you're a detainee, you worked last week, and you

5    never got paid, you didn't get your dollar or whatever --

6         Q.    Mm-hm.

7         A.    -- I could find, Oh, you didn't sign it.

8               And then I would -- you know, if I was in there

9    that day, I can verify you worked, and I can write a memo

10   saying oh, it got turned in before he signed it, or he was

11   somewhere else when -- and never got a chance to sign it,

12   if that makes sense.

13        Q.    To your knowledge, did ICE ever play any role in

14   assigning detainees to work assignments within the

15   facility?

16        A.    Not to my knowledge.

17        Q.    To your knowledge, did ICE ever play any role in

18   terminating a detainee from a work assignment?

19        A.    Not to my knowledge, besides them leaving the

20   facility.

21        Q.    Who sets the detainee worker schedule?

22        A.    I am not positive.

23        Q.    Let's take a look at Exhibit-309.

24               THE WITNESS:  Do you need this back?  It's from

25   someone else.

David Tracy                                    December 3, 2019

Page 88

1    since I started there, so I don't know who created it, who

2    put it into the play, but ...

3              Q.    Would it be fair to say then it's a GEO-approved

4    schedule?

5              A.    Yeah.  Yes.

6              Q.    All right, so there's a GEO-approved schedule

7    for detainee workers; correct?

8              A.    Correct.

9              Q.    And GEO provides detainee workers the training

10   they need to do their jobs; correct?

11             A.    Correct.

12             Q.    GEO provides them the equipment they need to do

13   their job; correct?

14             A.    Correct.

15             Q.    The detainee workers aren't allowed to deviate

16   from their job duties; correct?

17             A.    Correct.

18             Q.    GEO supervises the detainee workers as they go

19   about their work; correct?

20             A.    Like I said earlier, they're not standing over

21   there supervising them that specific task, there's

22   supervision while multitasking throughout the day.

23             Q.    If a detainee worker fails to carry out their

24   job duties or goes about them in an unsafe way, GEO can

25   fire them; correct?

David Tracy                                    December 3, 2019

Page 89

1            MS. MELL:  Object to the form of the question.

2        A.   Yeah.

3            MR. WHITEHEAD:  All right, let's take one more

4    break.

5            THE VIDEOGRAPHER:  Going off the record.  The

6    time is 12:38.

7                  (Recess at 12:38 p.m.)

8                  (Reconvened at 12:48 p.m.)

9            THE VIDEOGRAPHER:  Back on the record.  The time

10   is 12:48.

11       Q.   Mr. Tracy, earlier you told me about two

12   janitors by name that work at the Northwest Detention

13   Center; do you recall giving that testimony?

14       A.   Yeah, Edgecomb and Nguyen.

15       Q.   Do you know how much they're paid?

16       A.   I have no idea.

17       Q.   Mr. Tracy, I know I've asked you some pointed

18   questions today, but have I been fair with you?

19           MS. MELL:  Objection.  You don't have to answer

20   that.  You don't -- don't answer that.  No.  You don't have

21   to answer that question.

22           Are you done?

23       Q.   Yeah, I thought it was a fair question, but

24   if -- are you going to take the advice of counsel?

25   Ultimately it's your decision about whether or not you're

David Tracy                                                    December 3, 2019

                                                                    Page 113

  1                         C-E-R-T-I-F-I-C-A-T-E

  2

  3       STATE OF WASHINGTON )

  4                           )  ss.

  5       COUNTY OF THURSTON  )

  6

  7                   I, the undersigned Registered Professional
          Reporter and Certified Court Reporter, hereby
          certify that the foregoing deposition upon oral
  8       examination was taken stenographically before me and
          transcribed under my direction;

  9

 10                   That the witness was duly sworn by me,
          pursuant to RCW 5.28.010, to testify truthfully; that the
 11       transcript of the deposition is a full, true, and correct
          transcript to the best of my ability; that I am neither
 12       attorney for, nor a relative or employee of, any of the
          parties to the action or any attorney or counsel employed
 13       by the parties hereto, nor financially interested in its
          outcome.

 14

 15                   I further certify that in accordance with CR
          30(e), the witness was given the opportunity to examine,
 16       read, and sign the deposition, within 30 days, upon its
          completion and submission, unless waiver of signature was
 17       indicated in the record.

 18

 19                   IN WITNESS WHEREOF, I have hereunto set
          my hand this 10th day of December, 2019.

 20

 21

 22

 23       _____

          NCRA Registered Professional Reporter
 24       Washington Certified Court Reporter No. 2661

 25