# WHITEHEAD DECLARATION

# EXHIBIT V

Michael Heye                                    December 4, 2019

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

------------------------------------------------------------

UGOCHUKWU GOODLUCK NWAUZOR,            )

FERNANDO AGUIRRE-URBINA,               )

individually and on behalf of all     )

those similarly situated,             )

        Plaintiffs,                   )

    vs.                               ) No. 17-cv-05769-RJB

THE GEO GROUP, INC., a Florida        )

corporation,                          )

        Defendant.                    )

------------------------------------------------------------

** Transcript Contains Portions Designated Confidential **

** See Index on Page 4 **

------------------------------------------------------------

Videotaped Deposition Upon Oral Examination of

MICHAEL T. HEYE

------------------------------------------------------------

10:04 a.m.

Wednesday, December 4, 2019

810 Third Avenue, Suite 500

Seattle, Washington

REPORTED BY:  Keri A. Aspelund, RPR, CCR No. 2661

Michael Heye                                    December 4, 2019

                                                            Page 20

1          Q.    Are you aware that Officer Menza was deposed in

2     this action as well?

3          A.    Yes, he told me that he was.

4          Q.    And what did he say about his deposition?

5          A.    He didn't say anything about his deposition.

6          Q.    Did you ask him any questions about his

7     deposition?

8          A.    I did not ask any questions.

9          Q.    You've been a classification officer since 2009;

10    correct?

11         A.    Mm-hm.

12         Q.    That's a yes?

13         A.    Yes.

14         Q.    Are there any other classification officers at

15    the Northwest Detention Center?

16         A.    Ms. Singleton.

17         Q.    That's Alisha Singleton?

18         A.    Yes.

19         Q.    Anyone else?

20         A.    No.

21         Q.    Is it the case then that the classifications

22    unit is comprised of you and Ms. Singleton?

23         A.    Yes.

24         Q.    Are you and Ms. Singleton co-equals?

25         A.    Yes.

Michael Heye                                        December 4, 2019

Page 21

 1          Q.   She's not your boss?

 2          A.   No.

 3          Q.   You're not her boss?

 4          A.   No.

 5          Q.   In terms of your role as compared to hers, are

 6     they at all different?

 7          A.   No.

 8          Q.   Put another way, is there any aspect of the unit

 9     that you focus on, any aspect that she owns or works on in

10     particular?

11          A.   It's pretty much equal.

12          Q.   And is it the case that you both do and carry

13     out the same functions and responsibilities?

14          A.   Yes.

15          Q.   Is there any sort of division of labor, whether

16     it's official or unofficial, between how you two divide the

17     work?

18          A.   Not really.

19          Q.   So it's not the case that, you know, you have a

20     specialty within the classifications unit and she has one

21     as well?

22          A.   No, we pretty much can do all the things the

23     same.

24          Q.   Are there any tasks that you find yourself doing

25     more often than her?

Michael Heye                                    December 4, 2019

Page 22

1        A.   Not really, huh-uh, no.

2        Q.   So in terms of your duties and responsibilities,

3   it's 100 percent 50/50, if I understand you correctly?

4        A.   Correct.

5        Q.   All right, so what -- what does classifications

6   mean?

7        A.   We classify detainees that come into the

8   facility.

9        Q.   In what sense?

10       A.   Like how is the process --

11       Q.   Well --

12       A.   -- or what are you asking?

13       Q.   -- when you say you classify them, classify them

14   into what?

15       A.   Into levels.

16       Q.   And what are the levels?

17       A.   Low, medium low, medium high, and high.

18       Q.   And we're talking about security risk; is that

19   right?

20       A.   Correct.

21       Q.   All right, so it involves classifying detainees

22   into levels.

23            Does classifications mean anything else?

24       A.   No.

25       Q.   There's no other way, beyond security level, in

Michael Heye                                    December 4, 2019

                                                         Page 23

1     which you're classifying the detainees; correct?

2              MS. MELL:  Object to the form.

3         A.   We classify them and give them a level.  Is

4     there something else?

5         Q.   No, you know, I -- I don't know, you know, what

6     your attorney's told you about my style.  I'm not asking

7     you a gotcha question.  I mean, some of this I think I

8     know, but much of it I'm trying to learn from you.

9         A.   Mm-hm.

10        Q.   So my question about what are you classifying is

11    truly just that, a question.

12             So as I understand it, you're classifying people

13    into security risk levels; correct?

14        A.   Yes.

15        Q.   And is it an aspect of your job to assign

16    detainees to housing based on their classification?

17        A.    Intake houses them according to the

18    classification level.

19        Q.   And the Voluntary Work Program, is that part of

20    your responsibility, Ms. Singleton's responsibility, as

21    classification officers?

22        A.   Yes.

23        Q.   And as it relates to the Voluntary Work Program,

24    again it's an equal division of labor between you and Ms.

25    Singleton?

Michael Heye                                    December 4, 2019

Page 24

1        A.   Yes.

2        Q.   Now, in fulfilling your job as a classification

3    officer, can you tell me all of the ways, if any, in which

4    you work with ICE to do your job.

5        A.   The only time I need to talk to ICE is if the

6    paperwork that we get is unclear or needs to be clarified

7    so that I can classify a detainee.

8        Q.   What paperwork are we talking about?

9        A.   We get the I-385 and I-213, a medical -- not

10   medical, it's an evaluation form, and we go off of those

11   forms to classify a detainee.

12       Q.   And so let's take the I-385; what is that?

13       A.   It's a form that has the detainee's name, and A

14   number, and a picture.

15       Q.   So this is just a one-pager?

16       A.   Yes.

17       Q.   Who completes the I-385?

18       A.   I don't know who fills it out.  I believe ICE

19   does because that's where we get the paperwork from.

20       Q.   And is it the case then that the I-385, the

21   I-213, and the medical eval form all comes from ICE?

22       A.   Yes.

23       Q.   Is this part of a packet, so to speak, that

24   comes with each new entrant into the facility?

25       A.   Yes.

Michael Heye                                    December 4, 2019

Page 25

1        Q.   So the I-385 is a one-pager, what is the I-213?

2        A.   That's a -- it details whatever ICE wants to put

3   in it.  It tells me their criminal history, if they've ever

4   been deported or not, and we go off of that information to

5   classify.

6        Q.   So the I-213 is more of a maybe a background

7   statement about the detainee?

8        A.   Yes.

9        Q.   And the medical form, that sounds

10  self-explanatory, it's just a medal history of the -- the

11  detainee?

12       A.   No, we don't get a medical history.  The -- this

13  form just shows if they are -- if they have any medical

14  problems, if they have been sexually abused, or if they've

15  been assaulted at any time.  So it's just a -- it's a

16  checkoff form to just check one of these boxes or check

17  none is what that form is.

18       Q.   All right, so you receive this packet from ICE

19  that has the I-385, the I-213, and some medical

20  information, and then based upon that information you

21  receive from ICE, you go about your work classifying the

22  detainee?

23       A.   Correct.

24       Q.   And so other than this packet of information

25  that you receive from ICE, do you have any other interface

Michael Heye                                    December 4, 2019

                                                        Page 26

 1      with ICE as you go about your work as a classification

 2      officer?

 3           A.    No.

 4           Q.    Is ICE or anyone from ICE officed or situated in

 5      the Northwest Detention Center?

 6           A.    In the building, they are upstairs.

 7           Q.    This is the second floor?

 8           A.    Correct.

 9           Q.    There's an administrative unit or wing of the

10      facility; is that correct?

11           A.    Correct.

12           Q.    And in terms of the number of ICE personnel, how

13      many people are in that second floor, the admin unit?

14           A.    I don't know that.

15           Q.    Do you know the names of any of the -- the ICE

16      personnel that are situated in the Northwest Detention

17      Center?

18           A.    I know a couple of them, yes, that I deal with.

19           Q.    Who?

20           A.    Renner is one of them, Meyer is another one that

21      I deal with.  Renner, Meyer.  I'm horrible with names.  I

22      know people's faces.  Mitchell is another one.  Those are

23      pretty much the three main people that I will deal with if

24      I need to.

25           Q.    What is your understanding of what Renner,

Michael Heye                                    December 4, 2019

Page 28

1          A.    Mitchell is a he, and he works on detention
2     files.
3          Q.    And if you're interfacing with Renner, Meyer,
4     Mitchell, it's all in clarifying or getting more
5     information about that initial intake packet that you get;
6     is that fair to say?
7          A.    Yes.
8          Q.    Is it also fair to say then that once your
9     classification decision has been made, there is no further
10    interaction on your part with ICE?
11               MS. MELL:   Object to the form of the question.
12         A.    I don't have interaction with ICE every day.  I
13    get packets all the time, I classify them, and then that's
14    it.
15         Q.    Who do you report to?
16         A.    My -- they call it associate warden.
17         Q.    Who is in that role right now?
18         A.    Bruce Scott.
19         Q.    And I heard from someone else there was perhaps
20    a name change, warden went to --
21         A.    Oh, yeah --
22         Q.    -- is it facility administrator?
23         A.    There you go, yes.
24         Q.    And so then Bruce Scott is currently the
25    assistant facility administrator?

Michael Heye                                    December 4, 2019

Page 54

1      Q.   And put out updated rosters as necessary;

2  correct?

3      A.   Correct.

4      Q.   Other than what we've just discussed, are there

5  any other duties that you conduct with respect to the

6  Voluntary Work Program?

7      A.   I think we covered it.

8      Q.   Now, that list that you just gave me, other than

9  Ms. Singleton, is there anybody else in the facility that

10 performs those same functions?

11     A.   No.

12          MR. WHITEHEAD:  All right, this is a good spot

13 for a break.

14          THE WITNESS:  Okay.

15          MR. WHITEHEAD:  Let's go off the record.

16          THE VIDEOGRAPHER:  We're now going off the

17 record.  The time is 11:12 a.m.

18               (Recess at 11:12 a.m.)

19               (Reconvened at 11:28 a.m.)

20          THE VIDEOGRAPHER:  We're now back on the

21 records.  The time is 11:28 a.m.

22     Q.   Mr. Heye, before the break, you gave me a list

23 of your responsibilities with respect to the Voluntary Work

24 Program.  Do you consult with ICE to carry out any of those

25 duties?

Michael Heye                                    December 4, 2019

Page 55

1          A.    I don't.  My -- Bruce Scott does if I have any

2     questions.

3          Q.    And how do you know that?

4          A.    Because I tell him, and then he goes and talks

5     to ICE, and then he comes back and gives me an answer.

6          Q.    Give me an example of something you've related

7     to Mr. Scott that he's taken to ICE and then has brought

8     back down the chain to you.

9              MS. MELL:   Relative to the VWP?

10             MR. WHITEHEAD:   Yes, thank you.

11         Q.    Relative to the VWP?

12         A.    I don't know if I've ever done anything with

13    Bruce according to that.  Trying to -- I don't think I have

14    any -- done anything with Bruce Scott to ask ICE anything

15    that we've needed to do with the Voluntary Work Program

16    that I remember in that nature.

17         Q.    Well, and don't feel that you need to limit your

18    answer to Mr. Scott, I know that Mr. McHatton was Mr.

19    Scott's predecessor --

20         A.    Mm-hm.

21         Q.    -- and my question is whether directly or

22    indirectly, is there any interface on your part with ICE to

23    carry out the Voluntary Work Program responsibilities that

24    you described for me earlier?

25         A.    When they started -- the only one that I can

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com     206.622.6661 * 800.657.1110   FAX: 206.622.6236

Michael Heye                                    December 4, 2019

Page 56

1     remember that we talked with Mr. McHatton about was when

2     they started the barbershop.

3              Q.   And what was the question there?

4              A.   When we had the barbershop, they, detainees,

5     were cutting hair, and they only had three days that they

6     were assigned barbershop, and they wanted to be able to

7     work -- or to be assigned seven days.   So McHatton -- we

8     had talked to them, and McHatton had apparently talked to

9     ICE about it.   I don't know the whole -- I don't know any

10    of the conversation.   All that McHatton told me was when he

11    came back to me, he said ICE has authorized that the

12    barbershop worker or barbershop -- the assignment for the

13    barbershop can have another assignment so that they can

14    cover the rest of the seven days' work.   So that was one

15    thing that we -- that I had to add to the worker -- the

16    assignment program was for -- that the barbershop can get

17    another assignment because of the limitations for

18    barbershop.

19             Q.   Meaning that you added another slot for a barber

20    on the job assignment list?

21             A.   No, that the barbershop detainee can also get a

22    pod assignment as well or the barbershop cleanup

23    assignment.   That was something that I had to relay to

24    McHatton, and McHatton had to get approval through ICE so

25    that they could have another assignment.

Michael Heye                                    December 4, 2019

Page 57

1        Q.    Is it the case then that a detainee worker can
2    only have one assignment at a time --
3        A.    Correct.
4        Q.    -- generally speaking, and this is an example of
5    an exception to that rule?
6        A.    Correct.
7        Q.    Now, the people in this scenario where they
8    worked in the barbershop and also had a pod job, so two
9    details, could they work both jobs in the same day?
10       A.    Yes.
11       Q.    And in that scenario, would they receive a
12   dollar or would they get two dollars --
13       A.    They would --
14       Q.    -- for their work?
15       A.    They would receive a dollar per the assignment,
16   per each assignment, yes.
17       Q.    So in the scenario you've just described for me,
18   they'd receive a dollar for their barbershop work and a
19   dollar for the pod work?
20       A.    Yes.
21       Q.    All right, so other than this example where you
22   sought clarification through Mr. McHatton, who sought
23   clarification through ICE about the barbershop, can you
24   think of another time where you needed to interface with
25   ICE to do your job regarding the Voluntary Work Program?

Michael Heye                                          December 4, 2019

Page 58

1        A.    I don't know if that's -- they added shower
2   cleaners, so we -- they had a shower assignment, one for
3   the whole -- all three shifts -- there's three shifts,
4   there's day shift, swing shift, graveyard shift that
5   officers rotate through.  So the shower cleaners were --
6   there was one shower cleaner, and they cleaned the showers
7   twice a -- twice a day.  So they wanted to up that to where
8   they would have a shower cleaner on each shift.  So my boss
9   had to talk to ICE, and then once they got clarification of
10  that, he came back to me and said, Yes, put one on each
11  shift.
12        Q.    Now, you said they wanted another shower cleaner
13  on each shift; is they the detention officers?
14        A.    I don't know who exactly it was, I don't know if
15  ICE wanted it or if my A-dub had suggested it to ICE that
16  we need to have one on each shift, that I don't know.  I
17  don't know the conversation.  All I know is that my A-dub
18  told me that we're going to have a shower cleaner on each
19  shift and to add that in.
20        Q.    As I understood it, you said that someone came
21  to you and said, Can we add another shower cleaner to each
22  shift, and you then took that question to Mr. McHatton --
23        A.    No, no.
24        Q.    -- and then he took the question to ICE --
25        A.    So that was --

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110   FAX: 206.622.6236

Michael Heye                                    December 4, 2019

Page 59

1          Q.     -- did I get that wrong?

2          A.     That -- that was wrong.   That was -- that was
3    probably my bad.

4                 What happens is the A-dub will come to me and
5    say, Is there room on your paper or whatever, we want to
6    add three more -- you know, two more shifts to the shower
7    cleaners.   Because on the roster, you can only fit so much
8    on a piece of paper before you have to make it double
9    sided, or two, and all that other junk.   So they were
10   saying -- suggesting that they wanted -- that they were
11   going to put one on each shift.   They still had to get ICE
12   approval for that before it could be done.

13         Q.     And Mr. McHatton, did he tell you why they were
14   seeking, they being Mr. McHatton, another shower cleaner on
15   each shift?

16         A.     Now we're going into things that I only get so
17   vague about.

18                I don't know why or who, but they wanted the
19   showers cleaned three times a day instead of once -- or
20   instead of twice a day.   So to do that, you can't have the
21   one person doing all three, they wanted to split that up
22   and make one person each shift.   That's the clarification I
23   got from them.

24         Q.     And you don't know who got the ball rolling, so
25   to speak, with --

Michael Heye                                        December 4, 2019

Page 60

1          A.    I don't know.   They just tell me -- my A-dub
2     tells me that they got clarification through ICE, ICE
3     approved it, go ahead and do it.   That's what they tell me.
4          Q.    All right, so what you described for me
5     involving the barbershop and whether the barbers could, you
6     know, have an additional detail, when did that all occur?
7          A.    A while ago.   Years ago.
8          Q.    And is it the same with the shower cleaners, was
9     that a while ago?
10         A.    Not as long.
11         Q.    All right, so my question was to give me
12    examples of you interfacing either directly or indirectly
13    with ICE to carry out your duties for the Voluntary Work
14    Program, and you related to me this incident about the
15    barbershop and the barbers working more than one detail; is
16    that correct?
17         A.    I don't directly talk to ICE on that.   I talk to
18    my A-dub, and then my A-dub relays the information, however
19    he does, to ICE.
20         Q.    I don't mean to put --
21         A.    I never have -- I don't have direct contact with
22    ICE on the worker program.   That's not my chain of command.
23    My chain of command is my A-dub.   He's -- I report to him
24    and him only.
25         Q.    Got it.

Michael Heye                                    December 4, 2019

Page 61

1          So are you ever requesting of the A-dub to take
2   a question to ICE?
3          A.   No.
4          Q.   So you've never said in that way, Associate
5   warden, please ask ICE the following question related to
6   the Voluntary Work Program?
7          A.   No, I haven't.
8          Q.   How often are you going to the associate warden
9   or assistant facility administrator with questions about
10  the Voluntary Work Program?
11         A.   Hardly ever.
12              I -- typically it's pretty much set out
13  straightforward, and I don't really have to change anything
14  on it.  Those are the only two times that I remember that
15  anything had to be changed.
16         Q.   And when you say those two times, you're
17  referring to what you described for me involving the
18  barbers; correct?
19         A.   Yes.
20         Q.   And the shower cleaners?
21         A.   Correct.
22         Q.   How do detainee workers become a part of the
23  Voluntary Work Program?
24         A.   Through the kite system.
25              MS. MELL:  Could I get some water?  Would you

Michael Heye                                    December 4, 2019

Page 62

1    grab me some water before we get started?
2             MR. WHITEHEAD:  You can keep it running.  It
3    doesn't bother me, I guess.
4             (Exhibit-321 marked.)
5             THE COURT REPORTER:  This is Exhibit-No.-321.
6             MS. MELL:  You got it.
7        Q.   Mr. Heye, let's get you settled again.  We just
8    took a brief water break there.
9             Mr. Heye, you've been handed Exhibit-321.  Is
10   this the -- an example of a kite, of a detainee requesting
11   an assignment in the Voluntary Work Program?
12       A.   Yes.
13       Q.   And that signature there at the bottom, do you
14   know whose signature that is?
15       A.   It looks like Singleton.
16       Q.   Is it the case that the classification officer
17   always signs off on the kite?
18       A.   On a kite or all kites?
19       Q.   On a kite requesting an assignment in the
20   Voluntary Work Program?
21       A.   Yes.
22       Q.   What does the signature certify?
23       A.   That we've read the kite and the response.
24       Q.   At some point did GEO move to an electronic kite
25   system?

Michael Heye                                          December 4, 2019

Page 64

1    started working in the worker program, all the assignments

2    were already set up that way.

3         Q.    Let's take a look at Exhibit-309.

4               What are we looking at here?

5         A.    Pod porters, a roster in the pod.

6         Q.    And I'll point out to you that this is a

7    multipage document --

8         A.    Yeah.

9         Q.    -- there are notations to laundry details as

10   well as kitchen and -- and others, but just big picture, is

11   this a schedule for the detainee workers?

12        A.    Yes, this is -- this is the rosters that I hand

13   out to the pods.

14        Q.    So Exhibit-309, and the schedules that we see,

15   are you -- you refer to these as a roster?

16        A.    Yeah, I call them rosters.

17        Q.    And the rosters, is that a document that you

18   create?

19        A.    Yes.

20        Q.    And if we look at the first page there of

21   Exhibit-309, we see a heading A-1 Pod, and there are slots

22   for 15 different workers, although 14 of them have names.

23              Are you with me?

24        A.    Yes.

25        Q.    Who decided that there would be potentially 15

Michael Heye                                          December 4, 2019

```
                                                          Page 93

 1          Seattle, Washington; Wednesday, December 4, 2019

 2                         1:23 p.m.

 3              -------------------------

 4              THE VIDEOGRAPHER:  We're now back on the record.

 5     The time is 1:23 p.m.

 6                  (Exhibit-325 marked.)

 7              THE COURT REPORTER:  This is Exhibit-325.

 8              E-X-A-M-I-N-A-T-I-O-N (resumed)

 9     BY MR. WHITEHEAD:

10         Q.   I've just handed you Exhibit-325, and I'll

11     represent to you that the first and second pages are part

12     of the production from your company, GEO.  My questions to

13     you are about the third page.

14         A.   Okay.

15         Q.   What are we looking at here?

16              MS. MELL:  This is --

17              THE WITNESS:  Yeah, the third page.

18              MS. MELL:  Yeah, I know, it's just the same

19     problem here?  So is this one -- is it likely in this

20     series?

21              MR. WHITEHEAD:  So, okay, I know what happened

22     here.  So this particular one -- all right, Counsel, so

23     Exhibit-325 is a native file that GEO produced.  So this

24     was an Excel spreadsheet.  So the first page is the

25     metadata that was associated with the production.  The
```

Michael Heye                                    December 4, 2019

Page 94

1    second page is the slip sheet that bears the Bates number,

2    so you see there in the bottom right corner?

3              MS. MELL:   Yeah.

4              MR. WHITEHEAD:   This one says GEO-State 019281,

5    and then the printout from the Excel file is the third

6    page.

7              MS. MELL:   Okay.   Okay.

8         Q.   All right.   So, Mr. Heye, my -- my question to

9    you is, what are we looking at here on this third page of

10   Exhibit-325?

11        A.   Pods, workers, hours, total.

12             Spreadsheet?

13        Q.   Now, according to the metadata produced with the

14   Excel spreadsheet, mheye, H-E-Y-E, is listed as the author.

15             Did you create this spreadsheet?

16        A.   Yeah.

17        Q.   So what does this spreadsheet reflect?

18        A.   It shows the pods and outside details.

19        Q.   When did you create this document?

20        A.   A couple years ago.

21        Q.   So 2017?

22        A.   I believe it was.

23        Q.   Why did you create this document?

24        A.   It was my -- it was either -- I think it was the

25   A-dub -- or was it Ryan?   One of the admin people asked me

Michael Heye                                    December 4, 2019

Page 95

1    if they would -- if I would put a spreadsheet together on

2    how many pods we have, how many workers, or how many

3    assignments total there could be in each section, and then

4    they wanted to know how long certain things took and

5    average it out.

6            Q.   The information that's reflected here on the

7    spreadsheet, where is it derived from?

8            A.   The pods is how many pods we got, the workers is

9    the total number of assignments per unit, and then the --

10   where it says "Hours," I just called the pod and asked the

11   pod officer what is -- how long it typically takes for an

12   assignment to get completed.

13           Q.   Are you aware of any other purpose for this

14   document?

15           A.   Nope, they just asked me to put something

16   together.

17           Q.   So someone in your chain of command asked you to

18   put this document, which is Exhibit-325, together?

19           A.   Correct.

20           Q.   And the information that's reflected here, you

21   consulted with the detention officers to fill in the Hours

22   column; is that right?

23           A.   Correct, on some of it, and some of the other

24   stuff, kitchen and ...

25           Q.   For the kitchen, who did you consult with on

Michael Heye                                    December 4, 2019

Page 96

1      that?

2              A.    The -- don't remember exactly who, probably Bert

3      Henderson.   She's the kitchen -- head of kitchen.

4              Q.    And medical?

5              A.    Whoever the medical officer would be at the

6      time.

7              Q.    Grey mile?

8              A.    Talk with graveyard officer at that time would

9      have been.

10             Q.    Barber?

11             A.    Same.

12             Q.    Intake?

13             A.    Same.

14             Q.    Laundry?

15             A.    Mm-hm.

16             Q.    Laundry female?

17             A.    Yes.

18             Q.    And OSR?

19             A.    Yes.

20             Q.    And that column labeled Worker, the number of

21     workers there, did you get that number from the rosters --

22             A.    Yes.

23             Q.    -- that you create?

24             A.    Yes.

25                   THE WITNESS:   Sorry, I should wait until he's

Michael Heye                                    December 4, 2019

Page 97

1    done.

2              MS. MELL:   Everybody's going to start now.

3         Q.   You made this document in approximately 2017;

4    have you updated it since then?

5         A.   I have not.

6         Q.   And when you created the spreadsheet, did you

7    then give it to whoever it was that had requested that you

8    make the document?

9         A.   Yes.

10        Q.   Do you know what happened with the spreadsheet

11   from there?

12        A.   I do not.

13        Q.   Now, in creating this spreadsheet, was it your

14   goal to be accurate and reliable in the information that

15   you were recording?

16        A.   As best as I could.

17        Q.   And did you consider this to be part of your

18   job, to create spreadsheets like this?

19        A.   Part of my job?

20        Q.   Yes.

21        A.   Yeah, my boss asked me to create a spreadsheet.

22   I had most of the information.

23        Q.   In that way, was it created in the ordinary

24   course of business, so to speak?

25        A.   Yes.

Michael Heye                                    December 4, 2019

Page 98

1          Q.   And as far as the way you stored it, was it just
2     kept in the way that you normally keep records?
3          A.   I guess.  I don't -- just stored it, and then
4     that was the end of it, and I haven't seen it since.
5          Q.   And as you sit here today, do you have any
6     reason to dispute the accuracy of any of the data as you
7     recorded it back in 2017?
8          A.   It's accurate back then.  I would you have to
9     redo it again to see if anything has changed.
10          Q.   And if you were to create a spreadsheet today,
11     recording the same information, would it be the same,
12     different, or somewhere in the middle?
13          A.   I don't know.  I can't answer that one.
14          Q.   To your knowledge, did anyone else have access
15     to this spreadsheet that you created?
16          A.   I don't know if anybody else did or not.
17          Q.   Was it stored on your local hard drive or on a
18     server?
19          A.   It was stored on my computer.
20          Q.   Now, is there any effort on the part of GEO to
21     make sure that the -- any one job detail is not overstaffed
22     or understaffed?
23          A.   It's staffed however it's staffed.
24          Q.   What about the schedule?  I mean, I understand
25     the work details themselves, you've got the number of

Michael Heye                                          December 4, 2019

Page 115

1              My question to you will be, what -- what's going

2      on?  What's the -- the situation here that you're

3      addressing with Mr. McHatton?

4          A.   (Complying.)

5              I barely even remember this.

6              What is your question?

7          Q.   Well, describe for me what the situation is that

8      you're addressing with Mr. McHatton.

9          A.   Detainee pay is paid the next business -- or the

10     next day, typically the next business day.

11         Q.   Well, tell me what your role is, if any, with

12     the keefe banking data.

13         A.   I don't do it anymore, finance takes care of

14     that.

15         Q.   Did you do it for a time?

16         A.   I did, back in the day.

17         Q.   From when to when?

18         A.   When I started classification, and then I don't

19     know, it was several years ago that finance started doing

20     it.

21         Q.   So from 2009 to maybe 2016?

22         A.   Maybe '15?  I don't remember exactly when they

23     took it over.

24         Q.   So during that time, what exactly did you do

25     with the keefe banking system?

Michael Heye                                      December 4, 2019

                                                        Page 116

 1          A.   Similar to what they do now.  We get the sheets,
 2     and we go into the system, type in their A number, put a
 3     dollar, and that's it.
 4          Q.   This is the worker pay sheet --
 5          A.   Yes.
 6          Q.   -- that you're referring to?
 7          A.   Yes.
 8          Q.   Was there ever a time that you would review the
 9     entirety of the keefe banking ledger?
10          A.   No, I don't know how to use it.  They gave me
11     access to put in a dollar, and that was pretty much it for
12     the keefe system.
13          Q.   Is it keefe or keefe?
14          A.   I think it's called keefe.
15          Q.   I don't know, that's why I'm asking.
16          A.   They say it's called keefe, so that's the way I
17     got it.
18               MR. WHITEHEAD:  Let's take a look at another
19     exhibit here.
20                    (Exhibit-332 marked.)
21               THE COURT REPORTER:  This is Exhibit-332.
22          Q.   You've just been handed Exhibit-332.
23          A.   Okay.
24          Q.   Have you seen this document or a document like
25     this before?

Michael Heye                                          December 4, 2019

Page 125

```
 1                    C-E-R-T-I-F-I-C-A-T-E

 2

 3      STATE OF WASHINGTON )

 4                         )  ss.

 5      COUNTY OF THURSTON  )

 6

 7              I, the undersigned Registered Professional
        Reporter and Certified Court Reporter, hereby
 8      certify that the foregoing deposition upon oral
        examination was taken stenographically before me and
        transcribed under my direction;

 9

10              That the witness was duly sworn by me,
        pursuant to RCW 5.28.010, to testify truthfully; that the
11      transcript of the deposition is a full, true, and correct
        transcript to the best of my ability; that I am neither
12      attorney for, nor a relative or employee of, any of the
        parties to the action or any attorney or counsel employed
13      by the parties hereto, nor financially interested in its
        outcome.

14

15              I further certify that in accordance with CR
        30(e), the witness was given the opportunity to examine,
16      read, and sign the deposition, within 30 days, upon its
        completion and submission, unless waiver of signature was
17      indicated in the record.

18

19              IN WITNESS WHEREOF, I have hereunto set
        my hand this 16th day of December, 2019.

20

21

22

23      _____

        NCRA Registered Professional Reporter
24      Washington Certified Court Reporter No. 2661

25
```