

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

```
                          )
UGOCHUKWO GOODLUCK NWAUZOR,)
et al.,                    )
                          )
          Plaintiffs,      )  3:17-cv-05769-RJB
                          )  3:17-cv-05806-RJB
v.                         )
                          )  Tacoma, Washington
THE GEO GROUP, INC.,       )
                          )  January 10, 2020
          Defendant.       )
_____)  Preliminary
                          )  Pretrial
STATE OF WASHINGTON,       )  Conference
                          )
          Plaintiff,       )  10:30 a.m.
                          )
v.                         )
                          )
THE GEO GROUP, INC.,       )
                          )
          Defendant.       )
                          )
```

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. BRYAN
UNITED STATES DISTRICT JUDGE

_____

Proceedings stenographically reported and transcribed
With computer-aided technology

```
 1                          APPEARANCES

 2

 3    For the Plaintiff          JAMAL N. WHITEHEAD
      Nwauzor, et al.:           Schroeter Goldmark & Bender
 4                               810 Third Avenue
                                 Suite 500
 5                               Seattle, Washington

 6                               DEVIN T. THERIOT-ORR
                                 Open Sky Law PLLC
 7                               20415 72nd Avenue South
                                 Suite 110
 8                               Kent, Washington

 9                               R. ANDREW FREE
                                 Law Office of R. Andrew Free
10                               P.O. Box 90568
                                 Nashville, Tennessee
11

12    For the Plaintiff          ANDREA BRENNEKE
      State of Washington:       LANE POLOZOLA
13                               MARSHA J. CHIEN
                                 800 Fifth Avenue
14                               Suite 2000
                                 Seattle, Washington
15

16
      For the Defendant          COLIN L. BARNACLE
17    The GEO Group:             ADRIENNE SCHEFFEY
                                 Akerman LLP
18                               1900 Sixteenth Street
                                 Suite 1700
19                               Denver, Colorado

20                               JOAN K. MELL
                                 III Branches Law PLLC
21                               1019 Refents Boulevard
                                 Suite 204
22                               Fircrest, Washington

23

24

25
```

```
 1                              MORNING SESSION
 2                              JANUARY 10, 2020
 3            THE COURT:  This is the time we set for a preliminary
 4    pretrial conference in Cause Number 17-5769, Nwauzor versus
 5    GEO, and 17-5806, State versus GEO.
 6        Let me call the role here.  First, for Washington,
 7    Ms. Chien, Ms. Brenneke and Mr. Polozola.
 8        For the plaintiffs, Nwauzor and others, Mr. Whitehead.
 9            MR. WHITEHEAD:  Good morning, Your Honor.
10            THE COURT:  Mr. Theriot-Orr
11            MS. THERIOT-ORR:  Yes, sir, good morning.
12            THE COURT:  Mr. Free.
13            MR. FREE:  Yes, sir.
14            THE COURT:  For the defendants, Mr. Barnacle.
15            MR. BARNACLE:  Good morning.
16            THE COURT:  Ms. Scheffy and Ms. Mell.
17            MS. MELL:  Good morning, Your Honor.
18            THE COURT:  We have a number of things to cover this
19    morning.  First thing is, I want to get a better feel than I
20    have for exactly what the claims of the plaintiffs are here,
21    and understand a bit more of how you propose to prove your
22    claims.
23        I had this nice sheet with your names on it, and then I
24    covered it up.
25        I guess I should ask Mr. Whitehead to go first and tell me
```

1    exactly what claims you are pushing here and also what you

2    propose to do to prove them and an --

3              MR. WHITEHEAD:  Your Honor, would you --

4              THE COURT:  -- outline the evidence, if you will.

5         Yes, use the mic at the lectern, if you would.

6              MR. WHITEHEAD:  Your Honor, our claim is a claim for

7    back wages owed under the Washington Minimum Wage Act.  We

8    argue that under the law and the applicable standards for

9    determining an employment relationship, that GEO is in an

10   employment relationship with the detainee workers at

11   Northwest Detention Center.

12        Using the *Anfison* test, there other factors to consider as

13   well, but looking at the factors that Washington courts look

14   to, to establish an employment relationship, we will put

15   forth evidence showing those factors were met and there was,

16   in fact, a relationship there between GEO and the detainee

17   workers.

18              THE COURT:  Not by name, but who do you plan to call?

19   What types of witnesses?

20              MR. WHITEHEAD:  Your Honor, we intend to call

21   participants within the voluntary work program, as well as

22   GEO personnel.

23        Specifically, GEO detention officers would be a category

24   of personnel we would look to, to put flesh on the bones, so

25   to speak, about the level of supervision and management that

1   GEO exercised over the detainee workers in the voluntary work

2   program.

3           THE COURT:  Have you coordinated your anticipated

4   case in chief with the State?

5           MR. WHITEHEAD:  Yes, Your Honor.

6           THE COURT:  If I understand what you just told me,

7   your claim is based on the statute that is 49.46.090?

8           MR. WHITEHEAD:  Correct, Your Honor.

9           THE COURT:  That is the only claim the class has?

10          MR. WHITEHEAD:  That is correct, Your Honor.

11          THE COURT:  Okay.  All right.

12      Let me ask the State the same question.

13          MS. BRENNEKE:  Good morning, Your Honor.  On behalf

14   of the State, we just want to also extend some gratitude for

15   having this preliminary pretrial conference because, as we

16   are working on our pretrial statement, there are a lot of

17   logistical issues that we hope to be able to work out to be

18   more efficient in presenting the case, so thank you.

19      We have two claims.  Ours is first brought under the

20   Minimum Wage Act for injunctive relief moving forward for a

21   declaration that the Minimum Wage Act does apply to the

22   detainee worker relationship with GEO inside Northwest

23   Detention Center and to ensure that they pay minimum wage

24   moving forward.

25      As you know, we have no back wage claim or any kind of

1    damages claim associated with the Minimum Wage Act.

2        Our second claim, which is unique and separate from that,

3    is for the unjust enrichment under Washington State common

4    law.  For that claim, we need to prove that there was a

5    benefit to GEO from this detainee work that they knew about

6    and/or was a detriment to those detainees, and that it would

7    be unjust under the circumstances for them to retain that

8    benefit without disgorging it.

9        We seek a disgorgement of that unjust enrichment for the

10   period of 2005 to present.

11            THE COURT:  First, under the Minimum Wage Act, where

12   is your authority to bring this?

13            MS. BRENNEKE:  Your Honor, that issue was one of the

14   very first issues raised in this case.

15            THE COURT:  Speak right into the mic.

16            MS. BRENNEKE:  I believe that issue was one of the

17   very first issues that the Court confronted when this case

18   was filed.

19            THE COURT:  I don't remember what happened that long

20   ago.

21            MS. BRENNEKE:  Yeah, so the Washington State Attorney

22   General has parens patriae authority to enforce the laws of

23   the state of Washington, and our general structures of the

24   state laws allow us to do that with any state law that

25   impacts a substantial number of Washington residents.

1       In this case, in our parens patriae authority, we are

2  recognizing that the Minimum Wage Act laws and the unjust

3  enrichment common law is not being -- is not being abided by,

4  if you will.  This is a lot enforcement action to ensure that

5  the laws of Washington apply across our state, including in

6  the private contractor's facility at the Northwest Detention

7  Center.

8       THE COURT:  You think you have authority to seize on

9  any wrong that affects a substantial number of Washington

10  citizens to go after them?

11       MS. BRENNEKE:  Your Honor, to the extent we have a

12  Washington law that is being violated, the Attorney General's

13  Office has the authority to enforce the law.  Of course, if

14  it didn't involve a substantial number, as the Court has

15  already found that it does, that would be a different story.

16       If we were representing one individual plaintiff, for

17  example, that may not be ours to do.  That is not our lane.

18  Here, what we are doing is representing all of the state of

19  Washington.

20       We are doing what we can to ensure a vibrant economy in

21  the state of Washington, the way the legislature had intended

22  it when passing the Minimum Wage Act.

23       We are looking to make sure that all rules are enforced

24  equally for all employers of the state of Washington so one

25  doesn't get to benefit by a dollar-a-day policy when others

1   pay minimum wage or more for each hour of work.  We are

2   looking at not just the detainee workers who are there, which

3   we care about, but all immigrant workers, and really all

4   employees in the state of Washington and, in particular, in

5   Pierce County who could have had these jobs if GEO hadn't

6   taken advantage of this vulnerable set of workers.

7           THE COURT:  Let me ask you about the unjust

8   enrichment.  You have approached this as a separate claim.

9   It sort of seems to me that it is more a way to measure

10  damages than it is a separate claim.

11      What are the elements you have to prove if it is a

12  separate claim?

13          MS. BRENNEKE:  Your Honor, there is a little bit of

14  confusion around this when it comes to measurement of

15  damages.

16      When it comes to liability, they are absolutely separate.

17  I will go through those two things separately.  Okay?

18      For liability, what we need to prove is that the detainee

19  work was a benefit to GEO.  We need to prove that GEO knew of

20  that work happening, asked for it, whatever, or it has been

21  formulated alternatively that the work was a detriment to

22  those who performed it.

23      The third element is simply a question of equity for the

24  Court, which is:  Is it unjust under all the circumstances

25  for GEO to retain those benefits without disgorging it or

1  paying them back.  It is a purely equitable claim in that

2  regard.

3      When it comes to measurement of damages or -- let me

4  correct myself because they are not damages.  I sometimes

5  fall into that.  That is important to clarify.  When it comes

6  to a measurement of the remedy, we are seeking disgorgement

7  of the full benefit they have retained from that unjust

8  enrichment.

9      The way to measure that -- this is the slight area of

10  overlap -- one measurement of that is how much would they

11  have had to pay in minimum wages.

12      It is not the only one, because had they employed

13  non-detainee workers, had they employed people from the

14  Tacoma area, they would have had to have paid a prevailing

15  wage, which is higher than minimum wage.  Our economist

16  expert has analyzed this aspect of what was a fair wage by

17  those two well-established measurements in the field.

18      In addition to that, unjust enrichment can be measured

19  also by the profits they have gained from this work.  That is

20  a separate analysis.  To the extent we can, we will be

21  demonstrating evidence to you of the profits at the Northwest

22  Detention Center arising from the work.

23      There are basically three categories of number crunching,

24  if you will, and pieces of evidence that go into the

25  calculation of the remedy.

1          THE COURT:  Well, we are maybe a little ahead of this

2     discussion here, but since we are here, let me ask you

3     another question, which is:  How do your claims, if they are

4     not damages, claim results overlap with the class?

5          MS. BRENNEKE:  Yes, it is a really important

6     question.  If we keep in mind that we are working on behalf

7     of the state of Washington and all of the people of the state

8     of Washington, and that the class is representing the

9     specific detainee workers who worked at the Northwest

10     Detention Center, it is pretty easy to see the different

11     lanes.  They are looking at back wages to give to those class

12     members and distribute to those class members.

13          We have no representational obligations or distribution

14     obligations to distribute money to that class.  Instead, what

15     we are looking at is full disgorgement so that there is no

16     benefit to an employer that creates unfair labor practices in

17     the state of Washington and thinks they can get away with it.

18     Yeah, we can follow the law moving forward, but we still get

19     to keep our profits.

20          Part of the law enforcement importance of the disgorgement

21     remedy is to not allow them that windfall and that benefit

22     from having done these practices all this time.

23          THE COURT:  How are you going to measure disgorgement

24     other than by the minimum wage?

25          MS. BRENNEKE:  Our economist has done that for us.

1   We will present to the Court a number of different measures.

2   One is the minimum wage.  The other is the difference between

3   the prevailing wage, which is the fair wage they would have

4   had to pay the Tacoma area workers had they not had this

5   voluntary work product from detainee workers, that's

6   different.

7        We also have a measurement of their profits that they have

8   gained from this and have been able to benefit from by

9   reinvesting.

10       Those are the three factual and evidentiary pockets, if

11   you will.

12       The analyses for the damages and remedy phase, the number

13   crunching, we think could be distinct from the liability

14   trial.  The evidence of benefits and the way in which the

15   money works at GEO for the liability claims of the Minimum

16   Wage Act and on unjust enrichment, as we are working through

17   this, really seemed to need to be in the same case or the

18   same trial.

19       Your Honor, if I may.  I also just want to preserve two

20   things.  We are here to talk about a consolidated trial on

21   liability because that is what the court order was.  We are

22   working the best we can to make that happen.

23       Washington brought its claims separately, and we do not

24   consent to or -- and really did object to the consolidation

25   of the case because we would like to be able to try our case

1   in a cohesive manner before the Court with both the liability

2   and the damages intact.  We see some overlap in those things,

3   and we think it would be more efficient that way.

4       Because of this other case, we are working the best we can

5   to figure out how to preserve our claims and our rights, sort

6   of the integrity of our interests, together with the

7   efficiency of the Court in the consolidated trial.

8       We still want to register our objection for the record,

9   and also the fact that we do not consent in any way to a jury

10  trial in either of our claims.

11          THE COURT:  All right.  We will get to that in a

12  minute.

13      What kinds of evidence do you propose to submit here?

14          MS. BRENNEKE:  The evidence in some ways overlaps.

15  In terms of the witnesses and -- because those are the people

16  who were involved in the actual operations of the policies

17  and practices of the detention center, yes, there are GEO

18  employees; yes, there are detainee workers.  We also have

19  others who are going to testify to the benefit to the

20  detainee workers, including a GEO employee who is a -- we

21  have 30(b)(6) basically on their finances.  That is

22  additional evidence of the way this all works factually right

23  now, the way they have it operating.  That is important to

24  show the benefit to GEO of this work.

25      We also have -- we also have some witnesses, or at least

1   one witness, who would testify to the fact that there are

2   other employees in the community who would be interested and

3   need work, if the detainees didn't have that work.

4       A lot of the evidence is overlapping, although they have

5   slightly different, maybe -- the scope might be slightly

6   different.  The same witnesses and a lot of the same

7   materials will be there.  Our case will require some focus on

8   the financials of the operation.

9           THE COURT:  Even on the liability phase?

10          MS. BRENNEKE:  Yes, to some limited extent because

11  part of what we need to demonstrate is that there was a

12  benefit to GEO.  To that extent, we can show the benefit of

13  the work in an operational sense, but we should also be

14  entitled to show in the financial sense how it has benefitted

15  them in their operations generally.

16          THE COURT:  Something I wanted to ask you all about

17  is the work in issue.  I guess it has been a concern to me in

18  the back of my mind somewhere that perhaps even if GEO should

19  have paid a minimum wage or some other wage to detainees

20  under the program, there are some things that detainees do

21  and should be asked to do that may be outside of employment.

22  I mean, when you are living together with a bunch of people,

23  it's fair, I would think, to expect you to keep your own

24  space clean.  I don't know what else there might be.  That

25  comes to mind.

1   We used to have an awful time in the Kitsap County Jail

2   with people messing up their cells and then getting out and

3   leaving a mess.  I told the sheriff, "Don't let them out

4   until they clean up their cells."  That worked for a while.

5   The superior court judges once were in charge of jail

6   rules, and thankfully we got out of that business.

7   Is there some cut off of labor that would not be covered

8   by their minimum wage?

9   MS. BRENNEKE:  So your experience in the jail world

10  may be very helpful here.  There is a cut off that GEO has

11  established already and that creates a nice, I think, factual

12  distinction between work that is done to maintain one's own

13  cell and work that is done for the common good that GEO asks

14  for and permits them to do and pays them to do as employees.

15  What is, I think, helpful in terms of that bright line is

16  they have constituted what they call the voluntary work

17  program.  I think for purposes of thinking this through for

18  preparation for trial, the voluntary work program is what is

19  being addressed here in this case.

20  To the extent GEO has jobs and is asking them to do work

21  for the common good and is paying them a dollar a day, that

22  is what we are talking about.

23  In addition, GEO has expectations that detainees maintain

24  their own private cells.  Voluntary work is not -- the

25  voluntary work program does not cover whether you're making

1   your bed or putting away your stuff, you know, or leaving

2   that a mess.  I don't think we have to worry about that piece

3   of it.

4       There may be some -- there may be some argument from GEO

5   that not all the work is necessary.  We have heard that

6   before.  We would dispute that.  We believe any work within

7   the voluntary work program that they permit them to do and

8   pay them a dollar an hour is work that should be paid at

9   minimum wage.

10      What I will also say is there is additional work that

11  happens inside the pods.  The pods are very large spaces

12  with, you know, like 60 or more detainees.  The work that

13  happens in the pods that is part of the voluntary work

14  program includes, again, the general service to GEO and its

15  operations.  For example, making sure that the detainees'

16  eating areas are cleaned and that people aren't going to get

17  sick when the food is served.  Serving food and then cleaning

18  up food and trays after the meals because they do satellite

19  feeding.  It also includes things like their common restrooms

20  or common bathrooming area, so they have toilets that they

21  all use in common.  They also have showers that they use in

22  common.  Those are cleaned a few times a day and people are

23  paid for their jobs in those areas.

24      I think there is a fairly clean line between the work we

25  are saying needs to be paid minimum wage and the work that

1   doesn't.

2          MR. WHITEHEAD:  Your Honor, to --

3          THE COURT:  Counsel, you can remain seated so you can

4   reach the mic easily.

5          MR. WHITEHEAD:  Thank you.  I am trying to be

6   respectful.  I will sit back down.

7       Your Honor, to put a final point on it.  Certainly

8   maintaining your living space is a baseline requirement of

9   being within the facility.

10      The voluntary work program is a separate animal entirely.

11  If you look at the work of the laundry workers, the women in

12  the D Pod fold laundry for the entire facility.  If you look

13  at the work performed by the kitchen workers, they are

14  preparing food and serving the entire facility.

15      The work being performed in the voluntary work program is

16  truly work that benefits GEO and has nothing to do with

17  baseline cleanliness and hygiene of the individual living

18  quarters.

19      When it comes to cleaning the living quarters, for

20  example, you are not cleaning just your bed.  You are

21  cleaning the shower for the 100 other people in your pod.

22  That is a task that people should be fairly compensated for.

23          THE COURT:  I have heard anecdotally that there have

24  been some inappropriate things that went on there.  I have no

25  idea if any of it is true, and I haven't kept track of what I

1   have heard.  It seems to me there are things like punishment

2   for not working or different things that are not within what

3   you two have described today.  Are you anticipating any

4   evidence along those lines of inappropriate activities on the

5   part of GEO toward detainees?

6          MS. BRENNEKE:  I am thinking about our claims as

7   being fairly discrete whether or not the Minimum Wage Act is

8   being applied for work, and also whether there is an

9   injustice for them to retain the benefits of those for the

10  unjust enrichment claim moving forward.

11      I believe with the unjust enrichment claim, there is some

12  maybe potential for thinking about the circumstances in which

13  they are working and the injustice of that, that is a bit

14  broader because that is an equitable claim that is a

15  subjective standard.

16      We are not bringing claims you might have seen reported in

17  some of the cases like in Colorado and other places where

18  there is like a forced work situation or other types of

19  claims that I think could be brought in some circumstances.

20  We have not brought those claims.

21      Jamal, I don't know if --

22          MR. WHITEHEAD:  No, I don't have anything further to

23  add.  Certainly, Your Honor, we believe those things to be

24  true.  In terms of what we would try to present and prove at

25  trial, that is not the case we intend to bring.

 1          THE COURT:  Okay.  All right.

 2     Let me ask counsel for GEO to tell me what they think

 3  about -- I am particularly interested in the affirmative

 4  defenses that we have floating around here and what you

 5  anticipate being proof to support those defenses.

 6          MR. BARNACLE:  Yes, Your Honor.  The primary

 7  affirmative defense --

 8          THE COURT:  Keep your voice up.

 9          MR. BARNACLE:  The primary affirmative defenses we

10  intend to pursue at trial would be on the immunity side of

11  the coin, so derivative sovereign immunity as well as

12  intergovernmental immunity, preemption as it exists in the

13  Nwauzor case, as well as full defenses to the Minimum Wage

14  Act claims, arguments that certain exceptions under the

15  Minimum Wage Act do apply, as well as a defense on the

16  economic dependence test, as well as looking at the

17  fundamental nature of the work being done and where it is

18  being done.

19          THE COURT:  What do you have to prove in regard to

20  those defenses?

21          MR. BARNACLE:  For the derivative sovereign immunity,

22  I think the primary piece of evidence is the contract itself

23  and various provisions of the contract that the federal

24  government and ICE has asked GEO to do, and GEO following the

25  terms of that contract in that regard.

1    Obviously, the documentary evidence is very important as

2    well as testimony from individuals at GEO, as well as

3    individuals from the federal government to talk about that

4    contract and how GEO is, in fact, following that contract.

5    On the intergovernmental immunity defense, the important

6    evidence is proof that the State runs very similar programs

7    at its institutions.  It is a direct regulation as well as a

8    discriminatory regulation against GEO and the federal

9    government.

10   In that regard, the evidence would consist of documentary

11   evidence proving the State's own programs at its own

12   institutions, as well as testimony from individuals from

13   those institutions as to those programs in the parameters of

14   the work, purpose of the work, et cetera.

15   For the defense to the Minimum Wage Act, various

16   exceptions we believe apply.  Testimony from GEO as to the

17   conditions of detainment, the duties performed at the

18   facility, and why certain exceptions do apply, as well as the

19   economic dependence test and why those factors aren't met.  I

20   think that would include not only GEO employees, but

21   testimony from the detainees, probably the same detainees

22   that the State and the Nwauzor plaintiffs would bring

23   forward.

24   THE COURT:  Okay.  I gather those things are the

25   subject of further motions for summary judgment in the

1    Nwauzor case?

2              MR. BARNACLE:  Yes, Your Honor, you're correct.

3              THE COURT:  Well, we will get to those when they are

4    ripe.

5         With regard to the liability issues, let me ask you,

6    without commitment at this point, how long do you think it

7    will take?  It is a question directed to all of you.

8              MR. WHITEHEAD:  Your Honor, before we move on from

9    that, just a question in terms of GEO's defenses.  I

10   understand that the offset defense has been dropped as to the

11   State.  Is that live as to the private plaintiffs?

12             MR. BARNACLE:  It is.  In fact, it is something I

13   didn't mention when we were talking about it, but, yes, the

14   offset defense is alive and well against the Nwauzor

15   plaintiffs.  It is something we intend to pursue.

16             THE COURT:  Okay.

17             MR. WHITEHEAD:  Your Honor, as relates to length of

18   trial, as we have plotted it out, perhaps ten trial days,

19   maybe less.

20             MS. BRENNEKE:  Yeah.  We are talking for the

21   liability trial.  Obviously, our number crunching is going

22   to --

23             MR. BARNACLE:  My question is:  Is the ten days for

24   liability for you to present your case?

25             MS. BRENNEKE:  Correct.

1        MR. BARNACLE:  I think we probably have anywhere from

2   five to seven defense days to put on our case in defense of

3   that liability.

4        THE COURT:  Are you talking about the total trial or

5   your presentation?

6        MS. BRENNEKE:  We were trying to estimate our

7   presentation.

8        THE COURT:  You are looking at three or four weeks

9   just for the liability?

10       MS. BRENNEKE:  Probably three, uh-huh.

11       THE COURT:  That is a long time.

12       MR. BARNACLE:  Yes, it is.

13       THE COURT:  Efficiency is helpful and appreciated.

14     Now, then, if there is a judgment for plaintiffs as a

15   result of the first proceeding, we should, I guess, consider

16   what is that going to mean in terms of further trial?

17       MR. WHITEHEAD:  In terms of the damages phase of the

18   private plaintiffs' case, maybe a morning.  That is one of

19   the beauties and simplicities of a Minimum Wage Act case.  It

20   is just math.  They moved to strike our expert that would do

21   the math.  Assuming he's permitted to testify, I think our

22   damages case could be put on quickly.

23       MS. BRENNEKE:  For the bench to determine the Minimum

24   Wage Act and then calculate the remedy on the -- and the

25   liability on unjust enrichment and calculate that remedy, we,

1    too, could put that on in a short period of time.  We are

2    conscious, though, that to the extent there is any additional

3    unjust enrichment evidence and argument, like the closing,

4    for example, that wouldn't be brought before the jury, we are

5    going to also need to set aside some time for that and also

6    for the opening at the beginning.  There is a little bit of

7    logistics, but we feel like we can make that work.

8            THE COURT:  Well, this is tied up with the jury

9    issue.  That is next on my list to consider.

10       I have read everything you have submitted.  We have done

11   some additional work on that.  Without just repeating your

12   briefs, if there is anything else you want to say about it?

13           MS. BRENNEKE:  May I?

14           THE COURT:  Ms. Brenneke, it is your motion.

15           MS. BRENNEKE:  Your Honor, I appreciate the

16   opportunity to address the Court and to just reaffirm for

17   purposes of the record that we have not and will not consent

18   to a jury in our case.

19       I feel like -- it has been helpful for me to think about

20   the big picture of what is happening here, and that

21   Washington filed this lawsuit to enforce state law on behalf

22   of the State and all of its residents and for the health of

23   its economy.  We have unique claims.  There are some unique

24   defenses in the different cases.

25           Whether or not a right to jury attaches must be decided

1    for Washington's case only, and irrespective of the

2    consolidated trial and logistics around that.

3        It has been helpful to me to think of it, therefore, as

4    sort of in different lanes.  Driving down here sort of

5    reaffirmed that.

6        The plaintiffs' class is in a lane of the freeway, and

7    they have essentially one passenger, they are representing

8    the class of detainee workers.

9        State of Washington is effectively in the HOV lane.  We

10   have a bus.  Okay.  We have all of the State's residents.  So

11   while there is a seat for the detainee workers, all immigrant

12   workers and other workers are on that bus.  We have all

13   non-immigrant workers, all Tacoma area workers.  We have all

14   employers with a seat on the bus who want a fair playing

15   field for their businesses.  We also have the economy and the

16   very importance of enforcing laws that exist on our books so

17   that people don't run rampant in society.

18       To the extent we think about these as separate lanes, at

19   times they are going in the same direction and at times ours

20   is going to diverge because we are representing a very

21   different and much broader group of interests and elements in

22   our case.

23       It is important, I think, to keep the lanes separate, both

24   for the integrity of our claims and also to preserve issues

25   on appeal.

1     So for purposes of this motion, I would like us to think

2  about what would this case look like if the other case didn't

3  exist, which is how it was when we first filed it, how we

4  crafted the claims and how we brought them.

5     First, the Court has been very clear, and we agree, I

6  think all parties agree, that whether or not a right to a

7  jury depends upon the nature of the claims.  If it is an

8  equitable claim, it is a bench trial for the judge to decide.

9  If it is a legal claim, a jury decides.

10     Washington's Minimum Wage Act claim is for injunctive

11  relief only.  We need this Court to say yes, the Minimum Wage

12  Act applies, and that you need to follow it moving forward.

13     The declaratory judgment component of that is sui generis

14  in the sense that it doesn't have a right one way or the

15  other.  In our case, it is only attached to forward-looking

16  relief.

17     For these reasons, and because GEO doesn't dispute that

18  injunctive relief is inherently equitable, we don't see there

19  being any dispute on this Court being the trier of fact and

20  the deciding body for the Minimum Wage Act claim.

21     On our unjust enrichment case, it is equally clear the

22  Washington State Supreme Court, and all the courts that have

23  considered the elements of unjust enrichment, have talked

24  about this as an equitable claim, but it is a common law

25  claim.  Whether in equity one party has benefitted from

1   another party, and it is unjust under the circumstances for

2   them to retain that benefit without returning it, it is

3   inherently an equitable exercise, also for the Court.

4       The fact that we are seeking monetary relief doesn't

5   change the equitable nature of the claim.  This is not an

6   ERISA claim.  This is not a claim based upon whether there is

7   a legal right to get the money.  This has to do with the GEO

8   and NWDC profits and benefits that it has retained.  There is

9   no dispute they have retained those profits and have been

10  consistently profitable throughout the years.

11      We don't have the kinds of issues you might get in an

12  ERISA case or some other case where, hey, the money is

13  somewhere else, we don't have it, and now you have to do

14  something else.  It is not a money case in that sense.  It is

15  a disgorgement case.

16      For that reason, we do not see on our claims any issues of

17  controversy, legally or factually, that would suggest those

18  should be jury -- have a right to a jury or have a jury

19  trial.

20      GEO has raised some additional defenses.  The difficulty

21  we have here is that these are immunity defenses as to the

22  State.  There are no legal defenses as to the State.  I am

23  going to set aside whatever is happening in the Nwauzor case

24  with the offset and all those things.

25      For the immunity claims, generally those are

1    jurisdictional issues that a court is going to decide before

2    trial, in our experience.  Now, you run this case.  I don't

3    know how this proceeds exactly under the circumstances

4    because you have not yet ruled on the Nwauzor motions for

5    summary judgment.

6        When you ruled on the summary judgment motions in the

7    State's case, it was apparent that GEO did not have any

8    evidence to support those immunity claims.  The Court left

9    open the possibility that they could get some.  We have had a

10   substantial amount of discovery in the interim.  Okay.

11       We are at a place where, having sat through that

12   discovery, it is apparent to us that there is no

13   State-equivalent program to what is happening here.  The

14   State runs its own government facilities that have patients

15   in mental hospitals or have penological purposes, people are

16   indebted to society for having broken the law.  We don't have

17   a situation where we are contracting out to a private party

18   to operate those.

19       There is no State comparator, if you will, that would

20   create a factual foundation necessary for GEO to bring either

21   the intergovernmental immunity or the other sovereign

22   immunity claims against the State.  Just as before, they

23   didn't have evidence -- the threshold level of evidence to

24   support those claims, and we don't believe they do now.

25       The difficulty is where there is no such evidence, there

1    is some theoretical notion that maybe they could bring those

2    claims if they had that evidence, that can't transform a

3    non-jury trial into a jury trial.  We have to make the cutoff

4    threshold determination, is there substantial evidence that

5    they could support those claims at the outset?  Our answer

6    would be no, there is nothing there.  We have already tested

7    this.  We have briefed this issue.  The Court has ruled on

8    it.  We don't see anything new that has come up that is going

9    to alter those determinations.

10        When the Court's deciding on the jury trial versus not

11   jury trial, we would submit that looking at this based upon

12   our claims, first, no, there is no right to a jury trial on

13   the claims that Washington has brought separate from GEO's

14   defenses.  If there are factual issues that need to be tried,

15   then you need to consider whether or not those result in a

16   jury.  We would submit they shouldn't transform the nature of

17   our claim and we should not.  Those should be considered

18   separately.  We would submit to you that because there is no

19   threshold evidence of those, and the Court's going to need to

20   determine that up front, that just gets set aside.  As to our

21   case then, both the claims and defenses, there is no right to

22   a jury.

23        THE COURT:  You don't think there are any fact issues

24   that are likely to be presented on the affirmative defenses?

25        MS. BRENNEKE:  No, not as to the derivative sovereign

immunity or intergovernmental immunity.  Nothing that the
Court hasn't seen.  There are no fact issues that are
material.  They have tried to find them.  We don't believe
those exist.

THE COURT:  If I recall my last ruling, it basically
was on that subject that there were issues of fact to be
resolved at the trial on those defenses -- or on the one
defense that was before me.

MS. BRENNEKE:  Which was the intergovernmental
immunity?

THE COURT:  Yes.

MS. BRENNEKE:  Yeah, you know, seems to me the Court
has been prudent to recognize that if there is an immunity,
and there is evidence of that, the Court needs to consider
it.  At some point, the threshold question of whether that
evidence exists must be addressed.  Here, we have had the
opportunity for full briefing.  GEO didn't establish the
requisite evidence.  The Court's order clearly stated that
the evidence they had presented was not of comparable
institutions or situations in the state of Washington such
that intergovernmental immunity would apply.

What the Court did, though, I think rightly, was to
recognize that the Nwauzor case still had a discovery period
open, and because they were raising concerns that there might
be some development of that theory in their case.  Well, that

1    discovery is now done.  In our estimation, and we are not

2    briefing in that case, but in our estimation, nothing came up

3    that would be any different than what the Court has already

4    ruled on.  In other words, there is no relevant comparator

5    evidence that would have us run afoul of the

6    intergovernmental immunity doctrine.

7        For those reasons in Washington's case and for GEO's

8    defenses to Washington's case, there are no legal issues that

9    give right to a jury trial.  There should be no jury trial on

10   either claim.

11         THE COURT:  Let me ask you a question.  In regard to

12   the claim of unjust enrichment, assume that that claim is

13   going to go to a jury.  What are the elements of the claim

14   that you have to prove?  Of course, you have to prove whether

15   there is a jury or not, but what are the elements of the

16   claim?

17         MS. BRENNEKE:  Right.  So the elements would remain

18   the same, which is:  Was the work a benefit -- was the

19   detainee work to the benefit of GEO; was GEO aware of that

20   work; and/or was that work to the detriment of the detainees;

21   and would it be unjust under all the circumstances for GEO to

22   retain that benefit without disgorging it or returning it.

23   Three elements.

24       The reason the second element is a little wonky is because

25   it has been described in different ways in different cases.

1    Part of what it goes to is the idea that GEO -- that there

2    wasn't a situation that GEO simply didn't know about.  Do you

3    know what I'm saying?  There wasn't some benefit to them that

4    they didn't know about and didn't authorize.

5        In this case, they clearly knew about the voluntary work

6    program.  They operated it.  They knew every detail.  They

7    tracked the work to a tee.

8            THE COURT:  Ms. Brenneke, what if there was no

9    Minimum Wage Act?

10           MS. BRENNEKE:  No Minimum Wage Act claim, or if there

11   was no Minimum Wage Act, you would just look at the fair

12   wage.  That is really what the unjust enrichment action looks

13   at is:  Is it action that is unfair?  What I would say --

14   yes, sorry.

15           THE COURT:  Let me try and focus on what I am

16   thinking about and see if there is a response to this.

17       Leaving out the Minimum Wage Act, assuming there is no

18   governmental role in that way in the statute, where is your

19   authority to go after some corporation that is doing

20   something that you think is bad for the public?

21           MS. BRENNEKE:  Well, Your Honor, the common law of

22   the state of Washington is just as important as our statutory

23   law.  The parens patriae authority applies also to common law

24   violations.

25       What I would say is -- so I don't think our authority or

 1   our right to bring those claims differs in any respect.  The

 2   analysis is also on liability completely separate from the

 3   Minimum Wage Act.  We are looking at was there a benefit,

 4   right?  That has nothing to do with whether they are

 5   employees under the law.

 6         THE COURT:  How do you decide who is worthy of your

 7   efforts to stop a corporation or an individual doing

 8   something you don't like?

 9         MS. BRENNEKE:  You're asking about how is it that the

10   state of Washington determines what cases to bring under its

11   authority?  We are fortunate that we now have some

12   affirmative litigation units in our Attorney General's Office

13   that can bring affirmative litigation in the areas of civil

14   rights, environmental protection, consumer protection, where

15   in the past, perhaps, it was a more defensive kind of an

16   office.  Over the years, that has evolved.

17      The issues we bring, of course, are part of our

18   prosecutorial discretion, but we look at things very

19   carefully to see, is this something that impacts a broad

20   issue of importance to the people of the State.  Does it

21   impact a lot of people in our State?

22         THE COURT:  The things you mentioned all have some

23   statutory foundation.  Civil rights.  What else did you

24   mention?

25         MS. BRENNEKE:  Consumer protection.

1        THE COURT:  Consumer Protection Act.

2        MS. BRENNEKE:  Yes and no.  Just like ours has some

3    statutory rights and some common law rights, there are also

4    Consumer Protection Act claims that are brought that have

5    also similar common law claims brought alongside of them.  So

6    sometimes the state of Washington looks at things from a

7    holistic perspective as to the wrong that is being done in

8    our community, and then what are the legal strategies that we

9    can use to address it.

10       We are going to bring statutory claims, but we are also

11   going to bring common law claims, if that actually meets the

12   facts and the scenario better.

13       It is kind of like in Colorado where the -- that

14   particular Minimum Wage Act was so specific that it didn't --

15   that it looked at different standards.  The district court

16   determined, you know what, the Minimum Wage Act in Colorado

17   doesn't actually fit the detention work in that facility, but

18   they also had brought the common law claim of unjust

19   enrichment.  The court said, it does fit the standards for

20   common law unjust enrichment.  That decision went to the

21   Tenth Circuit and it was affirmed.  They are moving forward

22   on unjust enrichment class action alone in Colorado.

23       Our State statute on the Minimum Wage Act has much broader

24   purposes.  I think our legislature saw the importance of

25   minimum wage in a more holistic way to all of the people of

1  Washington and the economy and built that into the purposes

2  of the law.

3      We don't have the problem that they had in Colorado in our

4  case.  It doesn't mean that our unjust enrichment claim isn't

5  any more valid than what they are pursuing in the Colorado

6  case for very similar kind of work.

7          THE COURT:  What are the limits on you and what kind

8  of unjust enrichment claims could you bring?

9          MS. BRENNEKE:  Your Honor, I think the limits of

10  unjust enrichment are set forth by the elements that the

11  Supreme Court has identified for that claim.

12      We are very careful when we do an evaluation of a case to

13  determine what are the facts, what are the harms, what is the

14  justice.

15      The unjust enrichment claim, in particular, because it is

16  so subjective, this has been -- this was scrutinized and has

17  continued to be scrutinized with a lot of detail about

18  whether or not this is a fair and appropriate way of

19  organizing labor for a for-profit corporation in our state.

20  There are a lot of reasons that it is unjust for them to

21  create -- take advantage of vulnerable workers in a situation

22  that deprives other workers of good, prevailing-wage jobs.

23      We have looked at this from many, many angles.  I don't

24  feel any discomfort with that.  In a theoretical sense, what

25  I can tell you is there are always limited resources.  We

1   can't bring every claim that comes before us.  We are always

2   looking at cases that have a wide impact.

3       In this case, you have an internationally successful

4   company that is traded on the New York Stock Exchange that is

5   making profits from the Northwest Detention Center in

6   consistent ways since 2005, and has continued to invest that

7   into its company to the detriment of our people.

8           THE COURT:  I understand your arguments about that.

9           MS. BRENNEKE:  I get a little heated about that one.

10  Sorry.

11          THE COURT:  I need to look at those cases because

12  this is troubling to me.

13          MS. BRENNEKE:  Your Honor, the parens patriae cases

14  were briefed even before I was involved in the case.  It was

15  a long time ago.  I have been with this case for some time.

16  They were well briefed and well considered.  The Court made

17  its decision at the outset of the case.

18      If there is any concern about that, we would like the

19  opportunity to brief that again.  I can't see that anything

20  has happened in the intervening period that would lead the

21  Court to second guess the decision it made before.

22          THE COURT:  I will look back and see what I said.

23  This started out discussing the jury trial.

24      Mr. Barnacle, do you --

25          MS. BRENNEKE:  Are you complete with me, Your Honor?

1          THE COURT:  I am not done with you.

2          MS. BRENNEKE:  Do you want me to sit down?

3          THE COURT:  Yes.  For the moment, yes.

4          MR. BARNACLE:  Back to the motion to strike the jury

5    demand.  If we look at the two claims that have been brought

6    by the State of Washington, the minimum wage claim and the

7    unjust enrichment claim, first and foremost on the State of

8    Washington's minimum wage claim, yes, they have an injunctive

9    relief portion of it, but they also brought a declaratory

10   judgment action for forward-looking, future-looking

11   application of the law.  They have talked quite a bit about

12   this being a law enforcement action, that is their role in

13   this case.

14        First and foremost, the Ninth Circuit has definitively

15   stated a declaratory judgment action is an action at law.  We

16   cited that in our response to the brief.  They are seeking a

17   legal determination that a particular law applies to a

18   certain set of people on a going-forward basis.  If you look

19   at the type of action as well as the remedy sought, I think

20   the Ninth Circuit would support there being a jury

21   determination on that issue.

22        On the unjust enrichment claim, the State has stated

23   multiple times today and throughout this litigation that they

24   are seeking disgorgement of profits.  However, that issue is

25   not decided.  As of right now, GEO did move for summary

1    judgment saying that disgorgement of profits is not the

2    appropriate remedy on an unjust enrichment claim for personal

3    services.

4        The Court did not decide it, and said this is something

5    that needs to be determined on facts ultimately.  That

6    matters a lot because if we are talking about restitution for

7    the value of services performed, the Supreme Court has said

8    in this type of context, that is a legal claim.  The Supreme

9    Court has also said disgorgement of profits is an equitable

10   claim.

11       As we sit right now, we don't know what the proper remedy

12   for the unjust enrichment case is.  We believe it is

13   restitution based on personal services performed and the

14   value of the money.  That is a legal claim.  The

15   Supreme Court said that.  If it is truly disgorgement of

16   profits, which we don't think is appropriate in these

17   circumstances, then that would be inequitable.  As we sit

18   here right now, we don't know.  We think the Ninth Circuit

19   and Supreme Court has said when you talk about the Seventh

20   Amendment right to jury trial, you have to basically give

21   every reasonable presumption in favor of a jury.

22       I think those two issues leave us undecided, and we

23   deserve a jury on that issue.

24       I think when we are addressing, particularly, the

25   intergovernmental immunity defense, first, a couple of

1  observations.  First observation, I believe the State is

2  sticking to its guns on its analysis of the law.  The pre

3  *U.S. vs California*, the pre *Dawson vs Steager* state of the

4  law, we believe the Court, with those two cases, in its

5  proposed order stated what the law is at this point, then

6  basically said it is a factual issue now as to whether we

7  have met the legal standard.  Didn't say the issue was

8  closed.  Didn't say you have no evidence.  It said, I don't

9  see on this record here alone whether you met that standard.

10  That doesn't mean the evidence doesn't exist.  Doesn't mean

11  it is not in the record.  Doesn't mean it wasn't in their

12  record.  Doesn't mean it is not in the Nwauzor record.  We

13  believe it is, based on this Court's understanding of

14  intergovernmental immunity law today, we believe the evidence

15  is in the record, and it is before you in our Nwauzor brief.

16          THE COURT:  Okay.  Mr. Whitehead, do want to weigh in

17  on this issue at all?

18          MR. WHITEHEAD:  No, Your Honor.  I don't have

19  anything to add beyond what the State has offered.  I would

20  amplify and support their position.

21          MS. BRENNEKE:  May I have a quick rebuttal?

22          THE COURT:  Sure.

23          MS. BRENNEKE:  On the issue of our parens patriae

24  authority, it was also reminded to me from a colleague that

25  the Washington State Attorney General routinely brings acts

of negligence, which are also common law claims in a lot of
different areas which are necessarily statutory claims.  It
helps to broaden the perspective of what we do.

I want to talk about two things.  The Ninth Circuit
decision that the defense relies upon saying that
declaratory -- a declaratory judgment action is an action at
law.  It is based upon one case.  That is dicta in a case
where they had waived the right to a trial.

What the profound majority of the case law, including U.S.
Supreme Court case law, says is that the declaratory judgment
action is sui generis and it attaches to whatever it is going
along with.  In this case, it is going along with injunctive
relief.

Secondly, the unjust enrichment issues of the remedy phase
can include disgorgement of profit, but it can include
disgorgement of the unjust enrichment from the perspective of
the benefit of the beneficiary.  It is very important to
recognize that whether or not you measure that one way or the
other, the Washington State Supreme Court, which is the
authority on what this action is, looked at, in *Young vs
Young*, what that remedy should be.  They specifically
rejected what GEO has suggested, which is it is only based
upon the value of the services and some restitution kind of
measurement, and instead said you could do that or you can
look at the full benefit, the full benefit of that practice

from the perspective of that person or that party that
received the benefit and disgorge that full amount.

We are looking in a holistic way, as the State Supreme
Court has recognized we should, at what are the full measures
of the benefit to them.  It can't be limited to just what
they could get in a marketplace.

THE COURT:  Let me talk about this for a minute.
First, we have already a divided trial.  There are fact
issues that are to be determined in the first trial.  They
include whether there is a violation of the Minimum Wage Act.
Somebody will have to determine whether the detainees are
employees and whether GEO is an employer.  Those are fact
questions.  I think they deserve a jury.

That is not to say that insofar as the State's claim is
concerned, that the -- if we get to damages or judgment of
some kind against the defendant, that those are not equitable
issues that should be resolved by the Court.

Rachel, my law clerk, who is sitting over here, found a
parallel here that is particularly interesting.  What the law
we found indicates basically is that if there are both legal
and equitable issues in a case, the legal issues should be
resolved first.  Also, that if there are two parties in a
case, one of whom may be entitled to a jury and the other one
not, and then there is a judgment by the jury, that is likely
to be res judicata or collaterally estop the Court from

1   coming to a different result.

2       It seems to me that a jury trial is called for on the fact

3   issues that remain in this case.  It seems to me that whether

4   you call it an advisory jury or a true jury, doesn't make any

5   difference.  It would be a distinction without a difference

6   in regard to the Minimum Wage Act claim.

7       It is a little different with the second claim.  I need to

8   analyze that more to determine whether that jury should be

9   designated as an advisory jury.

10      I think you can -- no matter how we detail this issue out,

11  I think you can anticipate trying this first case before a

12  jury, then we will go from there.

13      I am also inclined to think that as to the class claims,

14  that we should proceed with the same jury and determine those

15  claims and set the State's relief trial, if there is a call

16  for one, separately so we don't get mixed up with the relief

17  question with that first -- after the first hearing.  There

18  may, of course, be no call for relief.

19          MS. BRENNEKE:  May I address the Court, Your Honor?

20          THE COURT:  Yes.

21          MS. BRENNEKE:  Presuming the first phase of the trial

22  is focused on issues and dispute regarding the Minimum Wage

23  Act claim, that is one lane or two lanes, if you will, that

24  are running parallel.

25      The State's case and the class action case end, though, at

1    a different point.  It would be our -- it would be our

2    suggestion to the Court that while the State's case ends in a

3    binding jury verdict -- sorry, when the plaintiffs' class

4    action case ends in a binding jury verdict, that the State's

5    case would be determined by the bench through its findings of

6    facts and its determination of the law, with the possibility

7    of the jury verdict being an advisory jury.  That is on the

8    Minimum Wage Act claim.

9        The problem, Your Honor, is that the class doesn't have an

10   unjust enrichment claim.  The jury is not going to be

11   instructed on unjust enrichment, and it won't be issuing any

12   verdict on unjust enrichment.

13         THE COURT:  Why won't it be?

14         MS. BRENNEKE:  There is no claim.  The class doesn't

15   have an unjust enrichment claim.

16         THE COURT:  I know.  You do.  Why can't we try them

17   in the same case?

18         MS. BRENNEKE:  We could.  That's the cart and the

19   horse question.  There is no right to a jury on that claim.

20   We have sought a bench trial on that claim.  While we are in

21   parallel presenting the evidence, our lane ends in the Court

22   determining the findings of fact as to unjust enrichment and

23   a determination of the law on whether or not there is unjust

24   enrichment.

25        There isn't a radical difference in terms of the logistics

of how this is done.  I think it is very important as to what the jury is instructed to do, and then what is in the Court's lane to do in our State case.

I would also say that as to the remedy phase, because the Court will be making findings of fact and a determination on unjust enrichment in the State's case, we would appreciate being able to put on our remedy phase shortly thereafter, like not a long time after.  So maybe the same jury considers the number crunching and damages on the Minimum Wage Act case for the class, but that we also be able to present that small amount of additional evidence for the Court in order to award and determine the remedy.

THE COURT:  Well, I hear what you are saying.  I am inclined to tell you, I think at least there will be an advisory jury on the unjust enrichment claim; because one party has two claims and the other party only has one on the plaintiffs' side doesn't mean they can't be resolved together.

MS. BRENNEKE:  Your Honor, advisory jury, and then the lane would ultimately end in your determination?

THE COURT:  Yes, but that's not a final ruling.  That is what I am thinking right now.  You can prepare with that in mind.  I will -- after we discuss it further, we will decide exactly how this should shake out.

MS. BRENNEKE:  Thank you, Your Honor.

1           THE COURT:  What else do you want to talk about?  Oh,
2      I know what we have to talk about.  That is notice to the
3      class.

4          I must say, Mr. Whitehead, I am a little disgusted that we
5      have to deal with this at this late date, and I gather that
6      you have a plan in effect, or I shouldn't say that.  A plan,
7      ready to be adopted, that is changed from the original?

8           MR. WHITEHEAD:  Yes, Your Honor.  I share your
9      disgust.  I regret to be in front of you this morning talking
10     about this issue.

11         Dealing with getting contact information for the class has
12     just been a complete quagmire.  We have tried to work
13     cooperatively with GEO's various counsel.  When the issue
14     finally came to an impasse, meaning it was clear that no
15     better or more information was coming, we have proposed this
16     plan to counsel in October and November.  I thought that we
17     would be able to get an agreement, because there was a
18     similar agreement in place in *Menocal*.  When it became clear
19     that we could not reach an agreement, I brought the current
20     motion before the Court.

21         It is late, but it is not too late.  We have got a plan in
22     place.  We have a third-party administrator called JND.
23     Counsel is familiar with JND and has used their services
24     previously.  It is a comprehensive publication campaign.  We
25     have Google, we have Facebook, we have radio ads, we have

press releases, website, a toll-free number.  We are ready to

execute on all of it.

I can give you some dates, if you like, because I

understand that's what you would like.  Would you like me to

go through the dates now?

THE COURT:  No.  What I am curious about is under

your plan, will all the notices be complete before the date

we have set for this trial?

MR. WHITEHEAD:  Yes.  Publication notice is a

different animal.  When we talk about direct mail, service is

effective as of the date of the postmark.  Whether or not it

gets to the intended recipient, who knows.  There is no

distinction to be drawn when it comes to what we are talking

about here with publication.  The standard isn't -- we have a

large class.  The standard isn't actual notice on every one.

It is the best notice practicable under the circumstances.

We have a transient class.  This is the best we can do

under these circumstances to apprise as many folks as we can

of the rights and the fact that there is this action going

on.

We know that we got this information recently.  I believe

we learned December 3rd that there are about 135 people that

are still in custody.  Frankly, I am suspect of that number,

but according to GEO, there are 135 people that are in the

class that are in custody.  We can have notice -- direct

1    notice to those people next week in the form of the long form

2    notice the Court previously approved.

3        I would suggest also posting would be nice.  Simply

4    blowing up a short form notice and making it a posting.  I

5    understand from counsel that hasn't been a problem in other

6    facilities.  I don't know what GEO's current position is on

7    that issue.  As to folks that are still in custody, which is

8    a large number of people at the 1500-bed facility on the Tide

9    Flats, just posting alone, in addition to direct mail alone,

10   in the facility is going to get a substantial number of

11   people.

12       For the radio, social media and the website, we are ready

13   to go live.  The website and the social media by no later

14   than -- on or before January 24th is the date.  I suspect it

15   is going to be before.  We are at the point now where we are

16   setting deadlines.  I don't want to be too aggressive and not

17   be able to execute.

18       That being the case, we would execute notice to the class

19   before adjudication on the merits, which is the standard that

20   the Court and we are operating under is notice before

21   adjudication on the merits.

22            THE COURT:  Have you shared your amended plan with

23   other counsel?

24            MR. WHITEHEAD:  The broad strokes of the plan are the

25   same.  The major change is removing the direct mail campaign.

1    I spoke with counsel on Wednesday.  It was a short

2    conversation.  I didn't have dates yet.  That was the part

3    that was the hang up.

4        In terms of what I have just proposed, there is no

5    difference from what the parties and what the Court had

6    previously complicated -- contemplated, excuse me, beyond --

7             THE COURT:  Complicated may be --

8             MR. WHITEHEAD:  Yes.  I think an appropriate slipup

9    there.

10       The substantial change is the direct mail to people in the

11   United States.  The address information, we have indication

12   from GEO that we have 9,000 class members.  46,000 rows of

13   address information where it is just maybe a street number or

14   a street name.  No indication of city, no indication of the

15   country.  To try and do direct mail under those

16   circumstances, I might as well stand over the overpass on I-5

17   and fling them into the air.

18            THE COURT:  Well, do you have something for me to

19   sign?

20            MR. WHITEHEAD:  No, Your Honor, I do not.  I can

21   prepare an order.  We submitted an order with the motion.  If

22   the Court would like a detailed order, I can submit that

23   before the end of the day.

24            THE COURT:  I haven't seen it.  I gather from Rachel

25   that we need a new order.

 1          MS. DOLVEN:  Taking into account what was in the

 2     other order, the order that came out.

 3          MR. WHITEHEAD:  Yes.  Okay.  Certainly, I can put

 4     together a detailed order and submit it before the end of the

 5     day.

 6          THE COURT:  Let me ask defense if they have input on

 7     this.

 8          MS. SCHEFFY:  I do.  May I approach, Your Honor?

 9       Your Honor, is this volume okay?

10       The first thing I think that GEO needs to address here is

11     the timing of the notice.  This is the first time GEO has

12     learned that notice effectively won't go out until January

13     24th.  That is going to be the same date that summary

14     judgment will be fully briefed.  That puts us directly into

15     the one-way intervention rule, which the Ninth Circuit

16     said --

17          THE COURT:  The what rule?

18          MS. SCHEFFY:  It is called one-way intervention.  The

19     key case in the Ninth Circuit is 69 F.3d, 293, from 1995.  It

20     is *Schwarzschild vs Tse.*  Effectively, because this is a due

21     process right for the individuals and also a due process

22     right for GEO because GEO wants to ensure that notice is

23     adequate so it can rely on collateral estoppel going forward

24     if a member of the class were to bring a separate suit,

25     notice is not effective when it goes out after the Court has

1    had the opportunity to rule on the merits or will rule on the

2    merits.  That's because a potential plaintiff could wait and

3    see.  They could hedge their bets.  They could say, I am

4    going to see if the court rules on summary judgment in my

5    favor, in which case I will opt in.  If not, I am going to

6    exclude myself from the class so I have a second bite at the

7    apple.  That is controlling here.

8        The Sixth circuit ruled last month, which is obviously

9    persuasive on this court, in a very similar circumstance.

10   The court had certified a class but notice hadn't gone out

11   before summary judgment was ripe and ruled upon.  The court

12   concluded that effectively the notice was -- the class

13   certification remains functionally incomplete until class

14   members receive notice.  The notice was of no consequence,

15   and the decision was only binding on the parties to that

16   case.

17       Here, that is the first issue we run into.  Looks like

18   there would only be 35 days between full briefing on summary

19   judgment and trial.  I have not found a case that would say

20   that is effective notice or that gives sufficient time.

21   Maybe plaintiffs' counsel has.

22       Also, one of the key aspects of notice is each individual

23   has the opportunity, should they wish to, to have their own

24   attorney file an entry of appearance and represent them.  If

25   summary judgment has been fully briefed, that is effectively

1  not a right they have anymore.  There is a question about

2  whether notice would be effective.

3      Beyond that, I did call counsel.  We have not had the

4  opportunity yet to discuss the actual notice plan and what he

5  envisions.  I haven't seen the website.  For example, one of

6  the components was a website.  I don't know what the web

7  address would be.

8      GEO would ask, if this Court asks plaintiffs' counsel for

9  a subsequent order, that GEO has 24 hours to make any

10  comments to the proposed order to make sure the language is

11  adequate and GEO can rely upon that for collateral estoppel

12  and res judicata purposes going forward.

13      If Your Honor wants me to address the factual issues of

14  posting notice, I can.  There are a few other issues I am

15  happy to address.

16          THE COURT:  I guess, what I don't get is what you're

17  suggesting.

18          MS. SCHEFFY:  We effectively have two choices, from

19  what I see in the case law.  Obviously, I would defer to

20  Your Honor.  It is either, we go forward with the individuals

21  who have received due process and are aware of this case --

22  that would be the named plaintiffs in GEO -- and that any

23  judgment of the court is only binding upon those individuals,

24  or the deadlines would have to move and summary judgment

25  would have to be reserved until after the notice period

1   closes.

2        THE COURT:  You mean not rule on the summary

3   judgments?

4        MS. SCHEFFY:  I have seen some cases where courts

5   reserved their ruling on summary judgment or having a trial

6   until the notice period closed.

7        THE COURT:  Until after the period closes?

8        MS. SCHEFFY:  Uh-huh.  I don't know how otherwise we

9   get out of this Ninth Circuit precedent, ensure due process

10  on both sides.

11    I apologize in advance to Rachel for not putting this case

12  before you.

13        THE COURT:  What was the cite again?

14        MS. SCHEFFY:  Ninth Circuit one is 69 F.3d 293, 1995.

15  That one addresses when class certification had not yet been

16  ruled upon.  The Sixth Circuit one which addresses the

17  counterpart is 944 F.3d, 593, that was decided early last

18  month.

19        THE COURT:  Let me ask, do you have a response?

20        MR. WHITEHEAD:  Your Honor, counsel is referring to

21  the *Schwarzschild* case.  In the case, the holding of the

22  Ninth Circuit is the defendant had waived as relates to the

23  one-way intervention rule by moving for summary judgment.

24    I would submit to the Court it has already been waived in

25  this case given that GEO -- this is the fourth or fifth

1    dispositive motion that we are up against here.

2        I think that is -- just in terms of contextualizing the

3    *Schwarzschild* case, it is about whether or not the defendant

4    has waived the one-way intervention rule.

5        I think just sort of taking a step back as a practical

6    matter, given that we are dealing with consolidated cases and

7    the fact the Court just acknowledged that a ruling in the

8    Nwauzor case would perhaps act as res judicata or estop, have

9    some sort of estoppel effect in the State's case, without

10   opining whether that is correct, I submit to the Court that I

11   would suspect the reverse would be true.  That if, for

12   whatever reason, let's say notice didn't even go out at all,

13   if there was a ruling in the State's case, I would think that

14   ruling would operate to estop anyone from bringing any

15   subsequent case in their own name.

16       You know, in that way, I appreciate the concerns being

17   raised by GEO.  As a practical matter, I see them as a

18   nullity.

19            THE COURT:  You have a response?

20            MS. SCHEFFY:  Just three quick things.  First, as to

21   the claim that the State's case would be preclusive.

22   Collateral estoppel requires privity between the parties.  I

23   am not sure GEO could effectively argue there is a privity

24   between the State and individuals.

25       Second, this is a mandatory requirement.  It is pretty

1   clear that notice must be given before any party can be

2   bound.  That would include a favorable ruling on plaintiffs'

3   summary judgment for class members.

4      Third, I wanted to raise that we believe GEO would be

5   prejudiced if the Court reserved ruling on summary judgment

6   until before trial.

7         THE COURT:  I don't think parties are legally

8   prejudiced when a judge doesn't get -- a federal judge

9   doesn't get his work out timely.

10     I have not had a motion or a bench trial under advisement

11  over 30 days since 1969.

12        MS. SCHEFFY:  I appreciate that, Your Honor.

13        THE COURT:  It may be just appropriate -- we'll take

14  a look at this.  It may be just appropriate to sit on that,

15  on those motions.  I don't like to do that.

16     Mr. Whitehead, let me ask you to get your proposed order

17  in here as complete as possible as soon as possible.  We will

18  look at these cases in the meantime and decide what to do

19  about notice.

20        MS. SCHEFFY:  Your Honor, will GEO have the

21  opportunity to weigh in if that order includes language that

22  we believe doesn't effectuate notice?

23        THE COURT:  It will have to be quick.

24        MS. SCHEFFY:  We can do it within 24 hours.

25        THE COURT:  Like Monday?

```
 1          MS. SCHEFFY:  We'll plan on it.  Thank you,
 2    Your Honor.
 3          THE COURT:  Any other matters for discussion,
 4    recognizing that it is almost noon?
 5          MS. BRENNEKE:  Your Honor, this may not be a
 6    substantive matter to address in this moment.  We did want to
 7    raise some issues having to do with the post mandamus
 8    financial document production.  The parties are still
 9    working -- GEO had a date certain by which it was to produce
10    those documents.  They did produce some of those documents.
11    We are in dialogue right now about supplementing those.
12        There is one document, however, that we have met and
13    conferred about where we have a disagreement as to whether
14    they are going to produce an unredacted version of a one-page
15    letter in which GEO has estimated the cost necessary to
16    achieve compliance with minimum wage for the plaintiffs in
17    this case and others.
18        Whether or not we want to talk about that now and have a
19    ruling or make time somehow for us to do that next week, we
20    feel like that issue is ripe for the Court's involvement.
21          THE COURT:  What has been cut out of the letter?
22          MS. BRENNEKE:  I have a copy of the letter here.  I
23    have copies for everyone.  There are large sections redacted.
24    What is pertinent is that this is a letter from GEO to ICE
25    seeking a request for equitable adjustment in a certain
```

amount.  The amount has been blacked out.  The total amounts

for request for equitable adjustment have been blacked out.

The legal expenses have been blacked out.  Frankly, we don't

care about those.  We are looking at the underlying issues.

There is a large block that says that -- that follows the

sentence, "We have conducted an estimation of the costs

necessary to achieve compliance with the plaintiffs."

In that block, we are imagining that for each state, there

was probably that assessment of what it would cost them.

This is very clearly a measure of the value of the work of

the detainees in those places.  That would go both to our

liability and damages.  We request it be produced in an

unredacted form.

THE COURT:  What is the secret?  This is a letter

from the government contractor to the government?  What is

the secret?

MR. BARNACLE:  Your Honor, what is redacted, in fact,

is not responsive in any way to what was ordered on the Ninth

Circuit's mandamus.  It required the disclosure of specific

information to the Northwest Detention Center.

Counsel just represented that she thinks it is broken down

by state.  It is not.  It is an aggregate of a number that

applies to every facility across the country, which is not

ordered by the mandamus order.  It is being withheld on those

grounds.  It is not ordered by mandamus.  It is not relevant

1  to this case.  It is not broken down for the Northwest

2  Detention Center.

3          MS. BRENNEKE:  Your Honor, if it would assist the

4  Court, we have a copy of that letter here.

5      I guess I have two points in response.  One is that if

6  there is only an aggregate analysis, then we should have that

7  aggregate analysis.  We know from other financial records,

8  discovery, that there is probably some underlying backup that

9  the facility -- or that the corporation has conducted that

10  would have, you know, the spreadsheets or whatever it is that

11  they use to determine that.  We would also ask that be

12  produced.

13      May I approach the Court?

14          THE COURT:  No.  I hate to say this, if you can't

15  agree, you should make a motion.

16      I find it hard to believe that after all this, you can't

17  agree on these things.  I would have to go back and look at

18  my order that was affirmed and apply it to this document.

19  You know, I have other things going on around here, too.  I

20  am starting what looks like a month-long case on Monday.  If

21  you can't agree, make a motion and we will deal with it.

22      It is hard for me to -- you know, I am not a government

23  contractor.  I am a government employee, I guess, not a

24  contractor.  It is always hard for me to understand what the

25  big deal is.  Why can't we have open government?  What is the

big deal?  There may be some big deal.  It gives you a right
to keep things back, but I don't know.  Because I don't know
the answer to this, I don't want to rule on it without full
briefing.

Okay.  Anything else?  You have burned into my lunch hour.

MS. SCHEFFY:  This may be something for briefing.  We
have been contacted about ICE about the photographs taken of
the site inspection.  You may recall your order had advised
counsel for both sides to be cautious not to photograph the
faces of detainees.

THE COURT:  Photograph what?

MS. SCHEFFY:  Faces of detainees, their likeness.

About 557 photos have photographs of detainees' faces.
ICE has asked to make the redactions and needs additional
time to make those.  We have reached an agreement that it
could be just to those the State intends to produce at trial,
but we don't have an agreement that ICE can make the
redactions.

In the interest of time, it is worth getting those to ICE
as soon as possible and the redactions can be disputed later.
It doesn't seem there would be any reason the faces of
detainees would be relevant to this claim.

MS. CHIEN:  We have proposed that there are, as you
heard, 557 photos -- possibly 557.  I actually don't know.
It is just really not efficient for ICE to sit there and

1    redact all those photos.  Since we are going through our

2    pretrial statement exhibit photos, we are narrowing the

3    photos we have and we can address that issue once we have

4    done our own culling so ICE doesn't spend so much time.  I

5    promise you we won't be submitting 557 photos before trial.

6    We would like to have the time to do so ourselves.

7              MS. SCHEFFY:  My only fear is ICE --

8              THE COURT:  You are all grown-ups.  Work it out.

9              MS. CHIEN:  We are happy to do that.

10             THE COURT:  Okay.  If there needs to be redactions,

11   figure out the most efficient way to do it and do it.  Okay.

12       Thank you for coming in.  I know a lot more about this, I

13   think, than did I before, but maybe it is because I have

14   forgotten so much.

15       Thank you.

16                  (The proceedings adjourned.)

17

18                 C E R T I F I C A T E

19

20    I certify that the foregoing is a correct transcript from the

21   record of proceedings in the above-entitled matter.

22

23   /s/ Angela Nicolavo

24   ANGELA NICOLAVO
     COURT REPORTER

25