The Honorable Robert J. Bryan

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

8

9

UGOCHUKWU GOODLUCK NWAUZOR,
FERNANDO AGUIRRE-URBINA,
individually and on behalf of all those
similarly situated,

Plaintiffs/Counter-Defendants,

v.

THE GEO GROUP, INC.,

Defendant/Counter-Claimant.

10

11

12

13

14

15

16

Case No. 3:17-cv-05769-RJB

**THE GEO GROUP, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:**
April 1, 2020

ORAL ARGUMENT REQUESTED

17

18

19

20

21

22

23

24

25

26

27

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB)

51277561;7

**AKERMAN LLP**

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................1

II.     RELEVANT FACTS............................................................................2

    1.      The Voluntary Work Program...........................................................2

        a.      Plaintiffs Nwauzor and Aguirre-Urbina...............................5

    2.      Voluntary Work Program tasks reduce idleness, improve morale and serve
        the purpose of combating the negative impacts of confinement..............6

3.      The Attributes of the VWP Do Not Indicate "Employment."....7

    a.      Control...............................................................................7

    b.      Training...............................................................................9

    c.      Supervision and Performance Standards...............................9

    d.      Permanence........................................................................10

III.    AS A MATTER OF LAW, THE WMWA DOES NOT APPLY TO DETAINEES IN
    WASHINGTON WHO RESIDE OR SLEEP AT A DETENTION FACILITY......11

    A.      Detainees are not employees under the resident exception to the WMWA....12

    B.      Detainees are not employees under the detainee exception to the WMWA...13

IV.     EVEN IF THIS COURT INTERPRETS THE STATUTORY LANGUAGE OF
    THE WMWA TO APPLY TO VWP PARTICIPATING DETAINEES AT THE
    NWIPC, PLAINTIFFS CANNOT SATISFY THE ECONOMIC DEPENDENCE
    TEST.................................................................................13

    A.      The Fundamental Purpose of the VWP is Not Employment...............18

    B.      Detainees' Participation in the VWP is Not Permanent.....................19

    C.      Detainees' Participation in the VWP is Not Controlled by GEO..............20

    D.      The Tasks Completed by Detainees are Not an Integral Part of GEO's
        Business........................................................................21

V.      UNJUST ENRICHMENT COUNTERCLAIM AND AFFIRMATIVE DEFENSE
    FOR OFFSET.................................................................22

VI.     CONCLUSION.................................................................24

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB)

51277561;7

AKERMAN LLP
_____
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

Defendant The GEO Group, Inc. ("GEO"), by and through its undersigned counsel, hereby submits its Opposition to Plaintiffs' Motion for Summary Judgment.

## I.      INTRODUCTION

Detainees at the Northwest ICE Processing Center ("NWIPC") are not employees. Put simply, they perform basic tasks in the Voluntary Work Program ("VWP") to decrease idleness, improve morale, and otherwise ameliorate the negative impacts of confinement. These tasks are characteristic of communal living and do not amount to employment under the Washington Minimum Wage Act ("WMWA"). Accordingly, as demonstrated herein and in GEO's Motion for Summary Judgment (ECF 227), Plaintiffs' claim that the ICE detainees are employees under the WMWA fails as a matter of law.

First, detainees at the NWIPC do not fall within the WMWA's definition of "employee." The WMWA explicitly exempts individuals who are required to sleep and reside where they work from the definition of "employee." RWC § 49.46.010(3)(j). It also excludes all detainees of civil detention facilities from the definition of "employee." RWC § 49.46.010(3)(k). There is no question that VWP participants are civil detainees at the NWIPC and are required to sleep and reside where they perform their VWP duties and are, therefore, exempted from the WMWA.

Second, the fundamental purpose of the VWP is not to create an employment relationship, but instead to provide a voluntary program that serves to reduce idleness, increase morale, and minimize the negative impacts of confinement. VWP participants are not working to sustain themselves or to ensure their work product is competitive and cost effective; rather, they are passing time while awaiting resolution of their immigration proceedings. As a result, like jury duty, or vocational work at state-run civil detention centers, the primary purpose of the VWP indicates that its participants are not "employees" under the WMWA.

Third, the remaining factors of the economic dependence test do not indicate that the VWP characteristics demonstrate the indicia of employment, and therefore, detainees are not employees under the WMWA.

Finally, whether GEO is entitled to an offset is dependent upon a finding of liability under

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 1

51277561;7

AKERMAN LLP

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

the WMWA. Because Plaintiffs cannot establish that detainees are employees, the Court need not reach GEO's counterclaim. If it does, it should find that there are issues of material fact that preclude summary judgment. Thus, as detailed more fully below, this Court should deny Plaintiffs' Motion for Summary Judgment ("Motion") and enter judgment in favor of GEO holding that detainees are not "employees" under the WMWA.[1]

## II.   Relevant Facts

### 1.   The Voluntary Work Program.

Detainees at the NWIPC are held in ICE custody.  Declaration of Barnacle,[2] Ex. A, Dec. of Johnson ¶¶ 7-8, 10. "[D]etainees sleep and live [at the NWIPC] while they are detained by the immigration statutes" Ex. B, Melody, 30(b)(6) Washington Attorney General, 150:7-9; Ex. C, Dec. of Scott ¶¶ 7-8. While at the NWIPC, detainees receive room, board, clothing, and medical care free of cost. Ex. C, Dec. of Scott ¶ 9. Detainees are provided these basic necessities with nothing expected in return. *Id.* Additionally, ICE requires that GEO provide detainees with an opportunity to stay productive through the VWP described in the PBNDS. While participation in the program by detainees is optional, GEO *must* develop and operate the VWP under its program with ICE—even if every single detainee declines to participate. Thus, detainees who wish to stay busy while detained have the opportunity to volunteer in the VWP to help with certain chores to occupy their time and feel productive. PBNDS § 5.8. These tasks are small, "nothing technical." Ex. D, Delacruz 49:2-5. The tasks are akin to household chores that are a typical part of communal living, including, laundry, cleaning up trash, wiping down counters, and cleaning showers.

---

[1] It is GEO's position that the issue of whether detainees are employees can be resolved as a matter of law because detainees fall squarely within the statutory exceptions to the definition of employer and GEO is entitled to various immunities as detailed in its Motion for Summary Judgment filed at Docket Number 227. In the event the Court reads the statutory language differently (which it should not do), GEO offers these additional facts in response to Plaintiffs' Motion based upon the economic realities test which attempts to resolve the issues on the record without citing, even a single time, to the deposition testimony or evidence submitted by named Plaintiff Nwauzor.

[2] All exhibits submitted with GEO's opposition are attached to the Declaration of Colin Barnacle. To avoid unnecessary redundancy, each document attached to Mr. Barnacle's declaration is cited herein by reference to the relevant exhibit number and a description of the cited document.

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 2

51277561;7

**AKERMAN LLP**

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

Most VWP tasks, regardless of where they are performed, take 30 minutes or less to complete. Ex. E, Tracy 45:11-13; Ex. F, Scott 30(b)(6), 81:6-8. Detainees can volunteer in the kitchen where they could help place frozen chicken patties on a pan or vegetables in a pot. Ex. D, Delacruz 49:2-5, 75:8-22. At the same time, another detainee may volunteer to move items from the storage room or freezer to the cooking area. Ex. D, Delacruz 76:3-7. Separate and apart from the tasks in the kitchen, detainees who volunteer as food servers complete very simple tasks; including a detainee whose exclusive task is to place a cup of orange juice and a spoon on each tray. Ex. G, Dec. of Jesus Lopez Paez ¶ 16. A different detainee may volunteer to push the cart of meal trays between the kitchen and the pod. *Id.* The tasks in intake are also minor, consisting of "wiping down the windows and . . . dry mopping it with a dust mop and then with a wet mop afterwards." Ex. E, Tracy 43:4-6. Other tasks include the "pod laundry" position, where volunteers are responsible for distributing clean laundry bags to the individuals in their dorm. Ex. H, Singleton 142:18-21. The graveyard pod cleaning crew simply picks up trash bags from outside of each unit and places the bags in a central location near the loading dock. Ex. I, Johnson 29:21-25. Officers must supervise detainees in this task and escort detainees on their route (despite the fact that this often makes the detainees' presence redundant). Ex. I, Johnson 29:21-25. Detainees are free to choose whether they want to perform a specific task, any task that is available, or no task at all. Ex. H, Singleton 80:1-17; Ex. J, Heye 99:20-25, 100:1-11.

In contrast, GEO employees have much greater responsibilities. GEO employees are responsible for all aspects of maintaining the operations at the NWIPC. Ex. J, Heye 89:21. While some tasks may overlap with detainees, this is simply a function of GEO's obligation to create a sufficient number of opportunities in the VWP so that a significant portion of detainees have the opportunity to participate, should they choose to do so. In contrast with the discrete tasks assigned to detainees, GEO employees perform a "a collateral job," meaning that they are "doing multiple things at once . . . [t]he main focus is safety and security, but a part of that is, you know, making sure that order is maintained and cleanliness is maintained in the units and other areas wherever you are assigned." Ex. I, Johnson 20:15-20. To that end, when there no detainee volunteers, GEO

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 3

51277561;7

AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

employees complete all tasks that could be assigned to VWP participants themselves. Ex. D, Delacruz 22:1-4. This flexibility is built into GEO's staffing plan that includes a number of "utility positions" or "extra people on staff . . . that can be pulled off [] and placed where they're needed." Ex. K, McHatton 143:14-19. Despite the unsupported argument to the contrary in the Motion, there is no indication that the operations would not be possible without detainee participants. Ex. D, Delacruz 32:18-19 (explaining the kitchen would continue to function without detainee participants or additional employees); Ex. L, Henderson 50:13-25 (same).

It is GEO employees, three cook supervisors, who are responsible for the cooking of every meal. Ex. D, Delacruz 45:4-16 (cooks do the "actual cooking"); *id.* 50:10-11 (same). There are typically three cook supervisors per shift. Delacruz 103:14-16. Of those three supervisors, one supervisor splits his or her time between preparing the food and ensuring the safety of the detainees in the kitchen. Ex. D, Delacruz 104:4-7. Without detainee participants, that individual would be free to focus exclusively on cooking. Likewise, guards who work in the laundry room spend most of their time cleaning laundry alongside the detainees. Ex. E, Tracy 41:1-5. While GEO's maintenance department is principally responsible for maintaining the paint in the facilities, detainees are periodically provided an opportunity to paint artwork on the walls and unleash their creativity. Ex. K, McHatton 49-50; Ex. M, Jaramillo 37: 13-24 (describing how a detainee would obtain approval to add his or her artwork to the wall). Furthermore, because detainees must stay within certain secure areas, they cannot perform many tasks that GEO employees perform. Ex. E, Tracy 68:24-25, 69:1-20 ECF 223-9 (describing all of the locations where detainees cannot go, but janitor employees can). And, those tasks that detainees perform must be supervised, for security purposes, not performance. Ex. I, Johnson 29:23. Ultimately, it is GEO employees who keep "the facility running and operational." Ex. J, Heye 89:21. And, detainees cannot perform the essential function of all employees at the NWIPC: "ensure the safety and security" of detainees. Ex. E, Tracy 20:7-9.

//

//

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 4

51277561;7

**AKERMAN LLP**

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

### a.  Plaintiffs Nwauzor and Aguirre-Urbina

The simplicity of the tasks completed by detainees is illustrated by the experiences of Plaintiffs Nwauzor and Aguirre-Urbina. Plaintiff Nwauzor had a simple activity that he performed daily: "When I was in detention, I cleaned the shower." Ex. N, Nwauzor 6:21. He cleaned the shower for a mere hour of his day, leaving the other 23 hours to eat, sleep, play football, attend church, read books, and call his family in Nigeria. 7:8 (cleaned his shower "one hour plus" per day); 85:2-25 (played football, used the recreation yard, read his bible, and called his family in Nigeria); 149:20-25 (describing going to church); 151:5-14 (describing reading books in detention). To keep the residents of NWIPC occupied, the showers are cleaned at least *two times a day*, but more often three times. Ex. N, Nwauzor 64:15-25, 65:1-16; Ex. G, Dec. of Paez ¶¶ 9,11. This task was Plaintiff Nwauzor's (and other detainees') *only* task as part of the VWP. Ex. N, Nwauzor 66:6-25,66:1, 67:2; Ex. G, Dec. of Paez ¶ 9 (normally, cleaning the showers and cleaning the bathrooms are separate tasks and two people would do the work each shift).

Meanwhile, Plaintiff Aguirre-Urbina's most recent task was to take the full trash bags from each pod to the larger trash bins—which would thereafter be placed in the outside dumpsters by GEO staff. Ex. O, Aguirre-Urbina 121:1-25, 170:1-9. This task "could take an hour. Less than an hour sometimes." Ex. O, Aguirre-Urbina 168:8. For the most part, Plaintiff Aguirre-Urbina spent his time in detention listening to talk radio, reading his bible, and writing poetry. Ex. O, Aguirre-Urbina 45:18-22; 117:6-11. On a typical day, he would spend one to two hours exercising, followed by bible study, playing dominoes with friends, watching T.V., writing poetry, and finding "something to do" with the rest of his free time. Ex. O, Aguirre-Urbina 117:6-13. And, Plaintiff Aguirre-Urbina did not need to worry about daily chores, as he and four of his roommates agreed to take turns cleaning their living area. Ex. O, Aguirre-Urbina 117:15-19. Plaintiff Aguirre-Urbina was not dependent upon participation in the VWP for funds as his sister would periodically provide him with "a couple hundred dollars," much more than he would make in the VWP. Ex. O, Aguirre-Urbina 135:1. He was fully aware when he volunteered for the program that the compensation was limited to a dollar per day. Ex. O, Aguirre-Urbina 163:17.

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 5

51277561;7

AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

### 2. Voluntary Work Program tasks reduce idleness, improve morale and serve the purpose of combating the negative impacts of confinement.

The nature of the relationship between GEO and detainees in the NWIPC is a custodial relationship, wherein GEO is in charge of ensuring detainees are safe and secure pending the resolution of their immigration proceedings. Ex. A, Dec. of Johnson ¶¶ 7-8, 10. As part of this relationship, GEO must meet certain federally mandated detention standards, including the PBNDS. Ex. A, Dec. of Johnson ¶¶ 11, 12. The VWP is one of the programs that the PBNDS require GEO to offer to detainees, along with recreation, telephone calls, visitation, and religious practices. PBNDS, ii; Ex. P, Kimble 30(b)(6) 20:22-25, 21:1-2 ("We follow ICE protocols and ICE rules on [the VWP], on giving opportunities for detainees to get out and use their mind and use their bodies where they're not just sitting in the detention center housing units."). Rather than serving the purpose of providing detainees with an opportunity to earn minimum wage or obtain work experience, the explicit stated purpose of the VWP—as set forth in ICE's PBNDS—is to address the "negative impact of confinement" by decreasing idleness, improving morale, and reducing disciplinary incidents. PBNDS § 5.8; Ex. A, Dec. of Johnson ¶ 11. The State of Washington implements similar programs at its criminal and civil detention facilities. Ex. Q, Eagle 9:19-25, 10:1, 19:1-7; Ex. R, Murphy 19:11-13, 20:22-24; Ex. S, Eisen 7:8-14. Those programs allow confined individuals to participate in tasks for subminimum wages in return for a sense of fulfillment or connection to their communities. Ex. Q, Eagle 9:19-25, 10:1, 19:1-7; Ex. R, Murphy 19:11-13, 20:22-24; Ex. S, Eisen 7:8-14; Ex. B, Melody 30(b)(6) of Attorney General's Office 142:13-15; Ex. T, Wonhoff 30(b)(6) of Governor's office 39:16-22.

The VWP serves its purpose. As Plaintiff Aguirre-Urbina explained, he participated in the VWP because "[i]t gave me a little bit of fulfillment." Ex. O, Aguirre-Urbina 120:5-6. The VWP gave him "a little something to do" and helped to "take [his] mind off of a lot of stresses I already have." Ex. O, Aguirre-Urbina 137:19-24. Detainees also take pride in keeping their living area clean. Ex. N, Nwauzor 68:23-25; Ex. F, Scott 30(b)(6), 83:3-12. Consistent with detainee's experiences, GEO officers have seen the benefits of the program to detainees who "gain some—a

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 6

51277561;7

AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

sense of pride from it, they gain the sense of I'm not stuck here." Ex. E, Tracy 81:7-10; Ex. I, Johnson 33:19 ("[T]hey enjoy the work there."); Ex. M, Jaramillo 25:16-20 ("[Detainees would] tell me, [y]ou know, I don't come to work for a dollar . . . . You can give that to somebody else I want to get out of my room."); Ex. M, Jaramillo 73:16-23 ("A lot of times, walking the units, they'd ask me for something to do just so they can keep themselves busy."); Delacruz 136:7-12 ("And I ask them, you like working here? And they—a lot of them do, say, oh, good I got out of the—you know, the pod . . . just to get out and go somewhere else instead of in the pod. And they—they kind of like to get out.").

### 3. The Attributes of the VWP Do Not Indicate "Employment."

#### a. Control

Plaintiffs make the hyperbolic claim that to argue that GEO does not have control over detainees is to argue "that GEO does not run a secure detention facility." ECF 221, 15. This contention is not logically sound. Plaintiffs' argument completely disregards the fact that the VWP is *completely voluntary*. Ex. D, Delacruz 70:8-10 ("either the people volunteer to work there or they don't, but that's -- that's probably what it is, they just didn't want to volunteer."). Detainee participants who volunteer do "whatever they want[], basically. If [a detainee] wanted to fold or put away clothes, [a detainee would] put away clothes. If [a detainee] wanted to wash clothes, [a detainee would] wash clothes." Ex. U, Menza 53:11-14. Because they volunteer, they are also free to not attend their shifts at any time. Ex. J, Heye 99:20-25, 100:1-11. Likewise, because of the voluntary nature of the program, it is detainees, not GEO who determine what shifts they wish to participate in. Ex. D, Delacruz 100:10 ("Detainees choose what shift they want to be on."); Ex. D, Delacruz 100:17-18 ("They might need to go see their lawyers in the afternoon, so they pick a morning shift[.]"). Detainees are aware of their autonomy in this respect and schedule their VWP positions around their other activities. Ex. G, Dec. of Paez ¶ 21 (describing setting his VWP schedule to accommodate other activities); Ex. V, Dec. of Noe Baltazar Noe ¶ 6 (describing quitting his first VWP position to get a position with a different schedule; Ex. J, Heye 99:20-25, 100:1-11 (describing how detainees choose whether they want to

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 7

51277561;7

AKERMAN LLP
_____
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

work, which tasks they would prefer to perform, and when they want to work). And should a VWP participant wish to change shifts, he or she can ask to do so at any time. Ex. D, Delacruz 108:5-20. While detainees must ask to change their shift, it is not because GEO selects certain detainees for certain tasks based upon their skills, but rather because detainees' safety is paramount so detainees cannot simply "mosey around the facility" without approval. Ex. D, Delacruz 108:13-14.

Nor can GEO refuse to place an individual in a VWP position because "that person's kind of a jerk" or because they have "attitude or behavioral issues;" GEO simply does not have the authority or control to "pass" on a detainee applicant. Ex. I, Johnson 44:10-24. Put simply, GEO does not terminate detainee VWP participants for unsatisfactory performance. Ex. P, Kimble 30(b)(6) 37:6-9. Likewise, when a detainee leaves his or her position GEO cannot control whom it places in the vacant position to place, for example, the best qualified or most efficient detainee in the newly available position. Ex. U, Menza 69:7-24, 96:14-18 (describing that he could not choose laundry volunteers based upon his own preference). Instead, GEO must provide positions to individuals based upon the order each detainee's request was received—regardless of skill. Ex. H, Singleton 84:17-18; Ex. W, Scott 39:20-25; Ex. I, Johnson 48:14-15. And, even in the rare circumstances where a detainee is removed from the program, either by their own choice or because of gross misconduct like theft or fighting, GEO is not the ultimate authority on whether the detainee's removal from the program stands. Ex. I, Johnson 56:1-20, 71:4-19. Instead, each detainee has the right to appeal the decision to ICE, at which point ICE has an opportunity to decide, over GEO's objection, whether the individual should be reinstated. Ex. I, Johnson 35:2-7. Any final decision is ultimately up to ICE. Ex. I, Johnson 43:2-6 ("ICE . . . say[s] what goes.").

Furthermore, unlike a traditional minimum wage job, detainee participants do not show up for a "shift" and then work the entire duration of the shift at the direction of an "employer." Rather, because detainees perform very limited tasks, GEO cannot direct them to do tasks for which they did not volunteer. For example, a food porter "can't do his job when there's no food there." Ex. E, Tracy 32:6. Consequently, regardless of the length of an assigned shift in the VWP,

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 8

51277561;7

AKERMAN LLP

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

detainees do what they please until it is their time to perform the discrete task for which they have volunteered. As detainees are not at GEO's disposal for an entire "shift," once it is time for the task to be completed, a guard may have to "go wake him up or let him know, if he's outside playing basketball or whatever[.]" Ex. E, Tracy 32:6-9.

### b.  Training

In contrast with the intensive training that GEO employees undergo, detainees often teach each other to perform the tasks in the VWP. Ex. N, Nwauzor 169:13-22 (describing how another detainee taught him to clean the shower); Ex. E, Tracy 32:1-5 (stating that detainees teach each other about the various VWP tasks); Ex. W, Scott 14:15-23 (describing the more extensive training required for GEO employees); Ex. K, Mchatton 23:25, 24:1-5 (describing that before GEO officers are placed they must complete a six week training academy plus two weeks on the job training) Ex. L, Henderson 22:17-21 (describing a six week training for GEO employee cooks in the academy). In other circumstances, detainees arrive at the NWIPC already possessing the relevant experience, obviating the need for additional training. *See e.g.* Ex. W, Scott 38:18-21 ("a lot of the barbers that we have have [sic] prior—were doing barbers before in prisons and jails or have other—have cut hair before.").

### c.  Supervision and Performance Standards

The supervision of detainees focuses on the security of the facility, not the sufficiency of their performance. Ex. M, Jaramillo 27:3-15 (describing that it is an officer's job to supervise detainees). Detainees are not removed from their positions for poor performance. Ex. H, Singleton 200:17-19. As Mr. Tracy, a GEO officer explained, when supervising VWP participants "you're out on the actual floor while they're working. You're not hovering over them, Hey, you missed a spot here, or like that, but you're physically out there with them. You can see what they're doing." Ex. E, Tracy 40:4-8. Unlike GEO's employees who must work together to ensure the job is completed, detainees work voluntarily without repercussions for failing to perform their work. Ex. D, Delacruz 24:18-20 (explaining that there are no repercussions if a detainee fails to work); Ex. D, Delacruz 30:7-13 (describing working together to get the job done without detainee volunteer);

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 9

51277561;7

AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

1   Ex. D, Delacruz 89:18-21 ("[I]f they volunteer to work there, then that's fine. If they don't, then --

2   then it falls on us."); Ex. E, Tracy 69:22-24; ECF 223-9 ("we all clean").

3        Unlike employees, detainee participants in the VWP are not subject to performance

4   reviews. Ex. D, Delacruz 111:10-12; Ex. H, Singleton 92:24-25 ("As long as they show up and

5   they do the job, then that's deemed sufficient."). Nor are they subject to an initial skill assessment

6   prior to their placement in a position. Ex. D, Delacruz 111:7-9. Thus, if a detainee cannot

7   complete certain tasks that are typically done in the VWP shift that the detainee choses, GEO will

8   provide an alternate task. Ex. D, Delacruz 112:18-24 ("If he -- if he can't wash walls, well can he

9   mop floors? You know, it's -- it's a vast amount of things that can be done in the kitchen that need

10  to be done with the minimum amount of people that we have or the maximum amount of people

11  we have."). There is also no requirement of timeliness. For example, where one detainee may take

12  an hour or two to sweep and mop because "he liked not being stuck inside the cell, and he's very

13  meticulous with everything he did," another detainee doing the same task may spend only 15

14  minutes. Ex. E, Tracy 44:8-15; Ex. I, Johnson 33:16-18 ("[T]hey're motivated –to do more, you

15  know, or go longer than one would reasonably expect to complete it."). At the same time, if a

16  detainee is "doing a lousy job consistently," a guard cannot say "you're not doing a good job,

17  you're not working anymore." Ex. E, Tracy 50:8-13; Ex. J, Heye 86:9-10 ("[Detainees] cannot be

18  fired. You can't tell a detainee that he's fired."). Instead, a participant would need to affirmatively

19  give up his or her task by signing a refusal to work form. Ex. E, Tracy 50:15-17; Ex. H, Singleton

20  195:20-25 (detainees cannot be fired because the program is voluntary).

### d.  Permanence

22       Detainees are anything but permanent fixtures at their VWP positions. Detainees are

23  constantly changing positions or resigning from their voluntary work all together. Delacruz 63:1-5

24  ("That could -- that could -- number is constantly changing. We could go from two to four to six

25  to 12 at the most. It's because people gets -- they're leaving, and they might work there for three,

26  four months, and then the Tuesday morning they have left."). Further, beyond their own choices,

27  detainees are not permanent because at any time they could leave the NWIPC because of a change

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 10

51277561;7

AKERMAN LLP
_____
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

in their immigration proceedings. Ex. D, Delacruz 68:18-25 ("[P]eople always are coming in and leaving, so it's -- it's not a permanent – permanent location or -- like it's not really -- it's not a permanent time line because they also are leaving, either being deported or -- or being let -- let free because of bond, or whatever the case may be, medical, or whatever the case may be, that people always are moving around, they're always leaving, coming and going.); Ex. D, Delacruz 98:6-9 ("I don't fire them. A lot of times they just don't show up for work, and they voluntarily – they voluntarily don't want to work. They voluntarily don't want to work."); Ex. V, Dec. of Noe ¶ 6,7 (describing leaving numerous positions, one after only 15 days, because he wanted a different position). In fact, GEO employees are unable to estimate how many individuals will participate in the VWP on any given day because of the voluntary nature of the program. Ex. D, Delacruz 69:11-13 ("every day is different, and the amount of people that comes in is different because it's a voluntary program.").

In sum, as the Washington Department of Labor and Industries ("L&I") has previously determined, detainees at the NWIPC are simply "not covered by the minimum wage act; they are not defined as employees." Ex. X.

### III.      As a Matter of Law, the WMWA Does Not Apply to Detainees in Washington Who Reside or Sleep at a Detention Facility.

"The court's 'fundamental objective when interpreting a statute is to discern and implement the intent of the legislature." *Becerra v. Expert Janitorial, LLC*, 176 Wash. App. 694, 703, 309 P.3d 711, 714 (2013), aff'd, 181 Wash. 2d 186, 332 P.3d 415 (2014). In determining whether the WMWA applies, as a threshold matter, a Court must determine whether an individual falls into an exception to the WMWA. "If an individual is not an employee under the MWA, the minimum wage requirements are never applicable[.]" *Berrocal v. Fernandez*, 155 Wash. 2d 585, 596, 121 P.3d 82, 87 (2005). Here, detainees are covered by two exceptions to the definition of employee: (1) their participation in and duties under the VWP require them to reside (and sleep) at the NWIPC—the same location where they participate in the VWP; and (2) they are in the confines of a detention facility within the State of Washington.

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 11

51277561;7

**AKERMAN LLP**
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

1

**A.  Detainees are not employees under the resident exception to the WMWA**

2

The WMWA explicitly provides that the definition of "employee… shall not include":

3

(j) Any individual whose duties require that he or she reside or sleep at the place of his or her employment or who otherwise spends a substantial portion of his or her work time subject to call, and not engaged in the performance of active duties;

4

5

6

RWC § 49.46.010(3)(j) (hereinafter the "resident exception"). The Supreme Court of

7

Washington has previously addressed the resident exception. In interpreting its statutory

8

language[3], the Supreme Court of Washington held that "[t]he plain language of RCW

9

49.46.010(5)(j) excludes two categories of workers from the MWA's definition of 'employee':

10

(1) those individuals who reside or sleep at their place of employment and (2) those individuals

11

who otherwise spend a substantial portion of work time subject to call, and not engaged in the

12

performance of active duties." *Berrocal*, 155 Wash. 2d at 598; *see also Strain v. W. Travel, Inc.*,

13

117 Wash. App. 251, 257, 70 P.3d 158, 162 (2003) ("The statute is plain: employees required to

14

sleep at their places of employment are exempt from coverage under the MWA.").[4] And, the

15

Washington Department of L&I has not altered this definition. WAC 296-128-600(5)

16

("'Employee' has the same meaning as RCW 49.46.010(3).").

17

It is undisputed that, here, detainees reside (and sleep) at the NWIPC. Ex. O, Aguirre-

18

Urbina 202:1 ("[T]his is where I live."); Ex. C, Dec. of Scott ¶¶ 7-9; Ex. B, Melody, 30(b)(6)

19

Washington Attorney General, 150:7-9. As in *Berrocal*, here, in addition to living and sleeping in

20

the NWIPC, Plaintiffs perform their work in the VWP at the NWIPC. Like in *Berrocal*, detainees

21

are provided room and board, healthcare, and payment (of less than the minimum wage). Ex. C,

22

Dec. of Scott ¶¶ 7-9. Accordingly, because detainees at the NWIPC reside (and sleep) at the

23

NWIPC, the unambiguous terms of the resident exception (and the Washington Supreme Court's

24

interpretation of the same) dictate that they are not "employees" under the WMWA.

25

[3] The same exact language in the present statute was previously located at RCW 49.46.010(5)(j).

26

[4] Furthermore, this exception is consistent with other states that also include resident exceptions. *See e.g.* Mont. Code Ann. § 39-3-406(1)(l) (exempting certain individuals that reside at their workplace); CT ST § 31-58(f) (same); N.M. Stat. § 50-4-21(C)(14) (same); MGL ch. 151, § 1A (same).

27

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 12
51277561;7

**AKERMAN LLP**
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

**B.  Detainees are not employees under the detainee exception to the WMWA.**

In addition to the exception for individuals who sleep or reside at their workplace, the WMWA exempts from the definition of employee "[a]ny resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution[.]" RWC § 49.46.010(3)(k) (hereinafter "detainee exception").[5] This exception, in its most natural reading, excludes those who are in government custody from the definition of employee.[6]

As with the resident exception, this Court first looks to the plain language of the statute to interpret its meaning. In analyzing the plain meaning of a statute, "[a] nontechnical statutory term may be given its dictionary meaning; statutes should be construed to effect their purpose, and unlikely, absurd, or strained consequences should be avoided." *State v. Smith*, 189 Wash. 2d 655, 662 (2017). Unlike the resident exception, the detainee exception has not been interpreted by the Washington Supreme Court. But courts that have interpreted the detainee exception have concluded that ***civil detainees*** are not "employees" under the WMWA. *Calhoun v. State*, 146 Wash. App. 877, 886 (2008), as amended (Oct. 28, 2008). Accordingly, Plaintiffs fall into the detainee exception to the WMWA of employee." RWC § 49.46.010(3)(k).

**IV.    Even if this Court Interprets the Statutory Language of the WMWA to Apply to VWP Participating Detainees at the NWIPC, Plaintiffs Cannot Satisfy the Economic Dependence Test.**

The Washington Supreme Court has rejected the argument that the right to control an individual is the key consideration in determining whether an employment relationship exists. *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wash. 2d 851, 870 (2012). In concluding that the right-to-control test was inapplicable, the Washington Supreme Court explained that

---

[5] The Washington Court of Appeals has explained that the detainee exception is not redundant of the resident exception, as the detainee exception covers situations where inmates or residents work off-site, but remain detained. *Strain*, 117 Wash. App. 251.

[6] Importantly, the word "state" is not capitalized in RCW 49.46.10(3)(k) and as such should not be construed as a proper noun referring to a specific state. Furthermore, when the legislature wants to refer specifically to Washington State, it knows how to do so. *See e.g.* RCW § 49.12.121(1) ("The department may at any time inquire into wages, hours, and conditions of labor of minors employed in any trade, business, or occupation **in the state of Washington** and may adopt special rules for the protection of the safety, health, and welfare of minor employees.) (emphasis added); RWC § 49.48.210 (11)(b) ("'Employer' means **the state of Washington** or a county or city, and any of its agencies, institutions, boards, or commissions") (emphasis added).

---

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 13

51277561;7

**AKERMAN LLP**

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

"minimum wage laws have a remedial purpose of protecting against the evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health." *Anfinson*, 174 Wash. at 870. Instead, in determining whether an individual is an employee, courts utilize the economic-dependence test.[7] *Id.* The economic-dependence test is not comprised of set factors that must be met. Rather, it is a flexible framework that allows a court to evaluate the relationship "based upon the 'circumstances of the whole activity.'" *Becerra*, 176 Wash. App. at 706–7 (*quoting Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). In so doing courts have identified thirteen non-exclusive factors that may be considered. *See Rocha v. King Cty.*, 435 P.3d 325, 332 at n.6 (Wash. Ct. App.), review granted sub nom. *Bednarczyk v. King Cty.*, 193 Wash. 2d 1017, 448 P.3d 64 (2019). And, federal case law provides additional guidance to courts applying the economic-dependence test in Washington. *Anfinson*, 174 Wash. 2d at 871 ("[W]e hold that the definition of "employee" in RCW 49.46.010(3) incorporates the economic-dependence test developed by the federal courts in interpreting the FLSA"); *Becerra v. Expert Janitorial, LLC*, 176 Wash. App. 694, 703 (2013), aff'd, 181 Wash. 2d 186 (2014) ("[The] state supreme court has repeatedly held that our courts may look to the federal courts' interpretation of the FLSA for guidance in interpreting the state MWA").

In assessing whether an individual is an employee, a critical consideration for a court is the "fundamental nature" of the activity and relationship. *Rocha*, 435 P.3d at 332–33. "[T]he economic reality test 'offers a way to think about the subject and not an algorithm. That's why

---

[7] While the economic-dependence test certainly controls when determining whether an individual is properly classified as an independent contractor or an employee—it is not clear this test controls in determining whether an individual in a detention setting, who performs certain tasks as part of his or her community, is an employee. Under Washington law, individuals in detention facilities are not employees. 49.46.010(k); *see also Calhoun v. State*, 146 Wash. App. 877 (2008). Under federal case law, where there is ambiguity about whether a detained individual is an "employee," a modified economic dependence test is applied. *See e.g. Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994) ("The *Bonnette* factors are properly applied when an individual is clearly employed by one of several entities and the only question is which one. They are of no help, however, in deciding the more fundamental question present here: whether the inmates are 'employed' in the relevant sense at all . . . Left without a concrete test to apply when analyzing inmate FLSA claims, we rely on the broad principles enunciated in *Hale*."). Here too, the Court should follow *Morgan* and/or *Calhoun* in addressing whether detainees are employees.

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 14

51277561;7

AKERMAN LLP

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

toting up a score is not enough.'" *Becerra*, 176 Wash. App. at 706–07 (quoting *Reyes*, 495 F.3d at 408). Instead, courts must consider not only the enumerated factors, but also the "true nature of the relationship." *Dawson v. Nat'l Collegiate Athletic Ass'n*, 250 F. Supp. 3d 401, 405 (N.D. Cal. 2017), aff'd, 932 F.3d 905 (9th Cir. 2019) (holding that in the context of student athletes, the focus was on the "true nature of the relationship" and that therefore student athletes were not "employees" under the FLSA.   As set forth in *Becerra*, the "'circumstances of the whole activity'" must be analyzed.  176 Wash. App. at 706–7

While the existence and degree of each element of the economic-dependence test presents issues of fact, a Court may rule as a matter of law, where the relationship presented to it is "legally indistinguishable from relationships that have already been determined to" not constitute employment. *Daskam v. Allstate Corp.*, No. C11-0131RSL, 2012 WL 4420069, at *2 (W.D. Wash. Sept. 24, 2012). This is true here. The Washington Court of Appeals has already ruled that circumstances that are indistinguishable from the VWP did not constitute employment. *Calhoun*, 146 Wash. App. at 884-885. Accordingly, the Court may rule as a matter of law that the relationship between detainees and GEO is "legally indistinguishable" from the relationship between the State of Washington and its civil detainees at the Special Commitment Center ("SCC"), as determined in *Calhoun*.

In *Calhoun*, the Washington Court of Appeals[8] addressed whether an individual who was civilly committed by the Washington Department of Social Health Services was an "employee" who could bring a claim for discrimination under Washington law. *Calhoun*, 146 Wash. App. at 884-85. The Court looked to the WMWA to determine whether the detainee fell within the

---

[8] The Washington Supreme Court has not yet addressed this issue. This Court, sitting in diversity jurisdiction, should defer to the Washington Court of Appeals. *Comm'r v. Bosch's Estate*, 387 U.S. 456, 471, 87 S. Ct. 1776, 1785, 18 L. Ed. 2d 886 (1967) (Where "a state court has reached a deliberate conclusion, where it has construed state law, the federal court should consider the decision to be an exposition of the controlling state law and give it effect as such."); *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237-38, 61 S.Ct. 179, 85 L.Ed. 139 (1940) (holding that federal  courts must defer to an intermediate state court's interpretation of state law, made in the very case under consideration, when the state supreme court has denied review)*Bui v. Alarcon*, 234 F.3d 1279 (9th Cir. 2000) ("Federal courts must defer to the judgment of a state court on interpretations of state law."); *Portalatin v. Graham*, 624 F.3d 69, 84 (2d Cir. 2010) (federal courts are "bound by [a state court of appeals] construction of [state] law.")

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 15

51277561;7

AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

definition of "employee." *Id.* at 886. The Court first concluded that under the plain language of RCW 49.46.010(5), the detainee was not an employee. *Id.* Next, the Court considered whether there were "indices of employment" by considering a handful of nonexclusive factors from the economic-dependence test. *Id.* The Court determined that while it was true that the SCC exercised control and direction over the program and the detainees' work performance, the fact that the program was "optional, paid, and supervised however does not necessarily demonstrate that he is an employee." *Id.* To the contrary, the Court concluded that the detainee was not an employee, reasoning as follows:

> [H]e is a pretrial detainee attempting to adapt to life at the SCC. It is healthy for SCC residents to remain active and feel productive on a daily basis. For many of these residents, contributing to the community in which they live undoubtedly facilitates the treatment process. The SCC, which recognizes this, has developed a treatment program into which these principles are integrated. Earning a living is the goal of most workers. But the primary goal of work at the SCC is to maintain a healthy lifestyle and promote good habits for the residents. *Id.*

Accordingly, because the purpose of the work program at the SCC was to benefit detainees during their confinement—the program did not serve the primary purpose of allowing the detainees to earn a living, and therefore, they were not employees.

Like in *Calhoun*, the Washington Court of Appeals recently considered whether individuals who perform jury service are employees under the WMWA. *Rocha*, 435 P.3d at 333. The court explained that while the plaintiffs emphasized the degree of control that the county exercised over jurors, they failed to consider "the fundamental nature of jury service." *Id.* at 333. The court held that "[t]he MWA definition of employee, even considering the economic-dependence test, does not transform the fundamental nature of jury service as a civic duty. Thus, jurors are not employees under the MWA." *Id.*

Similarly, applying the same test adopted by the Washington Supreme Court for determining whether an individual is an "employee," a Maryland federal court held that ICE detainees who participated in the VWP at a private detention facility were not employees in light of the realities of custodial detention:

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 16

51277561;7

**AKERMAN LLP**

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

> [P]laintiffs cannot be considered "employees" as defined by the FLSA or NMMWA. CoreCivic, under the Intergovernmental Service Agreement, was required to offer a voluntary work program for ICE detainees at Cibola. Plaintiffs were incarcerated detainees in this facility awaiting civil immigration proceedings and engaged in work offered by the Defendant on an entirely voluntary basis through this program. The economic reality of the Plaintiffs' situation is almost identical to a prison inmate and does not share commonality with that of a traditional employer-employee relationship. Accordingly, Plaintiffs were not "employees" of the Defendant during their detention.

*Ndambi v. CoreCivic, Inc.*, No. CV RDB-18-3521, 2019 WL 4735428, at *2 (D. Md. Sept. 27, 2019) (relying upon *Alvarado Guevara v. Immigration and Naturalization Service*, 902 F.2d 394 (5th Cir. 1990) (holding that the FLSA does not apply to immigration detainee work programs). This holding is consistent with both Washington State case law and the balance of federal case law, and therefore provides helpful guidance. *See Matherly SS v. Andrews*, 859 F.3d 264, 278 (4th Cir. 2017) (holding that civil detainee was not an "employee" under the FLSA); *Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (holding that the FLSA does not apply to a civil detainee committed as a sexually violent person under Wisconsin law); *Menocal v. GEO Grp., Inc.*, 113 F. Supp. 3d 1125, 1129 (D. Colo. 2015) ("because immigration detainees, like prisoners, do not use their wages to provide for themselves, the purposes of the CMWO are not served by including them in the definition of employee"); *Martin v. Benson*, 827 F. Supp. 2d 1022, 1027 (D. Minn. 2011) (applying the economic realities test to conclude a civilly detained individual was not an employee because plaintiffs participation in a "vocational work program has few of the indicia of traditional, free market employment"); *Shaw v. Briody*, No. 2:02CV500FTM–33SPC, 2005 WL 2291711, at *3 (M.D.Fla. Sept. 20, 2005) (civilly detained individual was not an employee under the economic reality test); *Miller v. Dukakis*, 961 F.2d 7, 9 (1st Cir. 1992) (holding that the FLSA does not apply to a civil detainee committed as a sexually dangerous person under Massachusetts law); *cf. Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994) ("So long as the economic reality of the employment relationship suggests that the prisoner's labor essentially belongs to the prison, the FLSA is inapplicable.").

//

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 17

51277561;7

AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

1

### A.  The Fundamental Purpose of the VWP is Not Employment.

2     At issue in this case is Plaintiffs' participation in the VWP at the NWIPC. The VWP is a

3 program that exists for the purpose of reducing the "negative impact of confinement" by

4 decreasing idleness, improving morale, and reducing disciplinary incidents. PBNDS § 5.8; Ex.

5 A, Dec. of Johnson ¶¶ 11, 12, 23-23. The VWP unquestionably serves this purpose. Ex. I,

6 Johnson 33:19 ("[T]hey enjoy the work there."); Ex. M, Jaramillo 25:16-20 ("[Detainees would]

7 tell me, [y]ou know, I don't come to work for a dollar . . . . You can give that to somebody else I

8 want to get out of my room."). Detainees who choose to participate appreciate the chance to stay

9 busy and feel productive. *See e.g.,* Ex. O, Aguirre-Urbina 137:19-24; *see also* Section II.3 *supra*.

10 In contrast, the purpose of the WMWA is to "protect[] against the evils and dangers resulting

11 from wages too low to buy the bare necessities of life and from long hours of work injurious to

12 health." *Anfinson*, 174 Wash. 2d at 870; *see also* RCW § 49.46.005(2) (stating that the purpose

13 of the WMWA is to "establish and enforce modern fair labor standards"); RCW § 49.46.020

14 (stating the purpose of the minimum wage is to "maintain employee purchasing power"); RCW §

15 49.12.020 (the purpose of a minimum wage is to provide workers with wages "which are []

16 adequate for their maintenance."). The VWP does not serve this purpose. Detainees are not

17 dependent upon the VWP to "buy the bare necessities." Instead, all detainees are provided with

18 room, board, clothing, and medical care free of charge. Ex. C, Dec. of Scott ¶ 9. Whether a

19 detainee voluntarily participates in the VWP to occupy what may otherwise be idle time has no

20 bearing on his or her access to basic necessities. And, the VWP does not present the threat of

21 "long hours of work injurious to health." Thus, the purposes of the VWP and the characteristics

22 of the VWP are not consistent with those of employment.[9]

23

24

25

26

27

---

[9] It is worth noting the incredible number of complexities that would arise if detainees are classified as "employees," despite the fundamental nature of their relationship with GEO. GEO's detention officers would serve as both managers to detainees while also serving as officers who monitor detainee safety—it would be nearly impossible to determine which hat a detention officer was wearing at any given time. Could a detention officer be accused of creating a hostile work environment if he implemented a mandatory lockdown? If detainees are "employees" they are likely also covered by a myriad of other employment statutes. Would detainees be able to claim that the detention officers were comparators for discrimination claims? Would the fact that detention officers have different

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 18

51277561;7

**AKERMAN LLP**

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

Indeed, if detainees are employees under the WMWA, it would follow that they are entitled the right to paid sick leave to "care for the health of themselves and their families," as explicitly intended by the legislature. § 49.46.005 (2). Yet, detainees who fall ill in the NWIPC are instead cared for by the facility. They are provided meals and medical care while ill, and they do not risk losing their housing, access to food, or access to medical care by skipping work. Ex. C, Dec. of Scott ¶ 9. Further, unlike employees, detainees can always return to their VWP positions, even if they demonstrate a pattern of absenteeism. Ex. J, Heye 99:20-25, 100:1-11; Ex. D, Delacruz 98:6-9. Thus, the VWP is not consistent with the fundamental purpose of the WMWA and weighs strongly against a finding that detainees are employees thereunder.

## B.  Detainees' Participation in the VWP is Not Permanent.

Another indication that the VWP is not characteristic of employment is the ephemeral nature of detainees' participation in the program. Because the program is voluntary, there is no guarantee that a detainee will volunteer for the same program more than once. Ex. D, Delacruz 98:6-9 ("I don't fire them. A lot of times they just don't show up for work, and they voluntarily – they voluntarily don't want to work. They voluntarily don't want to work."). Instead, a detainee may choose to volunteer for a position and then quickly change his or her mind, without any forewarning or consequence. Ex. V, Dec. of Noe ¶ 6,7 (describing leaving numerous positions, one after only 15 days, because he wanted a different position). Further, there is no set period of time that any detainee will be housed at the NWIPC, rather detainees are routinely released from the facility because they make bond or receive a deportation order. Ex. D, Delacruz 68:18-25 ("[P]eople always are coming in and leaving, so it's -- it's not a permanent – permanent location or -- like it's not really -- it's not a permanent time line because they also are leaving, either being deported or -- or being let -- let free because of bond, or whatever the case may be, medical, or

privileges and responsibilities form the basis of a discrimination claim? Would GEO be subject to claims of gender-based discrimination by complying with ICE protocols and ensuring male and female detainees never work together? Would detainees be eligible for paid time off? What about paid sick leave? As these rhetorical questions demonstrate, detainees' relationship with GEO was never intended to be, and is not, one of employer and employee, but instead is merely a custodial relationship. The mere fact that detainees are provided with a productive way to occupy their time while detained does not change this basic fact.

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 19

51277561;7

AKERMAN LLP

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

1  whatever the case may be, that people always are moving around, they're always leaving, coming

2  and going.). Therefore, the program is anything but permanent, weighing against a finding that the

3  VWP relationship is one of employment.

4  ### C.  Detainees' Participation in the VWP is Not Controlled by GEO.

5       Plaintiffs also argue that detainee VWP participants should be considered employees

6  because GEO, as the operator of the detention center, has the authority to exercise a high level of

7  control over detainees. This argument generalizes the relationship between detainees and GEO as

8  it relates to their confinement status and improperly conflates that relationship with the control

9  exercised over participants in the VWP. In doing so, Plaintiffs ignore the realities of the VWP,

10  which is completely *voluntary*. Ex. D, Delacruz 70:8-10; PBNDS § 5.8.

11       For example, Plaintiffs note that the detainees are required to wear uniforms supplied by

12  GEO. This is not an indicia of employment but rather a characteristic of the detention itself.

13  Every individual within the NWIPC is provided clothing, regardless of whether he or she

14  participates in the VWP. Ex. C, Dec. of Scott ¶ 9. Likewise, Plaintiffs argue that GEO "approves

15  shift locations and length." But, this too is simply incident to confinement as GEO must track

16  where detainees are in the facility at all times—regardless of their participation in the VWP. Ex.

17  D, Delacruz 108:13-14.

18       When it comes to the types of control that would indicate an employment relationship—

19  the VWP lacks those qualities. GEO has no degree of control over who is detained at the

20  NWIPC, and thus, no control over the potential volunteers. Furthermore, GEO cannot control

21  who volunteers for the VWP. Ex. D, Delacruz 89:18-21 ("[I]f they volunteer . . . then that's fine.

22  If they don't, then -- then it falls on us."); Ex. D, Delacruz 70:8-10, 100:10; Ex. V, Dec. of Noe ¶

23  6; Ex. J, Heye 99:20-25, 100:1-11. Nor can it control what tasks volunteers choose to perform.

24  Ex. U, Menza 53:11-14. GEO has no control over the duration for which a detainee will choose to

25  volunteer, be it a day or a week. Ex. J, Heye 99:20-25, 100:1-11. As such, detainees are free to not

26  attend their shifts at any time. *Id.* Detainees are free to set their own schedule. Ex. V, Dec. of Noe

27  ¶ 6; Ex. D, Delacruz 100:17-18. And, detainees are not reviewed for their performance. Ex. D,

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 20

51277561;7

AKERMAN LLP

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

1  Delacruz 111:11-12; Ex. H, Singleton 92:24-25. Correspondingly, GEO cannot deny a detainee a

2  position where the detainee has poor performance. Ex. I, Johnson 44:10-24. Nor can GEO select

3  certain detainees for certain positions based upon their skill. Ex. U, Menza 69:7-24, 96:14-18. As

4  GEO cannot control any of the aspects of detainees' participation in the VWP that an employer

5  typically dictates, including schedule, performance metrics, and skill requirements, GEO lacks

6  any control that would indicate an employment relationship exists between detainees and GEO.

7  Thus, this factor weighs against a finding that detainees are employees.

8          **D. The Tasks Completed by Detainees are Not an Integral Part of GEO's**
           **Business.**

9

10         Detainees do not perform work that is required for the operation of the facility. To list a

11  few examples, detainees do not cook full meals, they do not ensure the safety of all other

12  detainees, and they do not ensure that the facility is maintained in a sanitary condition in

13  compliance with national standards. Ex. E, Tracy 20:7-9; Ex. J, Heye 89:21; Ex. D, Delacruz

14  45:4-16. Instead, GEO is tasked by ICE and the PBNDS to create productive opportunities, in the

15  form of tasks, that allow the detainees to volunteer for the program.  As such, they perform small

16  tasks that help GEO staff perform their duties and keep the facility operational. *See supra*

17  Section II.1. In many of these small tasks, like assisting with gathering the trash, detainees are

18  supervised by individuals who would otherwise be able to complete the same tasks or dedicate

19  their time to monitoring the safety of the facility. Ex. O, Aguirre-Urbina 121:1-25, 170:1-9; Ex. I,

20  Johnson 29:23. Moreover, there is no indication that without detainees, GEO would be unable to

21  continue operating. Ex. K, McHatton 143:14-19; Ex. D, Delacruz 32:18-19; Ex. L, Henderson

22  50:13-25. Accordingly, their participation is, at best, redundant and cannot be fairly described as

23  an integral or important part of the NWIPC. Thus, this factor weighs in favor of a finding that

24  detainees are not employees.

25         The factors discussed above make clear that detainees who participate in the VWP are not

26  employees under the economic-dependence test. Thus, this Court should deny Plaintiffs' Motion

27  and enter a declaratory judgment that detainees at the NWIPC, who participate in the VWP, are

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 21

51277561;7

AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

1    not employees under the WMWA.

2    **V.        Unjust Enrichment Counterclaim and Affirmative Defense for Offset.**

3            Plaintiffs also argue that this Court should grant summary judgment in its favor as to

4    GEO's offset and affirmative defense based upon detainees' receipt of the benefit of room,

5    board, clothing, and medical care at no cost. As this issue requires many factual determinations,

6    the Court should not grant summary judgment.

7            This Court previously identified the necessary inquiry for GEO's unjust enrichment

8    counterclaim. ECF 40 at 4. The Court explained that GEO's counterclaim was not subject to

9    dismissal because "[t]he first element is satisfied by the allegation that Defendant conferred on

10   Plaintiff the benefit of food, lodging, and other necessities and amenities. The second element is

11   satisfied under the theory that if Plaintiff receives an award for lost wages from Defendant,

12   Plaintiff has received both the benefit conferred and the award for lost wages, both at

13   Defendant's expense. The third element is satisfied under the theory that such compensation

14   would unfairly increase Defendant's burden to comply with ICE contract obligations." *Id.* The

15   Court further explained that this argument "is an equitable argument better reached at trial." ECF

16   40 at 5.

17           This same reasoning rings true at this stage in the litigation. It is undisputed that detainees

18   received a benefit, which included food, lodging, medical care, and other necessities and

19   amenities. ECF 221 at 20 (conceding that "GEO has provided the Class Members and other

20   detainees with a benefit . . ."). At the time they received that benefit, detainees understood that

21   the rate they would be paid for participating in the VWP was $1 per day. Ex. O, Aguirre-Urbina

22   163:17. If this Court were to increase that benefit to include a payment for minimum wage,

23   where the VWP and the costs of operating the NWIPC were negotiated based upon the premise

24   that detainees would receive $1, it would be unjust for detainees to retain the minimum wage

25   payment without an offset for their lodging, food, and other benefits received. This would result

26   in an *inequitable* windfall to detainees who would receive the minimum wage while also

27   avoiding all expenses related to their day-to-day necessities. This inequity would be at GEO's

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 22

51277561;7

**AKERMAN LLP**

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

expense, as it would impose a new economic consideration in the contract which it did not have the opportunity to account for in its negotiations regarding contract pricing with ICE. This is particularly true where, as of 2014, GEO was operating in conformance with L&I's express opinion that the MWA did not apply to the VWP. It would be inherently inequitable to force GEO to retroactively pay more than it was contracted to pay, and more than it legally was obligated to pay, without offset for the costs.

As for GEO's affirmative defense, whether Plaintiffs will receive an award for lost wages remains to be seen. If Plaintiffs receive an award which does not account for the additional compensation that GEO provides detainees, through medical care, rent, food, and clothing—Plaintiffs would be unjustly enriched because if, at the outset, GEO had been able to negotiate their pay with ICE based upon an assumption that the WMWA applied, it would have negotiated an offset of those costs either with the government or in their agreements with detainees themselves.

Indeed, offsets for room and board are appropriate when calculating minimum compensation rates. *Evans v. Hartmann*, 5 Wn.2d 434, 105 P. 2d 717 (1940); 29 U.S.C.A. § 203(m); *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 105 S. Ct. 1953 (1985); *Walling v. Alaska Pac. Consol. Min. Co.*, 152 F.2d 812 (9th Cir. 1945); *Roces v. Reno Housing Authority*, 300 F.Supp. 3d 1172 (D. Nev. 2018); *Soler v. G. & U., Inc.*, 833 F.2d 1104 (2nd Cir. 1987). The appropriate offset for a live-in employee is the cost of providing the room and board. *Chavez v. Arancedo*, not reported, 2018 WL 4610567 (S.D. Fl. Sept. 24, 2018). In *Roces*, employees of a municipal housing authority were provided free housing only, but other wages, for their work as "live-ins" at apartment complexes. *Roces*, 300 F.Supp. 3d at 1886. The court found the Housing Authority could satisfy the <u>state</u> minimum wage requirement by offsetting the reasonable costs of the lodging provided. *Id.* at 1888. Similarly, in *Soler*, even substandard housing provided for migrant workers could be offset against wage calculations. *Soler*, 833 F.2d at 1111. And, in *Balbed*, the Fourth Circuit permitted offsets for the costs of lodging and other in-kind benefits afforded an innkeeper who worked for the owners of a bed

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 23

AKERMAN LLP

1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

51277561;7

and breakfast. *Balbed v. Eden Park Guest House, LLC*, 881 F.3d 285 (4th Cir. 2018). The same rationale is applicable here.

Accordingly, GEO's counterclaims and affirmative defenses involve the resolution of a number of factual considerations making their resolution inappropriate for summary judgment.

## VI.        CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment and enter an order declaring that the WMWA is inapplicable to detainees at the NWIPC.

Respectfully submitted, this 27th day of March, 2020.

By: *s/ Colin L. Barnacle*
**AKERMAN LLP**
Colin L. Barnacle (Admitted *pro hac vice*)
Christopher J. Eby (Admitted *pro hac vice*)
Ashley E. Calhoun (Admitted *pro hac vice*)
Adrienne Scheffey (Admitted *pro hac vice*)
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: christopher.eby@akerman.com
Email: ashley.calhoun@akerman.com
Email: adrienne.scheffey@akerman.com

By: *s/ Joan K. Mell*
**III BRANCHES LAW, PLLC**
Joan K. Mell, WSBA #21319
1019 Regents Boulevard, Suite 204
Fircrest, Washington 98466
Telephone: (253) 566-2510
Facsimile:   (281) 664-4643
Email: joan@3brancheslaw.com

*Attorneys for Defendant The GEO Group, Inc.*

THE GEO GROUP, INC.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT
(3:17-CV-05769-RJB) – PAGE 24

51277561;7

**AKERMAN LLP**
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

1

## PROOF OF SERVICE

2      I hereby certify on the 27th day of March, 2020, pursuant to Federal Rule of Civil

3  Procedure 5(b), I electronically filed and served the foregoing **THE GEO GROUP, INC.'S**

4  **OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** via the

5  Court's CM/ECF system on the following:

6  **SCHROETER GOLDMARK & BENDER**
Adam J. Berger, WSBA #20714
7  Lindsay L. Halm, WSBA #37141
Jamal N. Whitehead, WSBA #39818
8  Rebecca J. Roe, WSBA #7560
810 Third Avenue, Suite 500
9  Seattle, Washington 98104
Telephone: (206) 622-8000
10  Facsimile: (206) 682-2305
Email: hberger@sgb-law.com
11  Email: halm@sgb-law.com
Email: whitehead@sgb-law.com
12  Email: roe@sgb-law.com

13  **THE LAW OFFICE OF R. ANDREW FREE**
Andrew Free (Admitted *Pro Hac Vice*)
14  P.O. Box 90568
Nashville, Tennessee 37209
15  Telephone: (844) 321-3221
Facsimile: (615) 829-8959
16  Email: andrew@immigrantcivilrights.com

17  **OPEN SKY LAW PLLC**
Devin T. Theriot-Orr, WSBA #33995
18  20415 72nd Avenue S, Suite 100
Kent, Washington 98032
19  Telephone: (206) 962-5052
Facsimile: (206) 681-9663
20  Email: devin@openskylaw.com

21  **MENTER IMMIGRATION LAW, PLLC**
Meena Menter, WSBA #31870
22  8201 164th Avenue NE, Suite 200
Redmond, Washington 98052
23  Telephone: (206) 419-7332
Email: meena@meenamenter.com

24
*Attorneys for Plaintiffs*
25

26                    *s/ Nick Mangels*
Nick Mangels
27

PROOF OF SERVICE
(3:17-CV-05769-RJB) – PAGE 25

**AKERMAN LLP**
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone: 303-260-7712

51277561;7