# EXHIBIT I

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---

UGOCHUKWU GOODLUCK NWAUZOR,            )
FERNANDO AGUIRRE-URBINA,               )
individually and on behalf of all      )
those similarly situated,              )
                Plaintiffs,            )
        vs.                            ) No. 17-cv-05769-RJB
THE GEO GROUP, INC., a Florida         )
corporation,                           )
                Defendant.             )

---

Videotaped

Deposition Upon Oral Examination of

MARC A. JOHNSON

---

2:05 p.m.

Tuesday, December 3, 2019

1019 Regents Blvd., Suite 204

Fircrest, Washington

REPORTED BY:  Keri A. Aspelund, RPR, CCR No. 2661

```
 1    APPEARANCES:
 2    For the Plaintiffs:    JAMAL N. WHITEHEAD, ESQ.
 3                           Schroeter Goldmark & Bender
 4                           810 Third Avenue, Suite 500
 5                           Seattle, WA  98104
 6                           206-622-8000
 7                           whitehead@sgb-law.com
 8    For the Defendant:     JOAN K. MELL, ESQ.
 9                           III Branches Law
10                           1019 Regents Blvd., Suite 204
11                           Fircrest, WA  98466
12                           253-566-2510
13                           joan@3brancheslaw.com
14    Also Present:          LINDSAY HITCHCOCK, VIDEOGRAPHER
15
16                           LANE POLOZOLA, ESQ.
17                           Assistant Attorney General
18                           800 Fifth Avenue, Suite 2000
19                           Seattle, WA  98104
20                           lane.polozola@atg.wa.gov
21                           206-287-4182
22
23
24
25
```

Page 3

```
 1                    E X H I B I T S
 2   No.     Description                              Page/Line
 3   318     Email dated September 14, 2011, from        75    4
 4           Marc Johnson to Bertha Henderson
 5
 6                  E X A M I N A T I O N
 7   BY                                                Page/Line
 8   MR. WHITEHEAD                                        5   11
 9   MS. MELL                                            80    7
10   MR. WHITEHEAD                                       84    1
11   MS. MELL                                            85    6
12
13
14
15
16
17      (Note:  * Denotes phonetic spelling.)
18
19
20
21
22
23
24
25
```

Page 4

1          Fircrest, Washington; Tuesday, December 3, 2019
2                          2:05 p.m.
3                 ---------------------------
4               THE VIDEOGRAPHER:  We are going on the record at
5     2:05 p.m. on December 3rd, 2019.  This is media unit one,
6     volume one, of the video deposition of Marc Johnson taken
7     by the plaintiff, case number 17-cv-05769-RJB, in the
8     matter of Nwauzor, et al., vs. GEO Group, filed in the U.S.
9     District Court, Western District of Washington, at Tacoma.
10    This deposition is taking place at 1019 Regents Boulevard,
11    Suite 204, in Tacoma, Washington.
12              The videographer is Lindsay Hitchcock for
13    Seattle Deposition Reporters, 600 University Street,
14    Seattle, Washington 98101.  The court reporter is Keri
15    Aspelund for Seattle Deposition Reporters.
16              Counsel, at this time, please identify
17    yourselves for the record and the witness may be sworn in.
18              MR. WHITEHEAD:  Good afternoon.  Jamal Whitehead
19    on behalf of the certified class represented by Mr.
20    Nwauzor.
21              MS. MELL:  Oh, Joan Mell -- I'm sorry, I have to
22    stop this.
23              Joan Mell on behalf of GEO.
24              MR. POLOZOLA:  Lane Polozola, I'm counsel for
25    Washington in the consolidated Washington vs. GEO Group

```
 1    case.
 2              MS. MELL:  And again, you're here for the same
 3    reasons as expressed previously in the prior deposition?
 4              MR. POLOZOLA:  As expressed previously, I'm here
 5    because the cases have been consolidated and the court
 6    ordered parties in all cases to be present or participate,
 7    if they wish, so I'm here to witness the deposition.
 8                   --------------------------
 9    MARC A. JOHNSON:      Witness herein, having been
10                          duly sworn, testified as follows:
11                   E-X-A-M-I-N-A-T-I-O-N
12    BY MR. WHITEHEAD:
13         Q.   Good afternoon, Mr. Johnson.
14         A.   Good afternoon.
15         Q.   I introduced myself moments ago off the record,
16    but I will do so again for benefit of the record.
17         A.   Okay.
18         Q.   My name is Jamal Whitehead, and I am one of the
19    attorneys representing Mr. Nwauzor and Mr. Aguirre-Urbina
20    in their action against The GEO Group.
21              Sir, could you state and spell your full name
22    for the record.
23         A.   Sure, it's Marc Andrew Johnson, M-A-R-C
24    A-N-D-R-E-W, I don't spell my middle name a lot, and then
25    Johnson, J-O-H-N-S-O-N.
```

```
 1        Q.    In what way?
 2              MS. MELL:  Object to the form of the question.
 3        A.    If -- it would -- it would get done regardless
 4   if the detainees did it or not.  It's not a mandatory
 5   thing.
 6        Q.    But certainly the work they do helps out?
 7              MS. MELL:  Object to the form of the question.
 8        A.    Yes.
 9        Q.    Now, as a detention officer, do you believe that
10   part of your job is directing the work and providing
11   training and supervision of the detainee workers in the
12   Voluntary Work Program?
13              MS. MELL:  Object to the form.
14        A.    Yes, it's a collateral job.
15        Q.    When you say collateral, what do you mean?
16        A.    As a detention officer, we're doing multiple
17   things at once, you know.  The main focus is safety and
18   security, but a part of that is, you know, making sure that
19   order is maintained and cleanliness is maintained in the
20   units and other areas wherever you're assigned, so yes.
21        Q.    All right.  Well, let's take a look at
22   Exhibit-313.  Now, at the top there, this appears to be an
23   excerpt from GEO's Policy and Procedure Manual.  This is
24   the Chapter: Detainee Services and Program, Title:
25   Voluntary Work Program.
```

 1      A.    With regards to cleaning, I mean, it just
 2   depends on if I'm assigned that task.
 3            As a shift supervisor, you're in charge -- or a
 4   lieutenant, you're in charge of the whole building.  So,
 5   you know, periodically I'll check in, but I can't focus my
 6   whole time on that one thing.  And then having -- as an
 7   officer, you know, I've been assigned to a detail, hey,
 8   we're doing this detail, so that was my -- my -- one of my
 9   main focuses.
10            As the pod officer, same thing, you know, I'm --
11   I'm in charge of the security and the safety of everyone,
12   but it's that collateral duty to make sure we get the
13   meals, everyone gets a meal, we clean up after the meals.
14      Q.    Tell me about the details that you've been
15   assigned with respect to the Voluntary Work Program.
16      A.    Like it's mainly just there's a trash pickup at
17   night -- I've primarily worked graveyard shift for my ten
18   years.  I did work swing shift, but for the most part, I've
19   been on graveyard.
20            On graveyard they do a trash pickup at night.
21   The units place the trash in trash bags outside the unit,
22   and then detainees go around and pick it up and collect it
23   by the loading dock.  So we've supervised the movement.
24   Sometimes they have to take an elevator, which you have to
25   ride escorted.

```
 1        Q.   Now, with respect to the painting, is GEO
 2   training the detainee workers on proper painting technique?
 3        A.   Yeah, similar to the other jobs.
 4        Q.   What about the -- the buffing, waxing, and
 5   stripping of the floors, how long does that typically take?
 6        A.   It can take -- again, it varies.  It can take
 7   two hours to, you know, four or five hours.
 8        Q.   And it just depends on how much, you know,
 9   buffing, waxing, and stripping, you know, how much ground
10   essentially they've got to cover?
11             MS. MELL:  Object to the form.
12        A.   Yes.
13        Q.   And they, of course, being the detainee workers?
14        A.   Yes.
15             I've also seen it where the detainees, you know,
16   they -- they're motivated to -- to do more, you know, or go
17   longer than one would reasonably expect to complete it.
18        Q.   And what do you take from that?
19        A.   That they enjoy the work there, they're
20   motivated, and you know, it's kind of self-driven.
21        Q.   Do these workers that are self-driven and do a
22   good job, do they make more money?
23        A.   No.
24        Q.   Is there an opportunity for them to make more
25   money as, you know, stellar performers?
```

1  categories?
2      A.   ICE is the overall authority.  So they mandate
3  how the program functions, and approve any program updates,
4  and they also manage or authorize, you know, job hiring.
5  Sometimes there's worker disputes, like if someone gets
6  fired, you know, they can appeal to ICE, and ICE will say
7  this person gets to work again or -- or not.
8      Q.   All right, well maybe we'll take it one at a
9  time then for each of the categories here.
10          So kitchen worker, can you tell me about the
11 ways of which you're aware that ICE provides direction or
12 supervision to kitchen detainee workers?
13     A.   I mean, like I said, ICE mandates how many
14 kitchen workers, I believe, work each shift, the maximum
15 number, and then ICE, in coordination with the medical
16 department, they have to be authorized by medical to work
17 in the kitchen.
18     Q.   What makes you believe that ICE mandates the
19 number of kitchen workers?
20     A.   I believe that's something I was told before.
21     Q.   Who?  Who told you that?
22     A.   I believe it was someone in classification
23 during our annual refresher training, I was told ICE
24 mandates all the jobs.  There's only a fixed amount of
25 jobs.

Page 43

```
 1            MS. MELL:  Again, object to the form.
 2       A.   I mean, they're, you know -- it's -- it's -- ICE
 3   is -- ICE is the client.  They -- they say what goes.  So,
 4   you know, I've seen detainees appeal to ICE to have stuff
 5   changed, and they've done that, or ICE has mandated
 6   changes, you know.
 7       Q.   Do you believe though that GEO handles more of
 8   the day-to-day hands-on work of the facility?
 9            MS. MELL:  Object to the form of the question.
10       A.   I mean, yeah.
11       Q.   And that includes the direction and supervision
12   of the detainees and the detainee workers --
13            MS. MELL:  Object --
14       Q.   -- correct?
15            MS. MELL:  Object to the form of the question.
16       A.   According to the PBNDS.
17       Q.   That's GEO's role, to do the hands-on work of
18   managing the detainees, including the detainee work?
19            MS. MELL:  Object to the form of the question.
20       A.   Yes.
21       Q.   Now, how is it that detainees are assigned to
22   work in the VWP?
23       A.   I don't under -- the BWP?
24       Q.   The VWP?
25       A.   Oh, sorry, the Voluntary Work Program?
```

```
 1               It's in the detainee handbook.  I believe it's
 2    in the ICE national detainee handbook, and they're apprised
 3    in the orientation videos as well that there are job
 4    opportunities, and they can send a kite or a detainee
 5    request to be placed on a waiting list for a job.  And I'm
 6    sure living in the units, you know, they -- they make
 7    acquaintances with people that are workers -- excuse me --
 8    or you know, they see people working and -- and want to do
 9    that, that job.
10          Q.   If a detainee has attitude or behavioral issues,
11    does GEO have the discretion not to hire that detainee into
12    the -- the Voluntary Work Program?
13               MS. MELL:  Object to the form.
14          A.   No.
15               I mean, if they have demonstrated behavior
16    issues like, you know, misconduct stuff, they will be
17    reclassed into a higher class, and that limits their
18    opportunities, but if -- if -- if you're looking for like a
19    characterization of overall, hey, that person's kind of a
20    jerk, we -- we don't not hire them because of that.
21          Q.   Do you know whether or not you have the ability
22    or authority to pass on a worker for those reasons?
23               MS. MELL:  Object to the form.
24          A.   No, we don't.  We can't pass.
25               MS. MELL:  Counsel, I'm just going to need a
```

Page 48

```
 1                MS. MELL:  Object to the form.
 2           A.   Well, it lists the -- the certain things, but it
 3      says they impact not that they will affect, they just
 4      impact it.
 5           Q.   And do you see a distinction between impact
 6      versus affect?
 7           A.   Yes.
 8           Q.   Tell me, what is that distinction?
 9           A.   If it had an effect, I would interpret that to
10      be we could pick and choose who we wanted, whereas this
11      just says it will have an impact.
12                From what I understand, the worker -- once you
13      submit a request to be a worker, you go on a waiting list,
14      and GEO can't jump around on the list; it's first in, first
15      out, so to speak.
16           Q.   Now, there's a black bar towards the end, and I
17      redacted out someone's name there, but if you look above
18      that black bar, the last sentence of that paragraph, right
19      above it, it reads, "We thank you for your important
20      contribution to maintaining this facility."
21                Did I read that correctly?
22           A.   Yes.
23           Q.   Do you believe that the detainee workers make an
24      important contribution to maintaining the Northwest
25      Detention Center?
```

```
 1          Q.    Excessive absenteeism?
 2          A.    Yes.
 3          Q.    Misconduct and horseplay?
 4          A.    Yes.
 5          Q.    Theft?
 6          A.    Yes.
 7          Q.    Unsatisfactory work performance?
 8          A.    Yes.
 9          Q.    Now, in each of those instances, would it be GEO
10    that initiates the termination or disciplinary proceedings
11    against the detainee worker?
12          A.    It depends.
13          Q.    What does it depend on?
14          A.    I mean, the reason.
15          Q.    Well, my question drives more at who the actor
16    is that would initiate the proceedings; is it GEO or
17    someone else?
18          A.    A majority of the time it would be GEO.
19          Q.    And if not GEO, who?
20          A.    It could be ICE.
21          Q.    And if I remember from earlier, you said that
22    you cannot think of a time in which ICE initiated
23    termination or discipline against a Voluntary Work Program
24    participant; did I get that right?
25          A.    Not specifically, no.
```

```
 1         A.   Just a -- a sup -- I believe it's any
 2   supervisor, sergeant or lieutenant, or it may just be a
 3   lieutenant.
 4         Q.   So what's the difference between IDP and UDC?
 5         A.   The UDC is like a lower level infraction, an IDP
 6   is for a more serious infraction.
 7         Q.   Can you give me an example of a more serious
 8   infraction that would go to IDP?
 9         A.   So for fighting, two people fighting would go to
10   an IDP, whereas like a simple theft would just be a UDC.
11         Q.   What about poor performance in the Voluntary
12   Work Program, would that be UDC or IDP?
13         A.   You don't get written up for a poor performance.
14         Q.   Now, the UDC determinations, to your knowledge,
15   do those go to ICE at any point?
16         A.   I don't believe they do.  They go in your
17   detainee file.
18         Q.   And the IDP proceedings, ICE is a part of it?
19         A.   Correct.
20         Q.   As a detention officer, do you take attendance
21   for the detainee workers that are under your -- your
22   charge?
23         A.   Yeah, I would verify when they're supposed to
24   work and did they complete the work satisfactorily.
25         Q.   And that's -- is that back to the worker pay
```

                                                              Page 88

 1
                      C-E-R-T-I-F-I-C-A-T-E
 2

 3      STATE OF WASHINGTON )

 4                          ) ss.

 5      COUNTY OF THURSTON  )

 6

                I, the undersigned Registered Professional
 7      Reporter and Certified Court Reporter, hereby
        certify that the foregoing deposition upon oral
 8      examination was taken stenographically before me and
        transcribed under my direction;

 9

10              That the witness was duly sworn by me,
        pursuant to RCW 5.28.010, to testify truthfully; that the
11      transcript of the deposition is a full, true, and correct
        transcript to the best of my ability; that I am neither
12      attorney for, nor a relative or employee of, any of the
        parties to the action or any attorney or counsel employed
13      by the parties hereto, nor financially interested in its
        outcome.
14

15              I further certify that in accordance with CR
        30(e), the witness was given the opportunity to examine,
16      read, and sign the deposition, within 30 days, upon its
        completion and submission, unless waiver of signature was
17      indicated in the record.

18
                IN WITNESS WHEREOF, I have hereunto set
19      my hand this 10th day of December, 2019.

20

21

22
                    _____
23
                    NCRA Registered Professional Reporter
24                  Washington Certified Court Reporter No. 2661

25