The Honorable Robert J. Bryan

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9   UGOCHUKWU GOODLUCK
    NWAUZOR, FERNANDO AGUIRRE-
    URBINA, individually and on behalf of all
10  those similarly situated,

11                                    Plaintiffs,

12         v.

13  THE GEO GROUP, INC., a Florida
    corporation,

14                                    Defendant.

No. 17-cv-05769-RJB

DEPOSITION DESIGNATIONS
OF MICHAEL HEYE

15

16         Plaintiffs present (1) Plaintiffs' designations of the Deposition of Michael Heye, and

17  (2) Defendant's counter-designations and objections. The designated pages are attached, with

18  Plaintiffs' designations highlighted in yellow and Defendant's counter-designations

19  highlighted in green.

20         DATED this 24th day of April, 2020.

21                                    SCHROETER GOLDMARK & BENDER

22                                    *s/ Jamal N. Whitehead*
                                      Adam J. Berger, WSBA #20714
23                                    Lindsay L. Halm, WSBA #37141
                                      Jamal N. Whitehead, WSBA #39818

24

DEPOSITION DESIGNATIONS OF
MICHAEL HEYE (17-cv-05769-RJB) - 1

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

810 Third Avenue, Suite 500
Seattle, WA 98104
Tel: (206) 622-8000 ~ Fax: (206) 682-2305
berger@sgb-law.com
halm@sgb-law.com
whitehead@sgb-law.com

THE LAW OFFICE OF R. ANDREW FREE
Andrew Free (*Pro Hac Vice*)
P.O. Box 90568
Nashville, TN 37209
Tel: (844) 321-3221 ~ Fax: (615) 829-8959
andrew@immigrantcivilrights.com

OPEN SKY LAW, PLLC
Devin T. Theriot-Orr, WSBA # 33995
20415 – 72nd Avenue S, Suite 110
Kent, WA 98032
Tel: (206) 962-5052
devin@opensky.law

MENTER IMMIGRATION LAW, PLLC
Meena Menter, WSBA #31870
8201 164th Ave NE, Suite 200
Redmond, WA 98052
Tel: (206) 419-7332
meena@meenamenter.com

*Class Counsel*

DEPOSITION DESIGNATIONS OF
MICHAEL HEYE (17-cv-05769-RJB) - 2

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Devin T. Theriot-Orr
OPEN SKY LAW, PLLC
20415 – 72nd Avenue South, Suite 110
Kent, WA 98032
devin@opensky.law
*Attorney for Plaintiff*

R. Andrew Free
THE LAW OFFICE OF R. ANDREW FREE
PO Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com
*Attorney for Plaintiff*

Meena Menter
MENTER IMMIGRATION LAW PLLC
8201 – 164th Avenue NE, Suite 200
Redmond, WA 98052
meena@meenamenter.com
*Attorney for Plaintiff*

Joan K. Mell
III BRANCHES LAW, PLLC
1019 Regents Boulevard, Suite 204
Fircrest, WA 98466
joan@3ebrancheslaw.com
*Attorney for Defendant*

Colin L. Barnacle
Ashley E. Calhoun
Christopher J. Eby
Adrienne Scheffey
AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
colin.barnacle@akerman.com
ashley.calhoun@akerman.com
christopher.eby@akerman.com
adrienne.scheffey@akerman.com
*Attorneys for Defendant*

DATED at Seattle, Washington this 24th day of April, 2020.

*s/ Virginia Mendoza*
_____
VIRGINIA MENDOZA, Legal Assistant
Schroeter Goldmark & Bender
810 Third Avenue, Suite 500
Seattle, WA  98104
Tel: (206) 622-8000
mendoza@sgb-law.com

DEPOSITION DESIGNATIONS OF
MICHAEL HEYE (17-cv-05769-RJB) - 3

SCHROETER  GOLDMARK  &  BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

Michael Heye                          December 4, 2019

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

Plaintiff's Deposition Designations

------------------------------------------------------------

UGOCHUKWU GOODLUCK NWAUZOR,            )

FERNANDO AGUIRRE-URBINA,               )

individually and on behalf of all     )

those similarly situated,             )

          Plaintiffs,                 )

      vs.                             ) No. 17-cv-05769-RJB

THE GEO GROUP, INC., a Florida        )

corporation,                          )

          Defendant.                  )

------------------------------------------------------------

** Transcript Contains Portions Designated Confidential **

          ** See Index on Page 4 **

------------------------------------------------------------

Videotaped Deposition Upon Oral Examination of

                MICHAEL T. HEYE

------------------------------------------------------------

                10:04 a.m.

          Wednesday, December 4, 2019

          810 Third Avenue, Suite 500

                Seattle, Washington

REPORTED BY:  Keri A. Aspelund, RPR, CCR No. 2661

Michael Heye                                December 4, 2019

Page 2

```
 1    APPEARANCES:

 2    For the Plaintiffs:  JAMAL N. WHITEHEAD, ESQ.

 3                         Schroeter Goldmark & Bender

 4                         810 Third Avenue, Suite 500

 5                         Seattle, WA  98104

 6                         206-622-8000

 7                         whitehead@sgb-law.com

 8    For the Defendant:   JOAN K. MELL, ESQ.

 9                         III Branches Law

10                         1019 Regents Blvd., Suite 204

11                         Fircrest, WA  98466

12                         253-566-2510

13                         joan@3brancheslaw.com

14    Also Present:        LINDSEY LEWIS, VIDEOGRAPHER

15

16                         MARSHA CHIEN, ESQ.

17                         Assistant Attorney General

18                         800 Fifth Avenue, Suite 2000

19                         Seattle, WA  98104

20                         marshac@atg.wa.gov

21                         206-287-4182

22

23                         SYDNEY BAY

24

25
```

Michael Heye                              December 4, 2019

```
                                                    Page 3
 1                     E X H I B I T S
 2    No.    Description                      Page/Line
 3    319    Northwest Detention Center document -     41    2
 4           GEO-Nwauzor 085820-085821
 5    320    Email exchange dated November 5, 2012 -  48    25
 6           GEO Nwauzor 000313-000314
 7    321    Northwest Detention Center Detainee      62    4
 8           Request Form) - GEO-Nwauzor
 9           141925-141926
10    322    Kite - Laundry - #1,818,533 -            63    2
11           GEO-Nwauzor 065649
12    323    Email exchange dated December 25, 2012 - 70    9
13           GEO-Nwauzor 097538
14    324    Department Head Meeting Minutes, March   72    5
15           30, 2016 - GEO-Nwauzor 181325-181326
16    325    Slip Sheet, Created 06/30/2010, Detainee 93    6
17           Worker Average Hours.xls
18    326    Presentation Outline, December 29, 2011, 101   23
19           Detainee Worker Program - GEO-Nwauzor
20           016346-016350
21    327    Worker Program - GEO-Nwauzor 058848      103   20
22    328    Volunteer Work Program for Pod Workers   108   25
23           -GEO-Nwauzor 016427
24
25                              Continued ...
```

Michael Heye                                    December 4, 2019

```
                                                    Page 4
 1    329     Department Head Meeting Minutes, June    109   21
 2            14, 2011 - GEO-Nwauzor 075573-075574
 3    330     Memorandum dated April 12, 2012, from    111   25
 4            Classification, Singleton & Heye to
 5            Associate Warden, McHatton - GEO-Nwauzor
 6            016445
 7    331     Email exchange dated October 31, 2012    114   16
 8    332     GEO-Nwauzor 073752-073761                116   20
 9    333     Email exchange dated August 11, 2015 -   118   19
10            GEO-Nwauzor 176429-176431
11
12                  E X A M I N A T I O N
13    BY                                          Page/Line
14    MR. WHITEHEAD                                  6     8
15    MS. MELL                                      122    1
16
17          C O N F I D E N T I A L   T E S T I M O N Y
18                  Page 7     Lines 3-4
19
20
21      (Note:  * Denotes phonetic spelling.)
22
23
24
25
```

Michael Heye                                    December 4, 2019

Page 5

1        Seattle, Washington; Wednesday, December 4, 2019

2                        10:04 a.m.

3              -------------------------

4            THE VIDEOGRAPHER:  We're now on the record.

5    Today's date is December 4th, 2019.  The time is now 10:04

6    a.m.

7                This is the video recorded deposition of Michael

8    Heye in the matter of Ugochukwu Goodluck Nwauzor, et al.,

9    vs. The GEO Group, Inc., pending in the United States

10   District Court, Western District of Washington, at Tacoma,

11   case number 17-cv-05769-RJB.  This deposition is at the

12   request of the plaintiff.

13               My name is Lindsey Lewis, your videographer,

14   here with Keri Aspelund, your court reporter.  We represent

15   Seattle Deposition Reporters.

16               This deposition is taking place at Schroeter

17   Goldmark & Bender, 810 Third Avenue, Suite 500, Seattle,

18   Washington 98104.

19               Will counsel please identify and state your

20   appearances for the record.

21           MR. WHITEHEAD:  Good morning.  Jamal Whitehead

22   on behalf of the private plaintiffs, the class of Mr.

23   Nwauzor and those that he represents.

24           MS. MELL:  Joan Mell representing the GEO

25   defendants.  Mr. Heye is from the facility.

Michael Heye                                    December 4, 2019

                                                          Page 6

 1             MS. CHIEN:  And this is Marsha Chien, and I

 2   represent the State of Washington in a consolidated case.

 3             THE VIDEOGRAPHER:  Will the court reporter

 4   please administer the oath.

 5             --------------------------

 6   MICHAEL T. HEYE:       Witness herein, having been

 7                          duly sworn, testified as follows:

 8                  E-X-A-M-I-N-A-T-I-O-N

 9   BY MR. WHITEHEAD:

10        Q.   Good morning, Mr. Heye.

11        A.   Hello.

12        Q.   We met a moment ago off the record, but I would

13   like to introduce myself for benefit of the record.  My

14   name's Jamal Whitehead.  I represent Mr. Nwauzor and the

15   class of civil immigration detainees that he represents in

16   a private lawsuit against the GEO corporation.

17             Could you please state and spell your name for

18   the record.

19        A.   It's Michael Heye, M-I-C-H-A-E-L, and last name

20   is Heye, H-E-Y-E.

21        Q.   And your middle name, Mr. Heye?

22        A.   Thomas --

23        Q.   What's --

24        A.   -- T-H-O-M-A-S.

25        Q.   And your date of birth, please.

Michael Heye                                    December 4, 2019

                                                          Page 7

1       A.      █████68.

2       Q.      What's your address, Mr. Heye?

3       A.      ████████████████████████████████████

█   ████████

5               MS. MELL:  Can you please mark that as

6       confidential.

7       Q.      Have you ever given testimony under oath?

8       A.      No.

9       Q.      I see you pausing.

10      A.      I haven't been here -- I haven't done anything

11      like this before, how's that?

12      Q.      All right, very good.

13              Have you done something similar?

14      A.      No.

15      Q.      Well, there isn't too much to it.  I'm sure

16      you've covered the rules with your attorney, but there are

17      three things that I always like to stress at the outset of

18      a deposition.  The first being that this is not practice.

19      What you say now is just as important as if the judge and

20      the jury were in the room --

21      A.      Mm-hm.

22      Q.      -- and ready to make a determination.

23              Do you understand?

24      A.      Okay.

25      Q.      And with the --

Michael Heye                                    December 4, 2019

Page 8

```
 1              MS. MELL:  I'm going to interrupt you real quick

 2      because you're already saying mm-hm before --

 3              THE WITNESS:  Oh.

 4              MS. MELL:  -- he finishes the sentence, so

 5      that's one of the rules.  He can probably talk to you a

 6      little bit about that, but I'm going to remind you to let

 7      him finish.  He's going to be chit-chatting with you.  Let

 8      him finish, let me object, and then you can talk.

 9              THE WITNESS:  Got it.  Sorry.

10       Q.    Yeah, that's right.

11              I mean, like I said, I like to stress three

12      things at the outset, but there are a bunch of rules, and I

13      tend to cover them situationally, and your attorney has

14      raised a very good point.  It's important that you answer

15      my questions with words.  Uh-huhs, head nods, head shakes

16      just don't show up cleanly in the record, so please use

17      words in responding to my questions.

18              Do you understand?

19       A.    Yes.

20       Q.    One of the other things that's important to

21      stress, it's important that we speak one at a time.  I will

22      do my best to let you finish your answer before asking a

23      follow-up question, and I ask that you wait for me to

24      finish my question before beginning your answer.

25              Will you do that for me?
```

Michael Heye

GEO Objections Foundation, FRE 402, 701, 802.

December 4, 2019

Page 9

1       A.    Yes.

2       Q.    And your attorney will object from time to time.

3   Unless she instructs you not to answer, and you heed her

4   advice, the expectation is that you answer my question.

5             Do you understand that?

6       A.    Yes.

7       Q.    All right.  So as I was saying, this is not a

8   practice, and with the benefit of the written transcript

9   and the video that's being created today, the judge and the

10  jury will assess the extent of your cooperation and your

11  truthfulness.

12            Do you understand that?

13      A.    Yes.

14      Q.    Another thing that's important to clear up is

15  that I'm not a mind reader, so if you don't understand a

16  question that I've asked you, will you tell me as much?

17      A.    Yes.

18      Q.    And if there's anything that prevents you from

19  giving a full and accurate answer, will you let me know if

20  there's something that's getting in the way of giving a

21  full response?

22      A.    Yes.

23      Q.    The final thing that I want to stress is that

24  I'm looking for your full cooperation.  I want your best,

25  most accurate, most complete testimony.

GEO Objections Foundation, FRE 402, 701, 802.

Michael Heye                                              December 4, 2019

Page 10

1            Do you understand?

2       A.    Yes.

3       Q.    We've got a bit of a long day in front of us,

4  but I will do my best to work efficiently, and to that end,

5  I will ask many yes or no questions.  If I ask a yes or no

6  question, will you give me a yes or no answer?

7            MS. MELL:  Object to the form.

8       A.    Yes.

9       Q.    And then lastly, sometimes witnesses want to

10  avoid uncomfortable truths, and I see this in the form of

11  evasive answers or answering something other than the

12  question that's asked.

13            Will you avoid giving evasive answers?

14            MS. MELL:  And now object to the form.  That's

15  totally improper.

16            So I think he's just trying to give you advice,

17  you don't really have to answer that.

18            THE WITNESS:  All right.

19            MS. MELL:  It's improper.

20       A.    Don't have to answer.

21       Q.    You're reserving your right to give evasive

22  answers?

23            MS. MELL:  Object to the form.  That's not a

24  proper even introduction.  I don't even know what you're

25  trying to do, but it's improper, and he doesn't have to

Michael Heye                                    December 4, 2019

Page 11

 1    respond to it.

 2         A.   I guess I won't respond.

 3         Q.   Fair enough.

 4              What did you do to prepare for your deposition

 5    today?

 6         A.   I talked with -- sorry.

 7         Q.   Without revealing the conversations that you had

 8    with Counsel, what did you do to prepare for your

 9    deposition today?

10         A.   Nothing.

11         Q.   Did you ride up to my office with your attorney,

12    Ms. Mell?

13              MS. MELL:  Object to the form.  You're not

14    entitled to know all of that stuff.  You have no -- no

15    business asking anything about his relationship to me and

16    the time we spend together.

17         Q.   I'll back up.

18              Is Ms. Mell your attorney?

19         A.   Yes.

20         Q.   Did you ride up to the deposition with Ms. Mell?

21              MS. MELL:  Object to the form.

22              You have a privilege relationship with me for

23    purposes of this deposition.  You don't have to ask

24    privilege -- answer privileged questions.

25              MR. WHITEHEAD:  That question -- and I don't

Michael Heye                                    December 4, 2019

Page 12

1    mean to engage your objection, because frankly, it's

2    baseless, I have not asked for privileged communication,

3    I've simply asked whether or not he rode up to the

4    deposition with you.

5              MS. MELL:  For what purpose?

6              MR. WHITEHEAD:  I don't need to tell you the

7    purpose.

8              MS. MELL:  Well, you --

9              MR. WHITEHEAD.  It's probative of his

10   preparation.

11        Q.   And I'd just like to know, did you ride

12   together?

13             MS. MELL:  You want to know how much time he

14   spent with his attorney, and you're trying get it by asking

15   that question, and it's none of your business, it's

16   privileged.

17             MR. WHITEHEAD:  Are you instructing the witness

18   not to answer.

19             MS. MELL:  I am instructing the witness that he

20   has a privilege, and he may choose to not answer that

21   question based on the privilege.

22             MR. WHITEHEAD:  And are you asserting that I

23   have requested or am inquiring about privileged

24   communications?  No one is questioning the existence of a

25   privileged relationship.  Do you believe that the question,

Michael Heye                                    December 4, 2019

Page 13

1    Did you ride to the deposition with your attorney, calls

2    for a privileged communication?  Because I'd like to

3    clarify that on the record.

4            MS. MELL:  I'm not going to argue the merits or

5    lack of merit of your question.  So I am instructing him

6    that he has the opportunity to not respond to the question

7    that you asked him, and I would object to the form as it's

8    wholly irrelevant and it's wasting time.

9        Q.   Well, Mr. Heye, it's your choice whether or not

10   you're going to heed the advice of your attorney.  I can

11   tell you that based on the pace of the objections, we are

12   in for a long day.

13           This is one of those yes or no questions:  Did

14   you ride to the deposition with your attorney, yes or no?

15           MS. MELL:  Of course I would move to object --

16   or move to strike admonishment.  You need to stop telling

17   my client what to do and what not to do, and I object to

18   the form.

19       A.   I'm not going to answer that question.

20       Q.   How long did you meet with your attorney?

21           MS. MELL:  Same objection.

22       A.   I don't have a time frame for that.

23       Q.   Did you meet with her more than once?

24       A.   I'm not going to answer that question.

25       Q.   You have to, I'm sorry, sir.

Michael Heye                                    December 4, 2019

Page 14

 1              MS. MELL:  You do not.

 2              He does not.  You can't tell him what he has to

 3     do and what he doesn't have to do.  He has the choice.

 4     He's choosing not to answer those kinds of questions.

 5     They're irrelevant, and they're privileged, and it doesn't

 6     have anything to do with anything in this case.

 7         Q.    Well, sir, am I to assume that it was more than

 8     once?  More than three times?

 9         A.    We're not going to answer the question.

10         Q.    Can I assume that you met with your attorney for

11     multiple hours on end to prepare for this deposition?

12         A.    I'm not going to answer the question.

13         Q.    Other than your attorney, who did you speak with

14     to prepare for this deposition?

15         A.    I don't need to answer that question.

16              MR. WHITEHEAD:  Joan, we're going to have to get

17     the judge on the phone because these instructions right now

18     are wholly improper.

19              MS. MELL:  I didn't object to that question.

20              MR. WHITEHEAD:  All right, well then tell your

21     client that he needs to answer this question.  You've

22     set --

23              MS. MELL:  You don't tell me what to do.

24              MR. WHITEHEAD:  You've set the tone at this

25     point that answering my questions is somehow optional, but

Michael Heye                                    December 4, 2019

                                                      Page 15

 1    it's plain under the rule that the only basis on which to

 2    instruct a witness not to answer is to -- in respect of

 3    some protective order, to seek a limiting order, or to

 4    preserve privilege.  So the question of who did you speak

 5    with in no way falls under any of those three buckets.

 6         Q.    All right.  So Mr. Heye, your attorney is not

 7    objecting.  Please tell me, who did you meet with, other

 8    than your attorney, to prepare for this deposition?

 9         A.    I did not meet with anybody else.

10         Q.    Did you speak with Ms. Singleton?

11         A.    I did not speak with anyone else.

12         Q.    Are you aware that Ms. Singleton was deposed in

13    this case?

14         A.    I am aware that last year she did a deposition,

15    yes.

16         Q.    At any point have you talked to Ms. Singleton

17    about her deposition and the testimony that she gave?

18         A.    I did not.

19               MS. MELL:  Object to the form.

20               THE WITNESS:  Sorry.

21               MS. MELL:  That's okay.

22         Q.    You have not?

23         A.    I did not.

24         Q.    Did you review any documents to prepare for your

25    deposition today?

Michael Heye                                    December 4, 2019

Page 16

1           A.    I did not.

2           Q.    Can you give me a high level overview of your

3      educational background.

4           A.    High level?

5           Q.    Yes, please.

6           A.    Like what are you asking?

7           Q.    Did you go to college?

8           A.    I went to technical college for two years, yes.

9           Q.    Which one?

10          A.    Renton Technical College.

11          Q.    And did you graduate?

12          A.    I did.

13          Q.    You've got an associate's degree then?

14          A.    No.

15          Q.    What's the degree that you obtained?

16          A.    Electronics and computer.

17          Q.    So is that a bachelor?  I'm just trying to place

18     it.  What is the --

19          A.    It's a technical college, so they don't give

20     bachelor degrees, it's just a certificate saying that you

21     completed a course.

22          Q.    And when was that that you completed the course?

23          A.    Oh, it was 1990 -- 1989, yes.

24          Q.    When did you begin working for GEO?

25          A.    2004.

Michael Heye                                    December 4, 2019

Page 17

1          Q.   What was the job title that you were hired into?

2          A.   It was detention officer.

3          Q.   Can you give me a list of all the positions that

4     you've held at GEO?

5          A.   I was a pod officer, and an intake officer, and

6     classification officer.

7          Q.   Any others?

8          A.   No.

9          Q.   And so detention officer, how long were you a

10    detention officer?

11         A.   Oh, I still am a detention officer.

12    Classification is still listed under detention officer, so

13    my being classification officer in the worker program, I'm

14    still classified as a detention officer as well.

15         Q.   So a classification officer is a type of

16    detention officer; is that correct?

17         A.   Correct.

18         Q.   So always a detention officer.

19              And what about pod officer, is it the same

20    thing, or would that be something different?

21         A.   I don't know how to answer.

22              MS. MELL:  I don't think there's any such thing.

23         Q.   Well, you told me that you were a pod officer

24    for a time --

25         A.   I was --

Michael Heye                                    December 4, 2019

Page 18

```
 1          Q.   -- how long were you a pod officer?
 2          A.   I worked in the pod from 2004 to -- for roughly
 3     three years.
 4          Q.   And then you said you were an intake officer;
 5     how long were you an intake officer?
 6          A.   Roughly two years.
 7          Q.   So maybe 2007 to 2009?
 8          A.   Yes.
 9          Q.   And then when did you become a classification
10     officer?
11          A.   The end of 2009.
12          Q.   And that's the job title that you presently
13     hold?
14          A.   Correct.
15          Q.   What did you do before GEO?
16          A.   Worked as a wholesale electronics.
17          Q.   Which company?
18          A.   Electronic Resourcing.
19          Q.   How long did you work there?
20          A.   About 12 years.
21          Q.   Why did you leave?
22          A.   Because I got this job.
23          Q.   You were looking for a new job?
24          A.   Yes.
25          Q.   What attracted you to GEO?
```

Michael Heye                                    December 4, 2019

1          A.    Neighbors across the street worked for a -- for

2     the -- the Seattle detention facility, and they said that

3     one was opening up in Tacoma, and got a job application,

4     and applied, and got hired.

5          Q.    That's quite a move going from electronics to

6     detention; what did you think of that move?

7          A.    It was just another job to move into.

8          Q.    Have you talked to any of your coworkers about

9     this lawsuit?

10         A.    As to pertaining to what?  I mean --

11         Q.    Any aspect?

12         A.    I told some of my coworkers that I was doing a

13    deposition today.

14         Q.    And what was their response?

15         A.    Okay.

16         Q.    Who did you talk to?

17         A.    Just a couple of workers.

18         Q.    Which ones?

19         A.    Who did I talk to?  Menza, and I'm not really

20    good with names, so hang on.  Menza, and who else was it?

21    Officer Cook.

22         Q.    And Menza, Iolani; am I saying that correctly?

23         A.    I don't know his last name, I only know Menza.

24         Q.    Officer Menza?

25         A.    Mm-hm.

Michael Heye                                          December 4, 2019

Page 20

1        Q.    Are you aware that Officer Menza was deposed in

2    this action as well?

3        A.    Yes, he told me that he was.

4        Q.    And what did he say about his deposition?

5        A.    He didn't say anything about his deposition.

6        Q.    Did you ask him any questions about his

7    deposition?

8        A.    I did not ask any questions.

9        Q.    You've been a classification officer since 2009;

10   correct?

GEO Objections Foundation, FRE 402, 701, 802.

11       A.    Mm-hm.

12       Q.    That's a yes?

13       A.    Yes.

14       Q.    Are there any other classification officers at

15   the Northwest Detention Center?

16       A.    Ms. Singleton.

17       Q.    That's Alisha Singleton?

18       A.    Yes.

19       Q.    Anyone else?

20       A.    No.

21       Q.    Is it the case then that the classifications

22   unit is comprised of you and Ms. Singleton?

23       A.    Yes.

24       Q.    Are you and Ms. Singleton co-equals?

25       A.    Yes.

Michael Heye                                    December 4, 2019

                                                    Page 21

1       Q.   She's not your boss?

2       A.   No.

3       Q.   You're not her boss?

4       A.   No.

┌─────────────────────────┐
│ GEO Objections          │
│ Foundation, FRE 402,    │
│ 701, 802.               │
└─────────────────────────┘

5       Q.   In terms of your role as compared to hers, are
6  they at all different?

7       A.   No.

8       Q.   Put another way, is there any aspect of the unit
9  that you focus on, any aspect that she owns or works on in
10 particular?

11      A.   It's pretty much equal.

12      Q.   And is it the case that you both do and carry
13 out the same functions and responsibilities?

14      A.   Yes.

15      Q.   Is there any sort of division of labor, whether
16 it's official or unofficial, between how you two divide the
17 work?

18      A.   Not really.

19      Q.   So it's not the case that, you know, you have a
20 specialty within the classifications unit and she has one
21 as well?

22      A.   No, we pretty much can do all the things the
23 same.

24      Q.   Are there any tasks that you find yourself doing
25 more often than her?

Michael Heye                                    December 4, 2019

Page 22

1        A.   Not really, huh-uh, no.

2        Q.   So in terms of your duties and responsibilities,
3   it's 100 percent 50/50, if I understand you correctly?

4        A.   Correct.

5        Q.   All right, so what -- what does classifications
6   mean?

7        A.   We classify detainees that come into the
8   facility.

9        Q.   In what sense?

10       A.   Like how is the process --

11       Q.   Well --

12       A.   -- or what are you asking?

13       Q.   -- when you say you classify them, classify them
14   into what?

15       A.   Into levels.

16       Q.   And what are the levels?

17       A.   Low, medium low, medium high, and high.

18       Q.   And we're talking about security risk; is that
19   right?

20       A.   Correct.

21       Q.   All right, so it involves classifying detainees
22   into levels.

23            Does classifications mean anything else?

24       A.   No.

25       Q.   There's no other way, beyond security level, in

GEO Objections
Foundation, FRE 402,
701, 802.

Michael Heye

GEO Objections
Foundation, FRE
402, 701, 802.

December 4, 2019

Page 23

1    which you're classifying the detainees; correct?

2              MS. MELL:  Object to the form.

3         A.   We classify them and give them a level.  Is

4    there something else?

5         Q.   No, you know, I -- I don't know, you know, what

6    your attorney's told you about my style.  I'm not asking

7    you a gotcha question.  I mean, some of this I think I

8    know, but much of it I'm trying to learn from you.

9         A.   Mm-hm.

10        Q.   So my question about what are you classifying is

11   truly just that, a question.

12             So as I understand it, you're classifying people

13   into security risk levels; correct?

14        A.   Yes.

15        Q.   And is it an aspect of your job to assign

16   detainees to housing based on their classification?

17        A.   Intake houses them according to the

18   classification level.

19        Q.   And the Voluntary Work Program, is that part of

20   your responsibility, Ms. Singleton's responsibility, as

21   classification officers?

22        A.   Yes.

23        Q.   And as it relates to the Voluntary Work Program,

24   again it's an equal division of labor between you and Ms.

25   Singleton?

Michael Heye                                    December 4, 2019

GEO Objections
Foundation, FRE 402,
701, 802.                                       Page 24

1          A.    Yes.

2          Q.    Now, in fulfilling your job as a classification

3    officer, can you tell me all of the ways, if any, in which

4    you work with ICE to do your job.

5          A.    The only time I need to talk to ICE is if the

6    paperwork that we get is unclear or needs to be clarified

7    so that I can classify a detainee.

8          Q.    What paperwork are we talking about?

9          A.    We get the I-385 and I-213, a medical -- not

10   medical, it's an evaluation form, and we go off of those

11   forms to classify a detainee.

12         Q.    And so let's take the I-385; what is that?

13         A.    It's a form that has the detainee's name, and A

14   number, and a picture.

15         Q.    So this is just a one-pager?

16         A.    Yes.

17         Q.    Who completes the I-385?

18         A.    I don't know who fills it out.  I believe ICE

19   does because that's where we get the paperwork from.

20         Q.    And is it the case then that the I-385, the

21   I-213, and the medical eval form all comes from ICE?

22         A.    Yes.

23         Q.    Is this part of a packet, so to speak, that

24   comes with each new entrant into the facility?

25         A.    Yes.

Michael Heye                                    December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

Page 25

1      Q.   So the I-385 is a one-pager, what is the I-213?

2      A.   That's a -- it details whatever ICE wants to put

3    in it.  It tells me their criminal history, if they've ever

4    been deported or not, and we go off of that information to

5    classify.

6      Q.   So the I-213 is more of a maybe a background

7    statement about the detainee?

8      A.   Yes.

9      Q.   And the medical form, that sounds

10   self-explanatory, it's just a medal history of the -- the

11   detainee?

12     A.   No, we don't get a medical history.  The -- this

13   form just shows if they are -- if they have any medical

14   problems, if they have been sexually abused, or if they've

15   been assaulted at any time.  So it's just a -- it's a

16   checkoff form to just check one of these boxes or check

17   none is what that form is.

18     Q.   All right, so you receive this packet from ICE

19   that has the I-385, the I-213, and some medical

20   information, and then based upon that information you

21   receive from ICE, you go about your work classifying the

22   detainee?

23     A.   Correct.

24     Q.   And so other than this packet of information

25   that you receive from ICE, do you have any other interface

Michael Heye                                    December 4, 2019

Page 26

1    with ICE as you go about your work as a classification

2    officer?

3         A.    No.

4         Q.    Is ICE or anyone from ICE officed or situated in

5    the Northwest Detention Center?

6         A.    In the building, they are upstairs.

7         Q.    This is the second floor?

8         A.    Correct.

9         Q.    There's an administrative unit or wing of the

10   facility; is that correct?

11        A.    Correct.

12        Q.    And in terms of the number of ICE personnel, how

13   many people are in that second floor, the admin unit?

14        A.    I don't know that.

15        Q.    Do you know the names of any of the -- the ICE

16   personnel that are situated in the Northwest Detention

17   Center?

18        A.    I know a couple of them, yes, that I deal with.

19        Q.    Who?

20        A.    Renner is one of them, Meyer is another one that

21   I deal with.  Renner, Meyer.  I'm horrible with names.  I

22   know people's faces.  Mitchell is another one.  Those are

23   pretty much the three main people that I will deal with if

24   I need to.

25        Q.    What is your understanding of what Renner,

Michael Heye                                          December 4, 2019

Page 27

1    Meyer, and Mitchell do at the facility?

2         A.   Renner was our JPATS person.

3         Q.   What's a JPATS?

4         A.   Those are the detainees that are flown in or

5    flown out of the facility.

6         Q.   What's JPATS stand for?

7         A.   I don't -- I don't remember what that stands

8    for.

9         Q.   All right, fair enough.

10             So Renner does the JPATS, what about Meyer?

11        A.   Meyer, he -- so Renner -- Meyer is in charge of

12   the JPATS.

13        Q.   Okay.

14        A.   They call it ICE Air.  They used to use the

15   acronym JPATS.  Sorry, I still use JPATS, that's my -- my

16   bad.  It's called ICE Air.

17        Q.   And so Renner and Meyer do something with ICE

18   Air --

19        A.   Mm-hm.

20        Q.   -- is your understanding?

21        A.   Mm-hm.

22        Q.   That's yes?

23        A.   Yes.

24             Sorry, yes.

25        Q.   And then Mitchell, what does he or she do?

Michael Heye                                    December 4, 2019

Page 28

```
 1        A.    Mitchell is a he, and he works on detention

 2    files.

 3        Q.    And if you're interfacing with Renner, Meyer,

 4    Mitchell, it's all in clarifying or getting more

 5    information about that initial intake packet that you get;

 6    is that fair to say?

 7        A.    Yes.

 8        Q.    Is it also fair to say then that once your

 9    classification decision has been made, there is no further

10    interaction on your part with ICE?

11              MS. MELL:  Object to the form of the question.

12        A.    I don't have interaction with ICE every day.  I

13    get packets all the time, I classify them, and then that's

14    it.

15        Q.    Who do you report to?

16        A.    My -- they call it associate warden.

17        Q.    Who is in that role right now?

18        A.    Bruce Scott.

19        Q.    And I heard from someone else there was perhaps

20    a name change, warden went to --

21        A.    Oh, yeah --

22        Q.    -- is it facility administrator?

23        A.    There you go, yes.

24        Q.    And so then Bruce Scott is currently the

25    assistant facility administrator?
```

Michael Heye                                    December 4, 2019

Page 29

1        A.    Yes.

2        Q.    Do you know what prompted the name change?

3        A.    I do not.

4        Q.    All right, so we know who you report to; does

5   anyone report to you?

6        A.    No.

7        Q.    In that way, do you manage anyone?

8        A.    I do not.

9        Q.    All right, tell me about the training that

10   you've received to do your job as the classification -- or

11   a classification officer?

12        A.    The training, I worked in intake, and while I

13   was in intake, I learned how to classify.  I read on the --

14   I read the manuals that we have for that, and also

15   Singleton trained me in classification.

16        Q.    Do you know when Ms. Singleton became a

17   classification officer?

18        A.    Not exactly, no.

19        Q.    She was there though before you?

20        A.    Yes.

21        Q.    All right, so you said that was as an intake

22   officer you read manuals and you received on-the-job

23   training; was there anything else that you -- you did as

24   far as training goes -- strike that.  Let me try again.

25              I should have said that also.  I mean, I'm

Michael Heye                                    December 4, 2019

Page 30

1      definitely going to ask some bad questions today.  I'm

2      going to do my best to ask intelligible questions.

3                  Let's try again.

4                  Other than reading manuals and on-the-job

5      training from Ms. Singleton, did you receive any other

6      training to do your job as a classification officer?

7          A.   I did not.

8          Q.   Now, you said read manuals; are there any in

9      particular that you're thinking of right now?

10         A.   The PBNDS is one of them, and the -- I think

11     pretty much the PBNDS is the one that spells everything out

12     for us as to how we're supposed to classify.

13         Q.   Is there a particular section in the PBNDS that

14     you're thinking of?

15         A.   It's the classification section under PBNDS.

16         Q.   Do you know the specific subsection?

17         A.   2.2 I believe it is.

18         Q.   All right, so there's the classification section

19     of the PBNDS --

20         A.   Mm-hm.

21         Q.   -- and on-the-job training that you would have

22     received from Ms. Singleton.

23                  How often do you consult the PBNDS in doing your

24     job?

25         A.   I don't have anything specific, just when --

Michael Heye                                    December 4, 2019

Page 31

1    I'll pull it out every so often if I have something I need

2    to clarify.  For a crime that has been -- that I don't

3    understand, I'll refer back to that, or I'll go online and

4    look up what the crime is and try and put it in a category,

5    because they don't list every single crime in the PBNDS, so

6    we have to come up with something that's similar or close

7    to.

8         Q.   What about for the Voluntary Work Program, is

9    there a manual, or are there policies that you consult for

10   that, or if -- assuming that you consult those?

11        A.   The PBNDS also has the worker program listed in

12   there.

13        Q.   Who do you turn to if you have questions about

14   classifications?

15        A.   About classification?

16        Q.   Mm-hm.

17        A.   I talk with Ms. Singleton on it, and we

18   collaborate on it.

19        Q.   What about the Voluntary Work Program, who do

20   you talk to if you have questions about any aspect of how

21   to administer that program?

22        A.   Like I'll talk to the A-dub, and than the A-dub

23   will either talk to ICE or -- and get back to me on

24   whatever questions we have.

25        Q.   A-dub, is that assistant warden?

Michael Heye                                           December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

                                                            Page 32

1          A.    Sorry, the assistant facility administrator,

2     yes.

3                That name change was recent, so I'm still --

4     still consider him an A-dub.

5          Q.    So how much of your time do you spend on duties

6     related to the Voluntary Work Program?

7          A.    I would -- I would say it's almost half and

8     half, classification, half worker program.

9          Q.    Other than you and Ms. Singleton, is there

10    anyone else -- let me back up.

11               Is it fair to say that you and Ms. Singleton are

12    responsible for administering the VWP program at the

13    Northwest Detention Center?

14               MS. MELL:   Object to the form of the question.

15         A.    What do you mean administer?

16         Q.    Are you guys in charge of the program?

17               MS. MELL:   Object to the form of the question.

18         A.    We -- I don't know if we run the program, we

19    take care of the program, however you want to say it.

20         Q.    Well, certainly, I mean, you know, the facility

21    administrator's at the top, and you know, the hierarchy and

22    all that stuff, so I get that the buck may stop with the

23    warden, but in terms of programs that you're in charge of,

24    is it the case that you and Ms. Singleton are in charge of

25    the Voluntary Work Program?

Michael Heye                                    December 4, 2019

Page 33

```
 1              MS. MELL:  Object to the form.  Move to strike

 2      the testimony of Counsel.  ICE is at the top, not GEO.  If

 3      you want to have testimony here today, let's do it tit for

 4      tat, but you need to quit testifying.  You ask my client

 5      questions, you don't get to characterize how the facility

 6      operates.

 7              MR. WHITEHEAD:  You know, yesterday there were a

 8      lot of speaking objections, and they were speaking --

 9              MS. MELL:  That's not a speaking objection,

10      you're --

11              MR. WHITEHEAD:  Hold on, we can't --

12              MS. MELL:  -- you're testifying, and you need to

13      stop.

14              MR. WHITEHEAD:  Let's go one at a time here.

15              MS. MELL:  All right, fair enough.

16              MR. WHITEHEAD:  I allowed you to make your

17      record on the transcript, let me make mine.

18              You made many, many speaking objections

19      yesterday, you've made many, many today.  I think that last

20      one was the first instance though of coaching the witness.

21      Please don't interject facts like that again into the

22      deposition.

23              MS. MELL:  With response to that, you are asking

24      questions and testifying as to what you think the answers

25      should be, and your testimony is improper.  Your opinion as
```

Michael Heye                                      December 4, 2019

Page 34

1    to who's in charge of the facility and who's at the top is

2    not a question.

3                MR. WHITEHEAD:   And your recourse is to object

4    to form.

5                MS. MELL:   Okay, I object to the form.

6        Q.   All right.   Mr. Heye, I'm just trying to get a

7    sense of who's the point person for the -- the Voluntary

8    Work Program for GEO at the Northwest Detention Center.

9                Is it you and Ms. Singleton?

10       A.   ICE ultimately runs the program.   Anything that

11   we have a problem with or have to deal with, ICE gives us

12   the answer on that.

13       Q.   All right, so we've got ICE over here, but as

14   far as GEO personnel goes, who's the point person for the

15   Voluntary Work Program?

16               MS. MELL:   Object to the form.   Move to strike

17   the testimony of Counsel.

18       A.   ICE still runs the program.

19       Q.   So there's no point person then for the

20   Voluntary Work Program on the GEO side of things?

21               MS. MELL:   Object to the form of the question.

22       A.   What are you asking?

23       Q.   I'm trying to figure out who on the GEO side of

24   things is the point person for the Voluntary Work Program?

25   If it's multiple people, please say so.   If it's you and

Michael Heye                                    December 4, 2019

Page 35

1    Ms. Singleton, please tell me that.  I'm just trying to get

2    a sense of on the GEO side of things, who's responsible for

3    the Voluntary Work Program?

4              MS. MELL:  Object to the form of the question.

5         Q.   Your response?

6              MS. MELL:  Object to the form of the question.

7         A.   ICE.

8         Q.   Let's take a look at Exhibit-312.

9              You've got a stack of paper in front of you

10   there, and I'd like for you to go to Exhibit-312.

11             Are you there?

12        A.   Yes.

13        Q.   Now, this document is titled Northwest Detention

14   Center - Organizational chart.

15             Do you see that?

16        A.   Okay.

17        Q.   And at the bottom there's a date there, it says

18   Updated: July 18th, 2017.

19             Do you see that?

20        A.   I do.

21        Q.   Have you seen this document before?

22        A.   I have not.

23        Q.   Is this a fair and accurate representation of

24   the hierarchical structure at GEO as of July 2017?

25        A.   Warden Security -- do you want to know if this

Michael Heye                                    December 4, 2019

Page 36

1    is accurate?

2         Q.   Yes.

3              MS. MELL:  I'll --

4         A.   No.

5              MS. MELL:  -- yeah.

6         Q.   As of July 2017, is the structure that's

7    depicted here on Exhibit-312 accurate?

8         A.   I guess.

9              What -- are you asking if the people in the

10   spots are correct, or what are you asking?

11        Q.   I'm asking is the structure depicted there on

12   312 a fair and accurate representation of the way things

13   were back in July 2017?

14             I understand that personnel may have changed

15   since then, but in terms of the title and the way that the

16   reporting relationships are shown, is that accurate?

17             MS. MELL:  Object to the form.

18        A.   I can't say for sure because I don't know who

19   reports to who on all these places.

20        Q.   Do you have any reason to doubt the accuracy of

21   Exhibit-312?

22             MS. MELL:  That he's never seen before?  Object

23   to the form.

24        A.   I've never seen this.  I didn't even know my

25   picture was in here.  Wow.

Michael Heye                                    December 4, 2019

Page 37

```
 1        Q.    The first page there --
 2        A.    Yeah.
 3        Q.    -- the organizational chart that's shown --
 4        A.    Okay.
 5        Q.    -- do you have any reason to doubt the accuracy
 6   of that chart?
 7        A.    I can't say yes or no because I didn't make it
 8   up, and that's the first time I've seen it.  So if GEO put
 9   it out, I guess, but I can't say for sure.
10        Q.    And if -- do you know who Erwin Delacruz is?
11        A.    No.
12        Q.    Do you know the assistant food service manager
13   at GEO, at the Northwest Detention Center?
14        A.    Assistant food service manager.
15              Probably not by name, but if I see him, I do.
16        Q.    Do you know Marc Johnson?
17        A.    Yes.
18        Q.    If Ms. -- Mr. Johnson were to say that this
19   chart was accurate, would you have any reason to dispute
20   his claim?
21              MS. MELL:  Object to the form.  That's an
22   improper question.
23        A.    I can't say whether he would know it's correct
24   or not.
25        Q.    All right, well I want you to tell me then, are
```

Michael Heye                                    December 4, 2019

Page 38

1     you familiar with the organizational structure at the

2     Northwest Detention Center for GEO?

3          A.   As to how things work?

4          Q.   Yes.

5          A.   Like the warden --

6          Q.   Well, you know --

7          A.   -- and down from there?  I don't know.

8          Q.   -- if you've worked at the facility since

9     2004 --

10         A.   Correct.

11         Q.   -- do you have any sense of the reporting

12    structure there at the facility?

13         A.   Yes.

14         Q.   Well, we can work from Exhibit-312, and you can

15    tell me what is or is not accurate, or I can have you draw

16    me a chart.  How would you like to proceed?

17              MS. MELL:  No, this is not a -- this is not a

18    show and tell and you pick and choose how you -- I don't

19    even know what you're doing.  That's totally improper.  I

20    don't even know that it's a question.  He's not going to

21    pick and choose how to communicate what you're not asking

22    him.

23         Q.   Your response?

24         A.   Oh, I can't give you a structure.  I don't know

25    the whole structure.

Michael Heye                                    December 4, 2019

Page 39

```
 1        Q.   (Indicating.)

 2        A.   Yes.

 3        Q.   Just trying to figure out what I believe to be

 4   an easy question, right, the organizational structure of

 5   GEO.  I asked this question of the deponents yesterday,

 6   people were able to give me a very succinct one word

 7   answer, and I'm just trying to figure out a way to phrase

 8   this that you'll understand what it is that I'm driving at.

 9             I simply want to know whether or not this chart

10   that is Exhibit-312 is accurate.  So yes or no, is

11   Exhibit-312 an accurate depiction of GEO's current

12   hierarchy?

13             MS. MELL:  Objection, move to strike.

14             Counsel, you have no right to sit there and

15   lecture the witness and characterize your own questions as

16   simple or not simple, that's totally improper.  He's

17   already asked -- you've already asked him about the chart,

18   he's already answered that question.  We need to move on.

19   Object to form.

20        Q.   So to my question, is Exhibit-312 an accurate

21   depiction of GEO's current hierarchy?

22             MS. MELL:  Objection.

23        A.   I don't know.

24        Q.   You do not know?

25        A.   I can't give you a definite answer whether it is
```

Michael Heye                                    December 4, 2019

Page 40

1    or it's not.

2         Q.    You currently report to Bruce Scott; correct?

3         A.    I do.

4         Q.    Who does Mr. Scott report to?

5         A.    He reports to the warden.

6         Q.    Can you tell me what the other units are within

7    the Northwest Detention Center?

8         A.    What do you mean by units?

9         Q.    There's the kitchen unit; can you tell me

10   others?

11             MS. MELL:   Object to the form, move to strike

12   Counsel's testimony.

13        A.    Why do -- why do I need to answer that?

14        Q.    Will you answer my question?

15        A.    No.

16        Q.    And why not?

17        A.    Don't need to?

18             MS. MELL:   Did you want to see something?

19             THE WITNESS:   No, I guess not.

20             MS. MELL:   Okay.

21        Q.    Now, part of your job, does it involve training

22   the detention officers about the Voluntary Work Program?

23        A.    I show officers how to fill out the paperwork in

24   the pods for the worker program.

25             MR. WHITEHEAD:   Where did we leave off?

Michael Heye                                    December 4, 2019

                                                        Page 41

1                THE COURT REPORTER:   319.

2                   (Exhibit-319 marked.)

3                THE COURT REPORTER:   This is Exhibit-319.

4       Q.    You've just been handed Exhibit-319.

5             Do you know what we're looking at here?

6       A.    No, what is it?

7       Q.    I don't know, I'm asking.

8             I see towards the top there it says "Pre-service

9    Orientation."

10            Does that refresh your memory at all?

11      A.    Pre-service Orientation.

12            MS. MELL:   It's this language, I think

13   (indicating).

14            Is this where you're referring, Counsel, right

15   here (indicating)?

16      A.    Pre-service orientation week.

17            Okay.

18      Q.    And if you look at the far right column, there's

19   a heading that says "Instructor," and then about midway

20   down, with the date of training of July 31st, 2015, you'll

21   see your name in the Instructor column.

22      A.    Oh, okay.

23      Q.    Do you see that?

24      A.    Yeah.   Yes.

25      Q.    Were you or are you an instructor for the

GEO Objections Foundation, FRE 402, 701, 802.

Michael Heye                                    December 4, 2019

                                                      Page 42

1    detention officers about the Classification/Worker Program?

2         A.   I'd say yes for the worker program not for

3    classification.

4         Q.   All right, so worker program, tell me about the

5    training that you provide for the detention officers about

6    the worker program.

7         A.   And we used to do it, but I only do it to new

8    hires now not to the actual detention officers that have

9    been in there.

10             This was a program that every year they go

11   through retraining, and what I did is I went and talked to

12   them about the forms that they fill out for the worker

13   program and how to do it correctly.

14        Q.   Which forms?

15        A.   The volunteer agreement and the work assignment.

16        Q.   And what would you tell them about the volunteer

17   agreement?

18        A.   That one has to be filled out every time a

19   detainee takes on a new assignment.

20        Q.   Why is that?

21        A.   Because it's in the PBNDS.

22        Q.   What's your understanding of the importance of

23   the voluntary work agreement?

24        A.   That it has to be filled out because ICE says

25   so.

Michael Heye                                    December 4, 2019

Page 43

1          Q.   And it's as simple as that, it's just an ICE
2    requirement?
3          A.   Yes, it is.
4          Q.   All right, what about the work assignment, what
5    did you train the detention officers on about the work
6    assignment form?
7          A.   That it needs to be filled out correctly and
8    initialed next to the assignment that the detainee is
9    taking on.
10         Q.   So there's the forms; was there anything else
11   with regards to the training you provided the detention
12   officers about the worker program?
13         A.   That they show the detainee the job that they're
14   doing, or the assignment that they're doing, and that when
15   they sign the bottom of the paper, that's when the detainee
16   has been hired for the assignment and gets turned in to me.
17         Q.   When you say show them to the assignment they're
18   doing, what do you mean by that?
19         A.   They -- so when the detainee agrees to do the
20   assignment, the officer will show them what the assignment
21   is.  And it's also listed on the worker program -- on the
22   sheet what the assignment details.
23         Q.   Meaning show them the job description for what
24   the job is and what the duties are?
25         A.   What the assignment is and what the duties are,

Michael Heye                                                December 4, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 44

1      yes.

2            Q.    And you said that this was an annual training,

3      and now you only do it for new hires; did I get that right?

4            A.    Correct.

5            Q.    When was the change made to where it was only

6      the new hires that you train?

7            A.    I don't know.  A few years ago.

8            Q.    Now, am I to assume that Ms. Singleton would do

9      the same thing in terms of training the detention officers?

10           A.    Yes, she could train them as well.

11           Q.    And did she?

12           A.    Yes.

13           Q.    Have you ever been disciplined for your

14     performance at work?

15           A.    No.

16           Q.    I want to talk in more detail about the -- the

17     Voluntary Work Program.

18                 Can you give me a list of the classification

19     officers' responsibilities with respect to the Voluntary

20     Work Program?

21           A.    What we do --

22           Q.    Yes.

23           A.    -- in the volunteer work program?

24           Q.    Well, your duties and responsibilities with

25     respect to the Voluntary Work Program?

Michael Heye                                    December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

Page 45

1           A.    We receive the papers in from the officers, and

2    we put them on a -- a chart or a form, and the detainees

3    will submit kites to want to do an assignment.  We'll take

4    those in, put them on a list that goes back out to the pod,

5    and the detainees are put in the order that we received the

6    kites.  So when an assignment becomes available, then the

7    officer will go down the list that he has in the pod and

8    will ask the next detainee if he wants to work that

9    assignment or not.

10           And the detainees that work their assignments,

11   there's a sheet in there that has their names on it, and

12   once they are done with their assignment, they sign the

13   sheet of paper, the form, and in the evening, all those

14   forms get turned into the lieutenant's office, put into my

15   box, and I receive those the next day, I sort them, and

16   send them to finance.

17           Q.    Anything else?

18           A.    I update the rosters twice a week, and any

19   rosters that have changed get taken to the pods so that the

20   officer knows who is -- who has what assignment each day.

21   And there's three shifts, so that -- that roster stays in

22   there the whole time, and then each officer can see who

23   is -- has what assignment and when they do their

24   assignment.

25           Q.    Anything else?

Michael Heye                                    December 4, 2019

Page 46

1          A.    I think that's pretty much the logistics of it.

2          Q.    I made a list.  Let me see if I can recap this

3    here for you.

4          A.    Mm-hm.

5          Q.    So you said that you receive papers from the

6    officers?

7          A.    Yes, the papers are the voluntary agreements

8    that they have along with their -- the form that has what

9    assignment that they're doing.  Those are attached

10   together.  So I have to have both of those so that I can

11   put it in their blue folder.  That's the detainee's file.

12   Per PBNDS, I have to have all of that in there.  So I have

13   to make sure that we get all the forms correctly in for

14   who's working which assignment.

15         Q.    And so you process those forms?

16         A.    Yes.

17         Q.    You said that you -- something about charting

18   the forms from the papers?

19         A.    So when -- if we get kites in from detainees

20   that want to have an assignment, I have a -- a waiting

21   list, or on each chart that goes -- or each piece of paper

22   that we have that goes to all the pods, there's a waiting

23   list on there so that the officer can see who's next that

24   wants to participate in an assignment that happens to come

25   available in the pod.

Michael Heye                                    December 4, 2019

Page 47

1        I keep track of anything that's above and beyond
2    the waiting list, because I can only put so many on each
3    one.   So if I have more than four detainees that want to
4    work in a single unit, I'll have another waiting list
5    inside my -- at -- in my office, and then when I update it,
6    I'll move them over to the list as the list gets depleted.
7        Q.   And so processing forms from the detention
8    officers, including the voluntary work agreement and
9    whatnot; is that correct?
10       A.   Correct.
11       Q.   And then processing the kites, so the request to
12   work, from the detainees; is that correct?
13       A.   The assignments, yes.
14       Q.   Creating a list of the workers that will work in
15   each pod?
16       A.   Yes, if there is more -- so the detainees, they
17   come in, they say, Hey, I want to do something, I don't
18   want to sit here and do nothing.   So they just say, Give me
19   any job that's available, or any assignment that's
20   available, or they specifically ask for specific
21   assignments.
22       Q.   All right, so making the work assignments; is
23   that correct?
24       A.   Making the work assignments?
25       Q.   Yes.

Michael Heye                                    December 4, 2019

Page 48

1        A.   There's already work assignments, they're
2   already listed on there.
3        Q.   Explain that to me.
4        A.   We didn't -- so when I started in the worker
5   program, there were already assignments in each pod;
6   showers, gray mile, however it is.  And when one becomes
7   available, the officer will then ask the detainee if he
8   wants to work that assignment, the next one on the list.
9   And if there's nobody on the list, then they just ask
10  anybody that's in the pod if they want to have an
11  assignment or not.  Typically the detainees come up and
12  say, Hey, as soon as an assignment comes up, let me have
13  that.
14       Q.   So is it better to characterize it as
15  classification's approving the work assignments?
16       A.   No.  We don't approve it, the assignment, the
17  assignment is just given to the detainee that wants that
18  assignment.
19       Q.   Who gives the assignments?
20            MS. MELL:  Object to the form.
21       A.   The officer in the pod is the one that assigns
22  the -- gives the assignment to the detainee.
23            He doesn't give it, it's available for the
24  detainee to have, to do.  I don't know how to explain that.
25            (Exhibit-320 marked.)

Michael Heye                                    December 4, 2019

Page 49

1              THE COURT REPORTER:  This is Exhibit-320.

2         Q.   You've just been handed Exhibit-320.  Now, on

3    the face of the document, this is an email from Ms.

4    Singleton to Bill *Hatton and others.

5              Are you with me?

GEO Objections Foundation, FRE 402, 701, 802.

6         A.   Okay.

7         Q.   Who is Bill *Hatton?

8         A.   Bill McHatton?

9         Q.   Thank you, Bill McHatton?

10        A.   He was the associate warden.

11        Q.   And then we see Bruce Scott is cc'd on this

12   email.  He is the current associate warden; is that right?

13        A.   He is currently the associate warden, yes.

14        Q.   All right.  If you look at the start of Ms.

15   Singleton's email, she writes, "Since classification does

16   all job assignments we already have the list of who's

17   assigned in the pods."

18             Did I read that correctly?

19        A.   Yes.

20        Q.   Do you agree with her statement that

21   "classification does all job assignments"?

22        A.   All job assignments.

23             Classification, hm, handles job assignments?

24             All job assignments.

25             We put out the list of assignments to each pod

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com     206.622.6661 * 800.657.1110  FAX: 206.622.6236

Michael Heye                                      December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

Page 50

1    is what we do.

2         Q.    And is that the extent of it?

3         A.    Yeah.

4              The pod -- we don't hire any -- or do any of the

5    assignments in the pods.   The pod officer is the one that

6    asks the detainee if he wants the assignment, and if the

7    detainee does want the assignment, he fills out the

8    paperwork, gives it to us, and then we will put him on that

9    list that goes back to the pod so that the officer knows

10   who is -- who's in what assignment.

11        Q.    Does anyone, other than yourself and Ms.

12   Singleton, put out the assignments in the way that you just

13   described?

14        A.    No, me and Singleton give the paperwork back to

15   the pod officer so they know who is assigned to that

16   assignment.

17        Q.    And I don't want to put words in your mouth, and

18   I mean, I believe the phrase you used was put out work

19   assignments; is that a fair way to characterize what you

20   and Ms. Singleton do with respect to the work assignments?

21        A.    The assignment's already there.   I don't

22   understand -- we're not creating jobs or assignments, all

23   we're doing is putting names in the specific slots that the

24   detainee is asking to work in or to do their assignment in.

25        Q.    So there's a roster of available work details;

Michael Heye                                    December 4, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 51

1      correct?

2              A.   Yes.

3              Q.   And it is your job and Ms. Singleton's job to

4      put the names into those various work details, the names of

5      the detainee workers?

6              A.   Yes.

7              Q.   Besides you and Ms. Singleton, is there anyone

8      else at the facility that does that same job?

9              A.   No.

10             Q.   All right, so I'm still going through the list

11     of your responsibilities for administering the Voluntary

12     Work Program.

13                  As I understand it, you process forms received

14     from the detention officers --

15             A.   Mm-hm.

16             Q.   -- correct?

17             A.   Mm-hm.

18             Q.   That's a yes?

19             A.   Yes.

20             Q.   You process the kites; correct?

21             A.   Yes.

22             Q.   You assign detainee workers into the preexisting

23     job duties?

24             A.   Yes.

25             Q.   Moving down the list that you gave me, you said

Michael Heye                                     December 4, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 52

1    that there is a form that the detainees sign when the work
2    is done.
3                Did I get that right?
4         A.   Yes.
5         Q.   And that those forms are collected nightly and
6    then given back to you?
7         A.   Yes.
8         Q.   What are those forms called?
9         A.   Worker pay forms.
10        Q.   And what do you do with the worker pay forms?
11        A.   I sort them together.  If a detainee has not
12   signed next to the assignment that they're doing, then we
13   cross that one off.  And then I put it all together, and
14   finance comes and takes it.
15        Q.   And it's the case that if the detainee hasn't
16   signed the worker pay form, they don't get paid; is that
17   right?
18        A.   Correct.
19        Q.   All right, so you process the worker pay forms
20   and take them to finance?
21        A.   Finance comes and gets them from me.
22        Q.   You process the worker pay forms for finance?
23        A.   Correct.
24        Q.   And then you said that you update the rosters
25   twice a week?

Michael Heye                                          December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

Page 53

```
 1           A.    Yes.

 2           Q.    And that you give updated rosters to the

 3    detention officers?

 4           A.    Correct.

 5           Q.    All right, so I'm going to try and summarize --

 6           A.    Uh-oh.

 7           Q.    -- and you know, again, I'm not -- I don't want

 8    to put words in your mouth, you let me know if I'm getting

 9    it wrong, all right?  So let's give it a go.

10                 So to summarize your responsibilities as a

11    classification officer with respect to the Voluntary Work

12    Program, you process forms received from detention

13    officers; correct?

14           A.    Yes.

15           Q.    You process kites received from detainees;

16    correct?

17           A.    Correct.

18           Q.    You assign detainees to the preexisting job

19    details for the Voluntary Work Program; correct?

20           A.    Yes.

21           Q.    You process the worker pay forms for finance?

22           A.    Yes.

23           Q.    And you update the worker rosters as -- twice a

24    week; correct?

25           A.    Correct.
```

Michael Heye                                          December 4, 2019

GEO Objections Foundation, FRE
402, 701, 802.

                                                              Page 54

 1          Q.   And put out updated rosters as necessary;

 2   correct?

 3          A.   Correct.

 4          Q.   Other than what we've just discussed, are there

 5   any other duties that you conduct with respect to the

 6   Voluntary Work Program?

 7          A.   I think we covered it.

 8          Q.   Now, that list that you just gave me, other than

 9   Ms. Singleton, is there anybody else in the facility that

10   performs those same functions?

11          A.   No.

12               MR. WHITEHEAD:   All right, this is a good spot

13   for a break.

14               THE WITNESS:   Okay.

15               MR. WHITEHEAD:   Let's go off the record.

16               THE VIDEOGRAPHER:   We're now going off the

17   record.   The time is 11:12 a.m.

18                    (Recess at 11:12 a.m.)

19                    (Reconvened at 11:28 a.m.)

20               THE VIDEOGRAPHER:   We're now back on the

21   records.   The time is 11:28 a.m.

22          Q.   Mr. Heye, before the break, you gave me a list

23   of your responsibilities with respect to the Voluntary Work

24   Program.   Do you consult with ICE to carry out any of those

25   duties?

Michael Heye                                        December 4, 2019

GEO Objections Foundation; FRE 402, 701, 802.

Page 55

1      A.   I don't.  My -- Bruce Scott does if I have any

2   questions.

3      Q.   And how do you know that?

4      A.   Because I tell him, and then he goes and talks

5   to ICE, and then he comes back and gives me an answer.

6      Q.   Give me an example of something you've related

7   to Mr. Scott that he's taken to ICE and then has brought

8   back down the chain to you.

9           MS. MELL:  Relative to the VWP?

10          MR. WHITEHEAD:  Yes, thank you.

11     Q.   Relative to the VWP?

12     A.   I don't know if I've ever done anything with

13  Bruce according to that.  Trying to -- I don't think I have

14  any -- done anything with Bruce Scott to ask ICE anything

15  that we've needed to do with the Voluntary Work Program

16  that I remember in that nature.

17     Q.   Well, and don't feel that you need to limit your

18  answer to Mr. Scott, I know that Mr. McHatton was Mr.

19  Scott's predecessor --

20     A.   Mm-hm.

21     Q.   -- and my question is whether directly or

22  indirectly, is there any interface on your part with ICE to

23  carry out the Voluntary Work Program responsibilities that

24  you described for me earlier?

25     A.   When they started -- the only one that I can

Michael Heye                                      December 4, 2019

GEO Objections Foundation, FRE
402, 701, 802.

Page 56

1    remember that we talked with Mr. McHatton about was when

2    they started the barbershop.

3              Q.    And what was the question there?

4              A.    When we had the barbershop, they, detainees,

5    were cutting hair, and they only had three days that they

6    were assigned barbershop, and they wanted to be able to

7    work -- or to be assigned seven days.  So McHatton -- we

8    had talked to them, and McHatton had apparently talked to

9    ICE about it.  I don't know the whole -- I don't know any

10   of the conversation.  All that McHatton told me was when he

11   came back to me, he said ICE has authorized that the

12   barbershop worker or barbershop -- the assignment for the

13   barbershop can have another assignment so that they can

14   cover the rest of the seven days' work.  So that was one

15   thing that we -- that I had to add to the worker -- the

16   assignment program was for -- that the barbershop can get

17   another assignment because of the limitations for

18   barbershop.

19             Q.    Meaning that you added another slot for a barber

20   on the job assignment list?

21             A.    No, that the barbershop detainee can also get a

22   pod assignment as well or the barbershop cleanup

23   assignment.  That was something that I had to relay to

24   McHatton, and McHatton had to get approval through ICE so

25   that they could have another assignment.

Michael Heye                                    December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

Page 57

1        Q.    Is it the case then that a detainee worker can
2    only have one assignment at a time --
3        A.    Correct.
4        Q.    -- generally speaking, and this is an example of
5    an exception to that rule?
6        A.    Correct.
7        Q.    Now, the people in this scenario where they
8    worked in the barbershop and also had a pod job, so two
9    details, could they work both jobs in the same day?
10       A.    Yes.
11       Q.    And in that scenario, would they receive a
12    dollar or would they get two dollars --
13       A.    They would --
14       Q.    -- for their work?
15       A.    They would receive a dollar per the assignment,
16    per each assignment, yes.
17       Q.    So in the scenario you've just described for me,
18    they'd receive a dollar for their barbershop work and a
19    dollar for the pod work?
20       A.    Yes.
21       Q.    All right, so other than this example where you
22    sought clarification through Mr. McHatton, who sought
23    clarification through ICE about the barbershop, can you
24    think of another time where you needed to interface with
25    ICE to do your job regarding the Voluntary Work Program?

Michael Heye                                          December 4, 2019

Defendant's Objection FRE 602,
701, 802.

                                                              Page 58

1        A.   I don't know if that's -- they added shower

2    cleaners, so we -- they had a shower assignment, one for

3    the whole -- all three shifts -- there's three shifts,

4    there's day shift, swing shift, graveyard shift that

5    officers rotate through.   So the shower cleaners were --

6    there was one shower cleaner, and they cleaned the showers

7    twice a -- twice a day.   So they wanted to up that to where

8    they would have a shower cleaner on each shift.   So my boss

9    had to talk to ICE, and then once they got clarification of

10   that, he came back to me and said, Yes, put one on each

11   shift.

12        Q.   Now, you said they wanted another shower cleaner

13   on each shift; is they the detention officers?

14        A.   I don't know who exactly it was, I don't know if

15   ICE wanted it or if my A-dub had suggested it to ICE that

16   we need to have one on each shift, that I don't know.   I

17   don't know the conversation.   All I know is that my A-dub

18   told me that we're going to have a shower cleaner on each

19   shift and to add that in.

20        Q.   As I understood it, you said that someone came

21   to you and said, Can we add another shower cleaner to each

22   shift, and you then took that question to Mr. McHatton --

23        A.   No, no.

24        Q.   -- and then he took the question to ICE --

25        A.   So that was --

Michael Heye                                    December 4, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 59

1       Q.    -- did I get that wrong?

2       A.    That -- that was wrong.  That was -- that was
3   probably my bad.

4             What happens is the A-dub will come to me and
5   say, Is there room on your paper or whatever, we want to
6   add three more -- you know, two more shifts to the shower
7   cleaners.  Because on the roster, you can only fit so much
8   on a piece of paper before you have to make it double
9   sided, or two, and all that other junk.  So they were
10  saying -- suggesting that they wanted -- that they were
11  going to put one on each shift.  They still had to get ICE
12  approval for that before it could be done.

13      Q.    And Mr. McHatton, did he tell you why they were
14  seeking, they being Mr. McHatton, another shower cleaner on
15  each shift?

16      A.    Now we're going into things that I only get so
17  vague about.

18            I don't know why or who, but they wanted the
19  showers cleaned three times a day instead of once -- or
20  instead of twice a day.  So to do that, you can't have the
21  one person doing all three, they wanted to split that up
22  and make one person each shift.  That's the clarification I
23  got from them.

24      Q.    And you don't know who got the ball rolling, so
25  to speak, with --

GEO Objections Foundation, FRE
402, 701, 802.

Michael Heye                                    December 4, 2019

Page 60

1        A.    I don't know.  They just tell me -- my A-dub
2   tells me that they got clarification through ICE, ICE
3   approved it, go ahead and do it.  That's what they tell me.
4        Q.    All right, so what you described for me
5   involving the barbershop and whether the barbers could, you
6   know, have an additional detail, when did that all occur?
7        A.    A while ago.  Years ago.
8        Q.    And is it the same with the shower cleaners, was
9   that a while ago?
10       A.    Not as long.
11       Q.    All right, so my question was to give me
12  examples of you interfacing either directly or indirectly
13  with ICE to carry out your duties for the Voluntary Work
14  Program, and you related to me this incident about the
15  barbershop and the barbers working more than one detail; is
16  that correct?
17       A.    I don't directly talk to ICE on that.  I talk to
18  my A-dub, and then my A-dub relays the information, however
19  he does, to ICE.
20       Q.    I don't mean to put --
21       A.    I never have -- I don't have direct contact with
22  ICE on the worker program.  That's not my chain of command.
23  My chain of command is my A-dub.  He's -- I report to him
24  and him only.
25       Q.    Got it.

GEO Objections Foundation, FRE 402, 701, 802.

Michael Heye                                        December 4, 2019

Page 61

1          So are you ever requesting of the A-dub to take

2     a question to ICE?

3          A.   No.

4          Q.   So you've never said in that way, Associate

5     warden, please ask ICE the following question related to

6     the Voluntary Work Program?

7          A.   No, I haven't.

8          Q.   How often are you going to the associate warden

9     or assistant facility administrator with questions about

10    the Voluntary Work Program?

11         A.   Hardly ever.

12              I -- typically it's pretty much set out

13    straightforward, and I don't really have to change anything

14    on it.  Those are the only two times that I remember that

15    anything had to be changed.

16         Q.   And when you say those two times, you're

17    referring to what you described for me involving the

18    barbers; correct?

19         A.   Yes.

20         Q.   And the shower cleaners?

21         A.   Correct.

22         Q.   How do detainee workers become a part of the

23    Voluntary Work Program?

24         A.   Through the kite system.

25              MS. MELL:  Could I get some water?  Would you

Objection, Foundation,
402, 701, 802.

Michael Heye                                      December 4, 2019

Page 62

1    grab me some water before we get started?

2              MR. WHITEHEAD:  You can keep it running.  It

3    doesn't bother me, I guess.

4                   (Exhibit-321 marked.)

5              THE COURT REPORTER:  This is Exhibit-No.-321.

6              MS. MELL:  You got it.

7         Q.   Mr. Heye, let's get you settled again.  We just

8    took a brief water break there.

9              Mr. Heye, you've been handed Exhibit-321.  Is

10   this the -- an example of a kite, of a detainee requesting

11   an assignment in the Voluntary Work Program?

12        A.   Yes.

13        Q.   And that signature there at the bottom, do you

14   know whose signature that is?

15        A.   It looks like Singleton.

16        Q.   Is it the case that the classification officer

17   always signs off on the kite?

18        A.   On a kite or all kites?

19        Q.   On a kite requesting an assignment in the

20   Voluntary Work Program?

21        A.   Yes.

22        Q.   What does the signature certify?

23        A.   That we've read the kite and the response.

24        Q.   At some point did GEO move to an electronic kite

25   system?

Michael Heye                                    December 4, 2019

Page 63

1       A.   Yes.

2                 (Exhibit-322 marked.)

3                 THE COURT REPORTER:   This is Exhibit-322.

4       Q.   You've just been handed Exhibit-322.

5                 Does this appear to be an electronic kite

6    requesting an assignment in the Voluntary Work Program?

7       A.   It's an electronic kite assigned to supervisors.

8    It's -- what are you trying to ask on this?

9       Q.   Well, I think actually you just answered my

10   question.

11                Is this an electronic kite?

12      A.   Yes.

13      Q.   Is this the format in which the worker requests

14   come in, regardless of whether or not Exhibit-322 is in

15   fact a request, to be in the Voluntary Work Program?

16      A.   Yes, this is how they would request an

17   assignment, yes.

18                Seventeen.   Huh.

19      Q.   Who decides the number of detainee workers for

20   any given work assignment?

21      A.   ICE has set up that.

22                ICE has set that up.

23      Q.   Tell me more about that.   How is it that ICE has

24   set up the number of detainee workers for an assignment?

25      A.   I don't know how they came up with it.   When I

Michael Heye                                    December 4, 2019

                                                    Page 64

1    started working in the worker program, all the assignments

2    were already set up that way.

3         Q.    Let's take a look at Exhibit-309.

4               What are we looking at here?

5         A.    Pod porters, a roster in the pod.

6         Q.    And I'll point out to you that this is a

7    multipage document --

8         A.    Yeah.

9         Q.    -- there are notations to laundry details as

10   well as kitchen and -- and others, but just big picture, is

11   this a schedule for the detainee workers?

12        A.    Yes, this is -- this is the rosters that I hand

13   out to the pods.

14        Q.    So Exhibit-309, and the schedules that we see,

15   are you -- you refer to these as a roster?

16        A.    Yeah, I call them rosters.

17        Q.    And the rosters, is that a document that you

18   create?

19        A.    Yes.

20        Q.    And if we look at the first page there of

21   Exhibit-309, we see a heading A-1 Pod, and there are slots

22   for 15 different workers, although 14 of them have names.

23              Are you with me?

24        A.    Yes.

25        Q.    Who decided that there would be potentially 15

Michael Heye                                    December 4, 2019

                                                        Page 65

1    workers for the A-1 Pod on this given day or week?

2         A.   This was set up before I even started in the

3    worker program.   ICE is the one that allows us to have so

4    many workers or so many assignments.   So each pod is set up

5    with so many assignments.

6         Q.   So if I understand you correctly, in the ten

7    years or so that you've been a classification officer,

8    there is a template more or less that you've been working

9    from for the -- to complete the rosters?

10        A.   A template?

11             Like what are you asking?

12        Q.   Well, just backing up, my question was, who

13   decided that there would be potentially 15 workers for the

14   A-1 Pod on October 22nd, 2015, as shown here on

15   Exhibit-309?

16             And if I understood you, you said ICE; did I get

17   that right?

18        A.   Well, yeah, this has been 15 for I don't know

19   how long, forever, as far as I know.

20        Q.   And how is it that -- that you know that though,

21   that it's been 15?

22        A.   When I started the worker program in '09,

23   that's, I believe, because I don't have roster way back

24   then, how many were in that pod --

25        Q.   Are you --

Michael Heye                                        December 4, 2019

Page 66

1       A.    -- that were assignments.

2             There's only 14 because one of them -- somebody

3       is not currently in that position.

4       Q.    It sounds like you're referring to a limit; is

5       that fair to say --

6       A.    A limit?

7       Q.    -- of workers?

8       A.    ICE allows us to -- says how many you can have

9       in each unit.

10      Q.    And what I'm driving at is how was that

11      information communicated to you?

12      A.    To me?

13      Q.    Yes.

14      A.    It was never communicated to me by ICE because

15      it was already set up when I started.

16      Q.    And when you say it was already set up, what

17      is -- I mean, are you referring to a document, or did Ms.

18      Singleton just tell you?

19      A.    Ms. Singleton was already doing this.

20            This specific document right here I created to

21      make it easier to know who was doing what.  The document

22      that they had before was just a handwritten document of --

23      of the people that were assigned.

24      Q.    And that handwritten document, would it have

25      just had a number of slots available on it as well?

Michael Heye                                    December 4, 2019

Page 67

1        A.    It was a blank, and they wrote the names in it.

2        Q.    Did you ever write the names in on the blanks on

3   the old form?

4        A.    I -- when I was a pod officer I did, yes.

5        Q.    And how did you know the maximum number of names

6   that you could fill in, or did you know?

7        A.    It was a roster that we had that told us how

8   many slots we had.

9              The rosters have changed throughout the year.

10   When I came in here, there wasn't this.  I created this as

11   we went along to make it easier for the pod officers to see

12   who was in there instead of handwriting them in.

13       Q.    When did you create the new roster form?

14       A.    I don't know.  It was over the years.  I had to

15   perfect it and make it right.

16       Q.    And I just want to make sure I understand you.

17             So in terms of the number of workers that you

18   can assign to any given detail, that number is just what

19   it's always been as determined by ICE; is that your

20   testimony?

21       A.    Yes.

22       Q.    And in terms of how it was related to you what

23   the number is, right, the maximum number for any given

24   detail, where did you first hear or learn that information?

25       A.    Through Ms. Singleton.

Michael Heye                                      December 4, 2019

Page 68

1        Q.   And no other place?

2        A.   She was the one that trained me on the worker

3   program in the classification when I became a

4   classification officer.

5        Q.   As best you can remember, can you tell me what

6   she related to you about the maximum number of workers that

7   were eligible --

8        A.   She just --

9        Q.   -- for each assignment?

10       A.   -- said that's what ICE has put out, so that's

11   what we went with.

12       Q.   Now, is it different for the kitchen services in

13   terms of how the number of workers is decided?

14       A.   Like how many are allowed to work in the

15   kitchen?

16       Q.   Yes.

17       A.   Or be assigned to the kitchen?

18       Q.   Yes.

19       A.   That we have a maximum amount that's -- that's

20   allowed in the kitchen.

21       Q.   And who is that number set by, if you know?

22       A.   That's also ICE as well.

23       Q.   I'd like to show you a document.  So let's take

24   a look at Exhibit-302.

25            Just been handed Exhibit-302.  It's a multipage

GEO Objections Foundation, FRE
402, 701, 802.

Michael Heye                                    December 4, 2019

Page 69

 1    document.  It's an excerpt from GEO's Policy and Procedure

 2    Manual, the chapter's Food Service, the title is Food

 3    Service Operations.

 4              Are you with me?

 5        A.   Okay.

 6        Q.   Have you seen this document before?

 7        A.   No, I haven't read this specific one before.

 8        Q.   Well, could you turn to page 5 of 35.

 9        A.   Five of 35, okay.

10        Q.   And if you can look at the heading 10 there,

11    Detainee Workforce.

12              Do you see that?

13        A.   Okay.

14        Q.   It says "The number of detainees assigned to the

15    food service department will be based on a quote developed

16    by the FSA and approved by the Warden."

17              Who is the FSA?

18        A.   Food service administrator.

19        Q.   Now, in reading this section here from

20    Exhibit-302, the food service operations manual --

21        A.   Okay.

22        Q.   -- does that refresh or change your memory as to

23    who sets the number of workers for the food service

24    department?

25              MS. MELL:  Object to the form of the question.

Michael Heye                                    December 4, 2019

Page 70

1        A.    So far as I know, they have not set the quote of

2    how many food service workers they can have.

3              Well ...

4        Q.    Was there ever a time that you had to request or

5    recruit kitchen workers?

6        A.    No.

7        Q.    You know, I don't mean to play gotcha.  Give me

8    a second.  Let's have you review this email here.

9              (Exhibit-323 marked.)

10             THE COURT REPORTER:  This is Exhibit-323.

11       Q.    All right, you've just been handed Exhibit-323.

12   This is a short email from you to Van Ngonephasouk --

13       A.    Yeah.

14       Q.    -- dated December 26, 2012.

15             Are you with me?

16       A.    Yeah.

17       Q.    And you write, "Requesting Kitchen workers"?

18       A.    Yep.

19       Q.    Can you tell me what that's about?

20       A.    She works for the PHS, which is medical.  Any

21   kitchen worker has to be cleared by medical first before we

22   can assign them to the kitchen.  So what we do is anybody

23   that wants to be assigned to kitchen, we put them on a

24   list, and send that to medical, and Van is the one that

25   gets that list, and then she gives it to the nurses or

402, 701, 802.

Michael Heye                                          December 4, 2019

Page 71

1   whoever does the clearing to say that yes, they are good to

2   go to work in the kitchen, or to be assigned to kitchen,

3   and Van is the one that then gives me the list back.

4              What I'm doing is I'm saying, Where is my list?

5   We need kitchen.  How come it's taking so long, in a

6   nutshell.  So that's what that means.

7              So I have assigned people or detainees, I'm

8   waiting for them to be cleared, I'm going, Where are they?

9              MS. MELL:  So do you retract the gotcha?

10             MR. WHITEHEAD:  I said I don't mean to play

11  gotcha.  That wasn't my intent at all, not at all.  If I

12  was playing gotcha, I wouldn't have put the document in

13  front of him.

14       Q.    Does GEO hold periodic department head meetings?

15       A.    Yes.

16       Q.    Tell me about those.

17       A.    Typically once a month, department heads sit

18  together in a room like this, and the warden, and the

19  A-dub, and -- or facility administrator, and all them are

20  in there, and they talk about stuff that goes on in the

21  facility.

22       Q.    So the various department heads are making the

23  rounds and sort of giving updates about what's going on in

24  their departments --

25       A.    Correct.

Michael Heye                                    December 4, 2019

Page 72

1       Q.   -- is that fair to say?

2       A.   Yes.

3       Q.   And you participate in these meetings?

4       A.   I do participate.

5              (Exhibit-324 marked.)

6              THE COURT REPORTER:  This is Exhibit-324.

7       Q.   You've just been handed Exhibit-324.

8              What are we looking at here?

9              THE WITNESS:  Is he talking to me?

10      Q.   Yes.

11      A.   Oh, I didn't know.

12             It looks like Department Head Meeting Minutes.

13      Q.   And is it the case that minutes are taken at

14   these meetings?

15      A.   Yes.

16      Q.   Who typically takes the minutes?

17      A.   Let's see, the -- I want to say the warden's

18   secretary.

19      Q.   If you look at the back of Exhibit-324 --

20      A.   Shihpei.  Prepared by Shihpei Stevenson, yeah.

21      Q.   So there's someone there at the -- the meeting

22   taking minutes?

23      A.   Correct.

24      Q.   Let's look at the first page there under item 2,

25   Captain Portillo requested more Food Service detainee

Michael Heye                                    December 4, 2019

                                                      Page 73

1    workers.

2          A.    Mm-hm.

3          Q.    "We will increase the number to 15."

4                Did I read that correctly?

5          A.    Yeah.

6          Q.    Can you tell me about what was discussed at the

7    meeting as it relates it to Captain Portillo requesting

8    more food service detainee workers and increasing the

9    number to 15?

10         A.    That I don't know why they would say that.

11               Back then, we had -- what do you want to say --

12   detainees were not requesting to work in the kitchen or to

13   be assigned to kitchen, so what he's asking is that they

14   need to put out and ask detainees if they would like to be

15   assigned to the kitchen.  Not that we need more, we need

16   more, but we have a set number that we can have, which was

17   more than 15.  So the person that took the minutes didn't

18   quite write down the correct way that that was verb --

19   written.

20         Q.    But you have some --

21         A.    Does that make sense?

22         Q.    -- memory of Captain Portillo requesting more

23   food service workers?

24         A.    I do not.  Sorry, I don't.

25               That was way back in '16.  That's four years

Michael Heye                                          December 4, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 74

1    ago.

2           Q.   Now, when the detainee workers request work, are

3    they applying for specific detainee worker positions?

4           A.   Some ask for specific assignments and others ask

5    for any available assignment.

6           Q.   And there are job descriptions for the detainee

7    workers; is that correct?

8           A.   There is job descriptions.

9           Q.   Who creates the job descriptions?

10          A.   As to how it's done?

11          Q.   Well, my question was a little different, I

12   mean, who creates them, but if you'd like to start --

13          A.   Who creates them?

14          Q.   -- we can talk about the process for creating

15   them, if you'd like.

16          A.   The job descriptions were already put in when I

17   started.

18          Q.   So is your answer then you don't know?

19          A.   Correct, I don't know who set up the job

20   descriptions already.

21          Q.   Now, does your work require you to work with or

22   review the job descriptions?

23          A.   Yes.

24          Q.   How so?

25          A.   So when a job is like floor detail, they have to

Michael Heye                                    December 4, 2019

Page 75

1    put out signs, they have to get the mop buckets, fill them,

2    and then put everything away, and then put the signs away.

3    So that's like the job description, whether they want the

4    assignment to be -- or you know, the safest way to do the

5    assignment, or what does the assignment entail?

6            So when I made up my forms, I went off of the

7    descriptions that I had before on the old forms as to what

8    the job -- that right there shows a brief description of

9    what the job or the assignment is, and then the sheet that

10   they actually sign stating that they want that assignment

11   has more of what that description is of what they want --

12   of what the job -- or the assignment entails.

13        Q.   So if I understand you correctly, when you were

14   creating the rosters, an example of which is Exhibit-309 --

15        A.   Mm-hm.

16        Q.   -- you look at the job descriptions to complete

17   the column that talks about the main job responsibilities?

18        A.   Yeah, that's to help the officer know what the

19   assignment is, shower, if it's graveyard, if it's food

20   service --

21        Q.   So --

22        A.   -- if it's laundry.

23        Q.   -- you're agreeing with me that you review the

24   job descriptions so that you'll know what to give a summary

25   of essentially for the responsibilities on the roster you

Michael Heye                                          December 4, 2019

Page 76

1    create; did I get that right?

2         A.   Yes.

3         Q.   Okay, other than what you've just described of

4    reviewing the job descriptions so you can complete your

5    roster, are there -- is there any other occasion or reason

6    for you to look at the job descriptions?

7         A.   No.

8         Q.   Do you ever request or make changes to the job

9    descriptions?

10        A.   We have modified the description.

11        Q.   And when you say "we," you mean GEO?

12        A.   I have and gave it to the A-dub to have it

13   signed off by ICE so that -- because a pod officer was

14   requesting that they actually have, you know, something

15   else done while cleaning, or one of the descriptions needs

16   to be -- how do you say it? -- more specific because

17   detainees like to say, Well, that's not in my assignment, I

18   don't have to do that.  So we have to lay it out

19   specifically as to what the assignment entails, so ...

20        Q.   So how often does that happen where you've

21   requested a change or modification to a job description?

22        A.   I've maybe done it once.  It's pretty laid out

23   and straightforward already.

24        Q.   Well, let's take a look at some -- some job

25   descriptions.

Michael Heye                                    December 4, 2019

Page 77

1           Could you go to Exhibit-304, please.

2           So Exhibit-304 is comprised of several job

3     descriptions for kitchen area details.

4           Are you with me?

5      A.    Detainee Job Description, okay.

6           MR. WHITEHEAD:  And I'll, Counsel, represent for

7     the record, just like yesterday, there is no Bates stamp on

8     Exhibit-304, but it is, in fact, a document that was

9     produced to my office by GEO.  I believe some sort of

10    printing error occurred wherein the Bates number just was

11    not printed on the document.

12          MS. MELL:  We're still using -- we're using the

13    same one from yesterday; right?

14          MR. WHITEHEAD:  That's right.

15          MS. MELL:  Yeah, yeah, got it, thank you.

16     Q.    Now, looking at the job duties -- strike that.

17          Looking at the specific work duties for each of

18    these jobs, are they consistent with your understanding of

19    what these jobs entail?

20     A.    I've never seen this.

21     Q.    My question's a little bit different.

22          In looking -- and we can certainly take them one

23    by one if you'd like, but let's look at the first page of

24    Exhibit-304.

25     A.    Okay.

Michael Heye                                    December 4, 2019

Page 78

1          Q.   The job title is for Cook.

2          A.   Okay.

3          Q.   The work area is Kitchen.

4          A.   Uh-huh.

5          Q.   Have you ever seen a job description for cooks

6     in the kitchen before?

7          A.   Kitchen has their list of stuff that they do,

8     and I have not seen this one before.  I haven't -- I barely

9     looked at the ones that they have.  Kitchen takes care of

10    all their sign-offs, and -- and initialing, and all that

11    kind of stuff.

12              What my job is for kitchen is to take the kites,

13    process them through medical, and then assign them to

14    kitchen.  And then kitchen, once they go in there, the

15    kitchen staff does all the training, and all the sign-offs,

16    and all that.  So I don't know how many different sections

17    there are.  On my roster that I give kitchen, it's just

18    that they work in kitchen, breakfast, lunch, or dinner.

19              Now, what all the different assignments there

20    are in kitchen, I don't -- I don't have a list of that.

21         Q.   Well, my question's a little bit different --

22         A.   Okay.

23         Q.   -- in that was there a time or do you recall

24    looking at the job description for cook for detainee

25    worker?

Michael Heye                                December 4, 2019

Page 79

1          A.   No.

2          Q.   And is that because, as you just described, you

3    just -- the procedure's a little bit different for the

4    kitchen workers in terms that the -- the facility

5    administrator -- strike that.

6               Tell me what the difference is.

7          A.   The kitchen staff deals with all the kitchen

8    assigned detainees that are assigned in there.  I don't do

9    anything but get them cleared through medical and make sure

10   that they have detainees to work -- or to be assigned in

11   the kitchen.

12         Q.   And this is different than what you do for let's

13   say pod workers; is that the case?

14         A.   Pod workers, no, it's the same.  The officers in

15   the pod assign detainees the assignment in the pod.  I just

16   have a little more -- what do you call it --

17         Q.   Familiarity?

18         A.   -- correct, familiarity with it because I get

19   those forms personally that then get put into their file.

20         Q.   I'm with you.

21              Let's take --

22         A.   Whereas the kitchen's forms are -- are kept in

23   kitchen.

24         Q.   Let's take a look at Exhibit-315.  This is going

25   to be in your stack again.

Michael Heye                                    December 4, 2019

                                                      Page 80

1              Exhibit-315, these are various job descriptions

2     within the facility.

3              Do these appear more familiar?

4         A.   Yes.

5              They're older forms, yes.

6         Q.   So let's take the first one here.

7         A.   Mm-hm.

8         Q.   Exhibit-315, the first page, we've got job title

9     Barber.

10             Do you see that?

11        A.   Yes.

12        Q.   And the specific work duties, are those

13    consistent with your understanding of what the barber job

14    entails?

15        A.   It looks like what they would do.

16        Q.   Now, the specific work duties on the job

17    descriptions, are the detainee workers allowed to deviate

18    from their specific work duties?

19        A.   Deviate how?  I mean, do they do every single

20    thing that's on here, or do they do other things besides

21    what's on here?

22        Q.   Well, let's look at Exhibit-315, the middle

23    bullet there.

24        A.   Uh-huh.

25        Q.   This says, for example, "Towels will not be

Michael Heye                                          December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

Page 81

1    used."

2              A.    Okay.

3              Q.    Would a detainee be allowed to use a towel even

4    though the job description might say otherwise?

5              A.    The -- that I don't know because I don't work in

6    the barbershop, so I don't know what they allow them or do

7    not allow them to do.

8              Q.    Do you have an understanding about whether

9    detainees are expected to follow their specific job duties?

10             A.    I would say that they would follow the job

11   duties.

12             Q.    When you were a pod officer -- strike that.

13             You were a pod officer from about 2004 to 2007;

14   is that correct?

15             A.    Yes.

16             Q.    And did you direct and supervise detainee

17   workers as part of your job as a pod officer?

18             A.    Yes, detainees worked in -- had assignments in

19   the pods that I worked in, yes.

20             Q.    And when you were directing and supervising

21   detainee workers as a pod officer, was it your expectation

22   that they follow their specific work duties?

23             A.    To a degree, yes.

24             Q.    So, for example, if a pod worker said, I want to

25   clean a different unit today, would you allow something

Michael Heye                                           December 4, 2019

Page 82

1     like that?

2          A.     They can't.

3          Q.     And if a detainee worker said that I would like

4     to use a different cleaning solution today, could they?

5          A.     No, because there's specific cleaning solutions.

6     And each detainee is only allowed to be in their unit.

7     They can't go to any other unit anyways.

8          Q.     And GEO provides the detainee workers with the

9     cleaning solution that they would need to do the job;

10    correct?

11         A.     Yes.

12         Q.     And as a pod officer, would you provide training

13    to the detainee workers about how to do their job?

14         A.     Yes.

15         Q.     And if a detainee worker didn't do their job,

16    there could be consequences; is that correct?

17         A.     What kind of consequences?

18                What are you asking?

19         Q.     Discipline or termination from their detainee

20    worker job?

21         A.     There's no disciplinary for not doing your

22    assignment.  They either want to do the assignment or they

23    don't want to do the assignment.  If they don't want to do

24    the assignment, and they sign a refusal form refusing to do

25    the assignment, then another detainee can be offered that

Michael Heye                                    December 4, 2019

                                                        Page 83

1    assignment.

2         Q.   Poor job performance, could that be cause for

3    termination from a detainee worker job assignment?

4         A.   The only -- so if a detainee's supposed to sweep

5    and mop the floor, and it's not done completely, then the

6    officer can say, You need to finish the job or -- yeah,

7    finish the job.  And if the detainee does not want to

8    finish the job, then they can say, Well, then you can sign

9    a refusal form that you do not want to do your assignment.

10        Q.   Well, let's take a look at Exhibit-315.  Let's

11   look at page 3.  This is a detainee job description, job

12   title is Medical Cleaning.

13        A.   Medical Cleaning?

14        Q.   Yes.

15        A.   Okay.

16        Q.   If you look towards the bottom of the document

17   there, there's a heading that says Termination --

18        A.   Okay.

19        Q.   -- do you see that?

20        A.   Mm-hm.

21        Q.   That's yes?

22        A.   Yes.

23        Q.   And the first item there says "Failure to follow

24   CSC staff instructions."

25             Do you see that?

Michael Heye                                    December 4, 2019

Page 84

1        A.    I do.

2        Q.    Do you agree that failure to follow GEO staff

3   instruction could lead to termination of a detainee worker?

4        A.    CSC was a long time ago.

5              How old is this form?

6        Q.    I don't know.

7              To my question, do you agree that failure to

8   follow GEO staff instruction could lead to termination of a

9   detainee worker?

10       A.    Well, that's up to the detainee.  We don't -- we

11  cannot fire a detainee, they have to refuse to do the

12  assignment that they want.  If they do not follow staff

13  instructions, then that is not following the assignment or

14  not -- it's a safety issue.  So if they don't follow staff

15  instructions, it can be a safety issue.

16       Q.    All right, well --

17       A.    So if they don't follow staff instructions, it

18  can be a write-up for not following staff instructions, and

19  then from there on, it goes up the chain of command.

20       Q.    Well, let's take a look at the next item there

21  on Exhibit-315, page 3, in the Termination section, the

22  next one reads, "Failure to follow safety procedures."

23       A.    Correct.

24       Q.    Do you agree that failure to follow safety

25  procedures could lead to the termination of a detainee

Michael Heye                                    December 4, 2019

                                                        Page 85

1    worker?

2           A.   If you're unsafe, then the officer will let them

3    know that they're unsafe and try to correct the process.

4    If not, like I said, then you're not following staff

5    instructions, and for the safety of the facility and the

6    detainee, they need to follow safety instructions and the

7    instructions of the staff at all times.

8           Q.   Now, I'm doing my best to phrase this one as a

9    yes or no question, so I'll try one more time.

10               Do you agree that failure to follow safety

11   procedures can lead to the termination of a detainee

12   worker?

13          A.   I can't give you a yes or no answer on that

14   one --

15          Q.   All right.

16          A.   -- because it -- it depends on the circumstances

17   that have to go with it.

18          Q.   Well, how about theft, do you agree that theft

19   can lead to the determining -- the termination of a

20   detainee worker?

21          A.   Theft has per the disciplinary process.

22          Q.   So that's yes, you're agreeing with me?

23          A.   I'm saying that it can, but it's not always.

24          Q.   And that's all I'm asking, whether it could.

25               I mean, I -- I get that severity and magnitude

Michael Heye                                    December 4, 2019

                                                        Page 86

1    matter here, right, but I'm just asking could theft lead to

2    the termination of a detainee worker?

3         A.   Yes and no.  It has and it hasn't on both parts,

4    depending on the circumstances and what the disciplinary

5    process outcome has come out about from it.

6         Q.   Now, you said something about earlier that

7    detainee workers cannot be terminated; did I get that

8    right?

9         A.   No, cannot be fired.  You can't tell a detainee

10   that he's fired.

11        Q.   What about --

12        A.   Because officers like to, quote-unquote, say,

13   You're fired, which you cannot do.

14        Q.   What about termination, can GEO terminate

15   detainee workers?

16        A.   In policy and procedure, there's a stipulation

17   in there that the warden can remove a detainee from a

18   worker program.

19        Q.   So that's yes, you're agreeing with me?

20        A.   On how you want to stipulate it?  How you want

21   to say it?  Well, warden can.

22        Q.   The warden --

23        A.   That's what I'm saying, the warden can.

24        Q.   The warden is an extension of GEO.

25             So I'll try one more time, and then I'll --

Michael Heye                                          December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

Page 87

1    we'll move on to a different document.

2              Can GEO terminate a detainee worker under the

3    circumstances described in the job description here in

4    Exhibit-315, page 3?

5         A.   Through disciplinary process, they can, because

6    in the disciplinary process, it has in there that if you

7    are convicted of doing an infraction, you can have loss of

8    job.

9         Q.   Let's look -- take a look at Exhibit-3 --

10        A.   Or loss of assignment, sorry.  I keep messing

11   that one up.

12        Q.   Let's take a look at Exhibit-314.  This is the

13   Volunteer Work Program Agreement.

14        A.   Oh, okay.

15        Q.   Have you seen this document before?

16        A.   Yes.

17        Q.   Many times, in fact; correct?

18        A.   Yes.

19        Q.   Let's take a look at item 4 there at the very

20   top.

21        A.   Mm-hm.

22        Q.   It reads, "Unexcused absence, unsatisfactory

23   work performance, or participation in a serious infraction,

24   e.g. fighting, is cause for removal from a work

25   assignment."

Calls for speculation, Foundation, FRE 402, 701, 802.

Page 88

1          Do you see that?
2      A.   I do.
3      Q.   Do you agree with that statement?
4      A.   Yeah.
5      Q.   Let's look at item 6 there.  It
6   reads, "Detainees must adhere to all safety regulations and
7   to all medical and grooming standards associated with a
8   work assignment."
9          Do you see that?
10     A.   Yeah.
11     Q.   Do you agree that detainees must adhere to all
12  safety regulations and medical and grooming standards?
13     A.   Safety regulations, yes.
14     Q.   And the medical and grooming standards?
15     A.   They can come with messed up hair, I don't care.
16     Q.   Let's take the kitchen, for example, medical and
17  grooming matter there?
18     A.   Medical, they have to be or they cannot work in
19  the kitchen or be assigned to the kitchen, yes, they have
20  to be cleared by medical.
21     Q.   Let's look at the bottom of the Volunteer Work
22  Program Agreement.  There's a black bar there, we've
23  blacked out, redacted someone's name, but right above that,
24  the last sentence of that paragraph reads, "We thank you
25  for your important contribution to maintaining this

Michael Heye                                    December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

Page 89

1    facility."

2              Do you see that?

3         A.   I do.

4         Q.   Do you agree that the volunteer detainee workers

5    make important contributions to maintaining the Northwest

6    Detention Center?

7         A.   I always thank them when they're cleaning and

8    keeping the place nice and clean, yes.

9              And this is a very told old form, isn't it?

10   Yep.

11        Q.   So to my question, do you believe that the

12   detainee workers make an important contribution to

13   maintaining the facility?

14             MS. MELL:   Object to the form of the question.

15        A.   They don't maintain the facility, but they do

16   contribute to keeping it clean.

17        Q.   What's the distinction you draw between cleaning

18   and maintaining?

19        A.   Maintaining?

20        Q.   Mm-hm.  Yes.

21        A.   We keep the facility running and operational,

22   that's maintaining.

23        Q.   We being GEO and its personnel?

24        A.   GEO and its personnel, so that everybody is safe

25   and secure and that the maintenance is kept up, yes.

Michael Heye                                    December 4, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 90

1      Q.    Well, let's take the component parts --

2      A.    I don't know if that's even in there anymore.

3            Huh?

4      Q.    Let's break up the component parts.

5            Do you believe that the detainee workers make

6      important contributions to the Northwest Detention Center's

7      kitchen services?

8            MS. MELL:  Object to the form of the question.

9      A.    They take care of the food.

10     Q.    Do you believe that the detainee workers make

11     important contributions to the laundry operations at the

12     Northwest Detention Center?

13           MS. MELL:  Object to the form.

14     A.    It's the same thing.

15     Q.    Do you believe that the detainee workers make

16     important contributions to the barbershop?

17           MS. MELL:  Object to the form.

18     Q.    You've got to answer.

19     A.    Well, I keep saying the same thing.

20     Q.    Well, if the detainee workers didn't cut hair,

21     who would?

22           MS. MELL:  Object to the form.

23     A.    If the detainees do not cut hair, then they

24     don't get a haircut.

25           What?

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

Michael Heye                                        December 4, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 91

1      Q.   So it's your belief that if no one cut hair, the
2  detainee workers -- detainees just wouldn't get haircuts?
3           MS. MELL:  Object to the form of the question.
4      A.   Yeah, I don't understand.
5           If we didn't have a barbershop, we didn't have a
6  barbershop.
7      Q.   No, my question is, if there wasn't -- if there
8  weren't detainee workers cutting hair --
9      A.   Right.
10     Q.   -- who would?
11          MS. MELL:  Object to the form of the question.
12     A.   I don't know.
13     Q.   And if the detainee workers didn't clean the
14  pods, who would?
15          MS. MELL:  Object to the form of the question.
16     A.   (Shrugging.)
17     Q.   You've got to answer with words.
18     A.   It's -- it's not -- there's nothing to answer
19  there.
20     Q.   And the kitchen, if the detainee works didn't
21  assist in the kitchen, who would?
22          MS. MELL:  Object to the form of the question.
23     A.   I don't know who else would.
24     Q.   Well, does GEO use third-party services to clean
25  the pods?

GEO Objections: Foundation; FRE 402, 701, 802.

Michael Heye                                                    December 4, 2019

Page 92

1              MS. MELL:  Object to the form of the question.

2         A.   Hm.  To -- don't know.

3         Q.   Does GEO use a third-party service to cut hair

4    in the barbershop?

5         A.   Don't know.

6         Q.   What about laundry, does GEO use a third-party

7    service in the laundry department?

8         A.   Don't know.

9         Q.   Without the detainee workers, do you think that

10   GEO could carry out the cleaning responsibilities of the

11   detainee workers with GEO's existing workforce?

12        A.   I can't answer that.

13             MR. WHITEHEAD:  All right, let's take a break.

14             THE VIDEOGRAPHER:  We're now going off the

15   record.  The time is 12:30 p.m.

16                  (Lunch recess at 12:30 p.m.)

17

18

19

20

21

22

23

24

25

Michael Heye                                    December 4, 2019

                                                        Page 93

 1          Seattle, Washington; Wednesday, December 4, 2019

 2                          1:23 p.m.

 3                  -------------------------

 4          THE VIDEOGRAPHER:  We're now back on the record.

 5     The time is 1:23 p.m.

 6                  (Exhibit-325 marked.)

 7          THE COURT REPORTER:  This is Exhibit-325.

 8              E-X-A-M-I-N-A-T-I-O-N (resumed)

 9     BY MR. WHITEHEAD:

10          Q.   I've just handed you Exhibit-325, and I'll

11     represent to you that the first and second pages are part

12     of the production from your company, GEO.  My questions to

13     you are about the third page.

14          A.   Okay.

15          Q.   What are we looking at here?

16              MS. MELL:  This is --

17              THE WITNESS:  Yeah, the third page.

18              MS. MELL:  Yeah, I know, it's just the same

19     problem here?  So is this one -- is it likely in this

20     series?

21              MR. WHITEHEAD:  So, okay, I know what happened

22     here.  So this particular one -- all right, Counsel, so

23     Exhibit-325 is a native file that GEO produced.  So this

24     was an Excel spreadsheet.  So the first page is the

25     metadata that was associated with the production.  The

GEO Objections Foundation, FRE.
402, 701, 802.

Michael Heye                                          December 4, 2019

Page 94

1    second page is the slip sheet that bears the Bates number,

2    so you see there in the bottom right corner?

3                 MS. MELL:  Yeah.

4                 MR. WHITEHEAD:  This one says GEO-State 019281,

5    and then the printout from the Excel file is the third

6    page.

7                 MS. MELL:  Okay.  Okay.

8         Q.    All right.  So, Mr. Heye, my -- my question to

9    you is, what are we looking at here on this third page of

10   Exhibit-325?

11        A.    Pods, workers, hours, total.

12               Spreadsheet?

13        Q.    Now, according to the metadata produced with the

14   Excel spreadsheet, mheye, H-E-Y-E, is listed as the author.

15               Did you create this spreadsheet?

16        A.    Yeah.

17        Q.    So what does this spreadsheet reflect?

18        A.    It shows the pods and outside details.

19        Q.    When did you create this document?

20        A.    A couple years ago.

21        Q.    So 2017?

22        A.    I believe it was.

23        Q.    Why did you create this document?

24        A.    It was my -- it was either -- I think it was the

25   A-dub -- or was it Ryan?  One of the admin people asked me

Michael Heye                                          December 4, 2019

GEO Objections Foundation,
FRE 402, 701, 802.

                                                              Page 95

1    if they would -- if I would put a spreadsheet together on

2    how many pods we have, how many workers, or how many

3    assignments total there could be in each section, and then

4    they wanted to know how long certain things took and

5    average it out.

6              Q.   The information that's reflected here on the

7    spreadsheet, where is it derived from?

8              A.   The pods is how many pods we got, the workers is

9    the total number of assignments per unit, and then the --

10   where it says "Hours," I just called the pod and asked the

11   pod officer what is -- how long it typically takes for an

12   assignment to get completed.

13             Q.   Are you aware of any other purpose for this

14   document?

15             A.   Nope, they just asked me to put something

16   together.

17             Q.   So someone in your chain of command asked you to

18   put this document, which is Exhibit-325, together?

19             A.   Correct.

20             Q.   And the information that's reflected here, you

21   consulted with the detention officers to fill in the Hours

22   column; is that right?

23             A.   Correct, on some of it, and some of the other

24   stuff, kitchen and ...

25             Q.   For the kitchen, who did you consult with on

Michael Heye                                    December 4, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 96

1        that?

2              A.    The -- don't remember exactly who, probably Bert

3        Henderson.   She's the kitchen -- head of kitchen.

4              Q.    And medical?

5              A.    Whoever the medical officer would be at the

6        time.

7              Q.    Grey mile?

8              A.    Talk with graveyard officer at that time would

9        have been.

10             Q.    Barber?

11             A.    Same.

12             Q.    Intake?

13             A.    Same.

14             Q.    Laundry?

15             A.    Mm-hm.

16             Q.    Laundry female?

17             A.    Yes.

18             Q.    And OSR?

19             A.    Yes.

20             Q.    And that column labeled Worker, the number of

21       workers there, did you get that number from the rosters --

22             A.    Yes.

23             Q.    -- that you create?

24             A.    Yes.

25                   THE WITNESS:  Sorry, I should wait until he's

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com     206.622.6661 * 800.657.1110  FAX: 206.622.6236

Michael Heye                                            December 4, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 97

1    done.

2              MS. MELL:  Everybody's going to start now.

3         Q.  You made this document in approximately 2017;

4    have you updated it since then?

5         A.  I have not.

6         Q.  And when you created the spreadsheet, did you

7    then give it to whoever it was that had requested that you

8    make the document?

9         A.  Yes.

10        Q.  Do you know what happened with the spreadsheet

11   from there?

12        A.  I do not.

13        Q.  Now, in creating this spreadsheet, was it your

14   goal to be accurate and reliable in the information that

15   you were recording?

16        A.  As best as I could.

17        Q.  And did you consider this to be part of your

18   job, to create spreadsheets like this?

19        A.  Part of my job?

20        Q.  Yes.

21        A.  Yeah, my boss asked me to create a spreadsheet.

22   I had most of the information.

23        Q.  In that way, was it created in the ordinary

24   course of business, so to speak?

25        A.  Yes.

GEO Objections Foundation, FRE 402,
701, 802.

Michael Heye                                                    December 4, 2019

Page 98

1          Q.    And as far as the way you stored it, was it just
2     kept in the way that you normally keep records?
3          A.    I guess.  I don't -- just stored it, and then
4     that was the end of it, and I haven't seen it since.
5          Q.    And as you sit here today, do you have any
6     reason to dispute the accuracy of any of the data as you
7     recorded it back in 2017?
8          A.    It's accurate back then.  I would you have to
9     redo it again to see if anything has changed.
10         Q.    And if you were to create a spreadsheet today,
11    recording the same information, would it be the same,
12    different, or somewhere in the middle?
13         A.    I don't know.  I can't answer that one.
14         Q.    To your knowledge, did anyone else have access
15    to this spreadsheet that you created?
16         A.    I don't know if anybody else did or not.
17         Q.    Was it stored on your local hard drive or on a
18    server?
19         A.    It was stored on my computer.
20         Q.    Now, is there any effort on the part of GEO to
21    make sure that the -- any one job detail is not overstaffed
22    or understaffed?
23         A.    It's staffed however it's staffed.
24         Q.    What about the schedule?  I mean, I understand
25    the work details themselves, you've got the number of

Michael Heye                                    December 4, 2019

Page 99

1    slots, and you slot people into the slots --

2         A.   Mm-hm.

3         Q.   -- but in terms of the schedule, the hours of

4    day that people are assigned to work, how is that

5    determined?

6         A.   I don't know.  The hours were also on there at

7    the same time that the schedule was put out.  So graveyard

8    is graveyard, they start whenever they need to, I guess, at

9    lights out on graveyard, because that's -- when I was a pod

10   officer, that's when graveyard started, when lights out.

11        Q.   Well, what happens if everyone says that, you

12   know, I -- I want to work morning shift in the kitchen?

13   What do you do, if anything, as a classification officer

14   from there?

15        A.   Then I would --

16             MS. MELL:   Object to the form.

17        A.   I just put them on the list and specify what

18   shift they want.

19        Q.   Well, is there any communication back to the

20   detention officer, Hey, this shift is full, but we have

21   some availability for a shift later in the day?

22        A.   No, when they are -- when they apply for

23   kitchen, they'll either specify what shift they want or

24   they don't.  And if they don't, then when I call the pod

25   officer, I just say I have these.  So when we go to ask the

Michael Heye                                    December 4, 2019

Page 100

1   detainee if he wants an assignment, I'll call the pod

2   officer and say, Talk to detainee so and so and see if he

3   wants breakfast, lunch, or dinner.  Or I only have lunch or

4   dinner, see if they'll take either one of those.  That's

5   how the assignments are filled in to the kitchen.  If

6   there's space available, I will tell them there's space

7   available.  If there's no space available, then they either

8   specify, No, I want to wait for breakfast, and I put them

9   on a list, and when breakfast becomes available, then I'll

10  call them back and see if they want to work then or take

11  the assignment.

12          Q.   What are IDP sanctions?

13          A.   I -- that's disciplinary through the seg

14  officer.

15          Q.   Let me take it one level up, I guess, what is

16  IDP?

17          A.   Something disciplinary procedure.  Now you're

18  telling me acronyms I don't remember.

19               I don't remember.

20               MS. MELL:  That's fine.  That's an answer.

21          A.   I don't remember what IDP --

22          Q.   It's a panel related to disciplinary --

23          A.   Correct.  That I do know.  I just don't know

24  what the acronym is.

25          Q.   Do you have any involvement with the IDP

Michael Heye                                    December 4, 2019

                                                    Page 101

1    process?

2          A.    I do not.

3          Q.    Do you know who, as far as positions go, is on

4    the IDP panel?

5          A.    I know for IDPs -- I'm just -- as far as I know,

6    it's the seg lieutenant, and ICE, and some -- one -- a

7    regular officer, if they need one.  But I'm just -- you

8    know, that's what I know.  I know there's more involved in

9    that, but I do know that there's -- those three people are

10   involved.

11         Q.    As far as your job is concerned though, you

12   don't have anything --

13         A.    I have nothing to do with it.

14         Q.    What about UDC, what is UDC?

15         A.    It's one step lower than an IDP, I know that.

16         Q.    Do you have any involvement with the UDC

17   process?

18         A.    I don't.

19         Q.    Same thing?

20         A.    Right.

21               It's all disciplinary.  Segregation takes care

22   of that.

23               (Exhibit-326 marked.)

24               THE COURT REPORTER:  This is Exhibit-326.

25         Q.    Mr. Heye, you've just been handed Exhibit-326.

Michael Heye                              December 4, 2019

                                                    Page 102

1               Have you seen this document before?

2       A.    Yes.

3       Q.    What are we looking at here?

4       A.    It says Detainee Worker Program, prepared by

5  Alisha Singleton.

6       Q.    Is this part of the training that the

7  classification officers provide to the detention officers

8  and others about the worker program?

9       A.    It did, yes.

10      Q.    Have you ever worked from this outline before?

11      A.    This was a guide or an outline, like it says,

12  that we'd use to show the pod officers about the worker

13  program.

14      Q.    Now, the date on the first page of this one is

15  December 29th, 2011.

16      A.    Mm-hm.

17      Q.    Is this document still in use?

18      A.    No.

19      Q.    Is some version of this document still in use?

20      A.    I -- I don't know.

21      Q.    Well, looking at the topics that are represented

22  here, do these appear to be a fair and accurate

23  representation of the topics that you cover with the

24  detention officers and others when you're training them

25  about the worker program?

Michael Heye                                    December 4, 2019

Page 103

 1        A.    Similar topics, yes.

 2        Q.    Is there anything that you would add to the

 3   list?

 4        A.    Not that I'm aware of.

 5        Q.    Is there anything you would take off the list?

 6        A.    No, I'd have to read the whole thing, and I

 7   don't want to do that.

 8        Q.    Well, we've got a moment.  It's five pages,

 9   double-spaced, outline format.  Could you take a moment to

10   review the document?

11        A.    (Complying.)

12              Is there something you need to ask about on this

13   form?

14        Q.    The question that's pending is, is there

15   anything that you would remove from this list as far as the

16   training that you relate to the detention officers and

17   others about the detainee worker program?

18        A.    Well, skimming through it, as of right now, it

19   seems to be fine.

20                   (Exhibit-327 marked.)

21              THE COURT REPORTER:  This is Exhibit-327.

22        Q.    You've just been handed Exhibit-327.  It's a

23   document entitled Worker Program.

24              Have you seen this document before?

25        A.    Mm-hm.

Michael Heye                                    December 4, 2019

Page 104

1          Q.    That's yes?

2          A.    Yes.

3          Q.    What are we looking at here?

4          A.    Worker Program that has bullet points to it that

5    just -- it says certain things.  Detainees can only work

6    one job per day and only get one dollar per day.

7          Q.    Did you create this document?

8          A.    I did.

9          Q.    When?

10         A.    Shoot, I don't know.  Years ago?  A couple years

11   ago?  Three years ago?  I don't remember.

12         Q.    Is this a document that you still use?

13         A.    Yes.

14         Q.    What's the purpose of this document?

15         A.    So that I don't forget to tell our officers

16   certain things.  It's a help for me to remember when I'm

17   teaching.

18         Q.    So this is another checklist of sorts for topics

19   for you to cover when you're training people about the

20   detainee worker program; correct?

21         A.    Yes.

22         Q.    I want to look at the bullet towards the bottom,

23   it looks like it's the fifth from the bottom, it reads,

24   "You cannot fire workers.  If they are not doing their job

25   as required then you have them sign a refusal form.  If

Michael Heye                                    December 4, 2019

1    they refuse to sign, just put," in quotes, "refused to

2    sign," end quote, "on the detainee signature line."

3                Do you see that?

4          A.   I do.

5          Q.   What does that mean?

6          A.   That helps me tell the officers that they cannot

7    arbitrarily just fire a detainee, that if the detainee is

8    not performing the assignment as needed, he can tell them

9    to do the assignment again, or do it in the way that it's

10   supposed to be done, and if the detainee refuses, then the

11   officer can hand the refusal form to the detainee and have

12   him sign it saying he no longer wants to do the job.  And

13   if the detainee just refuses to sign or refuses to complete

14   the job as assigned, the officer has an option to write up

15   detainee for refusing staff orders and/or, you know, take

16   it from there, for the lieutenants, or however they want to

17   go with it.

18                This is just a guide to help me understand what

19   I need to explain to them.  It's an abbreviation, it's not

20   the whole -- so this form is abbreviation of a lot of

21   things that I teach.

22         Q.   Do you actually hand out this form, or is this

23   an outline you speak from?

24         A.   I think I've done both.

25         Q.   Now, that part about if they're not doing their

GEO Objections Foundation,
Rel. 402, 701,802

Michael Heye                                          December 4, 2019

Page 106

1    job and asking them to sign a refusal form --

2         A.    Mm-hm.

3         Q.    -- why sign a refusal form as opposed to just

4    the detention officer terminating that detainee worker's

5    employment or beginning the process to terminate that

6    worker's detainee job?

7              MS. MELL:  Object to the form of the question.

8         A.    The refusal form is part of an ICE policy, and

9    we have to have something in the file -- we have to have

10   paperwork in the file, whether they get assigned a job or

11   terminated from a job, whether they terminate it themselves

12   or whether it went through a disciplinary process and got

13   terminated, all paperwork has to be in the file, and so

14   when we get audited, they can go through the file and find

15   out what process was taken to do what needs to be done.

16             And it's also to help if a detainee wants to

17   grieve against something that has happened during the

18   worker program, we have it in the file as to the process

19   that happened.

20        Q.    From a paperwork standpoint, what requires more

21   to remove a detainee from a job, a refusal form or

22   beginning disciplinary or termination proceedings?

23             MS. MELL:  Object to the form of the question.

24        A.    What kind of question?  I mean, you need more or

25   less?

Michael Heye                                          December 4, 2019

Page 107

1          Q.   Well, I guess what I'm trying to get at is from

2     an administrative burden, which one is heavier, if a worker

3     that isn't performing, quote-unquote, quits from the job or

4     if GEO begins the process to have them removed from the

5     job?

6               MS. MELL:  Object to the form.

7          A.   Yeah, see, it doesn't work that way though.  The

8     detainee will either stop working and does not want to do

9     the job at all, goes back to their bunk, but won't sign a

10    refusal form either; still have to have a form that says

11    what happened, and the officer putting "refused to sign"

12    says the detainee no longer wants to work and is refusing

13    to do anything about it.

14         Q.   Well, what about in the case of a detainee

15    worker that is just doing a poor job or not carrying out

16    their specific job duties?

17         A.   The officer just tells them to do the job again

18    or do the assignment again until it's done the correct way

19    per the way it says in the job description.

20         Q.   And if their job performance is repeatedly

21    unsatisfactory, GEO has the right to begin the process of

22    termination for that detainee work assignment --

23              MS. MELL:  Object to the form of the question.

24         Q.   -- correct?

25         A.   No, that's not how they do that.

Michael Heye                                            December 4, 2019

GEO Objections Foundation, FRE
402, 701, 802.

Page 108

1          Q.    Well, just off the top of your head, the job

2    descriptions that you work with to create the detainee

3    worker rosters, do most of them feature a section called

4    Termination?

5          A.    On the which one?

6          Q.    The detainee worker job descriptions?

7                MS. MELL:  Object to the form of the question.

8          A.    I don't know if it does.  I don't -- on -- on

9    every form or just a certain form?

10         Q.    Well, my question was most, but are you aware of

11   any detainee worker job descriptions currently in use that

12   feature a section called Termination outlining the reasons

13   for terminating a detainee work assignment?

14         A.    I don't know, there may or may not anymore.

15         Q.    You're just not sure?

16         A.    I -- I don't know of all of them.  I have to

17   read them.  I know of a lot of them, and most of them do

18   not have the termination on there saying what -- what

19   dictates termination.

20         Q.    Okay.  Again, I'm just trying to understand.

21               Are there some currently in use that feature a

22   section called Termination?

23               MS. MELL:  Object to the form of the question.

24         A.    Yeah, I don't know if there still are.

25               (Exhibit-328 marked.)

Michael Heye                                    December 4, 2019

1              THE COURT REPORTER:  This is Exhibit-328.

2         Q.   You've just been hand Exhibit-328.  This one is

3    titled Volunteer Work Program for Pod Workers.

4              Do you see that?

5         A.   Yes.

6         Q.   Did you create this document?

7         A.   Yes.

8         Q.   What are we looking at here?

9         A.   General procedures for a pod officer.

10        Q.   Like Exhibit-327, is this another outline of

11   information to convey during your trainings for the

12   detention officers and others about the volunteer worker

13   program?

14        A.   Yeah.  Yes.

15        Q.   When did you create this document?

16        A.   This had to have been four years ago maybe.

17        Q.   And this document, did you give it to the people

18   that you were training or did you speak from it?

19        A.   Maybe a little of both; some I did, some I

20   didn't, just depended on the training.

21                   (Exhibit-329 marked.)

22             THE COURT REPORTER:  This is Exhibit-329.

23        Q.   Mr. Heye, you've just been handed Exhibit-329.

24        A.   Mm-hm.  Yes.

25        Q.   The document has a heading Department Head

Michael Heye                                        December 4, 2019

                                                           Page 110

1    Meeting Minutes, June 14th, 2011.

2             Do you see that?

3         A.   I see it.

4         Q.   Do you know whether you attended this meeting?

5         A.   It was so long ago, I do not, and is my name up

6    there?

7             My name's not even on it.  Looks like Alisha

8    Singleton.

9         Q.   Looking at the fourth item on this document, it

10   says "Ms. Singleton is working closely with ICE to revise

11   our classification system."

12            Do you have any knowledge about Ms. Singleton or

13   yourself working with ICE to revise the classification

14   system?

15        A.   June 2011.  That's a long time ago.

16            I know that -- I don't -- I don't know.  I

17   can't -- I can't speculate because I don't know for sure on

18   what it was about.

19        Q.   Let's look at the sixth item there.  It begins,

20   "The Voluntary Work Program is working well."

21            Do you see that?

22        A.   Okay.

23        Q.   Do you believe that the Voluntary Work Program

24   is currently working well?

25        A.   Yeah.  Yes.

Michael Heye                                          December 4, 2019

                                                          Page 111

1          Q.    Are there any aspects of the program that you
2    would change?
3          A.    Offhand, no.
4          Q.    If you could, would you pay the workers more
5    than a dollar a day?
6          A.    That's not for me to decide.
7          Q.    Let's look at the next line here.  It says "We
8    are looking for incentives that are allowed by the policy,
9    standards, and/or contract to compensate kitchen and
10   laundry workers beyond $1.00 a day."
11               Do you see that?
12         A.    I see it.
13         Q.    Do you recall any discussion about incentives to
14   compensate kitchen and laundry workers beyond a dollar a
15   day?
16         A.    I do not.
17         Q.    Do you have any reason to doubt that the meeting
18   attendees discussed incentives to compensate kitchen and
19   laundry workers beyond a dollar a day?
20               MS. MELL:  Object to the form of the question.
21         A.    Can't say that.
22         Q.    Is that a no?
23               MS. MELL:  Object to the form of the question.
24         A.    I can't say either way.  I wasn't there.
25                    (Exhibit-330 marked.)

Michael Heye                                    December 4, 2019

                                                      Page 112

1               THE COURT REPORTER:  This is Exhibit-330.

2          Q.   Mr. Heye, you've just been handed Exhibit-330.

3     This appears to be a memo from classifications, Ms.

4     Singleton and yourself, to Associate Warden McHatton.

5               Do you agree?

6               MS. MELL:  Object to the form.

7          A.   It's a memorandum to Associate Warden McHatton.

8     Okay.

9          Q.   Is this a memo from you and Ms. Singleton to

10    Associate Warden McHatton?

11         A.   I can't say because I don't remember this.  She

12    might have done it and put my name on it because we're both

13    working in the same capacity.

14         Q.   Do you remember --

15         A.   Yeah, I don't remember this memo, sorry.

16         Q.   Is it that you don't have a memory one way or

17    another --

18              MS. MELL:  Object --

19         Q.   -- about your involvement in authorizing this

20    memo --

21              MS. MELL:  Object --

22         Q.   -- or are you saying you did not?

23              MS. MELL:  Object to the form of the question.

24         A.   I don't remember the memo.

25         Q.   So it's possible, you just don't remember either

Michael Heye                                December 4, 2019

Page 113

1    way; correct?

2            MS. MELL:  Object to the form of the question.

3        A.   I don't remember.

4        Q.   Well, let's look at the last sentence of the

5    memo.  It reads, referring to the PBNDS standards for

6    2011, "that compensation is now at least $1.00 however

7    doesn't say we don't have the option to pay more if we

8    like."

9            Do you see that?

10           MS. MELL:  Object to the form of the statement.

11       A.   That's what is written.

12       Q.   What do you take that to mean?

13           MS. MELL:  Object to the form of the question.

14       A.   Yeah, I don't know exactly what it means.  I

15   don't know where she's getting it from.

16       Q.   Well, again, and I don't mean to be

17   argumentative, but is it that you're -- you did not author

18   this or you don't remember?

19           MS. MELL:  You are being argumentative.  Object

20   to the form of the question, asked and answered.

21       A.   I already answered already.

22       Q.   Well, Mr. Heye, like I said at the outset of the

23   deposition, there's a written transcript and a recording,

24   and I just want to give you one more chance before I play

25   this video for the judge and the jury --

Michael Heye                                December 4, 2019

GEO Objections
Foundation, FRE 402, 701, 802.

Page 114

1              MS. MELL:  Are you threatening my client?

2         Q.   -- are you saying --

3              MS. MELL:  Counsel, are you threatening my

4    client?  You need to stop doing that.

5              MR. WHITEHEAD:  Counsel --

6              MS. MELL:  He asked -- you asked it, he

7    answered.  If you don't like the answer, you don't get to

8    badger him, and don't threaten him.

9         Q.   Is it that you don't remember or you did not

10   author this document?

11             MS. MELL:  Object to the form of the question.

12        Q.   You need to answer my question with words.

13        A.   I already answered.

14        Q.   What is keefe?

15        A.   Keefe is the -- the what finance uses for funds.

16             (Exhibit-331 marked.)

17             THE COURT REPORTER:  This is Exhibit-331.

18        Q.   You've just been handed Exhibit-331.  It's an

19   email string, so it may make sense to start in reverse

20   chronological order here.  So if you look at the -- or I

21   should say chronological order.  So if you look at page 2,

22   there's an email from you to Mr. McHatton.

23             Do you see that?

24        A.   Yep.

25        Q.   Take a moment to read what you've written there.

GEO Objections Foundation, FRE 402, 701, 802.

Michael Heye                                                    December 4, 2019

Page 115

 1                My question to you will be, what -- what's going

 2    on?  What's the -- the situation here that you're

 3    addressing with Mr. McHatton?

 4         A.    (Complying.)

 5                I barely even remember this.

 6                What is your question?

 7         Q.    Well, describe for me what the situation is that

 8    you're addressing with Mr. McHatton.

 9         A.    Detainee pay is paid the next business -- or the

10    next day, typically the next business day.

11         Q.    Well, tell me what your role is, if any, with

12    the keefe banking data.

13         A.    I don't do it anymore, finance takes care of

14    that.

15         Q.    Did you do it for a time?

16         A.    I did, back in the day.

17         Q.    From when to when?

18         A.    When I started classification, and then I don't

19    know, it was several years ago that finance started doing

20    it.

21         Q.    So from 2009 to maybe 2016?

22         A.    Maybe '15?  I don't remember exactly when they

23    took it over.

24         Q.    So during that time, what exactly did you do

25    with the keefe banking system?

Michael Heye                                                    December 4, 2019

Page 116

       1          A.    Similar to what they do now.   We get the sheets,

       2     and we go into the system, type in their A number, put a

       3     dollar, and that's it.

       4          Q.    This is the worker pay sheet --

       5          A.    Yes.

       6          Q.    -- that you're referring to?

       7          A.    Yes.

       8          Q.    Was there ever a time that you would review the

       9     entirety of the keefe banking ledger?

      10          A.    No, I don't know how to use it.  They gave me

      11     access to put in a dollar, and that was pretty much it for

      12     the keefe system.

      13          Q.    Is it keefe or keefe?

      14          A.    I think it's called keefe.

      15          Q.    I don't know, that's why I'm asking.

      16          A.    They say it's called keefe, so that's the way I

      17     got it.

      18                MR. WHITEHEAD:  Let's take a look at another

      19     exhibit here.

      20                     (Exhibit-332 marked.)

      21                THE COURT REPORTER:  This is Exhibit-332.

      22          Q.    You've just been handed Exhibit-332.

      23          A.    Okay.

      24          Q.    Have you seen this document or a document like

      25     this before?

Michael Heye                                    December 4, 2019

1          A.    This one (indicating)?  No.

2          Q.    The top page you're saying?

3          A.    Correct.

4          Q.    And then the subsequent pages?

5          A.    Well, it looks similar to a printout that I do

6    after we batch it all together for the day.  This is a lot

7    more though.

8                      (Reporter requested clarification.)

9                 MS. MELL:  A lot more.

10         A.    Okay, so this is a lot more.  It looks similar,

11   but it's not the same.

12               After you enter all the amounts in for each

13   detainee, you -- you complete the batch, and then you

14   print, and it prints everything that you've done.

15               This is different than what I've seen.  So I

16   don't know what this exactly is, whether Barb does

17   something different or not, but I've never seen this part

18   of it.

19         Q.    Who's Barb?

20         A.    Shank?

21               She's the finance manager.

22         Q.    And so 2009 to 2015 or so, you would take the

23   worker pay sheets and enter in the amounts manually into

24   the keefe banking system?

25         A.    Correct.

Michael Heye                                    December 4, 2019

1          Q.    And this printout that we're looking at,

2     everything but the first page of Exhibit-332, looks similar

3     but is not the same as to the report that you would

4     generate?

5          A.    Correct.

6          Q.    Now, the -- the printouts that you would do,

7     where would they go, or what would you do with them?

8          A.    They get stapled, filed in the file cabinet, and

9     then after so much time, we box them up, and they get sent

10    off to storage.

11         Q.    Now, if you look at Exhibit-332, there is a date

12    and time column.  Do you know whether the date and time

13    reflected in the keefe banking system for the payment is

14    the day that the worker shift occurred or just the date

15    that the payment was made?

16         A.    The description is the date the detainee did the

17    assignment.  The Date Time could be when it was entered

18    into the system because it looks similar to what it is.

19                     (Exhibit-333 marked.)

20              THE COURT REPORTER:  This is Exhibit-333.

21         Q.    Mr. Heye, you've just been handed Exhibit-333.

22    The first page is an email from Bill McHatton to Jennifer

23    Nussbaum, and if you look there towards the end, you were

24    cc'd on the message.

25                     (Indicating.)

Michael Heye                                      December 4, 2019

                                                            Page 119

1                   Are you with me?

2          A.    Okay.

3          Q.    Do you remember this email?

4          A.    When was it?

5                I don't.

6          Q.    I'm just giving you a moment to read the email

7      here to orient yourself.

8          A.    Yeah, because I don't -- I don't remember this.

9          Q.    Well, my question is about a statement that Mr.

10     McHatton makes on the first page.  If you look at the

11     second -- actually, the third to the last sentence, he

12     writes, Rather than going through the disciplinary process,

13     CSO Jaramillo is meeting with the detainee and will

14     follow-up on the job termination by way of a memo to his

15     file.

16               Do you see that?

17         A.    Mm-hm.

18         Q.    That's yes?

19         A.    Yes.

20         Q.    What do you take that to mean?

21         A.    I do not know.

22               Yeah, I don't know.

23         Q.    And when Mr. McHatton writes about "Termination

24     by way of a memo to his file," do you have any insight into

25     what that might mean?

Michael Heye                                    December 4, 2019

Page 120

1          A.   I do not.

2          Q.   Is that a process that you're familiar with --

3     or is that a process, termination by memo?

4          A.   I --

5               MS. MELL:  Object -- I'd object to the form.

6          A.   I don't know.

7               MS. MELL:  I don't think that's what it says.

8          A.   I don't know.

9               Huh.

10         Q.   Mr. Heye, looking at the second page of

11    Exhibit-333, towards the top there, there's a reference to

12    CDR Anita Glenn-Reller.

13              Do you know who that is?

14         A.   Glenn-Reller?  No.

15         Q.   Do you know whether that's GEO personnel -- or

16    she is GEO personnel?

17         A.   I -- I don't know.  CDR Glenn-Reller.  I don't

18    know what that is.

19         Q.   I'm sorry, I couldn't quite hear you.

20         A.   Do you know what CDR is?  I don't know what CDR

21    is.

22         Q.   I don't know.  That's really why I'm asking.

23         A.   Yeah, I don't know it either.

24              CDR Glenn-Reller.

25              MR. WHITEHEAD:  All right, well let's take a

Michael Heye                                      December 4, 2019

                                                        Page 121

 1    break.

 2              THE VIDEOGRAPHER:  We're now going off the

 3    record.  The time is 2:16 p.m.

 4                   (Recess at 2:16 p.m.)

 5                   (Reconvened at 2:25 p.m.)

 6                   (Ms. Bay left the proceedings.)

 7              THE VIDEOGRAPHER:  We're now back on the record.

 8    The time is 2:25 p.m.

 9         Q.   Mr. Heye, I know I've asked you some pointed

10    questions today, but have I been fair with you?

11              MS. MELL:  Object to the form of the question.

12              That means we're done; right?

13              MR. WHITEHEAD:  It does.

14              MS. MELL:  All right.

15              THE WITNESS:  Done, yes.

16              MR. WHITEHEAD:  No follow-up today?

17              MS. MELL:  Actually, I was going to ask you one

18    question, that reminds me.

19              MR. WHITEHEAD:  Me and my big mouth.

20              MS. MELL:  I know.

21              THE VIDEOGRAPHER:  I'm sorry, Counsel, you don't

22    have your microphone on.

23              MS. MELL:  Sorry.

24

25

Michael Heye                                    December 4, 2019

Page 122

 1                    E-X-A-M-I-N-A-T-I-O-N

 2    BY MS. MELL:

 3        Q.    With regard to the disciplinary process --

 4    strike that.

 5              With regard to the testimony you provided today

 6    where you were asked about the warden's capacity to

 7    terminate a detainee from the VWP, is there a ICE oversight

 8    of the warden's determination in that regard?

 9        A.    Yes.

10        Q.    How does that work?

11        A.    The -- if the warden wants to terminate, it

12    still has to be cleared through ICE upstairs to have a

13    termination process beyond disciplinary or them just

14    signing a refusal form.

15        Q.    Okay.  And the IDP process you understand

16    involves ICE as the final decision maker?

17        A.    Yes.

18              MR. WHITEHEAD:  Object to form.

19              MS. MELL:  Okay, nothing further.

20              MR. WHITEHEAD:  Nothing further.

21              THE VIDEOGRAPHER:  This concludes the videotaped

22    deposition.  We're now going off the record.  Time is 2:26

23    p.m.

24              THE COURT REPORTER:  And you're going to have

25    this one transcribed?

Michael Heye                                    December 4, 2019

                                                   Page 123

1              MR. WHITEHEAD:  Yes, please.  Thank you.

2              THE COURT REPORTER:  And copy for you, Ms. Mell?

3              MS. MELL:  Yes, and we'll reserve.

4                   (Deposition adjourned at 2:26 p.m.)

5                   (Signature reserved.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Michael Heye                                        December 4, 2019

Page 124

1                          S-I-G-N-A-T-U-R-E

2

3

4              I declare under penalty of perjury under

5      the laws of the State of Washington that I have read

6      my within deposition, and the same is true and

7      accurate, same and except for changes and/or

8      corrections, if any, as indicated by me on the CHANGE

9      SHEET flyleaf page hereof.  Signed in..............,

10     WA, on the........day of..............., 2019.

11

12

13

14                         ........................

15                         MICHAEL T. HEYE

16                         Taken: Wednesday, December 4, 2019

17

18

19

20

21

22

23

24

25     Keri A. Aspelund

Michael Heye                                    December 4, 2019

Page 125

1                    C-E-R-T-I-F-I-C-A-T-E

2

3      STATE OF WASHINGTON )

4                         )  ss.

5      COUNTY OF THURSTON  )

6

               I, the undersigned Registered Professional
7      Reporter and Certified Court Reporter, hereby
       certify that the foregoing deposition upon oral
8      examination was taken stenographically before me and
       transcribed under my direction;

9

10             That the witness was duly sworn by me,
       pursuant to RCW 5.28.010, to testify truthfully; that the
11     transcript of the deposition is a full, true, and correct
       transcript to the best of my ability; that I am neither
12     attorney for, nor a relative or employee of, any of the
       parties to the action or any attorney or counsel employed
13     by the parties hereto, nor financially interested in its
       outcome.

14

15             I further certify that in accordance with CR
       30(e), the witness was given the opportunity to examine,
16     read, and sign the deposition, within 30 days, upon its
       completion and submission, unless waiver of signature was
17     indicated in the record.

18

               IN WITNESS WHEREOF, I have hereunto set
19     my hand this 16th day of December, 2019.

20

21

22

23     _____
       NCRA Registered Professional Reporter
24     Washington Certified Court Reporter No. 2661

25

Michael Heye                                        December 4, 2019

1              SEATTLE DEPOSITION REPORTERS, LLC

2               600 UNIVERSITY STREET, SUITE 320

3                    SEATTLE, WA  98101
                       (206) 622-6661
4
                    C-H-A-N-G-E  S-H-E-E-T
5
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
6    SHOWING PAGE, LINE AND REASON.

7    ----------------------------------------------------
     PAGE  LINE     CORRECTION AND REASON
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                        _____
                          MICHAEL T. HEYE
24                        TAKEN: Wednesday, December 4, 2019

25     Re: NWAUZOR v. THE GEO GROUP, No. 17-cv-05769-RJB