1

The Honorable Robert J. Bryan

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

UGOCHUKWU GOODLUCK
NWAUZOR, FERNANDO AGUIRRE-
URBINA, individually and on behalf of all
those similarly situated,

No. 17-cv-05769-RJB

10

DEPOSITION DESIGNATIONS
OF MARC A. JOHNSON

11

Plaintiffs,

12

v.

13

THE GEO GROUP, INC., a Florida
corporation,

14

Defendant.

15

16

Plaintiffs present (1) Plaintiffs' designations of the Deposition of Marc A. Johnson,

17

and (2) Defendant's counter-designations and objections. The designated pages are attached,

18

with Plaintiffs' designations highlighted in yellow and Defendant's counter-designations

19

highlighted in green.

20

DATED this 24th day of April, 2020.

21

SCHROETER GOLDMARK & BENDER

22

*s/ Jamal N. Whitehead*

Adam J. Berger, WSBA #20714

23

Lindsay L. Halm, WSBA #37141

Jamal N. Whitehead, WSBA #39818

24

DEPOSITION DESIGNATIONS OF
MARC A. JOHNSON  (17-cv-05769-RJB) - 1

1

810 Third Avenue, Suite 500
Seattle, WA 98104

2

Tel: (206) 622-8000 ~ Fax: (206) 682-2305
berger@sgb-law.com

3

halm@sgb-law.com
whitehead@sgb-law.com

4

THE LAW OFFICE OF R. ANDREW FREE

5

Andrew Free (*Pro Hac Vice*)
P.O. Box 90568

6

Nashville, TN 37209
Tel: (844) 321-3221 ~ Fax: (615) 829-8959

7

andrew@immigrantcivilrights.com

8

OPEN SKY LAW, PLLC
Devin T. Theriot-Orr, WSBA # 33995

9

20415 – 72nd Avenue S, Suite 110
Kent, WA 98032

10

Tel: (206) 962-5052
devin@opensky.law

11

MENTER IMMIGRATION LAW, PLLC

12

Meena Menter, WSBA #31870
8201 164th Ave NE, Suite 200

13

Redmond, WA 98052
Tel: (206) 419-7332

14

meena@meenamenter.com

15

*Class Counsel*

16

17

18

19

20

21

22

23

24

DEPOSITION DESIGNATIONS OF
MARC A. JOHNSON  (17-cv-05769-RJB) - 2

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Devin T. Theriot-Orr
OPEN SKY LAW, PLLC
20415 – 72nd Avenue South, Suite 110
Kent, WA 98032
devin@opensky.law
*Attorney for Plaintiff*

R. Andrew Free
THE LAW OFFICE OF R. ANDREW FREE
PO Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com
*Attorney for Plaintiff*

Meena Menter
MENTER IMMIGRATION LAW PLLC
8201 – 164th Avenue NE, Suite 200
Redmond, WA 98052
meena@meenamenter.com
*Attorney for Plaintiff*

Joan K. Mell
III BRANCHES LAW, PLLC
1019 Regents Boulevard, Suite 204
Fircrest, WA 98466
joan@3ebrancheslaw.com
*Attorney for Defendant*

Colin L. Barnacle
Ashley E. Calhoun
Christopher J. Eby
Adrienne Scheffey
AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
colin.barnacle@akerman.com
ashley.calhoun@akerman.com
christopher.eby@akerman.com
adrienne.scheffey@akerman.com
*Attorneys for Defendant*

DATED at Seattle, Washington this 24th day of April, 2020.

s/ Virginia Mendoza
_____
VIRGINIA MENDOZA, Legal Assistant
Schroeter Goldmark & Bender
810 Third Avenue, Suite 500
Seattle, WA 98104
Tel: (206) 622-8000
mendoza@sgb-law.com

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

Marc Johnson                                    December 3, 2019

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

--------------------------------------------------------

UGOCHUKWU GOODLUCK NWAUZOR,            )

FERNANDO AGUIRRE-URBINA,               )

individually and on behalf of all     )

those similarly situated,             )

         Plaintiffs,            )

    vs.                               ) No. 17-cv-05769-RJB

THE GEO GROUP, INC., a Florida        )

corporation,                          )

         Defendant.             )

--------------------------------------------------------

Videotaped

Deposition Upon Oral Examination of

MARC A. JOHNSON

--------------------------------------------------------

2:05 p.m.

Tuesday, December 3, 2019

1019 Regents Blvd., Suite 204

Fircrest, Washington

REPORTED BY:  Keri A. Aspelund, RPR, CCR No. 2661

Marc Johnson                                    December 3, 2019

                                                        Page 2

```
 1    APPEARANCES:

 2    For the Plaintiffs:   JAMAL N. WHITEHEAD, ESQ.

 3                          Schroeter Goldmark & Bender

 4                          810 Third Avenue, Suite 500

 5                          Seattle, WA  98104

 6                          206-622-8000

 7                          whitehead@sgb-law.com

 8    For the Defendant:    JOAN K. MELL, ESQ.

 9                          III Branches Law

10                          1019 Regents Blvd., Suite 204

11                          Fircrest, WA  98466

12                          253-566-2510

13                          joan@3brancheslaw.com

14    Also Present:         LINDSAY HITCHCOCK, VIDEOGRAPHER

15

16                          LANE POLOZOLA, ESQ.

17                          Assistant Attorney General

18                          800 Fifth Avenue, Suite 2000

19                          Seattle, WA  98104

20                          lane.polozola@atg.wa.gov

21                          206-287-4182

22

23

24

25
```

Marc Johnson                                    December 3, 2019

Page 3

1                        E X H I B I T S

2    No.    Description                        Page/Line

3    318    Email dated September 14, 2011, from      75    4

4           Marc Johnson to Bertha Henderson

5

6                     E X A M I N A T I O N

7    BY                                         Page/Line

8    MR. WHITEHEAD                                   5   11

9    MS. MELL                                       80    7

10   MR. WHITEHEAD                                  84    1

11   MS. MELL                                       85    6

12

13

14

15

16

17     (Note:  * Denotes phonetic spelling.)

18

19

20

21

22

23

24

25

Marc Johnson                                    December 3, 2019

Page 4

1          Fircrest, Washington; Tuesday, December 3, 2019

2                          2:05 p.m.

3               --------------------------

4          THE VIDEOGRAPHER:  We are going on the record at

5     2:05 p.m. on December 3rd, 2019.  This is media unit one,

6     volume one, of the video deposition of Marc Johnson taken

7     by the plaintiff, case number 17-cv-05769-RJB, in the

8     matter of Nwauzor, et al., vs. GEO Group, filed in the U.S.

9     District Court, Western District of Washington, at Tacoma.

10    This deposition is taking place at 1019 Regents Boulevard,

11    Suite 204, in Tacoma, Washington.

12              The videographer is Lindsay Hitchcock for

13    Seattle Deposition Reporters, 600 University Street,

14    Seattle, Washington 98101.  The court reporter is Keri

15    Aspelund for Seattle Deposition Reporters.

16              Counsel, at this time, please identify

17    yourselves for the record and the witness may be sworn in.

18              MR. WHITEHEAD:  Good afternoon.  Jamal Whitehead

19    on behalf of the certified class represented by Mr.

20    Nwauzor.

21              MS. MELL:  Oh, Joan Mell -- I'm sorry, I have to

22    stop this.

23              Joan Mell on behalf of GEO.

24              MR. POLOZOLA:  Lane Polozola, I'm counsel for

25    Washington in the consolidated Washington vs. GEO Group

Marc Johnson                                    December 3, 2019

Page 5

1    case.

2            MS. MELL:  And again, you're here for the same

3    reasons as expressed previously in the prior deposition?

4            MR. POLOZOLA:  As expressed previously, I'm here

5    because the cases have been consolidated and the court

6    ordered parties in all cases to be present or participate,

7    if they wish, so I'm here to witness the deposition.

8            -------------------------

9    MARC A. JOHNSON:      Witness herein, having been

10                         duly sworn, testified as follows:

11            E-X-A-M-I-N-A-T-I-O-N

12   BY MR. WHITEHEAD:

13        Q.   Good afternoon, Mr. Johnson.

14        A.   Good afternoon.

15        Q.   I introduced myself moments ago off the record,

16   but I will do so again for benefit of the record.

17        A.   Okay.

18        Q.   My name is Jamal Whitehead, and I am one of the

19   attorneys representing Mr. Nwauzor and Mr. Aguirre-Urbina

20   in their action against The GEO Group.

21            Sir, could you state and spell your full name

22   for the record.

23        A.   Sure, it's Marc Andrew Johnson, M-A-R-C

24   A-N-D-R-E-W, I don't spell my middle name a lot, and then

25   Johnson, J-O-H-N-S-O-N.

Marc Johnson                                    December 3, 2019

Page 6

    1        Q.   And your date of birth?

    2        A.   ███████████ 1978.

    3        Q.   And your current address?

    4        A.   P.O. box, will that work?

    5             MS. MELL:  Yes, because we don't want to mark

    6   it -- if you need to -- I'll accept if you need to get him.

    7             MR. WHITEHEAD:  You read my mind.  As long as

    8   you'll accept, that's fine.

    9             MS. MELL:  Yeah.

   10        A.   It's ███████████, Puyallup, Washington 98373.

   11        Q.   Is GEO your current employer?

   12        A.   Yes.

   13        Q.   What's your current title?

   14        A.   I'm a detention officer.

   15        Q.   I've read documents that refer to you as

   16   lieutenant; is that no longer the case?

   17        A.   Correct.

   18        Q.   All right.  I'll ask more questions about that

   19   later, but for now, have you ever given testimony under

   20   oath?

   21        A.   Yes.

   22        Q.   Okay.  In what context?

   23        A.   It was an arbitration.

   24        Q.   What type of arbitration?

   25        A.   An employee discharge.

Marc Johnson                                             December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 7

1        Q.   This was while you were at GEO?

2        A.   Yeah.

3        Q.   So a former GEO employee started an arbitration

4   against the company?

5        A.   Correct.

6        Q.   And you were a witness?

7        A.   Yes.

8        Q.   Were you the subject at all of the -- the

9   arbitration?

10       A.   No.

11       Q.   All right, well I know you've gone over the

12  rules with Ms. Mell.  I typically approach the rules

13  situationally.  When stuff pops up, I'll give you a gentle

14  reminder about how we should proceed and what we can do to

15  make a clean record.

16            For now though there are three things that I

17  like to stress at the outset of every deposition.  The

18  first of which is that this is not a practice.  What you

19  say now is just as important as if the judge and the jury

20  were in the room and ready to make a determination; do you

21  understand?

22       A.   Mm-hm.

23       Q.   You also understand that there's a written

24  transcript that is being created as well as a video of

25  everything that we say and discuss, and that the judge and

GEO Objections Foundation, FRE 402, 701, 802.

Marc Johnson                                           December 3, 2019

Page 8

1   the jury may use that to assess your ability -- credibility

2   or truthfulness in terms of the testimony you're about to

3   give; do you understand that?

4          A.   Yes.

5          Q.   And secondly, I'm not a mind reader, so if I ask

6   you a question that you don't understand, will you let me

7   know?

8          A.   Yes.

9          Q.   Also, if there's something that prevents you

10   from giving a full, or complete, or truthful answer,

11   whether it be a medical condition or something else, will

12   you let me know that?

13          A.   Yes.

14          Q.   And thirdly, I'm looking for your full

15   cooperation today.  I want your full, most truthful, most

16   complete testimony; do you understand?

17          A.   Yes.

18          Q.   Now, toward that end, I'm going to ask you many

19   yes or no questions in trying to work as efficiently as

20   possible so we can all get out and beat the traffic.

21          A.   Okay.

22          Q.   If I ask you a yes or no question, will you give

23   me a yes or no answer?

24               MS. MELL:  Object to the form of the question,

25   that's an instruction, to the extent that's a question.

Marc Johnson                                    December 3, 2019

Page 9

1        A.    Yes.

2        Q.    And I think that brings up one of the

3    situational rules.  Your attorney's going to object, and

4    unless she instructs you not to answer, and assuming you

5    heed her advice, the expectation is that you answer my

6    questions; okay?

7              So the way it'll go is I'll ask a question,

8    there may be an objection, and then we'll all look to you

9    for your answer --

10       A.    Okay.

11       Q.    -- do you understand?

12       A.    Yes.

13       Q.    Okay.  That brings up another situational rule.

14   It's important that we speak one at a time.  We've got a

15   court reporter here that's taking down everything that we

16   say, and the transcript is just really muddled and messy if

17   we're talking all over one another.  So I will do my best

18   to let you finish your answer before I ask the next

19   question, will you let me finish my question before you

20   begin your answer?

21       A.    Yes.

22       Q.    All right.  What did you do to prepare for your

23   deposition today?

24       A.    I showed up here, and talked to Ms. Mell.

25       Q.    And other than speaking with Ms. Mell, did you

Marc Johnson                                    December 3, 2019

 1   do anything else to prepare for your deposition today?

 2        A.   No.

 3        Q.   And it's my understanding that you drove to the

 4   deposition today with Mr. Tracy; is that right?

 5        A.   Correct.  Mm-hm.

 6        Q.   Did you and Mr. Tracy discuss the case or the

 7   testimony that you expect to give today?

 8        A.   No.

 9        Q.   What did you guys talk about?

10             MS. MELL:  Object to the form.

11        A.   We were talking about a work assignment we were

12   going to.

13        Q.   Did you speak with your captain, or assistant

14   warden, or anyone like that?

15        A.   Yes.

16        Q.   Who?

17        A.   The assistant facility administrator, Scott.

18        Q.   Bruce Scott?

19        A.   Bruce Scott.

20        Q.   When did you speak with Mr. Scott?

21        A.   I saw him at the facility earlier today.

22        Q.   And what did you discuss as it relates to this

23   case or the testimony that you're about to give?

24        A.   Just that we needed to come here and testify at

25   the deposition.

GEO Objections Foundation, FRE 402,
701, 802.

Marc Johnson                                    December 3, 2019

Page 11

```
 1        Q.   Are you being paid?

 2             Are you on the clock right now?

 3        A.   Yeah.

 4        Q.   Okay, good.

 5             Did you review any documents in preparation for

 6   today?

 7        A.   No.

 8        Q.   All right, so can you give me a high level

 9   overview of your educational history.

10        A.   I graduated high school.  I have attended some

11   community college but haven't -- you know, nothing of

12   substance.  I don't have an AA degree or anything.  And

13   that's pretty much it.

14        Q.   What did you study in college?

15        A.   Just general studies.

16        Q.   When did you begin working for GEO?

17        A.   April of 2009.

18        Q.   What did you do before GEO?

19        A.   I worked for a company called Diebold.  They fix

20   ATM machines.

21        Q.   Why did you leave Diebold?

22        A.   GEO paid better.

23        Q.   And what did you think about the prospect of

24   working in a detention facility?

25             MS. MELL:  Object to the form of the question.
```

Marc Johnson

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 12

1          A.   It didn't bother me.  I was interested in
2     working in a law enforcement type field.
3          Q.   All right, so GEO hired you in April 2009; what
4     was the position that you were hired into?
5          A.   As a detention officer.
6          Q.   And can you give me a list of the various titles
7     you've held since you began working for GEO?
8          A.   Detention officer, and then I was a lieutenant
9     for approximately 18 months, and now I'm back to being a
10    detention officer.  I believe they just call it officer, so
11    I believe they've dropped the detention part.
12         Q.   All right, so the move from detention officer to
13    lieutenant, that was a promotion; correct?
14         A.   Correct.
15         Q.   Okay.  And the move from lieutenant back to
16    detention officer, was that a demotion?
17         A.   It wasn't a demotion.  I -- I wasn't under any
18    type of disciplinary action.  As a lieutenant, I was paid a
19    salary, a fixed income, and for the betterment of myself
20    and my family, I chose to go back to being an officer.
21    Because it's an hourly rate, I can earn overtime.
22         Q.   How many hours a week, if you were to say, do
23    you work overtime?
24         A.   Approximately eight to 20.
25         Q.   What's your current hourly rate?

Marc Johnson                                    December 3, 2019

Page 13

1          A.    29.69 an hour.

2          Q.    And who do you report to right now?

3          A.    The shift supervisors, which includes sergeants

4     and lieutenants.

5          Q.    So it's a collection of people?

6          A.    (Nodding head.)

7          Q.    Does it rotate?

8          A.    They're assigned -- there's so many assigned to

9     each shift.

10         Q.    The shift supervisors, are they also referred to

11    it as sergeants?

12         A.    Some of them are sergeants, yes.

13         Q.    Who is the shift supervisor or who are the shift

14    supervisors that you report to?

15         A.    Sergeant Steffens, Sergeant Hillin, Lieutenant

16    Wilson, and Lieutenant Jackson.

17         Q.    Does anyone report to you?

18         A.    No.

19         Q.    You've got a stack of exhibits there.  I'd like

20    for you to take a look at the one that's labeled 312.

21               And you've just been handled -- or handed,

22    excuse me, Exhibit-312.  The first page carries a title of

23    Northwest Detention Center - Organizational Chart, and then

24    two pages afterwards with pictures and descriptions of

25    personnel.

Marc Johnson                                          December 3, 2019

Page 14

1              Do you see that?

2        A.   Mm-hm.

3              MS. MELL:   Is that a yes?

4        A.   Yes.

5        Q.   Now, that -- your attorney beat me to it.

6    That's another one of those situational rules.  It's very

7    important that you answer my questions with words; uh-huhs,

8    huh-uhs, and head nods just don't show up well in the

9    transcript.

10       A.   Sorry.

11       Q.   So that's a yes --

12       A.   Yes.

13       Q.   -- you've seen --

14       A.   Yes.

15       Q.   -- Exhibit-312 before?

16       A.   Oh, I have not seen it before, no.

17       Q.   Okay.  Well, I'm concerned mostly with the first

18   page there.  It depicts an organizational chart, and then

19   if you look there at the bottom of that first page, it

20   shows Updated: July 18th, 2017.

21             Do you see that?

22       A.   Yes.

23       Q.   Do you believe that this is a fair and accurate

24   representation of GEO's hierarchy or organizational

25   structure as of July 2017?

Marc Johnson                                      December 3, 2019

Page 15

1              MS. MELL:  Object to the form.

2       A.   Yes.

3       Q.   Now, some of the personnel may be different, but

4  in terms of the structure, is that more or less the way

5  that things are today?

6       A.   Yes.

7       Q.   All right, who's housed at the Northwest

8  Detention Center?

9              MS. MELL:  Object to the form.

10      A.   Detainees that have been taken into Immigration

11  and Customs Enforcement custody.

12      Q.   Are the folks there in any sort of criminal

13  detention?

14             MS. MELL:  Object to the form of the question.

15      A.   Not to my knowledge.

16      Q.   To your knowledge, are they there as punishment?

17             MS. MELL:  Object to the form of the question.

18      A.   No.

19      Q.   Have you or any of your coworkers talked about

20  this lawsuit?

21      A.   Yes.

22      Q.   Tell me about some of those conversations.

23      A.   We talked about that, you know, there is a

24  lawsuit.  I've seen some updates in the news and stuff.

25  It's been very brief, nothing -- nothing major.

Marc Johnson                                    December 3, 2019

Page 16

1        Q.    Have you talked with any of your colleagues and

2   encountered anyone that's in favor of the detained workers

3   getting paid the Washington State minimum wage?

4              MS. MELL:   Object to the form.

5        A.    No.

6        Q.    Have you ever been personally disciplined at

7   GEO?

8        A.    Yes.

9        Q.    For what?

10       A.    I falsified a count slip.

11             I believe it was five or six years ago.

12       Q.    Explain that for me.

13             First off, what is a count slip?

14       A.    We do a formal facility count several times a

15   day.  The policy is you have to have two people present to

16   count at the same time.  On my -- my instance, I -- I

17   had -- I counted by myself, and then another person came in

18   and counted.  I turned that in as a -- as the count slip.

19   Because we both weren't present at the same time, it was a

20   violation of policy.

21       Q.    Now, was this -- did you self-report that there

22   had been a violation, or did someone else detect this?

23       A.    No, a supervisor noticed it.

24       Q.    Who?

25       A.    Sergeant Hoffmeister.

Marc Johnson                                    December 3, 2019

Page 17

```
 1          Q.   What's his first name?

 2          A.   Marcus.

 3          Q.   And how do you spell Hoffmeister?

 4          A.   H-O-F-F-M-E-I-S-T-E-R.

 5          Q.   Is Sergeant Hoffmeister still there?

 6          A.   Yes.

 7          Q.   And was there any sort of disciplinary hearing

 8     or anything like that that you went through?

 9          A.   No.

10          Q.   Are you part of a union?

11          A.   Yes.

12          Q.   Which union?

13          A.   It's Local 883 of the United Government Security

14     Officers of America.

15          Q.   Did you grieve the discipline?

16          A.   At the time that this happened, we weren't part

17     of the union --

18          Q.   Got it.

19          A.   -- so it was before that.

20          Q.   Did you suffer any penalty as a result?

21          A.   I was placed on a final reprimand for one year.

22          Q.   Meaning that if anything else happened, you

23     could be terminated?

24          A.   Yeah.

25          Q.   Other than falsifying a count slip, have you
```

Marc Johnson                                      December 3, 2019

Page 18

1    ever been disciplined for any other reason at GEO?

2         A.   I was just disciplined for cutting some locks

3    off employee lockers.

4         Q.   Tell me about that.

5         A.   The -- the name tags weren't updated, and they

6    were all names of former GEO employees who I credibly

7    thought still had lockers, so I was trying to be proactive,

8    and I cut the locks off, but they were actually being used

9    by current employees.

10        Q.   And was this something that you self-reported,

11   or did someone else detect this violation?

12        A.   No, someone else had reported it as it happened.

13        Q.   Was there I guess an official charge, so to

14   speak?  I mean, you told me that the other thing was

15   falsifying a count slip; was there a title or name for what

16   occurred with the -- the locks?

17        A.   I think there was.  I can't -- it's like, you

18   know, it was violation of security protocol or some -- some

19   generic.

20        Q.   Did you grieve this incident?

21        A.   Yeah.

22        Q.   And what was the outcome of the grievance?

23        A.   It's still in progress.

24        Q.   Was there any sort of interim discipline or

25   penalty that you -- you faced?

Marc Johnson                                    December 3, 2019

                                                        Page 19

 1         A.    No, it's a level -- it's like a first written,

 2    so ...

 3         Q.    All right, other than what you've described to

 4    me about the falsifying the count slip and cutting the

 5    locks off the lockers, have you been disciplined at GEO for

 6    any other reason?

 7         A.    Other than like attendance, you know, they kind

 8    of count when you call off as discipline or are late.

 9         Q.    Well, tell me about that.  Have you been

10    counseled for your dis -- excuse me, attendance at GEO?

11         A.    I was -- I was late in October, so I got one

12    point for that, and I can't remember in the last year

13    before that.

14         Q.    Anything else?

15         A.    No.

16         Q.    What is the Voluntary Work Program?

17              MS. MELL:  Object to the form.

18         A.    It's a work program to provide an opportunity

19    for detainees to have something to do, and earn a dollar a

20    day, and it also helps, you know, run the facility or

21    maintain the facility.

22         Q.    Do you think that the detainee workers and the

23    work they do is an important part of the operations?

24              MS. MELL:  Object to the form of the question.

25         A.    I'm not sure.

GEO Objections Foundation, FRE 402,
701, 802.

Marc Johnson                                                    December 3, 2019

                                                                    Page 20

1          Q.    In what way?

2                MS. MELL:  Object to the form of the question.

3          A.    If -- it would -- it would get done regardless

4     if the detainees did it or not.  It's not a mandatory

5     thing.

6          Q.    But certainly the work they do helps out?

7                MS. MELL:  Object to the form of the question.

8          A.    Yes.

9          Q.    Now, as a detention officer, do you believe that

10    part of your job is directing the work and providing

11    training and supervision of the detainee workers in the

12    Voluntary Work Program?

13                MS. MELL:  Object to the form.

14          A.    Yes, it's a collateral job.

15          Q.    When you say collateral, what do you mean?

16          A.    As a detention officer, we're doing multiple

17    things at once, you know.  The main focus is safety and

18    security, but a part of that is, you know, making sure that

19    order is maintained and cleanliness is maintained in the

20    units and other areas wherever you're assigned, so yes.

21          Q.    All right.  Well, let's take a look at

22    Exhibit-313.  Now, at the top there, this appears to be an

23    excerpt from GEO's Policy and Procedure Manual.  This is

24    the Chapter: Detainee Services and Program, Title:

25    Voluntary Work Program.

Marc Johnson                                      December 3, 2019

1             Do you see that?

2       A.    Yes.

3       Q.    Have you seen this document before?

4       A.    I'm sure I have, but not specifically that I

5    recall.

6       Q.    Well, let's take a look at the bottom of the

7    first page there.  And at the bottom there it's -- it's

8    heading IV B, it says Work Assignment.

9             Do you see that?

10      A.    Yes.

11      Q.    And then on the first page and extending onto

12   the second page, it lists off five broad categories of

13   detainee work.

14            Do you see that?

15      A.    Yes.

16      Q.    The list includes Kitchen Worker,

17   Recreation/Barber, Living area, Evening workers, and

18   Laundry.

19            Did I read that correctly?

20      A.    Yes.

21      Q.    Now, big picture, are there any other big

22   categories of work that you would add to this list that the

23   detainee workers perform?

24            MS. MELL:  Object to the form of the question.

25      A.    I don't understand your question.

Marc Johnson                                    December 3, 2019

Page 22

1        Q.   Well, the work that they perform, I mean, you

2   know, there are many job titles, but you can agree or

3   disagree with me, but it -- it would seem to me that they

4   can be roughly grouped into one of the five buckets that's

5   identified here on Exhibit-313.  So --

6             MS. MELL:  So object --

7        A.   Okay, yeah, so --

8             MS. MELL:  Object to the form of that question,

9   if it was a question.

10       Q.   Would you agree that these appear to be broad

11  buckets of work that the detainee workers perform?

12            MS. MELL:  Object to the form.

13       A.   I agree to that.

14       Q.   So my follow-up question is, would you add any

15  other big bucket of work to this list?

16            MS. MELL:  Object to the form.

17       A.   Well, that's what I don't understand.  Like big

18  bucket, are you trying to imply there's a whole different

19  category that's not listed, or all the jobs would fall

20  under one of these five categories?

21       Q.   No, there -- there's no trick or implication,

22  I'm just trying to, you know, learn if you think there's

23  another category of work that -- that we're missing, that's

24  all.

25            MS. MELL:  Object to the form.

Marc Johnson                                    December 3, 2019

Page 23

1               Is that a question?

2               Is that a question?

3       Q.    So, with that clarification, do you believe

4    there's another broad category of work or categories of

5    work that should be added to this list?

6       A.    No.

7       Q.    All right.  Well, I want to work down this list

8    and talk about what you did with respect to directing and

9    supervising the detainee work.

10              So let's take kitchen worker; did you ever

11   direct or supervise detainee work in the kitchen?

12      A.    No directly.

13      Q.    What about indirectly?

14      A.    As a shift supervisor, yes.

15      Q.    Now, I understood you to say that you were a

16   lieutenant and a detention supervisor; you were a shift

17   supervisor as well?

18      A.    As a lieutenant is what I meant to say.

19      Q.    Got it.

20              All right, so tell me about how you indirectly

21   directed and supervised detainee work as a lieutenant/shift

22   supervisor.

23      A.    As a lieutenant, I would assist with movements

24   to and from the kitchen.  And then sometimes if the kitchen

25   thought there was something missing, we would review video,

Marc Johnson                                    December 3, 2019

Page 24

1    or conduct investigations regarding fights, assaults, or

2    thefts that possibly took place inside the kitchen.  And

3    then we would also assist with pat-down searches.

4         Q.   Anything else?

5         A.   Not that I can think of.

6         Q.   So assisting with movements, that's directing

7    the detainee workers to report to the kitchen?

8         A.   From their housing units to the kitchen, and

9    then back when they're finished.

10        Q.   And then the other category, you said something

11   missing, assaults, thefts, fights; that's essentially

12   misconduct in the kitchen?

13        A.   Yes.

14        Q.   And then the final thing, pat-downs, that's

15   more, I guess, part of your security function; would you

16   agree?

17             THE COURT REPORTER:  I need to go off the

18   record.

19             THE VIDEOGRAPHER:  Going off the record.  The

20   time is 2:32.

21                  (Recess at 2:32 p.m.)

22                  (Reconvened at 2:35 p.m.)

23             THE VIDEOGRAPHER:  Back on the record.  The time

24   is 2:35.

25        Q.   Mr. Johnson, we just took a brief break there,

Marc Johnson

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 25

1    but beforehand we were talking about your work in directing

2    and supervising detainee work in the kitchen, and you told

3    me that it was largely indirect; is that --

4         A.   Yes.

5         Q.   All right, well let's talk about the next

6    category here, recreation and barber.  Can you tell me all

7    the ways, if any, in which you've directed or supervised

8    detainee work as it relates to recreation and barber?

9         A.   As it relates to recreation and barber, just

10   facilitating the movements, again, to the barbershop or to

11   the recreation yard, and that's it.

12        Q.   That's for barber?

13        A.   That's for both.

14        Q.   For both, okay.

15             And is this both as a detention officer and as a

16   lieutenant?

17        A.   That was as a lieutenant.

18             As an officer, I've been posted in the

19   recreation yard.

20        Q.   Tell me about your work in directing and

21   supervising the detainee work in the recreation yard as an

22   officer.

23        A.   Just make sure that, you know, they have the

24   tools they need to clean, and trash bags pretty much, and

25   that they do the job satisfactorily, and maintain

Marc Johnson

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 26

1    everyone's safety.  That's it.

2         Q.   Making sure they have the tools to clean, that's

3    GEO providing the tools necessary to do the cleaning in the

4    recreation yard?

5         A.   Yes.

6         Q.   And that includes providing trash bags?

7         A.   Yes.

8         Q.   And of course you're directing the detainee

9    workers to clean the recreation yard as opposed to

10   somewhere else in the facility?

11             MS. MELL:  Object to the form of the question.

12        A.   Not necessarily.  If -- if they're new, then we

13   do have to give some guidance.  If they've been doing it

14   for a while, it's pretty much self-sufficient or

15   self-driven.

16        Q.   Tell me about the guidance you provide to the

17   new workers on the recreation yard.

18        A.   There's a -- a paper with a job description, and

19   for the new ones, we just kind of go over what the job

20   description is, what -- what's there to clean, stuff, just

21   make sure they understand this is what the job entails.

22        Q.   In this way then you're telling them what their

23   job duties are?

24             MS. MELL:  Object to the form.

25        A.   I mean, telling them or just explaining, yeah,

GEO Objections Foundation, FRE 402,
701, 802.

Marc Johnson                                        December 3, 2019

Page 27

1    giving them guidance.

2          Q.    Now, do the detainee workers in the recreation

3    yard have discretion to deviate from the rules,

4    regulations, or guidance, however you want to characterize

5    it, that you're -- you're giving to them?

6          A.    I mean, they can -- they can deviate if they

7    want.

8          Q.    But there are potentially consequences though if

9    they deviate; is that right?

10         A.    Yes.

11         Q.    Anything else as it relates to your direction

12   and supervision of detainee workers in the recreation yard?

13         A.    No.

14         Q.    And now living area and evening workers, I don't

15   know if we should tackle those separately or together, but

16   can you tell me what you've done to direct or supervise

17   detainee workers with respect to living area and evening

18   workers?

19         A.    So as a lieutenant for the living area, it's

20   been mostly indirect, just making sure that the units are

21   clean and sanitary.  Since laundry is listed under living

22   area, we do indirectly assist the laundry, similar to the

23   kitchen, you know, with movements or investigations for

24   theft or -- and other types of misconduct.

25               And then with regards to the evening workers,

Marc Johnson

GEO Objections Foundation, FRE 402,
701, 802.

December 3, 2019

Page 28

1    the facility janitorial, it's just kind of overseeing, you

2    know, if they're -- the general cleanliness of whatever

3    they're working on, and also like if there's waxing details

4    or stripping the floors.

5              As an officer, I've been directly involved with

6    the living areas, or supervising the cleaning of the

7    workers in the living areas, you know, cleaning up after

8    meals, the servers, going to pick up the meals, and

9    distributing the meals, cleaning up after meals, cleaning

10   up in general.

11             Again, there's a worker job description sheet

12   that explains kind of, you know, different stuff happens at

13   different times during the day, day cleaners, evening

14   cleaners, graveyard cleaners, or night cleaners.  For

15   example, they clean the showers at the end of the day when

16   the showers are all done being used.

17             And then as a -- as an officer supervising the

18   evening workers, just being, you know, posted to observe,

19   make sure they're okay, there's no security violations, and

20   also assist them with any supplies they may need or tools.

21        Q.   So this sounds like more hands-on supervision

22   and direction on your part?

23        A.   As an officer, yes.

24        Q.   And is that one of the main distinctions between

25   being a shift supervisor and an officer?

Marc Johnson                                          December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 29

1          A.   With regards to cleaning, I mean, it just

2     depends on if I'm assigned that task.

3               As a shift supervisor, you're in charge -- or a

4     lieutenant, you're in charge of the whole building.  So,

5     you know, periodically I'll check in, but I can't focus my

6     whole time on that one thing.  And then having -- as an

7     officer, you know, I've been assigned to a detail, hey,

8     we're doing this detail, so that was my -- my -- one of my

9     main focuses.

10              As the pod officer, same thing, you know, I'm --

11    I'm in charge of the security and the safety of everyone,

12    but it's that collateral duty to make sure we get the

13    meals, everyone gets a meal, we clean up after the meals.

14         Q.   Tell me about the details that you've been

15    assigned with respect to the Voluntary Work Program.

16         A.   Like it's mainly just there's a trash pickup at

17    night -- I've primarily worked graveyard shift for my ten

18    years.  I did work swing shift, but for the most part, I've

19    been on graveyard.

20              On graveyard they do a trash pickup at night.

21    The units place the trash in trash bags outside the unit,

22    and then detainees go around and pick it up and collect it

23    by the loading dock.  So we've supervised the movement.

24    Sometimes they have to take an elevator, which you have to

25    ride escorted.

GEO Objections Foundation, FRE 402, 701, 802.

Marc Johnson                                           December 3, 2019

Page 30

1          And then we -- we do -- they wax the floors,

2     they'll sweep and mop the floor, and then they'll also wax

3     or strip, you know, remove the previous floor shine and

4     apply new floor shine or wax, whatever you call it.

5          Q.   The floor waxing, buffing, shining, stripping, I

6     mean, does that primarily occur at night?

7          A.   Yeah.

8          Q.   And the workers, the detainee workers that do

9     that work, do they have previous experience with the

10    buffing, stripping, waxing the floors?

11         A.   Some have told me that they to.

12         Q.   Is that something then that GEO trains those

13    workers on if they don't have prior experience?

14         A.   Yes.

15         Q.   And of course GEO's providing the equipment to

16    do that work?

17         A.   Yes.

18         Q.   And the cleaning materials and solutions that

19    they'll need to also carry out that work?

20         A.   Mm-hm.  Yes.

21         Q.   And are you directing them in terms of where in

22    the facility to do the buffing, stripping, waxing, shining?

23         A.   Yes.

24              MS. MELL:  Counsel, could I interrupt for a

25    minute?  I'm getting a notification about arrangements for

Marc Johnson                                          December 3, 2019

Page 31

1    tomorrow.  It's 10 o'clock in --

2            MR. WHITEHEAD:  Oh, let's take a quick break.

3            THE VIDEOGRAPHER:  Going off the record.  The

4    time is 2:45.

5                    (Recess at 2:45 p.m.)

6                    (Reconvened at 2:45 p.m.)

7            THE VIDEOGRAPHER:  Back on the record.  The time

8    is 2:45.

9        Q.   So we were talking about the buffing, waxing,

10   shining, polishing of the floor at night; do you recall?

11       A.   Yeah.

12       Q.   Now, do the detainee workers have discretion

13   about where in the facility they can do that type of work,

14   or are they looking to you and others at GEO to tell them

15   where to -- to do the buffing, stripping, and waxing?

16       A.   It just depends.  If we're kind of starting

17   over, then, you know, we will generally give them an area

18   to start.  If it's -- if the -- if the crew has -- is the

19   same crew, and they've been doing it for a while, then they

20   will, you know, just kind of start in one area and then

21   progress to the other areas until it's all complete.

22       Q.   Painting, is that a nighttime activity, or is

23   that something that takes place at all points of the day?

24       A.   It takes place during different parts of the

25   day, not just generally nighttime.

Marc Johnson                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 32

1         Q.    Well, have you directed or supervised detainee

2    workers as they paint in the facility?

3         A.    Yes.

4         Q.    Tell me more about that.

5         A.    Similar to the other job duties, just making

6    sure they have the equipment, and they're -- they're okay

7    and safe, and following the rules, and painting in the

8    appropriate areas and stuff.

9         Q.    Now, this painting, is it touch-up paint, or is

10   it, you know, painting walls in corridors?

11        A.    It could be both.  Sometimes it's just touch up,

12   and sometimes it's repainting a whole area.

13        Q.    Along the gray mile?

14        A.    Correct, or other areas.

15        Q.    In the pods?

16        A.    Yes.

17        Q.    Anywhere else?

18        A.    Intake, the booking area.

19        Q.    So in terms of how long that painting takes, I

20   suppose it can vary depending on how large the job is?

21        A.    Yes.

22        Q.    Are you able to give me a range for how long the

23   painting might take?

24        A.    I've seen it take two hours to sometimes four

25   hours.

Marc Johnson                                    December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 33

1    Q.    Now, with respect to the painting, is GEO

2  training the detainee workers on proper painting technique?

3    A.    Yeah, similar to the other jobs.

4    Q.    What about the -- the buffing, waxing, and

5  stripping of the floors, how long does that typically take?

6    A.    It can take -- again, it varies.  It can take

7  two hours to, you know, four or five hours.

8    Q.    And it just depends on how much, you know,

9  buffing, waxing, and stripping, you know, how much ground

10  essentially they've got to cover?

11          MS. MELL:   Object to the form.

12    A.    Yes.

13    Q.    And they, of course, being the detainee workers?

14    A.    Yes.

15          I've also seen it where the detainees, you know,

16  they -- they're motivated to -- to do more, you know, or go

17  longer than one would reasonably expect to complete it.

18    Q.    And what do you take from that?

19    A.    That they enjoy the work there, they're

20  motivated, and you know, it's kind of self-driven.

21    Q.    Do these workers that are self-driven and do a

22  good job, do they make more money?

23    A.    No.

24    Q.    Is there an opportunity for them to make more

25  money as, you know, stellar performers?

Marc Johnson

GEO Objections Foundation, FRE 402,
701, 802.

December 3, 2019

Page 34

1      A.    No.

2      Q.    And the murals, there are murals along the gray

3   mile?

4      A.    Yes.

5      Q.    Were those painted by detainee workers?

6      A.    Yes.

7      Q.    Was that at GEO's direction?

8      A.    No.

9      Q.    Do you know how those murals came to be?

10     A.    GEO submitted a request to the detainees to see

11   if anyone wanted to paint the murals, and several detainees

12   submitted their interest, and I believe they had to submit

13   artwork submissions showing their skill set.

14     Q.    So an interview of sorts?

15          MS. MELL:   Object to the form of the question,

16   mischaracterizes the testimony.

17     A.    No.

18     Q.    All right, so we talked about your role in

19   directing or supervising work with respect to the kitchen,

20   recreation/barber, living area, evening workers, and

21   laundry.

22          Did I get that right?

23     A.    Yes.

24     Q.    Now, what role, if any, does ICE play in the

25   direction and supervision of workers in those same job

Marc Johnson                                    December 3, 2019

Page 35

1   categories?

2        A.   ICE is the overall authority.  So they mandate

3   how the program functions, and approve any program updates,

4   and they also manage or authorize, you know, job hiring.

5   Sometimes there's worker disputes, like if someone gets

6   fired, you know, they can appeal to ICE, and ICE will say

7   this person gets to work again or -- or not.

8        Q.   All right, well maybe we'll take it one at a

9   time then for each of the categories here.

10            So kitchen worker, can you tell me about the

11  ways of which you're aware that ICE provides direction or

12  supervision to kitchen detainee workers?

13       A.   I mean, like I said, ICE mandates how many

14  kitchen workers, I believe, work each shift, the maximum

15  number, and then ICE, in coordination with the medical

16  department, they have to be authorized by medical to work

17  in the kitchen.

18       Q.   What makes you believe that ICE mandates the

19  number of kitchen workers?

20       A.   I believe that's something I was told before.

21       Q.   Who?  Who told you that?

22       A.   I believe it was someone in classification

23  during our annual refresher training, I was told ICE

24  mandates all the jobs.  There's only a fixed amount of

25  jobs.

Marc Johnson                                    December 3, 2019

Page 36

1      Q.    So this is secondhand information related to you

2   by someone in classifications?

3            MS. MELL:   Object to the form of the question,

4   mischaracterizes the nature of his evidence.

5      A.    Yes.

6      Q.    Michael Heye or Alisha Singleton?

7      A.    I believe it was one of them, yeah.

8      Q.    Do you believe they'd be in a better position to

9   know --

10           MS. MELL:   Object --

11     Q.    -- whether or not --

12           MR. WHITEHEAD:   Let me get my question out.

13     Q.    Do you believe that Ms. Singleton or Mr. Heye

14  would be in a better position to know whether or not ICE

15  mandates the number of kitchen workers?

16           MS. MELL:   Object to the form of the question,

17  his opinion is irrelevant, not admissible.

18     A.    I believe they would, yes.

19     Q.    All right, and then you said medical is a --

20  medical clearance to work in the kitchen is another way

21  that ICE is involved.

22           Did I get that right?

23     A.    Yes.

24     Q.    Tell me about that.

25     A.    I -- other than I know that they have to be

Marc Johnson                                    December 3, 2019

1   cleared medically or approved medically.  I can't speak to

2   how it happens.

3        Q.   Well, on either front, whether it be the number

4   of kitchen workers or medical clearance, can you point me

5   to a specific policy related to ICE's involvement in the

6   direction and supervision of workers?

7        A.   I don't have it offhand.  I believe it's in

8   their PBNDS.

9        Q.   Now, this is the Performance-Based National

10  Detention Standards?

11       A.   Yes.

12       Q.   And it's your understanding, of course, that GEO

13  has to comply with the PBNDS; correct?

14       A.   Yes.

15       Q.   And part of that compliance is making sure that

16  GEO and its personnel are supervising and directing

17  immigration detainees consistent with the PBNDS?

18            MS. MELL:  Object to the form of the question.

19       A.   Yes.

20       Q.   All right, so other than your belief that ICE

21  mandates the number of kitchen workers and has a role in

22  medical clearance, are you aware of any other way in which

23  ICE directs and supervises kitchen workers?

24       A.   No.

25       Q.   Do you know whether or not there is an ICE

Marc Johnson                                    December 3, 2019

Page 38

1    officer or personnel stationed in the kitchen?

2         A.    I don't understand the question.

3         Q.    Well, I understand from my deposition of Mr.

4    Delacruz that there are a number of GEO personnel in the

5    kitchen.  My question to you is, do you know whether or not

6    there is ICE personnel stationed inside the kitchen?

7         A.    Yeah, it's the station part.  I mean, I know ICE

8    visits the kitchen, but I -- I don't believe they're

9    stationed there.

10        Q.    And when you say visits, what do you mean?

11        A.    There's a Detention Standards Manager Howard.

12   He visits the kitchen to ensure compliance with the

13   Performance-Based National Detention Standards.

14        Q.    Do you know how often Howard makes his rounds in

15   the kitchen?

16        A.    I do not, no.

17        Q.    And do you know whether or not Howard, in his

18   role, is it limited to just the kitchen, or is it

19   facilitywide?

20        A.    It's the whole facility.

21        Q.    And I'm sorry, Howard's title again was?

22        A.    Is the DSM, it's an acronym for detention

23   standards manager, I believe.

24        Q.    And it's your belief that he is an ICE employee?

25        A.    Yes.

Marc Johnson                                    December 3, 2019

1        Q.    Okay.  How many detention standards managers

2    work or are stationed at the Northwest Detention Center?

3        A.    One.

4        Q.    Big picture, how many ICE personnel are

5    stationed at the Northwest Detention Center?

6              MS. MELL:  Object to the form.

7        A.    I don't know.

8        Q.    If you had to guess?

9              MS. MELL:  No, don't guess.

10       Q.    I'm looking for a ballpark.

11             Is it more than five?

12       A.    I would imagine so, but I don't know for sure.

13       Q.    Well, in your ten years of experience there,

14   both as a detention officer and as a lieutenant, can you

15   tell me the names of other ICE personnel that have been

16   stationed at the Northwest Detention Center?

17       A.    Yes.

18       Q.    Who?

19       A.    Arroyo -- oh, man, on the spot here, let's

20   see -- Renner, Rukhstruhl, Muirhead.  I mean, there's more,

21   I'm just -- I can't recall offhand.

22       Q.    And where within the facility -- let me back up.

23             The people that you just named, do they have

24   offices within the facility?

25       A.    Yes.

Marc Johnson                                            December 3, 2019

Page 40

1      Q.   Are they clustered together, or are they

2 sprinkled throughout?

3      A.   They're all together.

4      Q.   Where?

5      A.   It's on the second floor of the administration

6 building.

7      Q.   Is that the only location?

8      A.   At the Northwest Detention Center, yes.

9      Q.   And the five people total that you mentioned,

10 and I understand that you said there may be more, are they

11 all currently employed, or are you just thinking about the

12 span of your ten-year career with GEO?

13      A.   I believe they're currently employed.

14      Q.   And of the names that you mentioned, I'm sorry,

15 was it Howard, is that the first name or last name for the

16 detention standards manager?

17      A.   That's the last name.

18      Q.   All right, so the detention standards manager

19 you mentioned is someone that you believe is responsible

20 for ensuring that GEO's in compliance with the PBNDS.  Do

21 you have any insights or understandings about the roles of

22 the other people that you named?

23      A.   I believe some of them are like deportation

24 officers or supervisory deportation officers.

25      Q.   Do you have any other insights into what their

Marc Johnson                                    December 3, 2019

Page 41

1    roles are?

2         A.    No.

3         Q.    And so it sounds like Detention Standards

4    Manager Howard is different than the other four that you

5    mentioned by name, is that fair to say, in terms of his

6    role at the facility?

7         A.    Yes.

8         Q.    Okay.  And then on Detention Standards Manager

9    Howard's visits to the kitchen, you believe that he may

10   offer direction and supervision to the detention -- or to

11   the detainees?

12        A.    No.

13        Q.    Is there anything else that you can think of in

14   terms of ICE's involvement with the supervision and

15   direction of detainee workers in the kitchen?

16        A.    No.

17        Q.    Now, we can do the same thing for the other

18   categories, recreation/barber, living area, evening

19   workers, laundry, in terms of ICE's involvement, but before

20   we do that, my question to you is, would your answer be any

21   different than what you've just described to me about ICE's

22   involvement in the kitchen?

23        A.    No, it -- it would be the same.  DSM Howard's in

24   charge of, you know, the whole building, so

25   responsibilities for all the areas, including these, and

Marc Johnson                                    December 3, 2019

Page 42

1    you know, it's overseen by ICE.

2         Q.   So how often would -- or are ICE personnel in

3    the pods, for example?

4         A.   I believe they come around once a week to do

5    visits with the detainees, and then I'm not sure if the --

6    they do what's called a kite pickup.  I think they have to

7    do that every day, Monday through Friday.

8         Q.   In that way, would you call ICE's involvement

9    more administrative, if they're picking up kites, and

10   detention visits are related to immigration status; is that

11   a fair characterization?

12              MS. MELL:  Object to the form of the question,

13   fairness is not relevant, nor is his opinion.

14        A.   What was the question?

15        Q.   Yeah, and I got a little lost in the objection

16   too.  I do want to hear your opinion.  I mean, you've

17   worked there for ten years, so you're going to know better

18   than myself and even Counsel about what takes place at the

19   facility.

20              My question is whether or not you view ICE's

21   role and involvement there as more administrative in

22   nature?

23              MS. MELL:  Object to the form of the question.

24        A.   No.

25        Q.   What would you call it?

Marc Johnson                                    December 3, 2019

Page 43

1            MS. MELL:  Again, object to the form.

2        A.   I mean, they're, you know -- it's -- it's -- ICE

3    is -- ICE is the client.  They -- they say what goes.  So,

4    you know, I've seen detainees appeal to ICE to have stuff

5    changed, and they've done that, or ICE has mandated

6    changes, you know.

7        Q.   Do you believe though that GEO handles more of

8    the day-to-day hands-on work of the facility?

9            MS. MELL:  Object to the form of the question.

10       A.   I mean, yeah.

11       Q.   And that includes the direction and supervision

12   of the detainees and the detainee workers --

13           MS. MELL:  Object --

14       Q.   -- correct?

15           MS. MELL:  Object to the form of the question.

16       A.   According to the PBNDS.

17       Q.   That's GEO's role, to do the hands-on work of

18   managing the detainees, including the detainee work?

19           MS. MELL:  Object to the form of the question.

20       A.   Yes.

21       Q.   Now, how is it that detainees are assigned to

22   work in the VWP?

23       A.   I don't under -- the BWP?

24       Q.   The VWP?

25       A.   Oh, sorry, the Voluntary Work Program?

Marc Johnson                                    December 3, 2019

Page 44

1            It's in the detainee handbook.  I believe it's

2    in the ICE national detainee handbook, and they're apprised

3    in the orientation videos as well that there are job

4    opportunities, and they can send a kite or a detainee

5    request to be placed on a waiting list for a job.  And I'm

6    sure living in the units, you know, they -- they make

7    acquaintances with people that are workers -- excuse me --

8    or you know, they see people working and -- and want to do

9    that, that job.

10            Q.   If a detainee has attitude or behavioral issues,

11    does GEO have the discretion not to hire that detainee into

12    the -- the Voluntary Work Program?

13            MS. MELL:  Object to the form.

14        A.    No.

15            I mean, if they have demonstrated behavior

16    issues like, you know, misconduct stuff, they will be

17    reclassed into a higher class, and that limits their

18    opportunities, but if -- if -- if you're looking for like a

19    characterization of overall, hey, that person's kind of a

20    jerk, we -- we don't not hire them because of that.

21            Q.   Do you know whether or not you have the ability

22    or authority to pass on a worker for those reasons?

23            MS. MELL:  Object to the form.

24        A.    No, we don't.  We can't pass.

25            MS. MELL:  Counsel, I'm just going to need a

Marc Johnson                                          December 3, 2019

Page 45

1   bathroom break before a half hour goes by, so whenever

2   you're ready.

3               MR. WHITEHEAD:  Yeah, let me ask a few more

4   questions here, and then we can take a break.

5        Q.   Let's take a look at Exhibit-314.  It will be in

6   your stack there.

7               Yep, there you go.

8               You're looking at Exhibit-314.  It's titled

9   voluntary -- excuse me, Volunteer Work Program Agreement.

10              Do you see that?

11       A.   Yep.  Yes.

12       Q.   Have you seen this document before?

13       A.   Yes.

14       Q.   Who is this agreement between?

15              MS. MELL:  Object to the form of the question.

16       A.   ICE and the detainee.

17       Q.   What makes you say that this is between ICE and

18   the detainee?

19       A.   Because it all -- it comes from ICE standards.

20       Q.   Well, looking at the bottom of the page, I see a

21   signature line for the detainee.

22              Do you see that?

23       A.   Yes.

24       Q.   Staff signature; do you know who that refers to?

25       A.   Yeah.

Marc Johnson                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 46

1      Q.   That's GEO personnel; correct?

2      A.   Correct.

3      Q.   Is there a line on this form for ICE to sign off

4  on?

5      A.   No.

6      Q.   Let's look at the fourth item there at the top.

7  It reads, "Unexcused absence, unsatisfactory work

8  performance, or participation in a serious infraction, e.g.

9  fighting, is cause for removal from a work assignment."

10          Did I read that correctly?

11     A.   Yes.

12     Q.   Is that statement true?

13     A.   Yes.

14     Q.   Now, who initiates the process for removal from

15  a work assignment, is that ICE or GEO?

16     A.   It could be either.

17     Q.   Tell me about a time that ICE initiated the

18  removal process.

19     A.   I can't think of any offhand.

20     Q.   In your ten years of experience at the Northwest

21  Detention Center, you can't think of a single instance in

22  which ICE initiated the removal of a detainee worker from a

23  work assignment?

24          MS. MELL:  Object to the form.

25     A.   Like I said, I can't recall.

Marc Johnson

GEO Objections Foundation, FRE 402,
701, 802.

December 3, 2019

Page 47

1          Q.    Let's look at the sixth item there on

2     Exhibit-314, the Volunteer Work Program Agreement.  It

3     reads, "Detainees must adhere to all safety regulations and

4     to all medical and grooming standards associated with a

5     work assignment."

6                Did I read that correctly?

7          A.    Yes.

8          Q.    Does GEO work to ensure that detainee workers

9     are complying with safety regulations and medical and

10    grooming requirements?

11         A.    Yes.

12         Q.    That's part of the job of a detention officer;

13    correct?

14               MS. MELL:  Object to the form.

15         A.    Yes.

16         Q.    And that eighth item there says "Primary factors

17    that impact hiring are classification level, attitude,

18    behavior, and physical ability to perform the job."

19               Did I read that correctly?

20         A.    Yes.

21         Q.    From that sentence, is it safe to assume that

22    GEO has some discretion in who to hire?

23               MS. MELL:  Object to the form.

24         A.    No.

25         Q.    How do you interpret that sentence?

GEO Objections Foundation, FRE 402, 701, 802.

Marc Johnson                                           December 3, 2019

Page 48

1                    MS. MELL:  Object to the form.

2           A.   Well, it lists the -- the certain things, but it

3    says they impact not that they will affect, they just

4    impact it.

5           Q.   And do you see a distinction between impact

6    versus affect?

7           A.   Yes.

8           Q.   Tell me, what is that distinction?

9           A.   If it had an effect, I would interpret that to

10   be we could pick and choose who we wanted, whereas this

11   just says it will have an impact.

12                From what I understand, the worker -- once you

13   submit a request to be a worker, you go on a waiting list,

14   and GEO can't jump around on the list; it's first in, first

15   out, so to speak.

16          Q.   Now, there's a black bar towards the end, and I

17   redacted out someone's name there, but if you look above

18   that black bar, the last sentence of that paragraph, right

19   above it, it reads, "We thank you for your important

20   contribution to maintaining this facility."

21                Did I read that correctly?

22          A.   Yes.

23          Q.   Do you believe that the detainee workers make an

24   important contribution to maintaining the Northwest

25   Detention Center?

Marc Johnson                                              December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 49

1          MS. MELL:  Object to the form of the question.

2     A.   Yes.

3          MR. WHITEHEAD:  All right, let's take a break.

4          THE VIDEOGRAPHER:  This is the end of media one.

5     This deposition will continue on media two.  The time is

6     3:13.  Going off the record.

7                    (Recess at 3:13 p.m.)

8                    (Reconvened at 3:23 p.m.)

9          THE VIDEOGRAPHER:  Back on the record.  This is

10    the beginning of media two to the deposition of Marc

11    Johnson.  The time is approximately 3:23.

12    Q.   Do the various work assignments for the detainee

13    workers have job descriptions?

14    A.   Yes.

15    Q.   Let's take a look at Exhibit-315.

16         And you've just been handed Exhibit-315, and

17    these are various detainee job descriptions.  The

18    descriptions are undated, but do these look familiar to

19    you?

20    A.   Yes.

21    Q.   I'd like to go through each of these and talk

22    about GEO's level of control over the detainee workers in

23    each of the job descriptions here.

24         So let's start with the first page; have you

25    supervised barbers in the barbershop ever?

GEO Objections Foundation, FRE 402,
701, 802.

Marc Johnson                                                December 3, 2019

Page 50

1          A.    No.

2          Q.    Based on what you know about directing and

3    supervising detainee work at the Northwest Detention

4    Center, would it be your expectation that detainee workers

5    in the barbershop follow the specific work duties outlined

6    on the job description?

7                MS. MELL:  Object to the form of the question.

8          A.    Yes.

9          Q.    Now, do detainee workers have the discretion to

10   deviate from their specific work duties?

11               MS. MELL:  Object to the form.

12         A.    No.

13         Q.    For example, looking at this job description

14   here on the first page of Exhibit-315, it instructs

15   barbers, it says "Towels will not be used."  Looks to be

16   the fifth bullet down.

17               Do you see that?

18         A.    Yes.

19         Q.    For example, could a detainee use towels even

20   though the job description says not to?

21         A.    I believe they could try, but the staff would

22   intervene and not allow it.

23         Q.    In that way, staff is supervising the detainee

24   workers to ensure that they're complying with their job

25   duties?

Marc Johnson

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 51

1          MS. MELL:  Object to the form of the question.

2     A.   Yes.

3     Q.   And GEO provides the barbers, in this case, with

4     the equipment they need to do their jobs?

5     A.   Yes.

6     Q.   And there's no expectation that the detainee

7     workers, you know, bring their own equipment to the

8     barbershop; correct?

9     A.   No.

10    Q.   In fact, they'd be prohibited from doing so?

11         MS. MELL:  Object to the form.

12    A.   Correct.

13    Q.   Now, if a barber has preexisting skill as a

14    barber, is there an opportunity for them to make more?

15    A.   No.

16    Q.   Can they earn more money if they do a complex

17    haircut or hairstyle?

18    A.   No.

19    Q.   Are there GEO barbers at the Northwest Detention

20    Center?

21    A.   I don't understand the question.

22    Q.   Are there -- is there GEO personnel that's

23    responsible for or that also cuts hair at the Northwest

24    Detention Center?

25    A.   No.

Marc Johnson                                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 52

1          Q.   If the detainees did not work as barbers, who

2     would cut hair?

3               MS. MELL:   Object to the form.

4          A.   I don't know.

5          Q.   GEO would have to hire someone; is that a safe

6     assumption?

7               MS. MELL:   Object to the form of the question.

8          A.   I'm not sure.

9          Q.   Now, let's look at the next page, page 2 of

10    Exhibit-315.  This is a job description for barbershop

11    cleaner.  Now, the first bullet there under the specific

12    work duties instructs detainee workers to spray liberally

13    the clippers with H42 cleaner.

14              Do you see that?

15         A.   Yes.

16         Q.   Could a detainee worker use a different type of

17    cleaner if they wanted to?

18         A.   No.

19         Q.   And GEO provides the barbershop cleaners with

20    the cleaning materials that they need to do their job;

21    correct?

22         A.   Yes.

23         Q.   Provides them with the training on the safety

24    regulations that they need to do the job as well?

25         A.   Yes.

Marc Johnson

GEO Objections Foundation, FRE 402,
701, 802.

December 3, 2019

Page 53

1           MS. MELL:  Counsel, I just realized that I don't

2      see continuing Bate -- Bates numbers on these pages, and I

3      thought you represented this was from the discovery.

4           MR. WHITEHEAD:  It is.  This is from GEO's

5      production.  I'm not quite sure why the Bates numbers did

6      not print.  I believe it's just one of the radio buttons

7      didn't get checked off when printing this from our document

8      management system.

9           MS. MELL:  But it's not -- this isn't the Bates

10     number down here?

11          MR. WHITEHEAD:  No, it's not.

12          Yeah, I don't know why, if it was just a matter

13     of it getting cut off, but I will represent for the record

14     that Exhibit-315 came from GEO's production.  And if you'd

15     like, after the fact I could find the specific Bate

16     numbers -- Bates numbers that are represented here in the

17     document.

18          MS. MELL:  Okay, thank you.

19          MR. WHITEHEAD:  Of course.

20          Q.   All right, with the barbershop cleaners, could

21     they decide on their own that they would like to clean the

22     clippers, for example, in the yard or a different part of

23     the facility outside of the barbershop?

24          A.   No.

25          Q.   Could the barbershop cleaners make more money if

Marc Johnson                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 54

1    they were efficient or good at their job in cleaning the
2    barbershop?
3         A.    No.
4         Q.    Have you ever had a detainee worker ask for a
5    raise?
6         A.    No.
7         Q.    Have you ever sought authorization to pay a
8    detainee worker more than a dollar a day for their work?
9         A.    No.
10        Q.    With the barbers, could they make more money if
11   they cut more heads in the barbershop?
12             MS. MELL:  I hope they aren't cutting heads;
13   more hair of heads -- on heads?
14        A.    No.
15        Q.    They couldn't charge per haircut, for example?
16        A.    No, it's a flat rate.
17        Q.    Of a dollar a day?
18        A.    Correct.
19        Q.    Let's look at page 3 of Exhibit-315.  This one
20   is a job description, job title Medical Cleaning.  Here
21   again, this job description lists specific duties.
22             Do you see that?
23        A.    Yes.
24        Q.    And do detainee workers have discretion to mop
25   other than the designated areas for medical?

Marc Johnson                                    December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

                                                       Page 55

1            A.   No.

2            Q.   Part of their job is to remove trash and replace

3     with new liners.   That's item 6 there.   GEO provides those

4     liners; is that correct?

5            A.   Yes.

6            Q.   And GEO provides the equipment they need to do

7     the cleaning?

8            A.   Yes.

9            Q.   As well as the cleaning solution?

10           A.   Yes.

11           Q.   GEO provides the medical cleaners on proper

12    sanitation and safety as it relates to their job; correct?

13                MS. MELL:   Object to the form of the question.

14           A.   Yes.

15           Q.   Now, there's a bottom section there entitled

16    Termination.

17                Do you see that?

18           A.   Yes.

19           Q.   Do you agree that failure to follow staff

20    instructions could lead to termination of a detainee

21    worker?

22           A.   Yes.

23           Q.   Do you agree that failure to follow safety

24    procedures could lead to termination of a detainee worker?

25           A.   Yes.

Marc Johnson                                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

                                                                    Page 56

     1          Q.   Excessive absenteeism?

     2          A.   Yes.

     3          Q.   Misconduct and horseplay?

     4          A.   Yes.

     5          Q.   Theft?

     6          A.   Yes.

     7          Q.   Unsatisfactory work performance?

     8          A.   Yes.

     9          Q.   Now, in each of those instances, would it be GEO

    10   that initiates the termination or disciplinary proceedings

    11   against the detainee worker?

    12          A.   It depends.

    13          Q.   What does it depend on?

    14          A.   I mean, the reason.

    15          Q.   Well, my question drives more at who the actor

    16   is that would initiate the proceedings; is it GEO or

    17   someone else?

    18          A.   A majority of the time it would be GEO.

    19          Q.   And if not GEO, who?

    20          A.   It could be ICE.

    21          Q.   And if I remember from earlier, you said that

    22   you cannot think of a time in which ICE initiated

    23   termination or discipline against a Voluntary Work Program

    24   participant; did I get that right?

    25          A.   Not specifically, no.

Marc Johnson                                    December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 57

1          Q.    Not specifically.

2                You can't recall specifically you're saying?

3          A.    Correct.

4          Q.    Again, working with Exhibit-315, let's look at

5     page 4.  This is a job description for job title General

6     Worker.  Now, the specific work duties there, are those

7     consistent with your understanding of what this job

8     entails?

9          A.    Yes.

10         Q.    And again, as it relates to those work duties,

11    the detainees -- the -- strike that.

12                As it relates to those specific job duties, it's

13    the case that the detainee workers may not deviate from

14    their specific duties and responsibilities; correct?

15         A.    Correct.

16         Q.    And here again, GEO provides the equipment they

17    need to do their job?

18         A.    Yes.

19         Q.    GEO provides the training they need to do their

20    job?

21         A.    Yes.

22         Q.    GEO supervises them to ensure that they're

23    complying with GEO's policies and regulations; correct?

24         A.    Correct.

25         Q.    Now, with the general workers, is there an

GEO Objections Foundation, FRE 402,
701, 802.

Marc Johnson                                    December 3, 2019

Page 58

1    opportunity for them to earn more money if they're good

2    workers?

3         A.    No.

4         Q.    They get paid regardless of whether or not they

5    have -- the same -- excuse me.

6               They get paid the same regardless of whether

7    they have prior experience in the janitorial industry;

8    correct?

9         A.    Yes.

10        Q.    Let's look at the bottom here of page 4.  Again

11   we see the Termination heading.

12              Do you agree that failure to follow staff

13   instructions could lead to the termination of general

14   workers --

15        A.    Yes.

16              MS. MELL:  I just object to the omission of CSC

17   in that phrase.  We're still dealing with CSC policy it

18   looks like.

19        Q.    No, my question was different, you know, my

20   question is exactly what I asked.

21              Failure to follow GEO staff instructions, could

22   that lead to a detainee worker's termination from their job

23   assignment?

24        A.    Yes.

25        Q.    And that's true of -- of any detainee worker

Marc Johnson                                        December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 59

1    job; correct?

2         A.   Yes.

3         Q.   Excessive absenteeism, that could lead to

4    termination; correct?

5         A.   Yes.

6         Q.   Misconduct and horseplay?

7         A.   Yes.

8         Q.   Theft?

9         A.   Yes.

10        Q.   And unsatisfactory work performance?

11        A.   Yes.

12        Q.   Let's look at the next page, page 5.  This one

13   is for Laundry Worker is the title of the job description.

14             Now, the specific work duties here listed, are

15   those consistent with your understanding of what the

16   laundry worker job entails?

17        A.   Yes.

18        Q.   Do the detainee workers, the laundry workers,

19   have discretion to deviate from these specific work duties?

20        A.   No.

21        Q.   And GEO supervises them to ensure that they're

22   complying with their work duties?

23        A.   Yes.

24        Q.   GEO provides them with the training they need to

25   do their job?

Marc Johnson

GEO Objections Foundation, FRE 402,
701, 802.

December 3, 2019

Page 60

1        A.    Yes.

2        Q.    And the equipment they need to do their job?

3        A.    Yes.

4        Q.    And the detainee laundry workers have no

5    opportunity to earn more money if they're good at their job

6    or do more work; correct?

7        A.    Correct.

8        Q.    To your knowledge, can the detainee workers seek

9    employment outside the Northwest Detention Center?

10       A.    Not while they're being detained by immigration.

11       Q.    Can detainee workers earn overtime?

12             MS. MELL:  Object to the form.

13       A.    No.

14       Q.    Do detainee workers that aren't very good at

15   their job make less money?

16       A.    No.

17       Q.    How many janitors are employed by GEO right now?

18       A.    Right now, I believe two.

19       Q.    And over your decade with GEO, has it been more

20   or less two janitors that work at the facility?

21       A.    I believe it's normally three.  They have had I

22   think sometimes four.

23       Q.    The janitors, where do they clean?

24       A.    Primarily the unsecured areas.

25       Q.    In other words, they clean the areas that the

Marc Johnson                                                December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 61

1       detainees don't have access to?

2              A.    Yes.

3              Q.    Do the janitors clean any of the secured areas?

4              A.    I believe the medical administration offices is

5       the only place on the secured side.

6              Q.    And is that because the medical administration

7       office is a secured area?

8              A.    Right, it's like restricted.  Medical would be

9       considered a secured area as well, but --

10             Q.    There's heightened restrictions for the admin

11      office?

12             A.    Right.

13             Q.    How big is the Northwest Detention Center, if

14      you know, in terms of square footage?

15             A.    I don't know.

16             Q.    It's pretty big though?

17             A.    It's a large -- large building, couple

18      buildings.

19             Q.    What is a pod porter?

20             A.    A pod porter is like a detainee worker that

21      works in their housing unit, their assigned housing unit.

22             Q.    Let's take a look at Exhibit-316, please.

23                   You're looking at Exhibit-316.  It's titled

24      Northwest Detention Center Pod Porter Job Descriptions.

25                   Have you seen this document before?

GEO Objections Foundation, FRE 402,
701, 802.

Marc Johnson                                    December 3, 2019

Page 62

1        A.    Yes.

2        Q.    What does this document describe?

3        A.    The different job duties within a unit.

4        Q.    And the pods, we're talking about the living

5    quarters then?

6        A.    Right.  Yeah.

7        Q.    How many pods are there?

8        A.    Let's see.  There are 21.

9        Q.    And do you know roughly how many pod porters

10   there are per pod?

11       A.    I could total them up based on this, but some of

12   these jobs are redundant and happen multiple --

13       Q.    Well, I have a document that I can show you

14   that -- that may help with regard to how many pod porters,

15   but for now, specifically with the Exhibit-316, the Pod

16   Porter Job Descriptions, the idea isn't that the pod

17   porters perform each of these jobs, it's just that a porter

18   would be assigned to any one of the jobs?

19       A.    Correct.

20       Q.    So, for example, the shower cleaners, there's a

21   pod porter that does the shower cleaning, but then there's

22   a separate pod porter that would do the bathrooms, for

23   example?

24       A.    Yes.

25       Q.    Now, under each of the various types of pod

Marc Johnson

December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 63

1    porters, there is a list of job duties; would you agree?

2          A.   Yes.

3          Q.   And this is the work that these pod porters are

4    directed to do?

5          A.   Yes.

6          Q.   Do they have discretion to deviate from their

7    specific job duties?

8          A.   No.

9          Q.   And GEO supervises the pod porters to make sure

10   that they are doing their job?

11         A.   Yes.

12         Q.   GEO provides the pod porters with the equipment

13   they need to do their job?

14         A.   Yes.

15         Q.   Provides them with the cleaning materials they

16   need to do -- they need to do their job?

17         A.   Yes.

18         Q.   GEO provides them with the training they need to

19   do their job?

20         A.   Yes.

21         Q.   And the pod porters don't make more money by

22   working longer or more hours; is that correct?

23         A.   No, it's not allowed by ICE.

24         Q.   So the answer to my question then is no?

25         A.   Correct, yeah --

Marc Johnson                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

                                                      Page 64

1             MS. MELL:  Object to the form.

2        A.   -- I should have said no.

3        Q.   Now, looking at the Pod Porter Job Descriptions,

4   on the back of the form here I see a line for the

5   detainee's name as well as the detainee's signature; is

6   that right?

7        A.   Yes.

8        Q.   And then it references offices -- officer's

9   signature.

10            Who is the officer referenced there?

11       A.   The GEO officer.

12       Q.   Is there a spot anywhere on this form where ICE

13   is expected to sign off?

14       A.   No.

15       Q.   Does ICE play any role in where detainees are

16   assigned to work?

17       A.   Not that I know of.

18       Q.   Let's take a look at Exhibit-309.

19            What are we looking at here at Exhibit-309?

20       A.   This is a daily pod worker list.

21       Q.   As you flip through, it's not just the pods,

22   there's references to laundry and kitchen as well.

23       A.   Oh, okay.  So yeah, it looks like it's the -- a

24   facility worker list.

25       Q.   Now, is this a document or something like this

Marc Johnson                                        December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 65

1    that you receive as part of your work?

2         A.   We don't receive it all together like this.  You

3    receive it for each individual area.  So if I was in like

4    A-1, for example, as the top page, I would have this

5    document.  If I was in A-2, I would have this one.  It's

6    broken down by unit or area.  If you're just in laundry,

7    you're going to have just the laundry one.  Kitchen has all

8    the shifts, breakfast, lunch, and dinner, and so on.

9         Q.   So as the detention officer, it just matters

10   where you're detailed to?

11        A.   Correct.

12        Q.   So if you're detailed to Pod A-1, you'll get the

13   Pod A-1 schedule?

14        A.   Yeah.

15        Q.   And in looking at Exhibit-309, does this refresh

16   your memory at all about how many pod porters there are per

17   pod?

18        A.   Yeah, and it depends on the size of the pod or

19   the area to be cleaned, because if you notice, so A-1 is a

20   larger pod, it has 15 pod porter who are cleaners, whereas

21   A-2 is a smaller one, and they only have 13.

22        Q.   Okay.  Do the pods vary in size?

23        A.   Yeah.

24        Q.   A lot or a little?

25             And I know those are rough terms, but --

Marc Johnson                                          December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 66

1      A.   So A-1 goes up to 115 beds.  It can go from

2   anywhere from 64 to 115.  Those are the maximum capacity.

3      Q.   Let's look at that first page there of

4   Exhibit-309.

5           So the first column, those appear to be the

6   detainee workers assigned as pod porters; is that right?

7      A.   Yes.

8      Q.   What does OTM stand for?

9      A.   I don't know.

10      Q.   And then Work Agreement, is that a reference to

11   the voluntary work -- worker agreement we looked at

12   earlier?

13      A.   Yes.

14      Q.   So some variation of Exhibit-314?

15      A.   The -- oh, if that's 314 --

16           MS. MELL:  What are you asking?  I didn't

17   understand that, some variation --

18      Q.   If you look at Exhibit-309, there's a column

19   that references worker -- Work Agreement, and I was asking

20   whether or not that references the Voluntary Work Program

21   Agreement at Exhibit-314?

22           MS. MELL:  I'm going to object to form.

23      A.   Yeah, but that -- it wouldn't be a variation,

24   that's it.

25      Q.   That's it?  Okay.

Marc Johnson                                December 3, 2019

Page 67

1              And then the next column over on Exhibit-309

2      says Main Job Responsibilities.

3           A.   Mm-hm.

4           Q.   What is meant -- what's meant by that?

5           A.   I think just what is listed.

6           Q.   Those are the areas or the type of cleaning that

7      that pod porter's responsible for; correct?

8           A.   Yes.

9           Q.   In that last column, what is that, the "Need to

10     check appropriate box and print officer name"?

11          A.   That is for any type of job changes regarding a

12     detainee.  Just like it says, if -- you know, if they

13     refuse to work, if they have booked out of the facility, or

14     if they switched jobs.

15          Q.   Now, looking at Exhibit-309, this particular one

16     is dated October 22nd, 2015.  Are these the assignments

17     just for that day, or would this -- are these typically

18     weekly assignments?

19          A.   It just depends on the movement.  It can be --

20     I'm -- I don't know if they put one out once a week.  I

21     think they do.

22          Q.   And Exhibit-309, is this more or less how this

23     particular schedule looks even today?

24          A.   Yeah.

25          Q.   At the bottom there it says "Do not turn this

GEO Objections Foundation, FRE 402, 701, 802.

Marc Johnson                                December 3, 2019

Page 68

1    form in.  It stays in the pod."

2             What does that mean?

3        A.   I think that's just a help for the officer.

4    Sometimes when there were changes, we would staple it all

5    together and turn it in, but then we wouldn't have a copy.

6        Q.   Let's take a look at Exhibit-308.  This is the

7    Daily Detainee Worker Pay Sheet.

8             Are you with me?

9        A.   Yes.

10       Q.   What is this document about?

11       A.   This is to verify that the detainees did the

12   work and make sure they get paid.

13       Q.   So then is there some sort of cross-reference

14   that takes place between Exhibit-309 and 308?  I mean, do

15   you look at the schedule, and then 308 is your

16   certification, as the officer, that the work was performed?

17       A.   Yes.

18       Q.   What if this form doesn't have a detainee

19   signature; what are we to take from that?

20       A.   There's no worker for that job, or they didn't

21   perform the work.

22       Q.   And is it the detention officer then that

23   decides whether or not a detainee worker may sign the

24   worker pay sheet?

25             MS. MELL:  Object to the form of the question.

GEO Objections Foundation, FRE 402,
701, 802.

Marc Johnson                                    December 3, 2019

Page 69

 1          A.    I'm sorry, repeat the question.

 2          Q.    Well, let me try and put it into context.

 3                So looking at Exhibit-308, if you look at the

 4     top there --

 5          A.    Mm-hm.

 6          Q.    -- that last bullet, it says "By detainee

 7     signature staff is affirming that the following have been

 8     evaluated and met acceptable standards: the job was

 9     completed, detainee maintained a good attitude, and the

10     detainee began work on time."

11                So my question is, is it the detention officer

12     that decides whether or not a detainee worker may actually

13     sign this form?

14          A.    No.

15          Q.    Let me try one -- one more time.

16                If a detainee hasn't performed their work to a

17     satisfactory fashion, could a detention officer say, No,

18     you don't get to sign the worker pay sheet today?

19          A.    Yes.

20          Q.    Does that happen?

21          A.    Yes.

22          Q.    Give me an example of a time when that would

23     happen or has happened?

24          A.    If they aren't cleaning the showers good, I --

25     you know, not scrubbing correctly, cleaning them, you know,

Marc Johnson

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 70

1    or they try and do it too quickly, like two minutes, and

2    then sign, I want to be done.

3         Q.   Can you tell me about another time?

4         A.   If they just, you know, refuse to get up for

5    their shift or clean.

6         Q.   They don't get paid?

7         A.   They don't get paid, and they could potentially

8    lose their job.

9         Q.   What are IDP sanctions?

10        A.   That's a disciplinary hearing.

11        Q.   And IDP, what does that stand for?

12        A.   I believe it stands for Institutional

13   Disciplinary Panel.

14        Q.   Who is on that panel?

15             And you can give me titles if you don't know

16   names.

17        A.   I believe it's the restricted housing unit

18   lieutenant and an ICE officer or supervisor, ICE

19   supervisor.

20        Q.   Anybody else?

21        A.   Just those two people.

22        Q.   What is a UDC hearing?

23        A.   I believe it stands for a Unit Disciplinary

24   Committee.

25        Q.   Who is on the Unit Disciplinary Committee?

GEO Objections Foundation, FRE 402,
701, 802.

Marc Johnson                                                December 3, 2019

Page 71

1          A.    Just a -- a sup -- I believe it's any
2     supervisor, sergeant or lieutenant, or it may just be a
3     lieutenant.
4          Q.    So what's the difference between IDP and UDC?
5          A.    The UDC is like a lower level infraction, an IDP
6     is for a more serious infraction.
7          Q.    Can you give me an example of a more serious
8     infraction that would go to IDP?
9          A.    So for fighting, two people fighting would go to
10    an IDP, whereas like a simple theft would just be a UDC.
11         Q.    What about poor performance in the Voluntary
12    Work Program, would that be UDC or IDP?
13         A.    You don't get written up for a poor performance.
14         Q.    Now, the UDC determinations, to your knowledge,
15    do those go to ICE at any point?
16         A.    I don't believe they do.  They go in your
17    detainee file.
18         Q.    And the IDP proceedings, ICE is a part of it?
19         A.    Correct.
20         Q.    As a detention officer, do you take attendance
21    for the detainee workers that are under your -- your
22    charge?
23         A.    Yeah, I would verify when they're supposed to
24    work and did they complete the work satisfactorily.
25         Q.    And that's -- is that back to the worker pay

GEO Objections Foundation, FRE 402, 701, 802.

Marc Johnson                                    December 3, 2019

Page 72

1    sheet, or is that something different?

2           A.   I would -- yeah, I would use the worker pay

3    sheet in accordance with the -- the roster, the detainee

4    work roster, or pod porter list, whatever you want to call

5    it.

6           Q.   I deposed Mr. Delacruz from the kitchen, and he

7    told me that in the kitchen, there are four shifts, there's

8    a morning, there's a lunch, there's a dinner, and there's

9    an evening or nighttime cleanup crew; are there shifts like

10   that for other detainee jobs within the facility?

11          A.   Yes.

12          Q.   Can you tell me what those shifts are.

13          A.   Laundry has a day shift and a swing shift.  I

14   think the outside rec has day shift cleaners and nighttime

15   cleaners.  And then in the units, like we read, you know,

16   there's like a shower cleaner, there's a day shift cleaner,

17   a swing shift cleaner.  So within the units there's

18   individual shifts as well.

19          Q.   And if I wanted to know how many people were

20   assigned to any given shift, I'd look at the -- the roster

21   that we looked at earlier, an example of which is

22   Exhibit-309?

23          A.   Yes.

24          Q.   Generally speaking, how long do the pod porter

25   shifts or duties take to complete?

Marc Johnson                                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 73

1          A.   It just depends.

2          Q.   Can you give me a range?

3          A.   Not really.  I mean, it just depends on how

4     quickly and satisfactorily they do their jobs.  Some jobs

5     last longer.

6               So, for example, the food porters, right, they

7     have to go pick up the trays, they bring them to the unit,

8     and then ICE mandates that the trays have to be in the unit

9     for 20 minutes.  So it's going to at least be, you know,

10    30, 35 minutes, and they clean up afterwards, and they do

11    that three times a day.

12              The shower cleaners, if the unit's larger, you

13    know, there's more showers, it's going to take longer to

14    clean all those showers.  If it's a smaller unit, there

15    will be less showers, they can clean it quicker.

16              Same with the generic porter, sweeping the

17    floors; the bigger the unit, the more it's going to take

18    than if it's a small unit.

19         Q.   This Exhibit-309, the schedule that we were

20    looking at, who creates this, do you know?

21         A.   I believe it comes from classification.

22         Q.   So this is Ms. Singleton or Mr. Heye perhaps?

23         A.   Yeah.

24         Q.   And I notice on many of the details there's a

25    wait list; what is the wait list?

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com     206.622.6661 * 800.657.1110  FAX: 206.622.6236

GEO Objections Foundation, FRE 402, 701, 802.

Marc Johnson                                          December 3, 2019

Page 74

1          A.    It's detainees who have expressed interest in

2    having a job but that job is currently filled.

3          Q.    So it's not the case that anybody that wants to

4    be a pod porter could be a pod porter, it's only if there's

5    a spot available?

6          A.    Correct, there's -- there's a fixed amount of

7    spots.

8          Q.    Do you know who determines the cap for, you

9    know, any of the various jobs?

10         A.    Immigration.

11         Q.    And how do you know that?

12         A.    That's what I was told by I believe it was Heye.

13         Q.    This is back to your conversation with someone

14   in classifications?

15         A.    Mm-hm.

16         Q.    Yes?

17         A.    Yes.

18               Sorry.

19         Q.    Do you know whether there's a minimum number

20   expected for each spot?

21         A.    No.

22         Q.    What happens if you don't have enough pod

23   porters?

24         A.    I'm not sure.

25         Q.    Well, has there ever been a time where you've

Marc Johnson                                    December 3, 2019

Page 75

1    encouraged a detained person to sign up to join the VWP,

2    the Voluntary Work Program?

3        A.   No.

4             (Exhibit-318 marked.)

5             THE COURT REPORTER:   This is Exhibit-318.

6        Q.   You've just been handed Exhibit-318.

7             What are we looking at here?

8        A.   It's an email from me to the kitchen -- kitchen

9    manager.  I'm not sure what her official title is.  She's

10   the head of the kitchen.

11            I've also cc'd classification, Singleton, and

12   Lieutenant Snyder, regarding some thefts from the kitchen.

13       Q.   Now, how were the thefts in the kitchen caught?

14       A.   I'm just reading the email.

15            I don't specifically remember, and I didn't say

16   how.

17       Q.   In the middle there you write "Investigations

18   have been conducted on all these incidents."

19       A.   Mm-hm.

20       Q.   Can you tell me about the investigation?

21       A.   Specifically to these?  I don't remember.

22       Q.   Well, who would have conducted the

23   investigation?

24            MS. MELL:   Object to the form.

25       A.   It appears it would have been me and Lieutenant

Marc Johnson                                    December 3, 2019

Page 76

1    Snyder.  So at the time I was an acting lieutenant.  I

2    would have been an officer.

3         Q.    Was this a part of a UDC proceeding?

4               MS. MELL:  Object to the form.

5         A.    It would have -- yeah, it would have -- yes.

6         Q.    While you were a lieutenant, did you preside or

7    make UDC determinations?

8         A.    Yes.

9         Q.    And part of that job was conducting

10   investigations?

11              MS. MELL:  Object to the form of the question.

12        Q.    What did that job entail?

13              MS. MELL:  What job?

14              Object to the form of the question.

15        A.    As the UDC lieutenant, I wouldn't be doing any

16   investigations.  I would conduct a hearing, and I would

17   review the investigation that was done and forwarded to me

18   as the UDC hearing officer.  I would make a recommendation

19   for sanctions or find them guilty or not guilty.

20        Q.    So while you were the UDC officer, is it the

21   case then that the detention officers were conducting the

22   investigation?

23        A.    No.

24        Q.    Tell me how it worked.

25        A.    So the shift supervisors would conduct the

Marc Johnson                                    December 3, 2019

Page 77

1    investigations.

2              So it appears, based on this email, that either

3    myself or Lieutenant Snyder were conducting the

4    investigation.  We make a packet, you know, try and get

5    statements from the detainees.  It's their right not to say

6    anything; sometimes they don't say anything, sometimes they

7    do.  Review video, other witnesses, staff.  Take all that,

8    put that into a packet, you know, put it all together.

9    There's an investigation form we fill out, you know, what

10   happened, make a recommendation, and that goes on either to

11   the UDC or to the IDP.

12             The UDC hearing officer will get that, review it

13   all, they can agree with the recommendation, change it,

14   find you guilty, not guilty, and then recommend sanctions.

15        Q.   And that's what's happening here in

16   Exhibit-13 -- I'm sorry, Exhibit-318?

17        A.   Right, this is an email, which would be part of

18   my investigation, letting the kitchen officer know about

19   the theft.

20        Q.   And in this case, your ultimate determination

21   was that those detainee workers would lose their jobs in

22   the kitchen and laundry?

23        A.   That was my recommendation.

24        Q.   Who are you making your recommendation to?

25        A.   The kitchen manager.

Marc Johnson                                    December 3, 2019

Page 78

```
 1       Q.   So is it the case then that you conduct the UDC
 2  hearing, make a determination, and then forward that to
 3  who?
 4            MS. MELL:  Object to the form of the question,
 5  mischaracterizes --
 6       Q.   Yeah, no, I'm sorry, I'm not trying to twist you
 7  up, I'm just trying to understand the process here.
 8            I mean, you told me about the investigation
 9  that's done, there's a packet, and then I thought I
10  understood you to say that a UDC officer makes a
11  determination whether discipline or sanctions are
12  warranted; did I get that right?
13       A.   Yeah.
14            I believe there was a change, and I don't know
15  if it was when the ICE PBNDS was updated, but it used to
16  be, it appears several years ago, that the kitchen manager
17  is the only one who could fire people from the kitchen, or
18  maybe because I was -- I was misinformed as an acting
19  lieutenant at the time, that's why I sent the email.
20            I believe, yeah, now the UDC hearing officer can
21  recommend firing a person from their job.
22       Q.   And that recommendation goes to whoever the
23  supervising officer is; is that right?
24       A.   Yeah.
25       Q.   Any of the work details that you had in
```

Marc Johnson                                    December 3, 2019

1    supervising detainee workers, did it involve providing the

2    workers with uniforms?

3         A.    Sometimes.

4         Q.    Which roles would that have been that got

5    uniforms, outside of the kitchen?

6         A.    Sometimes on the paint details, they get paint

7    on themselves, or the -- the -- you know, the stripping and

8    the waxing, you know, stuff splashes, so we would exchange

9    their uniform.

10        Q.    Any others?

11        A.    No.

12             MR. WHITEHEAD:  All right, let's take a -- let's

13   take a break.

14             THE VIDEOGRAPHER:  Going off the record.  The

15   time is 4:12.

16                  (Recess at 4:12 p.m.)

17                  (Reconvened at 4:24 p.m.)

18             THE VIDEOGRAPHER:  Back on the record.  The time

19   is 4:24.

20        Q.    Mr. Johnson, thank you for your time.  I just

21   have one last question.  Some of my questions may about

22   have been pointed today, but have I been fair with you?

23             MS. MELL:  Object to the form.  I don't think

24   it's relevant, and I don't think you have to answer that

25   question.

Marc Johnson                                        December 3, 2019

Page 80

1      Q.   Are you going to heed Counsel's advice, or are

2    you willing to answer?

3      A.   Yeah, I'm going to listen to Counsel.

4           MR. WHITEHEAD:  All right, I don't have anything

5    further.  Your attorney might have questions for you

6    though.

7                    E-X-A-M-I-N-A-T-I-O-N

8    BY MS. MELL:

9      Q.   Okay.  Officer Johnson, did the ICE detainees

10   clean up after you at the facility?

11     A.   No.

12     Q.   Would you characterize those activities that are

13   described in Exhibit-316 as chores?

14     A.   Yeah.

15     Q.   Are they activities of daily living?

16     A.   Yes.

17     Q.   Are they the kinds of things you do for yourself

18   at home?

19     A.   Yes.

20     Q.   Do you empty trash and replace liners in your

21   home?

22     A.   Yes.

23     Q.   Do you buy the liners and trash cans with your

24   wages?

25     A.   Yes.

Marc Johnson                                    December 3, 2019

Page 81

1        Q.    Do you clean sinks, microwaves, and counters

2    after you eat your breakfast?

3        A.    Yes.

4        Q.    Do you get paid minimum wages to do it?

5        A.    No.

6        Q.    How about the description of the activities set

7    forth at Exhibit-315, would you describe or characterize

8    those activities as chores?

9        A.    Yes.

10        Q.    Do you take care of your personal grooming, like

11    cutting your hair?

12        A.    Yes.

13        Q.    Do you pay for any haircuts or grooming with

14    minimum wages?

15        A.    Just supplies.

16        Q.    Okay.  All right.  Do you vacuum at home?

17        A.    Yes.

18        Q.    Mop your own floors?

19        A.    Yes.

20        Q.    Clean the showers?

21        A.    Yes.

22        Q.    Clean the toilets?

23        A.    Yes.

24        Q.    Is it correct that at the Northwest Detention

25    Center, there's not an individual toilet for all of the

Marc Johnson                                    December 3, 2019

Page 82

1    detainees to have their own toilet; correct?

2         A.    Correct.

3         Q.    So the Voluntary Work Program enables the chores

4    associated with a communal toilet to be accomplished by the

5    detainees who use it; correct?

6         A.    Yes.

7               MR. WHITEHEAD:   Objection, form.

8         Q.    And the Northwest Detention Center doesn't

9    operate on a hotel model in that nobody comes in and

10   changes the beds for all the detainees or --

11        A.    No.

12        Q.    -- serves them meals, or room service, or

13   anything like that?

14        A.    No.

15        Q.    Now, is it correct that from a disciplinary

16   process that results in a UDC hearing, a detainee can

17   appeal a UDC determination to ICE?

18        A.    Yes.

19        Q.    And is that the IDP process, or is that any

20   process?

21        A.    That's any process, they can appeal to ICE.

22        Q.    Okay.  So with respect to the email

23   communication set forth at 318 where you have communicated

24   that you're recommending the thieves, the detainees who

25   were stealing, not participate in the activities in the

Marc Johnson                                December 3, 2019

                                                      Page 83

 1   kitchen and laundry anymore, ICE could have overrode your

 2   recommendation?

 3        A.   Yes.

 4        Q.   With respect to the process that a detainee goes

 5   through to participate in the Voluntary Work Program, that

 6   is not the same process that you went through to be hired

 7   at GEO?

 8        A.   No.

 9        Q.   And with regard to the UDC process, or any

10   disciplinary process, that is not the same process that you

11   would be disciplined under as a GEO employee?

12        A.   No.

13        Q.   Would you necessarily know of those instances

14   when ICE initiated a action against a detainee based on

15   their observations of a detainee's actions in the VWP?

16             MR. WHITEHEAD:   Objection, form.

17        A.   No, I wouldn't.

18        Q.   And why is that?

19        A.   It's above my level.  You know, I'm not an

20   officer.

21        Q.   ICE doesn't need to defer to you; correct?

22        A.   No.

23        Q.   You would defer to ICE, however?

24        A.   Yes.

25             MS. MELL:  Okay, I have nothing further.

Marc Johnson                                        December 3, 2019

Page 84

1                F-U-R-T-H-E-R E-X-A-M-I-N-A-T-I-O-N

2     BY MR. WHITEHEAD:

3          Q.   Mr. Johnson, in your time as a UDC officer, did

4     ICE ever override a determination or recommendation that

5     you made?

6          A.   I'm not sure.

7          Q.   As you sit here today, is it that you -- you

8     cannot think of a specific instance in which ICE overrode a

9     determination or decision you made as UDC officer?

10         A.   No, it's they wouldn't -- just wouldn't tell me,

11    they wouldn't go back through me to tell me, Hey, we chose

12    to do something different.

13         Q.   Do you have any reason to believe that your

14    determination was overridden or reversed?

15              MS. MELL:  Object to the form.  He just said he

16    wouldn't know.

17         A.   I don't know.

18         Q.   And you also characterized some of the work done

19    by the detainee workers as chores; what's the distinction,

20    if any, you draw between job duties and chores?

21         A.   Well, basic cleaning of your living area I would

22    consider a chore.

23         Q.   Well, in the case of the pod porters, it's not

24    just their own personal area, they're doing the cleaning

25    for the entire pod; correct?

Marc Johnson                                    December 3, 2019

Page 85

 1        A.   Correct.

 2        Q.   And you told me earlier that the pods range from

 3   60 to 115 or so people; is that correct?

 4        A.   Yes.

 5             MR. WHITEHEAD:  Nothing further.

 6             F-U-R-T-H-E-R E-X-A-M-I-N-A-T-I-O-N

 7   BY MS. MELL:

 8        Q.   With regard to cleaning up in the pod, the pod

 9   porter isn't cleaning up after everyone in the pod,

10   they're -- they're doing additional work that's for common

11   areas within the pod; correct?

12        A.   Correct.

13             MR. WHITEHEAD:  Objection, form.

14        Q.   So there's multiple people picking up after

15   themselves, it's just that some additional duties have been

16   selected to keep activities available in the VWP for

17   individuals who choose to busy themselves during the day --

18             MR. WHITEHEAD:  Objection --

19        Q.   -- is that correct?

20             MR. WHITEHEAD:  -- form.

21        A.   Correct.

22        Q.   So the -- the distinction between what a pod

23   porter does in picking up in the pod and what an individual

24   does to pick up after him or herself is a distinction

25   almost without a difference, it's all work that needs to be

Page 86

1    done to maintain the health and safety and the integrity of

2    the communal space where they are living; correct?

3              MR. WHITEHEAD:  Objection, form.

4       A.   Yes.

5              MS. MELL:  I have nothing further.

6              MR. WHITEHEAD:  I'm done.

7              THE VIDEOGRAPHER:  This is the end of media two

8    and adjourns the deposition of Marc Johnson.  The time is

9    approximately 4:33.

10             THE COURT REPORTER:  Same thing, are you going

11   to order this one?

12             MR. WHITEHEAD:  Yes, please.

13             THE COURT REPORTER:  And copy for you?

14        MS. MELL:  Yes, please.

15               (Deposition adjourned at 4:33 p.m.)

16               (Signature reserved.)

17

18

19

20

21

22

23

24

25

Marc Johnson                                    December 3, 2019

Page 87

```
 1                    S-I-G-N-A-T-U-R-E

 2

 3

 4           I declare under penalty of perjury under

 5      the laws of the State of Washington that I have read

 6      my within deposition, and the same is true and

 7      accurate, same and except for changes and/or

 8      corrections, if any, as indicated by me on the CHANGE

 9      SHEET flyleaf page hereof.  Signed in...............,

10      WA, on the........day of................, 2019.

11

12

13

14                       ........................

15                       MARC A. JOHNSON

16                       Taken: Tuesday, December 3, 2019

17

18

19

20

21

22

23

24

25      Keri A. Aspelund
```

Marc Johnson                                    December 3, 2019

Page 88

 1                  C-E-R-T-I-F-I-C-A-T-E

 2

 3      STATE OF WASHINGTON )

 4                          )  ss.

 5      COUNTY OF THURSTON  )

 6

 7              I, the undersigned Registered Professional
        Reporter and Certified Court Reporter, hereby
        certify that the foregoing deposition upon oral
 8      examination was taken stenographically before me and
        transcribed under my direction;

 9

10              That the witness was duly sworn by me,
        pursuant to RCW 5.28.010, to testify truthfully; that the
11      transcript of the deposition is a full, true, and correct
        transcript to the best of my ability; that I am neither
12      attorney for, nor a relative or employee of, any of the
        parties to the action or any attorney or counsel employed
13      by the parties hereto, nor financially interested in its
        outcome.

14

15              I further certify that in accordance with CR
        30(e), the witness was given the opportunity to examine,
16      read, and sign the deposition, within 30 days, upon its
        completion and submission, unless waiver of signature was
17      indicated in the record.

18

19              IN WITNESS WHEREOF, I have hereunto set
        my hand this 10th day of December, 2019.

20

21

22

23      _____

24      NCRA Registered Professional Reporter
        Washington Certified Court Reporter No. 2661

25

Marc Johnson                                    December 3, 2019

Page 89

1                SEATTLE DEPOSITION REPORTERS, LLC

2                600 UNIVERSITY STREET, SUITE 320

3                     SEATTLE, WA  98101
                        (206) 622-6661
4
                    C-H-A-N-G-E  S-H-E-E-T
5
     PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
6    SHOWING PAGE, LINE AND REASON.

7    ----------------------------------------------------
     PAGE  LINE     CORRECTION AND REASON
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23                      _____
                        MARC A. JOHNSON
24                      TAKEN: Tuesday, December 3, 2019

25   Re: NWAUZOR v. THE GEO GROUP, No. 17-cv-05769-RJB