The Honorable Robert J. Bryan

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UGOCHUKWU GOODLUCK NWAUZOR, FERNANDO AGUIRRE-URBINA, individually and on behalf of all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE GEO GROUP, INC., a Florida corporation,<br><br>Defendant. | No. 17-cv-05769-RJB<br><br>DEPOSITION DESIGNATIONS OF BRUCE A. SCOTT, JR. AS RULE 30 (B)(6) DESIGNEE OF THE GEO GROUP, INC. |

Plaintiffs present (1) Plaintiffs' designations of the Deposition of Bruce A. Scott, Jr., as a rule 30(b)(6) designee of The GEO Group, Inc., and (2) Defendant's counter-designations and objections. The designated pages are attached, with Plaintiffs' designations highlighted in yellow and Defendant's counter-designations highlighted in green.

DATED this 24th day of April, 2020.

SCHROETER GOLDMARK & BENDER

*s/ Jamal N. Whitehead*

Adam J. Berger, WSBA #20714
Lindsay L. Halm, WSBA #37141
Jamal N. Whitehead, WSBA #39818

810 Third Avenue, Suite 500
Seattle, WA 98104
Tel: (206) 622-8000 ~ Fax: (206) 682-2305
berger@sgb-law.com
halm@sgb-law.com
whitehead@sgb-law.com

THE LAW OFFICE OF R. ANDREW FREE
Andrew Free (*Pro Hac Vice*)
P.O. Box 90568
Nashville, TN 37209
Tel: (844) 321-3221 ~ Fax: (615) 829-8959
andrew@immigrantcivilrights.com

OPEN SKY LAW, PLLC
Devin T. Theriot-Orr, WSBA # 33995
20415 – 72nd Avenue S, Suite 110
Kent, WA 98032
Tel: (206) 962-5052
devin@opensky.law

MENTER IMMIGRATION LAW, PLLC
Meena Menter, WSBA #31870
8201 164th Ave NE, Suite 200
Redmond, WA 98052
Tel: (206) 419-7332
meena@meenamenter.com

*Class Counsel*

DEP. DESIGNATIONS OF SCOTT GEO
30(B)(6) DESIGNEE (17-cv-05769-RJB) - 2

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Devin T. Theriot-Orr
OPEN SKY LAW, PLLC
20415 – 72nd Avenue South, Suite 110
Kent, WA 98032
devin@opensky.law
*Attorney for Plaintiff*

R. Andrew Free
THE LAW OFFICE OF R. ANDREW FREE
PO Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com
*Attorney for Plaintiff*

Meena Menter
MENTER IMMIGRATION LAW PLLC
8201 – 164th Avenue NE, Suite 200
Redmond, WA 98052
meena@meenamenter.com
*Attorney for Plaintiff*

Joan K. Mell
III BRANCHES LAW, PLLC
1019 Regents Boulevard, Suite 204
Fircrest, WA 98466
joan@3ebrancheslaw.com
*Attorney for Defendant*

Colin L. Barnacle
Ashley E. Calhoun
Christopher J. Eby
Adrienne Scheffey
AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
colin.barnacle@akerman.com
ashley.calhoun@akerman.com
christopher.eby@akerman.com
adrienne.scheffey@akerman.com
*Attorneys for Defendant*

DATED at Seattle, Washington this 24th day of April, 2020.

*s/ Virginia Mendoza*
VIRGINIA MENDOZA, Legal Assistant
Schroeter Goldmark & Bender
810 Third Avenue, Suite 500
Seattle, WA  98104
Tel: (206) 622-8000
mendoza@sgb-law.com

Bruce Scott, Jr.                                December 10, 2019

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

UGOCHUKWU GOODLUCK NWAUZOR,      )
FERNANDO AGUIRRE-URBINA,         )
individually and on behalf of   )
all those similarly situated,   )
                                )
          Plaintiffs,           )
                                )  No. 17-cv-05769-RJB
     vs.                        )
                                )
THE GEO GROUP, INC., a Florida  )
corporation,                    )
                                )
          Defendant.            )
_____

VIDEO DEPOSITION UPON ORAL EXAMINATION OF

BRUCE A. SCOTT, JR.

AS A RULE 30(b)(6) DESIGNEE OF

THE GEO GROUP, INC.

_____

810 Third Avenue, Suite 500

Seattle, Washington

**Plaintiff's Deposition Designations**

DATE:  Tuesday, December 10, 2019

REPORTED BY:  Donald W. McKay, RMR, CRR, CCR 3237

Bruce Scott, Jr.                                  December 10, 2019

Page 2

```
 1                   A P P E A R A N C E S

 2
     FOR THE PLAINTIFFS:
 3
                 JAMAL N. WHITEHEAD, ESQ.
 4               REBECCA J. ROE, ESQ.
                 Schroeter Goldmark & Bender
 5               810 Third Avenue, Suite 500
                 Seattle, Washington 98104
 6               206.622.8000
                 whitehead@sgb-law.com
 7               roe@sgb-law.com

 8   FOR THE DEFENDANT:

 9               JOAN K. MELL, ESQ.
                 III Branches Law PLLC
10               1019 Regents Boulevard, Suite 204
                 Fircrest, Washington 98466
11               253.566.2510
                 joan@3brancheslaw.com

12
     ALSO PRESENT:
13
                 LANE POLOZOLA, ESQ.
14               Assistant Attorney General
                 State of Washington
15               Office of the Attorney General
                 800 Fifth Avenue, Suite 2000
16               Seattle, Washington 98104
                 206.464.7744
17               lane.polozola@atg.wa.gov

18               LINDSEY LEWIS
                 Videographer
19

20

21

22

23

24

25
```

Bruce Scott, Jr.                                    December 10, 2019

1                          I N D E X

2    EXAMINATION BY                                          PAGE
     _____
3
     MR. WHITEHEAD.....................................    6
4

5

6                        E X H I B I T S

7    NUMBER      DESCRIPTION                                 PAGE
     _____
8
     Exhibit 353  Plaintiffs' Amended Notice of             9
9                 Videotaped Rule 30(b)(6) Deposition
                  to The GEO Group
10
     Exhibit 354  GEO's Fed. R. Civ. P. 26(a)(1) Initial    13
11                Disclosures

12   Exhibit 355  Untitled spreadsheets                     23
                  (GEO-Nwauzor 084666)
13
     Exhibit 356  Contract - Statement of Work              32
14
     Exhibit 357  Defendant The GEO Group, Inc.'s           43
15                Responses to Plaintiff Chao Chen's
                  First Interrogatories and Requests
16                for Production

17   Exhibit 358  Composite - Billing from The GEO Group    55
                  to DHS ICE
18
     Exhibit 359  Monthly Voluntary Worker Program          61
19                Spend - 2005-2016

20   Exhibit 360  Spreadsheet titled Northwest ICE          64
                  Processing Center Facility Financial
21                Statements

22   Exhibit 361  Performance-based National Detention      93
                  Standards 2011
23
     Exhibit 362  Batch Listing - Batch No. 3683 -          96
24                04/18/2006

25

Bruce Scott, Jr.                                    December 10, 2019

Page 4

1              E X H I B I T S (continued)

2    NUMBER          DESCRIPTION                        PAGE

3    ─────────────────────────────────────────────────────

     Exhibit 363  Memorandum dated April 12, 2012, to     104
4                 Associate Warden McHatton from
                  Classification, Singleton and Heye,
5                 re: Voluntary Work Program 2011 PBNDS
                  Standards
6
     Exhibit 364  E-mail chain dated August 30, 2014,     106
7                 to Lowell Clark from Bill McHatton,
                  re: Voluntary Work Program
8
     Exhibit 365  Letter dated May 30, 2018, to Peter     110
9                 Edge from (redacted)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bruce Scott, Jr.                                    December 10, 2019

Page 5

1          Seattle, Washington; Tuesday, December 10, 2019

2                          10:13 a.m.

3

4          THE VIDEOGRAPHER:  We're now on the record.

5          Today's date is December 10, 2019.  The time is

6     now 10:13 a.m.

7          This is the video-recorded deposition of Bruce

8     Scott, 30(b)(6) representative for The GEO Group, Inc.,

9     in the matter of Ugochukwu Goodluck Nwauzor, et al.,

10    versus The GEO Group, Inc., pending in the United States

11    District Court, Western District of Washington at

12    Seattle, Case No. 17-cv-05769-RJB.

13         This deposition is at the request of the

14    plaintiff.

15         My name is Lindsey Lewis, your videographer,

16    here with Don McKay, your court reporter.  We represent

17    Seattle Deposition Reporters.

18         This deposition is taking place at Schroeter

19    Goldmark & Bender, 810 Third Avenue, Suite 500, Seattle,

20    Washington, 98104.

21         Will counsel please identify and state your

22    appearances for the record.

23         MR. WHITEHEAD:  Good morning.  Jamal Whitehead

24    on behalf of Mr. Nwauzor and the certified class.

25         MS. ROE:  Rebecca Roe with Jamal Whitehead.

Bruce Scott, Jr.                                    December 10, 2019

Page 6

1            MS. MELL:  Joan Mell.  GEO.

2            Bruce Scott, witness, 30(b)(6).

3            MR. POLOZOLA:  My name is Lane Polozola.  I am

4   counsel for the State of Washington in a separate

5   consolidated lawsuit, Washington versus GEO.

6            THE VIDEOGRAPHER:  Will the court reporter

7   please administer the oath.

8

9   BRUCE A. SCOTT, JR.          called as a witness in the

10                               above-entitled cause, being

11                               first duly sworn, testified

12                               as follows:

13

14                E X A M I N A T I O N

15   BY MR. WHITEHEAD:

16     Q.  Good morning, Mr. Scott.  We met yesterday when

17   I deposed you in your individual capacity.  I will

18   introduce myself again, though, for the benefit of the

19   record.  I'm Jamal Whitehead.  I represent Mr. Nwauzor,

20   as well as Mr. Aguirre-Urbina in their lawsuit against

21   The GEO Group.

22            Mr. Scott, could you please state and spell your

23   name for the record.

24     A.  Bruce Arnold Scott, Jr.  B-R-U-C-E, A-R-N-O-L-D,

25   S-C-O-T-T, J-R.

Bruce Scott, Jr.

GEO Objections Foundation, FRE
402, 701, 802.

December 10, 2019

Page 7

1    Q.  I take it your employment status didn't change

2  overnight, you are still a GEO employee?

3    A.  Yes.

4    Q.  Well, we covered three ground rules at the

5  outset of your deposition yesterday.  I'd like to cover

6  them again, because I think it's always good to have

7  them front and center in your mind.

8        First and foremost is that this is not a

9  practice.  We are to conduct ourselves as if the judge

10  and the jury were here today and ready to make a

11  decision.  Do you understand that?

12    A.  Yes.

13    Q.  And with the help of the written transcript and

14  the video, the judge and the jury will use them to

15  assess your cooperation and your credibility.  Do you

16  understand that?

17    A.  Yes.

18    Q.  Second off, I am not a mind reader.  If there is

19  anything that prevents you from giving full and accurate

20  testimony, will you let me know?

21    A.  Yes.

22    Q.  And that goes for my questions.  I'll do my best

23  to ask good questions; but to the extent you don't

24  understand something that I've asked, will you let me

25  know?

BEO Objection to FRE: 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 8

1      A.  Yes.

2      Q.  And then, finally, I'm looking for your full
3  cooperation.  I want your best and most accurate
4  testimony.  Do you understand that?

5          MS. MELL:  Object to the form.

6          THE WITNESS:  Yes.

7  BY MR. WHITEHEAD:

8      Q.  I am going to ask many yes or no questions,
9  because I want to work efficiently to get us out of here
10  today.  To the extent I ask you a yes or no question,
11  will you give me a yes or no answer?

12          MS. MELL:  Object to the form.

13          THE WITNESS:  Yes.

14  BY MR. WHITEHEAD:

15      Q.  So the deposition today is different than the
16  deposition that you gave yesterday in that you've been
17  designated by The GEO Group to testify on the company's
18  behalf about information known or reasonably known to
19  GEO on certain subjects.  Is that your understanding of
20  why you're here today?

21      A.  Yes.

22      Q.  And have you agreed to testify on GEO's behalf
23  today?

24          MS. MELL:  Object to the form.

25          THE WITNESS:  Yes.

Bruce Scott, Jr.　　　　　　　　　　　　　December 10, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 9

1    BY MR. WHITEHEAD:

2        Q.   And you understand that your answers are binding

3    on the company?

4            MS. MELL:  Object to the form.

5            THE WITNESS:  Yes.

6            MR. WHITEHEAD:  This will be 353.

7            (Exhibit 353 marked for identification.)

8    BY MR. WHITEHEAD:

9        Q.   Mr. Scott, you've just been handed Exhibit 353.

10   Have you seen this document before?

11       A.   Let me review.

12            Yes.

13       Q.   And the matters of examination begin on page

14   four.  Have you reviewed those?

15       A.   Yes.

16       Q.   Tell me what GEO did to prepare you to provide

17   testimony about information known or reasonably

18   available to the company about the matters listed in the

19   30(b)(6) deposition notice that is Exhibit 353.

20            MS. MELL:  Object to the form.

21            THE WITNESS:  I just reviewed the standards, the

22   ICE standards, related to this deposition.

23   BY MR. WHITEHEAD:

24       Q.   Anything else?

25       A.   Some documents -- some documents that have been

Bruce Scott, Jr.                                    December 10, 2019

 1    produced already, to my knowledge, reviewed those just

 2    for subject knowledge.

 3         Q.   Anything else?

 4         A.   No.

 5         Q.   So you said ICE standards.  What ICE standards

 6    did you review to prepare for the deposition today?

 7         A.   The 2011 Revision 16 PBNDS standards, which is

 8    the Performance-Based National Detention Standards.

 9         Q.   That's a rather lengthy document.  Were there

10    any particular sections that you focused on?

11         A.   Particularly on the Voluntary Work Program

12    section.

13         Q.   Section 5.8?

14         A.   That sounds about right.  But like you said,

15    it's a very lengthy document.

16         Q.   Any other sections within the 2011 PBNDS that

17    you recall reviewing to prepare for your testimony today

18    as the 30(b)(6) designee?

19         A.   No.

20         Q.   You said documents that you believe have been

21    produced.  Which documents are you referring to?

22         A.   There was several documents, items along the

23    lines of some of these questions in Exhibit A and

24    throughout this.  I can't recall specifically which

25    documents, but they relate to this 30(b)(6) notice.

Bruce Scott, Jr.                              December 10, 2019

1       Q.   How many documents did you review?

2       A.   Maybe four.

3       Q.   And were they documents with narrative

4    descriptions?  Spreadsheets?  Give me an idea of the

5    type of documents that you reviewed.

6       A.   I remember a spreadsheet and I remember a

7    disciplinary action form.

8       Q.   What was the spreadsheet about?

9       A.   The spreadsheet had to do with numbers related

10   to the Voluntary Work Program and just overall numbers

11   of the 2016 Voluntary Work Program and expenditures of

12   the facility.

13      Q.   When did you review these documents, both the

14   ICE standards as well as the other documents that you

15   mentioned?

16      A.   Last night.

17      Q.   Are there any other sources of information that

18   you reviewed or had access to, to prepare for your

19   deposition today?

20      A.   No.

21      Q.   Please list for me the people that provided

22   factual information with respect to any of the matters

23   that you expect to testify to today as GEO's 30(b)(6)

24   designee.

25      A.   I didn't speak to anybody about the 30(b)(6)

Bruce Scott, Jr.                                December 10, 2019

Page 12

1   deposition notice.

2        Q.  Did you learn any facts from your attorney in

3   the context of preparing for your 30(b)(6) testimony?

4            MS. MELL:  Object to the form.

5            You don't have to answer anything that's

6   privileged.

7            THE WITNESS:  I'm not answering that question,

8   sir.

9            MR. WHITEHEAD:  Well, the rule is a little bit

10  different in the context of a 30(b)(6) deposition.   To

11  the extent the deponent learns facts from counsel,

12  attorney-client privilege is waived.

13           So, Ms. Mell, for the record, what is your

14  instruction to the witness?

15           THE WITNESS:  I can't instruct the witness --

16  I'm not going to instruct the witness not to answer.

17  There is a privilege that is associated with your past

18  question.  I don't know what you want to ask now and I

19  can't object to it until I know what you're asking him.

20  BY MR. WHITEHEAD:

21       Q.  My question is, Mr. Scott, did you learn any

22  facts in the context of preparing for this 30(b)(6)

23  deposition from counsel?

24       A.  No.

25       Q.  Are you able to tell us everything that GEO

GEO Objections Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 13

1   knows or has available to it with respect to the matters

2   listed in the 30(b)(6) notice that is Exhibit 353?

3            MS. MELL:  Object to the form.

4            THE WITNESS:  To the best of my ability.

5   BY MR. WHITEHEAD:

6        Q.  Are there any matters that you feel unprepared

7   or uncomfortable testifying about?

8        A.  No.

9            MS. MELL:  I would, just for the record, note

10  that we haven't waived any of the objections.

11  BY MR. WHITEHEAD:

12       Q.  Are you aware that GEO has filed a counterclaim

13  against the named plaintiffs for unjust

14  enrichment/offset?

15       A.  No.

16       Q.  What is GEO's claimed offset amount?

17       A.  From my understanding, the offset amount that is

18  claimed in the documentation I reviewed was $28.12.

19       Q.  And the document that you reviewed, do you know

20  what that is?

21       A.  The spreadsheet I referred to earlier.

22            (Exhibit 354 marked for identification.)

23  BY MR. WHITEHEAD:

24       Q.  Mr. Scott, you've just been handed Exhibit 354.

25  Have you seen this document before?

Bruce Scott, Jr.

GEO Objections Foundation,
FRE 402, 701, 802.

December 10, 2019

Page 14

1      A.   No.

2      Q.   Well, the first page of the document references

3  or is captioned GEO's -- it states the rule -- Rule

4  26(a)(1) Initial Disclosures.

5           I want to direct your attention to page three of

6  the document.  Are you with me?

7      A.   I am there.

8      Q.   In the middle of the page there, there is a

9  section called Computation of Damages, and then it shows

10  item one, "Offset: $17.12 per hour of participation in

11  the Voluntary Work Program."  Do you see that?

12      A.   I see that.

13      Q.   Is $17.12 per hour of participation in the

14  Voluntary Work Program GEO's claimed offset amount in

15  this case?

16      A.   The next paragraph looks more familiar to me

17  where it says, each detainee who elects to participate

18  in the voluntary program receives at least $27.12 per

19  hour in compensation.

20      Q.   To round out that sentence, it says, "in

21  addition to the $1.00 per day allowance."  That's my

22  question.  Is it $17.12 per hour or $27.12 per hour that

23  GEO is claiming as its offset?

24      A.   Currently, based on the available information --

25  and not all relevant information is known on the

SEATTLE DEPOSITION REPORTERS, LLC

Bruce Scott, Jr.

GEO Objections Foundation, FRE
402, 701, 802.

December 10, 2019

Page 15

1    computation of this offset -- we have it listed as

2    $27.12 an hour.

3        Q.  Do you know why $17.12 is listed on this

4    disclosure?

5        A.  I do not.  It seems to be a typo based on the

6    rest of the paragraph under that.

7        Q.  In that way, then, we can disregard $17.12 as

8    the company's claimed offset amount.  Is that correct?

9        A.  Yeah, our current estimated offset amount is

10   $27.12 per hour.

11       Q.  So to answer my question, the answer is yes, we

12   can disregard the $17.12 per hour amount listed on this

13   disclosure?

14           MS. MELL:  Object to the form.

15           I think we're struggling with an offset issue

16   and terminology.  I mean, you understand that you have

17   to know what the minimum wage is.  Right?

18           MR. WHITEHEAD:  I want the witness to answer the

19   question.  I mean, this is clearly defined as one of the

20   areas of examination.

21           MS. MELL:  I'm just saying, I think that's where

22   you're struggling, if you want to understand that

23   answer.  But that's fine.  I can ask him the questions

24   if it needs clarity.

25           MR. WHITEHEAD:  No, that's fine.

Bruce Scott, Jr.                                    December 10, 2019

GEO Objections Foundation, FRE
402, 701, 802.

Page 16

1    BY MR. WHITEHEAD:

2       Q.  So, Mr. Scott, as between $17.12 per hour and

3    $27.12 per hour, what is GEO's claimed offset amount?

4           MS. MELL:  Objection, asked and answered.

5           THE WITNESS:  The $27.12 is the claimed amount.

6    It's an estimated number based on some variables that we

7    don't know all the answers to at this time.

8    BY MR. WHITEHEAD:

9       Q.  All right.  Who came up with the $27.12?

10      A.  I don't know specifically who came up with it.

11   It's based on a number of data points and a formula that

12   come up to the $27.12.

13      Q.  Who came up with the formula to reach this

14   $27.12?

15      A.  A spreadsheet that I reviewed, Mr. Kimble had

16   come up with the formula for the $27.12 an hour.

17      Q.  And this offset figure, when did GEO first

18   arrive at this amount?

19      A.  I don't recall the specific date or time that it

20   was arrived at this amount.  This is based on a lot of

21   data and the formula that Mr. Kimble came up with to

22   determine this number.

23      Q.  I'll represent to you that this lawsuit was

24   filed in September 2014.  Was this offset amount reached

25   before the lawsuit or after?

GEO Objections Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 17

1      A.  After.

2      Q.  And $27.12, were there ever any other offset

3  amounts reached or discussed by GEO?

4      A.  No.

5      Q.  Walk me through how GEO arrived at the amount of

6  $27.12 per hour as the offset amount.

7      A.  We looked at total 2016 data, and took the total

8  participants in the Voluntary Work Program for 2016, and

9  we multiplied that by an estimated hours worked and

10  average hours worked per detainee during that time

11  period, to determine a total number of hours worked in

12  that year; and divided that by the total expenditures of

13  equipment, services, building costs, taxes, a number of

14  other factors, divided -- that equated out to the $27.12

15  an hour.

16      Q.  In 2016, what was the total number of

17  participants in the program?

18      A.  I can't recall off the top of my head.  I know

19  it's listed on some documentation somewhere.

20      Q.  Do you have those documents with you today?

21      A.  I do not.

22      Q.  All right.  And the estimated hours worked by

23  detainee, I believe you said was part of the formula.

24  Did I get that right?

25      A.  Yes.

GEO Objections Foundation,
FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 18

1      Q.   What was the estimated hour or hours worked by

2   detainees used in your formula?

3      A.   The estimated average hours worked by detainees,

4   I believe, was 1.72 hours.

5      Q.   How was that estimate reached?

6      A.   That is purely an estimate.  Most Voluntary Work

7   Program assignments only last 30 minutes, sometimes not

8   even 30 minutes.  We don't have time records of each

9   individual work period.  It was not a requirement and is

10  not a requirement of the ICE PBNDS standards for

11  voluntary work.  It's our best estimate of the number of

12  hours that each individual spent on average, working any

13  day for the Voluntary Work Program.

14     Q.   What sources of information did GEO consult to

15  reach that 1.72 hours estimate?

16     A.   Really just knowledge of the program, of what

17  detainees actually do in the Voluntary Work Program.

18     Q.   And in estimating 1.72 hours, was it GEO's

19  intent to be accurate in its estimate?

20          MS. MELL:  Object to the form.

21          THE WITNESS:  As accurate as available since the

22  ICE standard, nor contract require any such

23  documentation of time spent within the Voluntary Work

24  Program.

25  BY MR. WHITEHEAD:

Bruce Scott, Jr.                                    December 10, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 19

1        Q.   Well, I guess what I'm driving at is that this

2   wasn't an arbitrary number.   1.72 hours represents GEO's

3   best estimate.   Is that correct?

4             MS. MELL:   Object to the form.

5             THE WITNESS:   Based on available knowledge and

6   without any detailed information from the Voluntary Work

7   Program that's not required, it's our best estimate.

8   BY MR. WHITEHEAD:

9        Q.   And is 1.72 hours still GEO's best estimate of

10   the average detainee shift?

11             MS. MELL:   Object to the form of the question.

12             THE WITNESS:   It's hard to answer.   The

13   Voluntary Work Program from day-to-day is very fluid.

14   It's hard to come up with a specific set of hours.   It

15   probably would not be the same from day-to-day if we

16   actually counted hours in the Voluntary Work Program.

17   BY MR. WHITEHEAD:

18        Q.   Well, for purposes of deriving GEO's offset

19   amount, is GEO sticking with or changing the 1.72 hours

20   detainee shift estimate?

21             MS. MELL:   Object to the form of the question.

22             THE WITNESS:   Based on -- when more available

23   information is known about the -- how many detainee

24   workers or what the overall end process wants to be --

25   it's hard to know.   It's a number right now.   The 1.72

Page 20

1   hours is our best estimate within the Voluntary Work

2   Program.

3   BY MR. WHITEHEAD:

4       Q.  So that's yes, that is still GEO's estimated

5   hours for the average detainee shift?

6           MS. MELL:  Object to the form of the question.

7           THE WITNESS:  Based on the documentation in

8   front of me, yes.

9   BY MR. WHITEHEAD:

10      Q.  Well, it's not based on the documentation in

11  front of you.  Like I said at the outset, it's a

12  30(b)(6) deposition, so it's a little bit different.

13  You're speaking on behalf of the company.  So my

14  question is a yes or no one.  On behalf of the company,

15  is 1.72 hours still the company's estimate for the

16  average detainee shift?  Yes or no.

17          MS. MELL:  Object to the form of the question.

18  Move to strike.

19          And don't tell my client what to do.

20          THE WITNESS:  I've answered the question.  As of

21  right now, based on the documentation and the

22  information that we have, 1.72 hours is the number.

23  BY MR. WHITEHEAD:

24      Q.  And then you said that the total number of

25  participants multiplied by the estimated hours worked is

Bruce Scott, Jr.                                    December 10, 2019

1    then divided by GEO's expenditures.  Did I get that

2    right?

3        A.  The costs related to the detainees in that

4    program.  Hygiene, products used, bedding used,

5    uniforms, the cost of housing, food, a number of

6    different topics, taxes.  All those things that relate

7    to the detainee and their housing determines that

8    number.

9        Q.  That's what I would like for you to unpack for

10   me.  I want to discuss in detail the expenditures that

11   are included in GEO's offset analysis.  Could you give

12   me a list of the expenditures or costs that GEO has

13   considered in formulating its offset amount?

14            MS. MELL:  Object to the form of the question.

15            THE WITNESS:  There is a number of related

16   items.  I mean, we could sit down if you have some

17   documentation to review, but I won't be able to rattle

18   off everything from memory.  We have provided some

19   information that was related to determining these

20   numbers.  I'd like to refer to that documentation.

21   BY MR. WHITEHEAD:

22       Q.  Did you bring it with you?

23       A.  I do not have it.

24       Q.  Do you know the title of the document that

25   you're thinking of?

Bruce Scott, Jr.                                December 10, 2019

Page 22

1      A.  No.  It was a spreadsheet that you had related
2   to earlier.
3      Q.  Well, let's look at Exhibit 354, page three.
4   These are GEO's initial disclosures.  It appears that
5   some of those expenditures are detailed here.  The
6   disclosures list room, clothing, food, laundry,
7   utilities, et cetera.  Do you see that?
8      A.  Yes.
9      Q.  Are those items or expenditures that were
10  considered in reaching GEO's offset amount?
11     A.  Yes.
12     Q.  And those expenditures as listed, what time
13  period did GEO review?
14     A.  Well, I take -- in the fiscal year 2016
15  expenditures.
16     Q.  For the fiscal year 2016 -- let's back up a
17  step.  When does GEO's fiscal year run from?  From when
18  to when?
19     A.  Our fiscal year relates to the calendar year for
20  the information -- I believe that is from January
21  through December of 2016.
22     Q.  So for the fiscal year 2016, how much did GEO
23  spend on rooming civil immigration detainees at the
24  Northwest Detention Center?
25          MS. MELL:  Object to the form.

402, 701, 802.

Bruce Scott, Jr.                                     December 10, 2019

Page 23

 1            THE WITNESS:  I don't have the individual

 2    amounts memorized.  The total expenditures listed here

 3    equated to ██████████ .

 4            (Exhibit 355 marked for identification.)

 5    BY MR. WHITEHEAD:

 6        Q.  You've just been handed Exhibit 355.  It's a

 7    series of spreadsheets that GEO produced to the

 8    plaintiffs in this case.  Have you seen these documents

 9    before?

10        A.  These look similar to the 2016 spreadsheet that

11    I looked at.

12        Q.  And you're referring to the last page of the

13    document?

14        A.  Yes.

15        Q.  Looking at the last page of Exhibit 355,

16    entitled "Fiscal Year 2016," is this a fair and accurate

17    representation of GEO's expenditures for that fiscal

18    year?

19        A.  For the items listed on the page, yes.

20        Q.  Now, we'll discuss the items listed on this

21    page -- well, strike that.

22            The items listed on this page, the last page of

23    Exhibit 355, are these the expenditures that are

24    included within GEO's offset computations?

25            MS. MELL:  Object to the form.

GEO Objections
Foundation, FRE 402,
701, 802.

Bruce Scott, Jr.                                December 10, 2019

Page 24

1              THE WITNESS:   Yes.

2   BY MR. WHITEHEAD:

3      Q.  As far as expenditures go, are there any

4   expenditures missing from this list that GEO has

5   included in its offset calculations?

6              MS. MELL:  I'm going to object to the form.

7              Is your question as to all of this?

8              MR. WHITEHEAD:  Joan, my question is how did you

9   guys reach the offset amount?  So I want to break it

10  down and figure out the component parts of how the

11  offset amount was derived.

12             MS. MELL:  But there is not 2016 in here.

13             MR. WHITEHEAD:  Well, the last page of the

14  exhibit.  These are double sided.

15             MS. MELL:  I don't see it in here.

16             Oh, I'm sorry.  Okay.

17             MR. WHITEHEAD:  Are you with us?

18             MS. MELL:  I'm with you, but I still have the

19  same objection in terms of clarifying apples to apples.

20  If you want to go through each year --

21             MR. WHITEHEAD:  I want to true it up, and I'll

22  work with the witness to do so.

23  BY MR. WHITEHEAD:

24     Q.  All right.  So, Mr. Scott, looking at

25  Exhibit 355, the last page that represents fiscal year

GEO Objects as unfounded,
FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 25

1    2016, are there any expenditures not listed that GEO

2    includes within its offset calculations?

3        A.   No.

4        Q.   Now, looking at the first block of expenses that

5    appear to be related to meals and food, do those

6    expenditures represent the cost of detainee food

7    services or do they also include the cost of food

8    services provided to GEO personnel?

9        A.   These are related to detainee food service.

10       Q.   GEO provides meals to its employees.  Is that

11   correct?

12       A.   Yes.

13       Q.   Do you know how many meals, either on a daily or

14   a per-week basis, that GEO provides for its own

15   personnel?

16       A.   I don't have that information on the top of my

17   head.

18       Q.   But it's your testimony that those employee

19   meals are not reflected in the meal expenditures that we

20   see on Exhibit 355?

21       A.   The total meals prepared for the facility are

22   based on the detainee population.  There is extra food

23   that is prepped in that to make sure that we serve

24   enough food, and it's that spare amount of food that

25   staff are able to get during meal service during each

Bruce Scott, Jr.                                    December 10, 2019

Page 26

1    meal.

2        Q.  Looking at the laundry expenditures, does GEO

3    provide laundry services for its staff?

4        A.  No.

5        Q.  And the floor cleaning and maintenance of the

6    facility, as well as pest control, are those benefits

7    enjoyed by everyone at the facility, not just the

8    detainees?

9        A.  Those are areas required by the ICE PBNDS

10   standard.  The facility is there for the detainees.  All

11   that is in detainee areas -- occupied areas.

12       Q.  And if we look at the bottom-right figure

13   reflected on the last page of 355, we see ███████.

14   Do you see that?

15       A.  Yes.

16       Q.  Does that represent the total expenditures by

17   GEO for that fiscal year?

18       A.  No.

19       Q.  What's missing?

20       A.  I do not know what's missing.  That figure

21   calculates everything that's listed in the first column

22   on this page as related to detainees.

23       Q.  Perhaps that's a good question to orient us.

24   The expenditures that are reflected here on the last

25   page of Exhibit 355, what do they represent?

Bruce Scott, Jr.                                    December 10, 2019

Page 27

1      A.   They represent a calculation total of those line

2  items that are listed on this page.  All of these are

3  related to things that go towards the detainees, and

4  rooming, housing, and boarding a detainee.

5      Q.   So this is GEO's overhead, so to speak, for

6  housing detainees.  Is that a fair way to put it?

7          MS. MELL:  Object to the form.

8          THE WITNESS:  No, I don't believe so.  This

9  total number on the bottom is a calculation of all these

10  items on this page.

11  BY MR. WHITEHEAD:

12     Q.   This is not a trick question.  I'm just trying

13  to group or understand what I'm looking at here.

14          Is there any way for you to categorize or tell

15  us, big picture, what these expenditures represent?

16          MS. MELL:  Object to the form.

17          THE WITNESS:  As I previously stated, these

18  expenditures go towards what we have for rooming,

19  boarding detainees.  These are everything that we've

20  listed totaling the ███████ that we used in our

21  calculation to determine the offset.

22  BY MR. WHITEHEAD:

23     Q.   So things like GEO's personnel costs for its

24  correction officers, that would not be reflected on this

25  document?

GEO Objections Foundation, 585,
402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 28

1       A.  I do not see that listed on this document.

2       Q.  All right.  So the figure that we see in the

3   bottom-right corner of Exhibit 355 there on the last

4   page, ███████ , that's the same figure that we see in

5   GEO's initial disclosures, Exhibit 354.  Is that right?

6       A.  Correct.

7       Q.  And those figures are one and the same?

8       A.  Yes.

9       Q.  Looking at Exhibit 354, there is a reference to

10  the total allowance paid of ███████ .  What does that

11  number represent?

12      A.  Which exhibit are you looking at again, sir?

13      Q.  354, GEO's initial disclosures.  I'm on page

14  three.

15      A.  So that represents the total allowance -- the

16  total detainee pay that was done in fiscal year 2016.

17      Q.  So ███████ represents the wages that GEO paid

18  to detainee workers for fiscal year 2016?

19          MS. MELL:  Object to the form.

20          THE WITNESS:  That was the total allowance paid

21  under the Voluntary Work Program in accordance with the

22  ICE standards for 2016.

23  BY MR. WHITEHEAD:

24      Q.  Now, each dollar of that ███████ , does that

25  represent a detainee shift?

Bruce Scott, Jr.

GEO Objections Foundation, FRE 402, 701, 802.

December 10, 2019

Page 29

1        A.   Well, detainees don't work in shifts.   That one
2   dollar would represent a voluntary activity in the
3   Voluntary Work Program per each detainee in that year.
4        Q.   Is there a one-to-one correlation; meaning that
5   for each dollar spent by GEO in the program, does that
6   represent a detainee workday?
7             MS. MELL:   Object to the form of the question.
8             THE WITNESS:   The number is one dollar per
9   volunteer activity within the Voluntary Work Program in
10  accordance with the ICE standards.
11  BY MR. WHITEHEAD:
12       Q.   So each dollar spent represents a detainee
13  worker activity?
14       A.   Yes.
15       Q.   And tell me what is a detainee worker activity?
16  How are you defining that term?
17            MS. MELL:   Object to the form.
18            THE WITNESS:   The activity is the Voluntary Work
19  Program assignment activity that detainee performs.   It
20  could be five minutes, it could be one hour within that
21  day.   It's a Voluntary Work Program activity.
22  BY MR. WHITEHEAD:
23       Q.   The detainee work program, are detainee workers
24  paid by activity or by day?
25       A.   In accordance with the standard, the detainee is

GEO Objections Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 30

1    permitted one activity detail per day, and the

2    compensation for that is one dollar a day in accordance

3    with the ICE standard.

4        Q.   Now, the expenditures that GEO bases its claimed

5    offset upon, would the offset amount change if the

6    expenditure amount changed?

7             MS. MELL:  Object to the form.

8             THE WITNESS:  By definition of a mathematical

9    formula, if one number changed within the formula, I

10   would assume that the product of that formula would

11   change.

12   BY MR. WHITEHEAD:

13       Q.   So GEO's offset is based upon fiscal year 2016

14   figures.  Correct?

15       A.   The formula used to derive the $27.12 in

16   Exhibit 354 is based on the 2016 data.

17       Q.   Is GEO's claimed offset amount different or the

18   same for 2017?

19       A.   I do not know.  I don't have the 2017 numbers in

20   front of me to do the calculation.

21       Q.   What about 2018?  Is GEO's offset amount the

22   same or different for 2018?

23       A.   Again, sir, I don't have the 2018 data in front

24   of me to be able to determine the offset amount.

25       Q.   Is your answer the same if I were to ask about

Bruce Scott, Jr.                                    December 10, 2019

Page 31

1      2019?

2           A.   Yes.

3           Q.   Now, the expenditures for which GEO now seeks an

4      offset, is GEO reimbursed by ICE for those same amounts?

5                MS. MELL:  Object to the form.

6                THE WITNESS:  I don't know the answer to that

7      question.  There is a lot of different contract work

8      within that question to be able to answer it.

9      BY MR. WHITEHEAD:

10          Q.   With respect to how GEO reached its offset

11     amount for fiscal year 2016, have you told me everything

12     about the way in which GEO derived that number?

13               MS. MELL:  Did you say '16?

14               MR. WHITEHEAD:  I did.

15               MS. MELL:  Okay.

16               THE WITNESS:  Yes.

17     BY MR. WHITEHEAD:

18          Q.   Now, to my question about whether or not GEO is

19     reimbursed by ICE for its expenditures, would it help to

20     look at the ICE contract?

21               MS. MELL:  I object to the form.

22               THE WITNESS:  It's a lengthy contract with a lot

23     of different contract in it.  I don't think I would be

24     able to answer that -- that question.

25     BY MR. WHITEHEAD:

Bruce Scott, Jr.                                    December 10, 2019

                                                              Page 32

 1      Q.  Do you suspect the answer to question is

 2   contained within the contract?

 3          MS. MELL:  Object to the form of the question.

 4          THE WITNESS:  I don't suspect anything.  I do

 5   not know.

 6          (Exhibit 356 marked for identification.)

 7   BY MR. WHITEHEAD:

 8      Q.  You've just been handed Exhibit 356.  What are

 9   we looking at here?

10      A.  This appears to be a portion of the current

11   contract with the Statement of Work.

12      Q.  You say "a portion of."  What, if anything,

13   appears missing to you?

14      A.  Well, this is the base contract.  There is a

15   number of modifications to the contract over time with

16   different requirements from ICE that sometimes change

17   line item amounts, add additional requirements, take

18   requirements away.  I mean, this is the base contract,

19   but not all inclusive of everything that relates to

20   payment under the contract in the contracting sense.

21      Q.  If we look at the first page of Exhibit 356,

22   it's dated September 24, 2015.  Do you see that there in

23   the bottom-right corner?

24      A.  Where it says, "Date signed"?

25      Q.  Yes.  Do you see that?

Bruce Scott, Jr.                                    December 10, 2019

Page 33

1       A.  I see that.

2       Q.  Since September 24, 2015, can you tell me about

3   any revisions to the contract?

4       A.  There has been a number of revisions to the

5   contract.  I don't know how many or what those specific

6   changes were or what they changed.

7       Q.  Let's look at the second page of Exhibit 356.

8   Towards the bottom there, there is a reference to,

9   "Detention bed days, guaranteed minimum beds, 1,181

10  beds/day."  Do you see that?

11          MS. MELL:  I object to the form.  I'm not

12  following you.

13          THE WITNESS:  Do you have a line item that

14  you're looking at?

15  BY MR. WHITEHEAD:

16      Q.  0001A.

17          Are you with me now?

18      A.  I see that line item.

19      Q.  What is the reference, "Detention bed days"?

20      A.  There is a definition to a bed day on page 46,

21  which is Bates No. 096345 of that document.  The

22  contract defines what the bed day is.

23      Q.  And the bed day, does that form the basis for

24  how GEO is paid by ICE?

25      A.  That's just one of a series of numbers in this

Bruce Scott, Jr.                                    December 10, 2019

Page 34

 1    contract, sir.

 2       Q.  Was that the base assumption, though, that GEO

 3    is paid a basic bed day or bed rate by however many

 4    number of detainees are in the facility?

 5            MS. MELL:  Object to the form.

 6            THE WITNESS:  As one portion of a

 7    multiple-line-item contract.

 8    BY MR. WHITEHEAD:

 9       Q.  Is that the primary measure, though, for how GEO

10    is paid?

11            MS. MELL:  Object to the form.

12            THE WITNESS:  This is a multi-line-item

13    contract, sir.  It's just one point along the contract.

14    BY MR. WHITEHEAD:

15       Q.  Well, tell me, how is GEO paid under the

16    contract?

17            MS. MELL:  Object to the form.

18            THE WITNESS:  From my understanding and

19    knowledge, we submit a multiple-page invoice to the

20    contracting officer's representative, and then it's the

21    contracting officer's representative that determines

22    what is being paid under the contract.

23    BY MR. WHITEHEAD:

24       Q.  What's the contract amount?  Is there a total

25    contract amount?

Bruce Scott, Jr.                                December 10, 2019

Page 35

1       A.   Again, with a number of modifications to the

2   contract, which change some of the language that's here,

3   I do not know.

4       Q.   Take a look at page 42 of the contract.  It's

5   the one that bears Bates stamp GEO-Nwauzor 96341.

6       A.   Okay.  I'm on 96341.

7       Q.   If you look at line item 9006, the last sentence

8   of the page there, it says, "The total amount of award:

9   ██████████████."  Do you see that?

10      A.   Well, I see that listed on this page, sir, yes.

11      Q.   As of September 2015, was the total contract

12  award to GEO for operating the Northwest Detention

13  Center ███████████ as reflected here in the document?

14      A.   Again, without knowing all the in and outs of

15  any modification that's ever been made to this contract

16  and how the COR determines payment based on all of those

17  different modifications and line items, I do not know.

18      Q.   My question is, as of September 24, 2015, can

19  you say yes or no, whether or not ███████████ reflects

20  the contract from ICE to GEO?

21          MS. MELL:  Object to the form.

22          THE WITNESS:  I do not know, sir.  All the

23  information is not available to answer that question.

24  BY MR. WHITEHEAD:

25      Q.   Who would have that information?

GEO Objection - Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 36

1      A.  I think the owners of the contract, the ICE

2  contracting officers, may know the answer to that

3  question.

4      Q.  All right.  To the question, though, the bed-day

5  rate, looking at page 46 of the contract, Exhibit 356 --

6  are you on that page?

7      A.  Yes.

8      Q.  I'm looking at line item 6 there, the Bed-Day

9  Rate.  It reads, "Bed-day rate is an all-inclusive

10  burdened rate to include all costs inclusive of direct

11  cost, indirect costs, overhead and profit necessary to

12  provide the detention and food service requirements

13  required in the PWS."  Did I read that correctly?

14          MS. MELL:  Object to the form.

15          THE WITNESS:  The requirements described in the

16  PWS?

17          The document speaks for itself.  That's what the

18  words are on the page.

19  BY MR. WHITEHEAD:

20      Q.  So, that's my question, the bed-day rate, it

21  includes direct costs, the indirect costs, overhead and

22  profit.

23      A.  In accordance with the ICE contract, that's the

24  definition of a bed-day rate.

25      Q.  And ICE pays GEO the bed-day rate.  Correct?

Bruce Scott, Jr.                                December 10, 2019

Page 37

1       A.   As one line item in a multi-line-item contract,

2   we do get paid a bed-day rate.

3       Q.   To the extent that GEO seeks, as part of its

4   offset, food, hygiene, and housing costs, as part of its

5   offset, is GEO seeking to recover twice for the same

6   amounts?

7            MS. MELL:  Object to the form of the question.

8            THE WITNESS:  I don't know how you would

9   determine twice -- the spreadsheet is here.  The numbers

10  that we determined the offset are all listed.

11  BY MR. WHITEHEAD:

12      Q.   Well, looking at the spreadsheet -- and by

13  "spreadsheet," you're referring to Exhibit 355.

14  Correct?

15      A.   Yes.

16      Q.   Let's look at the last page, fiscal year 2016.

17  Are you with me?

18      A.   Yes.

19      Q.   The first line item there shows "Meals/Food

20  Expense."  Do you see that?

21      A.   Yes.

22      Q.   Meals/food expense, is that a component of the

23  bed-day rate?  Yes or no?

24           MS. MELL:  Object to the form of the question.

25           THE WITNESS:  Again, sir, there is various other

Bruce Scott, Jr.                              December 10, 2019

Page 38

1    line items.  This is a multi-line-item contract.  A

2    portion of it may be in the bed-day rate, but there is

3    multiple line items and amendments to a contract.  I

4    don't know where all these numbers tie into these

5    multiple line items.

6    BY MR. WHITEHEAD:

7      Q.  What about the line item for resident clothing?

8    Is resident clothing a component of the bed-day rate?

9    Yes or no?

10         MS. MELL:  Object to the form of the question.

11         THE WITNESS:  I don't see clothing listed in the

12   bed-day rate explanation of terms.  Again, with a

13   multi-line-item contract, it's hard to know exactly

14   where clothing fits into the contract.

15   BY MR. WHITEHEAD:

16     Q.  GEO's line item for utilities, is that a

17   component of the bed-day rate?  Yes or no.

18         MS. MELL:  Object to the form.

19         THE WITNESS:  Again, sir, I'm not the

20   contracting expert, and it's a multi-line-item contract

21   with multiple things.  I can read the definition that

22   the contract says the explanation of term of a bed-day

23   rate is.  I do not know, with all the different

24   modifications that are here, what all is included by

25   line item in that one explanation of term.

Bruce Scott, Jr.                                    December 10, 2019

Page 39

1    BY MR. WHITEHEAD:

2       Q.   Well, this deposition is a 30(b)(6) deposition,

3    meaning that you are testifying on behalf --

4            MS. MELL:   Counsel, don't --

5            MR. WHITEHEAD:   Hold on.

6            MS. MELL:   No, you're not asking a question.

7    You're not going to start lecturing to my client.   This

8    is a deposition.   You ask him a question and he'll

9    answer it.   You don't get to lecture him.   You don't get

10   to go on and on about what you want to hear.   Ask a

11   question and he'll answer the question.

12           MR. WHITEHEAD:   We've got to speak one at a

13   time, counsel, for the record.   I'm sure the court

14   reporter will appreciate it.

15   BY MR. WHITEHEAD:

16      Q.   Mr. Scott, this is a 30(b)(6) deposition.   You

17   told me at the outset that you understood that you were

18   testifying on behalf of the company.   Do you remember

19   that?

20           MS. MELL:   Object to the form.

21           THE WITNESS:   Yes.

22   BY MR. WHITEHEAD:

23      Q.   And you told me that you felt comfortable

24   testifying to the items listed in the 30(b)(6)

25   deposition notice.   Do you remember that?

Bruce Scott, Jr.                                December 10, 2019

Page 40

1          MS. MELL:  Object to the form of the question.

2     You're not going to sit here and badger my client.  Now

3     knock it off.  Ask him a question.  Those aren't

4     questions.  You're badgering him.  You're not even

5     asking him for information.  You're asking him to agree

6     with you.

7     BY MR. WHITEHEAD:

8          Q.  Do you remember telling me that you were

9     prepared to testify about the items listed in the

10    30(b)(6) notice?

11         MS. MELL:  He remembers.  Okay?  Come on.  Let's

12    get on with this deposition.  This is inappropriate.

13    You're just badgering the witness.

14    BY MR. WHITEHEAD:

15         Q.  Is that a yes, sir?

16         A.  There has been a lot of talk, sir.  Would you

17    repeat your question.

18         Q.  Well, I'd like for you to look at the notice.

19    Let's ground it in the notice.  We're looking at

20    Exhibit 353.  I'd like for you to look at page six.  I'm

21    looking at Item 4, subpart (j).  For example, are you

22    prepared today to testify about all compensation by ICE

23    to GEO for operating the Northwest Detention Center?

24         A.  I can explain facts and help you interpret some

25    of the items provided.  I do not know, in a

Bruce Scott, Jr.                              December 10, 2019

Page 41

1   multi-line-item contract, every in and out of the page,

2   what numbers are on the page.  I'm here, I can help you

3   understand the facts as presented in front of me for

4   this notice.  I don't think I'm expected to know and

5   memorize every word of a contract.

6        Q.  Well, a basic fact would be how much ICE is

7   paying GEO.  Would you agree?

8        A.  Yes.

9        Q.  So how much is the contract for between ICE and

10  GEO?

11           MS. MELL:  Object to the form.

12           THE WITNESS:  Again, sir, there is multiple

13  steps in the contract, multiple line items, amendments.

14  BY MR. WHITEHEAD:

15       Q.  Is your answer you don't know?

16           MS. MELL:  Object to the form of the question or

17  statement, commentary.  Move to strike.

18           THE WITNESS:  Sir, I can help you with documents

19  provided based on, you know, everything there is related

20  to a contract, multiple pages.  If we have that

21  documentation available to review, I can help explain

22  and define stuff; but I am not supposed to know, on a

23  multiple line item, with very many variables, what a

24  singular number is on multiple line items, amendments

25  that are not present here in this document.

Bruce Scott, Jr.                                    December 10, 2019

Page 42

 1    BY MR. WHITEHEAD:

 2        Q.  All right.  Last question on this subject.  That

 3    figure of ███████████ found on page 42 of

 4    Exhibit 356, what does that number represent?

 5        A.  This number is a listed number on this page of

 6    the contract.  I don't want to assume without adding up

 7    all the numbers on the other pages of this contract.

 8    The base contract as listed here by ICE -- all I can

 9    read is the total amount of the award.  ████████████

10    is the obligation for the award as shown in 15G.

11        Q.  Exhibit 355, the spreadsheets for GEO's

12    expenditures, do you know who prepared this document?

13        A.  There is not an author listed on this document.

14        Q.  Do you believe this document to be produced by

15    someone from GEO?

16        A.  Yes.

17        Q.  Do you know whether this was a litigation

18    document or if this was made in sort of the ordinary

19    course of business?

20        A.  I don't know specifically the cause of why this

21    document was created.  Since it's related -- the

22    ████████████ is related to the offset amount, this

23    document -- it looks it was created to assist in the

24    offset amount.

25        Q.  This document appears to be -- to have been

Bruce Scott, Jr.                                    December 10, 2019

Page 43

1   created by someone with knowledge of GEO's finances?

2       A.  At least knowledgeable with the line items that

3   they were adding to the computation of the offset

4   amount.

5       Q.  Do you have any reason to doubt the accuracy of

6   Exhibit 355?

7       A.  No.

8       Q.  Do you know the current Washington State minimum

9   wage?

10      A.  I do not.

11          (Exhibit 357 marked for identification.)

12  BY MR. WHITEHEAD:

13      Q.  You've just been handed Exhibit 357.  Have you

14  seen this document before?

15      A.  The document -- it looks like a legal document.

16  I've seen lots of them.  I can't recall if I've

17  necessarily seen this one or not.

18      Q.  Exhibit 357 is titled, "Defendant The GEO Group,

19  Inc.'s Responses to Plaintiff Chao Chen's First

20  Interrogatories and Requests for Production."  That's on

21  page one.  Do you see that?

22      A.  I see that.

23      Q.  Did you play any role in responding to

24  plaintiff's interrogatories and requests for production?

25      A.  I've done this a few times.  Recalling exactly

Bruce Scott, Jr.                                    December 10, 2019

Page 44

1    which questions answered, I don't remember which

2    specific questions.

3         Q.   Look at page 32 for me.  It's a verification

4    from an affiant, James Black.  Who is James Black?

5         A.   James Black was the regional vice-president of

6    the western region for the GEO Group.

7         Q.   I'd like to direct your attention to page --

8    it's the bottom of page 12, top of page 13.  There is an

9    interrogatory there with the question that says, "Please

10   describe in detail how you determined the offset amount

11   of $17.12 per hour described on page three of your

12   Rule 26 Initial Disclosures dated December 20, 2017."

13   Do you see that?

14        A.   I see that.

15        Q.   And then the response, GEO's response, follows

16   on the next page.

17        A.   In "Answer to No. 7"?

18        Q.   Correct.

19        A.   I see that.

20        Q.   The second to last sentence there says, "The

21   numbers come from the budget and actual expenditures of

22   the NWDC."  Do you see that?

23        A.   I do.

24        Q.   As far as expenditures go, does it mean anything

25   different than what you've already told me about?

Bruce Scott, Jr.                                    December 10, 2019

Page 45

 1      A.  This is related to that spreadsheet.  I don't
 2   have any reason to believe it's different.
 3      Q.  And as far as budget goes, what does that refer
 4   to?
 5      A.  A budget is a normal course of business.  Most
 6   businesses have a budget.  We have a budget that covers
 7   certain line items of the contract.  The numbers
 8   reported, to my knowledge, based on that spreadsheet,
 9   looks like they come from the actual expenditures within
10   our tracking systems.
11      Q.  GEO's budget, is it a deficit budget?
12          MS. MELL:  Object to the form.
13          THE WITNESS:  I don't know what type of budget
14   it is.
15   BY MR. WHITEHEAD:
16      Q.  Do you know what a deficit budget is?
17      A.  No.
18      Q.  Do you know whether GEO expects to break even on
19   its contract with ICE?
20          MS. MELL:  Object to the form.
21          THE WITNESS:  I don't know.
22   BY MR. WHITEHEAD:
23      Q.  Do you know whether GEO takes a loss on its
24   contract with ICE?
25      A.  I don't have that information.

Bruce Scott, Jr.                              December 10, 2019

Page 46

 1          MS. MELL:  I would object to the form, too.  I

 2    think that we do have a rule in this case -- remind me

 3    if this is incorrect -- but I think we have a rule on

 4    the disclosure side of the money equation that pertains

 5    to the Northwest Detention Center.  Did that change in

 6    this case?  You'd have to remind me where we are.  State

 7    versus Nwauzor.  I don't know.

 8          MR. WHITEHEAD:  We don't have anything in this

 9    case.  Obviously, the scope is a little bit different in

10    terms of GEO's finances for us.  But I think, as a basic

11    baseline question to the witness, does the GEO contract

12    with ICE -- do you know whether or not GEO takes a loss

13    on its contract?

14          MS. MELL:  I'll just object to the form of the

15    question.

16          THE WITNESS:  I don't know that information.

17    BY MR. WHITEHEAD:

18      Q.  GEO expects to make a profit.  Correct?

19          MS. MELL:  Object to the form of the question.

20          THE WITNESS:  GEO operates under contract with

21    Immigration and Customs Enforcement under this contract,

22    and we perform services for ICE to the best of our

23    ability in housing detainees safely and securely,

24    respecting their human rights and dignity.  We just

25    operate under a contract, sir.

Bruce Scott, Jr.                                December 10, 2019

Page 47

1   BY MR. WHITEHEAD:

2      Q.  That contract -- you're referring to

3   Exhibit 356 -- one of the components of it is that GEO

4   makes a profit.  Correct?

5      A.  It's a multi-page document.  We perform the

6   services listed in the contract.

7      Q.  Well, let's go to page 46.  We're back at the

8   bed-day rate.  Feel free to read the entirety of line

9   item six there.

10         My question to you is, do you agree that profit

11   is a component of the bed-day rate that ICE pays to GEO?

12      A.  I don't want to try to figure out what -- I can

13   read the bed-day rate.

14      Q.  Does GEO expect full reimbursement from ICE for

15   the cost of operating the Northwest Detention Center?

16         MS. MELL:  Object to the form of the question.

17         THE WITNESS:  Sir, again, with a multi-line-item

18   contract, there is -- this is not a singular amount.

19   There is multiple line items in the contract.  I do not

20   know how to answer that question.

21         MR. WHITEHEAD:  I think here is a good spot for

22   a break.

23         THE VIDEOGRAPHER:  We're now going off the

24   record.  The time is 11:24 a.m.

25         (Recess taken from 11:24 to 11:41.)

Bruce Scott, Jr.                                December 10, 2019

Page 48

```
 1          THE VIDEOGRAPHER:  We're now back on the record.

 2   The time is 11:41 a.m.

 3   BY MR. WHITEHEAD:

 4      Q.  Mr. Scott, have you heard the term "fully

 5   burdened contract" before?

 6      A.  No.

 7      Q.  Looking at Exhibit 356, this is GEO's contract

 8   with ICE as of September 24, 2015.  Do you know whether

 9   this contract contemplates all aspects of the services

10   that GEO is to provide for ICE?

11          MS. MELL:  Object to the form.

12          THE WITNESS:  In certain relations to the

13   contract and different modifications and amendments,

14   there is several things that have changed this contract.

15   I don't know how to answer that question.

16   BY MR. WHITEHEAD:

17      Q.  Well, as of September 24, 2015, I mean, is this

18   the expected contract amount that GEO can expect on its

19   contract with ICE?

20          MS. MELL:  Object to the form of the question.

21          THE WITNESS:  Again, sir, there is multiple line

22   items within this, with modifications, even as of this

23   date, new requirements that have come on.  It's

24   challenging to answer the question as you're asking.

25   BY MR. WHITEHEAD:
```

Bruce Scott, Jr.                                    December 10, 2019

Page 49

```
 1      Q.  All aspects of ICE's payment to GEO, are they
 2  covered by Exhibit 356 as of the date of the document?
 3           MS. MELL:  Object to the form of the question.
 4           THE WITNESS:  Sir, again, without having all of
 5  the potential modifications and amendments that have
 6  been made to the document -- to this contract, I don't
 7  know.
 8  BY MR. WHITEHEAD:
 9      Q.  Well, as you sit here today, are you aware of or
10  can you tell me about an amendment to the contract that
11  has affected GEO's expected contract amount?
12      A.  Sir, there has been multiple amendments and
13  modifications to the contract, based on service years.
14  Without having all the available information to review,
15  I can't say the number here is the number, in fact, when
16  you look at the entire auspices of the contract and any
17  modifications or amendments that relate to it.
18      Q.  Where would you look for that information?
19      A.  We would -- I would ask the government
20  contracting office to provide all information related to
21  the contract that they wish us to fulfill.
22      Q.  I asked the question, but I don't know that I
23  got an answer.
24           Are you aware of any amendments to the contract
25  that affect the contract price that GEO can expect from
```

Bruce Scott, Jr.                                December 10, 2019

Page 50

1    ICE?

2           MS. MELL:  Object to the form of the question.

3    Asked and answered.

4           Counsel, your commentary is improper.

5           THE WITNESS:  Without seeing -- I don't want to

6    guess as to what a document said or how it changed.

7    There has been multiple amendments and modifications to

8    the contract.  Without seeing those and relating to

9    those to determine the information to answer your

10   question -- I would like to refer to that instead of

11   just guessing.  I don't want to guess, sir.

12   BY MR. WHITEHEAD:

13      Q.  Well, can you describe one for me?

14          MS. MELL:  Object to the form.  One?

15          MR. WHITEHEAD:  A contract modification.

16          THE WITNESS:  Sir, again, there is many

17   potential modifications to the contract.  Trying to

18   guess or remember what the language on one page out of

19   many pages -- I'm more than willing to look at

20   documentation to help explain what that documentation

21   says if we have documentation provided to help me answer

22   that question.  I can't remember every page of a

23   multi-line-item contract.

24   BY MR. WHITEHEAD:

25      Q.  Is your answer, "I don't know"?

Bruce Scott, Jr.                                    December 10, 2019

Page 51

1          MS. MELL:  Object to the form of the question.

2   Mischaracterizes his testimony.

3          THE WITNESS:  I can't answer the information --

4   with the information provided.

5   BY MR. WHITEHEAD:

6      Q.  Let's look at Exhibit 355.  Back to the

7   spreadsheet.  I'd like for you to look at the last page,

8   fiscal year 2016.  I asked, at a higher level, about

9   whether or not GEO was reimbursed by ICE for certain

10  line items that are reflected on this document, but I'd

11  like to take it item by item, just to make sure that our

12  record is clear.  Do you understand?

13         MS. MELL:  I'm going to object.  I don't know

14  what you're instructing him to do or not do.

15         THE WITNESS:  I can relate to the information

16  that's on this page.  Whether or not -- you're asking me

17  to say have we been reimbursed for each of these line

18  items?  Is that what you're asking me to do, sir?

19  BY MR. WHITEHEAD:

20     Q.  Yes.  So let's take the first one.  Looking at

21  the fiscal year 2016, there is a line item there, 56510,

22  for meals/food and expense.  Do you see that?

23     A.  I do.

24     Q.  Is GEO reimbursed by ICE for this line item?

25         MS. MELL:  Object to the form of the question.

Bruce Scott, Jr.                                    December 10, 2019

1            THE WITNESS:  This document speaks for itself.

2    These are numbers that we listed as part of performing

3    the calculation of the offset.  Whether or not -- if we

4    have any billing information, invoices to show what was

5    actually submitted to ICE, I can't answer the question.

6    This document relates to data and information we put

7    down to help compute the offset of the $27.12.

8    BY MR. WHITEHEAD:

9        Q.  Well, let's try it this way:  I'll ask you yes,

10   no, or I don't know, and we'll go through each of the

11   items.

12           MS. MELL:  No, we're not going to do that.

13           MR. WHITEHEAD:  Meals --

14           MS. MELL:  He gets to answer the question as he

15   deems appropriate.  You can't instruct him what to

16   answer.  You can't instruct as to the answer before you

17   even ask the question.

18           MR. WHITEHEAD:  Let's speak one at a time so our

19   record is clear.

20           MS. MELL:  I'm speaking one at a time.

21   BY MR. WHITEHEAD:

22       Q.  All right.  So, Mr. Scott, meals/food and

23   expense, yes, no, or I don't know, does ICE reimburse

24   GEO for this line item?

25           MS. MELL:  Object to the form.

Bruce Scott, Jr.                                    December 10, 2019

Page 53

 1          THE WITNESS:  I don't have the relevant

 2     information to be able to answer that question.

 3     BY MR. WHITEHEAD:

 4        Q.  Where would you look for the relevant

 5     information?

 6        A.  Again, I would look for billing or invoices to

 7     see what we -- I mean, for example, I know, in the

 8     Voluntary Work Program that's listed in -- it's a line

 9     item on the contract -- GEO has zero profit in that

10     because it's -- whatever number that is, is passed right

11     to the ICE client and they pay.  As far as the rest of

12     these, I'm not going to guess or speculate on what was

13     reimbursed, how it was reimbursed, in accordance with

14     the bill given to the ICE contracting office

15     representative.

16        Q.  So is that what you would look to then as the

17     definitive statement, any bills submitted by GEO to ICE?

18          MS. MELL:  Object to the form.

19          THE WITNESS:  Again, sir, contracting is

20     complicated.  It's line items.  It's multiple things.

21     It's not just one set amount total; it's individual line

22     items, computations on those line items.  If you gave me

23     a total amount, I couldn't even tell you exactly which

24     line items were built into each one of these.

25     BY MR. WHITEHEAD:

Bruce Scott, Jr.                                    December 10, 2019

Page 54

1      Q.  I'm going to ask my question again as

2   straightforwardly as I possibly can.  Where would I look

3   if I wanted to know whether GEO is reimbursed by ICE for

4   meals and food?

5           MS. MELL:  Object to the form of the question.

6           THE WITNESS:  I would ask the ICE contracting

7   officer what she accepted as far as the line item in

8   that one item, as far as the invoice that we give to

9   ICE.

10  BY MR. WHITEHEAD:

11     Q.  So you would look to the contracting officer,

12  and he or she would give you some sort of information

13  about bills submitted to ICE.  Did I get that right?

14          MS. MELL:  Object to the form of the question.

15          THE WITNESS:  I don't know how ICE runs their

16  processes.  You're asking questions that I can't answer

17  with just a singular page of numbers in front of me on a

18  multiple-line-item budget with multiple different

19  computations under each line item.

20  BY MR. WHITEHEAD:

21     Q.  Looking at Exhibit 355, the statement for fiscal

22  year 2016, are you able to say definitively, for any of

23  these line items, whether or not GEO is reimbursed by

24  ICE?

25          MS. MELL:  Object to the form.

Bruce Scott, Jr.                              December 10, 2019

Page 55

 1          THE WITNESS:  I cannot say definitively without

 2     all the information available.

 3          (Exhibit 358 marked for identification.)

 4     BY MR. WHITEHEAD:

 5       Q.  You've just been handed Exhibit 358.  These

 6     appear to be bills submitted by GEO to ICE.  Do you

 7     agree?

 8          MS. MELL:  Object to the form.  This isn't the

 9     complete bill, I can tell you that.

10          Just so you know, the bill is this big

11     (indicating).  I mean, it's at least -- it's over --

12     it's like this.

13          MR. WHITEHEAD:  GEO -- Joan, you've made many,

14     many, many speaking objections throughout the

15     depositions that we've taken together.  Normally, I

16     don't engage.  But when it crosses the line to coaching

17     the witness, that's when I like to intervene.  Please

18     don't instruct the witness how to answer.

19          MS. MELL:  I'm not.  I'm telling you this is an

20     incomplete exhibit.  You were testifying as to what it

21     was.  So it's not.  It's not even the complete --

22          (Overlapping speakers.)

23          MR. WHITEHEAD:  That's a speaking objection that

24     instructs the witness on how to answer.  Don't do it

25     anymore.

Bruce Scott, Jr.                                December 10, 2019

Page 56

1          MS. MELL:  He can answer if he thinks it's

2     something complete.  But you're representing that it's

3     the bill.  It's not.

4     BY MR. WHITEHEAD:

5          Q.  Mr. Scott, have you had an opportunity to review

6     Exhibit 358?

7          A.  I've looked through 358, yes.

8          Q.  What are we looking at here?

9          A.  We're looking at a limited number of pages.  The

10    subject, monthly billing.  But this is an invoice --

11    certain invoice numbers.  I can't say if this is

12    inclusive of all the invoices, because of the

13    multiple-line-item budget.  This seems to be a portion

14    of a monthly bill to ICE.

15         Q.  Let's look at the first page of Exhibit 358.

16    It's dated March 4, 2017.  Do you see that at the top

17    left?

18         A.  Yes.

19         Q.  The next block of text there, it shows for the

20    period January 1st through 31st, 2017.  Do you see that?

21         A.  Yes.

22         Q.  What is that reference to?

23         A.  That's a reference of the information contained

24    on this page would be inclusive of the days January 1st

25    through January 31st, 2017.

Bruce Scott, Jr.                              December 10, 2019

Page 57

1    Q.  And this is a bill submitted by GEO to ICE,
2    covering that time period?
3    A.  This is an invoice number as a part of the main
4    bill.
5    Q.  Looking at this invoice, what are the line items
6    for which GEO is seeking payment from ICE?
7    A.  The line items that appear on the page that I'm
8    looking at marked CLIN 1001A, CLIN 1001B, there is some
9    transportation CLINs, facility CLINs, and a grand total
10   for the CLINs listed on this page.
11   Q.  What is a CLIN?
12   A.  A CLIN is a contract line item number as related
13   to the contract that we looked at earlier.  So this
14   would relate to a singular line in that multi-line item
15   budget -- not budget, I'm sorry -- but the contract.
16   Q.  So comparing Exhibit 358 to Exhibit 356, can you
17   tell what that first CLIN on 358 is referencing within
18   the ICE contract?
19   A.  Well, again, I can say what it relates to; but
20   without having all the modifications and amendments that
21   adjust this contract over time, I would not be able to
22   say with specificity.
23   Q.  Yes, no, or I don't know, that reference to
24   CLIN 1001A is a reference to the bed rate paid by ICE to
25   GEO?

Bruce Scott, Jr.                                December 10, 2019

Page 58

 1          MS. MELL:  Object to the form.

 2          THE WITNESS:  I can relate CLIN 1001A in the

 3   contract on Bates stamp 96304, but again, this may not

 4   be the actual based on amendments and modifications to

 5   the contract, but 1001A lines up with detention bed days

 6   in the contract.

 7   BY MR. WHITEHEAD:

 8      Q.  Looking at the statement there, CLIN 1003 for

 9   detainee worker pay, you see a figure of ▓▓▓▓.  Do

10   you see that?

11      A.  Yes.

12      Q.  Does each dollar here represent a detainee

13   worker workday?

14      A.  Each dollar here would represent a detainee -- a

15   Voluntary Work Program assignment within a day.  It's

16   not a workday; it's a program assignment.  It's a

17   detail.  The detainee could work for 15 minutes, 30

18   minutes.  It's a voluntary program work activity.

19      Q.  So each dollar spent there represents a

20   Voluntary Work Program activity.  Did I get that right?

21      A.  That's what I would relate it to.

22      Q.  May a detainee worker do more than one Voluntary

23   Work Program activity a day?

24      A.  The contract -- the ICE contract says detainee

25   should only perform one activity in a day.

Bruce Scott, Jr.                                    December 10, 2019

Page 59

1      Q.   So one activity a day.  Correct?

2      A.   In accordance with the ICE standard, yes.

3      Q.   And each dollar spent or reflected here on this

4   invoice, the first page of Exhibit 358, represents a

5   detainee work program activity?

6      A.   Yes.

7      Q.   You see transportation on this invoice as well.

8   What do these transportation line items refer to?

9      A.   They refer to individual line items within the

10  ICE contract.

11     Q.   Is this ICE Air?

12          MS. MELL:  Object to the form.  This?

13          THE WITNESS:  Not all inclusive of ICE Air.

14  There is multiple requirements in the contract, in the

15  ICE standards, for transportation.

16  BY MR. WHITEHEAD:

17     Q.   Looking at the first page of Exhibit 358, there

18  is a reference to contract.  That contract reference,

19  does it refer to what we see at Exhibit 356?

20     A.   Well, it refers to -- well, the base contract,

21  and it also lists the task order, which is one of those

22  items that change and modify a contract, which I don't

23  see listed, but I can see the base contract as listed

24  as ending 00015 as the base contract in Exhibit 356 as

25  ending 00015.

Bruce Scott, Jr.                                    December 10, 2019

Page 60

1      Q.  Is that the way to characterize Exhibit 356,

2  base contract?

3      A.  I refer to it as base contract because there are

4  multiple amendments and task orders and modifications

5  that change this contract.

6      Q.  I understand that part of your testimony.  But

7  as it relates to Exhibit 356, would you consider that

8  the base contract?

9      A.  That's my terminology for that.  This contract

10  labeled here as the number, HSCEDM-15-D-00015.

11      Q.  And what you call the base contract, have you

12  heard others refer to it using different terminology?

13      A.  The contract.

14      Q.  Anything else?

15          MS. MELL:  Object to the form.

16          Anything else?

17          THE WITNESS:  It is the contract.

18  BY MR. WHITEHEAD:

19      Q.  Looking at the next page of Exhibit 358, we see

20  again a reference to CLIN 1001A.  Is this a reference to

21  the bed rate that ICE pays GEO?

22      A.  It references the specific line item in the

23  contract, sir.

24      Q.  And that line item on the contract -- yes, no,

25  or I don't know --

GEO Objections Foundation,
FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 61

1          MS. MELL:  Objection.

2    BY MR. WHITEHEAD:

3      Q.  -- is that the bed rate?

4          MS. MELL:  Object to the form.

5          THE WITNESS:  Again, sir, that CLIN relates to

6    the contract.  It could relate to a modification.  It

7    could relate to an amendment of the contract.  I can

8    read what 0100A (sic) relates to in the contract.

9    BY MR. WHITEHEAD:

10     Q.  Which is?

11     A.  I'm looking for it, sir.

12         As listed in the contract, CLIN 1001A is listed

13   as the detention bed days.

14     Q.  Do you have any reason to believe that the

15   subsequent modifications that you've testified about

16   have changed CLIN 1001A to be anything other than the

17   bed-day rate?

18     A.  I would just refer to them numerically.  1001A

19   would equate to a line item, 1001A, in the contract.

20   That is the key identifier.

21         (Exhibit 359 marked for identification.)

22   BY MR. WHITEHEAD:

23     Q.  I've just handed you Exhibit 359.  Take a moment

24   to review the document.  But my question to you will be

25   what are we looking at?

Bruce Scott, Jr.                                      December 10, 2019

GEO Objections
Foundation, FRE 402, 701, 802.

Page 62

1        A.   Exhibit 359 is a number of -- it looks like

2   spreadsheets showing the Monthly Voluntary Worker

3   Program Spend in years ranging 2005 to 2016.

4        Q.   This represents the amount that GEO has paid to

5   detainee workers participating in the Voluntary Work

6   Program.   Correct?

7        A.   This would equate to a number on a line item of

8   the contract that ultimately ICE pays the detainees for

9   the Voluntary Work Program.

10       Q.   Break that down for me.   Is it the case that GEO

11  pays the detainee workers and then seeks reimbursement

12  from ICE or does ICE pay the detainee workers directly?

13       A.   Well, GEO pays the funds for the Voluntary Work

14  Program and then submits a pass-through line item to the

15  client, ICE, which then reimburses GEO for that amount

16  with zero profit.

17       Q.   All right.   So to my question, then,

18  Exhibit 359, the expenditures for the Voluntary Work

19  Program represent the amounts that GEO has paid to

20  detainee workers.   Correct?

21       A.   In those given years, yes.

22       Q.   And then GEO seeks reimbursement from ICE for

23  those exact same amounts.   Correct?

24       A.   Yes.

25       Q.   I had asked you a similar question with respect

Bruce Scott, Jr.                                December 10, 2019

Page 63

1    to Exhibit 358.  But are we to assume that each dollar

2    spent in the Voluntary Work Program represents a

3    Voluntary Work Program activity as you termed it

4    earlier?

5        A.  Yes.

6        Q.  And detainee workers are limited to one

7    Voluntary Work Program activity a day.  Correct?

8        A.  The standard language identifies that a detainee

9    should only work one activity in a day.

10       Q.  Now, this document here that is Exhibit 359, was

11   this created by someone knowledgeable about GEO's

12   spending on the Voluntary Work Program?

13       A.  Yes.

14       Q.  Does the information contained here appear

15   accurate to you?

16       A.  For the 2016 information we reviewed earlier, I

17   see the similar numbers.  I have no reason to believe

18   it's inaccurate.

19       Q.  Earlier, I asked you a question about whether or

20   not GEO makes a profit on its contract with ICE at the

21   Northwest Detention Center.  Do you remember that?

22       A.  Yes.

23       Q.  And your answer was?

24           MS. MELL:  Object to the form.

25           THE WITNESS:  I answered that.  We could go back

GEO Objections: Foundation, FRE 602, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 64

1    in the record and identify the answer.

2    BY MR. WHITEHEAD:

3        Q.  The transcript isn't ready yet.  Is it yes, no,

4    or I don't know?

5            MS. MELL:  No, we're not going to do that.

6            THE WITNESS:  I've already answered that

7    question, sir.

8            (Exhibit 360 marked for identification.)

9            (Discussion off the stenographic record.)

10   BY MR. WHITEHEAD:

11       Q.  Mr. Scott, I've just handed you Exhibit 360.

12   What are we looking at here?

13       A.  360 is titled, "Northwest ICE Processing Center

14   Facility Financial Summaries."

15       Q.  Have you seen this document before?

16       A.  No.

17       Q.  Do you know whether this was made by someone at

18   GEO?

19       A.  Well, there is no author on this, but I

20   recognize items on this page.  I would not have any

21   reason to believe it was not made by somebody at GEO.

22       Q.  Looking at the top there, we see a line item for

23   Total Revenue.  Do you see that?

24       A.  Yes.

25       Q.  What does that figure represent or those figures

Bruce Scott, Jr.                                December 10, 2019

Page 65

1    represent?  We see them on a year-by-year basis.  What

2    does that line item Total Revenue represent?

3        A.  It represents the total earned revenue.

4        Q.  Meaning all money coming into GEO at the

5    Northwest Detention Center on its contract with ICE?

6            MS. MELL:  Object to the form of the question.

7            THE WITNESS:  The document speaks for itself.  I

8    read earned revenue and a number of different dollar

9    amounts per year on this form.

10   BY MR. WHITEHEAD:

11       Q.  Let's look toward the bottom.  Do you see a

12   reference to Total Operating Expenses?  Do you see that?

13       A.  I see that.

14       Q.  What does Total Operating Expenses refer to?

15       A.  I would equate that to the line item -- the

16   individual line items right above that, in that area

17   that they total these listed line items on this page,

18   totaling the operating expenses.

19       Q.  And the next line item down, Gross Margin, what

20   does that refer to?

21       A.  Without doing the math on the form, it looks

22   like a formulaic entry computing a couple of different

23   data points on this form.

24       Q.  I haven't done the math either, but perhaps

25   revenue minus expenses.

Bruce Scott, Jr.                                    December 10, 2019

Page 66

1     A.  As a potential, but without doing the math, to

2  speak plainly --

3     Q.  Fair enough.

4        We see Indirect Costs underneath Gross Margin.

5  What does that refer to?

6     A.  The line item -- there is an asterisk which

7  indicates on this form a 2009 Pricing Index (sic)

8  Allocation.  All I can read is what this form says.

9     Q.  What about Facility Use Costs?  What does that

10  mean?

11     A.  Again, it's a line item on this report, Facility

12  Use Costs, with a number of dollar amounts over the

13  years.

14     Q.  And then, lastly, we see Net Margin.  What does

15  that mean?

16     A.  There is a number of -- a number of dollar

17  amounts assigned to net margin.  I again would assume

18  it's a formulaic entry on the form, computing some

19  different numbers on this page.

20     Q.  Based on what you see here and what you know of

21  GEO's operations, both in your capacity as a 30(b)(6)

22  designee and associate warden, does this figure

23  represent GEO's profit on a year-by-year basis?

24        MS. MELL:  Object to the form.

25        THE WITNESS:  GEO is a for-profit business.  I

Objection, Foundation,
701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 67

1    would say that this indicates, in some fashion, some of

2    the profit based on the numbers that I see on this page.

3    BY MR. WHITEHEAD:

4        Q.  So looking at fiscal year 2018, we see a net

5    margin of ███████.  Correct?

6        A.  That's what this individual page says, yes, sir.

7        Q.  Was that GEO's net profit for 2018?

8        A.  Based on this report that I'm reading, it was

9    the net margin for 2018.  I see ████████.

10       Q.  That was GEO's take-home based on what it made

11   on the contract less its expenses.  Correct?

12           MS. MELL:  Object.

13           THE WITNESS:  That, I don't know.  I'm just

14   reading what this report says.

15   BY MR. WHITEHEAD:

16       Q.  Do you have any reason to believe that this

17   figure of ████████ is anything other than GEO's

18   profit for the year?

19       A.  I don't know everything that goes into the

20   profit in the multi-line-item contract.  I can suspect

21   that it says the net margin for 2018 was ████████

22   based on this singular report.

23       Q.  Well, setting aside Exhibit 360, do you know

24   GEO's profit for last year?

25       A.  I do not.

Bruce Scott, Jr.                                    December 10, 2019

1      Q.  What about for 2017?  Do you know that answer?

2      A.  No.

3      Q.  2016?

4      A.  No.

5      Q.  2015?

6      A.  No.

7      Q.  And in terms of the figures shown for each of

8  those years on the Net Margin line, do you have any

9  reason to believe that those figures are anything other

10 than GEO's net profit for the years listed?

11     A.  This is a singular report that we're looking at.

12 I can read the numbers on the page, but without having

13 other reports and information -- I can read the numbers

14 on the page for each of those individual years as being

15 the net margin.

16     Q.  Mr. Scott, this goes back to one of those yes or

17 no questions.  I think this one lends itself well to yes

18 or no.

19         MS. MELL:  Your opinion about the nature of your

20 questions is totally irrelevant and an improper way to

21 handle a deposition.  It should be stricken.

22         MR. WHITEHEAD:  Joan, let me get my question

23 out.

24         MS. MELL:  Ask your question.

25         MR. WHITEHEAD:  And then you can lodge your

GEO Objection: Foundation,
FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 69

1    speaking objection and we can continue on with the

2    proceedings.

3    BY MR. WHITEHEAD:

4        Q.  So, Mr. Scott -- strike that line.

5            Mr. Scott, yes or no, was GEO's net profit for

6    2018 8,466,700 -- strike that.  I'm sorry.  I read it

7    wrong.

8            MS. MELL:  If you just use "margin," I won't

9    object. If you use the word "margin," it's not

10   objectionable.

11           MR. WHITEHEAD:  I want to use profit.

12           MS. MELL:  All right.

13   BY MR. WHITEHEAD:

14       Q.  Mr. Scott, yes or no, was ███████ GEO's gross

15   profit for fiscal year 2018?

16           MS. MELL:  Object to the form.

17           THE WITNESS:  This report does not show me what

18   you're saying.  I can read the form and the report shows

19   net margin for each year.  I can read that number for

20   you, sir.

21   BY MR. WHITEHEAD:

22       Q.  Yes or no.  Was GEO's net margin for 2018

23   ███████?

24       A.  Based on the form I'm looking at, yes.

25       Q.  What is the distinction you draw between net

GEO Objections Foundation,
Foundation, 292

Bruce Scott, Jr.                                        December 10, 2019

Page 70

1    margin and net profit, if any?

2        A.   Net margin is listed on this report with a

3    number attached to it.  Profit relating to any other

4    reports or expenses or contract line items, I would not

5    want to speculate on that.

6        Q.   Again, my question is different.  What is the

7    difference between net margin and net profit, as you

8    understand it?

9             MS. MELL:  Object to the form.

10            THE WITNESS:  Again, sir, net margin is listed

11   on this report, this singular report, with a number of

12   dollar amounts per these years.  The profit, if there is

13   another report or a series of reports that we want to

14   review to look at that -- I don't want to speculate as

15   to how this report relates to any other documentation in

16   a multiple-line-item contract.

17   BY MR. WHITEHEAD:

18       Q.   Yes, no, or I don't know, did GEO make a profit

19   last year?

20            MS. MELL:  Object to the form of the question.

21            THE WITNESS:  Yes.

22   BY MR. WHITEHEAD:

23       Q.   How much?

24       A.   I don't know.

25       Q.   Yes, no, or I don't know, did GEO make a profit

GEO Objections Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 71

1    in 2017?

2          MS. MELL:  Same objection.

3          THE WITNESS:  Yes.

4    BY MR. WHITEHEAD:

5        Q.  How much?

6        A.  I don't know.

7        Q.  Yes, no, or I don't know, did GEO make a profit

8    in 2016?

9          MS. MELL:  Object to the form.

10         Counsel, I won't object if you quit instructing

11   him how to answer the question.  If you ask him if they

12   made a profit, I won't object.

13         THE WITNESS:  Would you like to repeat the

14   question, please.

15   BY MR. WHITEHEAD:

16       Q.  Yes, no, or I don't know, did GEO make a profit

17   for 2016?

18         MS. MELL:  Object to the form.

19         THE WITNESS:  Yes.

20   BY MR. WHITEHEAD:

21       Q.  Yes, no, or I don't know, did GEO make a profit

22   in 2015?

23         MS. MELL:  Object to the form.

24         THE WITNESS:  Yes.

25   BY MR. WHITEHEAD:

GEO Objections Foundation;
FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 72

1       Q.  Yes, no, or I don't know, did GEO make a profit

2   for 2014?

3           MS. MELL:  Object to the form.

4           THE WITNESS:  Yes.

5   BY MR. WHITEHEAD:

6       Q.  Yes, no, or I don't know, has GEO been

7   profitable so far this year, 2019?

8           MS. MELL:  Object to the form.

9           THE WITNESS:  I don't have any information to

10  speculate on that.

11  BY MR. WHITEHEAD:

12      Q.  Would you be surprised if GEO did not make a

13  profit this year?

14      A.  I would not like to speculate without numbers

15  and facts.  Again, contract line items change, task

16  orders change.  I would not like to guess at what ends

17  up happening.

18      Q.  What is the Voluntary Work Program?

19      A.  The Voluntary Work Program is required by the

20  contract and the ICE Performance-Based National

21  Detention Standards as a program that allows detainees

22  to perform voluntary work, earning a compensation of one

23  dollar a day, in an effort to have them help out in the

24  facility, spend time, not be idle.  That's what the

25  voluntary program is.

Bruce Scott, Jr.                                    December 10, 2019

Page 73

1       Q.   What are the basic job categories?

2            MS. MELL:   Object to the form.

3            THE WITNESS:   There are no basic job categories

4    as listed by the standard.   There is a number of program

5    activities that detainees can volunteer into in various

6    parts of the facility.

7    BY MR. WHITEHEAD:

8       Q.   You're referring to job activities.   Isn't it

9    true that GEO creates job descriptions for the detainee

10   worker programs?

11      A.   There are descriptions of the activities that

12   they can perform under that program that list what they

13   should do in that program, so they know what they're

14   doing and what they're volunteering for.

15      Q.   And they're referred to as job descriptions.

16   Correct?

17      A.   They have been referred to as job descriptions.

18   I think the new policy changed some terminology in that

19   and they're called work program assignments -- voluntary

20   program assignments now.

21      Q.   When was that change made?

22      A.   I don't know the exact date of the change, but

23   there has been a policy change.

24      Q.   Well, I'll represent to you this lawsuit was

25   filed September 2017.   Do you know whether the change

Relevance objection.
402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 74

1   was made before or after the lawsuit?

2        A.  I would say that would be after that lawsuit.

3        Q.  Do you know why the change occurred?

4        A.  I don't know.  I'm not a policy developer for

5   GEO.

6        Q.  Do detainee workers work in the kitchen?

7        A.  Detainees volunteer to work in the kitchen.

8        Q.  Do detainee workers work in the laundry unit?

9        A.  Detainees volunteer to work in the laundry.

10       Q.  Do detainee workers perform janitorial services?

11       A.  Detainee workers clean portions of the facility

12   in multiple different areas.  Janitorial services is a

13   broad term.

14       Q.  Do detainee workers work in the barber shop?

15       A.  We do have detainee workers that volunteer in

16   the barber shop.

17       Q.  Do detainee workers paint?

18       A.  We do have detainees that volunteer to paint.

19       Q.  Now, if you were to take the detainee worker

20   labor out of the equation, how would GEO carry forward

21   its operations with respect to each of the job

22   categories we just discussed?

23           MS. MELL:  Object to the form of the question.

24           THE WITNESS:  I have trouble with your question.

25   Can you restate the question, please.

Bruce Scott, Jr.                                    December 10, 2019

GEO Objections Foundation, FRE
402, 701, 802.

Page 75

```
 1   BY MR. WHITEHEAD:

 2      Q.   Sure.  If you take detainee labor out of the

 3   equation and assuming GEO's present personnel levels,

 4   how would GEO carry out its operations with respect to,

 5   let's say, the kitchen?

 6           MS. MELL:  Object to the form.

 7           THE WITNESS:  We don't have detainee labor; we

 8   have detainees that volunteer.  It would come to the

 9   food service department.  If there were no detainees

10   that volunteered to work in the food service department,

11   the existing staff in the food service department would

12   perform the duties as required under the contract.

13   BY MR. WHITEHEAD:

14      Q.   How many people are in the food service

15   department right now, as far as GEO personnel goes?

16      A.   I have ten food service officers, a food service

17   administrator, an assistant food service administrator,

18   and food service clerk.  A total of 13.

19      Q.   They don't all work at once.  Correct?

20      A.   There are shifts.

21      Q.   So let's take morning shift.  How many GEO

22   personnel are on the morning shift in the kitchen?

23      A.   You would have to define some parameters of the

24   morning shift.

25      Q.   How do you define morning shift?
```

Bruce Scott, Jr.                                December 10, 2019

Page 76

1        A.   Typically, we have three food service officers,

2   which are also cooks, that show up in the morning prior

3   to 7 o'clock, 8 o'clock, when the food service

4   administrator and the clerk come in.  So it could start

5   at 3, depending on the holidays.  Typically, 3 in the

6   morning until the food service administrator and food

7   service clerk arrive, which puts us at 5.  And there are

8   some staggered shifts in there as well.  So it's hard to

9   say without getting very specific.

10       Q.   How many detainee workers work the morning

11  shift?

12       A.   That number fluctuates from day-to-day.

13       Q.   Give me a range.

14       A.   Some mornings, you may have three workers; some

15  mornings, you may have six to ten workers.  It just

16  really depends.

17       Q.   And as many as 30.  Is that correct?

18       A.   We do, in the Voluntary Work Program, have 30

19  spots available for volunteer workers in the food

20  service department.

21       Q.   All right.  So let's take the detainee workers

22  out of the equation.  Could GEO's existing personnel

23  carry out its morning shift operations in the kitchen?

24       A.   GEO would ensure that the morning shift

25  operations were covered should no detainee workers show

Bruce Scott, Jr.                                December 10, 2019

1   up.

2       Q.   How?

3       A.   If no detainees show up to the kitchen, we have

4   other available staff that could do other items like

5   clean dishes.  Not work with food, because you're

6   required a food handler card to cook the food.  We would

7   assign additional staff members into the kitchen or call

8   on other staff members, incur some overtime, the kitchen

9   staff, to ensure that the standards and feeding of the

10  detainees are met.

11      Q.   And would that be sustainable over the long

12  haul?

13          MS. MELL:  Object to the form.

14          THE WITNESS:  I don't want to speculate on what

15  the long haul would be.

16  BY MR. WHITEHEAD:

17      Q.   I understood, from your testimony yesterday,

18  that GEO has contingency plans in place in the event of

19  detainee worker stoppages.  Did I get that right?

20      A.   Yes.

21      Q.   So is there a contingency plan in place in the

22  kitchen in the event that there is a long-term detainee

23  worker stoppage?

24      A.   The contingency plan in place would look at many

25  variables in accordance with that, and the appropriate

Bruce Scott, Jr.                           December 10, 2019

Page 78

1    decisions would be made as needed based on the

2    information available for that work stoppage.

3        Q.  So that's yes, there is a plan?

4        A.  There is a plan available.

5        Q.  Tell me, what does that plan entail?

6        A.  The plan entails looking at different variables

7    of an emergency situation and making an informed

8    decision based on the information provided during that

9    event.

10       Q.  How long could a plan that entailed pulling GEO

11   personnel from other parts of the facility into the

12   kitchen last in the event of a long-term detainee worker

13   stoppage?

14       A.  I don't want to speculate on how that -- there

15   is other options that we could look at.

16       Q.  You would agree with me, though, that pulling

17   personnel from other parts of the facility into the

18   kitchen could impact the operations of other parts of

19   the facility?

20            MS. MELL:  Object to the form.

21            THE WITNESS:  No, sir.  We would not rob posts

22   to fill another one.  We would offer overtime, we would

23   seek possibly TDY staff from other facilities -- I'm

24   sorry -- seek TDY staff, temporary duty staff.  There

25   are a number of options available.  Speculating on the

GEO Objections Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 79

1   potentials of anything would just be that, it would be

2   speculating and planning for potential occurrences.

3   BY MR. WHITEHEAD:

4      Q.  What about in the barber shop?  What if --

5   strike that.

6          In the barber shop, do or does GEO personnel cut

7   hair?

8      A.  No.

9      Q.  It's only the detainee workers.  Correct?

10     A.  We have volunteer detainee barbers that work in

11  the barber shop.

12     Q.  And if the detainee workers did not cut hair,

13  who would?

14         MS. MELL:  Object to the form.

15         THE WITNESS:  Again, with contingency plans,

16  we've never -- as far as my knowledge, we've never had

17  that happen.  There is always detainees on that

18  volunteer for activities.  If one person doesn't want to

19  do it, there is usually somebody else that volunteers

20  for that activity.  There is usually people on a waiting

21  list, waiting to do that.

22  BY MR. WHITEHEAD:

23     Q.  But taking detainee work out of the equation,

24  what would GEO's plan be or what is GEO's plan in the

25  barber shop?

Bruce Scott, Jr.                                    December 10, 2019

Page 80

1            MS. MELL:  Object to the form.

2            THE WITNESS:  Again, I don't want to speculate

3    on what the overall plan would be.  Are we taking

4    detainee workers out of the equation for a day or --

5    there is many different variables to determine an

6    effective solution for that occurrence.

7    BY MR. WHITEHEAD:

8       Q.  Well, if you'll indulge me, assume three months.

9    What would GEO do in that scenario?

10      A.  That's assuming nobody else wants to volunteer?

11      Q.  Correct.

12      A.  We would look at the emergency plan.  We would

13   determine if there is still -- we would go to the

14   client, determine if there is still a need to perform

15   the haircuts under the standard, look at different

16   options, and an informed decision would be made based on

17   all the relevant facts and variables that were contained

18   therein.  I don't want to speculate on a future event

19   and planning, because there is always many different

20   ways you can plan and overcome obstacles.

21      Q.  Presumably, though, the answer would include

22   trying to pull in other GEO personnel to do the work?

23      A.  I don't think we would pull in other GEO

24   personnel to perform barber duties.  We would seek out

25   to the client, potentially look for a waiver of that

Bruce Scott, Jr.                                December 10, 2019

Page 81

1    line item, of barber shop activities for three months,

2    if we knew it was going to be three months.  There could

3    be other options that GEO looks at.

4        Q.  In terms of the options that GEO would look at

5    in the event of a long-term volunteer worker stoppage,

6    whether it be in the kitchen or any of the other jobs,

7    would one of the considerations be looking to an outside

8    contracting agency to perform the functions that were

9    previously performed by the detainee workers?

10           MS. MELL:  Object to the form.

11           THE WITNESS:  That could be one of many options

12   that were weighed.

13           MR. WHITEHEAD:  Lane, can I see your 314.

14           MR. POLOZOLA:  314.

15           MR. WHITEHEAD:  Yes, please.

16           Joan, I'm happy to print off another copy, if

17   you'd like.  But Exhibit 314 is the Volunteer Work

18   Program Agreement.  This is a copy of it.  May I show

19   the witness or would you prefer that we print another

20   copy and check it in as another exhibit?

21           MS. MELL:  I'm not sure what you're asking.

22   It's already an exhibit, you're just pulling it out of

23   your exhibit binder?

24           MR. WHITEHEAD:  Because we don't have the -- the

25   court reporters did not bring the previous exhibits --

Bruce Scott, Jr.                                    December 10, 2019

Page 82

 1           MS. MELL:  Right, right.

 2           Okay.  So -- no, I don't mind you showing it to

 3      the witness.  We're just going to all kind of share it?

 4           MR. WHITEHEAD:  Yes.

 5           MR. MELL:  Do you need it first?

 6           MR. WHITEHEAD:  No, I've got mine.  It's marked

 7      up.

 8           MS. MELL:  Okay.  Then we'll just look at this.

 9      That's fine.

10           MR. WHITEHEAD:  It's just one line that I've got

11      a question about.

12           MS. MELL:  No, that's fine.

13      BY MR. WHITEHEAD:

14           Q.  Mr. Scott, you've been handed Exhibit 314.  What

15      are we looking at here?

16           A.  We're looking at the Voluntary Work Program

17      Agreement dated 1/30/2014.

18           Q.  You've seen this form before.  Correct?

19           A.  Yes.

20           Q.  If you look towards the bottom there, above that

21      redacted line, it says, "We thank you for your important

22      contribution to maintaining this facility."  Do you see

23      that?

24           A.  Yes.

25           Q.  Do the detainee workers make an important

Bruce Scott, Jr.                                    December 10, 2019

Page 83

1    contribution in maintaining the Northwest Detention

2    Center?

3        A.   Detainees often take very much pride in the work

4    that they do.  This is just a way of thanking them for

5    volunteering and working inside the facility, that is on

6    a voluntary basis.

7        Q.   And it's an important part of the facility's

8    operations.  Correct?

9        A.   It covers a number of required standards in the

10   ICE contract and standards.  Cleanliness is an important

11   role in any facility, and detainees take great pride in

12   living in a clean facility.

13       Q.   Do they play an important role in keeping the

14   Northwest Detention Center clean?

15       A.   They're one of many roles that assist in that,

16   but -- again, I can read the sentence.  I don't want to

17   read outside the sentence.  The sentence says, "We thank

18   you for your important contributions to maintaining this

19   facility."  We appreciate the voluntary activities that

20   they do to keep themselves from not being idle and doing

21   the great work that they do.

22       Q.   Is it true that GEO assigns detainee workers to

23   individual work details?

24       A.   No.

25       Q.   How does that work?

Bruce Scott, Jr.                                    December 10, 2019

Page 84

1       A.   Detainees volunteer for the work program

2   assignment that they would like to perform.

3       Q.   And then GEO approves or not the work

4   assignment.   Is that fair to say?

5       A.   The only approval process that comes in, whether

6   or not a detainee, in accordance with the standards, can

7   perform a certain work detail.   There are certain

8   standards that do not permit detainees into certain work

9   program assignments.   But otherwise, we do not

10  discriminate in any reason, race, disability, sex, age,

11  religious preference, sexual preference, into that

12  program assignment.

13      Q.   GEO sets the schedule for detainee workers.

14  Correct?

15      A.   The schedule is set on a number of items, not

16  only GEO, but the healthcare department, healthcare

17  requirements, healthcare schedules, what they're doing

18  at a certain time.   There is other variables that play

19  into effect with a daily work schedule.   Some detainees

20  cannot be commingled with other detainees in accordance

21  with the standard.   So it's an ebb and flow of when

22  detainees can work, based on standard requirements, to

23  make sure that we don't violate any other portion of the

24  standards.

25      Q.   I understand that aspect of your testimony.   My

Bruce Scott, Jr.                                          December 10, 2019

GEO Objections Foundation, FRE
402, 701, 802.

Page 85

1   question is a little bit different.  It's not so much

2   how the schedule is created, but whether GEO sets the

3   schedule.  Does GEO set the work schedule for the

4   detainee workers?

5        A.  The schedules are set based on need, with all

6   the other parameters, to ensure that we can have

7   detainees where they're allowed to be at certain times

8   of the day.

9        Q.  And it's GEO that does that.  Correct?

10       A.  We may write the schedule based on information

11  from a lot of different things; courts, asylum cases,

12  facility movement schedule, classification levels, many

13  different variables.

14       Q.  But in each of those scenarios, it's GEO that

15  writes the schedule.  Correct?

16       A.  The master facility program schedule and the

17  hours of work, we write.

18       Q.  And GEO provides detainees with training

19  necessary to do their work assignments within the worker

20  program.  Correct?

21          MS. MELL:  Object to the form.

22          THE WITNESS:  Yes.

23  BY MR. WHITEHEAD:

24       Q.  To the extent one is necessary, GEO provides

25  uniforms to the detainee workers.  Correct?

402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 86

1          A.  Yes.

2          Q.  So, in the kitchen, GEO provides those uniforms

3   to the kitchen detainee workers.  Correct?

4          A.  Yes.  As a requirement of the ICE standard.

5          Q.  And detainee workers do not have the discretion

6   to deviate from their job assignments.  Correct?

7          A.  When you say "deviate from their job

8   assignments" -- should they want to volunteer for

9   another program assignment?

10          Q.  Well, if a detainee worker is scheduled to work

11   in the kitchen, they don't have discretion to perform

12   their kitchen functions elsewhere in the facility, for

13   example.

14          A.  Well, I don't think you would want to cook food

15   elsewhere in the facility, but there are job

16   descriptions and normal things to be done in the

17   kitchen.  We can't have a detainee do something outside

18   those job descriptions.

19          Q.  And GEO's expectation is that the detainee

20   workers perform the tasks that are on their job

21   descriptions.  Correct?

22          A.  As a matter of the Voluntary Work Program, in

23   accordance with the ICE standards and ACA, yes.

24          Q.  GEO supervises the detainee workers as they go

25   about their work?

Bruce Scott, Jr.                                   December 10, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 87

1        A.  Yes.  The contract requires supervision of all

2   detainees while they're housed at the Northwest ICE

3   Processing Center.

4        Q.  If detainee workers do not perform their job

5   satisfactorily, they can be terminated.  Correct?

6        A.  The standard says removal from a Voluntary Work

7   Program assignment.  If a detainee say is doing an

8   unsafe act or is otherwise doing something that would

9   violate a standard or a health code, they may be removed

10   from that work program assignment.

11        Q.  And GEO may initiate the process to have that

12   worker removed.  Correct?

13        A.  Typical removals work under the disciplinary

14   standard, which is a completely different set of

15   standards where a detainee can be removed from a work

16   program.

17        Q.  Again, without talking about the ins and outs of

18   the standards, the disciplinary procedures or

19   proceedings, my question is whether GEO may initiate

20   removal proceedings against a detainee worker for doing

21   a bad job.

22        A.  In accordance with the established standards,

23   yes.

24        Q.  And detainee workers cannot earn more money by

25   demonstrating exceptional skill in their job role.

Bruce Scott, Jr.                                    December 10, 2019

Bruce Scott, Jr. Confidential
701, 802.

Page 88

1    Correct?

2        A.   Under the standard in the contract, offer of

3    compensation for one dollar a day.

4        Q.   Everyone is paid the same, regardless of their

5    skill and experience.

6        A.   Yes.

7        Q.   Can detainee workers seek employment outside the

8    Northwest Detention Center?

9        A.   I do not recall anything in the contract or the

10   ICE standard that would permit that.

11       Q.   And GEO pays the detainee workers directly.

12   Correct?

13           MS. MELL:  Object to the form.

14           THE WITNESS:  GEO places a dollar a day in the

15   detainee's trust account, which the detainees have

16   access to.

17   BY MR. WHITEHEAD:

18       Q.   And then GEO seeks reimbursement for that amount

19   from ICE.  Correct?

20       A.   Yes.

21           MR. WHITEHEAD:  All right.  Let's take a break.

22           THE VIDEOGRAPHER:  We're now going off the

23   record.  The time is 12:44 p.m.

24           (Lunch recess taken from 12:44 to 1:38.)

25           THE VIDEOGRAPHER:  We're now back on the record.

Bruce Scott, Jr.                                    December 10, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 89

1    The time is 1:38 p.m.

2

3              E X A M I N A T I O N (continued)

4    BY MR. WHITEHEAD:

5         Q.   Mr. Scott, before the break, I had asked you

6    some questions about different work stoppage scenarios,

7    work stoppage on the part of detainee workers, and you

8    told me about some of the considerations or

9    contingencies that GEO had in place.   Do you recall

10   having that discussion?

11        A.   I remember talking about detainee work

12   stoppages.

13        Q.   And if I understood you correctly -- this is not

14   to put words in your mouth -- but that you listed off

15   several options, one being overtime for existing

16   workers.   Is that correct?

17        A.   That could be a potential option.

18        Q.   You had mentioned pulling in workers from other

19   parts of the facility.   Did I get that right?

20        A.   As far as overtime periods, yes.

21        Q.   As well as pulling in GEO workers from other GEO

22   facilities to work at the Northwest Detention Center.

23   Did I get that right?

24             MS. MELL:   Object to the form.

25             THE WITNESS:   I did say that TDY options would

GEO Objections Foundation, FRE
402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 90

1    be available.

2    BY MR. WHITEHEAD:

3         Q.   What does TDY stand for?

4         A.   Temporary duty.

5         Q.   You mentioned that a third-party contracting

6    agency would be an option.  Did I get that right?

7         A.   That could be an option.

8         Q.   Beyond what we just discussed, are there any

9    other options or considerations that GEO would have to

10   address a detainee worker stoppage of a prolonged

11   nature?

12             MS. MELL:  Object to the form.

13             THE WITNESS:  Again, it would be difficult to

14   outline every potential option based on the relevant

15   information that would be with any event.  The options

16   that I've listed now are the options that I can think of

17   that would be considered in any prolonged detainee work

18   stoppage.

19   BY MR. WHITEHEAD:

20        Q.   You also mentioned that GEO pays the detainee

21   workers directly for their participation in the

22   Voluntary Work Program, but that ICE then reimbursed GEO

23   for the cost.  Did I get that correct?

24             MS. MELL:  Object to the form.

25             THE WITNESS:  Yes.

Deposition Objections: Foundation/
FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 91

1    BY MR. WHITEHEAD:

2        Q.  When did that become the case, that ICE paid

3    directly and then sought reimbursement from GEO?

4            MS. MELL:  Object to the form.

5            THE WITNESS:  Restate it.  I think you have it

6    backwards.

7    BY MR. WHITEHEAD:

8        Q.  I did.  I apologize.

9            Has it always been the case that GEO paid

10   directly and then sought reimbursement from ICE for the

11   Voluntary Work Program?

12       A.  That's typically how it is.  If that's been the

13   case since the inception of the contract, I could not

14   state that.  But there has always been a line item in

15   the contract for Voluntary Work Program.  Whether that

16   was paid to the detainee trust fund by GEO or through

17   another vendor that runs the detainee trust account --

18   typically, we pay the detainee trust account, and then

19   we seek reimbursement through ICE for that dollar

20   amount.

21       Q.  And then, to your knowledge, has that always

22   been the sequence or was it different at some point?

23       A.  I don't believe it to be different at any

24   portion, but I don't have the relevant information to

25   specify that throughout the entire term of the number of

Rob Document 294 Filed 04/24/20 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 92

1    contracts that we have had.

2        Q.  What is GEO's policy with respect to detainee

3    worker pay in the Voluntary Work Program at the

4    Northwest Detention Center?

5            MS. MELL:  Object to the form.

6            THE WITNESS:  You're asking for the policy

7    number or just -- I'm not sure what you're asking, sir.

8    BY MR. WHITEHEAD:

9        Q.  Well, regarding the rate of pay, what is it?

10       A.  The compensation allowable under the contract is

11   one dollar per day.

12       Q.  How was that rate of pay determined?

13       A.  It is what's listed in the ICE PBNDS standard,

14   and there is a line item in the contract, I believe,

15   that states one dollar a day.

16       Q.  Anywhere else in terms of where GEO derives its

17   understanding that detainee worker pay is a dollar a

18   day?

19       A.  GEO would rely on the contract and the allocable

20   standards for that dollar amount.

21       Q.  So the contract, itself, and the PBNDS are the

22   two sources.  Correct?

23       A.  Yes.

24       Q.  Is there a specific section within the PBNDS

25   that you're thinking of?

Bruce Scott, Jr.                                    December 10, 2019

Page 93

1       A.   There is a compensation section in the Voluntary

2   Work Program standard.

3             (Exhibit 361 marked for identification.)

4   BY MR. WHITEHEAD:

5       Q.   You've just been handed Exhibit 361.  What are

6   we looking at here?

7       A.   This is Standard 5.8, Voluntary Work Program,

8   listed in the Performance-Based National Detention

9   Standards, 2011, revised December 2016.

10      Q.   Is this the current version of the Voluntary

11  Work Program provision regarding -- I'm sorry.  Strike

12  that.

13            Is this the current version of the PBNDS

14  regarding the Voluntary Work Program?

15      A.   This is the current -- Revision 2016 is the

16  current PBNDS standard.

17      Q.   Can you show me where within Section 5.8 of the

18  PBNDS that GEO derives the understanding that it pays

19  detainee workers a dollar a day?

20      A.   On page Bates number stamp 19097, under

21  paragraph K marked "Compensation."

22      Q.   Specifically, what is the language that GEO

23  refers to or relies upon?

24      A.   The language in the standard reads, "the

25  compensation is at least $1.00 (USD) per day."

Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 94

1      Q.  In reading that language, does GEO read that to
2   limit GEO to paying one dollar a day?

3      A.  GEO reads this as the minimum acceptable
4   allowance within the ICE PBNDS standard is one dollar a
5   day.

6      Q.  So this amount is the minimum, but it does not
7   represent a maximum.

8          MS. MELL:  Object to the form.

9          THE WITNESS:  I read the sentence, the
10   compensation is least one dollar per day.

11   BY MR. WHITEHEAD:

12      Q.  And that phrase, "at least," what does that mean
13   within the context of this sentence?

14          MS. MELL:  Object to the form.

15          THE WITNESS:  In the context of -- this sentence
16   is taken in the context of the standard where there are
17   expected practices and minimum acceptable limits of
18   work.  One dollar a day is the required amount in
19   accordance with the PBNDS standard.

20   BY MR. WHITEHEAD:

21      Q.  And to clarify, one dollar is the minimum
22   amount.  Correct?

23          MS. MELL:  Object to the form.

24          THE WITNESS:  The minimum amount -- as read, the
25   compensation is at least one dollar per day.

Bruce Scott, Jr.                                    December 10, 2019

Page 95

1   BY MR. WHITEHEAD:

2       Q.   Has GEO ever paid more than a dollar a day to

3   detainee workers at the Northwest Detention Center?

4       A.   To my knowledge, per activity, we pay one dollar

5   a day.  There was an occurrence in the barber shop where

6   there was very limited hours where we may pay a detainee

7   for two activities in a day.

8       Q.   And when was that in the barber shop that

9   certain barbers may have been paid more?

10      A.   The barbers -- barbers in the barber shop, based

11  on some of the -- or the standard language that we

12  referred to earlier, where certain classification levels

13  can't be mixed with other classification levels, it

14  really -- not everybody can be out at the same time,

15  meaning barbers can only cut within their certain

16  classification levels, and that only -- doesn't happen

17  every day of the month.  So a determination was made

18  that we would allow them to have another task when they

19  were not cutting hair; but I can't sit here and say that

20  they never did two tasks during the same day, but the

21  understanding was they would be able to cut hair and

22  then have another voluntary program work assignment,

23  earning a dollar a day, when they were not cutting hair.

24      Q.   Other than what you've just described for me

25  concerning barbers in some cases working more than one

Bruce Scott, Jr.                                December 10, 2019

Page 96

1   worker activity, can you think of another time that GEO

2   paid more than one dollar a day to a detainee worker?

3        A.  My recollection I have -- another time that we

4   looked at something similar was in the kitchen where we

5   were going to offer the females a chance at working in

6   the food service department, but that wasn't an everyday

7   event.  So kind of under the same premise, when they

8   were -- since it wasn't an available everyday detail,

9   they would be allowed to work in the kitchen and they

10  were allowed to have another voluntary program

11  assignment earning a dollar a day on days they weren't

12  working in the kitchen.

13       Q.  Anything else?

14       A.  To my knowledge, that's all I can remember at

15  this time.

16           (Exhibit 362 marked for identification.)

17  BY MR. WHITEHEAD:

18       Q.  You've just been handed Exhibit 362.  What are

19  we looking at here?

20       A.  This is titled a Batch Listing.  It seems to

21  indicate a detainee earning certain transaction amounts

22  on various days.

23       Q.  Let's back up a step.  What is or what are batch

24  listings?

25       A.  It's just a transaction term.  This batch looks

Bruce Scott, Jr.                                December 10, 2019

Page 97

1    like it was run for just this detainee.  It's a

2    processing application in the detainee pay system.

3        Q.  So this is a ledger, so to speak, reflecting

4    payments to detainees?

5            MS. MELL:  Object to the form.

6    BY MR. WHITEHEAD:

7        Q.  In terms of what a Batch Listing is, not

8    necessarily this exhibit.

9            MS. MELL:  Object to the form.

10           THE WITNESS:  I won't relate those two together.

11   This is just one batch, showing where these transactions

12   were made to this detainee's account.

13   BY MR. WHITEHEAD:

14       Q.  What do batch listings typically reflect?

15       A.  I don't know precisely what a Batch Listing

16   lists.  I see another batch on the second page of the

17   document that you've presented that has multiple

18   detainees.  It looks like this is just kind of what the

19   report title is for the data that is pulled for each

20   individual page.

21       Q.  Other than the Voluntary Work Program, are there

22   any other occasions or reasons that GEO would make a

23   payment to a civil immigration detainee at the Northwest

24   Detention Center?

25       A.  If a family member sends in funds, money or

FRE 402, 701, 802.

Bruce Scott, Jr.                                     December 10, 2019

Page 98

1     work -- or a money order to the detainee, you might

2     likely see that listed in the detainee account system.

3     If the detainee wants to send money external to a family

4     member, they may do that.  You may see a deduction on a

5     detainee's account based on where he wants to send his

6     money.

7          Q.  Any other reason that you can think of that GEO

8     would make a payment to a detainee at the Northwest

9     Detention Center?

10              MS. MELL:  Object to form.

11              THE WITNESS:  I can't think of anything.  I

12     don't see any other on the transactions that are listed

13     here that indicate any different to me at this time.

14     BY MR. WHITEHEAD:

15         Q.  And you mentioned the detainee account system.

16     Is that the Keefe banking system?

17         A.  We currently use Keefe as an accounting system

18     for detainee trust accounts.

19         Q.  How long has GEO used the Keefe banking system,

20     at the Northwest Detention Center?

21         A.  A number of years.  I don't know the specific

22     date that Keefe started operating with the Northwest ICE

23     Processing Center; but to my recollection, we've used

24     Keefe for a number of years now.

25         Q.  More than five?

Bruce Scott, Jr.                                December 10, 2019

Page 99

1      A.  I wouldn't hazard a guess.  There was one
2   previous banking system.  I don't know -- I can't recall
3   the name of that one.  We've been using Keefe ever
4   since.
5      Q.  So back to Exhibit 362.  On the first page, we
6   see a batch listing for an individual here on the first
7   line and it reflects a payment of two dollars.  Do you
8   have any explanation for why the payment there would be
9   two dollars?
10     A.  According to the Batch Listing, it looks like
11  the detainee performed laundry work on dates 4/5 and
12  4/7, therefore, earning a dollar for those days,
13  totaling two dollars for that line item.
14     Q.  So two separate shifts, then?
15     A.  Two separate program activities.
16     Q.  On separate days?
17     A.  On separate days.
18     Q.  Let's look at the next page.  In the middle of
19  the page, thereabouts, we see two individuals that
20  received two dollars.  What is the explanation for why
21  these individuals received a two dollar payment?
22     A.  I don't have an explanation.  It could be
23  that -- in the comments where it's listed that it was
24  kitchen work on 4/6, it could have been a typo of two
25  dollars instead of one dollar or a mis-entry of the

Bruce Scott, Jr.                                December 10, 2019

Page 100

1   detail.  Without going back and looking at applicable

2   records and pay sheets, I would not be able to determine

3   exactly why the items are listed on this page as they

4   are.

5       Q.  Has GEO ever considered revising the amount it

6   pays detainee workers on a daily basis?

7       A.  To my knowledge, we've never had ICE come down

8   and say there is any difference in the contract or the

9   PBNDS standard where we would pay more than one dollar a

10  day.

11      Q.  Is that direction that GEO is awaiting from ICE?

12      A.  It is an ICE standard and ICE contract that we

13  work for.  We intend to meet the provisions of the ICE

14  contract and the ICE standard.

15      Q.  Why does GEO pay one dollar per day to the

16  detainee workers?

17      A.  The Voluntary Work Program assignment details in

18  the contract and the PBNDS standard require one dollar a

19  day and that is the compensation that is paid under the

20  ICE Voluntary Work Program.

21      Q.  If I understood your testimony earlier regarding

22  the PBNDS, the requirement was that GEO pays at least a

23  dollar a day.  Did I get that right?

24          MS. MELL:  Object to the form.

25          THE WITNESS:  That's the language we read in the

Bruce Scott, Jr.                              December 10, 2019

Page 101

1    ICE standard, but I think I said we look at that as --

2    the minimum standard required to meet the expected

3    practice of the standard is one dollar a day.

4    BY MR. WHITEHEAD:

5        Q.  So back to my question.  Why doesn't GEO pay

6    more money?

7        A.  The ICE contract and the standard speak for

8    themselves.  We intend to meet the minimum expectation

9    requirements of the ICE contract and the standard, which

10   lists one dollar a day as the compensation.

11       Q.  You also referred to the ICE contract.  We've

12   got Exhibit 356, which you previously referred to as the

13   base contract, as of September 24, 2015.  Looking at

14   that base contract, can you show me where there is a

15   limitation that ICE can only pay one dollar a day?

16           MS. MELL:  Object to the form.

17   BY MR. WHITEHEAD:

18       Q.  I'm sorry.  That GEO can only pay a dollar a

19   day.

20           MS. MELL:  Object to the form.

21           THE WITNESS:  As an example, on page Bates

22   stamped 96341, line item 9006, "Detainee volunteer wages

23   for the detainee work program.  Reimbursement for this

24   line item will be at the actual cost of $1.00 per day

25   per detainee.  Contractor shall not exceed the amount

GEO Objections -
402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 102

1   shown without prior approval by the contracting

2   officer."

3   BY MR. WHITEHEAD:

4       Q.   Well, the reference there to the word

5   reimbursement, does that language refer specifically to

6   the rate at which ICE will reimburse GEO for the

7   Voluntary Work Program?

8       A.   I didn't write the contract to know what the

9   meaning of the language is.  I understand this to be

10  directly related to the Performance-Based National

11  Detention Standards which we're required to use, and

12  those do meet up together and say the one dollar a day

13  is the compensation for the Voluntary Work Program.

14      Q.   Has ICE -- excuse me.

15           Has GEO ever considered paying more than a

16  dollar a day to the voluntary workers?

17      A.   At the Northwest ICE Processing Center, not to

18  my knowledge, other than the two indications that I

19  mentioned earlier, with barber shop and female kitchen

20  workers.  To my knowledge, it's always been one dollar a

21  day under the Voluntary Work Program.

22      Q.   Has GEO ever sought guidance from ICE about how

23  much it can pay in the Voluntary Work Program?

24      A.   To my knowledge, no.  I'm not the only one that

25  may speak with ICE, but to my knowledge, no.

Bruce Scott, Jr.                                    December 10, 2019

                                                          Page 103

1      Q.   Back to Exhibit 361.  This is the excerpt from

2   the PBNDS regarding the Voluntary Work Program.  Looking

3   at the Compensation section that's on the page that

4   bears Bates stamp GEO-Nwauzor 19097 -- are you with me?

5      A.   Yes.

6      Q.   Now, the line there that we've been focusing on,

7   "The compensation is at least $1.00 (USD) per day."

8      A.   I see that listed in the standard.

9      Q.   Are you aware of what the previous version of

10   the PBNDS said with respect to detainee worker

11   compensation?

12      A.   There has been a number of previous versions.

13   To which version are you referring to, sir?

14      Q.   The one immediately preceding the one that we

15   are looking at as Exhibit 361.

16      A.   Would you be referring to the PBNDS 2011 with

17   the 2012 errata?  That version?

18      Q.   Yes.

19      A.   To my recollection, the language is the same in

20   that version as this version.

21      Q.   What about the version preceding the -- did you

22   say 2012 with the errata?

23      A.   Yes.

24      Q.   The version that preceded that, did that include

25   the same language about "at least"?

Bruce Scott, Jr.                                    December 10, 2019

                                                        Page 104

1       A.   The PBNDS 2011 version?

2       Q.   Yes.

3       A.   To my knowledge, the language is the same as the

4    2011 version that we see here.

5            (Exhibit 363 marked for identification.)

6    BY MR. WHITEHEAD:

7       Q.   You have just been handed Exhibit 363.  Have you

8    seen this document before?

9       A.   No, I'm not listed on the memo.  I don't recall

10   seeing this document before.

11      Q.   Who is Associate Warden McHatton?

12      A.   Associate Warden McHatton was the previous

13   associate warden to my position as the assistant

14   facility administrator.

15      Q.   And Singleton and Heye, who are they?

16      A.   They're officers that work in the classification

17   department.

18      Q.   If you look at the second item of this memo

19   here, it reads, "States that compensation is now at

20   least $1.00, however, doesn't say we don't have the

21   option to pay more if we like."  Do you see that?

22      A.   I see that.

23      Q.   I'm focusing on the word "now."  Reading that

24   sentence, does it refresh your memory about whether or

25   not the at least language was a recent change to the

Bruce Scott, Jr.                                December 10, 2019

                                                        Page 105

1   PBNDS?

2       A.   To my knowledge, the 2008 PBNDS standard -- the

3   language changed from 2008 standard and changed in the

4   2011 standard, where they added the word "at least."

5       Q.   So the 2008 version did not include the "at

6   least" language when talking about the dollar a day that

7   GEO must pay the detainee workers.  Did I get that

8   right?

9       A.   That's my recollection without reviewing the

10  2008 standard.  That was a number of years ago.  But to

11  my recollection, as stated in this memo, the language

12  changed, therefore, Officer Singleton and Heye are

13  reporting out that there was a language change to the

14  standard.

15      Q.   And this language change, is it true that it

16  gave GEO the option to pay more if it chose?

17      A.   Again, based on the contract line item and the

18  standard where we would have to have authority from the

19  contracting officer, I read it as the same as I've

20  stated before.  At least the expected practice is one

21  dollar a day unless ICE authorizes more.

22      Q.   Did GEO ever seek permission to pay more?

23      A.   Not to my knowledge, GEO has sought to pay more

24  than a dollar a day, based on the contract language in

25  the standard.

Bruce Scott, Jr.                                December 10, 2019

1          (Exhibit 364 marked for identification.)

2     BY MR. WHITEHEAD:

3          Q.   You've just been handed Exhibit 364.   It's an

4     e-mail exchange.   The initial e-mail was from Charles

5     Howard, according to the document.   Who is Charles

6     Howard?

7          A.   Charles Howard is an ICE headquarters employee

8     who is currently the detention services manager.

9          Q.   Do you know what he does as the detention

10    services manager?

11         A.   The detention services manager in terms --

12    audits the facility and gauges the contract to the

13    standards to ensure that we are following the contract

14    and the PBNDS standards.

15         Q.   And then the recipients to Mr. Howard's e-mail,

16    James Gronewold, who is that?

17         A.   At the time of this e-mail, James Gronewold

18    would be the contracting officer representative for ICE.

19         Q.   And Mr. Gronewold, is he stationed at the

20    Northwest Detention Center?

21         A.   At the time of this e-mail, Mr. Gronewold was

22    stationed at the Northwest Detention Center, and has

23    since retired from ICE service.

24         Q.   Bill McHatton, you've told me that he was the

25    associate warden at Northwest Detention Center.

Bruce Scott, Jr.                                December 10, 2019

Page 107

1    Correct?

2         A.   Yes, he was, prior to me, the associate warden

3    at the Northwest Detention Center.

4         Q.   R. Kimble, who is that?

5         A.   R. Kimble is the -- is Ryan Kimble.  He is the

6    business manager at the Northwest ICE Processing Center.

7         Q.   And then, finally, Edith Conway, who is that?

8         A.   Edith Conway is -- based on the e-mail tag,

9    ice.dhs.gov, is a government employee.  I can't remember

10   her specific title or location.

11        Q.   I said, finally, but there is one more

12   recipient, on the cc line, Nathalie Asher.  Who is that?

13        A.   Nathalie Asher, at the time, was the field

14   offices director for ICE.

15        Q.   Did she work out of the Northwest Detention

16   Center as well?

17        A.   No.

18        Q.   Where was she stationed, if you know?

19        A.   The field office director is out of the ICE --

20   the Tukwila ICE offices.

21        Q.   Now, looking at Mr. Howard's e-mail, he writes

22   to the recipients -- I'm reading the last sentence

23   there -- "According to the standard, there is a minimum

24   compensation of $1.00, however, there is no maximum."

25   Do you see that?

Bruce Scott, Jr.                                    December 10, 2019

Page 108

1       A.   I see that.

2       Q.   What do you take that to mean, that sentence?

3       A.   I'm not Mr. Howard to know exactly what he

4    stated, but based on the time period of the e-mail and

5    when the 2011 revision standards came out, he's

6    insinuating that there is a known language change from

7    the 2008 version to the 2011 version.

8       Q.   And that the language states no maximum that GEO

9    may pay the detainee workers at the Northwest Detention

10   Center.  Correct?

11      A.   I don't see that language in the standard.  We

12   can read the standard language again, sir.

13      Q.   Again, though, I'm focusing on the language here

14   for Mr. Howard.  Was anything along these lines

15   communicated to you, that ICE had written an e-mail

16   stating that there is a minimum compensation of one

17   dollar, however, there is no maximum compensation?

18           MS. MELL:  I object to the form.

19           Counsel, you used "you" there, and I just want

20   to make sure you're cautious as to how you're using it

21   there.  Are you still in the corporate sense?

22   BY MR. WHITEHEAD:

23      Q.   We can do it both ways.  I mean, based on the

24   testimony so far -- let's start with in your role as the

25   30(b)(6) designee.  Can you tell me about internal

Bruce Scott, Jr.                                    December 10, 2019

 1   discussions that GEO had in response to ICE personnel

 2   Howard's e-mail stating that there is no maximum

 3   associated with the Voluntary Work Program as shown on

 4   Exhibit 364.

 5       A.  To my knowledge, all discussion with -- the

 6   PBNDS language changed from 2008 to 2011.  It was just

 7   noting that there was a language change and the standard

 8   now says at least one dollar per day.

 9       Q.  Specifically to the point about there is no

10   maximum, do you recall any discussions about -- and I'm

11   speaking to you now as associate warden or perhaps chief

12   security officer at this time -- do you recall any

13   discussions about the fact that ICE had written an

14   e-mail stating that there is no maximum for detainee

15   worker pay?

16           MS. MELL:  Object to the form.

17           THE WITNESS:  No.  At the time, my recollection

18   is we noted the language change in the standard from

19   2008 to 2011, and we adjusted our policies and

20   procedures to represent the new language of the

21   standard.

22   BY MR. WHITEHEAD:

23       Q.  Were there any adjustments specifically related

24   to detainee worker pay?

25       A.  The only adjustments that would have been made

Bruce Scott, Jr.                              December 10, 2019

                                                  Page 110

1    is the new language to ensure that we stay consistent

2    with the current standard in place at the time.  We

3    would have changed our policies and procedures to

4    reflect the new language.

5         Q.  What is a request for an equitable adjustment?

6         A.  It's a business term.  I've heard that before.

7    Speaking specifically without looking at anything, I

8    don't know off the top of my head what the exact meaning

9    of a request for equitable adjustment is.

10             (Exhibit 365 marked for identification.)

11   BY MR. WHITEHEAD:

12        Q.  I've just handed you what has been marked as

13   Exhibit 365.  There are a number of redactions on the

14   page.  If you look at that first paragraph, it states,

15   "On February 14, 2018, GEO submitted a request for

16   equitable adjustment..."  Do you see that?

17        A.  I see that.

18        Q.  Tell me about that request for an equitable

19   adjustment.

20        A.  This looks outside the scope of the facility.

21   This was sent by Washington, D.C. to GEO headquarters.

22   I would not have any knowledge of this.

23        Q.  This letter appears to be sent from GEO to ICE.

24   Would you agree with me on that?

25        A.  It appears to be sent from GEO headquarters to

Bruce Scott, Jr.                                    December 10, 2019

Page 111

1    Washington, D.C.

2        Q.   Immigration and Customs Enforcement.   Correct?

3        A.   The subject line where it's sent to does say,

4    "Acting Deputy Director, Immigration and Customs

5    Enforcement."

6        Q.   And then that line about GEO submitting a

7    request for equitable adjustment, as you sit here today,

8    do you have any knowledge at all about that?

9        A.   I have no knowledge of this memo drafting or why

10   it was drafted.   This is not something we would see at

11   the facility level.

12       Q.   And then, if you look at the bulleted sentence

13   before the largest black box there on the page, it

14   reads, "We have conducted an estimation of the costs

15   necessary to achieve compliance with the plaintiffs."

16   Do you see that?

17       A.   I see that written on the memo.

18       Q.   Can you tell me about any estimated cost that

19   GEO has run regarding complying with Washington State

20   minimum wage laws?

21       A.   No, sir.   Again, this is at a much higher level

22   than the facility level.   I have no knowledge of any of

23   this.

24       Q.   Do you have any insights into what may be under

25   the redactions on this page?

GEO Objections Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                    December 10, 2019

Page 112

1           MS. MELL:  Object to the form.

2           THE WITNESS:  I have no idea, sir.

3           MS. MELL:  Counsel, is there something that's

4     responsive to this in the CR 30(b)(6)?

5           MR. WHITEHEAD:  I'm sure there is a topic that

6     covers it, probably the last one dealing with GEO's

7     communications with ICE.

8           MS. MELL:  I would just object in terms of

9     notice, that he needed to be prepared to speak as to

10    this subject matter, this particular exhibit.

11          MR. WHITEHEAD:  Duly noted.

12    BY MR. WHITEHEAD:

13      Q.  The Keefe banking data, that's currently the

14    system that GEO uses to transmit payment for the

15    Voluntary Work Programs to the individual detainee

16    workers.  Is that correct?

17      A.  The Keefe is the detainee accounting system.  It

18    does a number of things.  One of those things is where

19    we deposit a dollar a day for the detainee in the

20    Voluntary Work Program.

21      Q.  Are you aware of any facility-wide -- facility

22    being the Northwest Detention Center -- facility-wide

23    worker -- strike that.

24          Are you aware of any facility-wide -- facility

25    being the Northwest Detention Center -- detainee worker

Bruce Scott, Jr.                                    December 10, 2019

Page 113

1   stoppages in March 2014?

2       A.   That was quite some time ago.  We have had

3   detainees intermittently not work for two to three days.

4   Recalling a specific event off the top of my head back

5   in 2014, I don't recall one right now.

6       Q.   What about in April 2014?

7       A.   Again, sir, I don't recall any specific events.

8   They choose not to work in the voluntary program from

9   time to time on a limited basis.

10      Q.   What about May 2014?

11      A.   I don't know, sir.

12      Q.   February 2015?

13      A.   I don't know.

14      Q.   March 2015?

15      A.   I don't know.

16      Q.   August 2015?

17      A.   Again, there could be times throughout where

18  detainees have voluntarily not shown up to work.  I

19  don't recall any specific dates.

20      Q.   What about September 2015?

21      A.   I don't know, sir.

22      Q.   And lastly, October 2015.

23      A.   I don't know.

24      Q.   I'll represent to you that GEO has produced to

25  the plaintiffs in this action, Keefe banking data for

Bruce Scott, Jr.                                    December 10, 2019

Page 114

1   the volunteer work program participants; and looking at

2   the data, there is no data for the months that I just

3   inquired about.  Do you have any explanation or insight

4   into why there would be no Keefe banking data for those

5   dates?

6        A.  For specific dates within that time period?

7        Q.  The months.  My inquiry was on the month.

8        A.  There is an entire month where there is no data,

9   sir?  I don't have anything to review to --

10       Q.  I'm sorry?

11       A.  I don't have any documentation to refer to.

12       Q.  And I don't have a document to put in front of

13  you.  I'm just asking if you're aware of anything that

14  would account for why we don't have data between March

15  and May 2014, February to March 2015, and September to

16  October 2015.

17            MS. MELL:  Object to the form.

18            THE WITNESS:  No, I don't have any knowledge;

19  and to my recollection, we've never had any work

20  stoppages lasting that long.  To the best of my

21  recollection, detainees volunteer not to work for two to

22  three days.  I don't have enough information to answer

23  that question for you.

24  BY MR. WHITEHEAD:

25       Q.  Quickly, I'd like to go back to GEO's offset

Bruce Scott, Jr.                                    December 10, 2019

Page 115

1    calculations.  I had asked you about GEO's formula for

2    calculating the offset amount, and the first component

3    that you related to me was that GEO looked at the total

4    participants in the Voluntary Work Program as the first

5    step in calculating the offset.  Do you recall that?

6         A.   Is there a specific exhibit that we're referring

7    to now?

8         Q.   Sure.  We can take a look at Exhibit 354.  You

9    may also want to take a look at 355, and perhaps 359.

10        A.   Okay.  I have 354.

11        Q.   So 354 are GEO's Initial Disclosures.  The third

12   page there, there is a section, "Computation of

13   Damages," and it begins with, "Each detainee who elects

14   to participate in the Voluntary Work Program..."  Do you

15   see that?

16        A.   Yes.

17        Q.   My question is, how many detainee workers

18   participated in the program in 2016 at the Northwest

19   Detention Center?

20        A.   In 2016, based on the standard that one dollar a

21   day is used kind of as a benchmark to determining

22   program participants, since we do not keep time logs --

23   there is no requirement in the standard for that -- in

24   2016, based on the program spend for the monthly

25   voluntary worker program, we're estimating 157,913

Bruce Scott, Jr.                                December 10, 2019

Page 116

1   voluntary work tasks were done.  As far as the actual

2   number of detainees that performed those tasks over that

3   period, it's not recorded in this data.

4       Q.  So you looked at the number of tasks -- or I

5   should say that's what's reflected in Exhibit 359 -- on

6   the volunteer worker program spend?

7       A.  Correct.  Now, understanding that multiple

8   detainees -- in an entire month, the detainee is working

9   more than one day.  So if you're trying -- how many

10  actual detainees were in there?  That's not discernible

11  from this number.

12          MR. WHITEHEAD:  Let's take a break.

13          THE VIDEOGRAPHER:  We're now going off the

14  record.  The time is 2:27 p.m.

15          (Recess taken from 2:27 to 2:38.)

16          THE VIDEOGRAPHER:  We're now back on the record.

17  The time is 2:38 p.m.

18  BY MR. WHITEHEAD:

19      Q.  Mr. Scott, I know that some of my questions may

20  have been pointed, but have I been fair with you today?

21          MS. MELL:  Object to the form.  He's not

22  answering that question.

23          We're done.

24          MR. WHITEHEAD:  Okay.

25          MS. MELL:  Thank you.

Bruce Scott, Jr.                            December 10, 2019

                                                    Page 117

1            THE VIDEOGRAPHER:  This concludes the videotaped

2     deposition.  We're now going off the record.  The time

3     is 2:39 p.m.

4            THE REPORTER:  Is signature reserved?

5            MS. MELL:  Yes.

6            (Deposition adjourned at 2:39 p.m.)

7            (Signature reserved.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Bruce Scott, Jr.                                    December 10, 2019

1                    S I G N A T U R E

2

3          I declare under penalty of perjury under the laws

4    of the State of Washington that I have read my within

5    deposition, and the same is true and accurate, save and

6    except for changes and/or corrections, if any, as

7    indicated by me on the CHANGE SHEET flyleaf page hereof.

8          Signed in _____, Washington,

9    this _____ day of _____ 20___.

10

11

12                         _____

13                         BRUCE A. SCOTT, JR.

14                         Taken:  Tuesday, December 10, 2019

15

16

17

18

19

20

21

22

23

24   Re:  Nwauzor, et al., v. The GEO Group
     Cause No.:  17-cv-05769-RJB
25   Donald W. McKay, RMR, CRR, CCR

Bruce Scott, Jr.                                    December 10, 2019

Page 119

1                    C E R T I F I C A T E

2

STATE OF WASHINGTON        )
3                          ) ss
COUNTY OF KING             )

4

5          I, the undersigned Washington Certified Court
Reporter, hereby certify:

6

           That the foregoing deposition upon oral examination
7   of the witness named herein was taken stenographically
before me and transcribed under my direction;

8

           That the witness was duly sworn by me pursuant to
9   RCW 5.28.010 to testify truthfully;

10         That the transcript of the deposition is a full,
true and correct transcript to the best of my ability;

11

           That I am neither an attorney for, nor a relative
12  or employee of any of the parties to the action or any
attorney or counsel employed by the parties hereto, nor
13  financially interested in its outcome.

14         I further certify that in accordance with CR 30(e),
the witness was given the opportunity to examine, read,
15  and sign the deposition, within 30 days upon its
completion and submission, unless waiver of signature was
16  indicated in the record.

17

18

19  _____

20  Donald W. McKay, RMR, CRR
Washington Certified Court Reporter No. 3237
21  License effective until: 07/02/2020

22

23

24

25

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110  FAX: 206.622.6236

Bruce Scott, Jr.                                    December 10, 2019

Page 120

1                    SEATTLE DEPOSITION REPORTERS, LLC
                        600 University Street, Suite 320
2                            Seattle, WA  98101
                              (206) 622-6661
3

4                        C H A N G E   S H E E T

5    PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
     SHOWING PAGE, LINE AND REASON.
6    _____

7    PAGE     LINE    CORRECTION AND REASON

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21

22                   _____
                     BRUCE A. SCOTT, JR.
23                   Taken:  Tuesday, December 10, 2019

24   Re:  Nwauzor, et al., v. The GEO Group
     Cause No.:  17-cv-05769-RJB
25   Donald W. McKay, RMR, CRR, CCR