1                                                   The Honorable Robert J. Bryan

2

3

4

5

6
                    UNITED STATES DISTRICT COURT
7                  WESTERN DISTRICT OF WASHINGTON
                            AT TACOMA
8
UGOCHUKWU GOODLUCK
9    NWAUZOR, FERNANDO AGUIRRE-          No. 17-cv-05769-RJB
     URBINA, individually and on behalf of all
10   those similarly situated,           DEPOSITION DESIGNATIONS
                                         OF BRUCE A. SCOTT, JR.
11                          Plaintiffs,

12          v.

13   THE GEO GROUP, INC., a Florida
     corporation,
14
                            Defendant.
15

16          Plaintiffs' hereby present (1) Plaintiffs' designations of the Deposition of Bruce A.

17   Scott, Jr., and (2) Defendant's counter-designations and objections. The designated pages are

18   attached, with Plaintiffs' designations highlighted in yellow and Defendant's counter-

19   designations highlighted in green.

20          DATED this 24th day of April, 2020.

21                                          SCHROETER GOLDMARK & BENDER

22                                          *s/ Jamal N. Whitehead*
                                            Adam J. Berger, WSBA #20714
23                                          Lindsay L. Halm, WSBA #37141
                                            Jamal N. Whitehead, WSBA #39818
24

DEPOSITION DESIGNATIONS OF                      SCHROETER GOLDMARK & BENDER
BRUCE A. SCOTT, JR.  (17-cv-05769-RJB) - 1          500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
                                                        Phone (206) 622-8000 ● Fax (206) 682-2305

810 Third Avenue, Suite 500
Seattle, WA 98104
Tel: (206) 622-8000 ~ Fax: (206) 682-2305
berger@sgb-law.com
halm@sgb-law.com
whitehead@sgb-law.com

THE LAW OFFICE OF R. ANDREW FREE
Andrew Free (*Pro Hac Vice*)
P.O. Box 90568
Nashville, TN 37209
Tel: (844) 321-3221 ~ Fax: (615) 829-8959
andrew@immigrantcivilrights.com

OPEN SKY LAW, PLLC
Devin T. Theriot-Orr, WSBA # 33995
20415 – 72nd Avenue S, Suite 110
Kent, WA 98032
Tel: (206) 962-5052
devin@opensky.law

MENTER IMMIGRATION LAW, PLLC
Meena Menter, WSBA #31870
8201 164th Ave NE, Suite 200
Redmond, WA 98052
Tel: (206) 419-7332
meena@meenamenter.com

*Class Counsel*

DEPOSITION DESIGNATIONS OF
BRUCE A. SCOTT, JR.  (17-cv-05769-RJB) - 2

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on April 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

3  the following:

4  Devin T. Theriot-Orr               R. Andrew Free
OPEN SKY LAW, PLLC          THE LAW OFFICE OF R. ANDREW FREE

5  20415 – 72nd Avenue South, Suite 110    PO Box 90568
Kent, WA 98032                    Nashville, TN 37209

6  devin@opensky.law              andrew@immigrantcivilrights.com
*Attorney for Plaintiff*             *Attorney for Plaintiff*

7

8  Meena Menter                 Joan K. Mell
MENTER IMMIGRATION LAW PLLC    III BRANCHES LAW, PLLC

9  8201 – 164th Avenue NE, Suite 200     1019 Regents Boulevard, Suite 204
Redmond, WA 98052           Fircrest, WA 98466

10  meena@meenamenter.com        joan@3ebrancheslaw.com
*Attorney for Plaintiff*             *Attorney for Defendant*

11

12  Colin L. Barnacle
Ashley E. Calhoun

13  Christopher J. Eby
Adrienne Scheffey

14  AKERMAN LLP
1900 Sixteenth Street, Suite 1700

15  Denver, CO 80202
colin.barnacle@akerman.com

16  ashley.calhoun@akerman.com
christopher.eby@akerman.com

17  adrienne.scheffey@akerman.com
*Attorneys for Defendant*

18

19        DATED at Seattle, Washington this 24th day of April, 2020.

20

                              *s/ Virginia Mendoza*

21                          VIRGINIA MENDOZA, Legal Assistant
                          Schroeter Goldmark & Bender

22                          810 Third Avenue, Suite 500
                          Seattle, WA  98104

23                          Tel: (206) 622-8000
                          mendoza@sgb-law.com

24

SCHROETER  GOLDMARK  &  BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

----------------------------------------------------------

UGOCHUKWU GOODLUCK NWAUZOR,          )

FERNANDO AGUIRRE-URBINA,             )

individually and on behalf of all   )

those similarly situated,           )

            Plaintiffs,          )

     vs.                            ) No. 17-cv-05769-RJB

THE GEO GROUP, INC., a Florida      )

corporation,                        )

            Defendant.           )

----------------------------------------------------------

Videotaped

Deposition Upon Oral Examination of

BRUCE A. SCOTT JR.

----------------------------------------------------------

9:39 a.m.

Monday, December 9, 2019

1019 Regents Blvd., Suite 204

Fircrest, Washington

REPORTED BY:  Keri A. Aspelund, RPR, CCR No. 2661

Bruce Scott, Jr.                                      December 9, 2019

Page 2

```
 1    APPEARANCES:
 2    For the Plaintiff:    JAMAL N. WHITEHEAD, ESQ.
 3                          Schroeter Goldmark & Bender
 4                          810 Third Avenue, Suite 500
 5                          Seattle, WA  98104
 6                          206-622-8000
 7                          whitehead@sgb-law.com
 8    For the Defendant:    JOAN K. MELL, ESQ.
 9                          III Branches Law
10                          1019 Regents Blvd., Suite 204
11                          Fircrest, WA  98466
12                          253-566-2510
13                          joan@3brancheslaw.com
14    Also Present:         LINDSAY, HITCHCOCK, VIDEOGRAPHER
15
16                          MARSHA CHIEN, ESQ.
17                          Assistant Attorney General
18                          800 Fifth Avenue, Suite 2000
19                          Seattle, WA  98104
20                          marshac@atg.wa.gov
21                          206-287-4182
22
23
24
25
```

Bruce Scott, Jr.                                    December 9, 2019

Page 3

```
 1                    E X H I B I T S
 2   No.    Description                        Page/Line
 3   345    Bruce A. Scott information document    13    8
 4   346    September 8-10, 2014, Welcome Book ACA  38   12
 5          Re-Accreditation Audit - GEO-Nwauzor
 6          022874-022940
 7   347    Commission on Accreditation for        46   13
 8          Corrections Standards Compliance
 9          Reaccreditations Audit, September 8-10,
10          2014 - GEO-Nwauzor 028201-028239
11   348    September 25-27, 2017, Welcome Book ACA 50   13
12          Audit - GEO-Nwauzor 044051-044127
13   349    Commission on Accreditation for        51   12
14          Corrections Standards Compliance
15          Reaccreditations Audit, September 25-27,
16          2017 - GEO-Nwauzor 026329-026373
17   350    Letter dated January 20, 2017, from    54   12
18          Bruce A. Scott Jr. to American
19          Correctional Association - GEO-Nwauzor
20          096706-096719
21   351    Email exchange, the first of which is  56    3
22          dated February 13, 2013 - GEO-Nwauzor
23          003715-003721
24
25                            Continued ...
```

Bruce Scott, Jr.                                December 9, 2019

                                                          Page 4

1    352     Policy and Procedure Manual, Chapter:      71    2

2            Detainee Rules and Discipline, Title:

3            Infractions and Disciplinary Sanctions -

4            GEO-Nwauzor 060333-060351

5

6                      E X A M I N A T I O N

7    BY                                          Page/Line

8    MR. WHITEHEAD                                    6    4

9

10

11

12

13

14

15    (Note:   * Denotes phonetic spelling.)

16

17

18

19

20

21

22

23

24

25

Bruce Scott, Jr.                                    December 9, 2019

Page 5

1          Fircrest, Washington; Monday, December 9, 2019

2                         9:39 a.m.

3              -------------------------

4          THE VIDEOGRAPHER:  We are going on the record at

5     9:39 a.m. on December 9th, 2019.

6              This is media unit one, volume one, of the video

7     deposition of Bruce Scott taken by the plaintiff, case

8     number 17-cv-05769-RJB in the matter of Nwauzor vs. The GEO

9     Group, filed in the U.S. District Court, Western District

10    of Washington, at Tacoma.

11             This deposition is taking place at 1019 Regents

12    Boulevard, Suite 204, in Fircrest Washington.

13             The videographer is Lindsay Hitchcock for

14    Seattle Deposition Reporters, 600 University Street,

15    Seattle, Washington 98101.  The court reporter is Keri

16    Aspelund for Seattle Deposition Reporters.

17             Counsel, at this time please identify yourselves

18    for the record, and the witness may be sworn in.

19             MR. WHITEHEAD:  Good morning.  Jamal Whitehead

20    on behalf of Mr. Nwauzor and the certified class.

21             MS. MELL:  Joan Mell on behalf of GEO, and the

22    witness is Bruce Scott.

23

24

25

Bruce Scott, Jr.                                    December 9, 2019

Page 6

```
 1              -------------------------
 2   BRUCE A. SCOTT JR.:    Witness herein, having been
 3                          duly sworn, testified as follows:
 4                   E-X-A-M-I-N-A-T-I-O-N
 5   BY MR. WHITEHEAD:
 6       Q.   Mr. Scott, we met a moment ago off the record.
 7   I'll introduce myself for benefit of the record.  I'm Jamal
 8   Whitehead, I represent Mr. Nwauzor and Mr. Aguirre-Urbina
 9   in their class action lawsuit against The GEO Group.
10            Sir, could you state and spell your name for the
11   record, please.
12       A.    Bruce A. Scott Jr., B-R-U-C-E, A., Scott,
13   S-C-O-T-T, J-R.
14       Q.   And the A, what does that stand for?
15       A.   Arnold, A-R-N-O-L-D.
16       Q.   And your date of birth, Mr. Scott?
17       A.    ██████1971.
18       Q.   What's your current address?
19            MS. MELL:  You don't have to give your personal
20   address.
21            I'll accept.
22       Q.   Okay.  With that understanding, that Counsel
23   accepts service on your behalf, who is your current
24   employer?
25       A.    The GEO Group.
```

Bruce Scott, Jr.                                    December 9, 2019

Page 7

1        Q.   And your current job title?

2        A.   Assistant facility administrator.

3        Q.   Mr. Scott, have you ever given testimony under

4   oath before?

5        A.   Yes.

6        Q.   In what context?

7        A.   Under deposition, similar to this.

8        Q.   What was the nature of the lawsuit?

9        A.   The State's wage an hour lawsuit against GEO.

10       Q.   Anything else?

11       A.   There's been others.  I can't specifically

12   remember all the others at this time.

13       Q.   Can you give me an overview of the subject

14   matter of those other depositions?

15       A.   There was some depositions for detainee Chavez

16   Flores, and the rest escape me for right now.

17       Q.   And the one involving Mr. Chavez Flores, what

18   was that about?

19       A.   That was Mr. Chavez Flores had claimed that he

20   was hit by an officer during a use of force, which did not

21   occur.

22       Q.   And what was your role in that incident?

23       A.   I was not actively involved in the incident.  I

24   was the assistant.  I was the chief of security at the

25   time.

Bruce Scott, Jr.                                        December 9, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 8

1        Q.    All right, and other than what you've just told

2    me, do you have any other memories of deposition testimony

3    that you've given?

4        A.    No.

5        Q.    Well, I know you've gone over the rules with

6    your attorney.   I stress three things at the outset.   I'm

7    sure your attorney has probably told you what I stress at

8    the outset, but the first thing that I want you to remember

9    is that this is not a practice.   What you say now is just

10   as important as if the judge and the jury were here to make

11   a decision today.

12             Do you understand that?

13             MS. MELL:   Object to the form.

14       A.    Yes.

15       Q.    And that with the help of the written transcript

16   and the video, they will assess your cooperation and your

17   credibility.

18             Do you understand that?

19       A.    Yes.

20       Q.    The second thing that I want to stress is that I

21   am not a mind reader.   If there is something that prevents

22   you from giving full and accurate testimony, will you let

23   me know?

24       A.    Yes.

25       Q.    And that goes for if you don't understand a

Bruce Scott, Jr.                                         December 9, 2019

GEO Objections Foundation, FRE
402, 701, 802.

                                                              Page 9

1    question I ask.  If I ask a question, and it doesn't make

2    sense to you, will you let me know that?

3         A.   Yes.

4         Q.   And the final thing that I'd like to stress is

5    that I'm looking for your full cooperation today.  I'd like

6    your -- your full, most accurate, most truthful testimony

7    that you can give.

8              Do you understand that?

9         A.   Yes.

10        Q.   We've got a full day ahead of us, and I'm going

11   to do my best to work efficiently, and to that end, I will

12   ask many yes or no questions.  If I ask you a yes or no

13   question, will you give me a yes or no answer?

14             MS. MELL:  Object to the form.

15        A.   I'll do my best.  If I don't understand the

16   question, I will ask you to restate.

17        Q.   And you're represented by counsel today?

18        A.   Yes.

19        Q.   Did you have any role in selecting your

20   attorney?

21        A.   No.

22        Q.   Are you paying your attorney?

23        A.   I personally am not paying her.

24        Q.   Are you being paid today?

25             In terms of your -- I don't know if you're

Bruce Scott, Jr.                                    December 9, 2019

Page 10

1   salaried or hourly, but are you on the clock, so to speak?

2        A.   I am salary.

3        Q.   So in that way, are you being paid today?

4             MS. MELL:   Object to the form.

5        A.   Yes.

6        Q.   What did you do to prepare for your deposition

7   today?

8        A.   Oh, no big preparation for the deposition.

9        Q.   Well, without revealing any conversations that

10  you may have had with your attorney, did you speak with

11  anyone to prepare for today?

12       A.   No.

13       Q.   Did you speak to the warden, for example?

14       A.   No.

15       Q.   Did you review any documents to prepare for your

16  testimony today?

17       A.   No.

18       Q.   Did you speak with any ICE personnel?

19       A.   No.

20       Q.   ICE employees?

21       A.   No.

22       Q.   ICE attorneys?

23       A.   No.

24       Q.   Can you give me a high level overview of your

25  educational background, please.

Bruce Scott, Jr.                                    December 9, 2019

Page 11

```
 1          A.    I have a Bachelor's in Science from Southern

 2     Illinois University, I have an Associate's Degree in Fire

 3     Science from the Community College of the Air Force, and I

 4     also have an Associate's Degree in Human Resources from the

 5     Community College of the Air Force.

 6          Q.    What did you do before GEO?

 7          A.    I was a United States Air Force member.

 8          Q.    For how long?

 9          A.    Twenty years.

10          Q.    And the highest rank achieved?

11          A.    Master sergeant.

12          Q.    And the status of your -- your discharge?

13          A.    Honorable.

14          Q.    Why come to work for GEO?

15          A.    GEO had a fire safety manager position open that

16     best suited me at the time, and they saw -- they liked what

17     I had in my qualifications, so they hired me.

18          Q.    How did you learn about the opening?

19          A.    It was CareerBuilder.com.

20          Q.    And the fact that it would be you working in a

21     detention center, what were your thoughts on that?

22          A.    Interesting but nothing I had done before.

23          Q.    Who does GEO house?

24                MS. MELL:   Object to the form of the question.

25          A.    GEO houses individuals sent to us by
```

Bruce Scott, Jr.                                    December 9, 2019

                                                        Page 12

1    Immigrations and Customs Enforcement.

2          Q.    And to your knowledge, is this part of criminal

3    punishment?

4                MS. MELL:  Object to the form of the question.

5          A.    I have no knowledge of that.

6          Q.    Well, what is your understanding of the -- the

7    status of the people that are housed at the Northwest

8    Detention Center?

9                MS. MELL:  Object to the form of the question.

10         A.    I don't get involved in any of the status.  If

11   ICE gives us an individual and the proper documentation in

12   accordance with the contract and the standards, we house

13   that individual.

14         Q.    So I just want to make sure I understand your

15   testimony.  You have no knowledge of whether or not people

16   that are being housed at the Northwest Detention Center are

17   there as part of criminal confinement?

18               MS. MELL:  Object to the form of the question.

19         A.    I have no idea or information about that.

20         Q.    What is LinkedIn?

21         A.    LinkedIn?  LinkedIn is a online business type of

22   social media web site.

23         Q.    And do you have a LinkedIn plat -- profile?

24         A.    I do.

25         Q.    Did you create it yourself?

Bruce Scott, Jr.                                    December 9, 2019

Page 13

1        A.    Yes.

2        Q.    Does anyone else have access to your LinkedIn

3    profile?

4        A.    No.

5        Q.    And the information on your profile, is it

6    accurate and truthful?

7        A.    Yes.

8              (Exhibit-345 marked.)

9              THE COURT REPORTER:  This is Exhibit-345.

10       Q.    Mr. Scott, you've just been handed Exhibit-345.

11             Is this your LinkedIn profile?

12             MS. MELL:  Object to the form of the question.

13       A.    Well, I don't see any web addresses or other key

14   indicators that -- that show it's printed from my LinkedIn

15   profile.

16       Q.    Well, take a moment to review the document, and

17   then my question to you will be, is this a fair and

18   accurate representation of your LinkedIn profile?

19       A.    The information looks correct.

20       Q.    In that way, are you agreeing with me that this

21   appears to be a fair and accurate representation of your

22   LinkedIn profile?

23             MS. MELL:  Object to the form of the question.

24       A.    Yes.

25       Q.    I want to take a look at the position heading

Bruce Scott, Jr.                                    December 9, 2019

Page 14

1     there Regional Director, Contract Compliance.

2              Do you see that?

3     A.    Yes.

4     Q.    And according to your profile, this was the

5     position that you held from February 2016 to June 2016.

6              Did I get that right?

7     A.    Yes.

8     Q.    If you look at the description that you have

9     there, it begins, "Directed auditing, contract compliance."

10             What are you referring to there when you write

11    "contract compliance"?

12    A.    Contract compliance is -- is reviewing

13    information of internal audits with GEO on many -- at the

14    regional level at many different contracts that GEO holds.

15    Q.    How many contracts are we talking about?

16    A.    I have no idea how many contracts that there

17    are.

18    Q.    Well, during your time as the regional director,

19    contract compliance, how many contracts did you direct the

20    auditing and contract compliance of?

21             MS. MELL:   Object to the form of the question.

22    A.    I don't know specifically how many contracts.

23    There are multiple different types of contracts in the

24    Western Region.

25    Q.    Well, let's talk about at the Northwest

Bruce Scott, Jr.                                December 9, 2019

```
                                                    Page 15
 1    Detention Center.  I mean, certainly we're talking about
 2    the ICE contract; right?
 3         A.   The Northwest ICE Processing Center has an ICE
 4    contract, yes.
 5         Q.   Okay.  All right, so there's the ICE contract;
 6    what else?
 7         A.   What else as far as contracts?
 8         Q.   Yes.
 9         A.   I'm not understanding your question.
10         Q.   Sure.
11              I'm trying to get a sense of what you did as
12    regional director, contract compliance.
13              Are you with me so far on that?
14         A.   Yes.
15         Q.   Okay.  So I'm just trying to get a sense of
16    which contracts it was that you directed the auditing of.
17              MS. MELL:  Object to the form of the question.
18         A.   Well, I'm still confused.
19              At the Northwest ICE Processing Center, there is
20    an ICE contract --
21         Q.   Okay.
22         A.   -- and that is one of them, yes.
23         Q.   All right, well can you give me a list of your
24    responsibilities as it relates -- related to the ICE
25    contract.
```

Bruce Scott, Jr.                                          December 9, 2019

GEO Objections Foundation, FRE 402, 701, 802.

                                                                Page 16

 1          A.    As the regional director?

 2          Q.    Yes, please.

 3          A.    As the regional director, if the government sent

 4    in any communications related to questions on the contract,

 5    whether we were meeting the intent of the contract, those

 6    type of communications would go through me.

 7          Q.    Anything else?

 8          A.    We would -- I would oversee the internal

 9    auditing for The GEO Group say at the Northwest ICE

10    Processing Center.

11          Q.    Anything else?

12          A.    Related to contract compliance, that's -- that's

13    really about it.

14          Q.    All right, so taking that first one, you said

15    government communications, and you said that was handling

16    communications from the government about whether or not GEO

17    was meeting the intent of the contract.

18          Did I get that right?

19    A.    Yes.

20          Q.    Now, was that just one way, meaning that you

21    were receiving communications from ICE?

22          MS. MELL:    Object to the form of the question.

23    A.    We -- not directly.  I would get sometimes

24    communications from the facility administrators, from their

25    facilities that their -- their clients had sent to them.

Bruce Scott, Jr.                                    December 9, 2019

Page 17

1       Q.   Would you ever contact ICE on your own accord
2   about contract compliance issues?
3       A.   No.
4       Q.   All right, so this was always ICE contacting you
5   to make sure that GEO was in compliance?
6            MS. MELL:  Object to the form.
7       A.   ICE never contacted me directly.  I would get
8   communications through the facility administrators.
9       Q.   And who are the facility administrators?
10      A.   There are lots of facilities.  For example,
11  Stephen Langford is the facility administrator at the
12  Northwest ICE Processing Center.
13      Q.   And I hear you saying the Northwest ICE
14  Processing Center; is that the term that you're using?
15      A.   Yes.
16      Q.   Okay.  And that refers to what was previously
17  known as the Northwest Detention Center?
18      A.   Previously known as Northwest Detention Center.
19      Q.   When was the name change made?
20      A.   Name change was made, I don't remember the exact
21  date, but sometime late last year --
22      Q.   Do you know what prompted the change?
23      A.   -- or this year.  This is December.
24           I don't know what prompted the change.
25      Q.   And tell me, how do you know that the name

Bruce Scott, Jr.                                   December 9, 2019

Page 18

 1   changed?

 2        A.   We received notice from the -- corporate through

 3   our region of the name change and to start putting that on

 4   all our documentation.

 5        Q.   All right, so that was my next question.

 6             So that -- the name, has the signage changed at

 7   the facility?

 8        A.   Yes.

 9        Q.   And you said your corporate documents make

10   reference to the new name as well?

11        A.   Yes.

12        Q.   All right, so if I slip up and say the Northwest

13   Detention Center at some point today, like I know I will,

14   will you understand me to be referring to the Northwest ICE

15   Processing Center?

16        A.   Yes.

17        Q.   All right, so I want to go back to that list

18   then.

19             You said that Stephen Langford is -- I don't

20   know if is or was the facility administrator at the

21   Northwest Detention Center; what is his title?

22        A.   Facility administrator.

23        Q.   And is that a position that was previously

24   called warden?

25        A.   Yes.

GEO Objections Foundation, FRE 402, 701, 802.

Bruce Scott, Jr.                                          December 9, 2019

Page 19

1        Q.    So in the -- your role as regional director,
2    contract compliance, it was the facility administrator that
3    would have the direct communications with ICE?
4        A.    Yes.
5        Q.    I want to know specifically about your
6    involvement or work with ICE.
7              Did you have any direct work with ICE as the
8    regional director, contract compliance?
9        A.    No.
10       Q.    And then you talked about internal auditing at
11   Northwest Detention Center; what -- can you give me a list
12   of what you did with respect to internal auditing at the
13   Northwest Detention Center?
14       A.    Now, we're still talking about as the regional
15   director?
16       Q.    Yes.
17       A.    Well, during the time I was the regional
18   director, the only thing I would have done with the
19   Northwest ICE Processing Center was do the annual schedule,
20   because we did not have an internal audit during my time
21   as -- as the regional director.
22       Q.    When you say annual schedule, what do you mean?
23       A.    So part of the regional director's
24   responsibility was to ensure that the annual scheduled
25   audits for all facilities within the Western Region was

Bruce Scott, Jr.                                December 9, 2019

Page 20

1    scheduled so the facility administrators knew about what

2    time their annual audit would occur.

3         Q.    And was there a document or directive you

4    received mandating internal audits?

5         A.    There's a GEO policy on -- on auditing.

6         Q.    Do you know the policy number for that?

7         A.    I do not recall the policy number off the top of

8    my head.

9         Q.    All right.  Looking at your LinkedIn profile,

10   Exhibit-345, there's a statement there about ACA

11   accreditation.

12              What is that?

13        A.    ACA is the -- excuse me, American Correctional

14   Association.

15        Q.    And tell me what you did with respect to

16   securing or maintaining ACA accreditation as the regional

17   director, contract compliance?

18        A.    That was -- ACA operates audits on a three-year

19   cycle for those that have existing ACA contracts.  If it's

20   a new facility seeking ACA accreditation, it's a one-year

21   audit.  So as a -- as a director, I would ensure just the

22   annual schedule of those facilities that were due an audit

23   that year by ACA, it was on a schedule, and work with the

24   contract -- the compliance administrators at those

25   facilities to ensure that they are ready for those audits.

Bruce Scott, Jr.                                December 9, 2019

Page 21

1          Q.    And then I see a statement PREA, P-R-E-A; what
2    is that?
3          A.    PREA is the Prison Rape Elimination Act.
4          Q.    And your role as far as PREA goes during that
5    time when you were regional director, contract compliance?
6          A.    PREA also has an auditing cycle, and just
7    ensuring that the audits that were due for the -- those
8    years for any particular facility that had an audit in that
9    cycle knew about their upcoming audits, and again, that the
10   PREA compliance managers knew that and were preparing for
11   their audits and their annual requirements under that
12   standard.
13         Q.    And then *SAPPI, I don't know if I'm saying that
14   correctly, S-A-P-P-I; what is that?
15         A.    *SAPPI is Department of Homeland Security
16   equivalent to PREA.  It is the Sexual Assault and Abuse
17   Prevention Intervention standard.
18         Q.    Now, looking at your LinkedIn profile,
19   Exhibit-345, I see also in your list of experience,
20   compliance administrator from April 2012 through April
21   2017.
22               Do you see that?
23         A.    Yes.
24         Q.    And I take it this was compliance administrator
25   at the Northwest Detention Center?

Bruce Scott, Jr.                                          December 9, 2019

GEO Objections Foundation, FRE
402, 701, 802.

Page 22

1          A.   Yes.

2               Q.   Can you give me a list of your role and your

3     duties and responsibilities while you were compliance

4     administrator.

5               A.   While I was compliance administrator at the

6     Northwest Detention Center at the time, I was responsible

7     for policies and programs, the audit program, which

8     included ACA, the American Correctional Association, any

9     PREA or SAAPI-related audits and information, internal

10    audits in prep for the corporate annual audit, and then

11    other duties as designed by the facility administrator.

12              Q.   Anything else?

13              A.   No, that's a good overview.  There's -- but

14    that's the primary duties of a compliance administrator.

15              Q.   So policies and programs and internal audits; is

16    that right?

17              A.   Yes, and working with the -- the third-party

18    auditors when they came to the facility on the real audits,

19    the actual certification audits.

20              Q.   Now, in this role as compliance administrator,

21    did you have to work with ICE to fulfill your job duties?

22              A.   No.

23              Q.   Did you interface with ICE directly at all in

24    that role as compliance administrator?

25              A.   No.

Bruce Scott, Jr.                                    December 9, 2019

Page 23

1              Typically the facility administrators do the

2       direct interface -- interaction with -- with ICE.

3              Q.   What about with regards to the Voluntary Work

4       Program, did you have any involvement, if any, as

5       compliance administrator with the Voluntary Work Program?

6              A.   As compliance administrator, when it came to

7       policies and the ICE standards or the ACA standards, yes.

8              Q.   So it's fair to say then that your involvement

9       came in making sure that standards were met?

10             MS. MELL:   Object to the form of the question.

11             A.   One of the primary duties is to ensure that we

12      best meet policy and standards through our actions, yes.

13             Q.   So give me an example of how you would do that

14      with respect to the Voluntary Work Program.

15             A.   So with the Voluntary Work Program, or the GEO

16      policies, the ICE standards themselves, or the ACA

17      standards, had a -- a bit of what ICE calls expected

18      outcomes, what they would like to see.  The compliance

19      administrator would just collect documentation to show that

20      we were in compliance with those expected practices, and

21      would engage with staff to make sure when -- they knew

22      which questions the auditors would ask or the documentation

23      the auditors would like to see when they came to the

24      facility, just making sure that everything was ready and

25      completed in accordance with the ICE standards.

Bruce Scott, Jr.                                        December 9, 2019

                                                              Page 24

1          Q.    And chief of security, looking again at your

2     LinkedIn profile, I see that you were chief of security

3     from April 2017 to September 2018.

4                Did I get that right?

5          A.    Yes.

6          Q.    Now, moving from compliance administrator to

7     chief of security, is that a promotion?

8          A.    Yes.

9          Q.    Can you give me a list of your duties and

10    responsibilities as chief of security.

11         A.    As chief of security, I was in charge of the

12    entire security department under the, at the time,

13    assistant warden of security.  It involved all policies,

14    procedures, post orders, and just running the security

15    department from day to day.

16         Q.    In this role, did you work directly with ICE?

17         A.    No.

18         Q.    What role, if any, did the chief of security

19    play at administering the Voluntary Work Program?

20         A.    As chief of security, I had the policies and the

21    ICE standards that outline the Voluntary Work Program and

22    those employees that worked under me that may interact with

23    the Voluntary Work Program just to ensure policies and

24    procedures were followed in accordance with the ICE

25    contract and standards.

Deposition of Bruce Scott, Jr.
802.

Bruce Scott, Jr.                                    December 9, 2019

Page 25

```
 1        Q.    And assistant warden, moving from chief of
 2   security to assistant warden, again, I take it that was a
 3   promotion?
 4        A.    Yes.
 5        Q.    And can you give me a list of your job duties
 6   and responsibilities as assistant warden?
 7        A.    The assistant warden of security at the time,
 8   which is now the assistant facility administrator, jobs
 9   was -- I had the chief of security now under me.  So
10   overall had more responsibility of the entire security
11   department in accordance with the ICE standards and the ICE
12   contract.  And also the assistant facility administrator, I
13   have food service, the religious department, maintenance
14   departments, records department, classification department,
15   GTI department, the recreation department.  All those fall
16   under the assistant facility administrator.
17        Q.    And as the assistant facility administrator, you
18   report directly to the facility administrator?
19        A.    Yes.
20        Q.    Who reports to you?
21        A.    The department heads of all those
22   previously-listed departments that I -- I listed.
23        Q.    Do you conduct performance evaluations for the
24   department heads?
25        A.    Yes.
```

Bruce Scott, Jr.                                            December 9, 2019

GEO Objections Foundation, FRE 402,
701, 802.

                                                            Page 26

1        Q.    Have you conducted a performance evaluation for

2    Michael Heye?

3        A.    Michael Heye in the classification department is

4    under me.  I think last year I had a lieutenant do his

5    performance evaluation.

6        Q.    Do you have any insights into Michael Heye's

7    performance?

8              MS. MELL:  Object to the form.

9        A.    Yes.

10       Q.    Can you tell me about his performance.

11             MS. MELL:  Object to the form.

12       A.    Michael Heye is one of my better staff members,

13   very knowledgeable in the ICE contract and the ICE

14   standards, and does a very good job managing all the

15   programs, like the Voluntary Work Program or

16   classification, in accordance with those ICE standards.

17       Q.    And Ms. Singleton, do you know who she is?

18       A.    Yes.

19       Q.    I'm referring to Alisha Singleton.

20             Is it your understanding that Alisha Singleton

21   and Michael Heye carry the same job title?

22       A.    Yes, as a classification officer.

23       Q.    And as the classifications officers, is it the

24   case that they manage the Voluntary Work Program?

25             MS. MELL:  Object to the form of the question.

Bruce Scott, Jr.                              December 9, 2019

1        A.   They have portions of the Voluntary Work Program

2   which -- which they are responsible for.   I'd say nobody

3   manages the entire Voluntary Work Program.   There's many

4   standards in the ICE contract, and the ICE standards, and

5   the Performance-Based National Detention Standards that

6   must be accomplished within the Voluntary Work Program.

7        Q.   And do you draw a distinction between

8   responsibilities for versus managing the Voluntary Work

9   Program?

10        A.   I -- I do.   Many people manage it in accordance

11   with what the client directs for the Voluntary Work

12   Program.

13        Q.   The client being ICE?

14        A.   Yes.

15        Q.   On the GEO side of things, who carries primary

16   responsibility for managing the Voluntary Work Program?

17             MS. MELL:   Object to the form of the question.

18        A.   I would say the primary facility administrator

19   down through the assistant facility administrator and the

20   department heads for those areas.

21        Q.   And do they share equally in this

22   responsibility?

23             MS. MELL:   Object to the form of the question.

24        A.   I don't think they would share equally.

25   Everybody has certain parts of the Voluntary Work Program

Bruce Scott, Jr.                                    December 9, 2019

Page 28

1    that are required to be accomplished.  There's several

2    parts in the Performance-Based National Detention Standard,

3    which several expected practices, I -- we operate in

4    compliance with the ICE standards under the contract, which

5    is monitored by ICE.

6         Q.   And I -- I understand your testimony that ICE

7    and the performance-based national detention center -- the

8    Performance-Based National Detention Standards are

9    overarching for the facility, but I'm just trying to get a

10   sense of the day-to-day work, who carries the primary

11   laboring order when it comes to the Voluntary Work Program

12   on the GEO side of things?

13             MS. MELL:  Object to the form of the question.

14        A.   There's -- there's several applicable steps of

15   the standard.  I -- and we could put that on -- there's not

16   one person that manages the entire program.  It takes a

17   collected effort of the team to complete the Voluntary Work

18   Program and all the requirements of the ICE standard.

19        Q.   Well, if you had a question say about a policy

20   or standard about the Voluntary Work Program, who would you

21   direct that question to?

22        A.   Primarily the question would be directed to the

23   compliance administrator, but there could be subset

24   questions that I would ask Mr. Heye in -- in

25   classifications.

Bruce Scott, Jr.                                    December 9, 2019

Page 29

```
1          Q.   Such as?

2          A.   Well, I can't think of a such as.  There's --

3     again, there's many different expectations and expected

4     practices in that standard.

5          Q.   Tell me about your job performance at the

6     Northwest Detention Center; have you ever been disciplined

7     or counseled on your job performance?

8          A.   I received one I believe it was a counseling

9     from the facility administrator for my job performance.

10         Q.   And who was the facility administrator at the

11    time?

12         A.   Stephen Langford.

13         Q.   Who is the current facility administrator?

14         A.   Stephen Langford.

15         Q.   And when did Mr. Langford step into that role?

16         A.   Around July of last year, 2018.

17         Q.   And the counseling that you received from Mr.

18    Langford, what was it about?

19         A.   It had to do with managing the lieutenants' and

20    sergeants' labor control expectations.

21         Q.   What do you mean when you say "labor control

22    expectations"?

23         A.   Maintaining the staffing roster to ensure that

24    they -- they are effectively using overtime to fill needed

25    positions under the ICE contract.
```

Bruce Scott, Jr.    GEO Objections Foundation, FRE 402, 701, 802.   December 9, 2019

Page 30

1          Q.    Now, during your time as compliance

2    administrator, were there any documents that you consulted

3    regularly to do your job?

4          A.    I regular would consult the Performance-Based

5    National Detention Standards, the ACA manual, GEO policies,

6    and the ICE contract.

7          Q.    Anything else?

8          A.    Those are my most go to documents.

9          Q.    Were there any aspects of the Performance-Based

10   National Detention Standard that you would reference more

11   than others?

12         A.    Well, whatever audit tool that we're working on

13   at the time, or internal audit, or documentation, it really

14   just depends on what you're working on.  The -- the

15   national performance-based detention standards are a large

16   document with many different things inside of it.

17         Q.    As the compliance administrator, was the idea

18   that you were the person most knowledgeable about complying

19   with the Performance-Based National Detention Standards?

20         A.    As compliance administrator, my responsibilities

21   were to do internal audits, and to be there for the

22   external audits, whether it was GEO, ICE, or ACA, in

23   accordance with those standards.

24         Q.    In that way, did you view yourself as a subject

25   matter expert?

Bruce Scott, Jr.                                December 9, 2019

                                                        Page 31

 1              MS. MELL:  Object to the form of the question.

 2         A.   I think I would refer to myself as a subject

 3    matter expert when it comes to the standards.

 4         Q.   And as the compliance administrator, the idea

 5    was that you made sure that GEO complied with the

 6    Performance-Based National Detention Standards and other

 7    accreditation standards; correct?

 8              MS. MELL:  Object to the form of the question.

 9         A.   As the compliance administrator, I wouldn't say

10    I made anybody comply with it.  I would do audits

11    internally and pass that information up to -- through the

12    facility administrator to the region.  We don't make

13    anybody really do anything.

14         Q.   Well, was it your job to ensure that people met

15    the standards?

16              MS. MELL:  Object to the form of the question.

17         A.   My job was to accurately portray the facts that

18    I found through the compliance program and send that

19    information back to the department heads or who had those

20    people in those departments.

21         Q.   So to assess whether or not GEO was in

22    compliance with the ICE contract or their Performance-Based

23    National Detention Standard?

24              MS. MELL:  Object to the form.

25         A.   I would assess to our information.  You make it

Bruce Scott, Jr.                              December 9, 2019

Page 32

1    kind of sound like that I would assess for ICE.  I -- no,

2    we would just assess our position as compliance

3    administrator what we felt we were at in the standards.

4    The auditing bodies made the final assessment on whether

5    they thought the standards were being met or not.

6         Q.   I understand, but I mean, the title would

7    suggest that your -- your role was assessing for GEO and

8    then notifying perhaps whoever needed to be notified if

9    there was an issue; is that a fair way of characterizing

10   what you did?

11             MS. MELL:  Object to the form of the question.

12        A.   Again, we would do audits, and I would relay

13   that information up through the policies and procedures to

14   who needed to know about that, which typically the facility

15   administrator, the regional director of contract

16   compliance, internal audits to the department heads within

17   those departments.

18        Q.   Now, the Performance-Based National Detention

19   Standards, the ICE contract, the ACA manual, the GEO

20   policies that you mentioned, did those operate as the

21   baseline for what GEO must do in terms of carrying out its

22   operations?

23             MS. MELL:  Object to the form of the question.

24        A.   The standards and policies and procedures are

25   there to give the guidelines that defines what the expected

Bruce Scott, Jr.                                    December 9, 2019

Page 33

1     practice is.   We would do our jobs and duties, and we would

2     be audited by ICE and other external agencies to figure out

3     if they felt we were meeting those expected practices.

4          Q.    Well, how the detainee workers carried out their

5     jobs, that could affect whether or not GEO was found in

6     compliance by whoever the auditing body is?

7               MS. MELL:   Object to the form of the question.

8          A.    I'm not understanding your question.

9               Can you restate that?

10         Q.    Sure.

11              Let's take the Performance-Based National

12    Detention Standards; could the workers and the way that --

13    detainee workers -- well, let me try again.

14              Let's take the Performance-Based National

15    Detention Standards; how the detainee workers perform their

16    jobs, could that affect whether or not GEO was complying

17    with the Performance-Based National Detention Standards?

18              MS. MELL:   Object to the form of the question.

19         A.    I don't -- I don't think so.  I mean, there's

20    many expected practices.  I don't -- I don't recall that

21    being one of the expected practices, but there's various

22    things inside the standard for engaging in what you would

23    do on the performance of the detainee worker.  I don't

24    necessarily equate that to failing a standard.

25         Q.    Well, let's get more specific.

Bruce Scott, Jr.                                    December 9, 2019

Page 34

1            Are you aware that there are standards for

2    hygiene and sanitation in the kitchen?

3            MS. MELL:  Object to the form of the question.

4       A.   Yes.

5       Q.   And are there GEO policies about hygiene and

6    sanitation in the kitchen?

7       A.   Yes.

8       Q.   Are there ACA standards about hygiene and

9    sanitation in the kitchen?

10      A.   Yes.

11      Q.   Are there standards within the Performance-Based

12   National Detention Standards about hygiene and sanitation

13   in the kitchen?

14      A.   Yes.

15      Q.   So, in that way, could the detainee workers

16   impact whether or not GEO was found to be in compliance

17   with those standards?

18           MS. MELL:  Object to the form of the question.

19      A.   That's such a broad question to answer.  Could

20   we get into some specifics?  I mean, lots of people are

21   responsible for hygiene, not just detainees, but staff

22   members as well in the kitchen.  It's really too broad to

23   answer.

24      Q.   Well, I'm trying to narrow it down.  I mean,

25   let's focus on the kitchen.

Bruce Scott, Jr.                                    December 9, 2019

Page 35

1                If I understood you correctly, there are PBD --
2       PBNDS standards related to hygiene and sanitation in the
3       kitchen; correct?
4            A.   Yes.
5            Q.   You said there were ACA standards for hygiene
6       and sanitation in the kitchen; correct?
7            A.   Yes.
8                MS. MELL:  Object.
9                THE WITNESS:  Oh, Sorry.
10               MS. MELL:  Object.  These are all asked and
11      answered.  You can't go back and ask him all the same
12      things you just asked him.
13               MR. WHITEHEAD:  I'm just asking the list to
14      orient him again.
15           Q.   You said there were GEO policies --
16               MS. MELL:  No, no, we're not going to waste time
17      doing this today.  Come on.  It's argumentative, it's asked
18      and answered.  I don't even know where you're going with
19      this, but you're wasting a lot of time.
20           Q.   You said there are GEO policies in the kitchen
21      related to hygiene and sanitation; correct?
22               MS. MELL:  Object to the form.
23           A.   Yes.
24           Q.   Now, you expect -- GEO expects its kitchen
25      personnel to make sure that detainee workers are meeting

Bruce Scott, Jr.                                    December 9, 2019

Page 36

 1   those standards; correct?

 2        A.   Most of the standards that you're relating to

 3   are outside the Voluntary Work Program, so those -- those

 4   standards are -- are -- yes, there's hygiene and -- and

 5   sanitation standards that are not only in the Voluntary

 6   Work Program but outside the Voluntary Work Program as

 7   requirements of more than just detainees to do kitchen

 8   staff, clean in the kitchen as well, and that's why it's

 9   such a broad -- there's so many standards that we're --

10   we're talking about within the PBNDS, I'm trying to -- I'm

11   doing my best to answer you specifically.

12        Q.   Well, if GEO allowed detainee workers to work in

13   the kitchen with open sores on their hands, could that be

14   the basis for finding that GEO was not in compliance with

15   hygiene and sanitation standards?

16             MS. MELL:  Object to the form.

17        A.   Not necessarily.  There is a -- a standard

18   within the food service standard that we check detainees

19   for open sores, wounds, colds, things like that.  If the

20   detainee needs to go to sick call before they start work,

21   then we send them to sick call before they start work.

22   Whether that violates an entire standard, that's -- no,

23   there are just lots of portions to standards, there's lots

24   of writing in that PBNDS.  But we do check detainees for

25   open sores and stuff before they start work.

Bruce Scott, Jr.                                    December 9, 2019

Page 37

1        Q.   And you check them for open stores before they
2   start work to make sure that you're in compliance with
3   sanitation and hygiene standards; is that right?
4        A.   Well, that part is -- there's food service
5   standards outside of the PBNDS that -- that require that as
6   well.  There's many different things that require that, not
7   just the Voluntary Work Program.
8        Q.   Well, let's take a look at some of those
9   standards.
10            You said that ACA refers to American corrections
11  associations?
12       A.   Yes.
13       Q.   What does ACA do?
14       A.   ACA is an external auditing body that audits on
15  a set of standards that they adopt and ratify.  And then
16  agencies that want to be accredited with ACA seek
17  accreditation through their rules, their standards, and
18  apply for accreditation to which ACA sends out auditors.
19  They gauge the -- the level of -- of compliance with their
20  standards.
21       Q.   What's your understanding of why GEO sought ACA
22  accreditation?
23       A.   It's a --
24            MS. MELL:  Object to the form.
25       A.   It's required in the ICE contract to be ACA

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

Bruce Scott, Jr.                                    December 9, 2019

Page 38

1    certified.

2         Q.   And how often would the Northwest Detention

3    Center undergo an ACA audit?

4         A.   Now that we're existing contract with the ACA,

5    it would be every three years.

6         Q.   What is a -- a Welcome Book?

7         A.   A Welcome Book is -- is kind of a -- a general

8    information overview of the facility for different auditing

9    bodies.  Just kind of gives you a sense of what you're

10   walking into, who the people are, and it's really just an

11   overview.

12              (Exhibit-346 marked.)

13              THE COURT REPORTER:  This is Exhibit-346.

14              THE WITNESS:  Thank you.

15        Q.   You've just been handed Exhibit-346, and the

16   title of the document is Welcome Book ACA Re-Accreditation

17   Audit.

18              Do you see that?

19        A.   Yes.

20        Q.   On the face of the document, it says it's dated

21   September 8th through 10th, 2014.

22              Do you see that?

23        A.   Yes.

24        Q.   Sir, what are we looking at here at Exhibit-346?

25        A.   We're looking at the Welcome Book for the ACA

Bruce Scott, Jr.                                    December 9, 2019

Page 39

1    reaccreditation audit.

2         Q.   Did you have any role in putting this document

3    together?

4         A.   I believe I remember the role I would have is

5    just overview.  The administrative assistant at the time

6    primarily put this together.  I think my bio's in here.  I

7    probably would have given information for my -- my bio.

8         Q.   Have you seen this document before?

9         A.   Yes.

10        Q.   And this Welcome Book, was it something that GEO

11   put together as a matter of ordinary course before an

12   audit?

13        A.   Yes.

14        Q.   And this particular Welcome Book, Exhibit-346,

15   was it made at or near the time of the audit?

16        A.   Since I did not create this in entirety, I don't

17   know exactly when it was made.  It's typically prepared and

18   finalized very close to an audit.

19        Q.   Do you have any reason to believe that this book

20   and its creation deviated from that practice of making the

21   Welcome Book at or near the time of the audit?

22        A.   Give me some time to review.

23             I think it would have been prepared around the

24   time of the audit.

25        Q.   And this book is put together by GEO personnel

Bruce Scott, Jr.                                        December 9, 2019

Page 40

1    that is knowledgeable with GEO's operations; is that safe

2    to assume?

3              MS. MELL:   Object to the form of the question.

4         A.   Yes.

5         Q.   I want to take a look at what's marked as page 2

6    of Exhibit-346, and I'm looking at the page numbers for the

7    document, with the heading there is Introduction, and I'm

8    looking specifically at the subheading Major Renovation.

9              Are you with me?

10        A.   I see that spot on the page.

11        Q.   That last sentence there of that paragraph

12   reads, "Space was added to accommodate additional housing

13   units and the third Courtroom, as well as an extended

14   office space for the Administration areas for ICE and GEO."

15             Did I read that correctly?

16        A.   Yes.

17        Q.   Where are the ICE offices situated at the

18   Northwest Detention Center?

19        A.   The ICE offices are situated in the

20   administrative building on the second floor.

21        Q.   And how many offices does ICE have on the second

22   floor of the administrative wing of the building?

23        A.   It runs the entire length of the building.  I --

24   there's lots of offices up there.  I don't know how many

25   there are.

Bruce Scott, Jr.                                    December 9, 2019

Page 41

1        Q.   Do you know how many ICE personnel are stationed

2   in the office?

3        A.   I know there's lots of people up there.  I don't

4   know the ICE staffing.  I would ask ICE for that

5   information.

6        Q.   Well, can you name for me the ICE personnel that

7   you typically see on the second floor of the administrative

8   building?

9             MS. MELL:  Object to the form of the question.

10       A.   There's lots of ICE staff upstairs, sir.

11       Q.   I'm trying to get a sense of how many, because

12  lots doesn't really give me an answer on how many people it

13  is that we're talking about.

14            MS. MELL:  But he doesn't have any obligation to

15  know how many ICE people are on the second floor.

16       A.   I -- I -- I do not control their staffing, sir.

17  I do not know how many people they have upstairs.

18       Q.   Are there ICE offices anywhere else in the

19  building?

20       A.   And then when you say ICE, define ICE.  There's

21  several layers of ICE, sir, to try to answer your question,

22  but I -- I don't know their -- their staffing or how they

23  deploy their people, sir.

24       Q.   All right, let's take a look at page 6.

25            And you can rely on your experience in any of

Bruce Scott, Jr.                                          December 9, 2019

Page 42

1      the positions that you've held with GEO.

2                 Is this a fair and accurate depiction of the

3      facility layout?

4                 MS. MELL:  Object to the form of the question.

5           A.    It's fair and accurate.  There's some areas that

6      have two stories that we don't put a different set of

7      stories on the overview map for the auditors.

8           Q.    So the answer is yes?

9                 MS. MELL:  Object to the form of the question.

10          A.    Minus the second story, yes.

11          Q.    Now, can you tell me where on this map, if at

12     all, ICE personnel are stationed?

13          A.    So on the -- on the bottom right of the map,

14     where it says "Administration," the length of that building

15     from the right edge to the left edge of the Lobby, the

16     second floor of that entire building is ICE.

17          Q.    Anywhere else?

18          A.    And again, we'd have to define ICE a little

19     better.  There's court staff and -- and other type of staff

20     that -- that work with ICE under different contracts and

21     different government people.  I'm not sure if you're

22     referring to those as well, but that's why I'm trying to

23     define -- ICE is a very large agency.  I'm trying to answer

24     your questions the best I can, sir.

25          Q.    Well, however you would define ICE.  I mean,

Bruce Scott, Jr.                                December 9, 2019

Page 43

1    give me the -- your broadest definition of ICE, and then I
2    would like to know where on this facility layout map ICE
3    personnel are stationed as a matter of course.
4             MS. MELL:  Object to the form of the question.
5        A.   There's other government folks that I may
6    broadly associate with ICE that work on the first floor of
7    the administration building, and other court and ICE staff
8    that work in -- in the main building, which we would call
9    Building E, it's not designated on the map that way, that
10   occupy some front office space in that off of the
11   courtrooms, and we have five courtrooms in the center as
12   well where their staff work as well.  So there's quite a
13   lot of staff there, sir.
14       Q.   I understand that, that part of your testimony,
15   but I -- I just want you to focus in on my question.
16            Looking at page 6, other than the administration
17   building, is ICE staff or personnel stationed anywhere else
18   on the map that's depicted, as a matter of course?
19            MS. MELL:  Object to the form of the question.
20            And Counsel, your suggestion that he hasn't
21   completely and thoroughly answered your question should be
22   stricken from the record.
23       A.   If you look at the map where it's marked Courts,
24   those are the federal courtrooms.  Come down, make a left,
25   all of -- all of that area are government office space

Bruce Scott, Jr.                                December 9, 2019

Page 44

1    that's required by the ICE contract, and many government

2    folks occupy those areas.

3         Q.   Anywhere else?

4         A.   The ICE Immigration Health Services Corps

5    occupies the entire area that's listed as Medical.

6         Q.   Anywhere else?

7         A.   That's it as far as ICE or government staff.

8         Q.   I think I'd like for you to -- actually, no, I

9    don't want to.

10             All right, so let's take each of the three areas

11   that you mentioned then.

12             So Courts, what is your understanding of the

13   business that ICE carries out in the unit labeled as

14   Courts?

15             MS. MELL:  Object to the form of the question.

16        A.   Sir, I have no idea what they carry out.  I -- I

17   do not work for them, I do not audit the court or

18   government personnel or have anything to do with their

19   personnel.  I -- I do not know the specifics of what they

20   do.

21        Q.   Do you know whether it has anything to do with

22   immigration proceedings?

23        A.   Sir, I really don't know exactly what they do.

24   I -- I work for GEO.  I -- we're responsible for our areas.

25   I have no oversight over any of their areas to even begin

Bruce Scott, Jr.                                    December 9, 2019

Page 45

 1    to think of what they do.

 2        Q.   All right.  This will just -- just last time.

 3             Is it your testimony that you have no sense of

 4    the business that ICE conducts out in the courtroom section

 5    of GEO's Northwest Detention Center?

 6             MS. MELL:  Object to the form of the question.

 7        A.   I don't want to speak for an agency that I don't

 8    work for, sir.

 9        Q.   All right, what about medical, do you know what

10    business ICE carries out in the medical unit?

11             MS. MELL:  Object to the form of the question.

12        A.   Other than from the word "medical," they do

13    medical stuff, sir, but they are -- they are another

14    government agency that have their own staff and their own

15    requirements.

16        Q.   Let's take a look at page 7 of Exhibit-346.

17    It's labeled there Activity Schedules.

18             What are we looking at here?

19        A.   That's just a very broad sense of the daily

20    facility schedule listed for some of the things that

21    auditors usually like to know about.

22        Q.   What about on the next page, page 8?  It says

23    72-Hour Activity Schedule, and it continues on for several

24    pages.

25             What are we looking at here?

Bruce Scott, Jr.                              December 9, 2019

Page 46

```
 1        A.    Again, just a broad overview.  During audits,
 2   there's many different standards that auditors like to see.
 3   This kind of helps guide them to areas that they may want
 4   to see and help plan their auditing schedule for their
 5   three days while they're there.
 6        Q.    Is this a fairly typical schedule for the
 7   detention population at GEO?
 8              MS. MELL:  Object to form of the question.
 9        A.    Well, the schedule is listed as of September
10   8th, 2014, so for that audit, sir, I would say it would be
11   very typical.
12              THE COURT REPORTER:  This is Exhibit-347.
13                  (Exhibit-347 marked.)
14        Q.    You've just been handed Exhibit-347.
15              What are we looking at here?
16        A.    The title on the page is Commission on
17   Accreditation for Corrections Standards Compliance
18   Reaccreditation Audit for September 8th through 10, 2014.
19        Q.    Have you seen this document before?
20        A.    2014 is some time ago, but I believe I have seen
21   this document before.
22        Q.    Well, the ACA audits, is this the ACA's report
23   or findings for its September 2014 visit to the Northwest
24   Detention Center?
25        A.    Let me review the document, sir.
```

Bruce Scott, Jr.                                    December 9, 2019

                                                         Page 47

1              So this is the Visiting Committee's report to

2      the ACA board for the audit of 8-10 -- September 8 through

3      10, 2014.

4         Q.   Were there any aspects of this report that GEO

5      objected to?

6              MS. MELL:   Object to the form of the question.

7         A.   I don't know, sir, since this report, it goes to

8      the regional directors, the -- the heads of corporate

9      contract compliance, if they -- I -- I don't know if GEO

10     specifically objected to anything in this report or not.

11        Q.   So to your knowledge then, GEO did not object to

12     the ACA's report to the ACA board?

13        A.   I don't have any knowledge of that, sir.

14        Q.   Do you know whether GEO appealed any of the

15     ACA's findings?

16        A.   I do not know.

17        Q.   How, if at all, does GEO incorporate this ACA

18     report that's Exhibit-347 into its work in operating the

19     facility?

20        A.   I don't understand the question, sir.

21        Q.   Well, I guess what I'm trying to figure out is

22     you said this Exhibit-347 is a report from the people

23     that -- the ACA people that visited the facility to the ACA

24     board; did I get that right?

25        A.   Yes.

Bruce Scott, Jr.                                    December 9, 2019

Page 48

 1          Q.   So this report that's Exhibit-347, does GEO do
 2     anything at all with it?
 3          A.    In my time as a compliance administrator, I only
 4     know what I did with this form.   I -- I don't know what GEO
 5     did with the form.
 6          Q.   Fair enough.
 7               Tell me, what did you do, if anything, with this
 8     ACA report?
 9          A.   I would review the ACA report for any anomalies
10     that I remember from the auditing process, and would inform
11     the regional compliance director or the facility
12     administrator of any concerns.   I don't recall
13     specifically, with the 2014 audit, any concerns.
14          Q.   So you would use the report to spot any issues,
15     if there were any, and to fix them; is that a fair
16     summarization of what you would do with this ACA report?
17          A.    Should ACA give any concerns or if any concerns
18     were identified, I would report those findings to the
19     facility administrator and the regional director of
20     contract compliance.
21          Q.   So you'd rely on the report to ensure that GEO
22     is meeting the accreditation standards; is that a fair
23     characterization?
24               MS. MELL:   Object to the form of the question.
25          A.    As the compliance administrator, in auditing, we

Bruce Scott, Jr.                                    December 9, 2019

Page 49

1    just do fact-based auditing.  Whether or not we meet the

2    standards, again, with this, the visiting committee members

3    and the ACA board are making that determination.

4         Q.   Let's go to page 20 of Exhibit-347.

5              If you look towards the top there, it says

6    "Visiting Committee Findings."

7              Do you see that?

8         A.   Yes.

9         Q.   What is your understanding of what is meant when

10   they write "Visiting Committee Findings"?

11        A.   These were the findings of the nonmandatory

12   standards that were marked not applicable for the facility.

13        Q.   And these bold headings, let's take the first

14   one for example, it says "Standard #4-ALDF-1A-09, what is

15   that?

16             Not so much that particular standard, but just

17   are these ACA standards that those bolded numbers refer to?

18        A.   Yes, those are standards in the adult local

19   detention facility, Standard -- or Standard IE -- 1A-09.

20        Q.   And I'm sorry, the ALDF stands for again?

21        A.   Adult local detention facility.

22        Q.   And is there a book or a manual that contains

23   all of the adult local detention facility standards?

24        A.   There is a ACA manual that you can purchase

25   through ACA, and then an annual update book that updates

Bruce Scott, Jr.                                    December 9, 2019

                                                        Page 50

 1    any of the standards year to year.

 2          Q.    Let's take a look at page 31 of Exhibit-347.

 3    There's a table here that continues on for several pages.

 4                What does that table represent?

 5          A.    This table is typically what's called the

 6    outcome measures.  It's just a series of data points that

 7    ACA requests to be collected during the year prior to a

 8    reaccreditation audit.

 9          Q.    This is a table then depicting what?

10          A.    In the ACA manual, there is a table that is

11    exactly like this which just asks for a number of data

12    points to be input for and prior to an ACA audit.

13                      (Exhibit-348 marked.)

14                THE COURT REPORTER:  This is Exhibit-348.

15          Q.    You've just been handed Exhibit-348.

16                What are we looking at here?

17          A.    348 -- Exhibit-348 identifies -- it's a Welcome

18    Book for the ACA audit dated September 25 through 27 of

19    2017.

20          Q.    Have you seen this document before?

21          A.    Let me review.

22                I believe I remember looking at this one for

23    this audit, yes.

24          Q.    Is this another Welcome Book that GEO put

25    together for the ACA auditors?

Bruce Scott, Jr.                                    December 9, 2019

Page 51

1        A.    Yes.

2        Q.    In terms of how this document was created, is

3   there anything different that you're aware of as -- as it

4   relates to this document versus the earlier document that

5   we saw, the 2014 ACA Welcome Book at Exhibit-346?

6        A.    Different how, sir?

7        Q.    In terms of how the document came to be, and the

8   purpose for creating it, is there anything different that

9   you -- you would like to tell me about?

10   `       A.    I can't think of any differences.  It would be

11   a standard Welcome Book created prior to an audit.

12                    (Exhibit-349 marked.)

13              THE COURT REPORTER:  This is Exhibit-349.

14              THE WITNESS:  Thank you.

15        Q.    You've just been handed Exhibit-349.  You're

16   welcome to take a look at the document.

17              My question to you will be, what is it that we

18   are looking at?

19        A.    This is the Commission on Accreditation for

20   Corrections Standards Compliance Reaccreditation Audit,

21   September 25 through 27, 2017, the Visiting Committee

22   report to the ACA board for that particular ACA

23   reaccreditation audit.

24        Q.    So, similar to Exhibit-347, this is simply the

25   updated report for the updated audit?

Bruce Scott, Jr.                                    December 9, 2019

                                                         Page 52

1          A.    For the audit dated 25 through 27, 2017, yes.

2          Q.    Now, with this particular audit, did GEO object

3     to any of the ACA's findings?

4          A.    I don't know if GEO objected to any -- I -- any

5     findings on these reports.  It says our -- our tally that

6     they submitted to the -- to the ACA board is 100 percent

7     compliance in both mandatory and nonmandatory standards.

8          Q.    Do you know whether GEO appealed any of the

9     ACA's findings related to its September 2017 audit?

10         A.    I don't know if GEO did.

11         Q.    Take a look at page 9 of the report.  In the

12    middle of the page there you'll see a heading Offender Work

13    Programs.

14               Are you with me?

15         A.    I found it.

16         Q.    If you look to the second to the last sentence

17    of that paragraph, it reads, "Detainees work very hard to

18    ensure a clean and sanitary facility, as noted by the audit

19    team."

20               Did I read that correctly?

21         A.    Those are the words on the page, sir, yes.

22         Q.    Do you agree that detainees work very hard to

23    ensure a clean and sanitary facility?

24               MS. MELL:   Object to the form of the question.

25         A.    I think in the context of the audit, what

Bruce Scott, Jr.                                  December 9, 2019

Page 53

1   they're saying is detainees take very much pride in --

2   in -- in working hard to ensure a clean and sanitary

3   facility.

4            These are comments made by the visiting

5   committee members of what they saw detainees doing and the

6   condition of the facility when they arrived and during

7   their audit.

8        Q.   Well, do you agree that detainees work hard in

9   the worker program?

10            MS. MELL:  Object to the form of the question.

11       A.   I know a lot of detainees take pride in their

12   work.  I would have to define what the definition of hard

13   is there.  I -- I know they -- detainees that I've talked

14   to like to work and they take pride in what they do.

15       Q.   Could you go back to Exhibit-347, it's the 2014

16   ACA report, and if you could look at page 11 for me,

17   please.

18            At the bottom of the page, there's a heading

19   that says Offender Work Programs.

20            Do you see that?

21       A.   I see that area, yes.

22       Q.   Feel free to read the whole paragraph, but my

23   question is about the last sentence.  It reads, "With such

24   an extensive jobs program it helps to explain the high

25   level of sanitation throughout the facility."

Bruce Scott, Jr.                                December 9, 2019

Page 54

1              Do you see that?

2        A.   I see that.

3        Q.   Do you agree that the offender work program

4   helps maintain a high level of sanitation throughout the

5   Northwest Detention Center?

6              MS. MELL:  Object to the form of the question.

7        A.   I think there again, it just showcases the

8   detainees' pride in what they do in the facility, and we do

9   offer a lot of Voluntary Work Programs that allow detainees

10  to participate in that Voluntary Work Program in accordance

11  with the ACA standards.

12              (Exhibit-350 marked.)

13              THE COURT REPORTER:  This is Exhibit-350.

14              THE WITNESS:  Thank you.

15       Q.   You've just been handed Exhibit-350.

16             What are we looking at here?

17       A.   May I review the document for a moment?

18       Q.   Of course.

19       A.   This is a letter that reference ACA

20  Accreditation Annual Report for the Northwest Detention

21  Center sent to ACA on or around January 20th, 2017.

22       Q.   Is this a letter that you drafted?

23       A.   Yes, I drafted this letter.

24       Q.   And the letter is addressed to Major Samuel

25  Meyer.

Bruce Scott, Jr.                                    December 9, 2019

                                                         Page 55

 1              Who is Major Samuel Meyer?

 2         A.   Major Samuel Meyer is, from my knowledge, an ACA

 3    member that just oversees the annual accreditation reports

 4    sent from facilities.

 5         Q.   Why did you send in this letter to Mr. Meyer --

 6    or Major Meyer, excuse me.

 7         A.   The ACA accreditation manual requires an annual

 8    report be sent to ACA documenting our status for the year,

 9    where we feel we are with our compliance in between the

10    actual reaccreditation audits.

11         Q.   So this is GEO's internal assessment then of

12    whether or not it's meeting the ACA standards?

13         A.   I want to say this is not the assessment, this

14    is the annual report that we send to ACA with the

15    information that they request and require, as in the

16    outcome measures for the year and other information

17    contained here within.

18         Q.   Who gathers the -- or who measures the outcomes?

19         A.   There's no measurement.  ACA provides the

20    formulas that they want inside the table, we just provide

21    the -- the detailed stats.  Very similar to during the

22    accreditation audit that we saw earlier, it's just a series

23    of data points that are collected.

24         Q.   In that way then GEO completes this form and

25    then sends it off to ACA in between the audit cycles?

Bruce Scott, Jr.                                    December 9, 2019

Page 56

1                     Did I get that right?

2         A.    Yes.

3                     (Exhibit-351 marked.)

4               THE COURT REPORTER:  This is Exhibit-351.

5               THE WITNESS:  Thank you.

6         Q.    You've just been handed Exhibit-351.

7                     What are we looking at here?

8         A.    Let me review.

9                     So this is an email that I sent.  The subject is

10   Policy Updates.

11        Q.    Who did you send this email to?

12                    I see many names there, but is there some

13   unifying characteristic of the people that you emailed?

14        A.    No, no characteristics.

15        Q.    Are these department heads?

16        A.    Not all department heads.

17        Q.    You write on the second sentence of your email,

18   "I need you to review the policies assigned to you and make

19   sure they updated with current practice."

20                    Did I read that correctly?

21        A.    Yes.

22        Q.    So what was the purpose of this email?

23        A.    So every year there is a policy update period

24   that goes for many different accreditations, ACA requires

25   an annual policy review, an update, as do the PBNDS

Bruce Scott, Jr.                                December 9, 2019

Page 57

1    standards.  This begins our annual policy update for the

2    year 2013, which is typically completed in the April time

3    frame of each year.

4        Q.    And you emailed these various people asking for

5    their help in updating various policies; is that correct?

6        A.    Yes, the standards and accreditations request

7    that everybody have a hand in updating policies and

8    procedures.  This begins that process.

9        Q.    And then there's a multipage table, it has three

10   columns, Chapter, Title, and Assigned.

11            Do you see that?

12       A.    Yes.

13       Q.    Did you create this table?

14       A.    I can't recall specifically if I created the

15   table.  I attached it to the email and updated any owners

16   of policies that we wanted to review particular policies

17   for that -- that year's policy review.

18       Q.    Do you have any reason to believe that someone

19   else created this table?

20       A.    I don't.  I -- but this is 2013, and I am not

21   the only compliance administrator, or it's not the only

22   time we've done annual policy reviews.  I honestly can't

23   remember if this table -- table of contents was created,

24   who created it.  I know I attached it, and I would have

25   been the one that updated the assigned to for that

Bruce Scott, Jr.                                    December 9, 2019

1    particular year.

2         Q.    And the assigned, do you know how personnel was

3    assigned with policies to update?

4         A.    Typically the department heads or the -- the

5    staff that work in those areas were listed here as being

6    the owners of that -- of that policy and just responsible

7    for collecting inputs from various staff members within

8    their departments, collecting all that information, and

9    sending it up for the annual policy review.

10              MR. WHITEHEAD:  All right, let's take a break.

11   We've been going for about an hour and a half.

12              THE VIDEOGRAPHER:  This is the end of media one.

13   The deposition will continue on media two.  The time is

14   11:09.  Going off the record.

15                    (Recess at 11:09 a.m.)

16                    (Reconvened at 11:33 a.m.)

17              THE VIDEOGRAPHER:  Back on the record.  This is

18   the beginning of media two to the deposition of Bruce

19   Scott.  The time is approximately 11:33.

20         Q.    Mr. Scott, can you give me a list of your

21   various duties, specifically as it relates to the Voluntary

22   Work Program, in your present role.

23         A.    My present role as the assistant facility

24   administrator, duties related to the Voluntary Work

25   Program, and have an oversight over the standards, the ICE

Bruce Scott, Jr.                                    December 9, 2019

Page 59

1    Performance-Based National Detention Standards, any

2    applicable GEO policies, ACA accreditations, and having

3    oversight of the staff that review and update those

4    policies, and audit the areas therein to make sure that

5    we're doing good fact-based audits on our internal audits,

6    and maintaining the standards in accordance with the ICE

7    standards and the ICE contract.

8         Q.   So is it fair to summarize then as making sure

9    that the facilities and its personnel are in compliance

10   with whatever the standard may be, whether it be the PBNDS,

11   or GEO's policy, or ACA?

12        A.   All staff -- we strive to -- to meet the

13   standards at 100 percent compliance level, yes.

14        Q.   What about more hands-on work?  I mean, do you,

15   for example, create job descriptions for the detainee

16   workers?

17             MS. MELL:   Object to the form of the question.

18        A.   I do not create job descriptions for detainee

19   workers.

20        Q.   In any of your various roles with GEO, have you

21   ever created detainee worker job descriptions?

22        A.   The only one I can recall having a hand in is

23   when ICE requested some additional cleaning in the medical

24   area, ICE wanted some more cleaning in the med iso area,

25   other than the females that already do the Voluntary Work

Bruce Scott, Jr.                                    December 9, 2019

1    Program.  We did list some -- some items out for the -- the

2    COR of what we would add that to the Voluntary Work

3    Program.

4         Q.   COR, what is that?

5         A.   That is the contracting officer's

6    representative.

7         Q.   And how is it that you came to be involved with

8    the job description and ICE's request for more cleaning in

9    the medical area of the facility?

10        A.   From my recollection, medical asked ICE for some

11   additional Voluntary Work Program assignment that then came

12   back down through -- from ICE to the facility administrator

13   down, and we put together some information for the COR to

14   approve of that position because it adds to the ICE

15   contract, and we got her permission, and we -- we had

16   another work crew volunteer in the medical isolation area.

17        Q.   And as it relates to the job description, did

18   you create a new one or modify an existing?

19        A.   Well, we just -- the job description is just a

20   list of duties that we'll have those detainees volunteer

21   for in that area.

22        Q.   Who else, if anyone, helped in the creation of

23   the job description that you're mentioning now?

24        A.   I don't know who in particular.  The GEO policy

25   and the standards helped outline some of the things that

Objection to foundation.
402, 701, 802.

Bruce Scott, Jr.                                      December 9, 2019

Page 61

 1    should be in those job descriptions, and there's --

 2         Q.   Do -- I'm sorry, I almost cut you off there.

 3         A.   -- there's a lot of it things that -- that go

 4    into that.  It's an amalgam of information that -- that we

 5    put together to meet all the standards.

 6         Q.   Do you know the name of the position created?

 7         A.   It was just a medical isolation cleaner.

 8         Q.   And when was this?

 9         A.   I can't recall.  It was last year, late last

10    year, early this year sometime.

11         Q.   Other than detainee workers, does GEO use anyone

12    else to help with the cleaning of the Northwest Detention

13    Center?

14         A.   We do have three staff janitors positions and

15    one contract janitor position that also help clean

16    administrative areas where detainees are not authorized to

17    go.

18         Q.   So is that the division of labor then, the

19    janitors clean the areas that the detainee workers are not

20    permitted to go?

21         A.   Typically janitors are cleaning in those areas

22    where detainees are not authorized to go.  There is some

23    shared cleaning in the medical area where the janitors will

24    also touch on some floors that detainees may -- may work on

25    during the day, and janitors may touch up on some floor

Bruce Scott, Jr.                                                    December 9, 2019

Calls for speculation, Foundation, FRE
402, 701, 802.

Page 62

```
 1    areas in the afternoon.
 2          Q.    Let's take the pods for example; do the janitors
 3    play any role in cleaning the pods?
 4          A.    No.
 5          Q.    Do the janitors play any role in cleaning the
 6    barbershop?
 7          A.    No.
 8          Q.    Do the janitors play any role in cleaning the
 9    laundry area?
10          A.    No.
11          Q.    Do the janitors play any role in cleaning the
12    kitchen?
13          A.    No.
14          Q.    Do the janitors play any role in cleaning
15    recreation areas?
16          A.    No.
17          Q.    What about the gray mile?
18          A.    Typically not, but I can't say we've never had a
19    janitor touch up floor areas before, but typically what you
20    refer to as the gray mile, the main hallway in the
21    facility, janitors do not typically clean that area.
22          Q.    So I want to orient us again.  We're talking
23    about any direct responsibilities you may have had outside
24    of your compliance work when it comes to the Voluntary Work
25    Program.
```

Bruce Scott, Jr.                                    December 9, 2019

                                                        Page 63

     1              Are you with me?

     2              MS. MELL:  Object to the form.  I don't even

     3      know what you're saying.

     4              MR. WHITEHEAD:  Well, I'm trying to go back up

     5      my outline.

     6         Q.   But Mr. Scott, right now I'd like to continue

     7      talking about your direct work, if any, when it comes to

     8      the Voluntary Work Program.

     9              Did you have any role in assigning detainee

    10      workers to various job details?

    11         A.   No.

    12         Q.   And I'm talking about at any point in your

    13      career with GEO at the Northwest Detention Center?

    14         A.   No.

    15         Q.   What about detainee worker schedules?

    16         A.   As far as setting detainee work schedules?

    17         Q.   Yes.

    18         A.   Typically like in the -- an aspect of the

    19      medical, medical dedicated the hours that they would like

    20      to see people work based on their needs.  Those are really

    21      set by either needs of the facility or working around the

    22      facility schedule, when is the best time to have those

    23      voluntary activities completed.

    24         Q.   Outside of the medical unit, have you played any

    25      direct role in scheduling detainee workers?

Bruce Scott, Jr.                              December 9, 2019

Page 64

1          A.   No.

2          Q.   What about as it relates to detainee worker pay,

3    have you had any direct involvement in paying detainee

4    workers or setting pay levels?

5          A.   No.

6          Q.   What about staffing levels, have you played any

7    direct role in creating detainee worker staffing levels?

8          A.   No.

9          Q.   If we were to take detainee workers out of the

10   equation for cleaning at the Northwest Detention Center,

11   who would clean the pods, for example?

12         A.   We have policy/procedures in place should there

13   be a -- a work stoppage, detainees cease to volunteer to

14   clean stuff, we would -- we would go through an emergency

15   plan and determine the best method to accomplish the

16   requirements.

17         Q.   What if it -- well, let's back up.

18              That emergency plan, in the scenario of a work

19   stoppage in cleaning the pods, what is the plan?

20              MS. MELL:   Object to the form of the question.

21         A.   The plan is a confidential plan and depending on

22   many different facets.  I mean, it's a plan.  How it's

23   actually going to be enacted depends on the situation, how

24   many workers there are that are not volunteering, what --

25   what requires to be cleaned.  Obviously some have higher

GEO Objections Foundation, FRE 402, 701, 802

Bruce Scott, Jr.                                    December 9, 2019

Page 65

1    priority than others.  If it's just going to be three days,

2    maybe nobody does it for three days.  It's hard to

3    speculate on exactly how you're going to impact an

4    emergency plan based on the emergency scenario that

5    unfolds.

6         Q.   Well, assume for me a month-long work stoppage

7    in the pods; how would you cope with that scenario?

8              MS. MELL:  Object to the form of the question.

9         A.   I -- I -- I don't know how we would do that.  We

10   would open the plan, follow the plan.  I don't want to

11   suspect or formulate something when we don't have all the

12   ins and outs of the details.

13        Q.   Would you agree with me that detainee workers

14   are an important part of cleaning the Northwest Detention

15   Center?

16             MS. MELL:  Object to the form of the question.

17        A.   The -- the ICE contract requires a Voluntary

18   Work Program, ACA has standards that require a Voluntary

19   Work Program, they're nonmandatory standards, and the ICE

20   PBNDS standards have -- have standards, so we just operate

21   the best we can to meet the standards that are required of

22   us to meet.

23        Q.   I understand that, but my question's a little

24   bit different.

25             And my question is simply, do the detainee

Bruce Scott, Jr.                                    December 9, 2019

Page 66

1    workers play an important role in keeping the facility

2    clean?

3              MS. MELL:   Object to the form of the question,

4    asked and answered, improper opinion.

5         A.   We operate a Voluntary Work Program.   Whether

6    detainees choose to participate or not, that's up to them.

7         Q.   Do the detainee workers have the ability to

8    deviate from their job duties listed on their job

9    description?

10        A.   Again, as a Voluntary Work Program assignment,

11   we list out what we would like detainees to do, what they

12   volunteer for.   It's their choice whether they want to

13   deviate or not.

14        Q.   And if a detainee worker deviates from their job

15   duties, is that cause potentially for termination from

16   their job assignment?

17        A.   Well, the -- the standard doesn't, to my

18   recollection, anything about terminating a job assignment,

19   but if a -- if a detainee does not meet the expectation of

20   the cleanliness, and there's another person in the

21   Voluntary Work Program that wants to, that detainee may opt

22   out of the Voluntary Work Program, and then based on the

23   standards, another person would step into that voluntary

24   work activity.

25        Q.   Does GEO provide the detainee workers with the

Bruce Scott, Jr.                                    December 9, 2019

Page 67

1    training they need to do their jobs?

2         A.    There is a training sheet that each detainee

3    reads and signs that goes part of their -- their file.

4         Q.    And this is provided by GEO; correct?

5         A.    The training form is -- is provided by GEO in

6    accordance with the ICE standards and any applicable ACA

7    standards.

8         Q.    And it's the GEO officers that discuss the form

9    and any relevant training with the detainee workers;

10   correct?

11        A.    Yes.

12        Q.    GEO provides the detainee workers with the

13   equipment they need to do their jobs; is that correct?

14        A.    Any equipment or protective -- personal

15   protective equipment that is needed, GEO would provide that

16   for the detainee.

17        Q.    And detainees must work in the areas designated

18   by GEO; correct?

19        A.    Well, the -- the areas are listed out in

20   accordance with the Voluntary Work Program, and standards

21   like the PBNDS require certain, as we mentioned before,

22   hygiene and sanitation, you know, whatever the standard

23   says, the areas would be kind of laid out in accordance

24   with meeting the -- the expected outcomes of the standard.

25        Q.    Well, for example, the laundry workers don't

Bruce Scott, Jr.                                    December 9, 2019

Page 68

1    have discretion to fold clothes in the rec yard; is that

2    right?

3              MS. MELL:   Object to the form.

4        A.    It would not make sense to fold clothes in the

5    rec yard, but as part of -- part of the laundry duties and

6    other various -- and outside laundry, but there's other

7    workers that fold clothes in the Voluntary Work Program.

8    Those that volunteer for those activities would do them

9    either in laundry or potentially the housing unit.

10       Q.    Do you know whether detained persons at the

11   Northwest Detention Center may seek employment outside the

12   Northwest Detention Center?

13       A.    That would be something you'd have to ask ICE.

14   I -- we don't have any policies, or procedures, or

15   standards that I know about that.

16       Q.    In your time with GEO, are you aware of any

17   detained person working outside the Northwest Detention

18   Center?

19       A.    I don't have any knowledge of that.

20       Q.    Do you play any role in discipline of detained

21   persons at the Northwest Detention Center?

22       A.    The only role that I -- I play is reviewing

23   documentation after the Institutional Disciplinary Panel

24   Committee before it goes to the file.

25       Q.    Have you ever worked as a corrections officer

Bruce Scott, Jr.                                    December 9, 2019

Page 69

1    within the facility?

2         A.    No.

3         Q.    All right, and you mentioned a panel as it

4    relates to discipline; what panel are you referring to?

5         A.    The ICE standard requires, the PBNDS standard

6    requires one of two panels, a Unit Disciplinary Panel or an

7    IDP, which is Institutional Disciplinary Panel, to be held,

8    if there is a rule infraction, in accordance with the

9    standards.

10        Q.    And which panel proceedings have you been a part

11   of?

12        A.    I've not been a part of any of the panel

13   proceedings.

14        Q.    But you review them; did I get that right?

15        A.    I review the forms after the panels have -- have

16   held their hearings.

17        Q.    And the form, what form is it that you're --

18   you're referencing?

19        A.    It's the -- just we call it the -- the IDP form,

20   the Institution -- Institution Disciplinary Panel form,

21   which covers various information related to the hearing.

22        Q.    Is part of the information covered a

23   recommendation or finding about discipline to be meted out?

24        A.    Restate the question, please.

25        Q.    Sure.

Bruce Scott, Jr.                                    December 9, 2019

Page 70

1              On the form, does it include a recommendation or

2    a finding from the panel about the discipline to be issued,

3    if at all?

4         A.    Yes.

5         Q.    And then your review of the form, what is the

6    purpose of that?

7         A.    The form requires a facility administrator

8    signature in accordance with the standards, the ICE

9    standards.  If the facility administrator is not available

10   or off, I, as the assistant facility administrator, would

11   review the form and -- and sign that the disciplinary, and

12   the hearing, and all that information looks like it has

13   been followed correctly.

14        Q.    Has there ever been a time where you've withheld

15   your signature?

16        A.    No, but you -- the facility -- on the form, in

17   accordance with the standards, the facility administrator

18   could concur or not concur with the panel finding based on

19   the information.

20        Q.    Can you tell me about a time, if any, where you

21   did not concur with the panel finding?

22        A.    I can't recall any off the top of my head.

23   There's -- may be some where we did not concur with the --

24   the panel finding, but I -- I can't recall specifically.

25   Over the years, there's -- those forms come across the

Bruce Scott, Jr.                                    December 9, 2019

Page 71

 1    desk.  I can't pull out one specifically.

 2                   (Exhibit-352 marked.)

 3              THE COURT REPORTER:  This is Exhibit-352.

 4              THE WITNESS:  Thank you.

 5         Q.   Just been handed Exhibit-352.  Please take a

 6    moment to review the document.

 7              My question to you will be, what are we looking

 8    at?

 9              MS. MELL:  Counsel, did you -- when you pulled

10    these, did you look for the ones that were actually signed?

11              MR. WHITEHEAD:  I think we've got 200,000 pages.

12              MS. MELL:  Because I know that -- I know that

13    they were in there to be produced.  It would be better to

14    be using the actual executed copy.

15              MR. WHITEHEAD:  Yeah, I would prefer that.  So

16    if you can direct me to the signed copy, I would -- I would

17    love to see it --

18              MS. MELL:  Okay.

19              MR. WHITEHEAD:  -- but if -- in the 200,000 or

20    so pages that I've reviewed, I may have missed the executed

21    copy.

22              MS. MELL:  Okay.  Yeah, some of these have

23    highlights.  Okay.

24              MR. WHITEHEAD:  Yeah, and those -- for the

25    record, those are not my highlights.  I don't know where

Bruce Scott, Jr.                                December 9, 2019

Page 72

1    they came from.

2           MS. MELL:  No, I'm assuming they're -- this

3    looks like a draft copy of some sort.

4           A.   Okay, what we're looking at, the title of the

5    form says it's a GEO Northwest, at the time, Detention

6    Center policy for Infractions and Disciplinary Sanctions,

7    policy number 3.3.1, shows an effective date 11-7-2017.

8    And it is not a -- there's typically signatures on the last

9    page showing when the annual review was -- was completed

10   for -- for this document.

11          Q.   Have you seen policy 3.3.1 before, titled

12   Infractions and Disciplinary Sanctions?

13          A.   Yes.

14          Q.   I want to take a look at page 5 of Exhibit-352.

15   It says "Sanctions Options for Category II Offenses."

16          Do you see that?

17          A.   Yes.

18          Q.   Now, I understand there are questions about

19   whether or not Exhibit-352 is in fact the final enacted

20   policy dealing with infractions and disciplinary sanctions,

21   but my question to you, as it relates to page 5, is loss of

22   job, is that a sanction, to your knowledge, for committing

23   a Category II offense by a detainee worker?

24          A.   Loss of job is one of the possible sanctions

25   listed by the ICE Performance-Based National Detention

Video Deposition of Charles Kostelnik 402, 701, 802.

Bruce Scott, Jr.                                    December 9, 2019

Page 73

1    Standard, which is where this list comes from, yes.

2            Q.   And looking at page 7, again with the same

3    caveat about whether this is in fact the final policy, I'm

4    just asking for your understanding, is it your

5    understanding that loss of job can result if a detainee

6    worker commits a Category III offense?

7            A.   It is one of the potential sanctions on this

8    list, which, again, comes from the Performance-Based

9    National Detention Standards just iterated in this policy.

10           Q.   And looking at page 9, would you agree that loss

11   of job is a possible sanction for a Category IV offense?

12           A.   Yes, it's listed here as a potential sanction

13   for a Category IV.  And again, this list, though iterated

14   in 3.3.1, is a requirement of the Performance-Based

15   National Detention Standards.

16           Q.   Has a detainee worker ever asked you for a

17   raise?

18           A.   Detainees from time to time during rounds have

19   always said we'd like more money in the Voluntary Work

20   Program.

21           Q.   Do you have any understanding of why?

22                MS. MELL:   Object to the form of the question.

23           A.   I have no idea what detainees think.

24           Q.   Well, tell me as best you can remember a

25   conversation in which a detainee expressed some

Bruce Scott, Jr.                                    December 9, 2019

Page 74

1    dissatisfaction with the dollar a day rate.

2              MS. MELL:  Object to the form of the question.

3         A.    I've heard detainees ask for a minimum wage,

4    I've heard detainees ask for just more money.

5         Q.    Are you aware of any detainee workers receiving

6    more than a dollar a day?

7         A.    The barbershop detainees, because their manner

8    of work is -- is infrequent, to my recollection, were

9    enabled to have more than one voluntary assignment.

10   Whether that or not gave them more than a dollar a day here

11   or there, I mean, that could be a possibility, but

12   typically the standard requires compensation at a dollar a

13   day with not more than one detail in a day.

14        Q.    And the compensation standard refers to at least

15   a dollar a day; isn't that right?

16             MS. MELL:  Object to the form of the question.

17        A.    The current standard says at least one dollar a

18   day.

19        Q.    And that phrase "at least," what does that mean

20   to you?

21             MS. MELL:  Object to the form of the question.

22        A.    That's what the standard says.

23             There's also language in the contract about

24   compensation for the Voluntary Work Program that the -- the

25   government authorizes.  I don't want to speculate on the

Bruce Scott, Jr.                                December 9, 2019

Page 75

1    writer's intent of the standard.  I did not write the

2    standard.

3         Q.   I'm asking for your understanding of what the

4    importance of that phrase "at least" means.

5              MS. MELL:  Object to the form of the question.

6         A.   The standard says at least a dollar a day

7    compensation, so the bare minimum to meet the requirement

8    of the standard, one dollar a day can be the compensation

9    for the Voluntary Work Program.

10        Q.   Now, as you read that phrase, "at least one

11   dollar a day," do you read that as prohibiting GEO from

12   paying more than a dollar a day?

13             MS. MELL:  Object to the form of the question.

14        A.   Again, the -- the framers of that contract, I

15   don't want to speculate on their thoughts or

16   interpretations.  That's why we have a contracting officer

17   that looks at those kind of things and makes those kind of

18   determinations.

19        Q.   Again, though, I'm asking for your

20   interpretation.  That phrase "at least a dollar a day," do

21   you read that as prohibiting GEO from paying detainee

22   workers more than a dollar a day?

23             MS. MELL:  Object to the form of the question.

24        A.   There's other areas of the standard that -- that

25   relate to your question.  The at least a dollar a day, my

Bruce Scott, Jr.                                      December 9, 2019

Page 76

1    understanding is the bare minimum, we have to provide at

2    least one dollar a day for compensation in the Voluntary

3    Work Program.

4          Q.   Are there other areas of the PBNDS that you're

5    thinking of that mandate only a dollar day?

6          A.   The only other area that I'm recalling off the

7    top of my head, there's an area that says a detainee -- a

8    detainee in the Voluntary Work Program can only do one

9    assignment a day.

10         Q.   And you said that it's the contracting officer

11   that has better insight into the meaning of the contract;

12   did I get that right?

13         A.   Well, I don't know if I said those words.  I

14   don't think I did.

15         Q.   How would you phrase it?

16              I certainly don't want to put words in your

17   mouth; that's not my intention.

18              MS. MELL:  Object to the form of the question.

19         A.   What is the question?

20         Q.   You said something about the contracting officer

21   playing some role in understanding the meaning of the

22   contract, and my question was, did I get that right?

23              Sounds like from Counsel's objection, no, so I'm

24   asking you to help me explain.

25         A.   Okay, I'm still not hearing a question, sir;

Bruce Scott, Jr.                                December 9, 2019

Page 77

1    what is the question?

2         Q.    Who is the contracting officer?

3         A.    The contracting officer is Jack and -- Jackie

4    Duncan-Murray.

5         Q.    What does Jackie Duncan-Murray do as the

6    contracting officer?

7         A.    I know she's an ICE employee.  I don't know her

8    job description or what she does.

9         Q.    And from the GEO side of things, who interfaces

10   with Jackie Marie -- or Jackie Duncan about the meaning of

11   the ICE contract?

12        A.    Jackie Duncan-Murray typically associates and

13   refers to the facility administrator on contracting issues.

14        Q.    Is there anyone else that works directly with

15   Jackie Duncan-Murray -- Murray?

16        A.    I've talked with her from time to time, but

17   typically her communications go directly to the facility

18   administrator.

19        Q.    And your conversations with her, what have they

20   been about?

21        A.    Just needing -- give -- give these papers -- can

22   you walk these down to the facility administrator?  When's

23   the next audit?  When -- you know, just business stuff

24   really.  Have you seen this documentation?  You know, just

25   normal day-to-day business type stuff.

Bruce Scott, Jr.                                    December 9, 2019

Page 78

1        Q.    Have there been periods, that you're aware of,

2   where there's been a facilitywide strike by detainee

3   workers?

4        A.    Not a facilitywide one, no.

5        Q.    Are there specific units or jobs that -- that

6   you're thinking of where a strike may have occurred?

7        A.    We have had at times where detainees have chosen

8   not to participate in the Voluntary Work Program over a

9   weekend, maybe two or three days sometimes, maybe four

10  days.

11       Q.    Are you aware of any period where there's been a

12  month long strike facilitywide?

13       A.    No.

14       Q.    And as best you can remember, there have been

15  strikes here or there maybe lasting two or three days, but

16  none that you remember lasting longer than that?

17       A.    Yeah, none lasting or -- or not facilitywide.

18  It's intermittent detainees that choose not to participate

19  in the Voluntary Work Program.

20       Q.    Can you tell me the last time that you're aware

21  of a strike occurring?

22       A.    I can't recall any specific dates.  The last one

23  I remember, in food service we didn't have all -- all of

24  the workers come down, we had some workers come down, but

25  not -- not the normal group of workers that come down for

Bruce Scott, Jr.                                    December 9, 2019

Page 79

1    the -- the voluntary work in the kitchen.

2              MR. WHITEHEAD:  All right, let's take a quick

3    break.

4              THE VIDEOGRAPHER:  Going off the record.  The

5    time is 12:08.

6                   (Recess at 12:08 p.m.)

7                   (Reconvened at 12:11 p.m.)

8              THE VIDEOGRAPHER:  Back on the record.  The time

9    is 12:11.

10        Q.   Mr. Scott, I know some of my questions may have

11   been pointed today, but have I been fair with you?

12             MS. MELL:  Object to the form.

13             And you don't need to answer that.

14             We're done.  Let's go.

15             MR. WHITEHEAD:  I'm done.

16             THE VIDEOGRAPHER:  This is the end of media two

17   and adjourns this deposition.  The time is 12:11.

18             MR. WHITEHEAD:  We'll order.  I'm sure they'll

19   reserve.

20             THE COURT REPORTER:  Copy for you?

21             MS. MELL:  Yes.

22                  (Deposition adjourned at 12:11 p.m.)

23                  (Signature reserved.)

24

25

Bruce Scott, Jr.                                    December 9, 2019

Page 80

```
 1                    S-I-G-N-A-T-U-R-E

 2

 3

 4            I declare under penalty of perjury under

 5      the laws of the State of Washington that I have read

 6      my within deposition, and the same is true and

 7      accurate, same and except for changes and/or

 8      corrections, if any, as indicated by me on the CHANGE

 9      SHEET flyleaf page hereof.  Signed in...............,

10      WA, on the........day of................, 2019.

11

12

13

14                      ........................

15                      BRUCE A. SCOTT JR.

16                      Taken: Monday, December 9, 2019

17

18

19

20

21

22

23

24

25      Keri A. Aspelund
```

Bruce Scott, Jr.                                    December 9, 2019

Page 81

1                       C-E-R-T-I-F-I-C-A-T-E

2

3       STATE OF WASHINGTON )

4                          )  ss.

5       COUNTY OF THURSTON  )

6

7                   I, the undersigned Registered Professional
        Reporter and Certified Court Reporter, hereby
        certify that the foregoing deposition upon oral
8       examination was taken stenographically before me and
        transcribed under my direction;

9

10                  That the witness was duly sworn by me,
        pursuant to RCW 5.28.010, to testify truthfully; that the
11      transcript of the deposition is a full, true, and correct
        transcript to the best of my ability; that I am neither
12      attorney for, nor a relative or employee of, any of the
        parties to the action or any attorney or counsel employed
13      by the parties hereto, nor financially interested in its
        outcome.

14

15                  I further certify that in accordance with CR
        30(e), the witness was given the opportunity to examine,
16      read, and sign the deposition, within 30 days, upon its
        completion and submission, unless waiver of signature was
17      indicated in the record.

18

19                  IN WITNESS WHEREOF, I have hereunto set
        my hand this 19th day of December, 2019.

20

21

22

23      _____

24      NCRA Registered Professional Reporter
        Washington Certified Court Reporter No. 2661

25

Bruce Scott, Jr.                                    December 9, 2019

Page 82

1

2                SEATTLE DEPOSITION REPORTERS, LLC

3                 600 UNIVERSITY STREET, SUITE 320

4                      SEATTLE, WA  98101
                        (206) 622-6661
5
                     C-H-A-N-G-E   S-H-E-E-T
6
      PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
7     SHOWING PAGE, LINE AND REASON.

8     ---------------------------------------------------
      PAGE   LINE    CORRECTION AND REASON
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                    _____
                      BRUCE A. SCOTT JR.
25                    TAKEN: Monday, December 9, 2019