The Honorable Robert J. Bryan

1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9  UGOCHUKWU GOODLUCK
NWAUZOR, FERNANDO AGUIRRE-
URBINA, individually and on behalf of all
10  those similarly situated,

11                              Plaintiffs,

12          v.

13  THE GEO GROUP, INC., a Florida
corporation,

14                              Defendant.

No. 17-cv-05769-RJB

DEPOSITION DESIGNATIONS
OF DAVID M. TRACY

15

16          Plaintiffs present (1) Plaintiffs' designations of the Deposition of David M. Tracy,

17  and (2) Defendant's counter-designations and objections. The designated pages are attached,

18  with Plaintiffs' designations highlighted in yellow and Defendant's counter-designations

19  highlighted in green.

20          DATED this 24th day of April, 2020.

21                              SCHROETER GOLDMARK & BENDER

22                              *s/ Jamal N. Whitehead*
                              Adam J. Berger, WSBA #20714
23                              Lindsay L. Halm, WSBA #37141
                              Jamal N. Whitehead, WSBA #39818

24

DEPOSITION DESIGNATIONS OF
DAVID M. TRACY  (17-cv-05769-RJB) - 1

810 Third Avenue, Suite 500
Seattle, WA 98104
Tel: (206) 622-8000 ~ Fax: (206) 682-2305
berger@sgb-law.com
halm@sgb-law.com
whitehead@sgb-law.com

THE LAW OFFICE OF R. ANDREW FREE
Andrew Free (*Pro Hac Vice*)
P.O. Box 90568
Nashville, TN 37209
Tel: (844) 321-3221 ~ Fax: (615) 829-8959
andrew@immigrantcivilrights.com

OPEN SKY LAW, PLLC
Devin T. Theriot-Orr, WSBA # 33995
20415 – 72nd Avenue S, Suite 110
Kent, WA 98032
Tel: (206) 962-5052
devin@opensky.law

MENTER IMMIGRATION LAW, PLLC
Meena Menter, WSBA #31870
8201 164th Ave NE, Suite 200
Redmond, WA 98052
Tel: (206) 419-7332
meena@meenamenter.com

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Devin T. Theriot-Orr
OPEN SKY LAW, PLLC
20415 – 72nd Avenue South, Suite 110
Kent, WA 98032
devin@opensky.law
*Attorney for Plaintiff*

R. Andrew Free
THE LAW OFFICE OF R. ANDREW FREE
PO Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com
*Attorney for Plaintiff*

Meena Menter
MENTER IMMIGRATION LAW PLLC
8201 – 164th Avenue NE, Suite 200
Redmond, WA 98052
meena@meenamenter.com
*Attorney for Plaintiff*

Joan K. Mell
III BRANCHES LAW, PLLC
1019 Regents Boulevard, Suite 204
Fircrest, WA 98466
joan@3ebrancheslaw.com
*Attorney for Defendant*

Colin L. Barnacle
Ashley E. Calhoun
Christopher J. Eby
Adrienne Scheffey
AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
colin.barnacle@akerman.com
ashley.calhoun@akerman.com
christopher.eby@akerman.com
adrienne.scheffey@akerman.com
*Attorneys for Defendant*

DATED at Seattle, Washington this 24th day of April, 2020.

*s/ Virginia Mendoza*
VIRGINIA MENDOZA, Legal Assistant
Schroeter Goldmark & Bender
810 Third Avenue, Suite 500
Seattle, WA  98104
Tel: (206) 622-8000
mendoza@sgb-law.com

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

David Tracy                                December 3, 2019

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

---------------------------------------------------------

UGOCHUKWU GOODLUCK NWAUZOR,            )

FERNANDO AGUIRRE-URBINA,               )

individually and on behalf of all     )

those similarly situated,             )

           Plaintiffs,              )

      vs.                              ) No. 17-cv-05769-RJB

THE GEO GROUP, INC., a Florida        )

corporation,                          )

           Defendant.               )

---------------------------------------------------------

Videotaped

Deposition Upon Oral Examination of

DAVID M. TRACY

---------------------------------------------------------

10:13 a.m.

Tuesday, December 3, 2019

1019 Regents Blvd., Suite 204

Fircrest, Washington

REPORTED BY:  Keri A. Aspelund, RPR, CCR No. 2661

David Tracy                                    December 3, 2019

```
                                                    Page 2
    1     APPEARANCES:

    2     For the Plaintiffs:   JAMAL N. WHITEHEAD, ESQ.

    3                           Schroeter Goldmark & Bender

    4                           810 Third Avenue, Suite 500

    5                           Seattle, WA  98104

    6                           206-622-8000

    7                           whitehead@sgb-law.com

    8     For the Defendant:    JOAN K. MELL, ESQ.

    9                           III Branches Law

   10                           1019 Regents Blvd., Suite 204

   11                           Fircrest, WA  98466

   12                           253-566-2510

   13                           joan@3brancheslaw.com

   14     Also Present:         LINDSAY HITCHCOCK, VIDEOGRAPHER

   15

   16                           LANE POLOZOLA, ESQ.

   17                           Assistant Attorney General

   18                           800 Fifth Avenue, Suite 2000

   19                           Seattle, WA  98104

   20                           lane.polozola@atg.wa.gov

   21                           206-287-4182

   22

   23

   24

   25
```

David Tracy                                    December 3, 2019

```
 1                  E X H I B I T S

 2   No.    Description                       Page/Line

 3   310    Plaintiffs' Second Amended Notice of    8    22

 4          Videotaped Deposition of David Tracy

 5   311    Job Description, Job Title:  Sergeant -  19   11

 6          GEO-Nwauzor 000340-000341

 7   312    Northwest Detention Center -           25    3

 8          Organizational Chart - GEO-Nwauzor

 9          044059-044067

10   313    Policy and Procedure Manual, Chapter:   29    8

11          Detainee Services and Programs, Title:

12          Voluntary Work Program - GEO-Nwauzor

13          016419-016426

14   314    Volunteer Work Program Agreement        50   25

15   315    Northwest Detention Center Detainee Job  55   3

16          Descriptions

17   316    Northwest Detention Center Pod Porter    77   4

18          Job Descriptions - GEO-Nwauzor

19          078053-078054

20   317    Email dated October 26, 2017, from Nels 100  11

21          Riach to Alisha Singleton and others -

22          GEO-Nwauzor 038934

23

24

25
```

David Tracy                                    December 3, 2019

Page 4

1                    E X A M I N A T I O N

2    BY                                      Page/Line

3    MR. WHITEHEAD                              10     4

4    MS. MELL                                   90     5

5    MR. WHITEHEAD                              93     1

6    MS. MELL                                  104     4

7

8

9

10

11

12       (Note:  * Denotes phonetic spelling.)

13

14

15

16

17

18

19

20

21

22

23

24

25

David Tracy                                    December 3, 2019

                                                        Page 5

 1          Fircrest, Washington; Tuesday, December 3, 2019

 2                        10:13 a.m.

 3               -------------------------

 4          THE VIDEOGRAPHER:  We are on the record.  The

 5    time is approximately 10:13 on this day, December 3rd,

 6    2019.  This is media unit one, volume one, of the video

 7    deposition of David Tracy taken by the plaintiff, case

 8    number 17-cv-05769-RJB, in the matter of Nwauzor, et al.,

 9    vs. GEO Group, in the U.S. District Court, Western District

10    of Washington, at Tacoma.  This deposition is taking place

11    at 1019 Regents Boulevard, Suite 204, in Tacoma,

12    Washington.

13          The videographer is Lindsay Hitchcock for

14    Seattle Deposition Reporters, 600 University Street,

15    Seattle, Washington 98101.  The court reporter is Keri

16    Aspelund for Seattle Deposition Reporters.

17          Counsel, at this time please identify yourselves

18    for the record and the witness may be sworn in.

19          MR. WHITEHEAD:  Good morning, this is Jamal

20    Whitehead, class counsel on behalf of Mr. Nwauzor and the

21    class he represents.

22          MS. MELL:  Joan Mell on behalf of The Geo Group.

23          MR. POLOZOLA:  And Lane Polozola, counsel for

24    Washington in Washington vs. The GEO Group.

25          MS. MELL:  And for the record, what's the State

David Tracy                                    December 3, 2019

                                                       Page 6

 1    doing here?

 2              MR. POLOZOLA:  I beg your pardon?

 3              MS. MELL:  What's the --

 4              MR. POLOZOLA:  What's the State doing here?

 5              MS. MELL:  Why are you in this deposition?  I'm

 6    not aware of you having a role in this action.

 7              MR. WHITEHEAD:  Wait, hold on.  The case has

 8    been consolidated, and in that way, we've been instructed

 9    to serve notice on everyone.  So Mr. -- I won't speak for

10    him, but he's here to observe.

11              And it's my deposition, and I would like to get

12    underway.  If you'd like to discuss this further during a

13    break --

14              MS. MELL:  You know, I don't want him here if --

15    if there's a reason for him to be here, but he's not a

16    party, he can't ask questions, he's not -- he's not

17    permitted to be here.

18              MR. WHITEHEAD:  It's actually a deposition, I

19    mean, frankly, anyone can attend a deposition.

20              MS. MELL:  No, they can't.

21              MR. WHITEHEAD:  Yeah, that's -- that is the

22    rule --

23              MS. MELL:  No.

24              MR. WHITEHEAD:  -- and so if you'd like to seek

25    some sort of limiting order from the judge, you know, we

David Tracy                                          December 3, 2019

Page 7

```
 1    can get him on the horn; otherwise, I'd like to get

 2    underway.

 3              And it's especially true --

 4              MS. MELL:  I don't agree that you should be

 5    here.

 6              MR. WHITEHEAD:  -- especially true given that

 7    we're starting late.  It's 10:15.  I still haven't received

 8    a satisfactory explanation for why we started late, and if

 9    this was an issue, we should have addressed it before the

10    witness arrived.

11              MS. MELL:  I would make a record that you were

12    late.  You were more than 20 minutes late to start the

13    deposition.

14              So with regard to --

15              MR. POLOZOLA:  I will --

16              MR. WHITEHEAD:  That is patently false.

17              MR. POLOZOLA:  Both --

18              MR. WHITEHEAD:  I arrived on time, and the

19    witness just arrived.

20              Anyway, let's get underway.

21              Mr. Tracy --

22              MS. MELL:  No, we're not going to just get

23    underway until I understand.

24              Why don't you tell me why you're here.

25              MR. POLOZOLA:  My reaction is the same.  As you
```

David Tracy                                    December 3, 2019

Page 8

1    will recall, GEO moved and had these cases consolidated for

2    trial, and the judge instructed both Washington and class

3    counsel to participate in each other's depositions by being

4    present.  I'm not saying I'm going to ask questions, but I

5    am here because the cases are consolidated.

6              MS. MELL:  All right.  I'm not -- I'm just --

7    for the record, I don't concede that you have a party role

8    here.

9              MR. POLOZOLA:  I'm not suggesting that I have a

10   party role in this case.  I'm here as counsel for

11   Washington in Washington vs. GEO.

12             MR. WHITEHEAD:  And I'd also --

13             MR. POLOZOLA:  The cases are consolidated.

14             MR. WHITEHEAD:  I'd like for you to retract your

15   statement that I was 20 minutes late.  That's not true.

16             MS. MELL:  I came back at 9.  I understood that

17   it was starting at 9, and you weren't here.

18             MR. WHITEHEAD:  The deposition is noted for

19   9:30, and it looks like we've got Exhibit-1 -- I'm sorry,

20   this will be 310.

21             Could you please mark that as Exhibit-310.

22                  (Exhibit-310 marked.)

23             MR. WHITEHEAD:  I'm looking at Exhibit-310.

24   This is the deposition notice that my office served upon

25   yours.  The deposition is noted for 9:30 a.m., Tuesday,

David Tracy                                    December 3, 2019

                                                        Page 9

1    December 3rd, in your office.

2              With that statement, will you retract your

3    statement that I was 20 minutes late?

4              MS. MELL:  Yes, I stand corrected if the

5    deposition notice is -- notices it for 9:30.  It's my

6    understanding that it was 9 o'clock, and that's what was on

7    my materials and my schedule.

8              MR. WHITEHEAD:  So that was a misunderstanding

9    on your part?

10             MS. MELL:  That was a misunderstanding on my

11   part.  I apologize, Counsel.

12             MR. WHITEHEAD:  All right.  And so with that

13   correction, and Mr. Tracy, I see you looking, what have I

14   gotten myself into today?  Let's get underway.

15             I introduced myself off the record, but let me

16   introduce myself again for benefit of the record.  My name

17   is Jamal Whitehead.  I'm --

18             THE COURT REPORTER:  Let me interrupt.  The

19   witness hasn't been placed under oath yet.

20             MR. WHITEHEAD:  Oh, my apologies, thank you.

21

22

23

24

25

David Tracy                                    December 3, 2019

                                                      Page 10

1              --------------------------

2    DAVID M. TRACY:        Witness herein, having been

3                           duly sworn, testified as follows:

4                    E-X-A-M-I-N-A-T-I-O-N

5    BY MR. WHITEHEAD:

6         Q.   All right, so as I was saying, I'm Jamal

7    Whitehead.  I represent the private plaintiffs here in this

8    case, Mr. Nwauzor and Mr. Aguirre-Urbina, in their lawsuit

9    against The GEO Group.

10                 Mr. Tracy, could you state and spell your full

11   name for the record.

12         A.   David Michael Tracy, D-A-V-I-D M-I-C-H-A-E-L

13   T-R-A-C-Y.

14         Q.   And your date of birth?

15         A.   ██████████████ 1986.

16         Q.   And your address?

17         A.   ████████████████████████ Spanaway,

18   Washington 98387.

19         Q.   Who's your current employer, Mr. Tracy?

20         A.   The GEO Group.

21         Q.   And your current job title?

22         A.   Officer.

23         Q.   I've read documents referring to you as

24   sergeant; is that correct?

25         A.   At one point I was sergeant.

David Tracy                                    December 3, 2019

Page 11

1          Q.    And no longer?

2          A.    No longer.

3          Q.    All right, I'll ask you questions about that

4    later.

5                Have you ever given testimony under oath?

6          A.    Yes.

7          Q.    In what context?

8          A.    A deposition.

9          Q.    What was the case?

10         A.    One prior case associated with GEO, and then two

11   in my personal life.

12         Q.    The case about GEO, what was that about?

13         A.    A detainee was injured inside the facility.

14         Q.    Can you tell me more about what the allegations

15   were in the lawsuit?

16               MS. MELL:  If you know.

17               I'd just stipulate it's the Chavez matter.

18         Q.    And can you tell me what your understanding is

19   about what that lawsuit was about?

20         A.    A former detainee was alleging he was poked in

21   the eye.

22         Q.    And did he allege that you poked him in the eye?

23         A.    No.

24         Q.    That you were a witness?

25         A.    Yes.

David Tracy

GEO Objections Foundation, FRE 402,
701, 802.

December 3, 2019

Page 12

1          Q.   And then I don't want to get too deeply into

2    your -- your personal life, but the personal matters, were

3    those criminal in nature?

4          A.   No, it was a car accident.

5          Q.   Were you the plaintiff or defendant?

6               Did you --

7          A.   Plaintiff.  I'm sorry.

8          Q.   All right.  Fair enough.

9               All right, well I know you've probably covered

10   the rules with Ms. Mell, so I'm not going to rehash them

11   here, but there are three things that I want to stress at

12   the outset.

13               First and foremost, you know, this is not a

14   practice.  What you say now is just as important as if the

15   judge and the jury were in the room here today to make a

16   determination; do you understand?

17          A.   Yes, sir.

18          Q.   And that with the benefit of the written

19   transcript and the video, that the judge and the jury will

20   use them to assess your credibility and truthfulness; do

21   you understand that?

22               MS. MELL:  Object to the form.  Object to the

23   testimony and instructing the witness how the deposition

24   will be used.

25          Q.   Do you understand?

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 13

1           A.   Yes, sir.

2           Q.   Secondly, I'm not a mind reader.  If you don't

3     understand my question, will you let me know?

4           A.   Yes, sir.

5           Q.   And that goes for if there's anything that

6     prevents you from answering my question fully, if you've

7     got some sort of medical condition or anything at all that

8     prevents you from giving your best, most accurate

9     testimony, will you let me know?

10          A.   Yes.

11          Q.   And then finally, I'm looking for your full

12    cooperation today.  I want your best, most accurate, and

13    truthful testimony; do you understand that?

14               MS. MELL:  Object to the form.  What you want is

15    not relevant to these proceedings.

16          Q.   Do you understand?

17          A.   Yes.

18          Q.   Toward that end, I'm going to try my best to

19    work efficiently.  I think that's even more important here

20    given that we're getting underway late.  I'm going to ask

21    you many yes or no questions.  If I ask you a yes or no

22    question, will you give me a yes or no answer?

23               MS. MELL:  Object to the form and instructions.

24    You can't tell him how to answer a question.  This is

25    totally improper and is a waste of time.  Ask him the

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

GEO Objections Foundation, FRE 402, 701, 802.

David Tracy                                            December 3, 2019

Page 14

1    questions.

2         Q.   If I ask you a yes or no question, will you give

3    me a yes or no answer?

4              MS. MELL:  Object to the form.

5         A.   To the best of my ability.

6         Q.   And sometimes witnesses try to avoid

7    uncomfortable truths, and I've seen this in the way of

8    evasive or incomplete answers; will you avoid giving me

9    evasive answers?

10             MS. MELL:  Don't answer that.

11             This totally and wholly improper.  This is not

12   an opportunity for you to testify, this is not an

13   opportunity for you to badger the witness and explain to

14   them what you do or don't want.  We're going to end this

15   deposition if you're not going to ask him any questions.

16        Q.   Will you avoid giving me evasive answers?

17             MS. MELL:  Same objection.

18             Counsel, this is improper.  This is a waste of

19   our time.  You know you don't have an opportunity to

20   explain your position, and your thoughts, and your

21   feelings, and your desires, and suggest that he might try

22   to avoid giving you a truthful answer.

23        Q.   Your answer, sir?

24             MS. MELL:  Object to the form, it's improper.

25        Q.   Your answer, sir?

David Tracy                                    December 3, 2019

                                                    Page 15

 1            MS. MELL:  Object to the form, it's improper.

 2       Q.   Well, you know, and I think this -- what I like

 3   to do is approach the rules situationally, and this brings

 4   up a good rule to remember.  Your counsel's going to

 5   object, frankly, at the rate we're going, quite a lot.

 6   We're going to be in for a very long day at the pace at

 7   which she's lodging her objections.  She's going to state

 8   her objection, but the expectation is that you answer the

 9   question unless she instructs you not to answer; do you

10   understand that?

11            MS. MELL:  Object, move to strike.

12       Q.   Do you understand that you're expected to answer

13   the question unless Counsel instructs you not to answer?

14       A.   Yes.

15       Q.   Okay.  All right, what did you do to prepare for

16   your deposition today?

17       A.   Nothing.

18       Q.   Did you speak with anyone?

19       A.   I spoke with my attorney for one to two minutes

20   before walking in.

21       Q.   Did you speak with Lieutenant Marc Johnson?

22       A.   We rode together, but we didn't speak about

23   this.

24       Q.   You didn't talk about the case at all?

25       A.   No.

David Tracy                                    December 3, 2019

Page 16

1        Q.   What did you talk about?

2             MS. MELL:  Object to the form.

3        A.   We talked about missing our flight.

4        Q.   Tell me, what -- what happened this morning?

5             MS. MELL:  Object to the form.

6        A.   We were on our way to the airport, and we got

7   called back to come to the deposition.

8        Q.   Why were you going to the airport?

9        A.   For work.

10            MS. MELL:  Object to the form.

11            THE WITNESS:  Sorry.

12       Q.   Go ahead.

13       A.   For work.

14       Q.   What at work called you to need to take a plane?

15            You work at Northwest Detention Center; is that

16   correct?

17       A.   Correct.

18       Q.   So why would you have to fly somewhere?

19       A.   To another facility.

20       Q.   Okay.  Did you review any documents to prepare

21   for today?

22       A.   No.

23       Q.   Can you give me a high level overview of your

24   educational background.

25       A.   High school diploma, some college course work.

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                           December 3, 2019

Page 17

1          Q.    Did you get an associate's degree or anything

2    like that?

3          A.    No.

4          Q.    When did you begin working at GEO?

5          A.    October 2009.

6          Q.    What did you do before beginning work at GEO?

7          A.    I worked for Emerald Downs.

8          Q.    What did you do there?

9          A.    Off track -- off track betting manager.

10         Q.    Why did you leave Emerald Downs?

11         A.    To work at GEO Group.

12         Q.    Why come to work at GEO?

13         A.    Better opportunities.

14         Q.    In what sense?

15         A.    It was better pay, better benefits.

16               I had gone to college for law enforcement type

17   course work, and this is the kind of field I wanted to get

18   into anyways.

19         Q.    What was the position that you were hired into?

20         A.    Detention officer.

21         Q.    Can you give me a list of all the positions that

22   you've held with GEO.

23         A.    Detention officer, sergeant, detention officer.

24         Q.    And so you came in as a detention officer; the

25   move to sergeant, was that a promotion?

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                                    December 3, 2019

                                                                      Page 18

1          A.    Yes.

2          Q.    When did that occur?

3          A.    February 2017.

4          Q.    And then going back to detention officer, was

5      that a demotion?

6          A.    It was a -- I stepped down myself.  It wasn't a

7      demotion, it was a personal choice to step down.

8          Q.    Why did you step down?

9          A.    Personal choices in my life.

10         Q.    Well, again, I don't -- you know, this -- your

11     personal life really isn't the subject of the deposition,

12     but can you give me a little bit more as to what led you to

13     step down from sergeant to detention officer?

14         A.    As an officer, I have more freedom and choice in

15     my schedule, which I needed for my family life at the time.

16         Q.    Was there a reduction in pay?

17         A.    At the time, no.

18         Q.    Since?

19         A.    I'm -- I'm making more money now than when I was

20     a sergeant.

21         Q.    Okay.  And how is that?  Is that a function of

22     the hours or just a cost of living adjustment?

23               I'm trying to understand.  As a sergeant, what

24     was -- I'll put it this way, as a sergeant, what was your

25     hourly rate?

GEO Objections Foundation, FRE 402, 701, 802.

David Tracy                                    December 3, 2019

Page 19

1      A.    When I was -- 27.80 -- 27.84, I believe.

2      Q.    And then when you went back to detention

3  officer, what was your hourly rate?

4      A.    27.84.

5      Q.    Okay.  And what is your current hourly rate?

6      A.    29.69.

7      Q.    I want to talk about your time as a sergeant.

8            Was that a position that you applied for on your

9  own, or were you recommended into the position?

10     A.    I applied on my own.

11           (Exhibit-311 marked.)

12           THE COURT REPORTER:  This is Exhibit-311.

13           THE WITNESS:  Thank you.

14     Q.    You've just been handed Exhibit-311.

15           What are we looking at here?

16     A.    A job description.

17     Q.    Have you seen this document before?

18     A.    I'm not sure.  Probably at some point in my life

19  I've seen this.  I don't know if it was this exact job

20  description.

21     Q.    Well, do you think this is a fair and accurate

22  representation of the job description for sergeant, the

23  position of sergeant, at the Northwest Detention Center?

24     A.    Yeah.  Yes.

25     Q.    All right.  So looked like you just read the --

David Tracy                                    December 3, 2019

Page 20

1    the document front and back there.

2             Do you see the Primary Duties and

3    Responsibilities there on the first page?

4       A.  Yes.

5       Q.  And do you agree that those were your primary

6    duties and responsibilities as sergeant?

7       A.  I would say the overall primary duty is to

8    ensure the safety and security of all individuals inside

9    the building.

10      Q.  Certainly overarching, but as to the specific

11   duties and responsibilities, would you agree there that

12   that was an accurate statement of your duties and

13   responsibilities as sergeant?

14           MS. MELL:  Object to the form of the question --

15      A.  Yes.

16           MS. MELL:  -- asked and answered.

17      Q.  I'm sorry, your answer was yes?

18      A.  Yes.

19      Q.  Is there anything that you would add to this

20   list?

21           MS. MELL:  Object to the form.

22      A.  There's other things that could be added but not

23   necessary.  These are the primary duties.

24      Q.  I'd like for you to look at the tenth bullet

25   down for me.  It's the one that reads, "Directs work,

David Tracy                                        December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 21

1    provides training, and performs inspections of work

2    performed by inmate/detainee workers."

3             Do you see that?

4    A.   Yes.

5         Q.   Can you tell me all the ways in which you

6    directed detainee work as a sergeant at the Northwest

7    Detention Center.

8         A.   We would get a list of volunteers that want to

9    do some type of outside duty, they're not required to do

10   it, but something that they want to do.  Some people may,

11   you know -- if they're a really good painter, and they want

12   to paint, or they used to buff and wax floors outside

13   before they were there, and they want to do it, it gets

14   them outside of where they, you know, have to be.  So they

15   would come to -- usually they would go to one of the pod

16   officers, Hey, I want to do this, you know, is there a way

17   I can do it?

18             And then we would talk to them, get them the

19   equipment they need, make sure they have the understanding

20   of what needs to be done and how to make sure it gets done

21   safely.  If they need to wear goggle -- you know, safety

22   equipment, make sure they have their safety equipment, make

23   sure that they have all the equipment they need to do the

24   job they're going to do or they want to do.

25        Q.   Anything else as to how you directed the work of

David Tracy                                              December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 22

1     detainee workers while you were a sergeant?

2          A.   Besides assigning an officer to oversee the --

3     the actual work that was being done, I don't think so.

4          Q.   And is it the case, did you directly oversee the

5     work that was being done by detainee workers?

6          A.   Not -- you know, not standing over them, you

7     know, a hundred percent of the time, but occasionally, you

8     know, walking down the -- the hallway, you would check out

9     what they were doing, and talk to them, make sure

10    everything's going good.  And if they needed anything, they

11    could, you know, always ask.

12         Q.   So is it the case then that you would direct

13    them in terms of the tasks to carry out, but that your

14    supervision wasn't always direct?

15              MS. MELL:  Object to the form of the question.

16         A.   There would -- you know, with something like

17    buffing and waxing, there would be an officer present, but

18    paintingwise, you know, they could go and paint a hallway

19    without having to be directly supervised by an officer.

20         Q.   Would you agree that as a detention officer,

21    which is your current role, that part of your job is to

22    direct the work, provide training, and perform inspections

23    of work performed by inmate/detainee workers?

24              MS. MELL:  Object to the form of the question.

25         A.   Can you say it one more time?

David Tracy                                          December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 23

```
 1       Q.   Sure.
 2            Your current role is that of detention officer;
 3   correct?
 4       A.   Yes.
 5       Q.   Okay.  As part of your job as a detention
 6   officer, does it involve directing the work, providing
 7   training, and performing inspections of work performed by
 8   the detainee workers?
 9            MS. MELL:  Object to the form.
10       A.   Yes.
11       Q.   And as a detention officer, is your direction
12   and supervision of the detainee workers more hands on or
13   more direct than it was when you were a sergeant?
14            MS. MELL:  Object to the form of the question.
15       A.   Yes.
16       Q.   In what way?
17       A.   As the officer, you're there the whole time.
18   You know, if you're -- for example, if you're in a unit,
19   and they're -- a detainee's mopping the floor, you're
20   physically there in the area to see what's going on, versus
21   a supervisor, you would see it when you would come and do
22   round or if you needed to go to the unit for whatever
23   reason.  You weren't physically in that -- that location or
24   that area the whole time.
25       Q.   Any other distinction?
```

David Tracy                                    December 3, 2019

                                                        Page 24

 1              MS. MELL:  Object to the form.

 2         A.   Not that I can think of.

 3         Q.   Who do you currently report to?

 4         A.   Chain of command.  So my sergeant, lieutenant,

 5    captain, major.

 6         Q.   Who is your current sergeant that you report to?

 7         A.   On shift, it would be Sergeant Steffens or

 8    Sergeant Hillin.

 9         Q.   And the lieutenant?

10         A.   Wilson -- I'm sorry, Lieutenant Wilson or

11    Lieutenant Jackson.

12              THE WITNESS:  Can I get some water, please?

13              MS. MELL:  Yeah.

14              THE WITNESS:  Thank you.

15              MS. MELL:  Actually, let's -- I just need one

16    quick break while I fill that.

17              THE WITNESS:  Thank you.

18                  (Ms. Mell left the proceedings.)

19              MR. WHITEHEAD:  Well, looks like we're off the

20    record.

21              THE VIDEOGRAPHER:  Going off the record.  The

22    time is 10:37.

23                  (Recess at 10:37 a.m.)

24                  (Reconvened at 10:38 a.m.)

25              THE VIDEOGRAPHER:  Back on the record.  The time

David Tracy                                      December 3, 2019

Page 25

1    is 10:38.

2        Q.   I'd like to show you another document.

3              (Exhibit-312 marked.)

4              THE COURT REPORTER:  This is Exhibit-312.

5              THE WITNESS:  Thank you.

6        Q.   You've just been handed Exhibit-312.  It's a

7    multipage document, but not too many.  It's titled

8    Northwest Detention Center - Organizational Chart.

9              Have you seen this document before?

10       A.   No, not this specific document.  I've seen pages

11   of it, but not this intact into one package.

12       Q.   Looking at the first page there of Exhibit-312,

13   it's the one that says "Northwest Detention Center -

14   Organizational Chart."  At the bottom there it says

15   Updated: July 18th, 2017.

16             Do you see that?

17       A.   Yeah.

18       Q.   Okay.

19       A.   Yes.

20       Q.   Now, looking at the hierarchy that's depicted

21   here, does this look to be accurate as of July 2017?

22             MS. MELL:  Object to the form.

23       A.   Are you talking about is this -- if I can

24   understand your question, are you asking if this is the

25   exact same as it is right now?

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 26

```
 1          Q.   No, I mean, was it --

 2          A.   In 2017, was this correct?

 3          Q.   2017, does this look about right?

 4               MS. MELL:  Object to the form.

 5          A.   To the best of my knowledge, yes.

 6          Q.   And let's move forward to today.  Are there

 7     aspects of this organizational chart that are different

 8     today as compared to 2017?

 9          A.   Yes.

10          Q.   What's different?

11          A.   Names of position -- or the people in the

12     positions have changed.

13          Q.   As far as the positions and the structure, line

14     of command so to speak, is there anything different about

15     today versus 2017?

16          A.   The names of the positions have changed.

17          Q.   Which ones, that you know of?

18          A.   Warden.

19          Q.   What is the warden now called?

20          A.   Facility administrator.

21          Q.   Do you know what prompted the change?

22          A.   No.

23          Q.   Do you all still refer to the warden as warden

24     though sometimes?

25          A.   As -- I mean, after ten years, it's force of
```

GEO Objections Foundation, FRE 402, 701, 802.

David Tracy                                        December 3, 2019

Page 27

1    habit, but for the most part, it's FA.

2         Q.   All right, so there's the warden turning into

3    the facility administrator; any other name changes?

4         A.   The assistant warden.

5         Q.   Is now assistant facility administrator?

6         A.   Yeah, AFA.

7         Q.   Okay.  Any others?

8         A.   Not that -- not that I can think of.

9         Q.   Who does the Northwest Detention Center house?

10        A.   The detainees?

11        Q.   Yes.

12        A.   Detainees either waiting or fighting their case

13   within the immigration system.

14        Q.   To your knowledge, is any component of their

15   stay criminal punishment?

16             MS. MELL:  Object to the form of the question.

17        A.   No, it's all -- it's administrative.

18        Q.   Have you ever been disciplined at Northwest

19   Detention Center?

20        A.   Not -- not to my knowledge.

21        Q.   Do you receive performance reviews?

22        A.   Yes.

23        Q.   Have there been any issues or any aspects of it

24   that have been critical of your performance?

25        A.   In -- I don't know what year it was, the only

David Tracy

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 28

1    negative mark I believe I received was on attendance, and

2    it was due to a car accident where I missed multiple days

3    because of the car accident.  Besides that, no.

4            Q.    Tell me, what is the Voluntary Work Program?

5            A.    The Voluntary Work Program is a program where if

6    a detainee is housed within the facility, and they want to

7    work, they can submit a request, and if there's anything

8    open, you know, they'll get offered that position.  If

9    it's -- there's not an opening, they go onto a waiting

10   list.  You know, if they want to work in the kitchen,

11   laundry, inside the units, they have all those options.

12           Q.    And is this is work for money; correct?

13           A.    They -- yes.

14           Q.    How much are the detainee workers paid?

15           A.    A dollar per day.

16           Q.    And generally speaking, what are the various

17   work assignments within the facility?

18                 And I'm looking for the big buckets, if you can

19   group them, that's the type of answer I'm looking for.

20           A.    Okay, so working inside the housing unit, which

21   covers, you know, just daily cleaning, after meals,

22   bathrooms, showers, that type of thing, inside the kitchen,

23   inside of laundry, visitation has volunteer cleaners,

24   intake has voluntary cleaners, and then the detainees that

25   go out during the day and, you know, sweep and mop the main

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                                December 3, 2019

Page 29

1    hallway of the facility.

2         Q.    Anything else in terms of broad groupings of

3    workers?

4         A.    Then there -- every once in a while there will

5    be a paint -- a paint crew or a floor detail crew, which

6    actually buffs, and waxes, and strips the floors.  Outside

7    of that, I can't think of anything major.

8                    (Exhibit-313 marked.)

9               THE COURT REPORTER:  This is Exhibit-313.

10              THE WITNESS:  Thank you.

11         Q.   I've just handed you Exhibit-313.  This is an

12    excerpt from GEO's Policy and Procedure Manual, Chapter:

13    Detainee Services and Programs, Title: Voluntary Work

14    Program.

15              Have you seen this document before?

16         A.   I'm sure at some point in my career I've seen

17    it.

18         Q.   I want to look at the bottom there under heading

19    IV, subpart B where it says "Work Assignment."

20              Do you see that?

21         A.   Yes.

22         Q.   And it lists off five broad categories, Kitchen

23    Worker, Recreation/Barber, Living area, Evening workers,

24    and Laundry.

25              Do you see those?

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 30

1        A.   Yes, sir.

2        Q.   Would you agree with me that those are broad

3   work assignments that the detainee workers are assigned to

4   or work in?

5             MS. MELL:  Object to the form of the question.

6        A.   Yeah.  Yes.

7        Q.   I want to take each of the categories listed on

8   Exhibit-313 in which you told me as well about the broad

9   groupings, and discuss each of them individually, but in

10  particular, your role in supervising and directing detainee

11  work.

12            Do you understand?

13       A.   Yes.

14       Q.   And so let's start with kitchen workers.  Either

15  as detention officer or as sergeant, did you play any role

16  in directing or supervising the work in the kitchen?

17       A.   Not specifically.  They have their own kind

18  of -- I'm trying to look back at this organizational chart.

19            But the food service manager, and the cooks, and

20  the officers handle most of the issues in the kitchen.  If

21  there is an issue as a supervisor inside of the kitchen,

22  then we would have to go over and deal with whatever issue

23  may arise, but for the kitchen, unless I was -- I think I

24  maybe have been assigned one time there in ten years,

25  besides that, no.

David Tracy

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 31

```
 1        Q.    What about recreation/barber, can you tell me
 2   about all aspects of your direction or supervision that you
 3   provided to the detainee workers?
 4        A.    The barbershop is open during the days, day
 5   shift, which early morning.  I didn't work that shift.
 6        Q.    So you've had no involvement then with
 7   supervising or directing the work in the barbershop?
 8        A.    No.
 9        Q.    That would be just other detention officers
10   then?
11        A.    Other supervisors, other officers.
12        Q.    What about in the living areas, can you tell me
13   about all aspects of the direction and supervision that you
14   provided to detainee workers in the living areas?
15        A.    You allow them access to the janitor closet,
16   allow them to get what they need to do -- to do their job
17   they've requested, and then amongst just daily work inside
18   the unit, you're always cognitive of I know I've got a
19   group over here mopping and sweeping, so make sure they
20   have -- you know, make sure there's a wet floor sign down,
21   that type -- that type of stuff, overseeing what they're
22   doing.
23        Q.    Do you ever tell them where to clean?
24        A.    Yeah.
25        Q.    Do you tell them when to clean?
```

David Tracy                                    December 3, 2019

Page 32

1        A.    There's -- with inside the units, they kind of
2   have their own.  The other detainees, once they get a new
3   job, they kind of explain to them how it works.  So, for
4   example, the food porter, he works when the food comes.
5   That's what his job -- you know, that's what his job is.
6   He can't do his job when there's no food there.  So when
7   it's time for food, you know, you might have to go wake him
8   up or let him know, if he's outside playing basketball, or
9   whatever, meals -- meals are up.
10       Q.    So in that way then, you're directing whoever
11  that food porter is to show up to work?
12             MS. MELL:  Object to the form of the question,
13  totally mischaracterizes his testimony.
14       A.    Can you repeat your question one more time?
15       Q.    Sure.
16             You told me that with the food porter, for
17  example, that they can only work when the food arrives, and
18  that if they're asleep or in recreation, that you go to get
19  help; did I get that right?
20       A.    Yeah, let them know that, you know, the meals
21  are ready, ask them to go to the kitchen.  Not making them
22  go to the kitchen, because they don't have to do it, they
23  can always put a request in to not work anymore.
24       Q.    All right, you mentioned janitor, closet access;
25  do you remember that?

David Tracy                                           December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 33

1          A.    Yes.

2          Q.    Okay.  And that's so that they can access the

3    cleaning supplies?

4          A.    Correct.

5          Q.    And these are supplies that GEO provides;

6    correct?

7          A.    Correct.

8          Q.    Do the detainee workers supply their own

9    cleaning materials?

10         A.    No.

11         Q.    Does GEO provide the cleaning solution?

12         A.    Yes.

13         Q.    Does GEO provide the sponges and mops necessary

14   to do the cleaning?

15         A.    Yes.

16         Q.    The rags?

17         A.    Yes.

18         Q.    As it relates to the cleaning, do you train or

19   have you trained detainee workers on proper cleaning

20   technique?

21         A.    Yes, you explain, you know, how it's -- how it

22   needs to be done, or you know, what -- what to look for.

23   In the showers, you know, you might want to use this tool

24   instead of using a mop to wipe down the shower walls, you

25   might want to use a scrub brush, to use the scrub brush to

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110  FAX: 206.622.6236

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 34

1    actually scrub -- scrub inside the showers.

2         Q.   What if a detainee worker has no prior cleaning

3    experience; is it the case then that GEO would train that

4    person on how to do the job?

5         A.   I would explain to them how to do it.

6         Q.   And that explanation is essentially on-the-job

7    training; is that fair to say?

8         A.   Yeah.

9         Q.   Can the detainee workers -- again, we're talking

10   specifically about living areas --

11        A.   Okay.

12        Q.   -- could they clean a different pod for more

13   money?

14        A.   No.

15        Q.   If they worked quickly or more efficiently,

16   could they earn more money?

17        A.   No.

18        Q.   Could they earn overtime for working more?

19        A.   No.

20        Q.   Has a detainee worker ever tried to negotiate

21   with you about the rate of pay for cleaning their living

22   area?

23        A.   Not that I can recall.

24        Q.   Could a detainee worker -- strike that.

25             Do detainee workers have discretion to clean

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                         December 3, 2019

Page 35

1    outside the facility?

2            A.    When you say outside the facility --

3            Q.    Yeah, that wasn't -- that wasn't a good one.

4            And I should say that also.  I'll probably ask

5    some bad questions today.  I'm going to try my best to ask

6    good ones, and certainly let know if you don't understand,

7    just like you did there.

8            I guess what I'm driving at is if a detainee

9    worker says, I don't want to clean my assigned area, I want

10   to clean somewhere else, do they have the discretion to

11   make that call in the moment?

12           A.    They can basically quit their job they

13   volunteered for and put another request in to go clean

14   where they want to clean, and then they might join the

15   waiting list and have to wait for one of those spots to

16   open up.

17           Q.    That request is seeking authorization though he

18   to clean somewhere else; is that right?

19           MS. MELL:  Object to the form of the question.

20           A.    So if they're -- just for example, if they're a

21   worker in the living area, and they want to -- they don't

22   want to work in the living area anymore, they can say they

23   want -- they don't want to work anymore.  If they're in the

24   living area and want to work in the kitchen, they can --

25   they can still work in the living area and wait.  You know,

David Tracy                                          December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 36

1      the kitchen usually has a waiting list.  They can --

2      sorry -- they can still work in the unit until that job in

3      the kitchen comes available, and then once that job is

4      available, then they can make the decision hey, I want to

5      keep doing this, or no, I do not want to do this anymore,

6      I'm going to take that position in the kitchen.

7             Q.   The scenario you've just described though is --

8      involves the detainee worker though requesting to work

9      somewhere else; is that right?

10            MS. Mell:  Object --

11            A.   Yes.

12            MS. MELL:  Object to the form.

13            Q.   And they can only work somewhere else if GEO

14     authorizes them to do so?

15            MS. MELL:  Object to the form of the question.

16            Q.   Is that right?

17            MS. MELL:  Object to the form of the question.

18            A.   Yes, they need permission to work in certain

19     areas due to classification or whatever.

20            Q.   So that's my question.  I mean, if a detainee

21     worker was assigned to work in pod A, they couldn't just

22     wake up that day say, you know what, I'm going to clean in

23     the laundry today?  They don't have the discretion to do

24     that; is that correct?

25            A.   No.

David Tracy

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 37

```
1              MS. MELL:  Object to the form.
2         A.   No.
3         Q.   And when you say no, you're agreeing with me,
4    they lack the discretion to make that call in the moment
5    about where to work?
6         A.   I'm answering your question that they cannot
7    decide where they want to go work.  They're allowed to work
8    in the area that they're assigned to.
9         Q.   You talked about part of your supervision of
10   detainee workers in the living area about did you say
11   making sure that there was signage out?
12        A.   Correct.
13        Q.   So wet floor signs, for example?
14        A.   Yes.
15        Q.   So is this an example of you making sure that
16   they're conducting their work in a safe manner?
17        A.   Safe for everybody; safe for them, safe for
18   other -- other detainees, safe for officers.
19        Q.   Are there safety regulations that you're aware
20   of for the detainee workers working in the living area, or
21   frankly, anywhere in the facility?
22        A.   Can you go a little -- explain a little bit
23   further?
24        Q.   Sure.
25             All right, well let's ground it then.  We're
```

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                    December 3, 2019

Page 38

1    talking about the living area, so let's stick there.

2            Do you train detainee workers about safety when

3    it comes to cleaning in the living areas?

4            A.   There's safety data sheets that are available to

5    them that show this chemical, this is what it's for, this

6    is how it's supposed to be used, this is the dilution rate,

7    this is what you need to do if you interact with the

8    chemical, you know, if the chemical gets -- were to get

9    into your eyes, diluted and nondiluted, all that

10   information is available.

11           Q.   And as a detention officer, or as sergeant, did

12   you provide that information directly to the detainee

13   workers?

14           A.   It's in a book on the desk.  Anybody can look at

15   it at any time.

16           Q.   My specific question though is, did you provide

17   that to them?  Did you -- was there ever a moment at which

18   you affirmatively said, Hey, guys, gals, here are the

19   safety regulations for the work that you're about to do?

20           A.   I -- I can't recall.  I -- you know, working in

21   a unit, put many people into the work program.  I can't

22   force you to read something.

23           Q.   When you say you don't recall, is it the case

24   that it may have happened, and you just don't recall, or

25   that doesn't sound like something you would have done?

David Tracy

GEO Objections Foundation, FRE 402,
701, 802.

December 3, 2019

Page 39

1          A.   It -- I'm -- it probably has happened, but I
2    can't recall a specific date, a specific individual.  It's
3    just day-to-day work.
4          Q.   All right.  Is there anything else that you
5    could think of about the direction and supervision that you
6    provided to detainee workers working in the living areas,
7    beyond what you've already described to me?
8          A.   If they need something, you know, whatever they
9    needed to do the job that they needed to do, they can
10   always ask, and we get them the supplies or whatever item
11   they need to do the work to get what they need to do done,
12   if that makes sense.
13         Q.   It does.
14         A.   Okay.
15         Q.   GEO gives them what they need to do the job?
16         A.   Correct.
17         Q.   Let's talk about -- well, Exhibit-313 talks
18   about evening workers, and says in parentheses, they are
19   facility janitorial.
20              Do you know what that means?
21         A.   I don't specifically know what it means.
22   Looking at the classification to the right of that, where
23   it says "Low - Medium High," I'm going to take that as the
24   detainees that work outside after lights out.  So the
25   detainees that go and, you know, mop -- dust mop and mop

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                    December 3, 2019

Page 40

1    the main hallways that -- throughout the facility.

2          Q.    Did you ever direct or supervise detainee

3    workers performing those evening cleaning tasks?

4          A.    Yes, just on the basis that you're out on the

5    actual floor while they're working.   You're not so hovering

6    over them, Hey, you missed a spot here, or like that, but

7    you're physically out there with them.   You can see what

8    they're doing.

9          Q.    And that's as a detention officer, where the

10   direction and supervision is more hands on?

11         A.    Same as a supervisor.   Supervisor would leave

12   the office.   He's not stuck in the desk all day.

13         Q.    And when you say supervisor, are you referring

14   to sergeant?

15         A.    Sergeant, I'm sorry.   Sergeant.

16         Q.    And laundry, did you provide any direction or

17   supervision to detainee workers working in laundry?

18         A.    Yes.

19         Q.    Tell me about that.

20         A.    They are trained on how to use the washing

21   machine, the dryer, how to clean the equipment.

22         Q.    Anything else in terms of the direction and

23   supervision that you provided the detainee workers in the

24   laundry?

25         A.    When I personally worked in laundry, I worked

David Tracy

GEO Objections Foundation, FRE 402,
701, 802.

December 3, 2019

Page 41

1    with them.  So it was very hands on, you know, right next

2    to them.

3          Q.    Meaning you were doing the laundry right

4    alongside them?

5          A.    Yes.

6          Q.    How long did you work in laundry?

7          A.    A rough estimate, possibly a year.

8          Q.    You said that the detainee workers were trained

9    on how to use the washer and dryer; did I get that right?

10         A.    Correct.

11         Q.    And this is training that GEO provides to the

12   detainee workers?

13         A.    The officer in charge of laundry would be the

14   one doing it.

15         Q.    This is GEO's officer; correct?

16         A.    Correct.

17         Q.    Okay.  And that GEO would provide the detainee

18   workers training on how to clean the equipment; correct?

19         A.    Correct.

20               When I say clean, I'm not talking about like

21   taking apart the machine, but I'm talking about like the

22   dryers, the lint trap.  Not like actually taking apart of

23   machine and cleaning out the machine.

24         Q.    Okay.  Fair enough.

25               And GEO provided all of the laundry detergent to

David Tracy                                              December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 42

1    do the laundry; correct?

2         A.    Yes.

3         Q.    If a detainee worker had some secret home remedy

4    for how to get out stains, could they use it, or would they

5    have to stick with their training and do the work in the

6    way that GEO's instructed?

7         A.    If they did it, I'm not aware of it.  You know,

8    if they had, you know, personal soap or something like

9    that, I wasn't aware.  My expectation was use what we

10   provide to you.

11        Q.    And when you say you weren't aware, you never

12   observed anyone using anything other than what GEO

13   provided; is that fair to say?

14        A.    Yeah.

15        Q.    All right, we'll look at some job descriptions

16   later on, but I want to keep working through your post.

17              So you said laundry -- maybe I should ask in a

18   more open-ended fashion.

19              Did you ever direct and supervise detainee

20   workers -- strike that.

21              Tell me where else you've directed and

22   supervised detainee workers.  We talked about the living

23   areas, we talked about laundry; where else, if anywhere?

24        A.    I think I've worked everywhere in the building,

25   so visitation, intake, every unit besides the female unit.

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                      December 3, 2019

                                                          Page 43

1          Q.    And when we talk about visitation, intake, we're
2    talking about cleaning those areas; is that right?
3          A.    Yeah, usually it's, for the most part, just, you
4    know, wiping down the windows and taking a dust -- you
5    know, dry mopping it with a dust mop and then with a wet
6    mop afterwards.  That's the extent of cleaning.  Maybe take
7    the garbage -- you know, the garbage out, or just replace
8    the bags in the garbage.
9          Q.    What about medical, did you ever direct and
10   supervise detainee workers working or cleaning the medical
11   unit?
12         A.    Not to my knowledge.
13         Q.    Library?
14         A.    No.
15         Q.    Recreational --
16         A.    Can I go back to library?
17         Q.    Sure.
18         A.    I never worked in the library, but we had a
19   floor detail inside the hallway of the library.
20         Q.    All right, so you've mentioned the living areas,
21   laundry, visitation, intake, you said essentially every
22   unit --
23         A.    Yeah.
24         Q.    -- anywhere else that you've directed and
25   supervised detainee workers?

David Tracy

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 44

1      A.    Recreation yards.

2      Q.    Anywhere else?

3      A.    Intake, laundry.

4            I'm sure there is, but ...

5      Q.    Can you give me a rough estimate on how long it
6 would take a detainee worker to carry out their cleaning
7 assignment in the living areas?

8      A.    It, honestly, depends on the person.  There's --
9 you know, for example, I work in segregation right now.  We
10 have a detainee that was previously there, he would take an
11 hour or two hours just to sweep and mop, but part of that
12 is because we feel like he liked not being stuck inside the
13 cell, and he's very meticulous with everything he did,
14 everything was slow.  And the guy that cleans now maybe
15 takes 15 or 20 minutes to do the exact same job.

16     Q.    So anywhere from 15 to 20 minutes to one to two
17 hours?

18     A.    Depending on the individual.

19     Q.    What about the laundry, how long would a
20 detainee worker shift last in the laundry unit?

21     A.    Again, it depends on the detainees.  Depends on
22 the officer running laundry.  I would say for me, maybe --
23 just an approximation of time, maybe two and a half to
24 three and a half hours.

25     Q.    And how many detainee workers would work on a

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 45

1    laundry shift that you would supervise, for example?

2        A.    Roughly one to four.

3        Q.    And the cleaning, how long would it take to --

4    for a detainee worker to finish their assignment in the

5    visitation room?

6        A.    Approximately 20 to 30 minutes.

7        Q.    What about intake?

8        A.    I would say roughly the same time, 20 to 30

9    minutes.

10       Q.    What about the rec yard?

11       A.    I would say just in general, the normal

12   cleaning, just the sweeping, mopping, that type of thing,

13   roughly 20 to 30 minutes in -- in every area.

14       Q.    Now, the time estimates that you've just given

15   me, do you base them on your firsthand observation as a

16   detention officer or sergeant?

17       A.    Yes.

18       Q.    Now, we've talked a lot about the direction and

19   supervision that you provide.  What role, if any, does ICE

20   play in directing and supervising the detainee work?

21       A.    I believe -- well, they're not -- there's no

22   supervision from an ICE officer, but the only thing I

23   believe is that they set the dollar a day that works into

24   the voluntary worker program.

25       Q.    Sure, and we'll certainly talk about the dollar

David Tracy                                           December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

                                                              Page 46

1    a day, but to my specific question though about the

2    detainee work, to your knowledge, does ICE play any role in

3    directing and supervising the detainee work?

4              MS. MELL:   Object to the form of the question.

5         A.   No, they may observe if they happen to be in the

6    same area, but specifically, not to my knowledge.

7         Q.   You said you've been there for about ten years

8    at the facility?  Longer than that.

9         A.   October 2009.

10        Q.   2009, okay, yeah, so ten years.

11             In your ten years at the Northwest Detention

12   Center, have you ever observed any ICE personnel directing

13   a detainee worker in their work in the Voluntary Work

14   Program?

15        A.   Not to my knowledge.

16        Q.   To your knowledge, does ICE play any role in

17   inspecting the areas that detainee workers have cleaned?

18        A.   No, not to my knowledge.

19        Q.   All right.  I deposed Mr. Delacruz yesterday and

20   asked him a lot of questions about the kitchen, and he

21   described for me various detainee shifts.  If I remember

22   correctly, he said there was a morning, a lunch, a dinner,

23   and an evening shift.

24             Can you make any broad statements about detainee

25   worker shifts for other areas within the facility?

David Tracy                                    December 3, 2019

Page 47

1        A.   I would say the kitchen is kind of independent

2    on the fact that they have four complete different shifts,

3    but like laundry, there's a day shift crew and then a swing

4    shift crew.  And same thing in the units, there's, you

5    know, morning workers, afternoon workers, evening workers.

6        Q.   Let's go back to Exhibit-313.  This is the one

7    that's the excerpt from the GEO Policy and Procedure Manual

8    about the Voluntary Work Program.

9             Do you have that in front of you?

10       A.   Yes.

11       Q.   I'd like to go to the third page.  It's the one

12   that's marked page 3 of 8, and it also has a long number on

13   the bottom right corner, we call that a Bates stamp, it's

14   got a Bates stamp of GEO-Nwauzor --

15       A.   Okay.

16       Q.   -- 016421.

17            Are you there?

18       A.   Yes.

19       Q.   And actually, you may need to look at the page

20   just before it as well.

21            But I'm looking at the section called Detainee

22   Selection.  It starts as F at the bottom of page 2, and it

23   continues onto page 3.

24       A.   Okay.

25       Q.   Do you see that?

David Tracy                                    December 3, 2019

Page 48

1          A.    Yes.

2          Q.    I'd like for you to read over the procedures

3     there, and my question to you will be, do you agree that

4     this is an accurate statement of the detainee selection

5     procedure for the Voluntary Work Program?

6                MS. MELL:  Object to the form of the question.

7          A.    I would agree with it for the most part.

8          Q.    What, if anything, do you disagree with about

9     what's stated in the Policy and Procedure Manual about the

10    detainee selection process?

11         A.    I wouldn't say I disagree with it, I just

12    don't -- in my personal past, it hasn't happened, number 6.

13         Q.    And that's the one that reads, "The supervisor

14    will inquire from other staff about the detainee's attitude

15    and behavior"?

16         A.    Yeah, I've never had that brought to me.

17               And as well as number 8.

18         Q.    As it relates specifically to number 6, have you

19    been -- ever been instructed not to inquire about a

20    detainee's attitude or behavior?

21               MS. MELL:  Object to the form of the question.

22         A.    No, it's just -- it's a question that's never

23    been brought to me.

24         Q.    Let's look at number 7 there.  It says "Staff

25    will explain the rules and regulations as well as

David Tracy                                              December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 49

1    privileges relating to the detainee work status."

2         Do you see that?

3         A.   Number 7?

4         Q.   Yes.

5         A.   Correct.

6         Q.   Do detainee workers have the discretion to

7    disregard the rules and regulations as explained by GEO?

8         A.   No, but for example, lights out within the

9    building is 11:30.  Technically you're supposed to be in

10   your bunk, you know, ready to go to sleep when lights go

11   out.  There's people outside working -- not outside, but

12   outside the dormitory working at that time.  So that --

13   does that answer your question?

14        Q.   Well, it does in a way.

15             So let me -- let me try and rephrase it.

16             I mean, setting aside that narrow example of a

17   detainee worker trying to complete the work, I mean, it's

18   your expectation, as a detention officer and sergeant, that

19   the detainee workers comply with GEO's rules and

20   regulations for the Voluntary Work Program; correct?

21        A.   Yes.

22        Q.   And in fact, part of the supervision that you

23   provide is to make sure that the detainee workers are

24   complying with GEO's rules and regulations; correct?

25        A.   Correct.

David Tracy                                    December 3, 2019

Page 50

1          Q.    And in fact, I mean, there are consequences if

2    detainees don't comply with GEO's rules and regulations for

3    the detainee work?

4                MS. MELL:   Object to the form of the question.

5          A.    I mean, if -- if they don't want to work, they

6    don't have to work.   If they don't want to do the job, they

7    don't -- they don't have -- they don't have to do it.

8          Q.    That's right, but if a detainee worker was doing

9    a lousy job consistently, GEO would have the right to

10   terminate that worker's assignment; correct?

11               MS. MELL:   Object to the form of the question.

12         A.    I can't just say, You're not doing a good job,

13   you're not working anymore.   They would have to refuse to

14   do it, and then they would either sign a refusal to work

15   form, which is the same thing as them quitting, or I would

16   submit the refusal to work form, and write down that they

17   refused to sign it, but there's no punishment for I don't

18   want to do this job.

19         Q.    There's punishment or discipline for let's say

20   fighting during a detainee worker shift; correct?

21               MS. MELL:   Object to the form.

22         A.    There's punishment for fighting.

23         Q.    Or stealing?

24         A.    Correct.

25                    (Exhibit-314 marked.)

David Tracy                                              December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

                                                              Page 51

1              THE COURT REPORTER:  This is Exhibit-314.

2          Q.  You've just been handed Exhibit-314.

3              What are we looking at here?

4          A.  Volunteer work agreement.

5          Q.  Who is this agreement between?

6          A.  The detainee and I -- GEO.

7          Q.  And have you asked detainee workers to sign a

8     form like this?

9          A.  Yes.

10         Q.  In fact, this is a regular part of what you do?

11         A.  Yes.

12         Q.  Let's look at the fourth item there at the top.

13    It says "Unexcused absence, unsatisfactory work

14    performance, or participation in a serious infraction, e.g.

15    fighting, is cause for removal from a work assignment.

16    Workers are expected to be ready for work at the required

17    time."

18             Did I read that correctly?

19         A.  Yes.  Yes.

20         Q.  And do you agree that GEO has the right to

21    remove detainee workers from their work assignment?

22             MS. MELL:  Object to the form.

23         A.  Yes.

24      Q.  Let's look at item 6.  It reads, "Detainees must

25    adhere to all safety regulations and to all medical and

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                                    December 3, 2019

                                                                   Page 52

1    grooming standards associated with a work assignment."

2              Did I read that correctly?

3        A.   Yes.

4        Q.   And would you agree with me that the implication

5    is that if they don't adhere to safety regulations and

6    medical and grooming standards, that they can't work?

7              MS. MELL:  Object to the form of the question.

8        A.   In -- I believe that's specific to a certain

9    area, like the kitchen.

10       Q.   Let's look at number 8.  "Primary factors that

11   impact hiring are classification level, attitude, behavior,

12   and physical ability to perform the job."

13             Do you see that?

14       A.   Yes.

15       Q.   Would you agree that GEO has some discretion in

16   who to hire within the Voluntary Work Program?

17             MS. MELL:  Object to the form of the question.

18       A.   Yes.

19       Q.   Is there any sort of skills assessment that you

20   all do before a detainee worker begins working whatever

21   their job assignment may be?

22       A.   So I know for the kitchen, they have to be

23   cleared by medical.

24       Q.   Do you look for any prior experience?

25             MS. MELL:  Object to the form of the question.

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                        December 3, 2019

                                                          Page 53

1        A.    No.

2             This document, if they want to work, they fill

3   this out, and write a request, and that's how it's

4   completed.

5        Q.    Do people with prior experience get paid more

6   than people with no prior experience?

7        A.    No.

8        Q.    And by people, I mean the detainee workers?

9        A.    No.

10       Q.    So if a detainee worker has a vast amount of

11  experience buffing or waxing floors, they don't make any

12  more than someone that has no experience buffing and waxing

13  floors; correct?

14       A.    It's number 7, "Compensation shall be $1.00 per

15  day."

16       Q.    So you're agreeing with me, that detainee

17  workers --

18       A.    My -- my answer is they -- whether you have 50

19  years experience or one day experience, the compensation is

20  one dollar per day.

21            MR. WHITEHEAD:  Let's take a quick break.  I

22  think what I want to do next is a longer patch, so let's

23  break here.

24            THE VIDEOGRAPHER:  This is the end of media one.

25  This deposition will continue on media two.  The time's

GEO Objections Foundation, FRE 402, 701, 802.

David Tracy                                    December 3, 2019

Page 54

1    11:25.  Going off the record.

2                      (Recess at 11:25 a.m.)

3                      (Reconvened at 11:49 a.m.)

4              THE VIDEOGRAPHER:  Back on the record.  This is

5    the beginning of media two to the deposition of David

6    Tracy.  The time is approximately 11:49.

7         Q.    Mr. Tracy, do the various work assignments

8    within the Voluntary Work Program have job descriptions?

9         A.    Yes.

10        Q.    And are the job descriptions made available to

11   the detainee workers?

12        A.    Yes.

13        Q.    And they're made available before they request a

14   particular job assignment; is that the case?

15        A.    Yes.

16        Q.    And that's so they can know what they're getting

17   into in terms of duties and responsibilities?

18              MS. MELL:  Object to the form.

19        A.    Correct.

20        Q.    Is there also an accountability piece to the job

21   descriptions, meaning that if a worker isn't carrying out

22   their specific work duties, everyone will know that that

23   worker's falling short?

24              MS. MELL:  Object to the form.

25        A.    Not to my knowledge.

David Tracy                                December 3, 2019

Page 55

```
 1              MR. WHITEHEAD:  Let's take a look at detainee

 2     job descriptions.

 3                    (Exhibit-315 marked.)

 4              THE COURT REPORTER:  This is Exhibit-No.-315.

 5              THE WITNESS:  Thank you.

 6       Q.    You've just been handed a number of job

 7     descriptions.  These are just job descriptions I found

 8     within the documents that GEO produced to my office.

 9              Have you seen any of these job descriptions

10     previously?

11       A.    No.  Not these specific pages.  Maybe something

12     like this, but ...

13       Q.    Do these strike you as a fair and accurate

14     representation of what GEO's job descriptions look like for

15     the detainee worker program?

16              MS. MELL:  Object to the form of the question.

17     He's testified he's never seen them before.

18       A.    Yes.

19       Q.    Do you have any reason to doubt that these are

20     anything other than GEO's detainee worker job descriptions?

21              MS. MELL:  Object to the form of the question.

22       A.    No.  Like I just said, I don't believe I've ever

23     seen these exact forms.

24       Q.    Now, looking at Exhibit-315, and the job

25     descriptions that are contained within, each of them has a
```

David Tracy                                      December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 56

1    section called Specific Work Duties.  That section Specific

2    Work Duties, is that what GEO expects of the detainee

3    workers in terms of their duties and responsibilities?

4              MS. MELL:  Object to the form of the question.

5         A.   I don't know what GEO expects.  If I was the

6    officer in the barbershop, this is what I would expect for

7    myself and the detainee workers.

8         Q.   And that's true of each of the job descriptions

9    where we look at the specific work duties, that those will

10   be the work duties that the detainee worker would be

11   responsible for?

12        A.   Correct.

13        Q.   Now, taking that first page, in your experience

14   as a detention officer and a sergeant at the Northwest

15   Detention Center, do detainee workers working in the

16   barbershop have discretion to deviate from the specific

17   work duties that are shown there on the first page of

18   Exhibit-315?

19             MS. MELL:  Object to the form of the question.

20        A.   I have never worked in a barbershop.

21        Q.   Setting that aside, of what you know of the

22   facility and your work as a detention officer, and a

23   sergeant, and having looked at other job descriptions,

24   would detainee workers be allowed to deviate from their

25   specific work duties?

David Tracy                                    December 3, 2019

Page 57

1          MS. MELL:  Object to the form of the question.

2      A.   If these are the specific work duties, this is

3  what is expected.

4      Q.   So let's look at the second bullet there, "Apply

5  clipper oil after each cleaning."

6          Do you see that?

7      A.   Yes.

8      Q.   Would a detainee worker have the discretion to

9  disregard that instruction?

10         MS. MELL:  Object to the form of the question.

11     A.   No, if it says they're supposed to apply clipper

12  oil after each cleaning, the expectation is to apply

13  clipper oil after each cleaning.

14     Q.   Let's look a couple bullets down.  It says

15  "Towels will not be used."

16         Do you see that?

17     A.   Yes.

18     Q.   Could a detainee worker decide hey, I'm going to

19  use towels?

20         MS. MELL:  Object -- object to the form of the

21  question.

22     A.   They can make any decision they want to make.

23  The ramification is that they probably aren't going to work

24  in the barbershop anymore.

25     Q.   And that's the case, GEO's there, the detention

David Tracy                                    December 3, 2019

Page 58

1    officers, to supervise and to make sure that the detainee

2    workers are carrying out their specific job duties?

3          MS. MELL:  Object to the form of the question.

4        A.   I would disagree with that statement.  We're not

5    there to stand over them and make sure they're not -- if it

6    says "Towels will not be used," my job isn't to stand there

7    and make sure they don't use towels, I'm multitasking.  If

8    I see them using towels when they're not supposed to use

9    towels, I deal with it at that time.

10       Q.   Well, going back to your job description of

11   directing and supervising the detainee work, wouldn't you

12   be failing at your job if you allowed a detainee worker to

13   do something other than what they were charged with doing

14   in their job description?

15         MS. MELL:  Object to the form of the question.

16       A.   I wouldn't feel a failure in my job if they got

17   into a fight.  They're not allowed to get into a fight.

18       Q.   That's not what I asked you though.

19         My question was, if a detainee worker was doing

20   something other than what's listed in their job

21   description, would you be subject to a downgrade in your

22   performance as a sergeant or detention officer?

23         MS. MELL:  Object to the form of the question.

24       A.   I don't know.  It's never happened to me.  I

25   don't believe so.

David Tracy                                        December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 59

1      Q.   Detainee workers working in the barbershop don't

2   have discretion to cut hair in the yard, do they?

3           MS. MELL:  Object to the form of the question.

4      A.   No.

5      Q.   GEO directs them to cut hair in the barbershop;

6   correct?

7      A.   Correct.

8      Q.   And provides the space for them to do so;

9   correct?

10     A.   Correct.

11     Q.   And provides the scissors for them to cut hair?

12     A.   I don't know if they have scissors, clippers.

13     Q.   Provides the equipment for them to cut hair?

14     A.   Correct.

15     Q.   Detainee workers aren't allowed to use their own

16   equipment in the barbershop; is that right?

17     A.   Correct.

18     Q.   Detainee workers working as barbers don't get

19   paid more if they have preexisting skill as a barber; is

20   that right?

21     A.   Every person that works gets a dollar per day is

22   the compensation.

23     Q.   So you're agreeing with me then that regardless

24   of preexisting skill as a barber, they don't get paid more?

25           MS. MELL:  Object to the form.

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

                                                        Page 60

 1            A.   I'm telling you that just like I said earlier,

 2       50 years experience or one day experience, the compensation

 3       rate is a dollar per day.

 4            Q.   There's no opportunity for the barbers to make

 5       more if they are doing a more complex haircut or hair

 6       styling; correct?

 7            A.   No.

 8            Q.   And when you say no, you're agreeing with me,

 9       they can't make more?

10            A.   The compensation is one dollar per day, no more.

11            Q.   Are there any GEO barbers at the Northwest

12       Detention Center?

13            A.   Officers?

14            Q.   Correct.

15            A.   No.

16                 I don't know if they cut hair outside on their

17       own time.  I'm sure somebody does, but --

18            Q.   Have you --

19            A.   -- they don't cut detainee hair.

20            Q.   I'm sorry, I cut you off there.

21                 Have you ever observed GEO personnel cutting

22       hair at the Northwest Detention Center?

23            A.   No.

24            Q.   Are you aware of GEO personnel cutting hair at

25       the Northwest Detention Center?

David Tracy                                      December 3, 2019

Page 61

1        A.    No.

2        Q.    If detainee workers didn't cut hair at the

3   Northwest Detention Center, who would?

4              MS. MELL:  Object to the form of the question.

5        A.    I -- I don't know.

6        Q.    GEO would have to find someone; correct?

7              MS. MELL:  Object to the form of the question.

8        A.    I don't know.

9        Q.    All right, let's look at the next page of

10  Exhibit-315.  This is a detainee job description for

11  barbershop cleaner.

12             Are you with me?

13       A.    Yes.

14       Q.    Looking at that first bullet, it states "Clean

15  Clippers by turning clippers off, brush hair from blades,

16  turn clippers back on and spray liberally with H42 cleaner

17  until blades are clear of all foreign matter."

18             Do you see that?

19       A.    Yes.

20       Q.    Would you agree that GEO is directing barbershop

21  cleaners to use H42 cleaner?

22       A.    That's how I read it.

23       Q.    Do detainee barbershop cleaners have discretion

24  to use a different type of cleaner in cleaning the

25  clippers?

David Tracy                                    December 3, 2019

1        A.    Based on this sentence you just read me, no.

2   I've never worked in the barbershop, so the first time I am

3   seeing in this.  I can only answer with what I read.  It

4   says that they're supposed to use H42, that's what they're

5   supposed to use.

6        Q.    And is it fair to assume that GEO would provide

7   the H42 cleaner to the detainee barbershop cleaners?

8        A.    Yes.

9        Q.    Are you aware of any GEO personnel working as

10  barbershop cleaners?

11       A.    Not -- no.

12       Q.    Let's look at the next page.  This is the third

13  page of Exhibit-315.  It's a detainee job description for

14  medical cleaning.

15             Are you there?

16       A.    Yes.

17       Q.    Now, towards the top here, this one says "Pay

18  Scale Grade:  Unskilled."

19             Do you see that?

20       A.    Yes.

21       Q.    What does that unskilled mean?

22       A.    I don't know.  I didn't create the form.  I

23  don't know what the intentions of it is or why it's there.

24       Q.    Have you ever seed that -- seen that notation

25  before on job descriptions, unskilled?

David Tracy                                    December 3, 2019

Page 63

1       A.    If you continue to flip through the pages, it's

2   on every single one except for the barbershop.

3       Q.    Let's look at the specific work duties for the

4   medical cleaning job description.  The first item there

5   says "Dust Medical Offices."

6              Do you see that?

7       A.    Yes.

8       Q.    Could the medical cleaners clean in an area

9   other than the medical offices?

10      A.    I don't believe they clean in the medical

11  offices.

12      Q.    Could the medical cleaners dust anywhere other

13  than the medical offices?

14      A.    In the hallways, in the cells, behind the

15  counter, in the corners of the door, down the hallway, the

16  window sills in medical.

17      Q.    Well, my question then is, could they clean

18  outside of medical if they weren't assigned?

19      A.    If their job title is medical cleaning, no.  I

20  mean, they -- they can clean inside the unit if they want

21  to.

22      Q.    I guess I'm not phrasing this very well.

23             I mean, the job description is for medical

24  cleaning.  The expectation is that they clean the medical

25  unit; correct?

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 64

1          A.   Yes.  Correct.

2          Q.   And then it goes on to list about vacuuming,

3    mopping, cleaning.  GEO provides all of the materials

4    necessary to carry out those tasks; correct?

5          A.   Correct.

6          Q.   And in looking at these specific work duties,

7    GEO is directing the medical cleaners to dust, to vacuum,

8    to mop, to clean the toilets, to remove the trash; correct?

9          A.   Those are the work duties, yes.

10         Q.   Now, looking at this medical cleaning job

11   description, there's a section called Termination.

12              Do you see that?

13         A.   Yes.

14         Q.   The first item says "Failure to follow CSC staff

15   instructions."

16              What is CSC staff?

17         A.   I don't know.  I've never seen this form before.

18         Q.   But to my question, CSC, have you ever seen that

19   acronym before?

20         A.   Probably sometime in my life, but I don't know

21   what it refers to here.

22         Q.   Looking at the next item down, it says "Failure

23   to follow safety procedures."

24              Would you agree that failure to follow safety

25   procedures could lead to termination?

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 65

1          A.   Yes.

2          Q.   Item 3 says "Excessive absenteeism."

3               Would you agree that excessive absenteeism could

4     lead to termination of the medical cleaners?

5          A.   Yes.

6          Q.   Would you agree that misconduct and horseplay

7     could lead to termination of the medical cleaners?

8          A.   Yes.

9          Q.   Would you agree that theft could lead to

10    termination of the medical cleaner?

11         A.   Yes.

12         Q.   Would you agree that unsatisfactory work

13    performance could lead to termination of the medical

14    cleaner?

15         A.   Yes.

16         Q.   And it's GEO that decides if any of these

17    fireable offenses have occurred --

18              MS. MELL:  Object --

19         Q.   -- is that the case?

20              MS. MELL:  Object to the form.

21         A.   It could be anybody.  If two people are

22    fighting, and a nurse walks by, they're not going to ignore

23    the fighting, they're going to tell somebody.

24         Q.   That nurse would be GEO staff though; correct?

25         A.   No.

David Tracy

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 66

1           MS. MELL:  Object to the form.

2      Q.   No?

3           All right, well let's take item 6 there,

4   "Unsatisfactory work performance," who would make that

5   determination?

6      A.   An officer.

7      Q.   That's a GEO officer; correct?

8      A.   Correct.

9      Q.   And what about failure to follow safety

10  procedures leading to termination, who would make that

11  call?

12     A.   GEO.

13     Q.   Now, the medical cleaners, could they make more

14  money if they were excellent cleaners?

15     A.   Compensation for any job in the facility is one

16  dollar per day, whether they are an excellent cleaner, not

17  such a good cleaner, they have been cleaning for 50 years,

18  if this is the first day they picked up a mop, compensation

19  is one dollar per day, not more, not less.

20     Q.   Have you ever requested a pay raise, so to

21  speak, for any of the detainee workers that you've

22  supervised?

23     A.   No.

24     Q.   Have you ever inquired with -- within your chain

25  of command, to the lieutenant or the captain, about whether

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                        December 3, 2019

                                                          Page 67

1    or not GEO could pay detainee workers more than a dollar a

2    day?

3         A.   No.

4         Q.   Now, if the detainee workers didn't carry out

5    the medical cleaning described on page 3 of Exhibit-315,

6    who would?

7         A.   I don't know.

8         Q.   Are you aware of any GEO personnel that is

9    responsible for cleaning the medical unit?

10        A.   GEO has janitors.

11        Q.   How many janitors does GEO have?

12        A.   I'm not sure.   There were three at one point.

13        Q.   And would that be three working all at once, or

14   three spread out across various shifts?

15        A.   I don't know their schedule.

16        Q.   How many janitors does GEO have right now?

17        A.   I'm not sure.

18        Q.   Can you name any of them for me?

19        A.   Last name.

20        Q.   Sure, who?

21        A.   Edgecomb.

22        Q.   Spell that for me.

23        A.   Edgecomb, E-D-G-E-C-O-M-B, I believe.  That's

24   just a guess.

25        Q.   So Edgecomb.

David Tracy                                    December 3, 2019

Page 68

```
 1        A.   Nguyen.

 2        Q.   Spell that one for me.

 3        A.   N-G-U-Y-E-N, guessing.

 4        Q.   Anyone else?

 5        A.   Not that I can think of.

 6        Q.   Now, the -- you said that Mr. Edgecomb and Mr.

 7   Nguyen are current janitors?

 8        A.   Correct.

 9        Q.   Can you distinguish for me the work that these

10   two do as opposed to the janitorial services that the

11   detainee workers do?

12             MS. MELL:  Object to the form.

13        A.   They have access to parts of the facility where

14   detainees wouldn't be able to go.

15        Q.   Are you aware of any other distinction?

16        A.   Not to my knowledge.  I'm not a janitor.  I'm

17   not sure what the difference is.

18        Q.   And as you sit here today, the first thing that

19   you can think of though is that the janitors have access to

20   areas that the detainee workers can't go; correct?

21             MS. MELL:  Object to form.

22        A.   Correct.

23             They also have keys.

24        Q.   Can you tell me the areas that the janitors can

25   go that the detainee workers can't?
```

David Tracy                                    December 3, 2019

Page 69

1        A.    Would you like a list or --

2        Q.    Sure.

3        A.    Break room, male locker room, female locker

4   room, courts, immigration, warehouse, maintenance, loading

5   dock, front lobby, employee restrooms, visitation

6   restrooms, outside in the dog run, perimeter, upstairs in

7   immigration, through emergency doors, parking lot, on the

8   property.

9              I'm sure there's more, I just --

10       Q.    But the common theme though among all the items

11  that you just listed for me is that detainees can't go

12  there?

13       A.    Correct.

14       Q.    Now, are you aware of the janitors cleaning in

15  areas that detainees have access to?

16       A.    Medical, but parts that they wouldn't have

17  access to.

18       Q.    All right, so again, are you aware of the

19  janitors cleaning areas that the detainee workers have

20  access to?

21       A.    I mean, if they see something on the ground,

22  they might pick it up, if you consider that cleaning, but I

23  would think all the officers would do the same thing.  So

24  technically, we all clean.

25       Q.    I get that, and that certainly makes sense.  I

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 70

1    mean, if there was a piece of trash in Ms. Mell's hallway,

2    I would pick it up and throw it away for her.

3              But my specific question is whether or not you

4    observed the janitors cleaning in let's say a pod, for

5    example?

6         A.   No.

7         Q.   Have you observed the janitors cleaning in the

8    laundry room?

9         A.   No.

10        Q.   Have you observed the janitors cleaning in the

11   kitchen?

12        A.   No.

13        Q.   And these are all areas that the detainees have

14   access to?

15        A.   Correct.

16        Q.   So is it fair to say that the detainee workers

17   clean the areas that they have access to, and that the

18   janitors clean the areas that the detainee workers do not

19   have access to?

20        A.   Correct.

21             MS. MELL:  Object.

22        Q.   And in your ten years at the facility, has the

23   number of janitors been constant?  You mentioned that there

24   were three, but you named two for me --

25        A.   There was three, and I believe one retired.

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                    December 3, 2019

Page 71

```
 1         Q.   So maybe only two then right now?

 2         A.   I'm -- I think they have been trying to hire

 3    one, but I don't know if one's been hired or not.

 4         Q.   Let me ask my question again then.

 5              So in your ten years at the facility, are you

 6    aware of GEO having any more than three janitors working?

 7         A.   Not to my knowledge.

 8         Q.   Are you aware of GEO using any other third-party

 9    cleaning service?

10              MS. MELL:  Object to the form of the question.

11         Q.   Do you know what I mean?

12         A.   Yes.

13         Q.   Like an outside cleaner?

14         A.   Mm-hm.

15         Q.   Are you aware of GEO ever using an outside

16    cleaner?

17         A.   Yes.

18         Q.   When was that?

19         A.   On multiple times.

20         Q.   Well, let's start with who?

21              Is it a company?

22         A.   Yeah, a company.  I can't tell you names.

23         Q.   Well, the name of the company, do you know that?

24         A.   I don't know.  It would be like -- they would

25    come out and do the hood vents or whatever for the kitchen.
```

David Tracy                                    December 3, 2019

Page 72

1    It's specialized cleaning.

2         Q.   So the third-party cleaners that you've seen do

3    specialized cleaning?

4         A.   Like cleaning out the hood vents of the kitchen,

5    things like that.

6         Q.   I want to go back to Exhibit-315, the job

7    descriptions.  Let's look at page 4.  This is a job

8    description for general worker.

9              Are you there?

10   A.   Yes.

11        Q.   Now, again, this one lists specific work duties.

12             Do you see those?

13   A.   Yes.

14        Q.   Do the general workers have discretion to

15   deviate from these specific work duties?

16        A.   The work duties are there.  Those are the work

17   duties for the job.

18             Maybe I'm not understanding your question clear.

19        Q.   No, I think it's a pretty simple question, so

20   maybe that's what's catching you off guard; right?

21             I mean, this list of specific work duties, this

22   is what GEO expects of the general workers; correct?

23             MS. MELL:  Object to the form of the question.

24   A.   Correct.

25             It might not be -- for example, number 7, that

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 73

1    might not be an everyday thing, but it's a possibility they

2    could be asked to do that.  It's a -- it's a work duty they

3    may be asked to do.

4         Q.   And looking as page 4 there of Exhibit-315, we

5    see the section there at the bottom Termination.

6              Do you see that?

7         A.   Yes.

8         Q.   Is it the case then that general workers could

9    be fired for excessive absenteeism?

10        A.   Yes.

11        Q.   Could they be fired for misconduct and

12   horseplay?

13        A.   Yes.

14        Q.   Could they be fired for theft?

15        A.   Yes.

16        Q.   Could they be fired for unsatisfactory work

17   performance?

18        A.   Yes.

19        Q.   Could they earn more if they were really good at

20   their job?

21        A.   Compensation for any job is one dollar per day.

22        Q.   So that's no, they can't earn more?

23        A.   No.  Compensation's one dollar per day.

24        Q.   And it's the case that GEO provides all of the

25   equipment and cleaning materials necessary for the general

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                    December 3, 2019

                                                        Page 74

1    workers to do their job?

2           A.   Correct.

3           Q.   Can the general workers work outside the

4    Northwest Detention Center?

5           A.   What do you mean by outside?

6           Q.   Well, let me put it this way:   In your ten years

7    at the facility, are you aware of any detainee worker

8    working for another company outside the detention center?

9           A.   While they're being detained?

10          Q.   Yes.

11          A.   No.

12          Q.   So there's no opportunity then for a detainee

13   worker to say, I don't want to work for GEO, I want to work

14   down the street?

15          MS. MELL:   Object to the form of the question.

16          A.   No.   It's a secured facility.   They can't leave

17   and come as they want to.

18          Q.   They have to stay?

19          A.   Correct.

20          Q.   And you mentioned sometimes with the general

21   workers that -- no, strike that.

22               Let's look at the next page of Exhibit-315.

23   This is page 5.   This is for laundry worker.

24               Are you there?

25          A.   Yes.

David Tracy

December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 75

```
1          Q.    Would you agree that those are the specific work
2    duties of detainee workers in the laundry department?
3          A.    Yes.
4          Q.    And when you were working as the detention
5    officer in laundry, that's what you expected of the
6    workers; correct?
7          A.    Correct.
8          Q.    And they didn't have the discretion to deviate
9    from their specific work duties; is that the case?
10         A.    That's the job duties, that's what was expected.
11         Q.    GEO provided all of the equipment and materials
12   needed for them to do their jobs as laundry workers?
13         A.    Correct.
14         Q.    And they couldn't do their laundry work outside
15   of the laundry unit?
16               MS. MELL:  Object to the form of the question.
17         A.    No.
18         Q.    They couldn't, for example, take a load of
19   laundry and fold it in the yard?
20         A.    No.
21         Q.    Is there a third-party service that does laundry
22   at the Northwest Detention Center?
23               MS. MELL:  Object to the form.
24         A.    Not to my knowledge.
25         Q.    If the detainee workers didn't do laundry, who
```

David Tracy

GEO Objections Foundation, FRE 402, 701, 802.

December 3, 2019

Page 76

```
 1    would?

 2            A.   I -- I don't know.

 3            Q.   And then we also see here on the laundry worker

 4    job description a list of fireable offenses.

 5                 Do you see that?

 6            A.   Correct.

 7            Q.   Do you agree that failure to follow safety

 8    procedures could lead to termination of laundry workers?

 9            A.   Yes.

10            Q.   Excessive absenteeism?

11            A.   Yes.

12            Q.   Misconduct and horseplay?

13            A.   Yes.

14            Q.   Theft?

15            A.   Yes.

16            Q.   And unsatisfactory work performance?

17            A.   Yes.

18            Q.   And with any of the job descriptions that we've

19    seen, can detainee workers change the job duties?

20            A.   They cannot change the job duties.

21            Q.   Can they negotiate for more pay?

22            A.   No, compensation is a dollar per day.

23            Q.   What is a pod porter?

24            A.   Be a detainee who -- pod porter?

25            Q.   Yes.
```

David Tracy                                    December 3, 2019

Page 77

1        A.    I believe it would be a detainee who goes to get

2    the food and helps serve food during meal times.

3        Q.    I've got a document I'd like for you to look at.

4              (Exhibit-316 marked.)

5              THE COURT REPORTER:   This is Exhibit-316.

6        Q.    You've just been handed Exhibit-316.   It's a

7    two-page document.

8              Have you ever seen this before?

9        A.    Yes.

10       Q.    What are we looking at here?

11       A.    Pod porter descriptions.

12             I misspoke earlier when you asked me what a pod

13   porter was.   I was assuming you were talking about food

14   porter, which refers to server on the back side of this

15   page.

16       Q.    These are people that work in the pods?

17       A.    Correct.

18       Q.    And there are various jobs within the pod?

19       A.    Correct.

20       Q.    And Exhibit-316 lists out those various jobs?

21       A.    Yes.

22       Q.    Let's start at the top of the document there.

23   In the text there it's bolded and underlined, I'm looking

24   at the last sentence, it reads, "This form along with the

25   voluntary worker agreement form and a memo must be turned

David Tracy                                    December 3, 2019

Page 78

1    in before a detainee can be placed on the pod porter list
2    and begin getting paid."
3              Do you see that?
4    A.   Yes.
5    Q.   What is the memo?
6    A.   It's a memo from an officer.
7    Q.   What's in the memo?
8    A.   Stating -- basically reiterating what this says.
9    Q.   And is it a memo then about each worker?
10   A.   Correct.
11   Q.   Is there a title for the memo?
12   A.   I mean, there's no specific title.  You put
13   whatever you want.
14   Q.   Is this something that you're coding in a
15   computer, or something that you print out, or --
16   A.   Handwritten.
17   Q.   -- fill out by hand?
18   A.   Handwritten.
19   Q.   It's a handwritten document?
20   A.   Well, it could be printed, done on a computer.
21   Q.   And who do you submit the form to?
22   A.   This form, the Volunteer Work Agreement, and the
23   memo would be sent to classification -- well, sent to the
24   lieutenant's office, put in the classification box.
25   Q.   So this is Alisha Singleton and Michael Heye

David Tracy                                    December 3, 2019

Page 79

1    eventually end up with this?

2         A.   Correct.

3         Q.   These questions are going to be similar, but I'm

4    going to ask again.

5              Do the pod porters have discretion to deviate

6    from the job duties that are listed here?

7         A.   No.  These are the expectations.  This is what's

8    expected.

9         Q.   And the pod porters use the materials provided

10   by GEO; correct?

11        A.   Correct.

12        Q.   And they clean in the areas that GEO tells them

13   to clean in; correct?

14        A.   For a pod porter.  It's the common areas of the

15   living area.

16        Q.   Looks like there are -- well, let me back up.

17             Is it the case then that a pod porter is

18   expected to clean in each of these areas, or do they have a

19   specific area?

20        A.   So it's a specific area.

21        Q.   So let's take the first one for example, shower

22   cleaners.  So a particular pod porter could be assigned to

23   clean the showers only; is that the case?

24        A.   Correct.

25        Q.   And then a different pod porter or detainee

David Tracy                                          December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 80

1    worker could be assigned to clean the bathrooms and

2    bathroom cell?

3         A.   Correct.

4         Q.   So let's say a pod porter assigned to clean the

5    shower --

6         A.   Mm-hm.

7         Q.   -- do they have discretion to clean the bathroom

8    instead?

9         A.   That's not their job.  They can clean whatever

10   they want inside the unit, their job is shower cleaner.  So

11   they can help wherever they want to clean, they can clean

12   on their own time because they want, they like it, they

13   enjoy it, it gives them something to do, but that's their

14   main -- that's their job, shower cleaner.

15        Q.   And if they clean more, right, they don't make

16   more money?

17        A.   No.

18        Q.   Is it the case then that the detainee worker

19   signs this form that is Exhibit-316 and then to the

20   detention officer signs as well?

21        A.   Correct.

22        Q.   And GEO fires pod porters if they fail to do

23   their job; is that correct?

24        A.   Correct.

25        Q.   Now, if the detainee workers didn't clean the

David Tracy                                              December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 81

1    pods, who would?

2         A.   I -- I don't know.

3         Q.   Do you think the detainee workforce is an

4    important part of carrying out the operations at the

5    Northwest Detention Center?

6              MS. MELL:   Object to the form of the question.

7         A.   I think it's a benefit to the population.  They

8    gain some -- a sense of pride from it, they gain the sense

9    of I'm not stuck here.  It gives them -- you know, just

10   like everybody else, you know, everybody else works.  You

11   know, they have their normal job, that type of thing.  This

12   gives them a sense of I'm not just stuck in here, I have

13   this, this objective or goal that I have to do.  And it

14   helps them out financially.  I think it's a benefit to --

15   sorry -- the population overall.

16        Q.   Do you think GEO gets something out of it too

17   though?

18             MS. MELL:   Object to the form of the question.

19        A.   I'm sure they do.

20        Q.   I guess that's what I'm driving at.  I mean, do

21   you think that the work that GEO gets from the detainee

22   workers is important?

23             MS. MELL:   Object to the form of the question.

24        A.   Yes.

25        Q.   It's important to the operation of the facility?

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                      December 3, 2019

Page 82

1                MS. MELL:  Object to the form of the question.

2        A.   Correct.

3        Q.   What is a detainee worker pay sheet?

4        A.   It's a -- I don't -- do you -- do you have one?

5        Q.   I do.

6        A.   Okay, cool.  Because it's easier to explain

7   it --

8        Q.   Let's do it that way.

9        A.   -- instead of trying to explain it --

10       Q.   Yeah, no it's not --

11       A.   -- you hand it to me.

12       Q.   It's not a gotcha question.

13            Hold on, let me --

14       A.   Basically it's a sheet, once they've completed

15   their task or their job for the day, they sign the sheet

16   saying I've done, you know, whatever my job is, I've

17   completed it for the day.  And it gets turned in every

18   night.

19       Q.   Oh, I guess we used it yesterday.  Give me a

20   second.

21            Exhibit-308, please.

22            Okay.  All right, you've just been handed

23   Exhibit-308.

24       A.   Thank you.

25       Q.   Is this an example of a detainee worker pay

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 83

1    sheet?

2         A.    Yes.

3         Q.    Let's look at the top there of Exhibit-308.

4    That last bullet, it says "By detainee signature staff" --

5    excuse me, let try that again.  Strike that.

6              Let's look at the last bullet there at the top

7    of Exhibit-308.  It says, "By detainee signature staff is

8    affirming that the following have been evaluated and met

9    acceptable standards: the job was completed, detainee

10   maintained a good attitude, and the detainee began work on

11   time."

12             Did I read that correctly?

13        A.    I believe so.

14        Q.    Was that your understanding when a detainee

15   signed off, it was the staff affirming that the detainee

16   had done their job?

17        A.    We hold this paper, it's in the desk, or

18   wherever it may be, so us giving it to them and having them

19   sign it.

20        Q.    Well, let me ask a different way.

21             When and why do detainees sign off on this form?

22             MS. MELL:  Object to the form of the question.

23        A.    It's verifying that the work was done.

24        Q.    In that way then is this a sort of roll sheet so

25   that you have a record of whether or not the work was

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

GEO Objections Foundation, FRE 402,
701, 802.

David Tracy                                          December 3, 2019

Page 84

1    actually done?

2           A.    Correct.

3                 And it's -- you know, it's a paper trail so, you

4    know, if you're a detainee, you worked last week, and you

5    never got paid, you didn't get your dollar or whatever --

6           Q.    Mm-hm.

7           A.    -- I could find, Oh, you didn't sign it.

8                 And then I would -- you know, if I was in there

9    that day, I can verify you worked, and I can write a memo

10   saying oh, it got turned in before he signed it, or he was

11   somewhere else when -- and never got a chance to sign it,

12   if that makes sense.

13          Q.    To your knowledge, did ICE ever play any role in

14   assigning detainees to work assignments within the

15   facility?

16          A.    Not to my knowledge.

17          Q.    To your knowledge, did ICE ever play any role in

18   terminating a detainee from a work assignment?

19          A.    Not to my knowledge, besides them leaving the

20   facility.

21          Q.    Who sets the detainee worker schedule?

22          A.    I am not positive.

23          Q.    Let's take a look at Exhibit-309.

24                THE WITNESS:  Do you need this back?  It's from

25   someone else.

David Tracy                                    December 3, 2019

1              THE COURT REPORTER:  Yes.

2        Q.    Have you seen a document like this before?

3        A.    Yeah.  Yes.

4        Q.    What are we looking at here?

5        A.    The unit pod porter assignments.

6        Q.    Is this essentially a schedule?

7        A.    Yeah, lets you know who's supposed to clean

8   where and what they're signed up for.

9        Q.    Do you know who creates this document?

10       A.    Classifications.

11       Q.    So this is Ms. Singleton or Mr. Heye?

12       A.    Correct.

13       Q.    So looking at the first page of Exhibit-309, it

14   starts with A-1 Pod.

15             Do you see that?

16       A.    Correct.

17       Q.    So the detainee workers listed here, they're

18   scheduled to work A-1 Pod at the following date and

19   whatever time is specified; is that correct?

20       A.    That's their housing unit, Alpha, A-1 is the

21   housing unit.  So they live with inside the housing unit.

22       Q.    These are the people that are assigned to clean

23   the A-1 Pod?

24       A.    Correct.

25       Q.    And then below there, you see waiting list; what

David Tracy                                      December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 86

1    is the waiting list?

2          A.    That's when a position's not available, because

3    it was full, they go onto a waiting list.  So as soon as

4    the job opens, they can take that job, or they can go, I

5    don't -- you know, I don't want it.

6          Q.    So if GEO has enough detainee workers, it caps

7    the number of people working?

8          A.    Correct.

9          Q.    And those people that still want to work are

10   then placed on a waiting list?

11         A.    Correct.

12         Q.    Have you ever seen classifications permit too

13   many people to work on any given shift?

14         A.    No.

15         Q.    Have you --

16         A.    Not that I'm aware of.

17         Q.    Have you ever felt like the detainee workers

18   have been overstaffed in a unit that you've worked?

19         A.    No, it's kind of always been this way, the same

20   type of format.

21         Q.    So put another way, the idea is not too many,

22   not too few, just enough?

23         A.    Yeah.  I would -- I would agree with that

24   statement.

25         Q.    Now, who has the final say with scheduling

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402,
701, 802.

Page 87

1    matters?  Is it GEO?

2          A.    Their schedule?

3          Q.    Yes, the detainee workers?

4          A.    Like when they work or when they sign up to

5    work?

6          Q.    Well, I know the detainee workers can request a

7    shift, but let's say everybody requested the same shift --

8          A.    Mm-hm.

9          Q.    -- is it the case that GEO could decide who

10   actually gets to work and who doesn't?

11         A.    They would -- so if, you know, day -- day shift

12   breakfast kitchen is full, they would have the opportunity

13   to -- well, you can either keep waiting for breakfast, or

14   you can go to lunch, dinner, or the evening shift.  That's

15   ultimately up to the detainee.

16         Q.    But as it stands though, the official schedule

17   is the schedule that GEO sets?

18               MS. MELL:  Object to the form of the question.

19         A.    I don't know who sets it.

20         Q.    But --

21         A.    I would assume GEO sets it.

22         Q.    If I understood you, is it the case that

23   classifications, meaning Ms. Singleton or Mr. Heye, set the

24   schedule?

25         A.    It's always been pretty much the same time frame

GEO Objections Foundation, FRE 402, 701, 802.

David Tracy                                        December 3, 2019

Page 88

1    since I started there, so I don't know who created it, who

2    put it into the play, but ...

3         Q.    Would it be fair to say then it's a GEO-approved

4    schedule?

5         A.    Yeah.  Yes.

6         Q.    All right, so there's a GEO-approved schedule

7    for detainee workers; correct?

8         A.    Correct.

9         Q.    And GEO provides detainee workers the training

10   they need to do their jobs; correct?

11        A.    Correct.

12        Q.    GEO provides them the equipment they need to do

13   their job; correct?

14        A.    Correct.

15        Q.    The detainee workers aren't allowed to deviate

16   from their job duties; correct?

17        A.    Correct.

18        Q.    GEO supervises the detainee workers as they go

19   about their work; correct?

20        A.    Like I said earlier, they're not standing over

21   there supervising them that specific task, there's

22   supervision while multitasking throughout the day.

23        Q.    If a detainee worker fails to carry out their

24   job duties or goes about them in an unsafe way, GEO can

25   fire them; correct?

David Tracy                                    December 3, 2019

GEO Objections Foundation, FRE 402, 701, 802.

Page 89

1              MS. MELL:  Object to the form of the question.

2         A.    Yeah.

3              MR. WHITEHEAD:  All right, let's take one more

4    break.

5              THE VIDEOGRAPHER:  Going off the record.  The

6    time is 12:38.

7                   (Recess at 12:38 p.m.)

8                   (Reconvened at 12:48 p.m.)

9              THE VIDEOGRAPHER:  Back on the record.  The time

10   is 12:48.

11        Q.    Mr. Tracy, earlier you told me about two

12   janitors by name that work at the Northwest Detention

13   Center; do you recall giving that testimony?

14        A.    Yeah, Edgecomb and Nguyen.

15        Q.    Do you know how much they're paid?

16        A.    I have no idea.

17        Q.    Mr. Tracy, I know I've asked you some pointed

18   questions today, but have I been fair with you?

19             MS. MELL:  Objection.  You don't have to answer

20   that.  You don't -- don't answer that.  No.  You don't have

21   to answer that question.

22             Are you done?

23        Q.    Yeah, I thought it was a fair question, but

24   if -- are you going to take the advice of counsel?

25   Ultimately it's your decision about whether or not you're

David Tracy                                    December 3, 2019

```
                                                   Page 90
 1    going to refuse to answer a question.

 2         A.    Correct, I'll refuse to answer.

 3              MR. WHITEHEAD:  Fair enough.  All right, thank

 4    you for your time.  I don't have any other questions.

 5                   E-X-A-M-I-N-A-T-I-O-N

 6    BY MS. MELL:

 7         Q.    Okay, Mr. Tracy, can you tell me, if you failed

 8    to perform for GEO, GEO can terminate you; right?

 9         A.    Correct.

10         Q.    And GEO -- GEO has the final say in terminating

11    you?

12         A.    Correct.

13         Q.    Right.  So you're gone, you're gone?

14         A.    Yeah.

15         Q.    At GEO's say so?

16         A.    Correct.

17         Q.    Okay.  That's not the same for the detainees, is

18    it?

19              MR. WHITEHEAD:  Object to form.

20         A.    No.  So, for example, if you are a detainee, and

21    your duty was to sweep and mop, and you decided I'm done,

22    I'm not sweeping, mopping, I quit, or I -- there's a

23    refusal to work form, I would fill it out, ask you to sign

24    it.  If you don't want to sign it, you don't have to, I

25    just write refusal, refused to sign, or something to that
```

David Tracy                                        December 3, 2019

Page 91

1      nature.  Then that gets turned into classifications, just

2      like everything else, and class -- sorry, classification

3      makes the final determination at that point whether or not

4      they're going to stay in the program or not.

5              If the detainee doesn't agree with the decision

6      that I've made, that classifications made, they can write a

7      grievance or appeal to classification, they can appeal to

8      the facility administrator, they can appeal to ICE.

9              At the end of the day, ICE has the final say so

10     whether somebody is taken off the work program, if it gets

11     appealed to ICE.

12     Q.    All right.  So, for each instance, where Counsel

13     went through the job descriptions set forth at Exhibit-316,

14     Exhibit-315, those two exhibits, and he -- and he went

15     through and asked you, okay, so --

16     A.    Sorry.

17     Q.    -- if a detainee fails to follow CSC staff

18     instructions, you can terminate him, what -- what did you

19     mean by that?

20     A.    Basically if I --

21             MR. WHITEHEAD:  First off, excuse me, object to

22     form.

23     A.    Basically, like I kind of stated earlier, if

24     they refuse to do it, refuse to do their assigned job, I

25     would fill out a refusal to work form.  They either sign it

David Tracy                              December 3, 2019

Page 92

1  or don't sign it.  That form gets forwarded to

2  classification, and then classification makes a decision

3  whether they are removed or not removed.

4        If the detainee doesn't agree with the -- the

5  decision, they can write a grievance or an appeal form,

6  it's the same -- same thing, to immigration, immigration

7  can overturn that decision or agree with the decision.

8        Q.   And went you say immigration, you mean ICE?

9        A.   ICE.

10       Q.   Okay.  And with regard to the decision -- if a

11  detainee signs a refusal to participate form or refusal --

12  what's it called, a refusal --

13       A.   A refusal to work.

14       Q.   -- a refusal to work form, that detainee can

15  work in another area the next day?

16       A.   Yeah, so maybe they're just having a bad day,

17  and I'm done, I quit, I quit, blah, blah, blah, they sign

18  it, and then the next day they want to work again, just

19  have them fill out these -- the papers we went through

20  earlier, and they either go back on the waiting list or

21  they get offered -- offered whatever's available.

22            MS. MELL:  Okay.  All right, I have nothing

23  further.

24

25

GEO Objections Foundation, FRE 402, 701, 802.

David Tracy                                    December 3, 2019

                                                      Page 93

 1              F-U-R-T-H-E-R E-X-A-M-I-N-A-T-I-O-N

 2    BY MR. WHITEHEAD:

 3         Q.   Well, Mr. Tracy, I believe I asked you earlier

 4    if ICE played any role in the termination of detainee

 5    workers; do you recall me asking you that question?

 6         A.   Yes.

 7         Q.   And you told me no; do you recall giving that

 8    answer?

 9         A.   Yes.

10         Q.   We took a break; correct?

11         A.   (Nodding head.)

12         Q.   Correct?

13         A.   Correct.

14         Q.   Did you meet with your attorney during that

15    break?

16         A.   We spoke.

17         Q.   Okay.  And then we resumed your deposition;

18    correct?

19         A.   Correct.

20         Q.   And now you're giving me a different answer?

21         A.   I did not under -- when you -- can you repeat

22    the question?  Do you remember exactly how you phrased it?

23         Q.   It's written in the transcript, but I'm curious,

24    how did you come to this new understanding about ICE

25    playing a role in the terminations?

David Tracy                                    December 3, 2019

Page 94

1          MS. MELL:  Object to the form of the question,

2    and mischaracterizes his prior testimony, and that wasn't

3    the testimony, and it is not inconsistent.

4          You can answer if you want to.

5     Q.   No, it's not --

6          MS. MELL:   If you understand the question.

7     Q.   Please go ahead.

8     A.   When you said -- I believe the way you asked it

9    is does ICE have any direction to who works.  I'm assuming

10   you mean this paperwork gets turned into them, and they

11   personally hand pick who works where.

12    Q.   So this is --

13    A.   They can appeal any -- any decision we make,

14   disciplinary, anything, can be appealed to ICE.

15    Q.   And how is it that you've come to this

16   understanding about ICE's role in the appeals process?

17    A.   There's -- you -- I was -- I don't want to say

18   misled.  I didn't understand what you were speaking about

19   earlier.

20    Q.   My question though is how did you come to this

21   understanding about ICE's role in this appellant process

22   that you've just described for me?

23    A.   Well, you never asked me about an appeal

24   process, and I was answering my attorney's question.

25    Q.   So tell me, what -- what do you know about this

David Tracy                                    December 3, 2019

Page 95

1    appellate process?

2         A.    You can write a grievance to immigration and

3    explain the situation, just as a disciplinary process.

4         Q.    Well, tell me step-by-step then -- well, strike

5    that.

6              Tell me every way in which ICE is involved in a

7    termination decision at the Northwest Detention Center of

8    Voluntary Work Program workers?

9              MS. MELL:  Object to the form of the question.

10        A.    They -- they can overturn what we decide to do.

11             If I decide, for whatever reason, I'm going to

12   have you fill out this form because you don't want to work,

13   and you don't agree with it, you can, well, write a

14   grievance, it's basically an appeal, to immigration.

15   Immigration will go we agree or we don't agree.  Same way

16   as disciplinary.  Disciplinary can be appealed to -- for

17   fighting; maybe it's not a fight, maybe it's an assault,

18   and we got it wrong.

19        Q.    So in the scenario you just described, GEO makes

20   a determination, and the detained worker can at some point

21   and through some process ultimately appeal to ICE --

22        A.    Correct.

23        Q.    -- is that fair to say?

24        A.    Mm-hm.

25        Q.    And ICE can overturn GEO's decision; correct?

David Tracy                                    December 3, 2019

Page 96

```
 1        A.    Detaineewise, ICE has the overall say

 2    detaineewise.

 3        Q.    My question was a little bit different though.

 4              ICE can overturn GEO's decision about the

 5    discipline and termination; is that correct?

 6        A.    Correct.

 7        Q.    Or ICE can agree with GEO's determination;

 8    correct?

 9        A.    Correct.

10        Q.    What is a UDC hearing?

11        A.    Unit -- give me one second, it's been a

12    minute -- Unit Disciplinary Committee?

13        Q.    Who is on the Unit Disciplinary Committee?

14        A.    UDC is -- I believe it's just a -- it's usually

15    the seg lieutenant.

16        Q.    I'm sorry, seg lieutenant, that sounds like an

17    abbreviation; what is that?

18        A.    Segregation lieutenant.

19        Q.    Who else is on the UDC?

20        A.    I'm not sure.

21              I know -- I'm assuming you're going to ask me

22    about IDP?

23        Q.    Yes.

24        A.    That's a panel of, I believe, three people.  I

25    don't know if it's the same now.  When I was in segregation
```

David Tracy                                    December 3, 2019

1    on day shift, it was the seg lieutenant, if he's not

2    involved in the prior steps, a representative from

3    immigration, ICE, and another staff member that's not

4    involved.

5         Q.    Now, IDP, is that different than UDC?

6         A.    Correct.

7         Q.    So which step comes first, UDC or IDP?

8         A.    It depends on the severity of the charge.  So a

9    Level 300, 400 charge would be a UDC.

10        Q.    What is a Level 300, 400 charge?

11        A.    The severity of the charges.

12        Q.    Is 300, 400, is that severe or less severe?

13        A.    No, less severe.

14        Q.    Less severe, okay.

15              So if it's a less severe offense, it goes to

16   UDC?

17        A.    Yeah.

18              Higher severity would be IDP.

19        Q.    Give me an example of something that's higher

20   severity that would go to IDP?

21        A.    Assault.

22        Q.    Where would theft fall?

23        A.    In the 300.

24        Q.    Where would unsatisfactory performance in the

25   Voluntary Work Program fall?

David Tracy                                    December 3, 2019

Page 98

1          A.   300.  Or I don't know if there's a specific
2     charge to that, but 300 would probably be where it falls.
3          Q.   So in the case of a less severe offense, for
4     example, unsatisfactory work in the Voluntary Work Program,
5     that would go to UDC; correct?
6          A.   Correct.
7          Q.   And it's your understanding that it's the
8     segregation lieutenant that's on the UDC panel?
9          A.   Correct, if he's not involved.  If he's
10    involved, then it would be another supervisory staff or
11    higher.
12         Q.   So assuming the segregation lieutenant isn't
13    conflicted out, it would be him or her that would hear --
14         A.   Correct.
15         Q.   -- the charge?
16         A.   Norm -- I believe so, normally.
17         Q.   And is there anyone else that is part of the UDC
18    process?
19         A.   Not to my knowledge.
20         Q.   All right, so at the UDC hearing, the
21    segregation lieutenant can make a determination?
22         A.   Mm-hm.
23         Q.   Is that yes?
24         A.   Correct.
25              I'm sorry.

David Tracy                                December 3, 2019

Page 99

1        Q.    And is that the point at which a detainee worker
2    could appeal to ICE?
3        A.    Correct.
4        Q.    And ICE could either agree with GEO's
5    determination; correct?
6        A.    Correct.
7        Q.    Or disagree?
8        A.    Correct.
9        Q.    Now, is it the case for both the IDP proceedings
10   and UDC proceedings that GEO is calling -- is initiating
11   the matter?
12             MS. MELL:  Object to the form.
13       A.    What -- what do you mean?
14       Q.    Well, who gets the ball rolling, whether it's
15   UDC or IDP?
16             MS. MELL:  Object to the form.
17       A.    That would be --
18             THE WITNESS:  Sorry.
19       A.    It would be whoever writes it up.
20       Q.    GEO; correct?
21       A.    Or --
22             MS. MELL:  Object to the form of the question.
23       A.    Medical has written people up as well.
24       Q.    So medical and GEO?
25             MS. MELL:  Object to the form.

David Tracy                                    December 3, 2019

                                                   Page 100

    1        Q.   Anyone else?

    2             MS. MELL:  Object to the form.

    3        A.   No, that's -- that's it.

    4        Q.   Who is Nels Riach?

    5        A.   Nels Riach.

    6        Q.   Nels Riach?

    7        A.   He's a segregation lieutenant.

    8        Q.   So he would be someone, for example, that would

    9   conduct a UDC hearing?

   10        A.   Correct.

   11             (Exhibit-317 marked.)

   12             THE COURT REPORTER:  This is Exhibit-317.

   13        Q.   You've just been handed Exhibit-317.

   14             Have you seen this email before?

   15        A.   No.

   16        Q.   Have you seen an email like this before?

   17        A.   I'm sure sometime in my life at GEO I have.

   18        Q.   In reviewing Exhibit-317, do you have a guess as

   19   to what's going on here?

   20             MS. MELL:  Object to the form of the question.

   21             Don't guess.

   22        Q.   No, please guess.  I'm asking for your

   23   understanding based on your review of the document.

   24             MS. MELL:  No, don't guess.

   25             And don't instruct my client to guess in a

David Tracy                                    December 3, 2019

                                                    Page 101

1    deposition.

2         A.   Based off of the words in the email, Jean A

3    number, was charged with 323 attempting to steal, he is

4    found guilty with the loss of the job in the kitchen.

5              Avalos -- I'm not reading the A number.

6         Q.   Sure.

7         A.   Just A number, 323, that's the charge,

8    attempting to steal, 309 is the charge, lying to staff.  He

9    was found guilty with the loss of the job in the kitchen.

10             Flores, A number, 323 attempting to steel,

11   guilty with verbal reprimand.  He was told he could go back

12   to work on the 27th.

13        Q.   So these appear to be examples of Nels Riach, as

14   the segregation lieutenant, making a determination about

15   UDC proceedings; would you agree?

16        A.   Correct.

17        Q.   Are you aware of a time that ICE overturned

18   GEO's determination about firing a VWP worker?

19        A.   I know it's happened.  I can't give you a

20   specific case.

21        Q.   When you say you know it's happened but you

22   can't give me a specific example --

23        A.   Yeah, I've heard of it.

24        Q.   Well --

25        A.   Just the same way that they can reduce

David Tracy                                    December 3, 2019

Page 102

1    segregation time in the IDP or they can say we don't agree

2    with it.

3             Q.    Well, this is important here.

4                   Are you aware of a time that ICE has overturned

5    GEO's determination about firing a VWP worker?

6                   MS. MELL:   Object to the form.

7             A.    Yes.

8             Q.    Tell me about that time.

9             A.    I -- I can't tell you about the time.  I know

10   it's happened.  I can't give you a specific example from

11   ten years of work history.

12            Q.    More than once?

13            A.    I can't recall.

14            Q.    Less than five?

15            A.    I can't recall.

16            Q.    So you have no recollection one way or another

17   whether it's between one and five times?

18            A.    I don't know.

19            Q.    Who would I ask if I wanted to know?

20            A.    Ask Singleton.

21            Q.    And what you just told me about detainee workers

22   appealing to ICE, is there a specific policy or regulation

23   that you're thinking of?

24            A.    I don't know the policy -- I don't know if

25   there's a policy.  I know that's one of their options they

David Tracy                                    December 3, 2019

Page 103

1    have.

2         Q.    How often do appeals like that take place?

3         A.    I don't know.  I'm not a part of the process.

4         Q.    I don't mean to quarrel with you, but if you're

5    not a part of the process, how is it that you're aware --

6         A.    We used to get paper grievances.  We no longer

7    get paper grievances, they're all done by tablet.  So when

8    I would get a paper grievance I'd be able to see he what it

9    is.  Now I don't have the ability to look at the grievance

10   to see what the grievance is about.

11        Q.    When was that change made?

12        A.    Roughly a year and a half, two years ago.

13        Q.    So prior to that change, when you had visibility

14   into the paper grievances, how often did detainee workers

15   appeal a GEO determination about discipline or firing from

16   the Voluntary Work Program?

17        A.    It would usually come from segregation.

18        Q.    So is that often, not often?

19        A.    I don't -- I --

20        Q.    You can't venture a guess?

21        A.    It's been years since I've been in seg from when

22   we turned in the mail.  I know that's always explained to

23   them as an option.  Whether they want to venture down that

24   road or not, that's up to them.

25              MR. WHITEHEAD:  All right, I think that's it for

David Tracy                                    December 3, 2019

Page 104

1    me unless your attorney has more questions.

2             MS. MELL:  I have plenty more now.  You've

3    opened the door.

4             F-U-R-T-H-E-R E-X-A-M-I-N-A-T-I-O-N

5    BY MS. MELL:

6        Q.   All right, so when you testified with regard to

7    who can write up a detainee, you said medical and GEO.  Is

8    it correct that ICE officers who observe misconduct or

9    behavior that is write-upable, an ICE officer may write up

10   a detainee who is --

11       A.   They --

12            MR. WHITEHEAD:  Object to form.

13       A.   They can write them up.  I've never seen them

14   write a person up.

15       Q.   Have you seen them come to you and say, Hey,

16   what's going on?

17       A.   Correct.

18            MR. WHITEHEAD:  Object to form.

19       A.   I've been told, Hey, this is happening, or --

20       Q.   And you need to address it?

21       A.   Yeah.

22       Q.   By an ICE officer?

23       A.   But if you're an ICE officer and you tell me,

24   Hey, we saw this person do this, I can't write that up.

25       Q.   Okay.

David Tracy                                    December 3, 2019

Page 105

1          A.    I have to write what I see.

2          Q.    Okay.

3          A.    So I can look into it, or they can tell somebody

4    that can review the cameras, but I can't go off of your

5    word.  I can go look into the situation they're speaking

6    about, but I can't write it up based on their -- what

7    they've told me.

8          Q.    Okay, but I -- you have had the experience where

9    ICE has directed you to take action relative to a

10   detainee --

11               MR. WHITEHEAD:  Object to --

12         Q.    -- participant in the VWP?

13               MR. WHITEHEAD:  Object to form.

14         A.    Say -- sorry, say that one more time.

15         Q.    Is it my understanding from your testimony that

16   you've had the experience where an ICE officer has asked

17   you to look into something the ICE officer has observed of

18   a VWP participant?

19               MR. WHITEHEAD:  Object to form, misstates prior

20   testimony.

21         A.    I mean, it could be something as simple as, you

22   know, there's a group cleaning over here, and maybe they're

23   not cleaning, maybe they're trying -- a male trying to talk

24   to a female.  ICE officer, Hey, what is going on over

25   there?  Then you go look into it that way.

David Tracy                                    December 3, 2019

1          Q.   Okay.  And there's situations, for instance,

2     where ICE will be coming -- well, strike that.

3               ICE is in the facility all the time; right?

4          A.   Correct.

5          Q.   They're --

6               MR. WHITEHEAD:  Object to form.

7          Q.   ICE is around the detainee workers all the time?

8               MR. WHITEHEAD:  Object to form.

9          A.   Correct.

10         Q.   And there are instances where, for example, ICE

11    officials are walking down the gray mile, and there's water

12    accumulated in an area that they think presents a security

13    risk, and they will address it?

14              MR. WHITEHEAD:  Object to form.

15         A.   I don't know if they'll directly address it with

16    that person, they'll address it -- I know they'll address

17    it with one of us.

18         Q.   All right.  And you feel obligated to respond to

19    ICE in that instance?

20              MR. WHITEHEAD:  Object to form.

21         A.   Correct.

22         Q.   All right.  And the action that you would take

23    to respond to it would be what?

24         A.   Either talk to the group and tell them, you

25    know, less water, or make sure there's wet -- the wet floor

                                                    Page 107

1    sign's down, or maybe split the hallway into two.

2         Q.   All right.  Is it correct that you are trained

3    to defer to ICE at the facility?

4              MR. WHITEHEAD:  Object to form.

5         A.   Defer to ICE?

6         Q.   Defer to ICE.

7              If ICE is asking you to do something, you

8    respond to ICE?

9         A.   Yes.

10             MR. WHITEHEAD:  Object to form.

11        Q.   Okay.  So with respect to the questions you were

12   asked about a specific detainee policy and procedure, about

13   their ability to file a grievance to ICE, could you take a

14   like at Exhibit-313.

15        A.   One sec.

16        Q.   Let's see, where did that go?  There you go.

17             Exhibit-313 is from the GEO Policy and Procedure

18   Manual; is that correct?

19        A.   Correct.

20        Q.   And is it correct that each and every GEO policy

21   and procedure is ultimately approved and signed off by ICE?

22             MR. WHITEHEAD:  Object to form.

23        A.   Correct.

24             This should it right here.

25        Q.   All right.  So is it correct, based on your

David Tracy                                    December 3, 2019

 1    understanding, that any of the policies and procedures that

 2    are enforceable specific to the Voluntary Work Program at

 3    the Northwest Detention Center must be approved by ICE?

 4             MR. WHITEHEAD:  Object to form.

 5       A.    Correct.

 6       Q.    All right.  And with respect to the protocols

 7    and procedures that are applicable to the VWP, ICE has

 8    final say with regard to the detainee's participation as

 9    expressed on page 5, wherein it says "Detainee may file a

10    grievance to the Facility Administrator or local Field

11    Office Director if they believe they were unfairly removed

12    from work, in accordance with standard '6.2 Grievance

13    System'"; correct?

14       A.    Correct.

15       Q.    So this policy expressly communicates what

16    you've testified to as the ICE having the final say so with

17    regard to participation in the Voluntary Work Program;

18    correct?

19             MR. WHITEHEAD:  Object to form.

20       A.    Correct.

21       Q.    And do you know, with regard to Exhibit-315,

22    whether or not the acronym CSC pertains to correctional

23    services, the predecessor interest to GEO?

24       A.    That's would be my assumption.  I'm not

25    positive, but ...

David Tracy                                    December 3, 2019

Page 109

1          Q.    So is it correct that you don't even know

2     whether or not these detainee job descriptions are GEO

3     detainee job descriptions or were ever approved by ICE?

4          A.    Reading it, the descriptions, you know, match

5     the descriptions as close as I can think they match, but

6     yeah, just we don't go by CSC, so I don't want to say

7     that --

8          Q.    Okay.

9          A.    -- I know what that stands for or I know what

10    that means.

11         Q.    Okay.  And it's correct that you have never

12    punished any detainee based on your observation of their

13    behavior in a Voluntary Work Program --

14              MR. WHITEHEAD:  Object to --

15         Q.    -- in terms of sending them to segregation and

16    isolating them?

17              MR. WHITEHEAD:  Object to form.  We're outside

18    now the scope of the redirect or the next line of

19    questioning.

20         A.    Not based on their participation in the

21    Voluntary Work Program.  If they're working and get into a

22    fight, it's a separate situation.  Not solely based on the

23    volunteer -- something from the Voluntary Work Program.

24         Q.    Okay.  So if a fight errupts in the VWP, you

25    follow your standard security and safety protocols?

David Tracy                                           December 3, 2019

Page 110

```
 1        A.    Correct.

 2        Q.    And for the most part, for most of the VWP

 3   participation, the correctional officers are performing

 4   their usual and ordinary safety and security duties and

 5   responsibilities, they are not assigned to oversee the VWP?

 6        A.    Correct, I --

 7              MR. WHITEHEAD:  Object to form.

 8        A.    I kind of said it earlier, we're multitasking.

 9   Because I know you're over there sweeping, mopping, or

10   whatever, I still have to do everything else I would

11   normally do.  That doesn't change because you're over there

12   sweeping or mopping.

13        Q.    Right.  So you're -- there are no detention

14   officers assigned to the VWP, correct, that just do VWP

15   oversight?

16              MR. WHITEHEAD:  Object to form, outside the

17   scope.

18        Q.    They're doing their security task?

19        A.    It's a security task, it's not directly related

20   to the work program.

21              MS. MELL:  Right.  That's it, I think we're

22   done.

23              MR. WHITEHEAD:  I think we're good.

24              MS. MELL:  Okay.

25              THE VIDEOGRAPHER:  This is the end of media two,
```

David Tracy                                    December 3, 2019

                                                  Page 111

1    and concludes the deposition of David Tracy.  The time is

2    approximately 1:13.

3              THE COURT REPORTER:  Are you going to have this

4    one transcribed then?

5              MR. WHITEHEAD:  Yes.

6              THE COURT REPORTER:  And are you going to order

7    a copy?

8              MS. MELL:  I'll have a copy if they have a copy,

9    but I won't order if they didn't.

10             You ordered?

11             MR. WHITEHEAD:  I did.

12                (Deposition adjourned at 1:13 p.m.)

13                (Signature reserved.)

14

15

16

17

18

19

20

21

22

23

24

25

David Tracy                                    December 3, 2019

Page 112

1                    S-I-G-N-A-T-U-R-E

2

3

4            I declare under penalty of perjury under

5    the laws of the State of Washington that I have read

6    my within deposition, and the same is true and

7    accurate, same and except for changes and/or

8    corrections, if any, as indicated by me on the CHANGE

9    SHEET flyleaf page hereof.  Signed in..............,

10   WA, on the........day of..............., 2019.

11

12

13

14                       .........................

15                       DAVID M. TRACY

16                       Taken: Tuesday, December 3, 2019

17

18

19

20

21

22

23

24

25   Keri A. Aspelund

David Tracy                                December 3, 2019

Page 113

```
 1                    C-E-R-T-I-F-I-C-A-T-E
 2

 3     STATE OF WASHINGTON )
 4                        )  ss.
 5     COUNTY OF THURSTON  )
 6
                I, the undersigned Registered Professional
 7     Reporter and Certified Court Reporter, hereby
       certify that the foregoing deposition upon oral
 8     examination was taken stenographically before me and
       transcribed under my direction;
 9
10              That the witness was duly sworn by me,
       pursuant to RCW 5.28.010, to testify truthfully; that the
11     transcript of the deposition is a full, true, and correct
       transcript to the best of my ability; that I am neither
12     attorney for, nor a relative or employee of, any of the
       parties to the action or any attorney or counsel employed
13     by the parties hereto, nor financially interested in its
       outcome.
14
15              I further certify that in accordance with CR
       30(e), the witness was given the opportunity to examine,
16     read, and sign the deposition, within 30 days, upon its
       completion and submission, unless waiver of signature was
17     indicated in the record.
18
                IN WITNESS WHEREOF, I have hereunto set
19     my hand this 10th day of December, 2019.
20
21
22
23     _____
       NCRA Registered Professional Reporter
24     Washington Certified Court Reporter No. 2661
25
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com     206.622.6661 * 800.657.1110  FAX: 206.622.6236

David Tracy                                    December 3, 2019

                                                    Page 114

 1

 2              SEATTLE DEPOSITION REPORTERS, LLC

 3               600 UNIVERSITY STREET, SUITE 320

 4                   SEATTLE, WA  98101
                       (206) 622-6661
 5
                   C-H-A-N-G-E  S-H-E-E-T
 6
         PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
 7       SHOWING PAGE, LINE AND REASON.

 8       -----------------------------------------------------
         PAGE  LINE    CORRECTION AND REASON
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24             _____
               DAVID M. TRACY
25             TAKEN: Tuesday, December 3, 2019