1

The Honorable Robert J. Bryan

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6

7

8

UGOCHUKWU GOODLUCK
NWAUZOR, FERNANDO AGUIRRE-
URBINA, individually and on behalf of all
those similarly situated,

No.  3:17-cv-05769-RJB

**PLAINTIFFS' TRIAL BRIEF**

9

Plaintiffs,

10

v.

11

THE GEO GROUP, INC., a Florida
corporation,

12

13

Defendant.

14

15

16

17

18

19

20

21

22

23

24

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   PROCEDURAL HISTORY .....................................................................1

III.  FACTS TO BE PROVED AT TRIAL......................................................2

    A.   GEO Owns and Operates the Northwest Detention Center and Contracts with ICE to House Civil Immigration Detainees There................................................................................................2

    B.   ICE Required GEO to "Develop" and "Manage" the Voluntary Work Program at the NWDC in Accordance with ICE Regulations and State and Local Laws............................................3

    C.   ICE Has Little Involvement with the Day-to-Day Operation of the VWP, as GEO Alone Hires, Assigns, Trains, Supervises, Pays, and Terminates Detainee Workers......................................3

IV.   ISSUES FOR TRIAL..............................................................................5

    A.   GEO Is an "Employer" Under the MWA, and the Class Members Are Its "Employees."............................................................5

    B.   To the Extent the Court Relies Upon the Economic Dependence Test, It Should Use the Test as Described in *Anfinson,* and Not *Becerra.* ......................................................................................6

        1.   GEO directly supervises and controls the detainees' work. ...............................................................................8

        2.   Detainee workers work on GEO's premises using only GEO supplies...........................................................8

        3.   Detainee workers have no opportunity for profit or loss. ...................9

        4.   Working in the VWP requires no pre-existing skill or initiative. .............................................................9

        5.   The working relationship between GEO and the detainee workers is permanent..............................................9

        6.   Detainee workers are integral to GEO's operations at NWDC. ...............................................................10

    C.   GEO Failed to Pay Its Employees the Minimum Wage for All Hours Worked............................................................................10

PLTFS.' TRIAL BRIEF
(3:17-cv-05769-RJB) – ii

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
Phone (206) 622-8000 ● Fax (206) 682-2305

D.     Neither the Residential nor "Government-Owned Facility" Exemptions Apply to GEO...........................................................................11

       1.     The "Residential Exemption" is inapplicable because Plaintiffs' job duties do not require them to sleep or reside at NWDC. ................................................................11

       2.     The "State-Owned Facility" exemption under the MWA does not apply to GEO....................................................12

E.     Because the MWA Does Not Discriminate Against the Federal Government, the Doctrine of Intergovernmental Immunity Does Not Apply. .........................................................................................13

F.     Derivative Sovereign Immunity Does Not Bar Plaintiffs' Claims..............................................................................................13

G.     GEO Cannot Maintain a Claim in Equity for "Offset/Unjust Enrichment" Because GEO Contracted with ICE—and Received Payment—for the Benefits It Now Seeks to Disgorge from Plaintiffs. ...................................................................13

H.     Jurors Who Demonstrate Actual or Implied Bias Should be Stricken for Cause. ...................................................................14

I.     The Discriminatory Use of Peremptory Challenges in Jury Selection is Strictly Prohibited.....................................................15

J.     Relief Sought. .............................................................................16

V.     CONCLUSION ....................................................................................17

## I.  INTRODUCTION

Defendant The GEO Group, Inc. ("GEO") owns and operates what was formerly known as the Northwest Detention Center ("NWDC"). It uses civil immigration detainees participating in its Voluntary Work Program ("VWP"), like Plaintiffs Ugochukwu Goodluck Nwauzor and Fernando Aguirre-Urbina, to perform virtually all non-security functions in the facility. GEO pays these detainee workers $1.00 a day for their labor regardless of how many hours they actually work.

At trial, the jury will be asked to decide whether GEO employed the detainee workers within the meaning of the Washington Minimum Wage Act, and if so, whether GEO must pay the workers backpay damages for work performed at subminimum wages.

So far, GEO has avoided an adverse liability finding by obscuring the factual record and advancing hyper-technical legal arguments, but at trial, Plaintiffs will offer testimony and other evidence demonstrating that GEO undeniably permits detained persons to work and pays them for doing so, thereby forming an employment relationship under Washington law.

## II.  PROCEDURAL HISTORY

The State and Plaintiffs Nwauzor and Aguirre-Urbina (then Chao Chen) filed separate lawsuits against GEO for its practice of paying detained workers in the VWP $1 per day regardless of the length of time worked on September 20 and 26, 2017, respectively. On May 2, 2019, the Defendant filed a Motion to Dismiss, Stay or Consolidate Related Litigation. After oral argument on May 28, 2019, the Court denied the portion of the motions to dismiss or stay, and denied in part and granted in part the motion to consolidate. Specifically, the Court consolidated the liability issues, and denied without prejudice the damages issues. Thus, the liability phase of this trial will be heard jointly, and the damages phase separately.

PLTFS.' TRIAL BRIEF
(3:17-cv-05769-RJB) – 1

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

## III.   FACTS TO BE PROVED AT TRIAL

### A.  GEO Owns and Operates the Northwest Detention Center and Contracts with ICE to House Civil Immigration Detainees There.

GEO is a global, for-profit corporation providing correctional, detention, and community reentry services. In November 2005, GEO acquired the NWDC in Tacoma, Washington.[1] GEO contracts with U.S. Immigration and Customs Enforcement ("ICE") to provide detention management services at the NWDC. These include providing the facility itself, detention officers, management personnel, supervision, and staffing.

Detained persons at NWDC are held in administrative custody as they await immigration status review by ICE. They are not "resident[s], inmate[s], or patient[s] of a state, county, or municipal correctional, detention, treatment or rehabilitative institution" as defined in the Washington Minimum Wage Act, Washington Revised Code § 49.46.010(3)(k). Their detention is not penal or punitive, nor is it to treat mental health or disability. Their average stay lasts about 85 days but can span years.

In its Contract with ICE, GEO agreed to furnish detention services and bed space for up to 1,575 men and women through the year 2026 in return for a large sum of money. The total payment is based on a "bed-day rate" for each detained person at NWDC that includes GEO's direct costs, indirect costs, overhead and *profit* for providing the detention, food service, and other required services (such as laundry, barbershop, and sanitary facilities) at NWDC.

---

[1] Nearly two years into this litigation, GEO rebranded the NWDC as the "Northwest ICE Processing Center," despite the fact that ICE holds no ownership interest in the facility. A new name will not hide GEO's past conduct. Because nearly all of the relevant documents refer to the facility as the NWDC, Plaintiffs will also refer to it by its original name for consistency's sake and to avoid jury confusion.

PLTFS.' TRIAL BRIEF
(3:17-cv-05769-RJB) – 2

**B. ICE Required GEO to "Develop" and "Manage" the Voluntary Work Program at the NWDC in Accordance with ICE Regulations and State and Local Laws.**

The Contract requires GEO to perform all services in accordance with ICE's Performance-Based National Detention Standards (PBNDS). The PBNDS are a set of national detention standards developed by ICE to ensure that all entities with whom it contracts for detention services meet baseline standards for maintaining safe, secure, and humane facilities. The PBNDS do not dictate how the vendor is to perform the work, just the outcomes and results that the government expects.

Among other things, GEO's Contract with ICE requires it to develop and manage a detainee work program in line with the PBNDS and *all* applicable laws and regulations. Other parts of the Contract amplify this requirement, instructing GEO at least twice more that it must comply with all applicable federal, state, and local laws and standards. If any ambiguities arise, the Contract requires GEO to apply the most stringent standard.

Detained persons working within the VWP are paid for their labor. In 2008, the PBNDS set VWP compensation at $1.00 per day. In 2011, ICE changed the standards to require that GEO pay workers *at least* $1.00 (USD) per day. Despite the change to the PBNDS, GEO rarely exercises its discretion to pay the detainees more than $1.00 per day.

**C. ICE Has Little Involvement with the Day-to-Day Operation of the VWP, as GEO Alone Hires, Assigns, Trains, Supervises, Pays, and Terminates Detainee Workers.**

GEO's classification unit manages the VWP at NWDC. ICE is not directly involved in the day-to-day operation of the VWP and plays no role in assigning detainee workers to their individual work assignments. For each of the detainee worker assignments, GEO has created a job description, which includes the job title, work area, duties, hours, special requirements,

and grounds for termination for that position. GEO provides the job descriptions to detainees and allows them to request specific assignments by completing a "kite."

VWP assignments include kitchen and laundry workers, barbers, various janitorial roles, as well as temporary work details. GEO's classification officers review the kites and make work assignments as they become available, considering detainees' classification level, attitude, behavior, and ability to perform the job. GEO has discretion over whom to hire within the VWP. Its classification officers create a "roster" or schedule of detainee workers outlining when and where detainee workers are authorized to work.

Once hired, GEO provides detainee workers on-the-job training covering all performance aspects of the job assignment as well as all applicable health and safety regulations. Detainee workers with prior skill or experience have no opportunity to earn higher wages, nor can they seek employment or engage in commercial enterprises outside the VWP. GEO also provides all equipment and materials necessary for VWP jobs, including uniforms for the kitchen workers.

One of the primary duties of GEO personnel is to direct and supervise the work of detainee workers. ICE plays no direct role in managing or supervising detainee workers. Detainee workers may not deviate from GEO's direction or training, their specific work duties, work area, or the equipment or supplies provided by GEO. In the case of the kitchen detainee workers, GEO conducts regular hygiene inspections to ensure that the workers comply with all applicable safety standards.

GEO may fire VWP workers for unexcused absences from work or unsatisfactory work performance. Detainee workers acknowledge the same by signing GEO's required "volunteer work program agreement," which details GEO's baseline expectations for detainee workers.

The detainee worker job descriptions also list the specific grounds for "termination," including failure to follow staff instructions and unsatisfactory work performance.

At the conclusion of each shift, GEO staff complete a "Daily Detainee Worker Pay Sheet," in which they evaluate and "affirm" whether the detainee completed the job, maintained a good attitude, and began work on time. A detainee worker who fails to complete their work satisfactorily does not get paid.

About 470 detained persons work in the VWP at NWDC each day. In all, the average detainee shift lasts between 1.46 and 1.72 hours. GEO pays the detainee workers the day after their shift through the Keefe Banking System, depositing their pay in their commissary accounts. After GEO pays the detainees, it then seeks reimbursement from ICE for the amounts paid.

The work done by the detainee workers is essential to maintaining the NWDC. GEO has no one else to perform the janitorial, barbershop, and laundry services the detainee workers provide. In the kitchen, as many as 33 detainees working on one of three shifts assist in serving over 34,000 meals per week.

To summarize, GEO alone hires, assigns, trains, supervises, and terminates detainee workers.

## IV.   ISSUES FOR TRIAL

### A.   GEO Is an "Employer" Under the MWA, and the Class Members Are Its "Employees."

The question of whether GEO employed the detainee workers at the NWDC is answered by the plain language of Washington's Minimum Wage Act. The MWA defines an "employee" as "any individual employed by an employer...," RCW 49.46.010(3), and an "employer" as any individual or entity "acting directly or indirectly in the interest of an

employer in relation to an employee," *Anfinson v. FedEx Ground Package Sys., Inc.,* 281 P.3d 289, 297 (Wash. 2012) (quoting RCW 49.46.010(4)). To "employ" under the MWA, is "to permit to work." *Id.* (quoting RCW 49.46.010(2)). The Washington Supreme Court has held that "[t]aken together, these statutes establish that, under the MWA, an employee includes any individual permitted to work by an employer. *This is a broad definition.*" *Id.* (emphasis added). The "liberal construction" of the MWA augurs in favor of coverage for "employee[s]." *Id.* at 299. Indeed the Washington Supreme Court recently explained that the scope of "employee" under the MWA is largely defined by the specific statutory exclusions; a person who is engaged or permitted to work for pay is an employee unless one of the "narrowly" construed exemptions applies. *See Rocha v. King County,* -- P.3d – (Wash. April 9, 2020) ("Instead of being primarily defined by employments included, the MWA carves out from the definition of "employee" more narrow provisions that operate as exemptions.") Thus, the jury need only find that GEO permitted Plaintiffs and members of the class to work at NWDC to sustain a liability finding.

> **B.      To the Extent the Court Relies Upon the Economic Dependence Test, It Should Use the Test as Described in *Anfinson,* and Not *Becerra.***

If the Court finds that further analysis is necessary, it must look to the "economic dependence" test. Washington first adopted the test to distinguish an employee from an independent contractor. *Anfinson,* 281 P.3d at 302. ("Under the MWA," the economic dependence test is "the correct inquiry into whether a worker is an employee covered by the act or an independent contractor not covered by the act…"). But Washington later adopted a more extensive multi-factorial test to assess a joint employer relationship. *Becerra v. Expert Janitorial, LLC*, 332 P.3d 415, 421 n.7 (Wash. 2014) ("The joint employment test we articulate today is designed to determine obligations under the minimum wage act and does not otherwise govern a worker's employment status or employer's obligations."). There is overlap between

the Washington Supreme Court's formulation of the economic dependence test in *Anfinson* and *Becerra*, but there are differences, too, as *Becerra* identified an additional seven factors when a joint-employer relationship is the question. *Compare Anfinson,* 281 P.3d at 298-301 *with Becerra,* 332 P.3d at 420-22; *see also* Wash. Pattern Jury Instr. Civ. WPI 330.90 (7th ed.) (Employee Versus Independent Contractor pattern jury instruction identifying six factors and citing *Anfinson*); Wash. Pattern Jury Instr. Civ. WPI 330.91 (7th ed.) (Joint Employer Status pattern jury instruction identifying 13 factors and citing *Becerra*).

Neither test is a perfect fit here as no one argues the existence of a joint-employer relationship, and whether the detainee workers are "in business for [themselves]"—the central question under the economic realities test—misses the point for people in civil detention. *See Anfinson,* 281 P.3d at 299 ("The relevant inquiry is 'whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself.'").

But if the Court must choose between the two formulations, this case is more akin to *Anfinson*, in which the Washington Supreme Court utilized the test to determine whether workers were employees, than to *Becerra* in which the Court developed a test to determine whether workers had two employers.

Accordingly, the Court should use the "economic-dependence test" as described in *Anfinson* to determine employee status here. Plaintiffs propose using only some of the *Anfinson* factors, however, because the remaining elements, which might be relevant to distinguishing independent contractors from statutory employees, are not relevant to the determination of the employee-employer relationship in this case and would therefore only serve to confuse the

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

jury. Plaintiffs propose the following inquiry on their proposed alternative jury instruction (Dkt. 298-1 at 56-57):

1. GEO has the right to control and does control the work of the detainee workers;

2. GEO provides the equipment or materials required for the detainee workers' jobs;

3. The detainee workers could not affect their opportunity for profit or loss depending on their managerial skill and initiative;

4. The detainee workers render a service that is an integral part of GEO's business.

*See* Wash. Pattern Jury Instr. Civ. WPI 330.90 (7th ed.), Employee Versus Independent Contractor (Minimum Wage Act) (citing *Anfinson*). This list of factors is nonexclusive, and no single factor is dispositive. *Id.* All of the factors are satisfied here.

### 1.     GEO directly supervises and controls the detainees' work.

Under its Contract with ICE, GEO is charged with developing and managing a detainee work program. And while the program must adhere to ICE standards—as well as local and State laws—GEO carries out the day-to-day work of the operation. GEO creates the job descriptions for the detainee worker positions, evaluates whether detainee workers are suitable for a given job, approves shift locations and length, trains detainee workers, manages and directs the work, evaluates whether the work has been performed satisfactorily, signs off on the completion of the work, "removes" or "terminates" bad workers, and handles all aspects of payroll. GEO's control is absolute, and to argue otherwise is to argue that GEO does not run a secure detention facility. There is no genuine dispute on this point.

### 2.     Detainee workers work on GEO's premises using only GEO supplies.

Members of the class work at NWDC exclusively, and not offsite, using only GEO supplies and equipment. GEO's investment in the "equipment and facilities" directly reflects

PLTFS.' TRIAL BRIEF
(3:17-cv-05769-RJB) – 8

the Class Members' economic dependence on GEO as the entity that furnishes the supplies, equipment, and place where the work is performed. *See Torres-Lopez v. May*, 111 F.3d 633, 640-41 (9th Cir. 1997). This factor is undisputed.

**3.      Detainee workers have no opportunity for profit or loss.**

GEO caps detainee worker pay at $1 per day, and, as captured perfectly by one of GEO's former sergeants at deposition, Class Members have zero opportunity for profit or loss depending on their skill and experience. This factor is undisputed as well.

**4.      Working in the VWP requires no pre-existing skill or initiative.**

While many detainee workers were skilled laborers outside NWDC, the general janitorial, kitchen, and laundry work performed in the VWP requires no pre-existing skill or initiative. Instead, GEO provides on-the-job training to all those who want to work. There is no dispute over this factor.

**5.      The working relationship between GEO and the detainee workers is permanent.**

Satisfying the permanency inquiry does not mean that detainee workers must do the same job exclusively at NWDC or even that they participate in the worker program through the duration of their detention. Rather permanency is found when the relationship is such that workers "do not transfer from one [employer] to another as particular jobs are offered to them." *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1372 (9th Cir. 1981) (finding permanency of the relationship between employer and dry-cleaning agents because agents did not generally offer their services to different employers).

Here, GEO has operated the VWP at NWDC for the entirety of the class period (2014 to present), and approximately 470 detainee workers take part in the program daily. The working relationship between GEO and the detainee workers will last as long as GEO operates

PLTFS.' TRIAL BRIEF
(3:17-cv-05769-RJB) – 9

the VWP and so long as detainee workers are permitted to work and continue to work for the program. Moreover, it is generally anticipated that an individual detainee assigned to a particular work detail will continue to perform that job indefinitely; detainees are not simply assigned to jobs spontaneously from one day to the next. This factor is satisfied.

### 6. Detainee workers are integral to GEO's operations at NWDC.

GEO acknowledges that detainee workers make an "important contribution" to maintaining and operating NWDC. Each day, hundreds of workers cook, clean, and do laundry at NWDC to keep the facility running. For example, GEO employs two (maybe three) janitors that clean the non-secured areas of the facility, but the pods—where the detainees live—the kitchen, the laundry room, recreational areas, barbershop, and hallways in the 1,500-bed facility are cleaned exclusively by detainee workers. If detainee labor were removed from the equation—say in the event of a prolonged worker stoppage—GEO would need to authorize overtime for its existing workforce, bring in outside personnel, hire third-party vendors, or all of the above. This factor is satisfied as well.

Finally, from the larger standpoint of economic dependence, it is worth reiterating that working in the VWP is the only way detainees can earn money to buy supplemental toiletries and food from the commissary, pay for telephone calls, or do anything else that requires money. Indeed, detainees are specifically prohibited from undertaking any other commercial activity or operating any side businesses. While their basic necessities of food and shelter might already be met, their ability for any other economic gain is solely through the GEO-run VWP.

### C. GEO Failed to Pay Its Employees the Minimum Wage for All Hours Worked.

GEO does not contest that it paid all of the detainee workers $1 per day, regardless of the length of their shift.

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

**D.     Neither the Residential nor "Government-Owned Facility" Exemptions Apply to GEO.**

For its part, GEO will likely continue to insist that exemptions from the MWA shield it from liability. But exemptions to the MWA are narrowly construed and applied only to situations that are "plainly and unmistakably consistent with the terms and spirit of the legislation." *Rocha v. King County*, -- P.3d – *(*citing *Drinkwitz v. Alliant Techsystems, Inc.*, 996 P.2d 582, 587 (Wash. 2000)); *see Tift v. Prof'l Nursing Servs., Inc.*, 886 P.2d 1158, 1161 (Wash. Ct. App. 1995) ("Exclusions pertaining to MWA coverage should be construed strictly in favor of the employees so as not to defeat the broad objectives for which the act was passed."). "[T]he employer bears the burden of proving this 'exempt' status." *Drinkwitz*, 996 P.2d at 587.

Here, GEO argues in favor of two exemptions. Both are inapposite.

**1.     The "Residential Exemption" is inapplicable because Plaintiffs' job duties do not require them to sleep or reside at NWDC.**

GEO's claim to the residential exemption fails. The inquiry stops and starts with the plain language of the exemption:

"Employee" … shall not include:
…

(j) Any individual *whose duties require* that he or she reside or sleep at the place of his or her employment or who otherwise spends a substantial portion of his or her work time subject to call, and not engaged in the performance of active duties.

RCW 49.46.010(3)(j) (emphasis added); *see Lake v. Woodcreek Homeowners Ass'n,* 243 P.3d 1283, 1288 (Wash. 2010) ("If the statute is unambiguous after a review of the plain meaning, the court's inquiry is at an end.").

As this Court previously held, the residential exemption is met only for individuals whose "'duties require that he or she reside or sleep at the place of his or her employment'" or "who otherwise spends a substantial portion of his or her work time subject to call, and not engaged in the performance of active duties." Dkt. 280 (Order on Cross Motions for Summ. J.) at 12. GEO has adduced no facts indicating that either prong of this exception is met.[2]

At trial, Plaintiffs will prove that their job duties within the VWP *do not* require them to spend the night at NWDC. Indeed, cooking, cleaning, laundry, and working in the barbershop are not 24/7 affairs requiring workers to live on site. And as the State of Washington argues in its separate action against GEO, all of the jobs performed by detainee workers could be and in some cases are performed by Tacoma residents living outside the facility. Plaintiffs and members of the class came to "reside" at NWDC only by virtue of their uncertain immigration status and the circumstances of their civil detention, not because their labor was needed on-demand to maintain the facility.

### 2. The "State-Owned Facility" exemption under the MWA does not apply to GEO.

GEO has repeatedly argued that Plaintiffs are excepted from employee status under the MWA as "resident[s], inmate[s], or patient[s] of a state, county, or municipal correctional, detention, treatment or rehabilitative institution." RCW 49.46.010(3)(k). But as this Court has previously ruled, "[t]he word 'state' is followed by 'county, or municipal' indicating that the word state means Washington State." Dkt. 280 at 13. There is no factual scenario in which GEO can prove that the detainee workers are residents of a Washington State run facility.

---

[2] *See* Washington Department of Labor & Industries, Minimum Wage Act Applicability, ES.A.1 (Jul. 15, 2014) at 6(j), p. 5, available at https://lni.wa.gov/workers-rights/_docs/esa1.pdf (last visited on Mar. 16, 2020) ("Merely residing or sleeping at the place of employment does not exempt individuals from the Minimum Wage Act.").

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

Accordingly, the exemption is not met, and the issue should not go before the jury because of the outsized risk of juror confusion.

### E. Because the MWA Does Not Discriminate Against the Federal Government, the Doctrine of Intergovernmental Immunity Does Not Apply.

GEO alleges the MWA discriminates against the Federal Government and GEO by extension, but GEO offers only inapt comparisons in support of its claim. At trial, Plaintiffs will prove that Washington State contractors—the proper comparator to GEO as a for-profit government contractor—are held to the same standard the State of Washington and Plaintiffs seek to enforce here.

### F. Derivative Sovereign Immunity Does Not Bar Plaintiffs' Claims.

"Government contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States," but immunity is not absolute and will not attach where a contractor's discretionary actions creates the contested issue. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016). GEO has not—and *cannot*—show that it was directed by the government to pay participants in the VWP $1 per day. Rather, GEO elected to pay $1 per day, knowing it had discretion to pay more. In fact, evidence at trial will demonstrate that GEO has already admitted as much, and that GEO has paid workers more in the past.

### G. GEO Cannot Maintain a Claim in Equity for "Offset/Unjust Enrichment" Because GEO Contracted with ICE—and Received Payment—for the Benefits It Now Seeks to Disgorge from Plaintiffs.

GEO also argues that because it provides basic necessities to all detainees housed at NWDC, it is entitled to an offset of costs incurred caring for Class Members and operating the VWP. But GEO does not provide these basic necessities out of a sense of altruism or with an

PLTFS.' TRIAL BRIEF
(3:17-cv-05769-RJB) – 13

expectation of recouping its costs from the detainees—it is paid handsomely by ICE to do so as part of a gargantuan contract that is "inclusive of [GEO's] direct costs, indirect costs, overhead and *profit* necessary to provide the detention and food service" to detained persons at NWDC. GEO-ICE Contract, at 46.

There is no evidence that GEO entered the Contract with ICE expecting remuneration of any kind from the detainees for room and board. Indeed, most detainees at NWDC receive exactly the same detention, food, and other services required by GEO's Contract with ICE without ever participating in the VWP. Thus, in balancing the equities, GEO's counterclaim and affirmative defense for restitution of the basic necessities provided to Class Members and other civil immigration detainees fails.

## H.   Jurors Who Demonstrate Actual or Implied Bias Should be Stricken for Cause.

Given the subject matter of this case, the risk of bias amongst the potential jurors is high. The Plaintiffs ask the Court to give the parties some leeway in exploring challenges for cause in order to obtain a panel able to hear the evidence free of emotion and preconceived notions. "One touchstone of a fair trial is an impartial trier of fact--'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips,* 455 U.S. 209, 217 (1982)). "The principal purpose of voir dire is to probe each prospective juror's state of mind to enable the trial judge to determine actual bias and to allow counsel to assess suspected bias or prejudice." *Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir. 1981). "Challenges for cause are the means by which partial or biased jurors should be eliminated. To disqualify a juror for cause requires a showing of either *actual* or *implied* bias--'that is ... bias in fact or bias

conclusively presumed as a matter of law.'" *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000) (quoting 47 Am.Jur.2d Jury § 266 (1995)).

A thorough discussion of actual and implied bias can be found in *United States v. Gonzalez*, *supra*. In that case, the Ninth Circuit defines actual bias as "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *Id.*, at 1112 (quoting *United States v. Torres*, 128 F.3d 38, 43 (2nd Cir. 1997)). Implied bias, on the other hand, exists when "an average person in the position of the juror in controversy would be prejudiced." *United States v. Gonzalez*, at 1112 (quoting *United States v. Cerrato-Reyes*, 176 F.3d 1253, 1260-61 (10th Cir. 1999)). That prejudice is presumed when the relationship between the potential juror and an aspect of the case makes it highly unlikely that an average person could remain impartial. *United States v. Gonzalez*, at 1112. Put differently, the relevant question in determining bias is whether there is an inherent "potential for substantial emotional involvement, adversely affecting impartiality." *Id.* (quoting *United States v. Plache*, 913 F.2d 1375, 1378 (9th Cir. 1990)). It is an abuse of discretion for the district court to refuse to probe the jury adequately for bias or prejudice about material matters on request of counsel. *Darbin v. Nourse*, at 1114 (citing *United States v. Baldwin*, 607 F.2d 1295, 1297 (9th Cir. 1979).

## I.  The Discriminatory Use of Peremptory Challenges in Jury Selection is Strictly Prohibited.

The parties may not exercise their peremptory challenges in a manner that discriminates on the basis of race, gender, or sexual orientation. In *Batson v. Kentucky*, 476 U.S. 79, 86 (1986), the Supreme Court found the exclusion of members of a criminal defendant's race from sitting on a jury to violate the Equal Protection Clause of the Fourteenth Amendment. Batson has since been extended to gender and sexual orientation.

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

1    *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994); *SmithKline Beecham Corp. v.*

2    *Abbott Labs.*, 740 F.3d 471, 476 (9th Cir. 2014). "[W]hether the trial is criminal or civil,

3    potential jurors, as well as litigants, have an equal protection right to jury selection

4    procedures that are free from state-sponsored group stereotypes rooted in, and reflective of,

5    historical prejudice." *J.E.B. v. Alabama ex rel. T.B.*, at 128.

6          In order to analyze whether a peremptory strike violates *Batson,* a three-part inquiry

7    is conducted. "First, the party challenging the peremptory strike must establish a prima facie

8    case of intentional discrimination. Second, the striking party must give a nondiscriminatory

9    reason for the strike. Finally, the court determines, on the basis of the record, whether the

10   party raising the challenge has shown purposeful discrimination." *SmithKline Beecham Corp.*

11   *v. Abbott Labs.*, at 476 (citing *Kesser v. Cambra,* 465 F.3d 351, 359 (9th Cir.2006)).

12         **J.      Relief Sought.**

13         Plaintiffs are entitled to backpay for hours already worked for subminimum wages.

14   Plaintiffs' expert witness on damages, Jeffrey Munson, Ph.D., analyzed the monthly bills

15   submitted by GEO to ICE for reimbursement of the wages GEO paid the detainee workers

16   from September 26, 2014 through April 10, 2020, the average number of hours worked by the

17   detainee workers as determined by Michael Heye, one of GEO's classifications officers, and

18   the corresponding minimum wage for the dates the detainees worked.

19         Subsequently, Dr. Munson analyzed daily Keefe Banking data indicating individual

20   payments to detainee workers that GEO belatedly produced, applied assumptions regarding

21   the average number of hours worked in different job assignments derived from Mr. Heye and

22   the testimony of other GEO officers and staff, and concluded that detainee workers were

23   underpaid in the amount in the amount of $12,428,341.41.

24

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305

1    Plaintiffs also seek attorneys' fees and costs under RCW 49.46.090 and RCW

2   49.48.030.

3                           **V.    CONCLUSION**

4    GEO's payment of $1 per day to the detainees who worked in the VWP will establish

5   in the minds of the jurors that, more likely than not, GEO violated Washington's Minimum

6   Wage Act. Mr. Nwauzor and Mr. Aguirre-Urbina value the opportunity to appear before the

7   Court on behalf of the Class, to have the evidence fairly evaluated and appropriately

8   admitted, and to have a just outcome reached by a jury of their community.

9    RESPECTFULLY SUBMITTED this 29th day of April, 2020.

10                                  SCHROETER GOLDMARK & BENDER

11                                  *s/ Jamal N. Whitehead*
                                    Adam J. Berger, WSBA #20714
12                                  Lindsay L. Halm, WSBA #37141
                                    Jamal N. Whitehead, WSBA #39818
13                                  Rebecca J. Roe, WSBA #7560
                                    810 Third Avenue, Suite 500
14                                  Seattle, WA 98104
                                    Tel: (206) 622-8000
15                                  berger@sgb-law.com
                                    halm@sgb-law.com
16                                  whitehead@sgb-law.com
                                    roe@sgb-law.com

17                                  THE LAW OFFICE OF
                                    R. ANDREW FREE
18                                  R. Andrew Free (*Pro Hac Vice*)
                                    P.O. Box 90568
19                                  Nashville, TN 37209
                                    Tel: (844) 321-3221
20                                  andrew@immigrantcivilrights.com

21                                  OPEN SKY LAW, PLLC
                                    Devin T. Theriot-Orr, WSBA # 33995
22                                  20415 – 72nd Avenue S, Suite 110
                                    Kent, WA 98032
23                                  Tel: (206) 962-5052
                                    devin@opensky.law

24

PLTFS.' TRIAL BRIEF                          SCHROETER GOLDMARK & BENDER
(3:17-cv-05769-RJB) – 17                     500 Central Building ● 810 Third Avenue ● Seattle, WA 98104
                                             Phone (206) 622-8000 ● Fax (206) 682-2305

1

2
    MENTER IMMIGRATION LAW, PLLC
    Meena Menter, WSBA # 31870
3   8201 – 164th Avenue NE, Suite 200
    Redmond, WA 98052
4   Tel: (206) 419-7332
    meena@meenamenter.com
5
    *Class Counsel*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

PLTFS.' TRIAL BRIEF
(3:17-cv-05769-RJB) – 18

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Devin T. Theriot-Orr
OPEN SKY LAW, PLLC
20415 – 72nd Avenue South, Suite 110
Kent, WA 98032
devin@opensky.law
*Attorney for Plaintiff*

R. Andrew Free
THE LAW OFFICE OF R. ANDREW FREE
PO Box 90568
Nashville, TN 37209
andrew@immigrantcivilrights.com
*Attorney for Plaintiff*

Meena Menter
MENTER IMMIGRATION LAW PLLC
8201 – 164th Avenue NE, Suite 200
Redmond, WA 98052
meena@meenamenter.com
*Attorney for Plaintiff*

Joan K. Mell
III BRANCHES LAW, PLLC
1019 Regents Boulevard, Suite 204
Fircrest, WA 98466
joan@3ebrancheslaw.com
*Attorney for Defendant*

Colin L. Barnacle
Ashley E. Calhoun
Christopher J. Eby
Adrienne Scheffey
AKERMAN LLP
1900 Sixteenth Street, Suite 1700
Denver, CO 80202
colin.barnacle@akerman.com
ashley.calhoun@akerman.com
christopher.eby@akerman.com
adrienne.scheffey@akerman.com
*Attorneys for Defendant*

DATED at Seattle, Washington this 29th day of April, 2020.

s/ Virginia Mendoza

VIRGINIA MENDOZA, Legal Assistant
Schroeter Goldmark & Bender
810 Third Avenue, Suite 500
Seattle, WA  98104
Tel: (206) 622-8000
mendoza@sgb-law.com

SCHROETER GOLDMARK & BENDER
500 Central Building ● 810 Third Avenue ● Seattle, WA  98104
Phone (206) 622-8000 ● Fax (206) 682-2305