1
2
3
4
5
6        **UNITED STATES DISTRICT COURT**
7     **WESTERN DISTRICT OF WASHINGTON**
         **TACOMA DIVISION**
8
9
10    STATE OF WASHINGTON,                    Civil Action Case Nos.:

                         Plaintiff,
11                                            3:17-cv-05806-RJB
                                              3:17-cv-05769-RJB
         v.
12                                            GEO'S TRIAL BRIEF
      THE GEO GROUP, INC.,
13
                         Defendant
14
      _____
15

16    UGOCHUKWU GOODLUCK
      NWAUZOR, FERNANDO
17    AGUIRRE-URBINA, individually
      and on behalf of all those similarly
18    situated,

19                         Plaintiffs,

20       v.

21    THE GEO GROUP, INC., a
      Florida corporation,
22
                         Defendant
23

24
25
26
27    GEO'S TRIAL BRIEF - 1 of 25
      3:17 cv 05806 – RJB
28    3:17 cv 05769 - RJB
      52884332;3

The GEO Group, Inc. ("GEO") submits the following trial brief in the above referenced matter:

## I. <u>INTRODUCTION</u>

The State of Washington ("State") and Private Plaintiffs pursue a remedy for a fictional relationship that the federal government, GEO, and the detainees whom GEO cares for never contemplated and do not engage. The State and Private Plaintiffs (collectively "<u>Plaintiffs</u>") bring a wage and hour employment lawsuit against GEO, a federal ICE detention contractor, in which they seek to strip away all context of the circumstances in which detainees find themselves, and have a jury consider, in a vacuum, whether cleaning and cooking tasks within the facility are "jobs" that are compensable under the Washington Minimum Wage Act ("WMWA").

The reality is that whether detainees should be classified as employees is inherently tied to their status as civil detainees of ICE. All legal authority, across the United States has made this much clear. Individuals who are detained are not subject to the same economic pressures as are those who must pay for their own food, shelter, clothing and medical care. At the same time, it is widely accepted that people in confinement have increased morale and are involved in fewer disciplinary incidents when they are provided a productive outlet for their time. Thus, ICE requires all of its contractors to implement the Voluntary Work Program ("VWP") to reduce boredom and idleness. GEO implements the program as directed by ICE, and allows detainees unfettered freedom to participate (or not) in the program regardless of their skills. Implementing the VWP is significantly different than if GEO were to hire individuals to work for it, who it could screen for skills and efficiency. In implementing the program, GEO must ensure that regardless of any detainees' lack of skill, there is an outlet for him or her to feel productive as the first priority is to provide detainees mental stimulation. This often results in redundant efforts and inefficiencies that would never be tolerated in an employee-employer relationship. And, the underlying relationship of custodian-detainee is ever present—each task must be monitored with a keen eye towards ensuring safety. Many courts across the country have addressed this issue and preserved the key benefits of detention work programs, namely the avoidance of bored detainees inventing troublesome ways to occupy their time that may be detrimental to the population

as a whole. Thus, detainees may not coopt this custodial relationship to guarantee actual income above market rates by ignoring the fact that it is a custodial relationship, as regardless of the legal standard applied. And, in reviewing detainees in the context of their situation, it is clear that the detainee-custodian relationship governs every interaction between detainees and GEO, not an employer-employee relationship.

Once the jury understands ICE's relationship to GEO, it will become abundantly clear why Plaintiffs' claims must fail at trial under any theory. In addition to the absence of an employment relationship, there can be no question that GEO is simply carrying out its contract with ICE in implementing the VWP. GEO does not profit from the VWP, but rather, is burdened with its implementation and supervision without any tangible return. The turnover in the program is astronomical, GEO lacks the authority to assign skilled individuals to key programs, and as a result the inefficiencies not contemplated in an employment relationship. There is no escaping the fact that the VWP exists only to fulfill a contractual obligation to ICE in an area that is directly and exclusively regulated by the federal government (immigration). In short, this case is completely entangled in GEO's relationship with ICE, a relationship that never contemplated an employment relationship. And the relationship that exists, one of custodian and detainee, has been authorized by Congress. Every element of this case derives from GEO's contractual agreement with ICE. Yet, the State hypocritically seeks to single out GEO as subject to regulations that no other detention facility within the boundaries of Washington must follow. And, in so doing, it seeks to completely undermine the clear terms of GEO's contract with ICE and Congress' decisions with regard to housing detained immigrants. Under the United States Constitution, the State may not interfere with federal government contractors and frustrate the purposes of the federal government. Nor may it single out federal government contractors for special bad treatment. Accordingly, GEO is also entitled to immunity.

## II. <u>FACTUAL SUMMARY</u>

The United States Department of Homeland Security – Immigration and Customs Enforcement ("ICE") is tasked with enforcing more than 400 federal statutes, as part of the comprehensive

GEO'S TRIAL BRIEF - 3 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

immigration legislation implemented by Congress. Pursuant to its authority from Congress, ICE oversees the supervision, detention, and removal of aliens from the United States as required by federal law. While ICE oversees the process of detention and removal, due to Congressional mandates and budgetary concerns, ICE neither owns, constructs, *nor* operates its own facilities. Instead, it is entirely dependent upon states and private contractors to build, operate, and staff facilities where ICE detainees may be held. Thus, those in ICE custody are often housed in local jails or federal prisons, alongside those confined as a result of criminal convictions while others are housed in dedicated facilities, typically owned and operated by federal government contractors, like the Northwest ICE Processing Center ("NWIPC"). By avoiding investing heavily in detention facilities, ICE is able to conserve taxpayer money by not taking the risk that facilities will stand idle if the area experiences a drastic decrease in demand for detainee housing. In return, facilities like the NWIPC rely on their contracts with the federal government to offset some of the risk of their capital contributions to build and operate the facility by providing clear terms of performance (with accurate pricing) and little chance of a large change in the operating costs without the ability to obtain a corresponding change in the contract. In this way, ICE and its contractors (state or private) enter into a mutually beneficial relationship that reduces the outlay needed from federal taxpayers but also ensures that the operating costs of housing detainees will be covered.

Of course, ICE remains in charge of ensuring the conditions of confinement, of those in its custody (albeit that they are physically in secured by their contractors). Thus, ICE mandates that all of its contractors (state and private) operate in conformance with the Performance Based National Detention Standards ("PBNDS"). The PBNDS set forth requirements for contractors housing ICE detainees. Contractors are expected to implement all standards in the PBNDS without increasing its operating costs beyond the price negotiated and agreed in the contract. The NWIPC has a fully-burdened fixed price contract with ICE, which means that GEO must meet the PBNDS requirements, providing detainees everything needed, within the set bed day rate. Under GEO's contract, the bed

GEO'S TRIAL BRIEF - 4 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

day rate is $115 per day,[1] and each detainee must receive food, clothing, medical care, shelter, and all other accessory services and activities within that rate.

To ensure detainees are not sitting idle all day long, GEO must provide a number of activities within its negotiated price. Included in the activities that GEO provides to detainees are religious services, educational programs, television, video games, recreation, and special events. The PBNDS also mandate that GEO provide the VWP for detainees who wish to feel productive and contribute to their communal living situation. GEO's contract with ICE *requires* that the VWP positions enhance the essential operations of the facility. The positions are completely voluntary, but exist to give individuals an opportunity to feel productive and get out of their housing units for short periods of time. These tasks serve the dual purpose of reducing disciplinary incidents by fostering relationships between detainees who live together through common goals of completing daily chores like laundry, food preparation, sanitation, and personal hygiene for the general population.

Detainees who choose to participate volunteer their time. Volunteers select what activities they prefer to engage in to occupy themselves. Congress appropriated a one dollar per day per detainee allowance to any detainee who chooses to participate in the VWP. This allowance recognizes those who contribute to the program and also creates a mechanism for ICE to track detainee participation in the program and regulate the positions offered. GEO ensures ICE's daily stipend passes through to each individual detainee by managing the detainee trust accounts. VWP activities are not competitive employment where success achieves results. The VWP simply operates to allow as much of the general population as is willing to reduce their own idleness and care for themselves safely and securely.

Detention of those who have come to the United States unlawfully for removal has long been controversial. However, bipartisan leaders from Tacoma understood the economic value an ICE

---

[1] It is plain from the bed day rate alone that GEO and ICE never contemplated that detainee's would be paid minimum wage for volunteering to keep busy by participating in communal living tasks. Any detainee who kept him or herself busy for 4 hours a day folding laundry or cleaning up the common area would deplete nearly half the daily budget for shelter, food, clothing, and medical care on the payment of an allowance instead.

GEO'S TRIAL BRIEF - 5 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

detention center would have for the local economy. Tacoma's leaders facilitated ICE siting the NWIPC in the City, and taxed the operation accordingly. Advocacy groups indifferent to the economic advantages whose members fundamentally oppose immigration detention convened and developed oppositional strategies to undermine ICE detention policies, particularly private detention. The VWP became a prime target given the program's vulnerability to misunderstanding that detainee tasks are comparable to work performed in the course of employment in a competitive setting. Rather than describing the program as it is—a part of communal living in a detention setting—advocates set about characterizing the VWP as competitive employment. These claims of course ignore the realities that in all communal living situations, jails, group homes, and even college dorms: common chores will arise and should be divvied up by those who live in the shared space.  In fact, ICE mandates the development of the VWP for this very purpose. By asking those who benefit from the chores to help, the individuals involved in the daily tasks have a stake in the outcome, they will be wearing the clothes they wash, eating the food they cook, or living in the areas they clean. This creates a personal investment in the outcome of these responsibilities that is otherwise unavailable from hired help. Because of ICE's stated purpose of the VWP – to reduce idleness, increase morale, and decrease detainee disciplinary incidents –the value of this personal investment in the tasks that are for the benefit of those who live in the shared space, ICE requires anyone who participates in the program to be a detainee who lives and sleeps in the facility—thus the opportunities are not, and would never be, open to those who do not live at the facility (i.e., the general public). By requiring individuals who participate to live onsite, the operation of the program is enhanced because the individual and collective needs of those detained may change at any time on a given day.  Further, the underlying purpose of the VWP itself and the tasks made available thereunder would be null and void if performed by anyone other than the detainees who live and sleep at the NWIPC.  In this sense, the VWP duties absolutely require living and sleeping at the NWIPC.

While the VWP, as required by the PBNDS, is uniformly required for all facilities, including those operated by state governments, Plaintiffs single out the ICE detainees at the GEO facility

(ignoring all other detainees in the State) as somehow creating a special relationship with its detainees that amounts to employment, while identical circumstances across the State do not constitute employment, but rather are characterized properly as a relationship between detainee and custodian. Thus, the State is able to cut its expenses for its Department of Corrections by relying upon its custodial relationship with detainees, which does not require a minimum wage payment, to reduce its operating budget. The hypocrisy is such that the State wishes to classify the relationship between ICE detainees and GEO as one of employment, while classifying the same relationship between State detainees and the State as one that is not employment. In so doing, Plaintiffs seek to completely undermine GEO's contract with ICE, by placing burdens on the federal detention facilities that are not placed on the State itself.

The claims and defenses have been articulated in part within the Parties' proposed pre-trial order. This brief provides additional specificity on the law as applied to the facts for purposes of trial.

### III. ARGUMENT

A.   **ICE Detainees were never intended to be employees and the fundamental nature of their relationship with ICE and GEO makes clear they should not be classified as employees.**

Not all tasks are compensable. Certain work generates no right to minimum wages. For example, the jurors who will be seated to suffer the work of deciding this case have no right to minimum wages, their relationship to the court is fundamentally one of a civic duty. *Rocha v. King County*, 2020 WL 1809610 (April 9, 2020). Housekeeping in one's own home affords no minimum wage entitlement. RCW 49.60.010(b). A prisoner who cleans his cell is not entitled to minimum wage. § 49.46.010(3)(k).  A nanny who rewards a child for cleaning up his room with a popsicle or a dollar does not create an employment relationship. A student who volunteers to clean the communal showers in her dorm is not an employee of the school. Come November, volunteers for political campaigns, including that of Attorney General Ferguson, will not be considered employees of his office. And, students who volunteer to play on NCAA football teams are not employees of the school, their relationship remains fundamentally that a student. There is no legal test that applies to these

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

circumstances, but rather a logical understanding that certain relationships are not those of employee and employer. These principles should be similarly applied to detainees who volunteer to clean up after themselves, stir a pot of soup, fold towels, clean their own showers, or empty their own trashcans.

Whether a dollar is enough should not be a question for political debate by a jury because the jury cannot create an employment relationship that does not exist using the WMWA. RCW 49.46.120. The WMWA only sets a floor for the wage rate below which those who are truly employees must be paid—it does not apply to any other interactions outside of the employment context. Here, asking a jury to obligate GEO to pay a detainee who volunteers to hand out lunch trays at mealtime minimum wage rates or higher, assumes a legally binding relationship that neither party contemplated, proposed, nor engage. Further, it allows a nonparty and the State to effectively renegotiate and rewrite the terms of ICE's contract with GEO, without any authority to do so. As it stands, the federal government's contract expressly defines the relationship between GEO and detainees as caretaker and detainee. To avoid confusion, the contract also prohibits GEO from employing detainees and establishes unequivocal employment requirements that explicitly exclude detainees. Thus, it is clear that the fundamental relationship between detainees and GEO is not one of employee and employer.

**B.** **Detainees are explicitly excluded from classification as employees under the WMWA.**

Even if the fundamental nature of the relationship is not self-evident, as is the relationship between juror and the court or teacher and student, the WMWA explicitly excludes those who are required to live and sleep where they work:

> (j) Any individual whose duties require that he or she reside or sleep at the place of his or her employment or who otherwise spends a substantial portion of his or her work time subject to call, and not engaged in the performance of active duties;

RCW § 49.46.010(3)(j) (hereinafter the "resident exception"). The Supreme Court of Washington has previously addressed the resident exception. In interpreting its statutory language[2], the Supreme Court

---

[2] The same exact language in the present statute was previously located at RCW 49.46.010(5)(j).

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

of Washington held that "[t]he plain language of RCW 49.46.010(5)(j) excludes two categories of workers from the MWA's definition of 'employee': (1) those individuals who reside or sleep at their place of employment and (2) those individuals who otherwise spend a substantial portion of work time subject to call, and not engaged in the performance of active duties." *Berrocal v. Fernandez*, 155 Wash. 2d 585, 598, 121 P.3d 82, 88 (2005); *see also Strain v. W. Travel, Inc*., 117 Wash. App. 251, 257, 70 P.3d 158, 162 (2003) ("The statute is plain: employees required to sleep at their places of employment are exempt from coverage under the MWA.").

There can be no question that the VWP duties and requirements are set by GEO and ICE. Even Plaintiffs agree that GEO defines the duties and requirements for the VWP. And, GEO requires individuals who wish to perform any of the duties created under the VWP to live and sleep at the facility. There are no other considerations for the jury. The WMWA does not list certain tasks or duties that would not qualify for the exemption, such as cooking, cleaning, or laundry. Rather, the statute exempts individuals, who are on notice that the position for which they are applying, is not open to individuals who do not sleep or reside at the place where the tasks are performed. The critical inquiry is whether the individual soliciting the work (and providing lodging as part of the arrangement) decides to require that anyone who occupies the position live and sleep onsite. Here, GEO has done just that.

GEO requires all participants who perform VWP duties to live and sleep at the facility. It has never allowed someone who did not live and sleep at the facility to participate in the program. Further, the underlying goals of the program as articulated by ICE in the PBNDS, to reduce idleness and provide productive tasks for detainees, would be obliterated if the duties were performed by non-detainees who did not live and sleep in the facility. And, the positions, as crafted, depend upon a detainee's physical presence at the facility, including a commitment to the community cohabitation. It would be logistically unworkable to have employees who lived offsite be responsible for cleaning up a mess that was made, with no advance warning, or to wipe down a table when someone unexpectedly spilled his or her milk or ramen noodles. Not to mention, it would undermine the goals of reducing disciplinary actions which is part and parcel with creating a sense of mutual collaboration between

detainees in the same living area. Accordingly, to perform any duties in the VWP, an individual must live and sleep in the facility and be available when the task arises. Thus, GEO requires detainees to live and sleep at the facility as a prerequisite to participating and performing any duties in the VWP. For this reason alone, detainees are not employees.

### C.   Detention has its own economic realities.

And, if somehow, the jury is able to suspend all concepts of reality in order to find that the fundamental nature of GEO's relationship is insufficient to show that detainees are not its "employees" and acts with willful disregard of the fact that the VWP duties require detainees live and sleep at the facility, detainees still cannot establish an employment relationship under the applicable economic realities test. Because most detention facilities across the country (including the State's own jails and civil detention centers) ask their detainees to perform various tasks and contribute to daily chores, courts have repeatedly addressed the issue of whether detainees are employees. Acknowledging that some tasks in a detention facility are not employment, but that left completely unregulated detainee labor could conceivably be abused, courts have developed a modified economic dependence test, similar to that applied by *Calhoun v. State*, 146 Wash. App. 877, 886 (2008), as amended (Oct. 28, 2008). Federal courts addressing this issue have found that it is critical that the considerations unique to detention are factored into the test, because the typical economic realities test (i.e., the *Anfinson* test), which determines the difference between an independent contractor and an employee is unworkable in the detention context – a classic square peg in a round hole. *See e.g., Sanders v. Hayden*, 544 F.3d 812, 814 (7th Cir. 2008) (civil detainees performing chores like the ones in the VWP not employees); *Miller v. Dukakis*, 961 F.2d 7, 9 (1st Cir. 1992) (same); *Tourscher v. McCullough*, 184 F.3d 236, 243 (3d Cir. 1999) (same); *Villarreal v. Woodham*, 113 F.3d 202, 207 (11th Cir. 1997) (same); *Alvarado Guevara v. Immigration and Naturalization Service*, 902 F.2d 394 (5th Cir. 1990) (holding that the FLSA does not apply to immigration detainee work programs); *see also Bennett v. Frank*, 395 F.3d 409, 409 (7th Cir. 2005) ("The Fair Labor Standards Act is intended for the protection of employees, and prisoners are not employees of their prison, whether it is a public or a private one

GEO'S TRIAL BRIEF - 10 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

so they are not protected by the Act").[3]

Thus, in the detention context, a modified economic realities test most recently enumerated in *Matherly v. Andrews*, 859 F.3d 264, 278 (4th Cir. 2017), applies:

> (1) Whether the detainee is working to turn a profit for GEO;
>
> (2) Whether GEO and the detainee have an opportunity for mutual economic gain, as is present in a traditional employer-employee relationship;
>
> (3) Whether GEO provides the detainee with food, shelter, and clothing that employees would otherwise need to purchase in a true employment situation.

*See also Sanders* , 544 F.3d at 814; *Miller*, 961 F.2d at 9; *Tourscher*, 184 F.3d at 243;*Villarreal*, 113 F.3d at 207; *Alvarado*, 902 F.2d  at 394; *Bennett*, 395 F.3d at 409 ("The Fair Labor Standards Act is intended for the protection of employees, and <u>prisoners are not employees of their prison, whether it is a public or a private one</u>. So they are not protected by the Act"). This test appropriately takes into consideration the clear concerns that looking at the "control" factor created to identify independent contractor status would have inadvertent and incongruous consequences in the detention context. The test also considers that those in detention need not pay for their housing, food, or clothing costs—an important consideration in not only the underlying purpose of a minimum wage in the first place, but in contemplating the bargained for exchange of services prevalent in traditional employment

---

[3] While the Ninth Circuit has not yet addressed this issue in the context of civil detention, it has made clear that the economic realities test is "not a useful framework in the case of prisoners who work for a prison-structured program." *Hale v. State of Ariz.*, 993 F.2d 1387, 1394 (9th Cir. 1993) *abrogated on other grounds, Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996); *see also Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994) ("The *Bonnette* factors are properly applied when an individual is clearly employed by one of several entities and the only question is which one. They are of no help, however, in deciding the more fundamental question present here: whether the inmates are "employed" in the relevant sense at all."). And, in revisiting *Hale*, the Ninth Circuit in *Morgan* made clear that the fact that the individual was in prison as criminal punishment, rather than civil, had no bearing on the applicability of the economic realities test. *Id.* at 1293 ("The plaintiff in *Hale* who worked as a bookkeeper and office manager did so as part of a program that allowed inmates to run their own businesses while incarcerated. Work of this nature clearly doesn't promote the punitive objectives of the criminal justice system. Rather, as we acknowledged in Hale, prison programs of this sort serve primarily rehabilitative goals: They 'occupy idle prisoners, reduce disciplinary problems, nurture a sense of responsibility, and provide valuable skills and job training.'") (citation omitted). Rather, the relationship of custodian and detainee was sufficient to establish that the detainee was not an employee.

relationships. Further, it considers that in the detention context, regardless of whether detainees are treated as employees, the detention center operator will provide the detainees with uniforms and tools to ensure safety[4] in the detention center, not as evidence of an alleged employment relationship. Most importantly, the modified economic realities test makes clear that some work, such as a detainee who makes his or her bed or cleans his living area, would not be considered employment if not performed for mutual economic gain. At the same time, the modified test ensures that detainees are not being exploited for inexpensive labor in order to turn a profit, rather than obtain contributions to the tasks related to communal living. If for example, GEO had detainees assemble goods that were later sold into the stream of commerce at a mark-up, the test allows for a consideration that detainees are employees.  Those who replaced their manufacturing labor with prison labor wholly unrelated to self-care would not be able to do so by utilizing detainee labor to obtain a competitive advantage.[5] Thus, it is the appropriate test to apply in this circumstance.

As applied here, the jury will easily be able to conclude that GEO is <u>not</u> turning a profit from the detainee VWP tasks because the VWP pay is a 100% pass through cost to ICE, whereas other labor at the facility is charged to ICE with a 10% profit margin. In actuality, GEO *loses* money from the mandatory operation of the VWP. Moreover, here, there is no opportunity for mutual economic gain because, again, the payments to the detainees are a pass through cost to ICE and any amount paid over the reimbursable amount from ICE does not give GEO an opportunity for economic gain, but instead for economic loss. And, there is no question that detainees at the NWIPC receive food, shelter, and clothing. Thus, detainees are <u>not</u> employees. [6]

---

[4] It is easy to imagine why it would be dangerous for GEO to allow detainees who help in the kitchen to bring their own knives and keep possession of those knives in their housing units.

[5] Ironically, this is precisely what the State does with prisoner and detainee labor that makes up Washington's Correctional Industries program. While it is clear the State would struggle arguing against this factor for its own prisoners and detainees, as the Court is aware, it is not required to even engage in this analysis due to the *State* prisoner/detainee exception in the WMWA (but may be required to engage in this analysis in its pending litigation under the FLSA). 49.46.010 (3)(k).

[6] Even if this test does not apply, under the test for whether an individual is "permitted to work" volunteers who are permitted to work with the understanding that such work will be unpaid, are not employees. *See e.g. Armento*

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.      **GEO is Immune from Suit.**

a.      **Intergovernmental Immunity.**

In addition to GEO's defenses that detainees are not employees, GEO is also entitled to intergovernmental immunity, regardless of the application of any employment test. GEO previously convinced the Court that intergovernmental immunity applies, but the Court later reversed pending fact-finding as to comparator programs (specifically whether the State pays less than minimum wage to civil detainees). ECF 306. With those facts now clearly settled, GEO is sure to prevail on its defense of intergovernmental immunity.

The doctrine of intergovernmental immunity is derived from the Supremacy Clause, U.S. Const., Art. VI, which mandates that "the activities of the Federal Government are free from regulation by any state." Under the intergovernmental immunity doctrine, "a state regulation is invalid only if it [1] regulates the United States directly or [2] discriminates against the Federal Government or those with whom it deals." *See North Dakota v. United States*, 495 U.S. at 435 (1986). Because "a [state] regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself," intergovernmental immunity may apply to state regulation that affects government contractors, *see id.* at 438; *see also Boeing Co. v. Movassaghi*, 768 F.3d 832, 842-43 (9th Cir. 2014) ("The federal government's decision to hire Boeing to perform the cleanup rather than using federal employees does not affect our immunity analysis on [the grounds of discrimination]. When the state law is discriminatory, a private entity with which the federal government deals can assert immunity.").

b.      **Discriminatory Treatment.**

There is no question that the law at issue, the WMWA, is neither neutral nor generally applicable. As it pertains to all other forms of civil and criminal detention within the State of

---

*v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, No. 1:17-CV-00150-MR-DLH, 2019 WL 7373824, at *6 (W.D.N.C. Dec. 31, 2019). Courts considering whether an individual is a volunteer or an employee must review the totality of the circumstances to determine whether the facts and circumstances, objectively viewed, are indicative of an employment relationship. *Id.*

Washington, detainees (including ICE detainees) are not considered to be "employees" for purposes of their participation in work programs. The law singles the NWIPC, a federal immigration facility (by contract with GEO) where detainees are held, where the federal immigration court is housed, and where ICE maintains its offices for disparate treatment—for disparate treatment.[7] This case presents a compelling example of a State discriminating against the Federal Government and those with whom it deals. When a resident of a State detention facility performs work, Washington allows itself to pay that resident less than the minimum wage. But when a resident of a detention facility operated for the Federal Government by a federal contractor performs the <u>same</u> work, Washington insists that the federal contractor pay the resident the full state minimum wage. By doing so, the State of Washington is able to realize significant cost savings when compared to the regulatory scheme with which it burdens the federal government (and its contractors). Under the longstanding doctrine of intergovernmental immunity, Washington's approach can be justified only if significant differences between the two classes justify the differential treatment. Both the State and federal detention systems permit the utilization of work programs in detention settings to reduce idleness, increase morale, and reduce disciplinary incidents, including positions in laundry, sanitation, and the kitchen. Thus, it is clear that there are no significant differences in GEO's work programs and the State's work programs. In fact, the State's discrimination is so stark that ICE detainees held in State facilities could perform tasks identical to the VWP and not be considered "employees" while those held in the NWIPC would be "employees." This distinction would not be a result of the unique tasks performed or a distinct relationship, but instead it would be exclusively the result of <u>where</u> the detainees were housed—in a facility operated by a federal contractor. This result is impermissible under the tenets of intergovernmental immunity.

The Supreme Court's decision in *Dawson v Steager* provides the legal analysis for identifying the appropriate comparators for purposes of the intergovernmental immunity analysis. 139 S. Ct. 698,

---

[7] Indeed, if the law were neutral and generally applicable (as Plaintiffs argue), who GEO is compared to would be a moot point, as any entity governed by the law would be treated the <u>same</u> and the outcome would not change based upon the identity of the comparators. Clearly, this is not the case given the ongoing dispute about the appropriate comparators and *Dawson* governs the analysis.

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

705, 203 L. Ed. 2d 29 (2019). *Dawson* makes clear that the comparators in an intergovernmental immunity analysis are determined by *the legislature. Id.* "Whether a State treats similarly situated state and federal employees differently **depends on how the State has defined the favored class** . . . So how has West Virginia chosen to define the favored class in this case? The **state statute** singles out for preferential treatment retirement plans associated with West Virginia police, firefighters, and deputy sheriffs." *Id.* (emphasis added). Here, the State statute at issue is the "Government Institution" exception to the WMWA which treats the State of Washington and its related entities better than the federal government. The State statute defines the "favored class" as any "resident, inmate, or patient of a [Washington] state, county, or municipal correctional, detention, treatment or rehabilitative institution." 49.46.10(3)(k); *as modified by* ECF 280,11. Consequently, the proper comparators for the federal detainees at the NWIPC are any "resident[s], inmates[s], or patient[s]" covered by the statute, including, for example, residents of the Special Commitment Center ("SCC"). *Id.*

The correct comparators for intergovernmental immunity are not those who *do not receive the benefit,* but rather those who do:[8]

> "[T]he relevant question isn't whether federal retirees are similarly situated to state retirees who don't receive a tax benefit; the relevant question is whether they are similarly situated to those who do. So, for example, in *Phillips* we compared the class of federal lessees with the favored class of state lessees, even though the State urged us to focus instead on the disfavored class of private lessees. In *Davis,* we likewise rejected the State's effort to compare the class of federal retirees with state residents who did not benefit from the tax exemption rather than those who did." *Dawson,* 139 S. Ct. at 705–06 (internal citations omitted).

Likewise, the proper comparison here is to those who *receive* the benefit as defined by the legislature. Here that is those entities – the State of Washington and its prisons, jails, and civil detention centers – that receive special treatment under the Government Institution exemption. There is **absolutely no**

---

[8] Whether the definition in 49.46.10(3)(k) covers state contractors remains to be seen as this Court did not resolve that issue, despite positing that they are the proper comparators. Contractors used by the State would only be appropriate comparators if, like the State, they were equally covered by the Government Institution exception to the WMWA.

**argument that the favored class here is state government contractors.** Indeed, the State has **never** argued that state contractors receive any benefit under the WMWA, rather, they have continually argued that state government contractors are the **disfavored class.**

Here, the State (and its related entities) benefit from the exception to the Government Institution to the WMWA because they can operate voluntary work programs for less than minimum wage, reducing the costs of operating their prisons, jails, and civil detention centers while also reducing idleness. Thus, the "favored class" is comprised of Washington State prisons, jails, and civil detention centers where the State benefits from the ability to operate work programs without paying minimum wages to state detainees. 49.46.10(3)(k); *as modified by* ECF 280,11. It is undisputed that the State, including its SCC, benefit from the Government Institution exception. ECF 280, 5 ("The State of Washington operates civil detention centers where it pays less than minimum wage for work performed by detainees."). This reduces the overall budget of the Washington Department of Corrections. At the same time, the State seeks to increase the federal government's budget for housing ICE detainees by requiring the payment of a minimum wage for VWP tasks.

GEO (and the federal government) would be burdened by this discriminatory treatment. There can be no question that this burden will result in significant changes to the GEO-ICE contract.[9] The bed day rate agreed to by GEO and ICE is $115.33 per day. The current Washington minimum wage is $13.50 per hour. Presuming a detainee participates in the VWP for two hours a day, as Plaintiffs argue, that is a reduction of $27.00 from the bed day rate for that detainee. That brings the amount leftover to pay for staff, shelter, food, medical, clothing, and other items provided to that detainee down to $88.33 per day. On top of the wages, GEO would have to pay 12.4% in Social Security and

---

[9] ICE could increase the amount it pays for services from GEO, thereby significantly increasing the cost to the federal government and taxpayers and requiring Congress to reconsider its appropriations. But, more likely, ICE would simply seek a contract with the State of Washington itself, requiring housing in existing jails and detention facilities, including the provision of the VWP at subminimum wages. And, to highlight the discriminatory treatment, ICE detainees in this circumstance would not be entitled to minimum wage since they would be housed in a State facility. If that was not possible, ICE could simply move all detainees to another jurisdiction, without the input of GEO, at the expense of the detainees remaining close to their families and attorneys.

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

Medicare taxes[10] ($3.35), plus Washington State taxes. This would bring the bed day rate down to at least $84.00 per day, but GEO would still be required to provide the other services to detainees, including recreation, meals, clothing, and shelter (among others) despite the 25% reduction in the daily rate. This would simply not be sustainable and would be devastating to the detainees who would may experience decreased food variety, fewer programs, and reduced equipment such as televisions, videogames, and exercise equipment. What is more, assuming a detainee worked the maximum hours permissible under the PBNDS, 8 hours per day, he or she would be due $108.00 in wages and GEO would owe $13.39 in employment taxes, for a total of $121.39, completely eliminating the bed day rate for that detainee's entire care for the day.  Thus, GEO would be losing money on its bed day rate based upon the VWP alone, before spending a cent on food, clothing, staff, or its facilities – all for the care of the detainees themselves.

Further it appears there is an alternate motive for the State of Washington to single out GEO for regulatory burdens that are otherwise inapplicable to other detention facilities throughout the State—doing so is beneficial to the State. By arguing that government contractors can be discriminated against simply because they are government contractors, the State sets itself up to eliminate competition for ICE contracts. Plaintiffs take this position, not because there is legal support for discrimination against federal governmental contractors, but because it allows the State's Attorney General's Office (and not its legislature) to eliminate (or otherwise render unable to compete by way of regulation) privately operated ICE facilities within Washington's borders. If ICE cannot contract with GEO in the State of Washington absent a significant cost overhaul, ICE would need to look to other facilities that could hold its detainees. Because ICE does not construct, own, or operate its own facilities, it would be at the mercy of the State agreeing to a contract to hold ICE detainees within its existing prisons, jails, and detention centers.[11] Moreover, by way of example only, the State's labor

---

[10] IRS,  TC751, *available at* https://www.irs.gov/taxtopics/tc751 (last visited April 27, 2020).

[11] Of course, if the State chose to contract with ICE, it would effectively have eliminated its competition through this litigation with GEO and would be able to do an about face in whether it should pay ICE detainees minimum

force of represented employees whose unions contribute significantly to election campaigns like that of Bob Ferguson would be entitled to the work.  This too discriminates against the federal government.  The bottom line is that the State clearly has alternate motives in advancing this litigation, considering the sheer hypocrisy of its own reliance and profitability from prisoner, inmate, and civil detainee labor in its own facilities.

c.     **Direct Regulation.**

Under the direct regulation intergovernmental immunity doctrine, a federal contractor is regarded as the same as the federal government itself **<u>as a matter of law</u>**. *Boeing*, 768 F.3d at 844 ("[t]he federal government's decision to hire Boeing to perform the cleanup rather than using federal employees **<u>does not affect our immunity analysis</u>** on this ground); *see also United States v. California*, 921 F.3d 865, 882 n.7 (9th Cir. 2019) ("[f]or purposes of intergovernmental immunity, federal contractors are treated the same as the federal government itself."). Nor does this prove too much, since the direct regulation doctrine of intergovernmental immunity only applies where the federal government can prevail on the merits, where the law "directly interferes with the functions of the federal government," *Boeing*, 768 F.3d at 842; that is, where the interference is *substantial*. Intergovernmental immunity does not immunize the federal government or its contractors from *every* form of state and local regulation. Here, there can be no question that application of minimum-wage requirements substantially interferes with federal operations by "mandat[ing] the ways in which [GEO] renders services that the federal government hired [GEO] to perform." *Id.*

Requiring ICE to build and operate its own detention facilities in the State of Washington in order to be treated the same as the State is, in itself, an interference with the functions of the federal government. ICE cannot take advantage of the same benefits received by the State with respect to the WMWA Government Institution exception by simply "choosing" to not contract for detention services. ICE, in determining where to house detainees, must first "consider the availability for

---

wage payments as the State is explicitly exempted from paying minimum wage under the Government Institution exception to the WMWA.

purchase or lease of any existing prison, jail detention center, or other comparable facility suitable for such use." 8 U.S.C. § 1231(g)(1). Thus, the operations of the federal government specifically contemplate that ICE will utilize private facilities where doing so is consistent with the directives of Congress. As a result, ICE neither constructs nor operates its own immigration detention facilities. Due to significant fluctuations in the number and location of removable aliens apprehended by DHS and subject to detention, it is important for ICE to maintain flexibility with regard to its immigration detention facilities. Otherwise, ICE could invest heavily in its own facilities only to have them stand idle if a particular area later experiences a drastic decrease in demand for detainee housing. This is where GEO steps in, to house detainees under ICE's specifications—an activity that is clearly a federal function.

Thus, the operations of the federal government specifically contemplate that ICE will utilize private facilities where doing so is consistent with the directives of Congress. According to the rulings of this Court thus far, which GEO maintains represent erroneous propositions of law, if the federal government chooses a preexisting facility to house detainees (as opposed to building a new federal facility), it must pay minimum wage where it otherwise would not. So, under the Court's current framing of intergovernmental immunity, the WMWA *directly obstructs* the activities of the federal government by placing an additional regulation upon it, should it properly follow the direction of Congress (to first utilize private contractors). Furthermore, this construction of the law further frustrates ICE's federal functions. ICE prohibits GEO from employing detainees consistent with its nationwide policies for the detention of immigrants. In so doing, it preserves the custodian-detainee relationship that is required to successfully operate an ICE detention facility. At the same time, ICE provides for the VWP, to ensure detainees are not held in their cells all day, every day, without any ability to occupy their time or feel productive, as part of ICE's obligation to ensure the health and safety of ICE detainees. Under ICE's own PBNDS, the allowance for detainees who choose to participate may be as little as $1.00 a day, and there is no requirement that the allowance exceed that amount as the value of the program to detainees is not intended to be the monetary compensation, but

GEO'S TRIAL BRIEF - 19 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

rather the intangible benefits of the opportunity to feel productive. The dollar is an acknowledgment or recognition that a particular detainee participated in the VWP on a particular day doing a particular activity, which also facilitates administrative oversight of the VWP and facility as a whole. The State's effort to alter this federal function, by transforming the relationship between GEO and detainees to one of employer and employee and to add additional contractual terms and financial obligations to GEO's contract with ICE, significantly interferes with the functions of the federal government.

### d.    Derivative Sovereign Immunity.

GEO is also entitled to derivative sovereign immunity. There is no question that Congress has validly conferred on ICE the authority to provide for the custodial supervision of detainees, and to do so using private contractors like GEO. ICE has broad discretion to determine where to house ICE detainees. *See e.g. Rios–Berrios v. I.N.S.*, 776 F.2d 859, 863 (9th Cir. 1985) (a decision to detain an alien arrested in California at a facility in Florida was within the province of ICE); *Sasso v. Milhollan*, 735 F.Supp. 1045, 1048 (S.D.Fla. 1990) (a decision to transfer an alien from one locale to another is within the sound discretion of ICE). Congress delegated to DHS and its agency, ICE, the authority to detain aliens placed into removal proceedings. *See* 8 U.S.C. §§ 1103, 1226, 1231. In carrying out that mandate, ICE has the discretion to contract with private entities for detention services if government facilities are otherwise unavailable. 8 U.S.C. §§ 1103(a)(11), 1231(a)(2), (g). In these contracts, Congress has authorized ICE to provide for programs that pay allowances to detainees of less than the minimum wage. *See* 8 U.S.C. § 1555(d). The ICE contract at issue here, between GEO and ICE, is therefore, authorized by Congress's valid delegation of authority to ICE, and GEO.

Federal government contractors may "obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 672 (2016). While Plaintiffs attempt to complicate this analysis, it is actually quite simple. Plaintiffs here allege that GEO violated the WMWA by not classifying its detainees as "employees" and paying them minimum wage. Yet, GEO's contract with ICE states that GEO <u>may not</u> employ detainees as employees, including by extension, paying them minimum wage. ECF 223-2

at 82. It is of no moment that GEO *could* have had discretion to pay detainees more than a dollar. Plaintiffs have brought forward no cause of action that would allow them to claim entitlement to a remedy that is less than the minimum wage but more than what they are currently being paid. GEO has followed the terms of its contract with the federal government by not employing detainees and because Congress authorized ICE to enter into the contract with GEO (8 U.S.C. § 1231(g)(1)), GEO is entitled to derivative sovereign immunity. *Yearsley v. W.A. Ross Constr. Co.,* 309 U.S. 18, 21 (1940).

**5.      The State's unjust enrichment enforcement action.**

The State pursues an additional unjust enrichment claim seeking the wages that detainees would have been paid if they were entitled to a minimum wage as damages. The State claims that GEO should pay in effect a penalty for having administered ICE's VWP at NWIPC according to PBNDS standards, despite the fact that it condones its own detention centers doing the exact same. But, the State's unjust enrichment claim relies upon a belief that GEO should have redirected the funds that were allocated to care for detainees, including their medical care and food, to instead pay for the VWP, all at the detainees expense. Surely, this theory does not hold water. It is clear that GEO was not enriched by the operation of the program. Had GEO instead been given the opportunity to hire outside labor, not only could it have selected reliable and skilled workers, it could have also recouped a 10% profit margin on each additional employee it hired, as it is entitled to do under its contract terms and the Federal Acquisition regulations.  As noted previously, ICE's mandatory VWP effectively costs GEO money.

**6.      The relationship between ICE, detainees, and federal government contractors involves a political question.**

"There is … nothing automatic or obligatory about the assumption of "jurisdiction" by a federal court" to hear a declaratory judgment action" like this one. *Wilton v. Steven Falls Co*., 515 U.S. at 278-88, 115 S. Ct. 2137. The universal rule requires the Court first find a justiciable controversy before invoking its jurisdiction to decide the underlying controversy to provide declaratory relief. *To-Ro*

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

*Trade Shows v. Collins*, 144 Wn. 2d 403, 411, 27 P.3d 1149 (2001). Trial courts have discretion to decide whether to entertain a declaratory judgment action like this one. *Nolette v. Christianson*, 115 Wn. 2d 594, 599, 800 P.2d 359 (1990). An appellate court may be called upon to determine whether the trial court erroneously exercised its discretion either to consider or refuse to consider a declaratory action. *Id.* A trial court's justiciability analysis includes the limiting doctrines of standing, mootness, and the federal case-or-controversy requirement. *To-Ro Trade Shows,* 144 Wn. 2d at 411; *Haitian Refugee Ctr. v. Civiletti,* 503 F. Supp. 442, 452 (S.D. Fla. 1980), *modified sub nom. Haitian Refugee Ctr. v. Smith,* 676 F.2d 1023 (5th Cir. 1982).

Political questions like whether or not federal detainees should be paid more for doing chores and the collective activities of daily living like meal preparation while detained simply has no justiciability before a jury or judge and should be rejected outright. A claim presents a political question when the responsibility for resolving it belongs to the legislative or executive branches rather than to the judiciary. *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691 (1962). Political questions may be identified through various means, to include (a) constitutional commitment of the issue to a coordinate political department, (b) the absence of judicially discoverable standards for resolving the question, (c) the impossibility of deciding the question without an initial policy determination of a kind clearly for nonjudicial discretion, or (d) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government. *Id.* Any one of these rationales may be invoked to take this case from the jury on justiciability grounds. Congress and ICE has expressed that the Court should not hear Plaintiffs' cases because the Court is invading powers reserved to the other branches. ECF 52 at 5-8 (Congressional Ltr.); ECF 290 and ECF 298 (Statement of Interest). Rates that pertain to paying for necessary governmental functions linked to the budget may not be decided judicially for these reasons. *SEIU Healthcare 775NW v. Gregoire*, 168 Wn. 2d 593, 229 P.3d 774 (2010).

With these principles in mind, there can be no question that the allowance owed to ICE detainees is squarely within the purview of Congress. There is no area of law in which Congress has more

GEO'S TRIAL BRIEF - 22 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

unreviewable power than in immigration and naturalization matters. U.S. Const. art. 1, § 8 cl. 4; *see also Arizona v. United States*, 567 U.S. 387, 394-95 (2012). The Supreme Court has explicitly warned lower courts that they are not to imply restrictions on Congressional flexibility to respond to changing international conditions which might require changes in immigration and naturalization matters. *Id.* Long ago, Congress set voluntary work program rates via budget appropriation. 8 U.S.C. § 1555(d); *Your CO 243-C Memorandum of November 15, 1991*; *DOD Request for Alien Labor*, General Counsel Op. No. 92-63, 1992 WL 1369402, *1 (Nov. 13.1992). ICE then made a policy decision within the PBNDS that the lowest permissible payment under the VWP was not the minimum wage rate, but rather a dollar per day. PBNDS 5.8. ICE has never required any higher recognition for the completion of activities of daily living within the VWP. The federal government has filed its Statement of Interest in these proceedings acknowledging the budgetary ramifications of this case. ECF 290 and ECF 298 (Statement of Interest). It has not waived its right to decide VWP rates, nor has it delegated such decision making to local authorities or a jury. Thus, because neither Congress nor ICE have defined detainees participating in the VWP as "employees," the nature of their relationship cannot be construed to be that of employees.

To be sure, Plaintiffs own proffered evidence makes clear that the issue in this case involves a political question related to the terms of confinement for ICE detainees. Whether ICE detainees should have the right to earn minimum wages at taxpayer expense without the expectation of a corresponding contribution to their living expenses is a question squarely within the purview of Congress. Plaintiffs know this is a political question and seek to introduce testimony from Christopher Strawn, an attorney at the Northwest Immigrant Rights Project ("NIRP"), in favor of their case. The NIRP has significant involvement in lobbying for changes in immigration and detention policy and has, most recently, been working alongside the State legislature on a bill to prevent private companies from operating detention facilities in the State of Washington (similar to the California legislation on this topic). They will also seek to introduce arguments about general immigration policies in the United States in an effort to sway jurors based upon their political beliefs—not the law. Through their efforts, they seek to change

GEO'S TRIAL BRIEF - 23 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

how Congress allocates its budget for ICE. The effort to effect policy through the judiciary should be avoided during trial by carefully focusing on widely accepted legal standards that define the role of the State vis-à-vis the federal government for immunity purposes and by following settled case law as it relates to defining the relationships detained individuals have with their custodian.

## IV. CONCLUSION

For the reasons described previously, both cases have no merit and should be finally dismissed with prejudice.

Respectfully submitted this 28th day of April, 2020.

By: *s/ Colin L. Barnacle*
**AKERMAN LLP**
Colin L. Barnacle (Admitted *pro hac vice*)
Ashley E. Calhoun (Admitted *pro hac vice*)
Adrienne Scheffey (Admitted *pro hac vice*)
Allison N. Angel (Admitted *pro hac vice*)
1900 Sixteenth Street, Suite 1700
Denver, Colorado 80202
Telephone:  (303) 260-7712
Facsimile:   (303) 260-7714
Email: colin.barnacle@akerman.com
Email: ashley.calhoun@akerman.com
Email: adrienne.scheffey@akerman.com
Email: allison.angel@akerman.com

By: *s/ Joan K. Mell*
**III BRANCHES LAW, PLLC**
Joan K. Mell, WSBA #21319
1019 Regents Boulevard, Suite 204
Fircrest, Washington 98466
Telephone:  (253) 566-2510
Facsimile:   (281) 664-4643
Email: joan@3brancheslaw.com

*Attorneys for Defendant The GEO Group, Inc.*

GEO'S TRIAL BRIEF - 24 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PROOF OF SERVICE**

I hereby certify on the 29th day of April, 2020, pursuant to Federal Rule of Civil Procedure 5(b), I electronically filed and served the foregoing **GEO'S TRIAL BRIEF** via the Court's CM/ECF system on the following:

Marsha J. Chien
Andrea Brenneke
Lane Polozola
Patricio A. Marquez
OFFICE OF THE ATTORNEY GENERAL
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104

*Attorneys for Plaintiff State of Washington*

**SCHROETER GOLDMARK & BENDER**
Adam J. Berger, WSBA #20714
Lindsay L. Halm, WSBA #37141
Jamal N. Whitehead, WSBA #39818
Rebecca J. Roe, WSBA #7560
810 Third Avenue, Suite 500
Seattle, Washington 98104
Telephone: (206) 622-8000
Facsimile:  (206) 682-2305
Email: hberger@sgb-law.com
Email: halm@sgb-law.com
Email: whitehead@sgb-law.com
Email: roe@sgb-law.com

**THE LAW OFFICE OF R. ANDREW FREE**
Andrew Free (Admitted *Pro Hac Vice*)
P.O. Box 90568
Nashville, Tennessee 37209
Telephone: (844) 321-3221
Facsimile:  (615) 829-8959
Email: andrew@immigrantcivilrights.com

**OPEN SKY LAW PLLC**
Devin T. Theriot-Orr, WSBA #33995
20415 72nd Avenue S, Suite 100
Kent, Washington 98032
Telephone: (206) 962-5052
Facsimile:  (206) 681-9663
Email: devin@openskylaw.com

**MENTER IMMIGRATION LAW, PLLC**
Meena Menter, WSBA #31870
8201 164th Avenue NE, Suite 200
Redmond, Washington 98052
Telephone: (206) 419-7332
Email: meena@meenamenter.com

*Attorneys for Plaintiffs Oguchukwu Nwauzor, et al.*

*s/ Allen G. Stephens*
Allen G. Stephens

GEO'S TRIAL BRIEF - 25 of 25
3:17 cv 05806 – RJB
3:17 cv 05769 - RJB
52884332;3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph