# EXHIBIT A

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

UGOCHUKWO GOODLUCK NWAUZOR,                )
et al.,                                    )
                                           )
                Plaintiffs,                )
                                           )
        v.                                 )  3:17-cv-05769-RJB
                                           )  3:17-cv-05806-RJB
THE GEO GROUP, INC.,                       )
                                           )
                Defendant.                 )  Tacoma, Washington
_____          )
                                           )  October 21, 2021
STATE OF WASHINGTON,                       )
                                           )  Jury Trial
                Plaintiff,                 )
                                           )  9:00 a.m.
        v.                                 )
                                           )
THE GEO GROUP, INC.,                       )
                                           )
                Defendant.                 )
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT J. BRYAN
UNITED STATES DISTRICT JUDGE
_____

Proceedings stenographically reported and transcribed
With computer-aided technology

```
1                              APPEARANCES

2

3     For the Plaintiff        JAMAL N. WHITEHEAD
      Nwauzor, et al.:         ADAM J. BERGER
4                              Schroeter Goldmark & Bender
                               810 Third Avenue
5                              Suite 500
                               Seattle, Washington
6

7     For the Plaintiff        MARSHA J. CHIEN
      State of Washington:     ANDREA BRENNEKE
8                              LANE POLOZOLA
                               800 Fifth Avenue
9                              Suite 2000
                               Seattle, Washington
10

11    For the Defendant        JACQUELINE M. ARANGO
      The GEO Group:           Akerman LLP
12                             98 Southeast Seventh Street
                               Suite 1100
13                             Miami, Florida

14                             ADRIENNE SCHEFFEY
                               Akerman LLP
15                             1900 Sixteenth Street
                               Suite 1700
16                             Denver, Colorado

17                             WAYNE H. CALABRESE
                               JOSEPH NEGRON, JUNIOR
18                             The GEO Group
                               4955 Technology Way
19                             Boca Raton, Florida

20                             AL ROUNDTREE
                               Fox Rothschild LLP
21                             1001 Fourth Avenue
                               Suite 4500
22                             Seattle, Washington

23

24

25
```

1

2                     EXAMINATION INDEX

3     EXAMINATION OF:                                    PAGE

4      BRUCE SCOTT        DIRECT EXAMINATION (Resumed)
                          BY MR. CALABRESE                  11
5                         CROSS-EXAMINATION
                          BY MR. WHITEHEAD                  69
6                         CROSS-EXAMINATION
                          BY MS. CHIEN                     106
7                         REDIRECT EXAMINATION
                          BY MR. CALABRESE                 109
8
       JOSHUA GRICE       DIRECT EXAMINATION
9                         BY MR. NEGRON                    128
                          CROSS-EXAMINATION
10                        BY MR. POLOZOLA                  135

11     ERWIN DE LA CRUZ   DIRECT EXAMINATION
                          BY MS. ARANGO                    140
12
       BRYAN EVANS        DIRECT EXAMINATION
13                        BY MR. CALABRESE                 158
                          CROSS-EXAMINATION
14                        BY MS. BRENNEKE                  185

15

16

17                       EXHIBIT INDEX

18
       EXHIBITS ADMITTED                                 PAGE
19
        35                                                 49
20      36                                                 54
        A-302                                              61
21      A-356                                              59

22

23

24

25

1  the work you and your employees do at the Northwest ICE

2  Processing Center?

3  A   I and my employees take great pride in what we do.  We

4  take great pride in our audits and accreditations that have

5  shown the good work that we have done over time, as witnessed

6  by many people that have visited the facility over the years,

7  congressmen, everybody.

8     We train hard, we know the standards, we respect the

9  dignity and right of those contained in our care.  We do the

10  best we can to manage the time while they are there for the

11  federal government and hope that they get released quickly to

12  whatever adjudicates -- to however the federal government

13  adjudicates their case and gets them either released or back

14  to their families in the quickest, most safe and humane way

15  possible.

16        MR. CALABRESE:  Thank you, Mr. Scott.

17     No further questions, Your Honor.

18                   CROSS-EXAMINATION

19  BY MR. WHITEHEAD:

20  Q   Mr. Scott, a lot of ground was covered.  I would like to

21  start with Exhibit A-302.  This was the ledger for the class

22  representative, Mr. Goodluck Nwauzor.

23        If I understood your testimony correctly, you said that

24  Mr. Nwauzor began working November 11th, 2016.  I believe

25  that is page two of the document.  Do you see that there?  I

1   think the line you were referring to is the one noted for

2   November 11th.

3   A   I see that line as the first time we have a deposit into

4   his account.

5   Q   And each of those deposits, though, represent a shift or

6   work performed by Mr. Nwauzor, correct?

7   A   I don't really consider it a shift.  It is the detail that

8   he performed that day, one dollar per day.

9   Q   Each of those entries represents a detail that he worked,

10  correct?

11  A   I would agree with that.

12  Q   If we could clear the callout.  I would like for you to

13  tell me how many work details Mr. Goodluck Nwauzor missed

14  once he began working the month of November?

15  A   It looks like Mr. Goodluck was pretty consistent.  I see a

16  dollar for each day.  It looks like he performed that task

17  seven days a week.

18  Q   He worked every day, just like he testified, correct?

19  A   It appears to.

20  Q   Including Thanksgiving?

21  A   Daughter was born on the 24th.  I don't know the date

22  Thanksgiving was that year.  But in the time period that's

23  here, it looks like Thanksgiving was covered.

24  Q   Did you work on Thanksgiving 2016?

25          MR. CALABRESE:  Objection, Your Honor, form,

1    argumentative.

2            THE WITNESS:  I --

3            THE COURT:  Sustained.

4    BY MR. WHITEHEAD:

5    Q   Let's take a look at the month of December for

6    Mr. Nwauzor.

7            If we could clear the callout?  We might have to look

8    at page two.  The entries begin there.  And this is in

9    reverse chrono order.  So his first December entry there is

10   at the top of page two.  Do you see it?

11   A   I do.

12   Q   Let's continue to the next page.  My question is this:

13   How many days of work did Mr. Nwauzor perform for the month

14   of December 2016?

15   A   It looks like he did all the days.  I think he's probably

16   one of those detainees that take great pride in what he does.

17   Q   He worked every day, just like he testified, correct?

18   A   It would appear to.

19   Q   Including Christmas day?

20   A   Yes.

21   Q   Did you work Christmas day?

22            MR. CALABRESE:  Objection, Your Honor, same

23   objection.

24            THE COURT:  Sustained.

25            MR. CALABRESE:  Different holidays.

1    BY MR. WHITEHEAD:

2    Q   What do you call someone that performs a task for money?

3    A   That is really vague.  It could be a volunteer.  There are

4    so many different ways that could go.

5    Q   Let's go to Exhibit 35.  I think that is one of the

6    exhibits that was brought up.  This is one of the ACA books.

7    Let's start on page 3 of the document.

8         Now, that first sentence there, it reads that the

9    Northwest Detention Center is a privately owned and operated

10   detention facility.  Did I read that correctly?

11   A   You did.

12   Q   And that's because the Northwest Detention Center is

13   privately owned and operated?

14   A   In accordance with the contract with the federal

15   government.

16   Q   Well, this paragraph that we are looking at says nothing

17   about that, correct?

18   A   Well, this paragraph, annual report, no.  This is

19   summary.

20   Q   I would like to look at page 12 of this report.  Perhaps

21   we will go up one page to page 11.  This section deals with

22   classifications, correct?

23   A   I see that section.

24   Q   Okay.  Let's continue on to the next page.  At the top,

25   what does it have to say about detainee classifications at

1   the center as of the date of this report?

2   A   The date of the report, it breaks out, it looks like,

3   totality of the detainee classifications of those years by

4   the percentage of what were in each of those classifications.

5   Q   And less than ten percent of the detainee population, as

6   of the date of this report, was classified as high level,

7   high security, correct?

8   A   Less than ten percent during that time.

9   Q   Now, no one forces GEO -- we can clear the exhibit.

10      No one forces GEO to enter contracts with ICE, correct?

11   A   I don't think anybody forces you to enter into a contract.

12   Q   That's right.  And GEO wasn't conscripted; the

13   United States Government didn't say, GEO, you will perform

14   this task for us, correct?

15   A   I agree with that.

16   Q   GEO, we saw the contract earlier, and you told me that it

17   was a partnership-type relationship, correct?

18   A   I didn't say it was a partnership, but there's a definite

19   who is the client and who is the contractor.

20   Q   And GEO enters a relationship because it is a beneficial

21   relationship for GEO, correct?

22   A   Well, I would surmise.  I am not the contracting officer

23   for GEO to do that.  I come way down at the low level and

24   just manage contracts.  I don't get involved in that

25   upper-end stuff.

SCOTT - Cross

1    Q    Sir, you were just testifying about the upper-end stuff..

2    I think the question is a straightforward one.   GEO enters --

3              MR. CALABRESE:   Objection, Your Honor, form and the

4    argumentative nature of the question.

5              MR. WHITEHEAD:   Let me finish the question.

6              MR. CALABRESE:   The part I objected to was completed.

7    BY MR. WHITEHEAD:

8    Q    GEO enters these contracts --

9              THE COURT:   Just a minute.   Let me rule on the

10   objection.

11       Rephrase the question.

12   BY MR. WHITEHEAD:

13   Q    GEO enters contracts with ICE because it is beneficial for

14   GEO?

15   A    Well, I think one of GEO's core tenants is to provide

16   world-class services to the United States Government.   I

17   think that would be one of the purer things of why GEO does

18   that.   Is there a benefit?   I would say yes.

19   Q    GEO derives a benefit, correct?

20   A    By performance of the service.   I think the real benefit

21   is to the United States Government that has requested these

22   services and asked for somebody to do all of these things.   I

23   think really the benefit and service of this country is to

24   the United States of America.

25   Q    Now, ICE delegates to GEO certain functions under the

1    contract in performing Detention Management Services,

2    correct?

3    A    ICE requires us to do certain functions, as we have seen

4    in the contract and the Performance-Based National Detention

5    Standards.

6    Q    And we have heard about ICE's reliance upon GEO to perform

7    under this contract, correct?

8    A    ICE and Homeland Security, as the people that have the

9    contract, I would agree.

10   Q    We have heard about GEO's discretion within the

11   performance of these Detention Management Services and that

12   discretion abounds, correct?

13   A    I don't think there's -- there is not a lot of discretion.

14   We have to follow the standards.  Where facility

15   differences -- like I explained earlier, facility

16   differences, that's where some of those local supplements

17   come in, the availability to work the program that's audited

18   by the government to make sure that we do what we are

19   supposed to do.

20   Q    Well, you heard Mr. McHatton's testimony about how he

21   created a document called "Detainee Selection Criteria."

22   That was GEO, not ICE, correct?

23   A    That is a part of managing a program using similar

24   language that people are accustomed to understanding.  But I

25   don't think it draws any inference to the true meaning of

1   those words.

2   Q   And we heard testimony from Ms. Singleton and Mr. Heye,

3   GEO's classification officers, about how it is GEO's officers

4   that make the work assignments, correct?

5   A   I won't say "make the work assignments."  The work plan

6   that we are supposed to do by -- as called out by the

7   standard, which is a requirement, and who does that?  My

8   staff make that work plan, but it is all permitted by the

9   government.

10  Q   GEO's staff creates the work rosters, correct?

11  A   This is part of that work plan to make sure that we manage

12  all of those different competing requirements in a day to

13  make sure everything happens.

14  Q   And you heard testimony from Ms. Singleton that detainee

15  workers sometimes work three kitchen details.  Did you hear

16  that?

17  A   I heard that, but I don't believe that to be factually

18  true.  We could look at those documents again.  I think there

19  were some date differences on some of those documents.  I

20  don't believe that to be true.

21  Q   When Ms. Singleton testified about that being a practice

22  at the Northwest Detention Center, she was talking from her

23  experience as a classification officer for GEO, correct?

24          MR. CALABRESE:  Your Honor, we are going to object to

25  this line of questioning about another witness so

1   extensively.  It is almost as though he is using another

2   witness's testimony to impeach this witness.

3          MR. WHITEHEAD:  Your Honor, this is testimony that

4   was elicited at trial, it's evidence in the case.  Mr. Scott

5   is sitting here as the corporate designee.  He's heard

6   everything.  They have used him to rebut much of the

7   testimony that was offered by previous GEO employees.

8          THE COURT:  The objection is overruled.

9          THE WITNESS:  I would like the question repeated,

10  please.

11  BY MR. WHITEHEAD:

12  Q   Ms. Singleton, when she talked about GEO's practice of

13  allowing workers to work sometimes three kitchen shifts a day

14  at the Northwest Detention Center, she was talking about this

15  practice that occurred while she was a classification officer

16  at the center, correct?

17  A   The last time I heard.  But, to my knowledge, reviewing

18  the documentation, I know we have allowed detainees to do two

19  shifts a day as long as they do not work past the eight hours

20  a day in one day, per the standard.  I can understand that

21  happening.  Three shifts a day, I can't speak to that without

22  actually looking and reviewing some documentation.

23  Q   And working more than three shifts a day in the kitchen,

24  that would violate parts of the Performance-Based National

25  Detention Standards, correct?

1   A   It would.  But to my knowledge, we don't have any

2   violations.  And of the many audits throughout the many years

3   they have reviewed us in great detail, I think that would

4   have been found.

5   Q   Well, sir, you are offering your knowledge, but --

6          THE COURT:  Just a second, counsel.

7      Mr. Scott, it would be better if you just answered the

8   questions asked.

9          THE WITNESS:  Yes, sir.

10          THE COURT:  If an explanation is asked, fine.  If it

11   is not asked, you don't volunteer it.  Okay?

12          THE WITNESS:  Yes, sir.

13   BY MR. WHITEHEAD:

14   Q   Working more than three kitchen details in a day would

15   violate the Performance-Based National Detention Standards,

16   correct?

17   A   If we looked at --

18   Q   I phrased the question --

19          MR. CALABRESE:  Objection, Your Honor.  He's trying

20   to answer the question.

21   BY MR. WHITEHEAD:

22   Q   -- as a yes-or-no question.

23          MR. CALABRESE:  It doesn't call necessarily for a yes

24   or no.

25          MR. WHITEHEAD:  The witness may answer no if that's

1    the case.  But my question is phrased as --

2          THE COURT:  The objection is overruled.

3    BY MR. WHITEHEAD:

4    Q   This is a yes-or-no question, and I will put it to you

5    again, sir:  Working more than three kitchen details in a day

6    would violate the Performance-Based National Detention

7    Standards, correct?

8    A   If they went past eight hours.

9    Q   Now, you heard Ryan Kimble testify that some detainees

10   work more than one job a day?

11   A   That's correct.

12   Q   You are aware that some detainees worked more than one job

13   a day and that would violate the Performance-Based National

14   Detention Standards, correct?

15   A   It would, but we talked about we had --

16   Q   It's one of those yes-or-no questions.  Working more than

17   one job a day would violate the Performance-Based National

18   Detention Standards, correct?

19   A   By that singular line, without any definition of what

20   actually happened, yes.

21   Q   Now, you told us earlier in the week that you are GEO's

22   top employee at the detention center, correct?

23   A   Yes.

24   Q   You are a salaried employee?

25   A   Yes.

1   Q   That means you are being paid to testify right now,

2   correct?

3   A   I get paid a salary, sir.

4   Q   You have been designated as the company's corporate

5   representative?

6   A   Correct.

7   Q   And you have accepted this role?

8   A   Yes.

9   Q   It's because you want to help, correct?

10  A   I do the best I can to serve my country.

11  Q   Now, you have testified -- there has been testimony that

12  the Northwest Detention Center is a well-monitored facility.

13  I think that was yesterday.  Do you recall?

14  A   Yes.

15  Q   And you said that the detention center was audited

16  frequently.  Did I get that right?

17  A   Correct.

18  Q   I believe you said that all audit reports went by your

19  desk?

20  A   Correct.

21  Q   And some of those reports, they turned out just fine,

22  correct?

23  A   Many do.

24  Q   GEO's facility is found to be in compliance with whatever

25  is being audited?

SCOTT - Cross

1   A   I do not recall a report that ever said we were not in

2   compliance with a standard.

3   Q   Is it your testimony that GEO has never received an audit

4   finding that it was out of compliance with the

5   Performance-Based National Detention Standards?

6   A   No, I can't say that.  When it comes to auditing, there is

7   findings.  That doesn't necessarily mean that the auditor  is

8   finding you out of compliance with the entire standard.  But

9   there is report findings sometimes that we talk about

10  corrective action plans.  We have talked about stuff like

11  that.

12  Q   That's right, you couldn't say that because it wouldn't be

13  true.  GEO --

14          MR. CALABRESE:  Objection, Your Honor.  He's

15  testifying.

16  BY MR. WHITEHEAD:

17  Q   GEO has been found to be out of compliance with the

18  performance-based --

19          MR. CALABRESE:  Your Honor, I made an objection.

20          THE COURT:  Just a minute, counsel.

21      Rephrase the question.

22  BY MR. WHITEHEAD:

23  Q   GEO has been found to be out of compliance with the

24  Performance-Based National Detention Standards in years past

25  audits, correct?

1   A    I wouldn't consider that to be a true statement.

2   Q    I'm sorry.  You would consider that to be true?

3   A    I would not.

4   Q    What is the Office of the Inspector General for the

5   Department of Homeland Security?

6   A    It is an office that resides in its own hierarchy chain of

7   command.  Like any type of inspector general, they come down

8   and they have been to the facility multiple times.

9   Q    Now, the Office of Inspector General, it is a Department

10  of Homeland Security but separate and apart from ICE,

11  correct?

12  A    My understanding.

13  Q    Now, you're aware that the office of the inspector general

14  of the Department of Homeland Security inspected the

15  detention center in 2019, correct?

16  A    They have come a few times.  I don't have any reason to

17  believe they didn't come in 2019.

18  Q    In the 2019 inspection, it was unannounced, correct?

19  A    They have the ability to do unannounced inspections.

20  Q    The unannounced inspections, they are a tool that

21  inspectors use to see what a facility is like as-is, correct?

22  A    A tool?

23  Q    Tool.

24  A    It is a requirement of the contract that we get

25  unannounced and announced inspections.

SCOTT - Cross

1    Q   Well, unannounced visitors doesn't give you an opportunity

2    to tidy up, so to speak, correct?

3             MR. CALABRESE:  Objection, form of the question.

4             THE COURT:  He may answer.

5             THE WITNESS:  We run a facility, day in and day out

6    operations.  We like to say we are always audit ready, but

7    unannounced inspections come by.

8    BY MR. WHITEHEAD:

9    Q   Sir, isn't it true the Office of Inspector General found

10   GEO staff at the Northwest Detention Center had a policy of

11   placing physical restraints on detainees in the segregation

12   unit that did not comply with ICE standards?

13            MR. CALABRESE:  Your Honor, we are definitely

14   objecting to this sort of introduction or request for

15   testimony on something totally irrelevant to the case before

16   the Court.

17            MR. WHITEHEAD:  Your Honor --

18            MR. CALABRESE:  Inappropriate.

19            MR. WHITEHEAD:  We have sat through a day of

20   testimony about audit reports.

21            THE COURT:  The objection is overruled.

22            THE WITNESS:  I do recall that there being a change.

23   If we looked at the standard, this gets very involved.  I

24   don't want to --

25

BY MR. WHITEHEAD:

Q   This is one of those yes-or-no questions again.  Isn't it true that the Office of Inspector General found that GEO staff, at the Northwest Detention Center, had a policy of placing physical restraints on detainees in the segregation unit that did not comply with ICE standards?

A   It is a little bit more involved than that.  I believe that was their finding.

Q   Let's take a look at the report.  Can we get Exhibit 614, please.

    Sir, this is the Office of Inspector General's report, correct?

A   I see an overall capping report.  Looks like many different facilities in 2019.

Q   I don't want to ask you about any other facilities.  I am only going to restrict my questions to you, sir, of the facility that you operate.  Understood?

A   Yeah.

Q   I would like to go -- I would like to scroll through the document, if we could, just scroll through the pages here. Sir, you told us earlier that all audit reports come across your desk.  Is this one of the audit reports that came across your desk, yes or no?

A   I do remember seeing it.  I was not in the facility -- what date was this report?  2019?  July 1, 2020.  Yeah.

1    Q    When did you become a facility administrator?

2    A    February of this year.

3    Q    I think we have scrolled all the way through.

4         MR. WHITEHEAD:  Your Honor, we offer Exhibit 614 into

5    evidence.  This is a document that meets the hearsay

6    exception under Rule 803(a) -- 8, as a public record, self

7    authenticates under 902(a) as a government report.  In

8    addition, we are offering this as rebuttal evidence.

9         MR. CALABRESE:  Your Honor, GEO objects.  This report

10   and this inspection had to do with apparently with restraints

11   in the segregation unit.  Nothing to do whatsoever with

12   respect to the voluntary work program or the detainees in it.

13   It is irrelevant.  It is hearsay.  It is not covered by the

14   exceptions properly.  It does not speak for itself.

15        THE COURT:  I think it has a lot of information in it

16   that is not relevant, along with what is relevant.  I think

17   it should not be admitted in its present form.

18        MR. WHITEHEAD:  Your Honor, I think that we can

19   address that through a series of redactions.  As I have

20   stated to the witness, my only concern is the Northwest

21   Detention Center.

22       Your Honor, may I inquire about the findings specific to

23   the Northwest Detention Center?

24        THE COURT:  I think you can inquire about it.

25

1   BY MR. WHITEHEAD:

2   Q   Let's go to page 5 of the document.  Looking at the bottom

3   of the first paragraph, do you see that, sir?

4   A   Yes.

5   Q   Sir, are you aware there was a finding that the Northwest

6   Detention Center used restraints to control segregated

7   detainees during any movement outside their cells?

8   A   Yes, there was a recent change to the standard just prior

9   to this.

10   Q   Sir, isn't it the case there was a finding this practice

11   violated detention policies and standards, as well as

12   infringing on detainee rights?

13   A   I --

14          MR. CALABRESE:  Objection to the form of the

15   question.  Compound.  Assumes a fact not in evidence.

16          THE COURT:  Overruled.  You may answer.

17          THE WITNESS:  That's what the finding says.  Doesn't

18   show what our response was and the corroborating detail

19   beyond it.

20   BY MR. WHITEHEAD:

21   Q   Sir, I am confident your counsel will come and ask you

22   follow-up questions.  For now, I would like for you just to

23   answer my questions which are phrased as yes or no.

24   Understood?

25   A   Yes.

1  Q   Let's go to page 7 of the document.  Sir, isn't it true

2  that -- we have talked about segregation.  The findings of

3  the Office of Inspector General weren't limited only to GEO's

4  segregation practices, correct?

5  A   They are saying there was other areas mentioned in the

6  report.  I believe there are other areas mentioned in the

7  report.

8  Q   That's right.  Let's go to page 8.  Isn't it true that the

9  Office of Inspector General found GEO did not respond to

10 grievances or communications from detainees within the

11 applicable guidelines laid out by the Performance-Based

12 National Detention Standards, correct?

13 A   That's what it says.

14 Q   In fact, in most cases, GEO took nearly double the amount

15 of time prescribed by the Performance-Based National

16 Detention Standards to respond to detainee grievances,

17 correct?

18 A   Let me read that.  I don't know if that -- I understand

19 what you are saying.  This report was written for many

20 different facilities.  Can I have a minute to read it? Can

21 you repeat your question?

22 Q   My question to you was: Isn't it the case that the Office

23 of Inspector General for the Department of Homeland Security

24 found that in many cases GEO's response time to detainee

25 grievances was double the amount of time prescribed by the

1    Performance-Based National Detention Standards?

2    A   For the time period they looked at for this report.

3           MR. WHITEHEAD:  I think we can clear the report.

4    BY MR. WHITEHEAD:

5    Q   These findings by the Office of Inspector General, they

6    are the case even though there is an ICE contracting officer

7    on the premises everyday at the Northwest Detention Center,

8    is that the case?

9    A   Yes, ICE has a contract officer onsite.

10   Q   Right, and GEO was found to be not in compliance in the

11   ways we have just discussed, despite the fact there is a

12   contracting officer from ICE on premises, correct?

13   A   That -- yes.

14   Q   The findings we looked at, ICE concurred with the Office

15   of Inspector General's findings, correct?

16          MR. CALABRESE:  Objection, assumes a fact not in

17   evidence.

18          THE COURT:  He can answer if he knows.

19          MR. WHITEHEAD:  Let's get 614 back up, please.  This

20   will be page 15.  Mr. Berger, 18 for you.

21   BY MR. WHITEHEAD:

22   Q   Sir, isn't it the case that ICE concurred with the Office

23   of Inspector General's findings about the Northwest detention

24   standard not being in compliance with the Performance-Based

25   National Detention Standards in the ways you have just

1  described?

2  A   Says ICE concurred with the described corrective action

3  plan, which explains more about those things for the many

4  different facilities.

5  Q   Sir, it is the case that the Northwest Detention Center

6  gets audited or inspected by a number of different government

7  agencies?

8  A   Yes.

9  Q   Each of those agencies is auditing for compliance with

10  legal requirements for standards that fall within the purview

11  of the auditing authority, correct?

12  A   I can agree with that.

13  Q   So ICE or DHS don't audit for compliance with the Federal

14  Insecticide, Fungicide and Rodenticide Act, correct?

15  A   Well, I am not a federal guy, but those would be specific

16  to those federal agencies.

17  Q   Correct.   That's the EPA letter we saw earlier in the

18  week, right?

19  A   Correct.

20  Q   ICE and DHS, they don't audit for compliance with Tacoma

21  health codes, do they?

22  A   Not for Tacoma health codes in detail.

23  Q   That's right, that's the City of Tacoma that comes in to

24  inspect GEO's kitchen in the way Bert Henderson described for

25  us, correct?

1    A    Correct.

2    Q    ICE and DHS, they are not charged with enforcing

3    Washington's Minimum Wage Act, are they?

4    A    Repeat the question.

5    Q    ICE and DHS, they are not charged with enforcing

6    Washington's Minimum Wage Act, correct?

7    A    I don't work for -- I know they have made statements about

8    that.  I don't know.  I can't speak for them.

9    Q    Do you harbor any belief that ICE is responsible for

10   enforcing Washington's Minimum Wage Act?

11   A    No --

12           MR. CALABRESE:  Objection, calls for a legal

13   conclusion.

14           THE COURT:  Asks for his belief.  The objection is

15   overruled.

16           THE WITNESS:  My understanding is that ICE has said

17   that the Washington State Minimum Wage Act does not apply to

18   the contract facility or the voluntary work program.

19   BY MR. WHITEHEAD:

20   Q    Well, let talk about that.  In business have you heard the

21   phrase, "If it isn't written down, it didn't happen"?

22   A    I have heard that.

23   Q    What does that mean to you?

24   A    Means we should have documentation.

25   Q    That's right.  As a corporate leader and someone who

1  formerly worked in corporate compliance, you know the

2  importance of written records, correct?

3  A   Yes.

4  Q   Why is it important to document events?

5  A   As I stated, as part of the Performance-Based National

6  Detention Standards, those reports are used to help prove

7  audits and then work towards those corrective action plans.

8  Q   Well, I am speaking at a higher level.  As a former

9  corporate compliance officer, what is the purpose of

10 documenting events?

11 A   To help prove compliance with the required standards.

12 Q   That's right.  Well, it could be to comply with legal

13 mandates, correct?

14 A   Could be.

15 Q   It could be to ensure operational consistency?

16 A   Could be.

17 Q   Could be risk management?

18 A   Could be.

19 Q   All right.  Why is it important to document agreements

20 reached between business partners?

21 A   To prove that you are operating in accordance with the

22 contract.

23 Q   It is to capture the full understanding of the parties,

24 correct?

25 A   I think from the -- my aspect, it goes to the contractor

1    is following the rules of the contract.

2    Q   I am talking about documents between business partners.

3    The purpose also is to make sure there is no misunderstanding

4    about what has been agreed to, correct?

5    A   I suppose.  I am a facility administrator, but I am not --

6    I am the corporate rep here.  I think you are speaking way

7    above my level.

8    Q   You are testifying on behalf of GEO and you previously

9    stated compensation to detainee workers is a dollar a day,

10   correct?

11   A   I may have said that in the past related to the previous

12   standard, which it was a dollar a day before it changed to at

13   least a dollar a day.

14   Q   Well, sir, you previously testified, we talked about that

15   special deposition, right, where you were designated by GEO

16   to testify on the company's behalf.  Do you recall?

17   A   Yes.

18   Q   And just like today, you were under oath back then,

19   correct?

20   A   Yes.

21   Q   Now, previously you testified GEO's complete understanding

22   about the detainee rate of pay is taken from the written

23   contract and the written PBNDS, correct?

24   A   I would agree with that.

25   Q   Here is how you put it previously, we are going to look at

1    Clip 44.   This is page 92, line 9 through 23 of the 30(b)(6)

2    transcript.

3              (Clip 44 played for the jury.)

4    Q   We know from your testimony that you never sought guidance

5    from ICE about how much GEO can pay under the voluntary work

6    program.  From that same deposition, you described it like

7    this.  This is Clip 43, page 102, line 22 through 25.

8              MR. CALABRESE:  Your Honor, is this being introduced

9    to impeach this witness in a statement?  I am not familiar

10   with what the purpose of this is.  We don't want to sit here

11   and watch old videos.

12             MR. WHITEHEAD:  This is Rule 32, deposition testimony

13   of a corporate designee being offered for another purpose.

14             MR. CALABRESE:  For what purpose?  I couldn't hear

15   you.

16             MR. WHITEHEAD:  Another purpose as stated in the

17   rule, Rule 32.

18             MR. CALABRESE:  Another purpose?

19        Objection, Your Honor.

20             THE COURT:  I think it is appropriate.

21        (Clip 43 played for the jury).

22   BY MR. WHITEHEAD:

23   Q   So when it comes to the detainee worker rate of pay, what

24   we have in writing is the PBNDS, correct?

25   A   Correct.

SCOTT - Cross

1    Q    And the contract, correct?

2    A    Correct.

3    Q    One portion of the written contract states GEO is expected

4    to become familiar with all constraints affecting the work to

5    be performed under the contract, correct?

6    A    Without looking at the contract, that sounds vaguely

7    familiar.

8    Q    Well, let's bring up the contract.  Can we get Exhibit

9    129, please.  It has been previously admitted.  We'll be

10   looking at pages 43 and 44.  I am happy to look at the

11   language again.  We are at the bottom of page 43.  If we

12   could get a blowup of the last two sentences.  Even better.

13   We have the language from page 43, which also continues on to

14   page 44.  Sir, you have seen this language before, right?

15   A    I have.

16   Q    You review the contract all the time?

17   A    Yes.

18   Q    You are familiar and know that GEO is expected to operate

19   under certain constraints?

20   A    Correct.

21   Q    You also know that GEO is expected to become familiar with

22   the constraints, correct?

23   A    Correct.

24   Q    It says GEO is expected to become familiar, meaning that

25   the onus is on GEO, correct?

1  A   Right, but there are parts in the contract if I have

2  questions it tells me who to go to like the COR.

3  Q   We will get to that.  Now, the written contract also

4  states that GEO is to be knowledgeable of any changes to the

5  constraints?

6  A   Yes.

7  Q   That's what it says in writing?

8  A   Yes.

9  Q   Again, this says the onus is on GEO, not ICE?

10  A   That's what that says.

11  Q   Now, when we look at the contract on page 44, there are a

12  number of constraints.  In particular, let's look at q).  The

13  written contract states that GEO must comply with all

14  applicable federal, state and local labor laws and codes.

15  Correct?

16  A   I see that.

17  Q   Let's look at page 52.  Looking at the "ambiguities"

18  section.  If there is any question about which standard

19  should apply, the most stringent standard shall apply,

20  correct?

21  A   I see that.  Says here "ambiguities" directly after the

22  definition portion of the contract.

23  Q   I am asking what is written.  "The most stringent standard

24  shall apply."  Do I have that right?

25  A   That's what it reads.

1  Q   You told us that the word "shall" is a special word.

2  Means an order, a command?

3  A   Yes.

4  Q   Here ICE is commanding GEO to act in a certain way,

5  correct?

6  A   I can read the contract.  Speaks for itself.

7  Q   It does.  The command is GEO is to apply the highest

8  standard if there is ever a conflict between the standards?

9       MR. CALABRESE:  Objection to the use of the word

10 "higher" as a characterization of what this says.

11      THE COURT:  Fair objection.

12      MR. WHITEHEAD:  It is.

13 BY MR. WHITEHEAD:

14 Q   The most stringent standard?

15 A   It does say that.

16 Q   That's ICE's command to GEO?

17 A   In the context of this one sentence in the whole area, but

18 yes.

19 Q   Well, you did talk about this second sentence.  You told

20 us earlier in the week you found it important in that about

21 the contracting officer; is that right?

22 A   Contracting officer, yes.

23 Q   I think you testified that if GEO had questions that it is

24 to go to the contracting officer who decides?

25 A   Yes.

1   Q   Between paying one dollar a day and the state minimum

2   wage, it is obvious which standard is the most stringent,

3   correct?

4          MR. CALABRESE:  Objection, Your Honor, form.  Nothing

5   obvious.

6          THE COURT:  Well, that's the question.  The objection

7   is overruled.

8          THE WITNESS:  Again, the ambiguity, I mean, highest

9   applicable standard.  It talks about the applicable state

10  law.  I don't know if that is applicable to us or not.  I

11  don't.

12  BY MR. WHITEHEAD:

13  Q   Well, sir, we know, again, from your testimony that you

14  did not consult with ICE about how much GEO can pay in the

15  voluntary work program, right?  We just saw the clip.

16  A   I -- others may have.  I, myself, particularly in the

17  position I was in at the time, no.  I don't know if anybody

18  else did.

19  Q   Well, let's talk about your positions.

20          THE COURT:  Just a second, counsel.  It is time for

21  lunch.  Let's pick this up at 1:00.  Please be back ready to

22  go.

23

24

25

1      AFTERNOON SESSION

2      OCTOBER 21, 2021

3   (The following occurred outside the presence of the jury.)

4          THE COURT:  Please be seated.  Bring the jury in.

5          MR. WHITEHEAD:  Before we do so.

6          THE COURT:  Don't bring the jury in.

7          MR. WHITEHEAD:  Exhibit 614, the OIG report, I

8   prepared a redacted version.  It excludes the names of the

9   other facilities, findings of the other facilities.

10          THE COURT:  Did you give it to opposing counsel?

11          MR. WHITEHEAD:  Yes, Your Honor, I provided a copy to

12   opposing counsel.

13          MR. CALABRESE:  We have been given a copy of what

14   appears to be a redacted copy.  We haven't had time to go

15   through the entire document yet.  We'll be doing that.

16          MR. WHITEHEAD:  This is a fair objection.  I wanted

17   to provide a copy for both the Court and opposing counsel to

18   review.  We will be offering the redacted version of 614.

19          THE COURT:  You don't know if that will require more

20   evidence about it.

21          MR. WHITEHEAD:  I don't.  I believe a sufficient

22   foundation has been laid both as a rebuttal exhibit --

23          THE COURT:  I was thinking if there is some objection

24   to your blacking out part of the document. What I am saying

25   is I will wait to rule until after defense has had a chance

1    to take a look at it.

2         (The following occurred in the presence of the jury.)

3              THE COURT:  Mr. Whitehead, you may continue.

4    BY MR. WHITEHEAD:

5    Q   Mr. Scott, before the break, I was about to ask you about

6    one of the previous roles you held.  I understand you were

7    GEO's regional director of corporate compliance for a time?

8    A   Western regional contract compliance director.

9    Q   That was western region contract compliance director?

10   A   Director of contract compliance for the western region.

11   Q   As director of contract compliance, you didn't have any

12   direct work with ICE in that role, correct?

13   A   Not directly.  All went through the vice president of

14   contract compliance.

15   Q   When it came to the contracting officer, you had no idea

16   about her job description or what she did at the time that I

17   deposed you; is that correct?

18   A   Well, I knew what contracting officer -- officer

19   representative does.  I don't think that is -- ask that

20   question again.

21   Q   Sure.  In addition to deposing you as a corporate

22   representative, I also deposed you in your individual

23   capacity.  Do you recall that?

24   A   I do recall that.

25   Q   I think it was back-to-back dates we did it.  Does that

1  sound right?

2  A   It was awhile ago.

3  Q   About two years ago.  At that time were the assistant

4  facility administrator, do I have that right?

5  A   Time frame sounds about right.

6  Q   At that time, you said I don't know the job description or

7  what she does, in relation to the ICE contract officer that

8  was situated at the facility, correct?

9  A   I recall touching around that topic.  I can't remember

10  exactly what I said at that time.

11  Q   Well, we have another clip to show.  I would like to

12  direct counsel to page 77, lines 7 and 8 of Mr. Scott's

13  deposition testimony.  This is Clip 48.

14       (Clip 48 played for the jury.)

15  Q   That's you in the video, correct?

16  A   Yes.

17  Q   Now, GEO's written contract states that detainee labor

18  shall be used in accordance with the work plan developed by

19  the contractor.  Do I have that right?

20  A   Sounds correct.

21  Q   Let's go back to Exhibit 129.  Yes, this is the contract

22  again.  Direct your attention to page 82.  There is that word

23  "shall" again.  See that?

24  A   Yes.

25  Q   It says, "The detainee work plan must be voluntary and may

1    include work for program assignments for industrial,

2    maintenance, custodial services or other jobs."  Let's clear

3    the callout.  I want to look at the last sentence of the

4    first paragraph there.  There we go.  "The detainee work

5    program shall not conflict with any other requirements of the

6    contract and must comply with all applicable laws and

7    regulations."

8         Do you see that?

9    A    Yes.

10   Q    That word "must," it is like "shall," correct?

11   A    Yes.

12   Q    An order from ICE to GEO?

13   A    Yes.

14   Q    Here the order is GEO comply with all applicable laws and

15   regulations as relates to the work program, correct?

16   A    Yes.

17   Q    I know when we were reviewing that previously with GEO's

18   counsel, the "must comply" language, that was skipped over in

19   your recitation of the contract; is that right?

20        MR. CALABRESE:  Objection to the characterization of

21   it being skipped over.

22        THE COURT:  Rephrase your question.

23   BY MR. WHITEHEAD:

24   Q    I want to move to, let's see, another provision that was

25   looked at here on page 82.  Let's look at the last paragraph.

SCOTT - Cross

1    In looking at this language, it is a reference to ICE's role

2    to assigning detainee security levels, correct?

3    A    I read that as the voluntary work details and

4    classification level, meaning the standards.  Whole standard

5    on classification.

6    Q    That's right.  Certain classification levels have certain

7    restrictions that go with them, correct?

8    A    I agree with that.

9    Q    This section is talking about ICE's role in the

10   classification levels and that certain classification levels

11   are not permitted or face restrictions in the work they are

12   allowed to do, correct?

13          MR. CALABRESE:  Objection, Your Honor, states a fact

14   not in evidence.  The sentence does not say that.

15          THE COURT:  I think he may answer.

16          THE WITNESS:  Would you mind repeating?

17   BY MR. WHITEHEAD:

18   Q    Certainly.  This clause is in reference to ICE's role when

19   it comes to the classification levels, correct?

20   A    It says classification levels.  I find this to mean by the

21   section -- the heading of that section to be all applicable

22   to the voluntary work program.

23   Q    "In classification level," that's the rest of the clause

24   there, correct?

25   A    Right, indicating there are other rules that apply.

1   Q   No comma that separates the two -- the sentence there or

2   breaks it apart.  It reads as one, talking about voluntary

3   work details and the classification levels and the

4   restrictions that may flow therefrom?

5   A   I don't see any restrictions.  I -- sole responsibility of

6   ICE to determine whether a detainee will be allowed to

7   perform work on the voluntary work detail and at what

8   classification level.

9   Q   A higher classification level may result in restrictions

10  on the work that can be performed, correct?

11  A   In accordance with the PBNDS, yes.

12  Q   I don't mean to bounce back and forth here.  I do want to

13  go back to the first paragraph one other time.  I want to go

14  back to the language about GEO must comply with all

15  applicable laws and regulations.  Do you see that?

16  A   Yes.

17  Q   Now, that's in recognition that laws differ from state to

18  state, correct?

19  A   State to state, state to government, yes.

20  Q   In the State of Washington, the Washington Minimum Wage

21  Act is the law, correct?

22  A   Depending if it is applicable or not.  I believe it is a

23  law.

24  Q   It is GEO that bears the risk of non-compliance with the

25  law, correct?

1   A   GEO, by contract extension ICE, I would agree.

2   Q   If GEO didn't follow the City of Tacoma's zoning laws,

3   that's on GEO, not ICE, correct?

4   A   Yes.

5   Q   If GEO doesn't follow the City of Tacoma health standards

6   for kitchen operations, that's on GEO, not ICE?

7   A   On GEO, but ICE has a vested interest in the contract.  I

8   have to report that kind of information to them.

9   Q   If GEO doesn't follow EPA requirements, that's on GEO, not

10   ICE?

11   A   Again, EPA, I would say different because EPA, unlike

12   OSHA, can be individual.

13   Q   When it comes to paying its employees the minimum wage,

14   that's on GEO, not ICE?

15   A   It would be, but I have no knowledge of us not paying any

16   of our employees minimum wage.

17   Q   Nothing ICE does prevents GEO from paying more than a

18   dollar a day to detainee workers, correct?

19           MR. CALABRESE:  Objection, Your Honor.  Form.

20           THE COURT:  He may answer.

21           THE WITNESS:  ICE could say differently.  I can't

22   control what they tell me to do.  They can say differently.

23   BY MR. WHITEHEAD:

24   Q   I am not asking you to speak to ICE.  I don't want you to

25   speak for ICE.  My question to you is:  Nothing that ICE does

SCOTT - Cross

1  prevents GEO from paying more than a dollar a day to detainee

2  workers, correct?

3  A  I don't know if I can fully agree with that because ICE

4  issues directives, I have to follow direction of ICE as the

5  contractor.  That's kind of assuming, speculating.  I can't

6  do that.

7  Q  Well, we looked at the contract documents.  We looked at

8  the PBNDS.  Nothing in writing says contrary?

9  A  To specifically?

10  Q  That GEO is limited to paying only a dollar a day?

11  A  No, we have established a dollar a day, at least a dollar

12  a day.  I find those similar.  We said GEO can pay more than

13  a dollar a day.

14  Q  When it comes to determining whether or not the minimum

15  wage is applicable, that's not GEO's call, is it?

16  A  I don't believe so, no.

17  Q  It is the Court's?

18       MR. CALABRESE:  I'm sorry, I couldn't hear.

19       THE WITNESS:  Can you repeat the question?

20  BY MR. WHITEHEAD:

21  Q  It is the Court's determination that matters, not GEO's

22  correct?

23       MR. CALABRESE:  Objection, Your Honor.  There is a

24  jury as well.

25       THE COURT:  The objection is sustained.

1   BY MR. WHITEHEAD:

2   Q   It is the jury's determination, not GEO's, correct?

3          MR. CALABRESE:  Objection, Your Honor.  The jury has

4   a job, GEO has a job.

5          THE COURT:  The objection is sustained.  Calls for a

6   legal conclusion.

7          MR. WHITEHEAD:  I have no further questions for this

8   witness, Your Honor.

9                         CROSS-EXAMINATION

10  BY MS. CHIEN:

11  Q   Mr. Scott, just couple points.  I heard you earlier

12  testify about a detainee welfare fund.  Do you remember that?

13  A   As opposed to the -- the Keefe banking system, the

14  detainee welfare fund.

15  Q   When your counsel was asking you about a detainee welfare

16  fund, you were talking about something separate from the

17  Keefe system.  Maybe it is not.  Were you testifying about

18  the detainee welfare fund?

19  A   I do recall talking about a detainee welfare fund.

20  Q   You testified that GEO uses the fund to buy exercise

21  equipment, is that right, for the detainees?

22  A   Well, I remember that.  The detainee welfare fund is

23  connected to the commissary system in accordance with the ACA

24  standards.  Any money left over, no profit to GEO there.  Any

25  money left over in that or comes through the detainee welfare

1   fund can be used for and has to be used by the accreditations

2   for the detainees, and we have bought exercise equipment

3   through that for detainee use only.

4   Q    Exercise equipment.  You said you purchase movies with the

5   detainees welfare fund?

6   A    Yes.

7   Q    Other nice things for the detainees; is that right?

8   A    Yes.

9   Q    You just testified the welfare fund comes from commissary

10  purchases; is that right?

11  A    Yes.

12  Q    Detainees make the commissary purchases; is that right?

13  A    They do.

14  Q    GEO doesn't even buy the exercise equipment, detainees do;

15  is that right?

16       MR. CALABRESE:  Objection, mischaracterizes and

17  assumes facts not in evidence.

18       THE COURT:  I think it is a fair question.

19       THE WITNESS:  It is not entirely true.  The exercise

20  equipment on the recreation yards and other stuff has been

21  purchased by GEO.  When detainee asks for some stuff and what

22  can be done in the detainee welfare fund for detainees in

23  accordance with the accreditation standards, we do that.

24  BY MS. CHIEN:

25  Q    The detainee welfare fund is funded with commissary

SCOTT - Cross

1  purchases, though, right?

2  A    I don't want so say it is funded by that.  The program is

3  very similar to state and federal facilities.  If there is

4  money -- if there is any extra money that comes out of the

5  purchase of commissary items, the profit does not go to the

6  contractor operator of the facility.  It has to, by standard,

7  go into the detainee welfare fund that is there only to use

8  for detainee purposes.

9  Q    Detainees make the commissary purchases; is that right?

10  A    They do.

11  Q    All right.  I think I would like to move on.  We have

12  testified about the work program; is that right, quite a bit?

13  A    Quite a bit.

14  Q    I hear you referring to it as the "federal work program;"

15  is that right?

16  A    Operating under a federal contract, with the

17  Performance-Based National Detention Standards, yes.

18  Q    You keep referring to it as "ICE's work program;" is that

19  right?

20  A    Yes.

21  Q    You also testified about detainee grievances about the

22  work program; is that right?

23  A    Yes.

24  Q    Again, you have been sitting in trial so you have heard

25  Mr. Orlando Marquez's testimony; is that right?

1    A   I do recall that.

2    Q   He had a grievance about the work program; isn't that

3    right?

4    A   I see many grievances.  I would not put it past that he

5    has one.

6    Q   Just to orient ourselves.  I would like to show Exhibit

7    607 which was previously admitted.

8    Q   You heard that Mr. Marquez complained about the work

9    program to ICE; isn't that right?

10   A   Yes.

11   Q   I would like to blow up the last sentence.  The response

12   from ICE was this is GEO's issue; isn't that right?

13   A   That's what the ICE officer stated.  Typically --

14          MS. CHIEN:  No further questions.

15                      REDIRECT EXAMINATION

16   BY MR. CALABRESE:

17   Q   Mr. Scott, a few minutes ago plaintiffs' counsel asked you

18   what do you recall a person that performs work for money?  Do

19   you remember that question?

20   A   I do.

21   Q   Do you know what the state calls its detention facility

22   detainees that work for money?

23          MS. CHIEN:  Objection.

24          MR. WHITEHEAD:  Leading, argumentative.

25          MS. CHIEN:  Motion in limine.

```
 1              THE COURT:  Objection is sustained.
 2    BY MR. CALABRESE:
 3    Q   Does the State have detention facilities?
 4              MS. CHIEN:  Objection.
 5              THE COURT:  I don't think that is relevant, counsel.
 6              MR. CALABRESE:  Your Honor, we would like to be heard
 7    on that pursuant to your motion in limine order.
 8              THE COURT:  Well, that's fine.  Save it for the next
 9    break.
10              MR. CALABRESE:  We will.
11    BY MR. CALABRESE:
12    Q   Mr. Scott, does the fact Ms. Singleton testified to
13    something make it a fact?
14    A   No, it doesn't.
15    Q   You heard from her testimony, and you know from your
16    personal experience with her, that her employment was
17    terminated; is that correct?
18    A   I do.
19    Q   Why was it terminated?
20    A   ICE pulled her clearance.
21    Q   By pulling her clearance, she was no longer permitted to
22    be on the site?
23    A   That --
24              MR. WHITEHEAD:  Objection, leading.
25
```

BY MR. CALABRESE:

Q   What does pulling her clearance mean?

A   Pulling her clearance, I have to notify the COR and ICE of any activities that might violate the contract.  If ICE pulls a clearance, means she can no longer work as part of that contract, which then means I have to terminate her employment.

Q   Do you know how Ms. Singleton felt about that?

A   She was not happy about it.

Q   Ryan Kimble, we were reminded, testified that on an occasion or two more than one job was worked or was allowed by detainees on a particular day.  Do you recall that?

A   I do recall that.

Q   I believe you wanted to give an explanation of it.  What was the explanation?

A   The barber detainees complained a little bit because based upon the detainee movement schedule I talked about in classification that people can't be in the same place at the same time, the level 3 barbers that worked in those -- actually, any barber, based on classification at that time as we saw the annual report, I had a lower number of level 3s at the time.  They didn't cut hair every day.  They may have cut hair two, three times a month maybe.  Maybe once a week.  They were saying it is very unfair for them to have a job that they can only earn one dollar a week, per se.

1      We went to ICE and talked to ICE and said, yeah, that

2  doesn't really make sense, let's look at this whole thing.

3  You can have another job where you can make other money.  We

4  allowed them to have two positions, so if they worked in the

5  housing unit as a porter, they could do that.  They shouldn't

6  have done two details in one day, but I can't sit here and

7  say that possibly never happened.  We might have missed that.

8  Typically that is what the barbershop and what ICE allowed

9  two jobs a day to really mean.

10 Q   Does that happen any other time?

11 A   Typically, doesn't happen any other time because other

12 jobs in the voluntary work program, their schedule permits

13 them to really work as much as we can.  We have seen the

14 detainees that work seven days a week because they want to.

15      MR. CALABRESE:  Your Honor, GEO reserves its right to

16 object to the OIG report when we complete our review of it.

17 I would like to ask some questions about it, if I may.

18 BY MR. CALABRESE:

19 Q   You talked about a report that the OIG issued in --

20 pursuant to a 2019 inspection.  I believe the date on the

21 report was July 1, 2020.  You saw that report?

22 A   I did.

23 Q   You are familiar with that report?

24 A   Yes.

25 Q   Do you know who that report was sent to?

SCOTT - Redirect

1    A    Sent to ICE.

2    Q    It was addressed to them with respect to their compliance;

3    is that correct?

4    A    Correct.

5    Q    The report about the policy putting physical restraints on

6    detainees in detention segregation and their movements, I

7    guess to and from the unit.  Can you explain what that was

8    about?

9    A    There was a change in the standard where before detainees

10   that were in restricted housing, any time you are in

11   restricted housing, any time you moved outside of your cell,

12   you were placed in hand restraints.  The standard changed

13   where automatic placement or placement in restricted housing

14   did not automatically mean restraints were required anymore.

15   It gave some ability for certain detainees maybe not to be

16   restrained if they were in protective custody and didn't have

17   any disciplinary or assaultive behavior to them.  Those

18   detainees should not automatically be restrained.

19       In the process of the standard changing and us updating

20   our policy, the OIG found that, we corrected the policy.  We

21   created signs for those detainees that were assaultive

22   behavior on the door to make sure we didn't make a mistake

23   and open the door of an assaultive person versus a

24   non-assaultive person.  They found that.  We corrected that

25   through policy and practice, and we are good now.

1  Q    Was ICE aware of the remedial actions and the response?

2  A    Yes, we have to provide a corrective action plan to ICE,

3  which states what we are doing in accordance with that

4  finding.

5  Q    Did the report contain any audit findings whatsoever

6  pertaining to detainees working in the voluntary work

7  program?

8  A    I didn't see any of that in the report that reflected our

9  facility, no.

10  Q    Mr. Scott, being the facility administrator of a large

11  facility is much like being the manager of a small city,

12  would you agree?

13  A    I would agree with that.

14  Q    Do events happen certainly weekly, if not daily that an

15  unannounced audit might pick up?

16  A    Nobody says we are perfect.

17  Q    Based on your audit experience, is that what audits are

18  for?

19  A    Yes.

20  Q    Mr. Scott, you were shown a list of constraints that GEO

21  is required to follow.  Do you remember that?

22  A    I do.

23  Q    Constraint small q) called for GEO to follow applicable

24  federal, State and local labor laws.  Do you remember that?

25  A    I do.

1  Q   Is it your understanding that the State's Minimum Wage Act

2  is applicable to the detainee workers in the voluntary work

3  program at the Northwest Detention Center?

4          MS. CHIEN:  Objection.

5          MR. WHITEHEAD:  Objection, calls for legal

6  conclusion.

7          THE COURT:  Sustained.

8  BY MR. CALABRESE:

9  Q   Have you been told by anyone that the State Minimum Wage

10  Act is applicable to the detainees at the center?

11          MR. WHITEHEAD:  Objection, calls for hearsay.

12          THE COURT:  Sustained.  I expect you're excluding --

13  well, never mind.  Go ahead.

14  BY MR. CALABRESE:

15  Q   Does the State's Minimum Wage Act apply, in your opinion,

16  to the detainees working in the program?

17          MS. CHIEN:  Objection.

18          MR. WHITEHEAD:  Objection, calls for legal

19  conclusion.

20          THE COURT:  This calls for his opinion.  I don't know

21  if he is speaking as an individual or as a representative of

22  the company at this point, which may make a difference as to

23  that objection.  Whose opinion are you asking for?

24          MR. CALABRESE:  I am asking for his opinion as a

25  corporate representative.

1    MR. WHITEHEAD:  Same objection, Your Honor.

2    THE COURT:  The objection is sustained.

3    MR. CALABRESE:  I will ask you in your personal

4  opinion.

5  BY MR. CALABRESE:

6  Q   Does the State's Minimum Wage Act, in your personal

7  opinion, apply to the detainees in the voluntary work program

8  at the Northwest Detention Center?

9  A   No, I never seen it in any program like ours.

10  Q   Plaintiffs' counsel asked you if ICE had said that the

11  State's Minimum Wage Act applied to the detainees in the

12  voluntary work program at the center.  Do you remember that

13  question?

14  A   I do.

15  Q   He also asked you -- he also said to you, "Nothing in

16  writing from ICE that says otherwise."  He asked you if that

17  wasn't true that had you nothing in writing from ICE that

18  says otherwise?

19  A   I remember him saying that.

20  Q   What's your understanding of ICE's position on this issue?

21    MS. CHIEN:  Objection.

22    MR. WHITEHEAD:  Objection.

23    THE COURT:  The objection is sustained.

24  BY MR. CALABRESE:

25  Q   Do you have an understanding of ICE's position on this

1    issue?

2          MS. CHIEN:  Same objection.

3          MR. WHITEHEAD:  Same objection.

4          MR. CALABRESE:  Your Honor, may we be heard?

5          THE COURT:  I am going to excuse you for a minute,

6    while we deal with this folks.  Take a short break.

7     (The following occurred outside the presence of the jury.)

8          MR. CALABRESE:  Your Honor, the first issue we wanted

9    to clarify with you came from your order on motions in

10   limine, Docket 568, that was filed September 28th, 2021.  The

11   State of Washington had made additional motions in limine in

12   advance of the October 12th retrial.  They asked you to

13   exclude all evidence of work programs at state and local

14   government facilities.  Your Honor wrote, with that ruling,

15   you said, "It is clear that the defense of intergovernmental

16   immunity is out of the case."  You said with that ruling,

17   "Comparison of the voluntary work program operated by GEO

18   with the State of Washington's voluntary work programs for

19   immunity comparisons," set off by commas, "is also out of

20   this case.  To that extent, the State's motion should be

21   granted.  Like other issues in this case, implementation of

22   this ruling can better be handled at trial."

23     We are not attempting to introduce testimony about the

24   State's detention facilities and the practices there with

25   respect to the work programs where they have admittedly paid

SCOTT - Redirect

1  about a dollar a day.  That would be improper for us to

2  introduce for intergovernmental immunity defense arguments.

3  The Court left open the door for us to introduce that

4  testimony for other purposes.

5       THE COURT:  What is the other purpose?  I didn't

6  think it was relevant.

7       MR. CALABRESE:  The other purposes would be to

8  prepare or to establish what the general practices here in

9  the State of Washington are with respect to work programs for

10 detainees, including civil detainees in a sex offender

11 institution.  It is a very close and comparable situation.

12 Civil detainees, civil detainees; in a work program, in a

13 work program.  One is exempt, one is not.

14     We are not offering it for intergovernmental immunity

15 purposes, but for purposes of making -- allowing the jury to

16 understand what the practices are with respect to corrections

17 and detention in the State of Washington, it is absolutely

18 relevant.

19     We tried to get Mr. McHatton, who had a 30-year career

20 with the State Department of Corrections, to testify about

21 this, and he was not allowed on an objection.  We have held

22 off until now to try to clarify this because it is so

23 important for us to it be able to put on full and fair

24 defense.

25       MS. CHIEN:  Your Honor, for the State of Washington,

1   what DOC facilities do is irrelevant.  The motion in limine

2   that GEO counsel itself has filed excluding evidence of

3   any -- of work programs across the country, so it makes no

4   sense for GEO to argue out of one side of its mouth that

5   other -- what is happening in other facilities is irrelevant,

6   while it matters to show the industry standard at DOC.

7       It doesn't matter.  The requirement under the minimum wage

8   is whether or not employees at this facility are permitted to

9   work.  DOC is different from a private company.  We have

10  established that through four years of briefing.  No reason

11  for it to be coming in at this moment.  It will confuse the

12  jury and prejudice our side.

13          MR. CALABRESE:  Nothing could be further from the

14  truth.

15          THE COURT:  Hold on just a minute.

16          MR. WHITEHEAD:  I'll keep it brief.  I don't have

17  much to say.

18      Your Honor, it is not relevant.  The law is different.

19  The standards are different and 403.

20          MR. CALABRESE:  Your Honor, GEO has not, to my

21  knowledge, filed a motion in limine to block the introduction

22  of this sort of evidence about what other facilities around

23  the world, let alone the United States, do with respect to

24  work programs.  There is not, I repeat, there is not a single

25  facility in the world where minimum wage is paid to detainees

1   or prisoners working in institutional work programs.  We have

2   not filed such a motion.  We would welcome the introduction

3   of that evidence in volumes.  That was an inappropriate and

4   incorrect statement by the State.

5          THE COURT:  This goes back to your famous *Ndambi* case

6   where the court said, I think as dicta and as an aside, that

7   the reason the Fair Labor Standards Act contains no express

8   exception for prisoners is probably that the idea was too

9   outlandish to occur to anyone when the legislation was under

10  consideration by Congress.

11      You know, that's partly what this is about.  You can't

12  prove or disprove the issues in this case by what is

13  happening around the country.  There are many cases, as you

14  refer, that have come out different.  None of which that I

15  know of are directly on all fours with this case.  I don't

16  think it is relevant.  I don't think it is relevant.

17         MR. CALABRESE:  I believe your ruling allowed an open

18  door for us to introduce testimony about what other

19  facilities do.

20         THE COURT:  The door is open for relevant testimony.

21  I don't think what you have offered, what you have asked

22  about is relevant to the issues in this case.

23         MR. CALABRESE:  Is there relevance at all in your

24  opinion with respect -- we won't waste time bringing back

25  other witness who is will testify as to what the State's

1    practices are with respect to their programs.  It is either

2    relevant or it is not.  We believe --

3            THE COURT:  It is not relevant.

4            MR. CALABRESE:  It is not relevant?

5            THE COURT:  Not relevant.

6            MR. CALABRESE:  Are you ruling there is no basis for

7    us to introduce that testimony?  We need this for our record.

8            MR. WHITEHEAD:  They are asking for a prospective

9    ruling here.  The evidence before the Court right now is such

10   that it is clearly not relevant.  Also for purposes of

11   clarifying the record, because the record does matter, GEO

12   did, in fact, move to exclude evidence related to pay rates

13   in other facilities.  This before Mr. Calabrese's time on the

14   case.  Looking at Docket 256, GEO did, in fact, move on that

15   basis.  This is a goose versus gander issue.

16           MR. CALABRESE:  Your Honor, we are asking for your

17   clarification with respect to your ruling.

18           THE COURT:  Let me give you a little more

19   clarification.

20      There are many rulings that are ripe for appeal that I

21   have made in this case before you ever came into it --

22           MR. CALABRESE:  Yes.

23           THE COURT:  -- that still are part of the rulings in

24   the case.  This is one of them.  I left the door open for

25   relevant evidence.

1      What you have proposed, in my judgment, is not relevant to

2   the issues in this case.  You talked about keeping our eye on

3   the rabbit.  This ain't the rabbit.

4           MR. CALABRESE:  I believe the jury would feel very

5   differently if they got a look at this rabbit.  I think they

6   would chase it right down the rabbit hole.

7           THE COURT:  Well, the rabbit would get away.

8           MR. CALABRESE:  May I be heard on the second issue we

9   have come up against in the testimony?

10          THE COURT:  What is that now?

11          MR. CALABRESE:  Plaintiffs have opened a door widely,

12   not a crack, but widely, with respect to whether or not we

13   can introduce the government's statement of interest in this

14   case.

15          Listen to what was asked, Mr. Whitehead asked this witness

16   if ICE had said that the State's Minimum Wage Act applied to

17   the detainees in the program at the center.

18          He also said to him, "You have nothing in writing from ICE

19   that says otherwise."  When in fact, he does.  He should be

20   permitted to introduce that testimony, and we should be

21   permitted, under the same hearsay 803(8) whatever it is

22   exception the State used or plaintiffs used.  We should be

23   able to introduce that statement of interest at this time.

24   He should be able to testify that the federal government is

25   on record in this case saying that the Minimum Wage Act of

1   Washington does not, in fact, apply.

2       We will redact the whole thing from IGI issues.  We are

3   not asking the jury take it into the jury room with them.  We

4   think they need to hear what the government had to say about

5   this.  This is the way to do it.  They opened the door for us

6   to introduce this testimony.

7           MS. CHIEN:  We would disagree.  The statement of

8   interest is also legal argument.  It is not testimony.  It is

9   not evidence.  The Court gets to instruct the jury as to what

10  the law is, not the U.S. Government via a statement of

11  interest filed on this docket.  Obviously, we would oppose

12  introduction of an ECF filing by the U.S. Government.

13          MR. WHITEHEAD:  Nothing further to add.  Well said.

14          MR. CALABRESE:  Your Honor --

15          THE COURT:  I have to reread it.  I would have to

16  reread it to see if it is admissible.

17          MR. CALABRESE:  We have it.  I would only say that we

18  are not attempting to submit it for the purposes of

19  suggesting that the jury be instructed this is the law.  Just

20  simply to go along with the testimony that was essentially

21  solicited from this witness by plaintiffs with respect to

22  what he understands the government to have said or not said.

23  Here is a copy.

24          MR. WHITEHEAD:  What is the docket number?

25          THE COURT:  Docket No. 290.  We will come back to

1    that.

2              MR. CALABRESE:   Okay.

3              THE COURT:   This raises some other questions as to

4    whether this is impeaching your own witness as to what he has

5    already said about his knowledge and, of course, whether

6    there is a particular statement authorized by the government.

7              MR. CALABRESE:   Your Honor, with respect to those two

8    points.   His knowledge came after that video clip, number

9    one.   Number two, we have asked for the Court to consider

10   this under the 803(8) exception as well as under Rule 201,

11   which we will be prepare --

12             THE COURT:   I'm sorry, I am not hearing you.

13             MR. CALABRESE:   The information that he would testify

14   to about this statement was learned by this witness after

15   that video clip.   I am not impeaching him with it.   I am just

16   asking him to supplement what he knows.

17       We are introducing it under the hearsay exception 803(8).

18   We will also be pleased to brief it under Rule 201 and

19   reserve the right to do so, but would prefer to do that in

20   writing.

21             THE COURT:   What was the last?

22             MR. CALABRESE:   Rule 201.

23             MR. WHITEHEAD:   Judicial notice.

24             MR. CALABRESE:   Yes.

25             THE COURT:   Oh, sure.

1          MR. WHITEHEAD:  Your Honor --

2          THE COURT:  If it is front and center in your mind,

3     can you refer me specifically to what the statement is here

4     that you would --

5          MR. CALABRESE:  I think if you flip through, it is a

6     little bit past the middle.  I highlighted a couple things

7     that I was going to read, but I am not telling you those are

8     the only parts in the statement that I would want to refer

9     to.  Just the ones that caught my eye at lunch.

10          MR. WHITEHEAD:  Your Honor, what I would say also,

11     just adding to that, number one, this is a hearsay document.

12     It is certainly not a public record.  This is a litigation

13     document prepared by counsel.  As such, it is not evidence in

14     the case.

15          THE COURT:  Okay.  Let me take a look at it.

16          MS. CHIEN:  Counsel, can you tell us what you

17     highlighted so we can also look?

18          MR. CALABRESE:  Again, I am not sure that is all I

19     would look at.  I think -- where was I?  Maybe page 12, 13.

20     I am not sure entirely.

21          THE COURT:  I don't know.  Here is the copy with

22     highlights.

23       Anything further outside the presence of the jury?

24          MR. CALABRESE:  Sorry?

25          THE COURT:  Anything further outside the presence of

1  the jury?

2      MR. CALABRESE:  No, just a couple brief questions

3  with the jury.

4      THE COURT:  Okay.  Bring the jury in.

5      (The following occurred in the presence of the jury.)

6      THE COURT:  All right.  You may continue.

7      MR. CALABRESE:  Thank you.

8  BY MR. CALABRESE:

9  Q   Really, just one more issue, Mr. Scott.  I would like to

10 bring back up Exhibit 129, page 82 that we were looking at a

11 little while ago with plaintiffs' counsel.  Earthquake

12 issues?  There we go. If you can enlarge -- blow up the last

13 paragraph on the page.  Thank you.

14     If the jury can look at that as well.  Mr. Scott, you

15 were asked if this sentence was really about classifications.

16 Read that sentence, will you please?

17 A   "It will be the sole responsibility of ICE to determine

18 whether a detainee will be allowed to perform on voluntary

19 work details and at what classification level."

20 Q   Before we get to the "and" in that sentence, it is pretty

21 clear that ICE has the sole responsibility to determine

22 whether detainees will be allowed -- sounds like permitted --

23 to perform on voluntary work details; is that correct?

24     MS. CHIEN:  Objection.

25     MR. WHITEHEAD:  Objection.

GRICE - Direct

1      THE COURT:  Well, technically, that misstates --

2      MR. CALABRESE:  I will rephrase.

3      THE COURT:  The objection is sustained.

4      MR. CALABRESE:  I will rephrase.

5   BY MR. CALABRESE:

6   Q   Who has the sole responsibility in this section with

7   respect to the determination of whether detainees will be

8   allowed to perform on voluntary work details?

9   A   ICE.

10  Q   And what other authority sole responsibility does ICE

11  retain with respect to that performance allowance?

12  A   Can you repeat the question?

13  Q   No.  No way.

14      What other responsibility does ICE retain sole

15  responsibility for with respect to classification levels?

16  A   That we follow the Performance-Based National Detention

17  Standards and the contract.

18      MR. CALABRESE:  Thank you.  No further questions.

19      MR. WHITEHEAD:  No further questions.

20      MS. CHIEN:  No further questions.

21      THE COURT:  Thank you, Mr. Scott.  You may step down.

22      MR. NEGRON:   Your Honor, the defense would call

23  Joshua Grice.

24      THE COURT:  If you will remove your mask, raise your

25  right hand and be sworn.

1        JOSHUA GRICE,

2     having been sworn under oath, testified as follows:

3          THE COURT:  Please be seated here to my right.  Speak

4     into this mic, and keep your voice up, if you will, please.

5                    DIRECT EXAMINATION

6     BY MR. NEGRON:

7     Q   Good afternoon, sir.

8     A   Good afternoon.

9     Q   My name is Joe Negron.  I represent the GEO Group.

10        Would you please state and spell your name for the

11    jury, please?

12    A   Sure.  Joshua Grice, J-O-S-H-U-A, G-R-I-C-E.

13    Q   And who do you work for, Mr. Grice?

14    A   The Washington State Department of Labor & Industries.

15    Q   Approximately when did you start?

16    A   I started with L&I in July of 2017.

17    Q   What is your position, sir, with Washington Labor &

18    Industries?

19    A   My current position is employment standards program

20    manager.

21    Q   In that position, Mr. Grice, are you responsible for

22    enforcement of the Washington Minimum Wage Act?

23    A   Yes.

24    Q   Have you, in fact, be designated as the speaking agent for

25    the Department of Labor & Industries of the State of