**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UGOCHUKWU GOODLUCK NWAUZOR; FERNANDO AGUIRRE-URBINA, individually and on behalf of all those similarly situated, | No. 21-36024 |
| *Plaintiffs-Appellees*, | D.C. No. 3:17-cv-05769-RJB |
| v. | ORDER |
| THE GEO GROUP, INC., a Florida corporation, | |
| *Defendant-Appellant*. | |

| | |
|---|---|
| STATE OF WASHINGTON, | No. 21-36025 |
| *Plaintiff-Appellee*, | |
| v. | D.C. No. 3:17-cv-05806-RJB |
| THE GEO GROUP, INC., | |
| *Defendant-Appellant*. | |

Filed August 13, 2025

Before: Mary H. Murguia, Chief Judge, and William A.
Fletcher and Mark J. Bennett, Circuit Judges.

Order;
Statement by Judges Murguia and W. Fletcher;
Dissent by Judge Bumatay;
Dissent by Judge Collins

## SUMMARY[*]

### Washington's Minimum Wage Act

The panel denied a petition for panel rehearing and a petition for rehearing en banc in a case in which the panel affirmed the district court's judgment in favor of a class of detainees and Washington State in their consolidated actions against GEO Group, Inc., which operates the Northwest Immigration and Customs Enforcement Processing Center in Tacoma, Washington, for violations of Washington's Minimum Wage Act.

Respecting the denial of rehearing en banc, Chief Judge Murguia and Judge W. Fletcher wrote briefly to emphasize three points concerning Judge Bumatay's dissent from denial of rehearing en banc. First, the majority opinion's holding does not discriminate against the federal government. The employment of plaintiffs—civil detainees—was part of a private company's business model. The Washington Minimum Wage Act regulates this type of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Case 3:17-cv-05769-RJB Document 360 Filed 08/13/25 Page 3 of 34

private business activity uniformly regardless of whether the entity is contracting with the federal or state government. Second, the panel majority disagreed with the new argument in the dissent from denial of rehearing en banc, not made by any party or amicus, that plaintiffs were not "employees" and Washington therefore could not apply its Minimum Wage Act. Third, the dissent's equation of the federal government and its contractors is contrary to long-settled law.

Dissenting from the denial of rehearing en banc, Judge Bumatay, joined by Judges Callahan and VanDyke, wrote that this case should be reheard en banc because, in addition to the reasons cited in Judge Bennett's dissent, reclassifying detainees as "employees" and applying the minimum wage law would interfere with the performance of a federal operation. The panel majority's decision sets a dangerous precedent because it allows any State to impair any federal policy—no matter how central to the federal government— so long as the State regulates federal contractors rather than the federal government itself.

Dissenting from the denial of rehearing en banc, Judge Collins, joined by Judges R. Nelson and Bress, wrote that, for substantially the reasons set forth in Judge Bennett's panel dissent, he agreed that the panel majority's decision contravened controlling Ninth Circuit and Supreme Court precedent applying the doctrines of intergovernmental immunity and federal preemption.

**ORDER**

Chief Judge Murguia and Judge W. Fletcher voted to deny the petition for panel rehearing. Judge Bennett voted to grant the petition for panel rehearing. Chief Judge Murguia voted to deny the petition for rehearing en banc, and Judge W. Fletcher so recommended. Judge Bennett voted to grant the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 40(c). Judges Christen and Miller did not participate in the deliberations or vote in this case.

Appellant's Petition for Panel Rehearing or Rehearing En Banc (Dkt. No. 145) is **DENIED**.

---

MURGUIA, Chief Judge, and W. FLETCHER, Circuit Judge, respecting the denial of rehearing en banc:

Our colleague, Judge Bumatay, dissents from our Court's denial of rehearing en banc.

Our majority opinion speaks for itself, and we will not repeat here everything we wrote in the opinion. We write briefly to emphasize three points.

First, our colleague contends that our holding discriminates against the federal government. We strongly disagree. Our colleague argues that we require GEO to pay higher wages to its employees than Washington pays its comparable employees. He compares the wage GEO must

pay to its detainees to the wage Washington pays to its "detainees."  He writes, "Washington State's own policy caps pay to *detainees* at its criminal detention facilities at '$40 per week,'" a "more than a '*1500%* increase'" over what GEO is required to pay.  Diss. at 11 (first emphasis added).

Our colleague's comparison is inapt.  The Washington "detainees" to which he refers are convicted felons held in state-operated and state-owned prisons.  The employment of these "detainees" is part of Washington's penal regime.  The plaintiffs in the case before us are civil detainees, held while their immigration status is determined.  They are not convicted felons.

Through its employment of civil detainees, GEO is able to avoid hiring about 85 full-time employees.  Plaintiffs' employment was not part of a State's penal regime.  It was part of a private company's business model.  The Washington Minimum Wage Act regulates this type of private business activity uniformly regardless of whether the entity is contracting with the federal or state government.

Second, our colleague argues that plaintiffs were not "employees" and Washington therefore cannot apply its Minimum Wage Act.  This is a new argument, not made by any party or amicus.  Here, too, we strongly disagree.  In support of his argument, our colleague argues that "federal law prohibits the employment of illegal aliens."  Diss. at 26.  Even if our colleague's statement of law were applicable to this case, it ignores the fact that some of the detainees confined by GEO are not "illegal aliens."  Some detainees held by GEO are entitled to remain in the United States.  They will be released back into the United States once their immigration status is determined.  Further, our colleague

ignores the basic facts and law of this case. The Washington Supreme Court's reasoned response to our certified question concluded that "detained workers at a private detention facility are 'employees' within the meaning of the [Minimum Wage Act]." *Nwauzor v. The Geo Grp., Inc.*, 540 P.3d 93, 104 (2023). Our majority opinion faithfully applied that holding. However much our colleague would like to see the matter differently, plaintiffs were, in fact, employees. They performed work for GEO, and they were paid for performing that work. Finally, our colleague again compares plaintiffs in this case to convicted criminals, writing that "the State cannot dictate terms about their employment status any more than it could if the facility housed federal prisoners serving custodial sentences." Diss. at 13. Our colleague continues to ignore the fact that federal prisoners are convicted criminals, whose employment in prison is part of their criminal punishment, while plaintiffs are civil detainees.

Third, our colleague ignores the fundamental distinction between the federal government and its contractors. He would require Washington to treat the federal government's contractors in the same manner it is required to treat the federal government itself. He writes, "When a federal contractor acts on behalf of the federal government to administer a federal function—like the detention of aliens— the contractor is not merely a private business; it steps into the shoes of the federal government for Supremacy Clause purposes." Diss. at 14. Again, we strongly disagree.

Our colleague's equation of the federal government and its contractors is contrary to long-settled black letter law. Adoption of his position would allow any government contractor to refuse to pay state-mandated minimum wage to its employees. For example, any defense contractor could

refuse to pay minimum wage.  No one in this case, not even GEO, has suggested that this is the law.

---

BUMATAY, Circuit Judge, joined by CALLAHAN and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

State frustration with federal policies is nothing new. From the very beginning, States have sought to thwart federal policies.  In 1792, Thomas Jefferson was incensed about the establishment of a national bank.  *See* Thomas Jefferson, From Thomas Jefferson to James Madison, Founders Online, Nat'l Archives (Oct. 1, 1792).[1]  In his view, the creation of a bank was left to the States alone, and the federal government had no authority to erect one.  *Id.* His opposition to a national bank was so vehement that he told James Madison that it was "an act of *treason* against the state." *Id.*  Indeed, instead of Virginia creating a competing bank as suggested by Madison, Jefferson proposed that the State should "adjudge[]" any employee of the national bank "guilty of high treason and suffer death accordingly, by the judgment of the state courts."  *Id.*  He had hope that this "example"—executing bank employees—would be followed by other States.  *Id.*  To Jefferson, it was this extreme response or else "nothing should be done."  *Id.*

Of course, Jefferson's hyperbole never came to fruition. But another State, Maryland, did try to interfere with the Bank of the United States years later by taxing its operations. *See McCulloch v Maryland*, 17 U.S. 316, 425 (1819).  Even while recognizing that taxation was within the traditional

---

[1] https://perma.cc/28U9-H7UY.

sphere of state power, the Supreme Court stopped Maryland's tax as violating the Constitution's Supremacy Clause. *Id*. at 436. Simply, "the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *Id.*

True, under our federalism, States may generally regulate businesses within their borders. And it's largely an advantage of our constitutional system that each State may experiment with social and economic policies through its police powers. *See, e.g.*, *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

But by ratifying the Constitution, we placed some limits on state power. *See* U.S. Const. art. VI, cl. 2. Under the Supremacy Clause, if state law interferes with the operation of federal law, then federal law trumps—no matter how strong the state opposition. And States can't get around that supremacy by indirect means. Given the explosion of federal work done by contractors, the Supremacy Clause would mean little if States could attack federal policies through regulation of federal contractors. Thus, anytime a state law "would defeat the legitimate operations" of the federal government—even if only through the federal government's contractors—it's unconstitutional. *McCulloch*, 17 U.S. at 427.

\* \* \*

Since the 1980s, the federal government has used privately owned facilities to assist with immigration control. By 1991, private contractors operated half of the federal government's detention facilities. In 2020, the federal government owned only five detention facilities, and even those were contractor run. This reflects the federal government's belief that contracted facilities better serve its needs—expanding and contracting more nimbly than permanent federal institutions as the detainee population fluctuates. This results in cost savings for the public. Since 2005, Immigration and Customs Enforcement ("ICE") has operated one privately owned immigration-detention facility in the State of Washington—the Northwest ICE Processing Center in Tacoma ("Northwest ICE Center"). The Northwest ICE Center is owned and operated by the GEO Group, Inc., a private corporation.

It's no understatement to say that the State of Washington dislikes the federal government's use of private facilities for immigration detention. In 2021, the Washington Legislature passed a law prohibiting the operation of "a private detention facility within the state." *See* Wash. Rev. Code § 70.395.030. Armed with this law, Washington tried to shut down the Northwest Detention Center. *See Geo Grp., Inc. v. Inslee*, 702 F. Supp. 3d 1043, 1046 (W.D. Wash. 2023) ("*Inslee I*"). But even the State conceded that its efforts to close the facility violated the Constitution's Supremacy Clause. *See id.* As we've said, a State's attempt to ban private immigration-detention centers violates the "foundational limit on state power." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 758 (9th Cir. 2022) (en banc). Undeterred, in 2023, the Washington Legislature tried again by enacting onerous requirements on private-detention

facilities within the State. *GEO Grp., Inc. v. Inslee*, 720 F. Supp. 3d 1029, 1037 (W.D. Wash. 2024) ("*Inslee II*"). While written broadly, the law's "history and text ma[d]e clear that it applie[d] only to" the Northwest ICE Center. *Id.* Once again, much of the law was struck down as discriminating against the federal government. *Id.* at 1039.

What Washington couldn't do directly, it now tries indirectly by attacking ICE's work program at the facility. ICE requires its detention facilities to establish a Voluntary Work Program for detainees. *See* U.S. Immigr. & Customs Enf't, *Performance-Based National Detention Standards 2011* § 5.8, at 406 (rev. 2016) ("ICE Detention Standards").[2] The Voluntary Work Program is important to ICE's detainee management. ICE believes that the Program enhances operations and services "through detainee productivity." *Id.* at 405. It helps mitigate the negative impact of confinement by decreasing idleness, improving morale, and reducing disciplinary incidents. *Id.* In other words, ICE implemented the Program to improve conditions and safety at detention facilities for both the detainees and staff. Nothing in ICE's guidelines classifies those who participate in the Program as "employees." For decades, Congress has blessed these voluntary work programs—appropriating allowances to pay "aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555(d). Given that these detainees are not "employees," Congress last set the rate for these allowances at $1 per day in 1978. *See* Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriation Act of 1979, Pub. L. No. 95-431, 92 Stat. 1021, 1027 (1978). It has not raised the allowance since then.

---

[2] https://perma.cc/NY8C-U394.

GEO's contract obligates it to run the Voluntary Work Program at the Northwest ICE Center. Under ICE's guidelines, GEO pays detainees the minimum allowance of $1 per day, as established by Congress. Washington now seeks to interfere with the operation of the Voluntary Work Program at the Northwest ICE Center. In 2017, Washington and a class of detainees sued GEO, arguing that detainees who participate in the Program are "employees" and thus the State's minimum wage law must apply to them. In 2025, that would mean detainees are owed $16.66 per hour. *See* Wash. Rev. Code § 49.46.020.[3] Put differently, the detention facility would need to pay *more than 130 times* the minimum wage set by Congress in an eight-hour day ($133.28 v. $1). By contrast, Washington State's own policy caps pay to detainees at its criminal detention facilities at "$40 per week." *See Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 773 (9th Cir. 2025) (Bennett, J., dissenting). So if a detainee works for 40 hours in a week, Washington State would pay the detainee only $40 but the Northwest Detention Center would have to pay the same detainee $666—more than a "*1500%* increase." *See id*. Even so, a jury found that GEO violated the minimum wage law and awarded more than $17 million in back pay to the detainee class. After a bench trial, the district court penalized GEO almost $6 million in unjust enrichment and enjoined GEO from operating the Voluntary Work Program without paying detainees Washington's minimum wage. That represents a cumulative $23 million in added cost and a mandatory restructuring of ICE's program. In response, ICE permitted

---

[3] Wash. State Dep't of Labor & Indus., *Minimum Wage*, https://perma.cc/SAU3-273M.

GEO to shut down the Voluntary Work Program at the Northwest ICE Center.

On appeal, a divided panel of this court affirmed the rulings. *Id.* at 750 (majority opinion). First, the panel majority rejected GEO's claim of intergovernmental immunity on two grounds. *Id.* at 763. It ruled that the minimum wage law "neither controls federal operations nor dictates the terms of the contract between ICE and GEO." *Id.* at 761. And it concluded that the minimum wage law isn't discriminatory because it doesn't treat "private facilities operated under contract with the federal government differently from private facilities operated under contract with the state government." *Id.* at 761–63. Second, the panel majority determined that the minimum wage law wasn't preempted by federal law because the state law "falls squarely within the states' historic police powers to establish and require payment of a minimum wage." *Id.* at 768. Finally, the panel majority refused to grant GEO derivative sovereign immunity because the company's contract with ICE didn't prohibit the company from complying with the minimum wage law. *Id.* at 770–71.

Judge Bennett forcefully dissented on two grounds— each reason enough to reconsider this case en banc. First, the dissent correctly concluded that Washington's law discriminated against the federal government. As the dissent noted, Washington's law "punishes the federal government for its policy choice to use private contractors and treats the federal government differently from state facilities. That is the very definition of a state affording itself better treatment than it affords the United States." *Id.* at 774 (Bennett, J., dissenting). Second, the dissent made strong arguments that federal law preempts the minimum wage law's application to the Northwest ICE Center. *Id.* at 778–83. The dissent

Case 3:17-cv-05769-RJB Document 860 Filed 08/13/25 Page 13 of 34

emphasized that "[t]he majority has charted a roadmap for states to circumvent the Supremacy Clause and Congress's authority and force the federal government to meet a higher standard than the state imposes on itself." *Id.* at 778.

On top of the reasons laid out in the dissent, here's another—reclassifying the detainees as "employees" and applying the minimum wage law would interfere with the performance of a federal operation. Simply, ICE, with the blessing of Congress, has determined that operating a Voluntary Work Program at its detention facilities assists in its immigration-control duties. As part of that operation, Congress has determined that participants in the program are not federal employees and should be paid a minimum allowance of $1 per day. The State of Washington can't then countermand that congressional directive by demanding the restructuring of the Voluntary Work Program and imposing a higher wage floor. As the Court has said, "because the Supremacy Clause immunizes the activities of the Federal Government from state interference, . . . direct state regulation of federal facilities is allowed only to the extent that Congress has clearly authorized such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 n.1 (1988). Washington does not have the power to define the employment status of federal detainees. While the detainees at the Northwest ICE Center may be housed in a private facility, they are there because they're *federal detainees* in federal custody. So the State cannot dictate terms about their employment status any more than it could if the facility housed federal prisoners serving custodial sentences.

And while Washington's attempt to impair the Northwest ICE Center is less draconian than Jefferson's suggestion, it's still interference contravening the Supremacy Clause. In denying intergovernmental immunity

on direct-regulation grounds, the panel majority all but admitted that the minimum wage law would violate the Supremacy Clause if the federal government had run the ICE Detention Center "directly." *See Nwauzor*, 127 F.4th at 761. The panel majority didn't contest the government's argument that there would be "no dispute that if the federal government *operated the detention facility* and *implemented the Voluntary Work Program directly*, principles of intergovernmental immunity would bar application of state minimum wage laws to detainees." *Id.* Instead, the panel majority simply brushed away the argument because the government doesn't "perform[] those functions" but "GEO, a private for-profit company," does. *Id.*

So the fundamental question here is whether the Supremacy Clause protects a federal program, performed by federal contractors, from state regulation. The answer must be "yes." When a federal contractor acts on behalf of the federal government to administer a federal function—like the detention of aliens—the contractor is not merely a private business; it steps into the shoes of the federal government for Supremacy Clause purposes. The constitutional directive of federal supremacy shouldn't turn on the ownership of the plot of land used to carry out the federal policy or who provides the immediate paycheck of those implementing the federal policy. In the end, if a federal policy is "made in Pursuance" to constitutional law, U.S. Const. art. VI, cl. 2, then States can't "retard, impede, burden, or in any manner control" that federal policy, *McCulloch*, 17 U.S. at 436—even if the federal government chooses to use contractors to execute it.

Allowing the panel majority's decision to stand sets a dangerous precedent. Under this court's decision, any State can impair any federal policy—no matter how central to the

federal government—so long as the State regulates federal contractors rather than the federal government itself. Doing so would be unworkable—granting States the power to undermine federal operations based on policy disagreements whenever federal contractors are involved. Otherwise, to avoid all this, the federal government would be forced to stop using contractors to carry out its work. That contravenes the constitutional design. We should have taken this case en banc to correct this error.[4]

I respectfully dissent from our decision not to rehear this case en banc.

## I.

The use of private contractors to implement government policies predates the Founding of our country. Indeed, our government's contracting practices trace their origins to the French and Indian War, when American colonists helped supply the British Army's war effort in the Americas. That conflict served as the colonists' first introduction to the challenges of supplying an army during war. James F. Nagle, *A History of Government Contracting Vol. I* 10 (3d ed. 2012). Under the British contracting system, the generals in charge of an army awarded supply contracts to merchants. These contracts "were more like carte blanche delegations of authority" and suppliers were expected to use their own contacts (and credit) to keep the army supplied. *Id.* at 11, 13. In return, contractors received a 5% commission on the supplies they procured for the army. *Id.* at 11; Theodore

---

[4] Because the Supremacy Clause is enough to invalidate the application of Washington's minimum wage law to the Northwest ICE Center, there's no need to discuss the panel majority's derivative sovereign immunity ruling. But that doesn't mean it's correct.

Thayer, *The Army Contractors for the Niagara Campaign, 1755-1756*, 14 Wm. & Mary Q. 31, 33 (1957).

Keeping with the British tradition, the use of contractors continued through the American Revolution. Private merchants supplied the Continental Army largely on a commission basis. The Continental Congress appointed the first commissary general in 1775 and George Washington appointed a quartermaster general soon after—both merchants paid by salary or commission. Nagle, *History of Government Contracting Vol. I*, at 19. Even then, the Continental Congress recognized that government functions, such as supplying the military, benefited from partnerships with the private sector. After all, "[o]nly a merchant had the knowledge, the trade connections, and the credit needed to handle procurement." *Id.*; *see also* E. Wayne Carp, *To Starve the Army at Pleasure: Continental Army Administration and American Political Culture 1775–1783* at 20–21 (1984) (noting the Continental Congress's lack of expertise in organizing and supplying a war effort). After Independence, our nation continued to depend on private parties for government functions—offering the same 5% commission used during the war. Nagle, *History of Government Contracting Vol. I*, at 42. The national government also relied on private parties to transport and deliver mail—another fundamental government function at the time. *Id.* at 42–43.

Things became more formalized after the Constitution's ratification. Congress established the Office of Purveyor of Public Supplies in 1795. *See* Act to establish the Office of Purveyor of Public Supplies, ch. 27, 1 Stat. 419 (1795). Congress placed the Purveyor of Public Supplies under the Secretary of the Treasury and empowered him "to conduct the procuring and providing of all arms, military and naval

Cases 3:17-cv-05769-RJB/2025 Document 860347, Filed 08/13/25, Page 17 of 34

stores, provisions, clothing, Indian goods, and, generally, all articles of supply requisite for the services of the United States." *Id.*

How did government contracting look in the post-ratification period? Lighthouses are a good early example. Lighthouses served an important public safety function and facilitated the flow of commerce—a particular focus of our early government. According to the National Park Service, "[i]n one of its first acts after its formation in 1789, the US Government assumed control of all aids to navigation in the country." National Park Service, *History of Lighthouses in the United States* (2009).[5] And yet, private parties largely operated lighthouses—federal contractors built, supplied, and inspected them. Nagle, *History of Government Contracting Vol. I*, at 46. These contractors "virtually administered the lighthouse organization and exercised wide discretion in performing their duties" for more than 50 years after the Founding. *Id.*

Following the War of 1812, the federal government made greater efforts to standardize its contracting and procurement processes. For instance, Congress charged the Ordnance Department with procuring arms and munitions for the military, as well as "supervising the government armories and storage depots." *Id.* at 81. This brought about significant change—most notably the introduction of a "uniformity system," which imposed strict quality controls on contractors. *See id.* at 85, 87.

The Civil War marked a massive expansion in government contracting. The federal government expanded the military rapidly to meet the needs of the war.

---

[5] https://perma.cc/WSN3-XUSX.

Particularly, the federal government used a combination of its own production and contracts with private parties who manufactured or dealt in arms. *Id.* at 132. The government contracted with private parties for all sorts of supplies— everything from weapons and clothing to railroad transportation and ships. *See id.* at 130–33, 136, 139, 146– 50. The massive spike in production and contracting during the Civil War led to the significant increase of private corporations and further entrenched the government's reliance on the private sector to fulfill its most essential functions. *See id.* at 157–58.

In the modern era, the federal government's reliance on contractors has increased still. Following the World Wars and the New Deal, the federal government's activities expanded into a range of new areas. *See* James F. Nagle, *A History of Government Contracting Vol. II* 149–52 (3d ed. 2012). While the federal government once primarily contracted for goods—military supplies and the like—it now increasingly contracts for services. *Id.* at 170. Service providers help the government perform various tasks, including those historically considered quintessentially government activities. For example, private companies now directly "train troops, collect and analyze intelligence, and carry out special operations." Lindsay Windsor, *James Bond, Inc.: Private Contractors and Covert Action*, 101 Geo. L.J. 1427, 1428 (2013); *see also* P. W. Singer, *Corporate Warriors: The Rise of the Privatized Military Industry* 121, 124, 136, 142–44 (2003) (describing how private contractors provided instructors for command colleges, developed training plans and analyses, and supported logistics for military operations).

So our government has relied on private contractors to assist with, and indeed sometimes perform, its constitutional

duties from the very beginning. The partnership with the private sector offered the federal government the expertise and efficiency needed to build our country from the ground up. And today that partnership is as vital as ever. Disturbing the federal government's use of private contractors by state regulation would impair the federal government from carrying out its duties.

## II.

Today, the constitutional directive of federal supremacy has evolved into two related doctrines—intergovernmental immunity and preemption. First, under intergovernmental immunity, the Supremacy Clause "prohibit[s] state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals (*e.g.*, contractors)." *United States v. Washington*, 596 U.S. 832, 838–39 (2022) (simplified). Second, preemption occurs when "state and federal law directly conflict," and requires that "state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (simplified).

Judge Bennett's panel dissent conclusively establishes how Washington's minimum wage law singles out the federal government's contractors for less favorable treatment and so violates the Supremacy Clause. *See Nwauzor*, 127 F.4th at 771–77 (Bennett, J., dissenting). The panel dissent also makes strong arguments for preemption of the state law as applied to the Northwest ICE Center. *Id.* at 777–83. Those arguments show why we should have taken this case en banc.

But applying Washington's minimum wage to the Northwest ICE Center *also* violates another facet of the Supremacy Clause—the direct regulation of the federal government. Simply, the state law "retard[s], impede[s],

burden[s]" and "control[s]," *McCulloch*, 17 U.S. at 436, the operation of the Voluntary Work Program—a congressionally approved program to maintain order and safety at a federal detention center. Thus, even if run by federal contractors, the state law violates the Supremacy Clause when applied to the Northwest ICE Center.

**A.**

Alexander Hamilton observed that the supremacy of federal law is essential to our constitutional system because, without it, the Constitution "would otherwise be a mere treaty, dependent on the good faith of the parties, and not a government, which is only another word for political power and supremacy." The Federalist No. 33 (Alexander Hamilton). He was right. The Supremacy Clause reads:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl.2. By its own terms, the Supremacy Clause "creates a rule of decision" that commands courts to "not give effect to state laws that conflict with federal laws." *Armstong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). Instead, the Clause establishes that, in the event of a conflict with state law, state and federal courts "shall" recognize the federal law as "supreme." U.S. Const. art. VI, cl.2. "The Clause, in the standard account of its origins, was

profoundly nationalistic, rejecting the weakly constructed union of the Articles of Confederation and creating a true national government that would prevail in contests with the states—and indeed enlisting state judges as enforcers of national power." Michael D. Ramsey, *The Supremacy Clause, Original Meaning, and Modern Law*, 74 Ohio St. L.J. 559, 575 (2013).[6]

*McCulloch v. Maryland* shows how interference with a federal objective violates the Supremacy Clause—even if a private corporation is involved. By 1816, Congress incorporated the Second Bank of the United States. The Bank was no federal government agency. Instead, it was privately owned—taking deposits and loans from both the federal government and private parties. The Bank proved unpopular with some—particularly the Jeffersonian Republicans. In response, the State of Maryland enacted a seemingly general law—"an act to impose a tax on all banks . . . in the state of Maryland, not chartered by the [state] legislature." *McCulloch*, 17 U.S. at 320 (quoting from syllabus). The tax required these banks to pay a 1–2% tax

---

[6] The constitutional design didn't leave States without a say in what became the "supreme Law." All three sources of "supreme Law"—the "Constitution," "the Laws of the United States which shall be made in pursuance thereof," and "Treaties made . . . under the Authority of the United States"—required some buy-in from the States as an original matter. *See* Ramsey, *The Supremacy Clause*, *supra*, at 565, 598. Statutes and treaties require approval from the Senate, U.S. Const. art. I, § 7—and Senators were originally chosen by state legislatures and were thus direct representatives of the States' interests in Congress. *See id.* art. I, § 3, cl. 1. The Constitution's ratification itself needed the approval of nine States. *Id.* art. VII. And amendments need to be approved by three-fourths of States (either by legislatures or ratifying conventions) to become part of the Constitution. *See id.* art. V. So States weren't powerless in determining the "supreme" law as an original matter.

on bank notes or pay $15,000 to the State in advance. *Id.* at 321. While broadly written, the tax *only* targeted the Bank of the United States. *Id.* at 392 ("But this tax is levelled exclusively at the branch of the United States Bank established in Maryland. There is, in point of fact, a branch of no other bank within that state, and there can legally be no other.") (statement of William Pinkney, attorney for the Bank, at oral argument).

Under the Supremacy Clause, the Court held that no State has the power to defeat a constitutional congressional directive. The Court started with three axioms: (1) the "power to create implies a power to preserve," (2) a "power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve," and (3) "where [a] repugnancy exists, that authority which is supreme must control." *Id.* at 426. So, "[i]t is the very essence of supremacy, [for a supreme government] to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *Id.* at 427. Since Congress had the authority to establish the Bank under the Necessary and Proper Clause, Maryland's tax could not stand. After all, "the power to tax involves the power to destroy" and that "power to destroy may defeat and render useless the power to create." *Id.* at 431. In sum, "states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." *Id.* at 436.

So it didn't matter that Maryland imposed the tax on the Bank and not directly on a federal agency. Instead, it was enough the bank was an "instrument" "employed by the

ases 3:17-cv-05769-RJB/2025 Document 360347, Filed 08/13/25, Page 23 26 of 43

government in the execution of its powers." *Id.* at 432. Thus, as it was argued in *McCulloch*, the bank could "equally claim" the federal government's "protection" as "proceed[ing] from the supreme power." *Id.* at 396 (Pinkney). While States could still tax real property of the Bank like other real property within their borders, they couldn't place a "tax on the operation of an instrument employed by the government of the Union to carry its powers into execution." *Id.* at 436–37.

## B.

It flows directly from *McCulloch* that the State of Washington can't demand treatment of detainees of a federal detention facility as "employees" and increase the minimum allowance paid to them to defeat the operation of a federal work program. First, the federal government's immigration-detention policies are entitled to the protection of the Supremacy Clause. Second, both Congress and the executive branch have determined that a voluntary work program will help carry out the government's duty to detain certain aliens in removal proceedings. Third, Washington's minimum wage law burdens voluntary work programs because it requires the federal government to treat immigration detainees as "employees" and given them concomitant pay. Fourth, it makes no difference that federal contractors administer the Voluntary Work Program on behalf of the federal government. The result of all this? Applying Washington's minimum wage law to the Northwest ICE Center violates the Supremacy Clause.

1. Federal policy over immigration detention is entitled to federal supremacy. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S.

387, 394 (2012). And Congress "has plenary power over immigration matters." *Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 201 (1993) (Blackmun, J., dissenting); *see* U.S. Const. art. I, § 8, cl. 4 (granting Congress the power to "establish an uniform Rule of Naturalization"). Under that authority, Congress mandates that federal officials detain certain aliens. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1)(B)(ii), (b)(2)(A), 1226(a), (c)(1), 1231(a)(6). Congress thus directed that the federal government "shall arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1). To complete this duty, Congress has authorized the federal government to "expend . . . amounts necessary to acquire land and to acquire, build, remodel, repair, and operate facilities . . . necessary for detention." *See* 8 U.S.C. § 1231(g)(1). The federal government has "broad discretion" to decide where aliens should be detained. *Newsom*, 50 F.4th at 751 (simplified).

Given the federal government's constitutional duty to oversee immigration detention, any state interference with federal immigration-detention policy offends the Supremacy Clause. Simply, no state law can "defeat the legitimate operations of [the federal] government." *McCulloch*, 17 U.S. at 427.

2. ICE's Voluntary Work Program stems directly from congressional and executive action. The benefits of the Voluntary Work Program are obvious. As we recognized elsewhere, these detention center work programs "occupy idle prisoners" and "reduce disciplinary problems." *Morgan v. MacDonald*, 41 F.3d 1291, 1293 (9th Cir. 1994) (simplified). And ICE has found that the Voluntary Work Program "enhance[s]" the "[e]ssential operations and services" of a detention facility "through detainee

productivity." *See* ICE Detention Standards § 5.8, at 405. In ICE's view, the Program reduces "the negative impact of confinement . . . through decreased idleness, improved morale and fewer disciplinary incidents." *Id.* So Congress authorized the Program to promote safety and maintain order at federal immigration-detention facilities.

Congress decided not to treat detainees who volunteer for the Program as "employees" entitled to federal minimum wage laws and other benefits. *See* 8 U.S.C. § 1324a(1)(A) (prohibiting employment of illegal aliens); *see also Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 371–75 (4th Cir. 2021) (alien detainees participating in ICE's work program are not "employees" under the Fair Labor Standards Act). Instead, Congress authorized funds for the federal government to offer "payment of allowances (at such rate as may be specified from time to time in the appropriation Act involved) to aliens, while held in custody under the immigration laws, for work performed." 8 U.S.C. § 1555(d). Notice Congress used the term "allowances," not "wages." It then set the rate—"not in excess of $1 per day." *See* Pub. L. No. 95-431, 92 Stat. at 1027. The $1-a-day rate applies until Congress changes it. And despite efforts over the years, Congress has stuck with that allowance. *See* H.R. 4431, 117th Cong. § 221 (2021) (proposing changes to the minimum allowance which did not become law).

Consistent with that congressional authority, ICE promulgated detention standards *requiring* detention facility contractors to offer detainees the opportunity to participate in the Voluntary Work Program. *See* ICE Detention Standards § 5.8, at 406 ("Detainees shall be provided the opportunity to participate in a voluntary work program."). The detention standard implements detainee allowances—it must be "at least $1.00 (USD) per day." *Id.* at 407.

Thus, ICE's Voluntary Work Program, including its minimum-allowance standard, was enacted "in pursuance" of a constitutional authority and is entitled to protection under the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2.

3.  Applying Washington's minimum wage law to the Voluntary Work Program interferes with federal immigration-detention policy.  The Washington law "frustrate[s] the expressed federal policy" of not treating detainees as "employees" and providing only a minimal allowance. *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956).  Congress said that detainees are not employees, that they should be given an allowance of only $1 a day, and that no allowance increase was necessary.  The State's minimum wage law effectively overrides Congress's decision on the detainee's status and the appropriate floor to pay detainees at immigration-detention facilities.  In effect, Washington stepped in and said, "no, detainees are employees and they should be paid more than 130 times more."  Whatever reasons Congress had for its classification decision and for setting the allowance floor so low, it's not up to us or any State to second guess it.

Congress has the exclusive authority to define the status of aliens present in the United States. *See* U.S. Const. art. I, § 8, cl. 4.  And federal law prohibits the employment of illegal aliens. *See* 8 U.S.C. § 1324a(1)(A).  ICE's contract similarly prohibits GEO from both employing illegal aliens *and* from using detainees participating in the Voluntary Work Program "to perform the responsibilities or duties of an employee of the Contractor."  So GEO cannot treat the detainees at the Northwest ICE Center as "employees" and comply with the requirements of federal law or the mandates of its contract with ICE.

And restructuring of the Voluntary Work Program enables the State to control federal operations. As Chief Justice Marshall noted long ago, "the power to tax involves the power to destroy." *McCulloch*, 17 U.S. at 431. While a minimum wage is not exactly a tax, the same logic applies here. *McCulloch* was concerned that increased costs to the Bank of the United States through taxation could make bank services so costly that they would interrupt the Bank's operations. In the same way, Washington could set a minimum wage so high that the Voluntary Work Program becomes too expensive.

GEO and the federal government say that Washington has already done so. Under Washington's minimum wage law, detainees participating in the Voluntary Work Program must be paid $16.66 per hour—*more than 130 times* higher for an eight-hour period than the $1-per-day rate set by Congress. That's on top of the $23 million that GEO owes for back pay and unjust enrichment. All told, these costs make the Voluntary Work Program unworkable, according to GEO and the federal government. Indeed, ICE permitted the Voluntary Work Program at the Northwest ICE Center to be shut down because of the district court's injunction.

And contrary to the panel majority's view, it doesn't matter that GEO has at times given detainees more than the minimum allowance or that Congress did not set a *maximum* allowance rate for detainees. *See Nwauzor*, 127 F.4th at 761. When it comes to state interference with federal operations, "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988). The bottom line is that Congress and the executive branch may decide how to execute their constitutional authority over immigration detention. And state law can't "retard, impede,

burden, or in any manner control, the operations of" the federal government's legitimate immigration-detention program. *McCulloch*, 17 U.S. at 436. And there's no question that a 130-fold increase in the minimum allowance burdens immigration-detention policy. *Cf. Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 95–96 (1945) (observing that a state law would interfere with a federal function if it "burdens" the government's "selection of its employees," "its relations with them," or "define[s] the terms of . . . federal employment or . . . any aspect of it").

The panel majority brushes away these concerns by essentially arguing that GEO makes a lot of money. According to the panel majority, the \$17-million back pay figure represents only \$2.5 million a year over seven years. *Nwauzor*, 127 F.4th at 763. Meanwhile, the panel majority observed that GEO makes between \$18.6 million to \$23.5 million per year in gross profits running the Northwest ICE Center. *Id.* So because the panel majority thought that GEO makes enough money on the facility to pay Washington's minimum wage law, the law is constitutional. Even if the law were really that burdensome, the panel majority thought that GEO could just renegotiate a higher rate to operate the Voluntary Work Program. *Id.* Or, the panel majority would presumably tell the federal government to just stop using federal contractors.

But this is not how constitutional law works. We don't see if the federal government can afford the state regulation to decide whether it violates the Supremacy Clause. Compare this with *McCulloch*, in which the Court didn't engage in a cost-benefit analysis into whether the Bank of the United States could pay Maryland's 1% to 2% tax on bank notes or the \$15,000 prepayment requirement. *See* 17 U.S. at 321. Instead, it was enough that Maryland could tax

Cases 3:17-cv-05769-RJB/2025 document 09860347, Filed 08/13/25, Page 29 of 43

the bank "to the excess of destruction, . . . which[] would banish that confidence which is essential to all government." *Id.* at 431. So it was the mere contention that Maryland was "capable of arresting all the measures of the government, and of prostrating [the federal government] at the foot of the states" that made the tax unconstitutional. *Id.* at 432.

Regardless of whether Washington's current minimum wage law makes it impossible to run the Voluntary Work Program now (as GEO and the federal government believe), it's an affront to the Supremacy Clause that Washington is "capable of arresting" the Program at all. *See id.* If a State can unilaterally regulate terms at a federal detention facility against the wishes of Congress, the federal law "would not be the supreme law of the land" and the State's actions would be "an usurpation of power not granted by the [C]onstitution." *See* The Federalist No. 33.

4. And nothing in the historical understanding of the Supremacy Clause excludes federal contractors administering a federal program from the protection of federal supremacy.

Consider again *McCulloch*. In that case, Maryland taxed the Bank of the United States, which was neither a federal agency nor run by federal employees. Instead, the Bank of the United States was a private commercial bank that served both the federal government and the public at large. And the federal government didn't directly control the Bank. The federal government owned only one-fifth of the Bank's stock and the President appointed only one-fifth of its directors.[7] So in the foundational Supremacy Clause case, the Court did

---

[7] Federal Reserve Bank of New York, The Founding of the Fed, https://perma.cc/R3PA-FMCJ.

Case 3:17-cv-05769-RJB Document 860347, Filed 08/13/25, Page 30 of 43

not require the federal prerogative to be owned or run by the federal government. It only mattered that the state tax impeded the "operation of an instrument employed by the government of the Union to carry its powers into execution." 17 U.S. at 436–37.

To put a finer point on it, when Ohio likewise tried to tax the Bank of the United States, the Court *expressly* compared the employees of the Bank to "contractors" and yet still considered the Bank's operations to be protected by federal supremacy. *Osborn v. Bank of U.S.*, 22 U.S. 738, 866 (1824). The Court acknowledged that the bank's directors and officers were not "officers of government" and instead had more "resemblance to contractors." *Id.* at 867. Even then, the Court held that "the right of the State to control [the Bank's] operations, if those operations be necessary to its character, as a machine employed by the government, cannot be maintained." *Id.* at 867. The Court then compared taxing the Bank to interference with more well-known federal contractors: "Can a contractor for supplying a military post with provisions, be restrained from making purchases within any State, or from transporting the provisions to the place at which the troops were stationed?" *Id.* Of course not, said the Court. "[W]e do not admit that the act of purchasing, or of conveying the articles purchased, can be under State control." *Id.*

And the understanding that States can't interfere with federal contractors in the performance of federal duties has continued to this day. In *Hancock v. Train*, Kentucky sought to enforce against federal agencies a state law requiring all air-contaminant sources to obtain a state permit. 426 U.S. 167, 172–73 (1976). The Court said that no State may "[place] a prohibition on the Federal Government"—and it made no difference that one of the federal facilities was

operated by a contractor rather than the federal government. *Id.* at 174 n.23, 180 (simplified). "*Hancock* thus establishes that a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Goodyear Atomic Corp.*, 486 U.S. at 181; *see also United States v. New Mexico*, 455 U.S. 720, 735 n.11 (1982) ("[S]tate [regulations] on contractors are constitutionally invalid if they . . . substantially interfere with [the Federal Government's] activities."); *Boyle*, 487 U.S. at 507 (observing that the "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts" either by contractors refusing to perform for fear of state liability or by raising the costs of the contractors' goods or services).

Contrary to the panel majority, it also doesn't matter that the state regulation appears to be a "neutral, nondiscriminatory" law. *Nwauzor*, 127 F.4th at 761. Recall that Maryland's tax, too, was facially neutral—but it only applied to the Bank of the United States. *See McCulloch*, 17 U.S. at 317–18, 392. As in *McCulloch*, Washington's minimum wage law applies to no other detention facility in the State but the Northwest ICE Center. In any case, while States may enact regulations borne "in common" by others similarly situated within their border, it still can't regulate "the operations" of "an instrument employed by the [federal] government." *Id.* at 436–37. So if a seemingly "neutral, nondiscriminatory" state regulation impedes a federal government operation, it violates the Supremacy Clause. *See Hancock*, 426 U.S. at 172–73; *New Mexico*, 455 U.S. at 735 n.11.

Thus, the panel majority is simply wrong to assert "[t]he scope of a federal contractor's protection from state law under the Supremacy Clause is substantially narrower than that of a federal employee or other federal instrumentality." *Nwauzor*, 127 F.4th at 760–61 (simplified); *see also id.* at 761 ("Private contractors do not stand on the same footing as the federal government, so states can impose many laws on federal contractors that they could not apply to the federal government itself.") (simplified). When a state regulation interferes with federal operations or when there's a clear conflict between state and federal objectives, it makes no difference that the state law falls only on federal contractors. *See Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534, 544 (1958).

The panel majority now claims that following the Supremacy Clause here would allow government contractors to refuse to pay state minimum wages to its employees. But that's wrong. A state minimum-wage law on all employees in the State isn't a regulation on federal operations, even when applied to federal contractors. As *McCullouch* made clear, the general principle "does not extend" to taxes that are "in common with the other" taxpayers in the State. 17 U.S. at 436. The heart of the problem here is that Washington wants to force ICE to *reclassify* its "detainees" housed at the Northwest ICE Center as "employees." Neither the federal government nor Congress established them as employees. It's only after the forced restructuring of the Voluntary Work Program that GEO must pay these extra minimum-wage costs. As the panel majority acknowledges, Washington State doesn't treat their own criminal detainees as "employees" and nothing gives the State the authority to compel the federal government to classify its immigration detainees as such.

Thus, States are generally free to impose minimum-wage laws on federal government employees as long as the law is neutrally and non-discriminatorily applied to all employees in the State. What they can't do is force the federal government to accept the State's classification of detainees to cram down a minimum-wage law.

Here, GEO houses immigration detainees under the federal government's exclusive power to detain aliens in removal proceedings. GEO is tasked by the federal government to implement its Voluntary Work Program, which the federal government believes assists with its federal duties. Washington's minimum wage law interferes with GEO's ability to carry out that federal directive. It overrides Congress's determination that detainees are not employees and need only be paid $1 a day. Thus, the Supremacy Clause precludes applying Washington's minimum wage law to detainees at the Northwest ICE Center.

In contrast, the panel majority's position would grant States near unfettered authority to regulate any federal operation run by federal contractors. If States may force the federal government to recognize its detainees at privately run detention facilities as employees, what's to stop States from making the federal government also provide them healthcare benefits, pensions, and vacation leave as other employees receive? Even more, because the panel majority provides no limiting principles, the same rules would also apply to federal criminal detainees in work programs at contractor-run prisons. The Constitution would not countenance such interference.

## III.

Whether for the reasons in the panel dissent or in this dissent, the panel majority got this case wrong. And the effect of this decision will be widespread. Our court provides a "roadmap" for States seeking to undermine federal policies with which they disagree. *Nwauzor*, 127 F.4th at 778 (Bennett, J., dissenting). Our court's message is clear: So long as States focus their regulation on federal government contractors—rather than on the federal government itself—the States may frustrate the performance of any federal government activities they wish. We should have taken this case en banc to correct this error.

As always, I respectfully dissent.

---

COLLINS, Circuit Judge, with whom R. NELSON and BRESS, Circuit Judges, join, dissenting from the denial of rehearing en banc:

For substantially the reasons set forth in Judge Bennett's panel dissent, *see Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 771–83 (9th Cir. 2025) (Bennett, J., dissenting), I agree that the panel majority's decision contravenes controlling Ninth Circuit and Supreme Court precedent applying the doctrines of intergovernmental immunity and federal preemption. Accordingly, we should have reheard this case en banc, and I dissent from our failure to do so.